UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Lori Raffa Maxwell and Anthony Deluccia : | Case No.: 1:25-cv-5643 |
| Individually and on Behalf of All : | |
| Others Similarly Situated. : | |
| *Plaintiff*, : | **CLASS ACTION COMPLAINT** |
| : | **FOR VIOLATIONS OF THE FEDERAL** |
| v. : | **SECURITIES LAWS** |
| : | |
| William Sarris : | **JURY TRIAL DEMANDED** |
| *Defendant.* : | |

Plaintiffs, individually, and on behalf of all others similarly situated, by and through their

undersigned counsel, bring this Class Action Complaint against Defendant William Sarris

("Sarris"), the founder and former CEO of Linqto, Inc. ("Linqto") and allege the following upon

personal knowledge as to their own acts, and upon information and belief as to all other matters,

based upon the investigation of counsel, including interviews of former Linqto employees who

worked directly under Sarris; interviews of Social Media Influencers who were hired and utilized

by Sarris for marketing, customer recruitment and advertising; review of a legal memorandum,

dated October 16, 2023, from a law firm experienced in securities law ("Legal Memorandum");

review of an internal memorandum dated October 25, 2024, from Linqto's General Counsel,

Deputy General Counsel, and Chief Compliance Officer ("Internal Memo"); a Wall Street

Journal article, dated June 30, 2025, titled, *A Hot New Firm Opened the Private Market to the*

*Little Guy. Now It Is In Big Trouble* ("WSJ Article"); a civil lawsuit filed by Gene Zawrotny, a

former Linqto employee who worked directly under Sarris; Bankruptcy Petition and Declaration

of Jeffrey S. Stein in Support of Chapter 11 Petitions, First day Motions, and Related Relief, *In*

1

*re: Linqto Texas, LLC, et al.,* United States Bankruptcy Court, filed in the Southern District of Texas; and relevant securities laws.

## PRELIMINARY STATEMENT

Sarris is the founder and former CEO of Linqto, a financial technology online platform ("Platform") intended to enable investors to indirectly invest in private-market startups and pre-IPO companies, with a primary focus on the technology sector. The Platform provided accredited investors ("Accredited Investors") and non-accredited investors ("Non-Accredited Investors") the opportunity to purchase securities ("Series Membership Interests") in one or more series (each Private Company being a "Series") of Linqto Liquidshares, LLC, a Delaware series limited liability company ("Liquidshares"). More specifically, Sarris directed Liquidshares to purchase and hold securities of privately held companies and then directed Liquidshares to allocate an economic interest in the Securities to a special purpose vehicle ("SPV") in the form of a series limited liability company (the "**Series**"). Sarris would then offer Customers an opportunity to purchase an indirect economic interest in the Securities of these different private companies by purchasing units in the Series. In sum, the Series Membership Interests offered to investors aimed to provide Accredited Investors and Non-Accredited Investors economic exposure to private securities of non-public companies.

Sarris was able to source the supply of underlying Private Securities from current or former employees, early investors, and advisors of each Private Company. Sarris would authorize buying underlying shares of a Private Company at a certain price per share. The Private Company would update its books and records (e.g. Cap Table) to reflect the owner of the acquired Private Securities in the name of the Series. Sarris would then sell the Series Membership Interests (stated in units per share) at marked-up prices to both Accredited Investors

and Non-Accredited Investors, purportedly relying on either Rule 506(b) or Rule 506(c) of the Securities Act and Section 3(c)(1) of the Investment Company Act. Each Series was supposed to be associated with a different Private Company on the Platform and one unit in each Series was purportedly to corresponded to one share of the underlying Private Company, acquired, and held by Liquidshares.

By advertising low investment minimums, Linqto's Platform rose in popularity. Customers could buy stakes in popular private companies for as little as $1,000 - compared with $10,000 or even $100,000 on other platforms with higher minimums. Sarris was quick to recognize that by offering significantly lower investment thresholds, he could reach eager investors who've been typically excluded from participating in private equity investing. On the Platform's website, it reads: "Linqto offers private market starting at $1,000 unlike private equity investments with $25,000 + minimums."

Eventually the demand and sales revenue became too tempting, and Sarris began ignoring U.S. securities laws, as well as FINRA rules on pricing. In his rush to sign up more users, Sarris also pushed other boundaries, buying email lists that contained prospective customers from sanctioned nations such as Iran and North Korea. Sarris directed staff to allow people who weren't accredited investors to participate on the Platform in direct violation of securities laws.

SPVs put investors one step away from actual ownership of shares because they own units of the SPVs, rather than the stock itself, but the way Sarris directed advertising and marketing blurred the lines for investors, many of whom, were not sophisticated and did not meet Accredited Investor status. In fact, for thousands of investors, investing on the Platform was the first time they had ever experienced investing in private equity.

3

Sarris was capitalizing on the desire of smaller investors wanting to buy pieces of very expensive private companies. One company, Ripple Labs, Inc. ("Ripple"), stood out the most. Ripple is a FinTech Blockchain Company associated with the third largest cryptocurrency in the world – XRP. The XRP community is an extensive decentralized global community with hundreds of thousands of XRP holders around the world. Tens of thousands of XRP holders believe strongly in Ripple as a company and maintain a strong sense of loyalty to Ripple. For example, when the Securities & Exchange Commission ("SEC") filed an enforcement action against Ripple, seventy-five thousand (75,000) XRP holders, from one-hundred forty-three (143) countries joined the lawsuit as amici curiae. Undersigned counsel served as counsel for XRP holders in the SEC v. Ripple case. Sarris was very aware of the XRP community, referencing the community quite often. He was aware demand for Ripple stock would be significant.

By lowering the minimum investment thresholds, Sarris was able to capitalize and leverage XRP holders' loyalty and desire to own Ripple shares. In doing so, Sarris orchestrated a deceptive marketing scheme. In fact, according to a recent Wall Street Journal article, "Sarris gained the nickname 'Wizard of Oz' because he pulled levers controlling the firm's sales and strategy, often without telling anyone around him and without warning." Sarris also hired popular Social Media Influencers within the XRP Community, convincing them Linqto would be the next great Unicorn (a private company valued at $1 billion or more). Sarris didn't just direct sales teams, subordinates, and influencers, he met with groups of investors, including those in this district, during zoom meetings and town halls, hyping Linqto's growth, claiming Linqto would become a major player for selling private shares and the next multibillion-dollar company in the financial-services industry. Sarris made misleading statements to investors and the public, boasting that Linqto had 750,000 customers, when in reality, it had no more than 15,000.

4

Part of the deceptive marketing strategy was to leverage and exploit the demand for Ripple shares. First, the marketing and advertising, directed by Sarris, was misleading, causing investors, including Non-Accredited Investors, to believe that they were purchasing actual shares of Ripple instead of only an interest in an SPV holding Ripple shares. Many customers were led to believe they directly owned shares of Ripple. Second, Sarris intentionally created customer FOMO (fear of missing out) in being able to acquire Ripple shares. Despite Liquidshares owning tens of thousands, or even hundreds of thousands of additional Ripple shares, Sarris directed his team to whip up demand by blasting out emails and social media alerts stating that Ripple stock was in VERY short supply. Despite having tens of thousands, or even hundreds of thousands, of Ripple shares on hand, Sarris would advertise that Linqto was doing its very best to somehow find and acquire more Ripple shares but warned, if successful, available shares would be VERY limited and that Linqto would likely sell out very quickly. Days later, after allegedly selling out of Ripple shares, Sarris would direct the sales and marketing teams to announce a sudden, supposedly new availability of Ripple shares. Sarris would then rinse and repeat the marketing ploy, related to Ripple shares. Many, if not all, on the Linqto sales and marketing teams, were completely unaware that Sarris was lying about selling out of Ripple shares. Hence, the nickname, Wizard of Oz.

The deceptive marketing worked! Of the approximately 13,000 SPV holders, approximately 11,300 investors (both Accredited and Non-Accredited) invested in **HUNDREDS** of Ripple SPV Series - a direct violation of the SEC's Integration Rule, which Sarris was made aware of multiple times, yet ignored. With minimal checks about income and assets, investors, both Accredited and Non-Accredited, like the Plaintiffs, were able to start buying securities in private companies, especially in Ripple.

5

Sarris also implemented marketing tactics to drive demand even higher. He encouraged Linqto customers to recruit friends in order to earn "Linqto Bucks" - credits in their own accounts to apply to their own purchases of SPV units. In practice, this caused Accredited Investors to help recruit Non-Accredited Investors. Sarris provided those Accredited Investors with Linqto Bucks (denominated in dollars). When Accredited Investors applied their Linqto Bucks to purchase Ripple units, it lowered the price per share they paid. The Non-Accredited Investors they recruited, however, ultimately paid a higher price per share for the same Ripple offering.

If Sarris wasn't giving out Linqto Bucks to reward recruitment, it was XRP. Sarris was aware that many in the XRP Community were XRP Rich but Cash Poor. Sarris, therefore, devised a plan to accept XRP as payment for Ripple shares. Sarris used XRP and the SEC v Ripple litigation to drive demand for Ripple shares. In the Ripple litigation, the SEC alleged that XRP was an investment contract (aka security) with Ripple. Sarris directed his marketing team to advertise to XRP holders that they could help demonstrate XRP's utility AND prove XRP was not a security by using it to purchase *actual shares of Ripple*. The marketing tactic, distinguishing XRP from actual securities (i.e., shares), was quite clever, but misleading. Investors, including many Non-Accredited Investors, who purchased SPV units in Ripple, by using XRP as payment, believed they were actually acquiring Ripple shares. Furthermore, Sarris misled investors into believing that Linqto, like XRP holders, had an Uphold account. Uphold Inc. ("Uphold") is a digital finance platform founded in 2013, headquartered in New York, with offices in California and London. It offers a multi-asset trading and digital wallet service, allowing users to buy, sell, and transfer various assets, including over 360 cryptocurrencies, stablecoins, precious metals and some equities. During the pendency of the SEC v. Ripple case,

6

Uphold was one of the very few platforms or exchanges that allowed users to trade XRP. Sarris promoted that Linqto accepted payment in XRP for Ripple shares, suggesting to investors that there was a formal arrangement between Uphold and Linqto, bolstering Linqto's credibility. The truth is, however, Linqto NEVER maintained a corporate account with Uphold. Sarris simply used *his personal Uphold account* to accept payment in XRP. Sarris also offered "XRP Airdrops" as a reward for buying Ripple shares on the Platform. The way it was sold to investors was that they bought Ripple shares on the platform, they would receive XRP in their Uphold XRP wallet. This suggested partnership with Uphold bolstered Linqto's credibility among investors. Yet, Sarris was using his personal XRP Uphold wallet the entire time. When lawyers, staff, or even his own compliance officer informed Sarris that what he was doing was misleading, and he should stop, Sarris ignored them. Sarris's attitude was expressed in his own words in an email he sent to staff: "Take no prisoner. This is guerrilla warfare." That same attitude drove his marketing strategy and on January 5, 2023, Sarris wrote an email stating:

**"When we go for a Spike Day (over $1M in sales), we sometimes have to pull out all stops and even sell to the unwashed. 😊"**

Because of high demand**,** Sarris focused on Ripple shares. In an email to sales managers, he wrote: "Throw everything we have at this one targeted date…influencers, marketing, ads, social, calls and smoke signals." At times, employees pushed back over the promotional emails fabricated FOMO, or just raised legal concerns generally. Sarris's usual response: "Forget what legal says." At times, if an employee pushed back too hard, Sarris threatened to fire him. In fact, one employee, Gene Zawrotny, who served as Linqto's Chief Revenue Officer for a period, sued Linqto and Sarris, alleging that he was wrongfully terminated by Sarris after raising concerns about blatant compliance violations within the company. According to Zawrotny, he discovered

that many of the customers were Non-Accredited Investors, despite the company's offerings being limited to Accredited Investors. Zawrotny raised alarms about other compliance concerns, including misleading marketing practices and unlicensed brokers operating within the firm. According to Zawrotny, he tried to get Sarris to take the compliance issues seriously but was unable. He claims he was fired less than two months after bringing the regulatory issues to Sarris's attention.

Sarris controlled the SPVs and the shares of Ripple like he managed his Uphold XRP account – like a personal piggy bank. At the end of 2023, Sarris learned that Ripple, which remains private, was preparing to buy back shares from customers at roughly $61 per share. Sarris reached out to customers and convinced them to sell 144,000 shares of Ripple back to Linqto at an average price of $55 per share. Sarris then sold those 144,000 shares to Ripple at the $61 price, booking more than $8 million in revenue. Sarris didn't always, however, ask for consent before selling customer interests in Ripple for a huge profit. During another Ripple tender offer, Sarris, without informing customers, sold 3% of the Ripple shares held in the hundreds of Ripple SPV Series. The payday was more than $18 million dollars. Customers owning the interests in those Ripple shares received nothing. In fact, most customers remain unaware that some of their interests in Ripple shares have been sold.

Zawrotny wasn't the only one raising compliance issues to Sarris. On October 16, 2023, Sarris received a Legal Memorandum by an outside firm documenting multiple securities and FINRA violations, including anti-fraud violations. The Legal Memorandum documented the corrective action necessary. Sarris ignored it. One year later, on October 25, 2024, Sarris received an Internal Memo from Linqto's General Counsel, Deputy General Counsel, and Chief Compliance Officer. The Internal Memo, likewise, documented the multiple violations. Sarris,

8

once again, took no corrective action. By this time, the SEC and FINRA had begun

investigations into Sarris and Linqto's business practices. On March 13, 2025, Linqto's new

management shut off the Platform, citing regulatory issues. On July 7, 2025, Linqto filed for

Chapter 11 Bankruptcy Protection in the Southern District of Texas. Upon information and

belief, Sarris is facing a DOJ investigation and possible indictment.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class of

approximately 13,000–14,000 investors ("Class") who purchased Series Membership Interests

("SPV units") in one or more series of Linqto Liquidshares, LLC ("Liquidshares") through the

Linqto online platform between January 1, 2018, and the present ("Class Period"). The Class

includes both accredited and non-accredited investors who were misled by Defendant William

Sarris's fraudulent and unlawful conduct, resulting in significant financial losses and harm.

2.      Sarris, the founder, and former Chief Executive Officer of Linqto, personally

orchestrated a scheme to offer and sell securities in violation of multiple provisions of the

Securities Act of 1933 (15 U.S.C. §§ 77a et seq.), the Securities Exchange Act of 1934 (15

U.S.C. §§ 78a et seq.), the Investment Company Act of 1940 (15 U.S.C. §§ 80a-1 et seq.), and

Financial Industry Regulatory Authority (FINRA) rules. These violations include unregistered

broker-dealer and dealer activities, excessive and undisclosed markups, fraud, unregistered

investment company operations, non-exempt unregistered securities offerings, and inadequate

anti-money laundering (AML) and know-your-customer (KYC) procedures, all while knowingly

or recklessly disregarding warnings from legal and compliance advisors.

3.      Sarris received the Legal Memorandum, dated October 16, 2023, which detailed extensive securities law violations in Linqto's operations, recommending immediate remedial actions. Over a year and nine days later, on October 25, 2024, Sarris received the Internal Memo from Linqto's General Counsel Jack Drogin, Deputy General Counsel Jodi Jamison, and Chief Compliance Officer Susan Woodard, reiterating ongoing violations in light of an SEC request for information and likely FINRA enforcement actions. This blatant failure to take corrective action, after being advised by both outside and inside counsel, in and of itself, demonstrates Sarris's intent or reckless disregard to violate securities laws, establishing scienter. Sarris continuously demonstrated contempt for U.S. securities laws and his intent to violate them whenever an employee raised legal or compliance issues. Sarris's usual response (both verbally and in email correspondence) to such legal concerns was simply to say: "Forget what legal says" or "If I think legal should be overridden, I will tell you."

4.   Cumulatively, the Legal Memorandum and Internal Memo warned Sarris of:

• Directing unregistered broker-dealer activities by overseeing Linqto's Marketing Intelligence (MI) team and sales operations, violating Section 15(a)(1) of the Exchange Act (15 U.S.C. § 78o(a)(1)).

• Authorizing excessive and undisclosed markups of 20–50% (Legal Memorandum) or over 10% (Internal Memo) on SPV units, deemed fraudulent, violating Section 17(a) of the Securities Act (15 U.S.C. § 77q), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 (17 CFR § 240.10b-5).

• Structuring integrated SPV series that exceeded the 100-investor limit, violating Section 7(a) of the Investment Company Act (15 U.S.C. § 80a-7).

• Overseeing non-compliant securities offerings under Rule 506(b) and Rule 506(c) of Regulation D, violating Section 5 of the Securities Act (15 U.S.C. § 77e).

• Failing to implement adequate anti-money laundering (AML) and know-your-customer (KYC) procedures, exposing investors to unregulated transactions.

• Directing non-compliance with FINRA Rules 2010, 2020, 2121, and 5122, including directing fraudulent marketing and high-pressure sales tactics by intentionally creating investor FOMO (fear of missing out) related to customers and investors interested in purchasing interests in the Ripple Labs Inc.-related series ("Ripple series").

5.       Sarris's personal actions, as the controlling and sole decision-maker, caused investors to purchase SPV units at inflated prices due to fraudulent marketing and high-pressure sales tactics, creating a false sense of urgency or FOMO, at undisclosed excessive markups, without proper disclosures or compliance with exemptions under Rule 506(b), Rule 506(c), or Rule 144 (17 CFR § 230.144). These actions led to losses when the truth was revealed, exacerbated by regulatory scrutiny and investor frustration, loss of confidence and complaints.

6.       This action is brought solely against Sarris in his individual capacity for his personal fraudulent conduct and intentional violations, independent of Linqto's corporate actions. Plaintiffs seek compensatory damages, rescission, and disgorgement for Sarris's violations, which affected both accredited and non-accredited investors who relied on his misrepresentations and omissions. In sum, Sarris made millions while innocent investors have or will experience significant financial harm.

7.    During the Class Period, Sarris made materially false and misleading statements regarding the Company's business operations, the availability of SPV shares related to the Ripple series, Linqto's financial condition, and compliance practices. Sarris orchestrated a scheme of rewarding accredited investors with Linqto Bucks and/or XRP air drops from his personal Uphold Account, reducing the costs of SPV unit shares for accredited investors while using fraudulent and deceptive marketing, creating FOMO by claiming very limited Ripple series availability, and causing non-accredited investors to pay even higher mark-ups.

8.    As a result of the Defendants' wrongful acts and omissions, Plaintiff and other Class members have or will suffer significant losses and damages.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to:

- Section 22 of the Securities Act (15 U.S.C. § 77v);
- Section 27 of the Exchange Act (15 U.S.C. § 78aa);
- Section 44 of the Investment Company Act (15 U.S.C. § 80a-43);
- 28 U.S.C. § 1331 (federal question jurisdiction); and
- 28 U.S.C. § 1367 (supplemental jurisdiction for state law claims).

10.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Sarris's fraudulent marketing and sales activities personally and through the Linqto platform targeted investors in New York, and he conducted business in this District.

## PARTIES

11.    **Plaintiffs**: Lori Raffa Maxwell and Anthony Deluccia are residents of New York, Linqto customers and SPV unit holders who purchased units in one or more series of Linqto

Liquidshares, LLC during the Class Period and was damaged thereby. Plaintiffs, and all others similarly situated, include both accredited and non-accredited investors who suffered financial losses due to Sarris's misconduct.

12.    **Defendant William Sarris**: Sarris is a resident of California and founder and former CEO of Linqto, a financial technology platform intended to enable investors to indirectly invest in private equity, with a primary focus on the technology sector. Linqto is a Delaware company with offices in California. Sarris has conducted business in this District. Sarris personally directed and knowingly participated in the fraudulent scheme, including designing, and overseeing the Linqto platform, structuring SPV offerings, orchestrating inflated prices due to fraudulent marketing and high-pressure sales tactics, creating FOMO and setting pricing practices with excessive markups. Sarris received the Legal Memorandum on October 16, 2023, and the Internal Memo on October 25, 2024, placing him on notice of violations, yet intentionally or recklessly failed to take corrective action, demonstrating his personal intent to violate securities laws. Sarris's intent to violate U.S. securities laws was evident because his usual response to any employee who raised legal concerns was simply to say: "Forget what legal says." Sarris often expressed disregard for Linqto lawyers to his employees, saying in one email: "If I think legal should be overridden, I will tell you."

## CLASS ALLEGATIONS

13.  Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class defined as:

All persons or entities who purchased SPV units in any series of Linqto Liquidshares, LLC through the Linqto platform during the Class Period (January 1, 2018, to present), including

13

both accredited and non-accredited investors. Excluded from the Class are Sarris, his immediate family members, and any entities he controls.

14. The Class is so numerous that joinder is impracticable, with approximately 13,000–14,000 investors, including an estimated 11,300 in the Ripple series. As noted in the Legal Memorandum, dated October 16, 2023, at that time, there were 6,497 investors in the Ripple series. Sarris, knowing full well that Linqto was engaging in multiple securities and FINRA violations, directed another 4,803 SPV investors into the Ripple series.

15. Common questions of law and fact predominate, including:

- Whether Sarris violated Sections 5 and 17(a) of the Securities Act, Sections 10(b) and 15(a)(1) of the Exchange Act, and Section 7(a) of the Investment Company Act through his personal actions;

- Whether Sarris engaged in a scheme to defraud investors through undisclosed markups, integration violations, and non-compliance with exemptions;

- Whether Sarris's offerings complied with Rule 506(b), Rule 506(c), or Rule 144 (17 CFR § 230.144);

- Whether Sarris's failure to take corrective action after receiving the Legal Memorandum and Internal Memo demonstrates scienter;

- The extent of damages suffered by the Class due to Sarris's intentional and reckless conduct.

16. Plaintiffs' claims are typical of the Class, as they purchased SPV units during the Class Period, relied on Sarris's misrepresentations, and suffered losses due to his unlawful conduct.

17.  Plaintiffs will fairly and adequately represent the Class, having no conflicts and retaining competent counsel experienced in securities class actions.

18.  A class action is superior for adjudicating these claims, given the large number of investors and common issues. Both accredited and non-accredited investors can be included in the same class, as their claims arise from Sarris's fraudulent scheme, with common legal and factual issues predominating. Subclasses may be certified if distinct issues arise, such as non-accredited investors' exposure to improper Rule 506(b) offerings or differing reliance related to marketing, advertising, statements or disclosures.

## FACTUAL ALLEGATIONS
### Sarris's Role in Linqto's Operations

19.  Sarris, as the founder and CEO of Linqto, Inc., personally designed and controlled the Linqto online platform, which offered investors, both accredited and non-accredited, the opportunity to purchase SPV units providing economic exposure to private securities of non-public companies ("Private Securities").

20.  Sarris directed the structuring of SPV offerings, including the purchase of Private Securities, funded by loans he authorized, and their resale to SPV series at a profit. He personally oversaw the pricing of SPV units, imposing undisclosed excessive markups (as high as 60%) and managed marketing and sales activities, including through the Marketing Intelligence (MI) team.

21.  SPV units were restricted securities under Rule 144(a)(3) (17 CFR § 230.144(a)(3)), subject to resale limitations unless registered or exempt, which Sarris failed to ensure.

### The Legal Memorandum and Initial Notice of Violations

22. On October 16, 2023, Sarris received the Legal Memorandum, which detailed extensive securities law violations in Linqto's operations under his control, recommending immediate remedial actions, including ceasing excessive markups, terminating non-compliant Rule 506(b) offerings, and correcting Form D filings. The Memorandum warned Sarris of:

- **Unregistered Broker-Dealer Activity**: Sarris directed Linqto's MI team and sales operations to solicit investors, engaging in unregistered broker-dealer activities in violation of Section 15(a)(1) of the Exchange Act. Transaction-based compensation was a hallmark of such activity.

- **Excessive Markups**: Sarris authorized undisclosed markups of 20–50% on SPV units, violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, Rule 10b-5, and FINRA Rules 2010, 2020, and 2121, which presume markups over 5% excessive.

- **Fraudulent Offerings and Series Deficiencies**: Sarris oversaw offerings with inadequate disclosures of markups, ambiguous ownership of Private Securities, and failure to observe corporate formalities, constituting fraud under Section 17(a) and Rule 10b-5.

- **Non-Exempt Unregistered Securities Offerings**: Sarris structured integrated series offerings (e.g., 164 Ripple Labs series) that required registration under Section 12(g) of the Exchange Act, violating Section 5 of the Securities Act due to non-compliance with Rule 152 safe harbors.

- **Unregistered Investment Companies**: Sarris's structuring of integrated series exceeded the 100-investor limit under Section 3(c)(1), violating Section 7(a) of the Investment Company Act.

- **Improper Form D Filings**: Sarris approved the use of a single CIK for Form D filings, undermining separate offering claims, risking violations of Rule 506(d).

23.  The Legal Memorandum cited *SEC v. Straightpath Venture Partners LLC*, No. 1:22-cv-03897 (S.D.N.Y. 2023), as a comparable case, reinforcing the likelihood of SEC enforcement against Sarris's conduct.

### The Internal Memo and Continued Non-Compliance

24.  On October 25, 2024, over a year and nine days after the Legal Memorandum, Sarris received the Internal Memo, reiterating ongoing violations under his control in light of an SEC request for information and likely FINRA enforcement actions. The Internal Memo confirmed Sarris's failure to take corrective action since October 2023, evidencing his intentional or reckless disregard. It detailed:

- **Unregistered Broker-Dealer Activity**: Sarris directed the MI team to solicitor SPV unit sales without licensing or supervision, violating Section 15(a)(1). The issuer exemption was inapplicable due to active sales roles.

- **Unregistered Dealer Activity and Undisclosed Markups**: Sarris authorized buying and reselling securities at markups exceeding 10%, deemed inherently fraudulent if undisclosed, violating Section 17(a), Section 10(b), and Rule 10b-5.

- **Unregistered Investment Companies**: Sarris's structuring of integrated SPVs (e.g., Ripple Labs) exceeded the 100-investor limit, violating Section 7(a) of the Investment Company Act, exacerbated by single CIK Form D filings.

- **Non-Compliance with Rule 506(c)**: Sarris permitted self-certification of accredited investor status, violating Rule 506(c), risking unregistered securities sales under Section 5.

- **AML/KYC Deficiencies**: Sarris failed to implement compliant AML/KYC procedures, including non-compliant Plaid ID verification and lack of transaction monitoring, exposing investors to penalties, as highlighted by the TD Bank AML case.

- **FINRA Violations**: Sarris's oversight of marketing without Series 24 principal review, high-pressure sales tactics, and inadequate complaint handling violated FINRA Rules 2010, 2020, and 2121.

25.  Cumulatively, the Legal Memorandum and Internal Memo demonstrate Sarris's knowledge of violations since October 16, 2023, and his failure to act by October 25, 2024, establishes scienter through intentional or reckless disregard of securities laws.

### Violations of Rule 144

26.  Sarris's direction of SPV unit sales, restricted securities under Rule 144(a)(3), failed to comply with Rule 144's safe harbor, negating the Section 4(a)(1) exemption (15 U.S.C. § 77d(a)(1)):

- **Lack of Current Public Information**: Sarris failed to ensure adequate public information, as required by Rule 144(c)(2) for non-reporting issuers (17 CFR § 240.15c2-11).

- **Holding Period Violations**: Rule 144(d)(1)(ii) requires a one-year holding period for non-reporting issuers. Sarris authorized sales without ensuring compliance, particularly for non-accredited investors.

- **Notice Requirements**: For sales exceeding 5,000 shares or $50,000, Rule 144(h) requires Form 144 filings. Sarris approved the use of a single CIK, violating this requirement.

27.  These failures rendered Sarris an underwriter under Section 2(a)(11) (15 U.S.C. § 77b(a)(11)), requiring registration.

### Impact on Investors

28.  Sarris's misrepresentations and omissions, directed personally, included:

- Undisclosed markups of 20–50% (Legal Memorandum) or over 10% (Internal Memo), inflating SPV unit prices, at times as high 60%.

- False claims of compliance with Rule 506(b), Rule 506(c), and Rule 144 exemptions.

- Failure to disclose integration risks and unregistered investment company status.

- Inadequate AML/KYC procedures, exposing investors to unregulated transactions.

29.  Both accredited and non-accredited investors relied on Sarris's misrepresentations, purchasing SPV units at inflated prices. Non-accredited investors faced additional harm from

improper Rule 506(b) offerings without required disclosures under Rule 502(b)(2) (17 CFR § 230.502(b)(2)).

30.  Regulatory scrutiny, investor complaints, and revelations of Sarris's violations caused SPV unit values to plummet, resulting in losses estimated at tens of millions of dollars.

## Independence from Bankruptcy Proceedings

31.  This action is brought solely against Sarris in his individual capacity for his personal fraudulent conduct and intentional violations, not as an officer acting within corporate duties. Sarris's actions, including disregarding explicit warnings in the Legal Memorandum and Internal Memo, were knowing or reckless, constituting independent tortious conduct outside the scope of Linqto's bankruptcy estate.

32.  The claims against Sarris are not derivative of claims against Linqto or its affiliates and do not seek recovery from corporate assets, ensuring this action is not subject to the automatic stay under 11 U.S.C. § 362. The Class seeks to hold Sarris personally liable for his direct role in defrauding investors, independent of Linqto's impending bankruptcy filing.

## <u>CAUSES OF ACTION</u>

### Count I: Violation of Section 17(a) of the Securities Act (Against Sarris)

33.  Plaintiffs incorporate paragraphs 1–32 by reference.

34.  Sarris, in the offer or sale of securities, by the use of interstate commerce or mails, directly or indirectly:

- Employed devices, schemes, or artifices to defraud;

- Obtained money by means of untrue statements or omissions of material fact; and

- Engaged in transactions, practices, or courses of business that operated as a fraud, in violation of Section 17(a)(1), (2), and (3) (15 U.S.C. § 77q(a)).

35.  Sarris's authorization of undisclosed markups, integration violations, and non-compliance with Rule 506(c), as warned in both memoranda, constituted fraudulent conduct.

36.  Sarris's failure to act on the Legal Memorandum (October 16, 2023) and Internal Memo (October 25, 2024) demonstrates scienter through intentional or reckless disregard.

37.  Plaintiffs and the Class suffered damages, purchasing securities at inflated prices.

**Count II: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Against Sarris)**

38.  Plaintiffs incorporate paragraphs 1–37 by reference.

39.  Sarris, in connection with the purchase or sale of securities, by the use of interstate commerce, directly or indirectly:

- Employed devices, schemes, or artifices to defraud;

- Made untrue statements or omitted material facts necessary to make statements not misleading; and

- Engaged in acts, practices, or courses of business that operated as a fraud, in violation of Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 CFR § 240.10b-5).

40.  Sarris's misrepresentations included undisclosed markups, false exemption claims, and integration issues, as detailed in both memoranda.

41.  Sarris's inaction over a year after the Legal Memorandum, reiterated by the Internal Memo, establishes scienter.

42.  Plaintiffs and the Class relied on these misrepresentations, suffering damages.

**Count III: Violation of Section 5 of the Securities Act (Against Sarris)**

43.  Plaintiffs incorporate paragraphs 1–42 by reference.

44.  Sarris directed the offer and sale of securities without a registration statement or applicable exemption, in violation of Section 5(a) and (c) (15 U.S.C. § 77e(a), (c)).

45.  The integrated SPV offerings and non-compliance with Rule 506(b), Rule 506(c), and Rule 144, as noted in both memoranda, required registration.

46.  Plaintiffs and the Class are entitled to rescission or damages.

**Count IV: Violation of Section 7(a) of the Investment Company Act (Against Sarris)**

47.  Plaintiffs incorporate paragraphs 1–46 by reference.

48.  Sarris structured integrated SPVs that exceeded the 100-investor limit under Section 3(c)(1), constituting an unregistered investment company in violation of Section 7(a) (15 U.S.C. § 80a-7).

49.  Plaintiffs and the Class suffered damages and seek rescission.

**Count V: Violation of Section 15(a)(1) of the Exchange Act (Against Sarris)**

50.  Plaintiffs incorporate paragraphs 1–49 by reference.

51.  Sarris directed unregistered broker-dealer and dealer activities, violating Section 15(a)(1) (15 U.S.C. § 78o(a)(1)).

52.  Plaintiffs and the Class suffered damages due to reliance on Sarris's unregulated activities.

### Count VI: Common Law Fraud (Against Sarris)

53. Plaintiffs incorporate paragraphs 1–52 by reference.

54. Sarris knowingly or recklessly made false representations and omissions, intending to induce investor reliance, as confirmed by both memoranda.

55. Plaintiffs and the Class relied on these misrepresentations, suffering damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request:

A. Certification of the action as a class action under Rule 23, appointing Plaintiffs as class representatives and their counsel as class counsel;

B. Compensatory damages against Sarris, including pre- and post-judgment interest;

C. Rescission of SPV unit purchases, returning funds plus statutory interest;

D. Disgorgement of Sarris's ill-gotten gains, which is in the millions;

E. Injunction against Sarris's further violations;

F. Reasonable attorneys' fees, costs, and expenses;

G. Other relief as the Court deems just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

**DATED**: July 9, 2025

23

**Respectfully submitted,**

Counsel for Plaintiffs and the
Proposed Class

*/s/ John E. Deaton*
John E. Deaton, Esq.
SDNY Bar # 31415
Deaton Law Firm LLC.
450 North Broadway
East Providence, RI 02914
Tel: +1 (401) 351-6400
all-deaton@deatonlawfirm.com