**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Lori Raffa Maxwell and Anthony Deluccia | : | Case No.: 1:25-cv-5643-LAK |
| Individually and on Behalf of All | : | |
| Others Similarly Situated. | : | |
|     *Plaintiff*, | : | ORAL ARGUMENT REQUESTED |
| | : | |
| v. | : | |
| | : | |
| William Sarris | : | |
|     *Defendant*. | : | |

## <u>MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANT'S MOTION TO DISQUALIFY JOHN DEATON AS COUNSEL FOR PLAINTIFFS</u>

<u>*/s/ John E. Deaton*</u>
John E. Deaton, Esq.
SDNY Bar # 31415
Deaton Law Firm LLC.
450 North Broadway
East Providence, RI 02914
Tel: +1 (401) 351-6400
all-deaton@deatonlawfirm.com

*Attorney for Plaintiffs*

**Table of Contents**

I.     INTRODUCTION .................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................... 1

III.   LEGAL STANDARD ....................................................................... 13

IV.   ARGUMENT ................................................................................... 14

A.  No Attorney-Client Relationship Existed Between Deaton and Sarris .................... 14

B.  The Matters Are Not Substantially Related ................................................. 16

C. The Current Representation is Not Materially Adverse to Sarris ......................... 17

D. No Evidence of Access to Privileged Information ......................................... 17

E. The Absence of Written Consent Is Irrelevant ............................................ 18

F.  Sarris's Motion is a Tactical Maneuver .................................................... 18

G. Disqualification Would Prejudice the Plaintiffs ........................................... 19

V. CONCLUSION ............................................................................... 20

## Table of Authorities

**Cases**

*Ardemasov v. Citibank, N.A.*,
    14 F. Supp. 3d 39 (D. Conn. 2014) ........................................................................16, 22

*Bd. of Educ. v. Nyquist*,
    590 F.2d 1241 (2d Cir. 1979) ........................................................................16

*Brandice M.C.*,
    221 A.D.3d 1532 ........................................................................21

*Colorpix Sys. of Am. v. Broan Mfg. Co.*,
    131 F. Supp. 2d 331 (D. Conn. 2001) ........................................................................15

*Evans v. Artek Sys. Corp.*,
    715 F.2d 788 (2d Cir. 1983) ........................................................................16

*Giambrone v. Meritplan Ins. Co.*,
    117 F. Supp. 3d 259 (E.D.N.Y. 2015) ........................................................................18

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*,
    409 F.3d 127 (2d Cir. 2005) ........................................................................20

*In re Peck*,
    112 B.R. 485 (Bankr. D. Conn. 1990) ........................................................................18, 19

*In re Persaud*,
    467 B.R. 26 (Bankr. E.D.N.Y. 2012) ........................................................................20

*Katena Computing Techs., Inc. v. DeNaut*,
    No. 3:23-mc-48 (SDV), 2023 U.S. Dist. LEXIS 186738 (D. Conn. Oct. 4, 2023) ..................16

*Pierce & Weiss, L.L.P. v. Subrogation Ptnrs. L.L.C.*,
    701 F. Supp. 2d 245 (E.D.N.Y. 2010) ........................................................................16, 17

*S.D. v. St. Luke's Cornwall Hosp.*,
    63 Misc. 3d 384 (N.Y. Sup. Ct. 2019) ........................................................................17

*Steinbeck v. Steinbeck Heritage Found.*,
    400 F. App'x 572 (2d Cir. 2010) ........................................................................17

*Stratavest Ltd. v. Rogers*,
    903 F. Supp. 663 (S.D.N.Y. 1995) ........................................................................21

*United States v. Prevezon Holdings Ltd.*,
    839 F.3d 227 (2d Cir. 2016) ........................................................................16

*Vincent v. Essent Healthcare of Conn.*,
  465 F. Supp. 2d 142 (D. Conn. 2006) .........................................................................18, 19, 20

*Waldman v. Foote*,
  No. 260568/2019E, 2024 N.Y. Misc. LEXIS 15802 (N.Y. Sup. Ct. Sept. 30, 2024) ...............20

**Other**

New York Rules of Professional Responsibility Rule 1.9 ......................................................18, 21

Plaintiffs, Lori Raffa Maxwell and Anthony Deluccia, individually and on behalf of all others similarly situated, respectfully submit this memorandum of law in support of their objection to Defendant's Motion to Disqualify Opposing Counsel.

## I.    INTRODUCTION

Defendant William Sarris's motion to disqualify John Deaton as counsel for the Plaintiffs is without merit and should be denied. Under the Second Circuit's three-factor test, Defendant's motion fails to meet the *stringent* legal standard for attorney disqualification. The defendant has not established the existence of an attorney-client relationship, a substantial relationship between the prior and current matters, or the likelihood that Deaton had access to relevant, privileged information. Disqualification is a *drastic remedy* that should not be granted lightly, and the defendant's arguments fall short of the required showing. The Defendant's motion is a transparent attempt to disrupt the Plaintiffs' case and deprive over two thousand Plaintiffs their counsel of choice.

## II.    FACTUAL BACKGROUND

To fully understand the nature of the conversations and interactions between Attorney John Deaton (Deaton) and Defendant, William Sarris (Sarris), the Court must not evaluate only one or two emails between Deaton and Sarris, taken totally out of context, as suggested by the Defendant.  It is necessary to have the complete context and understanding as to *why Sarris contacted Deaton* in March of 2025. At no time, was Sarris seeking legal advice or legal services from Deaton. Instead, Sarris was seeking Deaton's agreement to become a Linqto Board member for the sole purpose of advancing Sarris's self-serving agenda, which was to gain control of the Board and remove Linqto's current CEO, Dan Siciliano, and replace him with Sarris.

1

To fully comprehend why Sarris specifically reached out to Deaton, *not for legal services*, but instead, wanting Deaton to join the Linqto Board, the Court must first understand Deaton's relationship and reputation within the Linqto and XRP communities, including Deaton's reputation among Linqto Board members.

There are approximately thirteen thousand (13,000) customers/investors who purchased units or interests in pre-IPO shares of private companies from Linqto. Deaton Decl.¶ 21. Some of these companies include Coinbase, SoFi, Circle, Uphold, and SpaceX. *Id*. However, one company overwhelmingly drove Linqto's popularity and success, and that company is Ripple Labs, Inc. (Ripple). *Id*. Ripple is a FinTech Blockchain Company associated with the third largest cryptocurrency in the world – XRP. Deaton Decl.¶ 22. The XRP community is an extensive decentralized global community with hundreds of thousands (if not millions) of XRP holders around the world. *Id.* Tens of thousands of XRP holders strongly believe in Ripple as a company and maintain a strong sense of loyalty to Ripple. *Id.*

Of the 13,000 Linqto customers, approximately eleven thousand three hundred (11,300) invested in Ripple. Deaton Decl.¶ 22. In sum, without Ripple, or XRP holders, Sarris and Linqto would not be successful. *Id*. For example, Linqto holds 4.7 million shares of Ripple, which is held on behalf of the 11,300 Linqto customers. *Id*. The company Ripple recently made a tender offer up to 4% of outstanding Ripple shares at a price of $175 per share. *Id*. Hence, the 4.7 million Ripple shares, held in trust for Linqto customers, equals over eight-hundred million dollars ($800,000,000). *Id*. No other private company on Linqto's platform comes close to Ripple's popularity. Almost all 11,300 investors, who acquired units in Ripple, also own the digital asset XRP. *Id.*

After the Securities and Exchange Commission (SEC) sued Ripple, alleging XRP to be a security, Deaton filed a Motion to Intervene on behalf of tens of thousands of XRP holders. Deaton Decl.¶ 23. In total, approximately seventy-five thousand (75,000) XRP holders, from one hundred forty-three (143) countries signed up to be part of the amici class. *Id.* Many of those same XRP holders, from the same different countries around the globe, became Linqto customers who wanted to invest in Ripple, the company associated with XRP. Deaton Decl.¶ 23. Sarris leveraged the XRP community for his and Linqto's benefit. *Id.* When the SEC sued Ripple, alleging XRP to be a security, all major exchanges, like Coinbase, delisted XRP. *Id.* In the United States, only Uphold traded XRP. Sarris would reward investors who acquired shares in Ripple, by sending them XRP. *Id.* Sarris made it known that XRP holders could buy Ripple shares by paying Linqto in XRP instead of sending a bank wire transfer as payment. *Id.* Sarris intentionally gave the impression to customers that Linqto and Uphold maintained a partnership. *Id.* However, there was no special relationship between Uphold and Linqto. Sarris was accepting XRP as a method of payment, as well as rewarding investors who bought Ripple, by sending them XRP, all from his personal Uphold XRP Wallet. *Id.* The tactic paid off because out of 13,000 Linqto customers, 11,300 own units in Ripple. In sum, Sarris leveraged the XRP community for his own financial benefit and, as discussed below, also leveraged Deaton's name and reputation whenever he could, including attempting to use Deaton to perpetuate a fraud against the Linqto Board. *Id.*

After 75,000 XRP holders joined Deaton's putative class, and after Deaton was appointed amicus counsel by Judge Analisa Torres in the *SEC v. Ripple* case, Deaton became a prominent figure in both the XRP and Linqto communities, which, in many ways, is the same community. Deaton Decl.¶ 24. Because of Deaton's role as amicus counsel, he was often asked, by Linqto

management, to serve as a guest speaker at Linqto events. *Id.* During one Linqto event, Sarris introduced Deaton to the audience and described Deaton as a "Hero of the XRP Community" and as a relentless advocate for investors. *Id. Sarris publicly commented that he would never want to face Deaton as an adversary*. *Id.* On June 2, 2022, Sarris emailed Deaton, thanking Deaton for all that he was doing for the XRP community. Deaton Decl.¶ 24, Exhibit 2. Other than the one-time Sarris introduced Deaton as a guest speaker, Deaton had no contact with Sarris until March 2025. Deaton has never met Sarris, in person. Deaton Decl.¶ 18. Other than speaking on the phone, Deaton has never been in a private meeting with Sarris. *Id.* In March 2025, Sarris called Deaton, several times, **not seeking legal advice**, but instead, requesting that Deaton become a director on Linqto's Board of Directors (Board). Deaton Decl.¶ 25. After Deaton initially declined, Sarris informed Deaton if he refused, Sarris was concerned Linqto customers could potentially lose their investments. *Id.* Sarris explained that a new CEO, named Dan Siciliano (Siciliano), had taken control of Linqto, and was attempting to raid, or even steal, customer assets. *Id.* Sarris explained that Siciliano was using minor regulatory infractions, that took place under Sarris's leadership, as an excuse to drive the company into bankruptcy, and then seize customer assets. *Id.* Sarris alleged Siciliano was exaggerating the nature of the infractions to shut the platform down for the sole purpose of cutting off revenue and forcing bankruptcy. *Id.* Sarris communicated to Deaton that he believed Siciliano's plan was to buy Linqto out of bankruptcy for pennies on the dollar and steal or convert customer assets. *Id.* Sarris informed Deaton that Sarris's plan to save customer assets was to get Deaton, along with Linda P. Jones (a Linqto investor/promoter), on the Board and to vote Siciliano out as CEO. Deaton Decl. ¶¶ 26-27. Sarris explained to Deaton that he needed Deaton, *not for legal services, but for Board services,* because two specific Board members, Adam Henderson, and Norman

4

Reed, held Deaton in very high esteem and Sarris believed that they would likely vote however Deaton voted. *Id.* at ¶ 26. Sarris also commented that, with Deaton on the Board, it could help repair the damaged Linqto brand, caused by Siciliano. *Id.* Sarris informed Deaton that Linda P. Jones had already committed to voting Siciliano out as CEO, and if Deaton voted the same, Sarris would have a majority vote secured. Deaton Decl. ¶ 27. Deaton immediately informed Sarris that, unlike Linda P. Jones, he would not commit on how he would vote before learning all relevant facts. *Id.*

During several calls between them, Deaton informed Sarris that he would not participate in a conspiracy to oust Siciliano. Deaton Decl. ¶ 28. Moreover, Deaton advised Sarris that if Deaton was selected to the Board, Deaton intended to disclose everything Sarris had conveyed to him, to the full Board. *Id.* Deaton informed Sarris that their conversations *were not privileged or confidential*. *Id.* Sarris stated he understood but remained adamant that Deaton be on the Board because Sarris was confident Deaton would ultimately agree that Siciliano had to be removed to protect customers. *Id.*

During these conversations, Deaton specifically asked Sarris questions regarding the regulatory issues that Sarris described as minor. Deaton Decl. ¶ 29. Sarris told Deaton the infractions were equivalent to a speeding ticket. *Id.* Sarris claimed he expected no more than a $25,000 fine for such minor infractions and that he was close to resolving the matter just before Siciliano assumed control. *Id.* Sarris claimed Siciliano was exaggerating the regulatory issues as a ruse to file bankruptcy and steal customer assets. *Id.*  Deaton specifically asked Sarris if there were any allegations of Sarris or Linqto committing fraud against customers. Deaton Decl. ¶ 30. Sarris emphatically denied committing fraud and assured Deaton the regulatory infractions were minor issues such as late filings and incomplete or improper forms. *Id.*

During these conversations with Sarris, Deaton warned Sarris that if he committed fraud against innocent investors, many of whom trusted Sarris with their life savings, Deaton would personally sue Sarris. Deaton Decl. ¶ 31. Despite Deaton's warning and promise to sue Sarris regarding any potential fraud, Sarris stated that he really needed Deaton on the Board. *Id.* Deaton agreed to serve, if selected. *Id.* Sarris informed Deaton that Sarris's lawyer, Dave Anderson, would conduct an interview of both Deaton and Linda P. Jones.

On March 18, 2025, Sarris's lawyer, Dave Anderson, called Deaton for the purpose of screening Deaton for potential conflicts so that Deaton could quickly get on the Board. Deaton Decl. ¶ 32. Deaton informed Dave Anderson, if selected to the Board, Deaton would vote for whatever **or whoever** was in the best interests of customers, regardless of whether Deaton's vote disappointed Sarris. On March 18, 2025, Dave Anderson sent an email to Deaton and Linda P. Jones, copying Sarris, answering questions posed by Linda P. Jones during her interview with Dave Anderson, related to compensation and insurance for Board members. Deaton Decl. ¶ 32, Exhibit 3.

On March 23, 2025, Sarris sent Deaton an email stating: "Many thanks for your *willingness to serve on the Linqto Board* …. I would like to speak with you prior to [the Board] meeting and update you on everything so you have full knowledge before your election to the Board." Deaton Decl. ¶ 33, Exhibit 4. *These calls with Sarris had nothing to do with seeking Deaton's legal services as a lawyer.* The communications between Deaton and Sarris were **solely** about Sarris attempting to get Deaton selected to the Board, with Linda P. Jones, hoping they would vote Siciliano out.

On March 25, 2025, Sarris called Deaton, **not to receive legal advice**, but to discuss Deaton's selection to the Linqto Board. Deaton Decl. ¶ 34, Exhibit 5. During this call, Sarris

informed Deaton that a fellow Board member, Victor Jiang, filed a motion to remove Siciliano as CEO. *Id*. During this specific call, Deaton informed Sarris that Siciliano, and others involved in Linqto's new management, were making claims that the regulatory violations were very significant, including involving SEC and FINRA investigations and that there were rumors of a criminal investigation. During this call, Deaton warned Sarris that if Linqto turned out to be another FTX or Celsius, involving fraud, Deaton would sue Sarris and show him just how relentless Deaton can be when innocent investors are defrauded. Deaton Decl. ¶ 34. Sarris claimed the allegations were not true and that Siciliano was likely behind the false rumors. Deaton Decl. ¶ 35. During this call, Deaton reminded Sarris that Deaton had hundreds of customers and investors asking him to file a class action lawsuit against Linqto *and Sarris*. *Id.* In fact, almost immediately after this call with Sarris, Deaton forwarded Sarris an email from March 15, 2025, that discussed suing Linqto and its executives, ***which included Sarris***. Deaton Decl. ¶ 36, Exhibit 6. Sarris acknowledged, via email, receiving the class action lawsuit email Deaton sent 10 days prior. *Id.*

On or about March 26, 2025, at 3:53 PM EST, Sarris emailed Deaton a copy of a letter to the Linqto Board in support of Victor Jiang's motion to remove Siciliano as CEO. The purpose of this letter was to persuade Deaton to vote in favor of Siciliano's removal if, Deaton got on the Board. Deaton Decl. ¶ 38, Exhibit 7.

On March 26, 2025, at 8:03 PM EST, Sarris informed Deaton, via email, that the Linqto Board had held a meeting but adjourned "so they would have more time to review our claims." Deaton Decl. ¶ 39, Exhibit 8. In this email, Sarris asked Deaton if he was willing to contact Sarris's lawyer, Dave Anderson, "and see what we may be able to do to protect our assets as we navigate this Board stonewall?" *Id*. Sarris then stated, "If you would like an engagement letter

and retainer, LMK." *Id*. Deaton didn't reply via email nor did Deaton contact Dave Anderson. Deaton, on more than one occasion, had promised to sue Sarris, if Sarris had committed fraud. Therefore, Deaton never asked for a retainer or payment of any kind. *Id*.  Deaton never forwarded or received an engagement letter as well. According to Deaton, he believes Sarris started experiencing a feeling of the earth crumbling under his feet and this was a desperate attempt to see if Deaton would bite at a bribe. Deaton Decl. ¶ 39.

On or about March 26, 2025, after receiving Sarris's email about a retainer, Deaton and Sarris spoke on the phone. Deaton asked Sarris that if everything Sarris was claiming about Siciliano was true, why was Sarris not taking legal action in Delaware Court where Linqto is incorporated or why not seek an emergency shareholder meeting? Deaton Decl. ¶ 40. Sarris replied that, if need be, ***his lawyers*** would take legal action, but the best plan was still getting Deaton and Linda P. Jones on the Board so that they could get rid of Siciliano and turn the platform back on. *Id.* During this call, Deaton, again, reminded Sarris that he was not promising to vote one way or the other. Deaton Decl. ¶ 40. Deaton questioned Sarris, stating that if everything Sarris was claiming about Siciliano was true, then he should be able to secure a majority vote from the current Board, and not need Deaton or Linda P. Jones. Deaton Decl. ¶ 41. Sarris responded to Deaton's inquiry by stating the reason Sarris needed Deaton on the Board was because two Board members, Adam Henderson, and Norman Reed, held Deaton in the highest of regards and would likely vote however Deaton voted. *Id.* Sarris made a point to inform Deaton that both Norman Reed and Adam Henderson contributed to Deaton's U.S. Senate run in 2024. Deaton Decl. ¶ 41, Exhibit 9. Deaton reminded Sarris, if selected to the Board, Deaton would be obligated to disclose everything Sarris had told Deaton. Deaton Decl. ¶ 42. Deaton informed Sarris that Deaton was not going to participate in conspiring to remove anyone until

Deaton was made aware of all relevant facts, including the precise nature of any regulatory issues. *Id.* Deaton informed Sarris that *because Deaton is not Sarris's lawyer* he could be called to testify against Sarris regarding any litigation involving Siciliano or other Board members. Deaton Decl. ¶ 42. Sarris only responded that he was confident Deaton would see things the same as Sarris, once on the Board. *Id.*

During their talks, Deaton asked Sarris why Sarris hadn't filed for relief in Delaware. Deaton Decl. ¶ 43. Sarris replied that **his lawyers** were working on something in case his Board plan fell through. Deaton asked Sarris why not just reason with Norman Reed and Adam Henderson? *Id*. Sarris responded that the only person he believes Adam Henderson and Norman Reed would listen to was Deaton. *Id.* Sarris claimed that Deaton's opinion on how to proceed would carry significant weight and Deaton would likely persuade Adam Henderson and Norman Reed to vote the same as Deaton. *Id.* Sarris asked if it was possible for Deaton to email Sarris a sample complaint involving a shareholder lawsuit by Sarris and other Board members, including Victor Jiang, who shared Sarris's desire to remove Siciliano. Deaton Decl. ¶ 44. Sarris informed Deaton that Sarris wanted to show a draft complaint to Adam Henderson and Norman Reed to persuade them to appoint Deaton and Linda P. Jones as two new Board members and thus, avoid litigation. *Id*. Deaton replied: "I'm not your lawyer, Bill, have your attorney, Dave Anderson, do it." *Id*. Sarris responded that **because Deaton was not his attorney**, but instead, one of the most respected investors on the Platform, combined with Deaton's reputation among Adam Henderson and Norman Reed, a complaint in an email from Deaton would be the best way for Deaton to get on the Board to help customers. *Id.*

Sarris stated that he needed the complaint to be attached in an email from Deaton, so that Sarris could forward the email to both Adam Henderson and Norman Reed. Deaton Decl. ¶ 45.

Sarris said that if a draft complaint came **from one of his personal lawyers**, it would have little impact but if it came from Deaton, it could be a "game changer" for the direction of the company. *Id.* Deaton informed Sarris that Deaton had never filed such a Complaint, and that if he sent one, it wouldn't be very credible. *Id*. Sarris's responded by saying that it didn't matter because *Sarris had no intent to file the complaint* and *the only thing that mattered was the impact it would have on Norman Reed and Adam Henderson*, *because it was coming from Deaton. Id.* Sarris stated **the *only purpose*** for Deaton emailing a draft complaint was to show Adam Henderson and Norman Reed *that it came from Deaton.* Deaton Decl. ¶ 45. Sarris stated that he was very confident that if Deaton sent an email with a complaint, Adam Henderson and Norman Reed would immediately agree to vote Deaton onto the Board, and once on the Board, Deaton could help protect the twelve thousand XRP holders who were also Linqto customers, now in jeopardy of losing everything. *Id.*

Based on the statements and representations of Sarris, coupled with the desire to help thousands of Linqto customers and XRP holders, Deaton agreed to send an email with an AI-drafted complaint. Deaton Decl. ¶ 46. Deaton told Sarris he would quickly draft something up and send it in an email so Sarris could forward it to Adam Henderson and Norman Reed. *Id*. Sarris offered to pay Deaton and even joked that he could send Deaton XRP. *Id*. Deaton replied that it would only take 10 minutes or less using Artificial Intelligence (AI) plus, reminded Sarris he would not accept any form of payment because Deaton intended to sue Sarris if Sarris was lying or had committed fraud. *Id.*

On March 28, 2025, Deaton emailed Sarris the AI-drafted complaint, based entirely on Sarris's statements and allegations. Deaton Decl. ¶ 51. Deaton did so, *not to provide legal services but to join the Linqto Board*, for the sole purpose of trying to protect customers who had

trusted Sarris and Linqto with their entire life savings. Deaton Decl. ¶ 51, Exhibit 13. After

sending the AI-drafted complaint, via email, Deaton spoke to Sarris on the phone briefly and

joked: "It's a good thing I'm not your lawyer and that this Complaint isn't for real, because what

I emailed would be malpractice." *Id*. The AI-drafted Complaint does not bear Deaton's name or

law firm's name. *Id*. Deaton performed no legal research to verify its contents, as it was not

created for the purpose of providing legal services. *Id.* The AI-drafted complaint was based on

the assertions, allegations, and statements made by Sarris to Deaton. Deaton Decl. ¶ 47. All that

Deaton performed, was inputting all of Sarris's claims against Siciliano in an AI app and in less

than two minutes, the AI printed out a draft. *Id*.

On March 28, 2025, Sarris emailed Deaton, stating that Sarris feared the nominating sub-

committee "stuffed with only [Siciliano] directors they could approve you and put their own pick

on instead of Linda." Deaton Decl. ¶ 52, Exhibit 13. In this email, Sarris stated: "Will let you

know how I make out with Adam [Henderson]." *Id.* This email (Exhibit 13) demonstrates and

corroborates the fact that *the sole purpose* of Deaton sending an email with an AI-drafted

complaint was *not for legal representation*. *Id*. Sarris wanted to use Deaton's name and

reputation to perpetuate a fraud on fellow Board members by cashing in on the good will that

several Board members held for Deaton. *Id*. Deaton's sole purpose of interacting with Sarris was

not to provide legal advice or representation but to try and help innocent Linqto customers. *Id.*

On April 2, 2025, Sarris emailed Deaton, indicating that he had spoken to Adam

Henderson and that Adam had indicated that both Deaton and Linda P. Jones were being

considered as Directors of the Board. Deaton Decl. ¶ 52, Exhibit 9. Deaton assumed Sarris

forwarded Deaton's email with the AI-drafted complaint to Adam Henderson and that the email

served its purpose of getting Deaton on the Board. *Id.* Sarris encouraged Deaton o "reach out to

Adam directly and inquire about the status of your nomination." *Id.* Sarris suggested that Deaton discuss with Adam the irreparable harm to Linqto's customer relations if things aren't turned around soon. *Id.*

The purpose of Sarris asking Deaton to contact Adam Henderson *wasn't to represent Sarris in any way***.** Deaton Decl. ¶ 52. The goal was to convince Adam Henderson, who was the Chairman of the Board, to appoint Deaton and Linda P. Jones to the Board as soon as possible. Deaton Decl. ¶ 52, Exhibit 9. This email (Exhibit 9) demonstrates and corroborates the fact that the entire purpose of Deaton sending an *email with an AI-drafted complaint was not for legal representation*. Sarris wanted to use Deaton's name and reputation *for non-legal reasons* – to influence Adam Henderson to act the way Sarris wanted him to. In this email, Sarris once again comments that Adam Henderson and Norman Reed contributed to Deaton's 2024 U.S. Senate campaign. *Id.*

On or about April 10, 2025, Dan Siciliano, CEO of Linqto, emailed Deaton, attaching a Board Observer Agreement. Deaton Decl. ¶ 56, Exhibit 14. Siciliano, with the consent of other Board members, including Adam Henderson and Norman Reed, suggested that Deaton become a Board Observer, and then evaluate whether Deaton was agreeable to join the Board, as a director. *Id.* As Board Observer, in contrast to being a Director, Deaton would have access to non-public information but unable to vote on issues affecting the Company. As Siciliano wrote: "By having you come aboard as a board observer (see attached agreement), you avoid any formal obligations (fiduciarily speaking) except for matters related to confidentiality." *Id.*

Along with two other individuals, Deaton became a Board Observer. Deaton Decl. ¶ 57. Linda P. Jones, however, was not one of the other two Board Observers selected. On or about May 20, 2025, Linda P. Jones sent an email to members of the Linqto Board, including Sarris,

Victor Jiang, Karim Nurani, Siciliano, Adam Henderson and Norman Reed. Deaton Decl. ¶ 58,

Exhibit 15. In her email, Linda P. Jones withdrew her name from consideration of being selected

as a Board Observer because an Observer lacked voting rights. *Id*.

### III.    LEGAL STANDARD

The Second Circuit applies a three-prong test to determine whether disqualification is

warranted in cases of successive representation. The moving party must establish: 1) The

existence of a prior attorney-client relationship; 2) The current representation must be materially

adverse to the former client; 3) The matters involved in the prior and current representations

must be substantially related. *Colorpix Sys. of Am. v. Broan Mfg. Co.*, 131 F. Supp. 2d 331 (D.

Conn. 2001), *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227 (2d Cir. 2016).

Disqualification is warranted only where these factors are clearly satisfied, and *any doubts must

be resolved in favor of the attorney's continued representation. Brandice M.C. v. Wilder*, 2023

NY Slip Op 05871, 221 A.D.3d 1532, 199 N.Y.S.3d 768 (App. Div. 4th Dept.). The burden of

proof rest with the party seeking disqualification, and courts are required to grant such motions

with caution due to their potential for abuse as a tactical device. *Ardemasov v. Citibank, N.A.*, 14

F. Supp. 3d 39 (D. Conn. 2014), *Katena Computing Techs., Inc. v. DeNaut*, No. 3:23-mc-48

(SDV), 2023 U.S. Dist. LEXIS 186738 (D. Conn. Oct. 4, 2023). The reason the standard is strict

is because disqualification affects both the client's right to counsel and the integrity of the legal

process.

The Second Circuit has emphasized that disqualification is a drastic remedy and should

only be granted sparingly. *See Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979). In

*Nyquist*, the court emphasized that motions to disqualify should not be granted lightly because

they interfere with a party's right to counsel of choice and are often made for tactical or strategic

reasons rather than genuine ethical concerns. *See also Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983).

IV.     **ARGUMENT**

**A. No Attorney-Client Relationship Existed Between Deaton and Sarris**

The defendant's claim that an attorney-client relationship existed is unsupported by the facts. An attorney-client relationship requires a mutual understanding that the attorney will provide legal services, which may be evidenced by a written retainer agreement, payment of fees, or other indicia of consent. *Pierce & Weiss, L.L.P. v. Subrogation Ptnrs. L.L.C.*, 701 F. Supp. 2d 245 (E.D.N.Y. 2010). Here, no such agreement or payment exists. The absence of a written retainer agreement is significant, as New York law requires such agreements in most cases involving legal representation. *S.D. v. St. Luke's Cornwall Hosp.*, 63 Misc. 3d 384 (N.Y. Sup. Ct. 2019). An attorney-client relationship arises only when a person manifests an intent that the lawyer provide legal services, and the lawyer consents to do so, either explicitly or implicitly through conduct. *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572 (2d Cir. 2010). While the absence of a formal engagement letter or payment of fees is not dispositive, it is relevant in determining whether an attorney-client relationship existed. The facts here show that Deaton did not undertake any explicit legal task for Sarris, and their interactions were limited to non-legal matters, related to Board appointments.

While the defendant points to emails marked privileged and a draft complaint as evidence of a relationship, these actions alone do not establish an attorney-client relationship. Courts have held that informal communications or the provision of preliminary advice do not necessarily create such a relationship, particularly in the absence of a formal agreement. *Pierce & Weiss, L.L.P. v. Subrogation Ptnrs. L.L.C.*, 701 F. Supp. 2d 245 (E.D.N.Y. 2010). Deaton explicitly and

14

repeatedly informed Sarris that he was not acting as his attorney and that their communications regarding the Linqto Board were not confidential or privileged. Deaton informed Sarris that Deaton was ethically bound to disclose to all members of the Board, everything Sarris had said and asserted in his conversations with Deaton.

Deaton's refusal to accept payment and his repeated warnings to Sarris that Deaton intended to sue Sarris, if Sarris was lying or had committed fraud, further demonstrates that no attorney-client relationship was formed. A unilateral belief by Sarris that Deaton was acting as his attorney, despite Deaton's promise to sue Sarris, is insufficient to establish an attorney-client relationship. *Steinbeck*, 400 F. App'x 572.

Deaton's Declaration, coupled with the Exhibits and evidence contained therein, unequivocally proves that Sarris was not seeking legal advice or representation in his dealings with Deaton. Sarris's sole purpose interacting with Deaton was an attempt to use Deaton's name and reputation to **perpetuate a fraud** on fellow Board members by cashing in on the good will several Board members held for Deaton. After reviewing Deaton's Declaration and the attached Exhibits, the entire purpose of Deaton sending an email with an AI-drafted complaint was **not for legal representation but for the non-legal purpose** of getting onto Linqto's Board. From the very beginning of Sarris's interactions, emails and conversations with Deaton, Deaton warned Sarris that if he was lying to Deaton or, if Sarris had committed fraud, Deaton would sue Sarris on behalf of innocent Linqto customers. Deaton even forwarded Sarris an email that raised the possibility of Deaton suing Sarris. Deaton Decl.¶ 33, Exhibit 6. The evidence is indisputable that Deaton never intended to provide legal services or provide legal advice to Sarris and the sole purpose of Deaton's interaction with Sarris was to help innocent Linqto customers by becoming a Board member, not by becoming Sarris's lawyer.

**B. The Matters Are Not Substantially Related**

To establish a substantial relationship, the Defendant must show that the issues in the prior and current representations are patently clear or essentially the same. *In re Peck*, 112 B.R. 485 (Bankr. D. Conn. 1990), *Vincent v. Essent Healthcare of Conn.*, 465 F. Supp. 2d 142 (D. Conn. 2006). The defendant has failed to demonstrate that the issues in the prior and current representations are substantially related. Under N.Y. R. Prof. Conduct Rule 1.9, matters are substantially related only if they involve the same transaction or legal dispute, or if there is a substantial risk that confidential factual information obtained in the prior representation would materially advance the clients position in the subsequent matter. *Giambrone v. Meritplan Ins. Co.*, 117 F. Supp. 3d 259 (E.D.N.Y. 2015). The prior interactions between Sarris and Deaton were limited to discussions about Board selection and general concerns about Linqto management. According to Sarris, regulatory issues, involving Linqto, were minor. These matters are distinct from the issues in the current litigation, which involve allegations of fraud, securities and FINRA violations, and customer harm.

The Second Circuit has held that disqualification is warranted only when there is a substantial risk that confidential information obtained during the prior representation could be used adversely in the current matter. *In re Peck*, 112 B.R. 485 (Bankr. D. Conn. 1990), *Vincent*, 465 F. Supp. 2d 142. Here, Sarris has not identified any specific confidential information that Deaton allegedly obtained or how it could be used against him. Even though the conversations between Sarris and Deaton were not confidential (which was communicated to Sarris multiple times), nothing that Sarris said could be relied on to file the current lawsuit. Almost everything Sarris stated to Deaton was not true. Deaton Decl. ¶ 62. For example, Sarris claimed the regulatory infractions were *very minor* in nature and that he expected a civil fine not to exceed

$25,000. *Id.* The truth, however, is that, on October 16, 2023, Sarris received an 18-page Legal Memorandum from Lowenstein Sandler LLP documenting multiple securities and FINRA violations, **including anti-fraud violations**. Deaton Decl. ¶ 48, Exhibit 10. The October 16, 2023, Legal Memorandum informed Sarris that Linqto was engaging in "Unregistered Broker-Dealer Activity"; "Excessive Markups"; **"Fraudulent Securities Offerings"**; "Non-Exempt Unregistered Securities Offerings"; and "Non-Exempt Unregistered Investment Company Offerings" - to name a few. *Id., Exhibit 10, at 1-2.* None of the conversations between Deaton and Sarris included such information. In sum, Deaton and Sarris discussed ways to help Deaton get on the Linqto Board. Not only did Deaton and Sarris not discuss things like securities fraud offerings, Sarris denied such things occurred. Board selection and the allegations in this litigation are very distinct. The defendant has not shown that any confidential information from the prior representation to be relevant to the current case. *Id.*

### C. The Current Representation is Not Materially Adverse to Sarris

Even if an attorney-client relationship had existed (it did not), Sarris has failed to demonstrate that the current representation is materially adverse to him. The plaintiffs in this case are suing Sarris for alleged misconduct as Linqto's CEO, which is unrelated to any prior interactions between Sarris and Deaton. The current representation is focused on protecting the interests of Linqto customers, not advancing any personal agenda against Sarris.

### D. No Evidence of Access to Privileged Information

Even if an attorney-client relationship existed (which it did not), the defendant has not shown that Deaton had access to or obtained confidential information that could materially prejudice Sarris. *See Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127 (2d Cir. 2005). The Second Circuit presumes that confidences are shared only when a substantial

relationship between the matters is established. *Waldman v. Foote*, No. 260568/2019E, 2024 N.Y. Misc. LEXIS 15802 (N.Y. Sup. Ct. Sept. 30, 2024). As discussed above, no such relationship exists here. Moreover, Sarris's general assertions about confidential discussions are insufficient to meet the burden of proof. *In re Persaud*, 467 B.R. 26 (Bankr. E.D.N.Y. 2012). Moreover, Deaton repeatedly informed Sarris that not only were their discussions *not* confidential or privileged, but Deaton also informed Sarris that he intended to disclose everything Sarris said or alleged to the other members of the Linqto Board.

Simply put, Sarris cannot credibly claim he believed his communications with Deaton were confidential or protected by the attorney client privilege. Deaton repeatedly informed Sarris that he was legally bound to disclose all communications between the two of them to the other Linqto Board members. Deaton even informed Sarris that Deaton could be called as a witness against Sarris if Sarris got sued by other Board members. Deaton Decl. ¶ 42. In sum, any claim by Sarris that he believed Deaton was working as his attorney, for free, or that he's surprised that Deaton sued him, is not true.

### E. The Absence of Written Consent Is Irrelevant

The defendant argues that Deaton violated Rule 1.9 by failing to obtain written consent for the current representation. However, this argument presupposes the existence of an attorney-client relationship and a substantial relationship between the matters, neither of which has been established. *Stratavest Ltd. v. Rogers*, 903 F. Supp. 663 (S.D.N.Y. 1995). Without these elements, the issue of consent is moot.

### F. Sarris's Motion is a Tactical Maneuver

Sarris's motion to disqualify Deaton is a transparent attempt to disrupt the Plaintiffs' case and deprive them of their chosen counsel. Courts have recognized that disqualification motions

are often used as *tactical weapons* to disrupt litigation and should be viewed with skepticism. *Brandice M.C.*, 221 A.D.3d 1532. The Defendant's motion appears to be a strategic attempt to derail the Plaintiffs' case, rather than a genuine concern about any ethical violations.

Sarris is very familiar with Deaton's reputation among Linqto customers. As Linqto's CEO, Sarris took advantage of that reputation by inviting Deaton to be a guest speaker at many Linqto events. This motion is an attempt to disqualify an attorney that Sarris, himself, described as a relentless advocate, and an attorney Sarris would never want to face as an adversary. This meritless motion is a manifestation of that fear.

The facts demonstrate that Deaton warned Sarris that he would sue Sarris if Sarris was guilty of committing fraud against innocent investors who trusted Sarris with their life savings. Deaton even warned Sarris that he would do it for free and that Sarris would learn first-hand just how relentless Deaton can be. Deaton filing this case is simply Deaton fulfilling the threat or promise that Deaton had made to Sarris multiple times. Deaton has committed publicly, and in writing, not to accept attorney fees for his time prosecuting this case. Simply put, Sarris fully understands a lawyer motivated by justice, and not money, is a lawyer Sarris would like to disqualify.

### G. Disqualification Would Prejudice the Plaintiffs

Disqualifying Deaton would severely prejudice the plaintiffs by depriving them of their chosen counsel. The Second Circuit disfavors motions to disqualify because of their potential to delay proceedings and disrupt a party's right to choose their counsel. *Ardemasov v. Citibank, N.A.*, 14 F. Supp. 3d 39 (D. Conn. 2014), *Katena Computing Techs., Inc.*, 2023 U.S. Dist. LEXIS 186738 (Oct. 4, 2023). Many of the Linqto customers were part of the 75,000 XRP holders Deaton represented in the *SEC v. Ripple* litigation. In fact, over two thousand Linqto customers

have already signed up to be represented by Deaton in this case. Deaton Decl. ¶ 65. Deaton has publicly committed to representing the Plaintiffs without seeking attorney fees, ensuring that any recovery will go directly to the harmed customers. Disqualifying Deaton would force the Plaintiffs to retain new counsel, likely at significant cost, and delay the resolution of this case.

As the founder and former CEO of Linqto, Sarris defrauded and harmed innocent customers. After being sued by those customers, instead of defending his conduct, or accepting responsibility for his conduct, his very first move is to disqualify the counsel for those customers, who has committed to representing them for free to make customers whole. Hence, although William Sarris is no longer CEO, he is still harming customers. Sarris's very first motion in this case is to try and disqualify their counsel to allow a different counsel to step in, who is unlikely to prosecute the case for free. Sarris's contempt and disdain for the very customers he defrauded, who made him a muti-millionaire, simply has no limits.

## V.    CONCLUSION

Under these facts, Sarris claiming that he believed conversations with Deaton were confidential and privileged and/or believed they entered an attorney-client relationship is just not credible. If disqualified under these facts, anyone could call up someone they know, who happens to be an attorney, and intentionally strike up a conversation that has nothing to do with legal representation, not enter into a representation agreement, not pay the attorney, and effectively preempt that attorney from suing them. If the Defendant's motion is granted, and Deaton is disqualified, the ruling could have dire consequences.

For the foregoing reasons, the defendant's motion to disqualify John Deaton as counsel for the Plaintiffs should be denied. Sarris has failed to meet his burden of proving the existence of an attorney-client relationship, the material adversity of the current representation, or the

substantial relationship between the prior and current matters. This motion is without merit and should be denied.

Dated July 31, 2025                                        Respectfully submitted,


                                                           */s/ John E. Deaton*
                                                           John E. Deaton, Esq.
                                                           SDNY Bar # 31415
                                                           Deaton Law Firm LLC.
                                                           450 North Broadway
                                                           East Providence, RI 02914
                                                           Tel: +1 (401) 351-6400
                                                           all-deaton@deatonlawfirm.com


                                                           *Attorney for Plaintiffs*

21