## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Lori Raffa Maxwell and Anthony Deluccia
Individually and on Behalf of All
Others Similarly Situated.
     *Plaintiffs*,

v.

William Sarris
     *Defendant*.

Case No.: 1:25-cv-5643-LAK

**DECLARATION OF JOHN E. DEATON
IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANT'S
MOTION TO DISQUALIFY OPPOSING
COUNSEL**

## <u>DECLARATION OF JOHN E. DEATON</u>

I, John E. Deaton, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am an attorney admitted to practice in the Southern District of New York, Massachusetts, Rhode Island, Connecticut, and Iowa. I am the founder and Managing Partner at Deaton Law Firm LLC and Plaintiffs' counsel in this matter.

2.     I respectfully submit this declaration in support of Plaintiffs' opposition to Defendant's motion to disqualify me as Plaintiffs' counsel.

3.     Attached hereto as **Exhibit 1** is a true and accurate copy of a March 15, 2025, email from John Deaton to Nick Burrafato.

4.     Attached hereto as **Exhibit 2** is a true and accurate copy of a June 2, 2022, email from William Sarris to John Deaton.

5.     Attached hereto as **Exhibit 3** is a true and accurate copy of a March 18, 2025, email from Dave Anderson to John Deaton, Linda P. Jones, William Sarris, Hardy Callcott, Rob Carlson, and Jen Hiwa.

6.     Attached hereto as **Exhibit 4** is a true and accurate copy of a March 23, 2025, email from William Sarris to John Deaton.

7.      Attached hereto as **Exhibit 5** is a true and accurate copy of a March 25, 2025, email, at 7:10 PM EST, from William Sarris to John Deaton.

8.      Attached hereto as **Exhibit 6** is a true and accurate copy of a March 25, 2025, email, at 7:39 EST, from William Sarris to John Deaton, acknowledging receipt of John Deaton's earlier email, dated March 25, 2025, at 4:21 PM EST, to William Sarris, forwarding John Deaton's March 15, 2025, email to Nick Burrafato.

9.      Attached hereto as **Exhibit 7** is a true and accurate copy of a March 26, 2025, email, at 12:53 PM, from William Sarris to John Deaton.

10.      Attached hereto as **Exhibit 8** is a true and accurate copy of a March 26, 2025, email, at 8:03 PM EST, from William Sarris to John Deaton.

11.      Attached hereto as **Exhibit 9** is a true and accurate copy of an April 2, 2025, email from William Sarris to John Deaton.

12.      Attached hereto as **Exhibit 10** is a true and accurate copy of an 18-page Legal Memorandum from Lowenstein Sandler LLP to Linqto Inc., with the subject line titled: Linqto Regulatory Review Memorandum, dated October 16, 2023.

13.      Attached hereto as **Exhibit 11** is a true and accurate copy of a Wall Street Journal article, authored by Susan Pullium and Carrie Driebusch, dated June 30, 2025, titled, *A Hot New Firm Opened the Private Market to the Little Guy. Now It Is In Big Trouble.*

14.      Attached hereto as **Exhibit 12** is a true and accurate copy of an 8-page internal Legal Memorandum from Linqto's General Counsel, Jack Drogin, Linqto's Deputy General Counsel, Jodi Jamison, and Linqto's Chief Compliance Officer, Susan Woodward, to Bill Sarris, Linqto's Chief Executive Officer, with the subject line titled: Outstanding Legal and Regulatory Issues for Linqto, dated October 25, 2024.

15.     Attached hereto as **Exhibit 13** is a true and accurate copy of email correspondence, dated March 28, 2025, between William Sarris and John Deaton.

16.     Attached hereto as **Exhibit 14** is a true and accurate copy of an April 10, 2025, email from Dan Siciliano to John Deaton.

17.     Attached hereto as **Exhibit 15** is a true and accurate copy of a May 20, 2025, email from Linda P. Jones to Alison Kutler, copying Adam Henderson, Dan Siciliano, Karim Nurani, Norman Reed, William Sarris, and Victor Jiang, withdrawing her application for Board of Directors.

18.     I have never met William Sarris (Sarris) in person. I have never been in a private meeting, alone with Sarris, virtually, via zoom, or other video-teleconferencing technology. During the last four years, I have been on two or three zoom calls with Sarris, along with other Linqto investors, **as a guest speaker**, related to my involvement as amicus counsel in the *SEC. v. Ripple* litigation, filed in this district. Additionally, I observed one or two Linqto Board meetings wherein Sarris was present, along with other members of the Linqto Board.

19.     In March of 2025, the current CEO of Linqto, Dan Siciliano (Siciliano), sent a letter to Linqto customers stating that the Linqto platform was being shut down due to regulatory compliance issues. My law firm immediately started receiving frantic emails from Linqto customers who were scared over the safety of their assets and concerned about Siciliano's letter. Because of customer concern, on March 15, 2025, I emailed Nick Burrafato, a Linqto sales manager, informing him that the CEO's letter, combined with Linqto suddenly asking customers to acknowledge that private equity investing is risky and that they understood they could lose all their investment funds, was causing great distress among Linqto customers. *See Exhibit 1.* In the email, I informed Nick Burrafato that many customers were asking me to file a class action

lawsuit against Linqto, **and its executives**. *Exhibit 1*. I was told that my email, discussing a class action lawsuit against Linqto executives would be forwarded to both Sarris and Siciliano.

20.     Prior to filing suit against Sarris, Sarris called me on several occasions, **not seeking legal advice**, but because Sarris wanted me to agree to become a member of the Linqto Board (discussed more below).  **I have never represented Sarris on any matter**, personally or professionally. **Sarris has never paid me any compensation, of any kind, at any time**. **I have never entered an Attorney-Client relationship with Sarris**. In fact, during our telephonic conversations (detailed more below), I reminded Sarris that **I was not his attorney nor were our conversations privileged**. Moreover, I informed Sarris that, if selected to be on the Linqto Board, I had a duty to disclose EVERYTHING Sarris had shared with me to the other Board members. Sarris could not have reasonably believed our conversations were privileged or protected by an attorney-client relationship because he stated that he fully understood and accepted that I would repeat all the allegations and statements that he was making to all members of the Linqto Board. Sarris could not have reasonably expected that I was working (*for free, nonetheless*) as his attorney because I warned Sarris that if he was lying to me and if he committed fraud against Linqto customers, **I would be the one who sued him**. During several telephone conversations, Sarris acknowledged my warning, more than once.

21.     To fully understand the nature of my conversations and interactions with Sarris, it is necessary to have full context as to why Sarris contacted me and why he was encouraging me to agree to become a Linqto Board member. There are approximately thirteen thousand (13,000) Linqto customers who purchased SPV units or interests in pre-IPO shares of private companies. Several of these private companies included Coinbase, SoFi, Circle, Uphold, and SpaceX.

However, there was only one company that overwhelmingly drove the popularity and success of the Linqto platform. That company is Ripple Labs, Inc. (Ripple).

22.     Of the 13,000 Linqto customers, approximately eleven thousand three hundred (11,300) are invested in Ripple. Ripple is a FinTech Blockchain Company associated with the third largest cryptocurrency in the world – XRP. The XRP community is an extensive decentralized global community with hundreds of thousands of XRP holders (if not millions) from around the world. Tens of thousands of XRP holders strongly believe in Ripple as a company and they maintain a strong sense of loyalty to Ripple. In sum, without Ripple or XRP holders, Linqto would not be successful. In fact, the CEO of Ripple, Brad Garlinghouse, recently confirmed Linqto holds 4.7 million shares of Ripple, which is held in trust on behalf of the 11,300 Linqto customers. The company Ripple recently made a tender offer for up to 4% of outstanding Ripple shares at a price of $175 per share. Hence, the 4.7 million Ripple shares, held in trust for Linqto customers, equals over eight-hundred million dollars ($800,000,000). No other private company comes close to Ripple's popularity on the Linqto platform. Of great significance, almost all 11,300 investors who acquired SPV units in Ripple, also own the digital asset XRP.

23.     After the Securities and Exchange Commission (SEC) sued Ripple, alleging XRP to be a security, I filed a Motion to Intervene on behalf of tens of thousands of XRP holders. In total, approximately seventy-five thousand (75,000) XRP holders, from one hundred forty-three (143) countries around the world, signed up to be part of the amici class. Many of those same XRP holders, from the same different countries around the globe, became Linqto customers who wanted to invest in Ripple, the company associated with XRP. In sum, Sarris leveraged the XRP community for his own financial benefit. When the SEC sued Ripple, alleging XRP to be a

security, major exchanges like Coinbase, Kraken, and others, delisted XRP. The only exchange in the U.S. to trade XRP, at that time, was Uphold. Sarris would reward investors who acquired units/shares in Ripple, by sending them XRP. Sarris informed XRP holders that Linqto would also accept XRP as payment (in lieu of a bank wire transfer) **for investments made in Ripple**. Sarris intentionally gave the impression to customers that Linqto and Uphold maintained a partnership. In truth, Sarris was accepting XRP as payment, as well as rewarding investors who bought Ripple, by sending them XRP, **from his own personal Uphold XRP Wallet**. In sum, despite false advertising to the contrary, there existed no business arrangement between Linqto and Uphold. Of course, Sarris did not share any of this information during our phone calls or emails because our conversations were **limited solely to getting me on the Linqto Board** (discussed more in detail below).

24.     After 75,000 XRP holders signed up to join the amici class, and after I was appointed amicus counsel by Judge Analisa Torres in the *SEC v. Ripple* case, I became a prominent figure in the XRP and Linqto communities. For one, I did all my legal work, representing the interests of 75,000 XRP holders for free. Because of my role as amicus counsel, on more than several occasions, I agreed to be a Guest Speaker at Linqto events. On one such occasion, Sarris introduced me to the audience, describing me as a "Hero of the XRP Community" and as a "relentless advocate for investors who he would never want to face as an adversary" or words to that effect. In fact, on or about June 2, 2022, Sarris sent me an email stating: "John – just wanted to say thanks for all that you are doing for **our XRP community**." *See Exhibit 2* (emphasis added).

25.     During March 2025, Sarris called me several times, **not seeking legal advice,** but asking if I would be willing to become a director and sit on Linqto's Board (Board). At first, I

informed Sarris that I was too busy and could not commit a lot of my time to Board activities.

After I declined, Sarris proceeded to inform me that he was afraid that if I did not get involved,

Linqto customers could lose everything. Sarris stated that he had mistakenly hired a new CEO,

Dan Siciliano (Siciliano), who was now engaged in a hostile takeover of Linqto, attempting to

raid both Linqto and customer assets. Sarris stated that he hired Siciliano to take over as CEO

because Sarris wanted to retire. Sarris claimed that Siciliano was using some very minor

regulatory infractions that took place under Sarris's leadership as an excuse to drive the company

into bankruptcy. Sarris explained that the regulatory infractions were extremely minor and that

he had everything under control, and nearly resolved, before Siciliano even assumed control.

Sarris alleged Siciliano was exaggerating the nature of the infractions and he shut the platform

down for the sole purpose of cutting off revenue and forcing bankruptcy. Sarris claimed that

Siciliano intended to try and buy Linqto out of bankruptcy for pennies on the dollar and possibly

steal or convert customer assets.

26.     My initial response to Sarris was, "What the hell can I do?"  Sarris responded by

saying that he had a plan to win back control of his company and stop Siciliano's attempted theft

of corporate and customer assets, by winning over two members of the Board, Adam Henderson,

and Norman Reed. Sarris stated that these two Board members held me in very high esteem and

that they would likely follow my lead and vote however I voted. Sarris said because of my

reputation within the XRP and Linqto communities, combined with my fierce advocacy for retail

investors and Linqto customers, I could also help repair the damaged Linqto brand.

27.     Sarris stated, in addition to me, he was pushing to have another Linqto investor,

Linda P. Jones, also added to the Linqto Board. During these conversations, Sarris stated that he

had already secured a commitment from Linda P. Jones and that she would vote Siciliano out as

CEO of Linqto. Sarris stated that if I voted the same as Linda P. Jones, he would then have a majority vote ousting Siciliano as CEO. In response, I specifically informed Sarris that I had zero loyalty to him and would only vote in a manner consistent with the protection of customer assets, regardless of who's CEO. I also informed Sarris that, unlike Linda P. Jones, I would not prejudge any issue, nor would I commit to vote a specific way, before learning all relevant facts.[1]

28.     During these calls, I informed Sarris that I would not be a part of a conspiracy to oust Siciliano as CEO and, if I did get selected to sit on the Board, I would have a duty **to disclose and repeat** EVERYTHING Sarris conveyed to me to the full Board. I informed Sarris that our conversations were **not** privileged or confidential in any way and that he may not want me on the Board if he's looking for me to commit one way or the other. Sarris stated he understood but still wanted me on the Board because he was confident that I would agree that Siciliano had to be removed to protect customers.

29.     As a Linqto customer myself, I asked Sarris questions regarding the regulatory issues he referenced as being minor. Sarris informed me that the nature of the regulatory infractions amounted to a speeding ticket. Sarris stated that it was minor stuff and that he **and his lawyers** had already handled the matter and expected no more than a $25,000 fine. I replied that a $25,000 fine is no reason to shut the entire platform down, preventing customers from having access to their funds. I stated that something was off because it made no sense. Sarris replied that the only thing that made sense was that Siciliano, working with lawyers from Sullivan & Cromwell, was intentionally driving Linqto into bankruptcy to steal customer assets. **Sarris**

---

[1] I do not presume Sarris's claims, related to how Linda P. Jones would vote, to be accurate or truthful. Considering almost everything Sarris said to me was a lie and thus, inaccurate, his statements regarding how Linda P. Jones would vote could also be untrue. The relevance is not whether it was true, regarding how Lind P. Jones would vote, but that Sarris made those statements which caused me to make a very specific reply, which is very relevant to the present motion.

**pleaded with me that he needed my help to protect customers,** many of whom, I had already

helped in the Ripple XRP litigation.

30.      I specifically asked Sarris if he was downplaying the regulatory issues. He

replied: "Not at all" and stated that the infractions involved late filings and incomplete and

improper forms. Sarris stated that he could fight the $25,000 fine but it would cost more in

attorney fees than the fine itself. I specifically asked Sarris: "Bill, are there any allegations of you

committing fraud against customers?" Sarris stated, "Absolutely not."

31.      I warned Sarris that if he and Linqto committed fraud against innocent investors,

many of whom trusted him with their entire life savings, **I would be the one who files a lawsuit**

**against him, on behalf of those innocent investors**. **I told Sarris it wouldn't be about money,**

**it would on principle, and I would do it for free.**  He said he understood and that that's why he

wanted me on the Board, because I would do what's best for customers. Based on his answers to

my questions, I agreed to become a Board member, if selected. Sarris informed me that **his**

**lawyer** Dave Anderson at Sidley Austin would conduct an interview of both me and Linda P.

Jones, which would allow Sarris to make a motion to add me and Linda as Directors.

32.      On March 18, 2025, Sarris's lawyer, Dave Anderson, called me for the purpose of

screening me for potential conflicts that might prevent me from sitting on the Linqto Board. *This*

*was **not** a call between two attorneys representing the same client*. In fact, I informed Dave

Anderson that Sarris needed to understand that I felt no obligation, duty, or loyalty to Sarris in

anyway, and if selected to the Board, I would vote for whatever **or whoever** was in the best

interests of Linqto customers, including whether that vote disappointed Sarris in any way. Dave

Anderson stated that that is what would make me a good Board member. I informed Dave

Anderson, with all that understood, I would agree to serve on the Board. Following this phone

call, Dave Anderson sent an email to me, Linda P. Jones, Sarris, **and Sarris's other attorneys**, dated March 18, 2025, answering specific questions posed by Linda P. Jones during her interview with Dave Anderson, related to compensation and insurance for Board members. *See Exhibit 3.* During my conversations with both Sarris and Dave Anderson, I never asked about compensation or stock options, but did make it very clear that I would do whatever I could to protect customers.

33.     On March 23, 2025, Sarris sent me an email stating: "Many thanks for your willingness to serve on the Linqto Board …. I would like to speak with you prior to [the Board] meeting and update you on everything so you have full knowledge before your election to the Board." *See Exhibit 4. Clearly, these calls with Sarris had nothing to do with seeking my legal services as a lawyer.* It was about Sarris attempting to get me selected to the Board, along with Linda P. Jones, hoping we would vote Siciliano out. Any claim otherwise is a bold-faced lie.

34.     On March 25, 2025, Sarris called me, **not to receive legal advice**, but to manipulate my vote, assuming I would be selected to the Linqto Board. He asked me to provide any information I had to help him convince other Board members to vote to add me to the Board. *See Exhibit 5.* During this call, Sarris informed me that a fellow Board member, Victor Jiang, had filed a motion before the Board to remove Siciliano as CEO of Linqto. He stated that the motion cited conflicts of interests and asserted many of the same things that Sarris had already alleged during our calls. During this specific call, I informed Sarris that Siciliano, and others involved in Linqto's new management, were making claims that the regulatory violations **were not mino**r but instead, **very significant**. I informed Sarris that there were allegations that the SEC and FINRA were conducting active investigations and rumors were spreading that the Department of Justice (DOJ) criminal division was also involved. I told Sarris: "Talks of people

going to jail don't occur for speeding tickets, Bill!" I also said: "*If Linqto turns out to be another FTX or Celsius, you're going to personally see just how relentless I can be when it comes to protecting innocent investors.*"

35.     Sarris claimed that Siciliano was greatly exaggerating the regulatory violations and was likely behind the false rumors. Once again, Sarris informed me that he had already resolved the minor infractions and was in the middle of negotiating a small civil fine, unlikely to exceed $25,000. I reminded Sarris that our conversations were not privileged or confidential and that if he was lying and manipulating me, or if customers were defrauded, **I would sue both he and Linqto**. In fact, during this call, I brought up the fact that dozens of Linqto customers had already contacted my law firm, **asking me to represent them in a class action lawsuit against Linqto *and its executives*.**

36.     Indisputable evidence exists, supporting the fact that I warned Sarris, during this call, **that I would sue him** if he was being deceitful or if he had defrauded customers. Almost immediately following this March 25, 2025, call, I forwarded Sarris my March 15, 2025, email to Nick Burrafato, wherein I discuss filing a class action lawsuit "**against Linqto and *its executives*.**" *See Exhibit 6*. On that same day (March 25, 2025), at 7:39 PM EST, Sarris acknowledged receiving the email discussing filing a lawsuit against Linqto executives, **which included him**. *Id.*

37.     Any claim by Sarris that he believed I was working as his attorney, for free, or that he's surprised that I sued him, is simply not true. He was warned, more than once. In fact, during this March 25, 2025, call, Sarris stated he understood and accepted my warning about suing him if he had defrauded customers. Sarris stated that he was being completely truthful and that **if I didn't get on the Board to help stop Siciliano, customers could lose everything.**

During this call, once again, I informed Sarris that if I were selected to the Board, I would do two things: 1) disclose to the full Board all statements and allegations Sarris was making; and 2) evaluate all relevant information and vote according to the best interests of customers. During this call, I also made a specific distinction between Linqto customers and Linqto equity shareholders, making it known, I would give priority to customers, not equity shareholders, like Sarris.

38.    On or about March 26, 2025, at 3:53 PM EST, Sarris emailed me a copy of a letter to the Linqto Board in support of Victor Jiang's motion to remove Siciliano as CEO. The purpose of this letter was to persuade me to vote in favor of Siciliano's removal, if selected to the Board. *See Exhibit 7*.

39.    On March 26, 2025, at 8:03 PM EST, Sarris informed me, via email, that the Linqto Board had held a meeting but then adjourned the meeting "so they would have more time to review our claims." *See Exhibit 8*. In this email, Sarris asks if I'm willing to contact his attorney Dave Anderson "and see what we may be able to do to protect our assets as we navigate this Board stonewall?" *Id*. Sarris then stated, "If you would like an engagement letter and retainer, LMK." *Id*. I never contacted Dave Anderson to discuss a way to protect whatever assets Sarris was referencing. I have no idea what Sarris meant by "our assets" and whether he was referencing Linqto corporate assets or customer assets. **Obviously, after promising to sue Sarris, if he had committed fraud, I never asked for a retainer or payment of any kind. Clearly, I also never forwarded or received an engagement letter of any kind.** Quite frankly, I believe Sarris started experiencing a feeling of the walls caving in on him and he offered me money for the first time as an attempted bribe or as a preemptive strike to prevent me from suing him, as I promised, if he had committed fraud.

40.     On or about March 26, 2025, after receiving Sarris's email referenced above, Sarris and I spoke on the phone. I asked Sarris: "If everything you and Victor Jiang are claiming is true, why haven't you guys taken legal action in Delaware Court or called for an emergency shareholder meeting?" Sarris danced around answering the question but did say something insightful that cast doubt over his credibility. Sarris said: "If we go to court, **my lawyers** told me everything becomes public." I immediately responded: "Why would that be bad, Bill, if you haven't done anything wrong?" Sarris replied: "We will absolutely go to court if we must but if we can get you and Linda P. Jones on the Board, we can get rid of Dan and turn the platform back on and hopefully avoid a Court battle that might jeopardize customer funds" or words to that effect. I responded by stating customer assets wouldn't be in jeopardy, assuming everything was done properly. In retrospect, Sarris was evasive in his response.

41.     Once again, I reminded Sarris that I was not promising to vote one way or the other. I also informed him that his answers and behavior were causing me to doubt his veracity. I stated to Sarris that if everything he was alleging was true, he shouldn't need me and Linda P. Jones on the Board to cast a vote – he should be able to secure a majority vote from the current Board, considering they have a fiduciary responsibility to customers and shareholders. ***In response, Sarris stated that that is the very reason he needed me to be on the Board.*** Sarris stated that two Board members, Adam Henderson, and Norman Reed, held me in the highest of regards because of my work fighting on behalf of retail investors in the *SEC v. Ripple* case. Sarris made a point to tell me that both Norman Reed and Adam Henderson contributed to my U.S. Senate run in 2024. *See Exhibit 9.*

42.     I informed Sarris, if selected to the Board, I would be obligated, and duty bound, to disclose EVERYTHING he had shared with me. I told him that although he claims Siciliano

stacked the Board, one could argue he is doing the same. I informed Sarris that all I cared about was the protection of customer investments and that I intended to disclose EVERYTHING he told me. I informed him if there was litigation from shareholders, other Linqto Board members, or from Siciliano**,** I could be called as a witness against him **because I am not his lawyer**. Again, I informed Sarris that I intended to disclose EVERYTHING he had said to me. Sarris stated that he understood all of this and that he was confident that I would agree with his position and vote to remove Siciliano and turn the platform back on. Any claim today that he believed our conversations were confidential and/or protected by attorney-client privilege is a complete and utter lie, asserted only to save his own skin.

43.     During this call, when I asked Sarris why not file an action for relief in Delaware, he stated that **his lawyers** were working on something in case his Board plan fell through. I said why don't you just tell Norman Reed and Adam Henderson that you plan on going to court if they don't take the appropriate action to protect customers and appoint two new Board members? Sarris responded that the only person he believes Adam Henderson and Norman Reed would listen to is me. Sarris said that my opinion on how to proceed forward would carry significant weight and I would likely persuade Adam Henderson and Norman Reed to vote the same.

44.     Sarris asked if it was possible for me to email him a sample complaint involving a shareholder lawsuit by him, and a couple other Board members, including Victor Jiang, who shared Sarris's desire to remove Siciliano. Sarris informed me that he wanted to show a draft complaint to Adam Henderson and Norman Reed to persuade them to appoint two new Board members and thus, avoid litigation. I told Sarris: "I'm not your lawyer, Bill, have your attorney, Dave Anderson, do it."  Sarris stated that **because I am not his attorney,** but instead, one of the most respected investors on the Platform, combined with my reputation among Adam Henderson

and Norman Reed, a complaint in an email from me is the best way for me to get on the Board
and then I would be able to help customers.

45.      Sarris stated that he needed the complaint to be attached in an email from me, so
that he could forward that email to both Adam Henderson and Norman Reed. Sarris said that if it
came from one of his personal lawyers, it would have little impact; but if it came from me, it
could be a "game changer" for the direction of the company. I responded by stating that I have
never filed such a Complaint, and it wouldn't be very credible. Sarris's responded by saying that
it didn't matter because he had no intent to file the complaint and that I was underappreciating
my reputation and stature within the community. Sarris stated the **only purpose** for me emailing
a draft complaint was to show Adam Henderson and Norman Reed **that it came from me**. Sarris
stated that that he was very confident that if I sent him the email, these two Board members
would agree to have me appointed to the Board and once on the Board, I could help protect the
twelve thousand XRP holders who were also Linqto customers, now in jeopardy of losing
everything. Sarris was clearly manipulating my desire to help innocent investors for his own
charade of trying to stop the walls from caving in because, I learned later, that Siciliano was
cooperating fully with SEC, FINRA and DOJ investigations. It is crystal clear today, that what
Sarris wanted, was control of the company so he could take a much less cooperative approach
with the feds.

46.      Based on the statements and representations of Sarris, coupled with the desire to
help thousands of customers and XRP holders, many of whom I had a personal and professional
connection with, I told Sarris I would quickly draft something up and send it in an email so he
could forward it to Adam Henderson and Norman Reed. Sarris offered to pay me for my time
**and even joked that he could send me XRP**. I responded that it would only take 10 minutes or

less using Artificial Intelligence (AI) plus, I would not accept any form of payment because, as I told him several times before, if he was lying or if he had defrauded customers, "**I will not hesitate to sue you Bill and, trust me, I'm a man of my word**."

47.    Despite promising to sue Sarris if he lied about committing fraud, Sarris, through his counsel, now claims I portrayed Sarris as a Champion of Linqto customers, valiantly trying to protect customers from Siciliano's plan to drive the company into bankruptcy and steal their assets. *See* ECF No. 7 at 1. Sarris, through his counsel, also claims that I "said Linqto's regulatory issues were not a serious threat to its customers." *Id.* These arguments, made by Sarris, to disqualify me, corroborates everything I'm stating in this Declaration, made subject to the penalties of perjury. I've never portrayed Sarris as a Champion protecting customers nor have, I ever suggested Linqto's regulatory issues were minor. **Those were the statements and assertions made by Sarris to me, during our conversations.** All I did was insert **Sarris's allegations and statements** into an AI app and in less than 2 minutes, the AI spit out a drafted Complaint, making the same **untruthful assertions Sarris alleged** to me, *as he was trying to convince me to join the Linqto Board.*

48.    No. credible lawyer could describe Linqto's regulatory issues as minor. Those allegations are what Sarris stated to me multiple times. Sarris claimed the infractions were akin to a speeding ticket and involved late or improper form filings. He told me he expected no more than a $25,000 fine. The truth, however, is that, on October 16, 2023, Sarris received an 18-page Legal Memorandum from Lowenstein Sandler LLP documenting multiple securities and FINRA violations, **including anti-fraud violations**. *See Exhibit 10*. The October 16, 2023, Legal Memorandum informed Sarris that Linqto was engaging in "Unregistered Broker-Dealer Activity"; "Excessive Markups"; "**Fraudulent Securities Offerings**"; "Non-Exempt

16

Unregistered Securities Offerings"; and "Non-Exempt Unregistered Investment Company Offerings" - to name a few. *See Exhibit 10, at 1-2*. The October 16, 2023, Legal Memorandum, advised Sarris of the necessary corrective action to take. Despite being told Linqto was committing securities fraud, Sarris chose to ignore it. In fact, when employees, under him, emailed Sarris "citing worries by the company's lawyers about mentioning specific companies, [Sarris] replied: '**Forget what legal says**.'" *See Exhibit 11*, Wall Street Journal, Susan Pullium and Carrioe Driebusch, dated June 30, 2025, titled, *A Hot New Firm Opened the Private Market to the Little Guy. Now It Is In Big Trouble*. (WSJ Article).

49.　　One year later, on October 25, 2024, Sarris received an 8-page Internal Legal Memo from Linqto's General Counsel, Deputy General Counsel, and Chief Compliance Officer. *See Exhibit 12.* The Internal Memo, likewise, documented the same multiple violations, but additionally, it referenced an "SEC request for information" and "the likely FINRA enforcement actions." *Id.* at 1.  This internal legal memo, **one year after the October 16, 2023, Legal Memorandum** (Exhibit 10), explained to Sarris that the undisclosed and excessive markups that Linqto was engaging in "**would be considered inherently fraudulent**" by the SEC. *Exhibit 12 at 2*. Sarris, once again, took no corrective action. Sarris's practice, when it came to accepting legal advice from his real lawyers was documented in the WSJ Article: "[Sarris] sometimes expressed disregard for Linqto's lawyers, saying in one email: 'If I think legal should be overridden, I will tell you.' *" See Exhibit 11 at 4.*

50.　　Upon information and belief, Sarris is currently the subject of a criminal investigation, within the SDNY, and is likely to be indicted. Because I have never been Sarris's attorney, he did not share any of the above information with me. Instead, he made self-serving, untruthful statements to manipulate me in his attempt to perpetrate a fraud on the Linqto Board.

Any claim, by Sarris, that he was seeking my legal services is as truthful as is his claim that Linqto's regulatory issues equaled a speeding ticket.

51.     On March 28, 2025, I emailed Sarris the AI-created complaint, based entirely on his statements and allegations. I did this to join the Linqto Board, for the sole purpose of trying to protect customers who had trusted Sarris and Linqto with their entire life savings. *See Exhibit 13*. After sending the Ai-drafted complaint, via email, I spoke to Sarris on the phone briefly and joked: "It's a good thing I'm not your lawyer and that this Complaint isn't for real, because what I emailed would be malpractice." The AI-drafted Complaint does not bear my law firm or my name and, considering it was not offered for legal services, I performed no legal research to verify its contents. It was not created for the purpose of providing legal services.

52.     Apparently, Sarris's plan to get both me and Linda P. Jones on the Board was in jeopardy, because later that day, Sarris emailed me, stating that he feared the nominating sub-committee "stuffed with only [Siciliano] directors they could approve you and put their own pick on instead of Linda."  *See Exhibit 13*. In this email from Sarris, he stated: "Will let you know how I make out with Adam [Henderson]."  This email demonstrates and corroborates the fact that the entire purpose of me sending an email with an AI-drafted complaint was **not for legal representation**. Sarris wanted to use my name and reputation to perpetuate a fraud on fellow Board members by cashing in on the good will that several members held for me. My sole purpose of interacting with Sarris was not to provide legal advice or representation but to try and help innocent Linqto customers.

53.     On April 2, 2025, Sarris emailed me, indicating that he had spoken to Adam Henderson and that Adam had indicated that both me and Linda P. Jones were being considered as Directors of the Board. *See Exhibit 9.* I assumed Sarris forwarded my email with the AI-

drafted complaint to Adam Henderson and that the email served its purpose of getting me on the Board. *Id.* Sarris encouraged me to "reach out to Adam directly and inquire about the status of your nomination." *Id.* Sarris suggested that I discuss with Adam the irreparable harm to Linqto's customer relations if things aren't turned around soon. *Id.*

54.    It is crystal clear, that the purpose of Sarris asking me to contact Adam Henderson **wasn't to represent Sarris in any way.** The goal was to convince Adam Henderson, who was the Chairman of the Board, to appoint me and Linda P. Jones to the Board as soon as possible. *See Exhibit 9.* This email demonstrates and corroborates the fact that the entire purpose of me sending an email **with an AI-drafted complaint was not for legal representation**. Sarris wanted to use my name and reputation **for non-legal reasons** – to influence Adam Henderson to act the way Sarris wanted him to. In this email, Sarris once again comments that Adam Henderson and Norman Reed contributed to my 2024 U.S. Senate campaign. *Id.*

55.    Despite Sarris's request to do so, I never contacted or reached out to Adam Henderson, regarding the status of my Board selection. At this point, Sarris's statements and behavior had given me pause and reason to believe that he was not being truthful.

56.    On or about April 10, 2025, Dan Siciliano, CEO of Linqto, emailed me, attaching a Board Observer Agreement. *See Exhibit 14.* Siciliano, with the consent of other Board members, including Adam Henderson and Norman Reed, suggested that I become a Board Observer, and then evaluate whether I was agreeable to join the Board, as a director. As Board Observer, in contrast to being a Director, I would have access to non-public information but unable to vote on issues affecting the Company.  As Siciliano wrote: "**By having you come aboard as a board observer (see attached agreement), you avoid any formal obligations (fiduciarily speaking) except for matters related to confidentiality**." *Id.*

57. Along with two other individuals, I agreed to become a Board Observer. Linda P. Jones, however, was not one of the other two Board Observers selected. On or about May 20, 2025, Linda P. Jones sent an email to members of the Linqto Board, including Sarris, Victor Jiang, Karim Nurani, Siciliano, Adam Henderson and Norman Reed. *See Exhibit 15*. In her email, Linda P. Jones withdrew her name from consideration of being selected as a Board Observer because an Observer lacked voting rights. *Id*. As an additional basis for withdrawing her name, Linda P. Jones stated that she "encountered information that raises concerns about potential conflicts of interest and a lack of oversight and transparency in financial reporting." *Id.*

58. As a Board Observer, I believe I only observed two meetings wherein the entire Board was present. I am not disclosing any information from those meetings that have not already been made public. Norman Reed led a special sub-committee investigation into the allegations made by Sarris, allegations that formed the basis of Victor Jiang's motion to remove Siciliano as CEO, including allegations over conflicts of interests, claims that Siciliano was greatly exaggerating regulatory issues or violations, and improper motive to drive Linqto into bankruptcy to steal or seize assets. The final report of the sub-committee, led by Norman Reed, determined that the allegations and motion to remove were without merit. In sum, although I owed Sarris no fiduciary duty as a Board Observer, nothing I learned or observed in the few meetings I was present was relied on to file this case. I received materials and exhibits utilized herein independently from other sources, including former employees of Sarris.

59. On or about July 7, 2025, Linqto filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court, filed in the Southern District of Texas. *See generally* Bankruptcy Petition and Declaration of Jeffrey S. Stein in Support of Chapter 11 Petitions, First Day Motions

and Related Relief, *In re: Linqto Texas, LLC, et al.,* United States Bankruptcy Court, filed in the Southern District of Texas.

60.     Between March 10, 2025, until July 9, 2025, I received hundreds of emails from Linqto customers frantically concerned about the investments that they've made on the Linqto platform, during the last five years. For many of these customers, their investments on the Linqto platform represent their entire life savings or retirement funds. These investors are looking for me to help protect their assets. They've requested I represent them in a lawsuit against Sarris for his fraud – the exact type of lawsuit I warned Sarris I would file against him if he had committed fraud. In fact, I informed Sarris, both verbally, and via email, about customers requesting that I sue Linqto **and its executives**. *See Exhibit 6.*

61.     During this period, I conducted interviews of former Linqto employees, who worked directly under Sarris, including those on Sarris's management team. I also conducted interviews of social media influencers, who were hired and utilized by Sarris for marketing, customer recruitment and advertising. I've been provided internal emails and memorandum by some of these former employees and influencers. I'm not the only one who's obtained these types of records. Investigative journalists have obtained some of the same materials. *See WSJ Article at Exhibit 11.*

62.     Even though the conversations between Sarris and myself were NOT confidential (which was communicated to him), NOTHING that was said by Sarris was relied on to file this lawsuit. It would be impossible to rely on or use anything Sarris said because almost EVERYTHING he said was a complete lie or fabrication. I gained no insight or knowledge from these non-privileged conversations that could assist me in the prosecution of this case. For example, Sarris claimed the regulatory infractions were *very minor* in nature and that he

expected a civil fine not to exceed $25,000. Sarris informed me that his lawyers were close to a settlement with regulators just prior to Siciliano taking over as CEO. Sarris's statements regarding regulatory violations were complete and utter lies. The regulatory infractions committed by Sarris could NEVER be accurately described as "minor." Sarris's own lawyers in 2023 informed him he was committing fraud. As, detailed in the Wall Street Journal article, Sarris sent emails to his senior management team writing, "ignore the lawyers" or that he would "override legal" if they got in the way. Sarris intentionally chose to ignore his actual lawyers – the one's he paid compensation to – and now claims he was relying on the lawyer who's NEVER represented him and to whom he's never paid a cent. The bottom line is that: 1) my conversations with Sarris were not confidential or privileged in any way; and 2) even if Sarris subjectively believed (which he didn't) the conversations were confidential, he provided nothing in those conversations that could be relied on in filing or prosecuting this case. Moreover, Sarris did commit fraud, is under criminal investigation, and is expected to face criminal indictment within this District.

63.    As Linqto's founder and CEO, Sarris defrauded investors. He priced gauged customers and used misleading and deceptive marketing schemes, while violating almost every securities act created. He ignored the lawyers who told him he was committing fraud. When the walls were closing in, he conspired and attempted to perpetuate a fraud upon the Linqto Board, attempting to use my name and reputation to save him. **I warned Sarris along the way, during our conversations and interactions, that I would sue him if he was lying and attempting to manipulate me or if he had harmed customers.**

64.    On or about July 16, 2025, counsel for Sarris, James Heyworth, and Kevin Rubino, called to inform me that they were going to file the present motion to disqualify. In

Attorney Heyworth's declaration he alleges that my primary basis for objecting to Sarris's motion to disqualify is that I was never paid for my legal services. Not true. Attorney Heyworth's declaration conveniently leaves out the part of our conversation wherein I stated that I never entered an attorney-client relationship with Sarris and, in fact, warned Sarris that I would sue him if he committed fraud.

65.    As of today's date, July 31, 2025, approximately two-thousand two-hundred and fifty-six (2,256) Linqto customers and investors have signed up and requested to be represented by me in the class action lawsuit against Sarris.

Executed on July 31, 2025, in Bolton, Massachusetts.

Respectfully Submitted,

*/s/John E. Deaton*
John E. Deaton
SDNY Bar # 31415
Deaton Law Firm LLC
450 North Broadway
East Providence, RI 02914
Tel.: +1 (401) 351-6400
Email: all-deaton@deatonlawfirm.com