

**MEMORANDUM**

*Confidential Attorney Work Product,*
*Attorney-Client Privileged*

**From:** Lowenstein Sandler LLP
**To:** Linqto, Inc.
**Date:** October [16], 2023
**Subject:** DRAFT - Linqto Regulatory Review Memorandum

## I. Introduction

You have asked us to review and advise on the regulatory and practical considerations of the products and services offered by Linqto, Inc. ("Linqto Parent") and its affiliates[1] (together with Linqto Parent, "Linqto"). Reference is made to the buy-side flow of funds diagram (the "Transaction Flow Chart") attached hereto as Exhibit A. What follows is our understanding of the material facts, the regulatory considerations at issue, and proposed mitigatory and remedial actions. We appreciate you correcting any of these understandings that may be inaccurate so we can ensure that each issue has been assessed fully and accurately.

## II. Executive Summary

Based on the facts and analysis described below, Linqto is likely to be deemed to have violated several United States ("U.S.") securities laws and regulations by a court or government regulator, including, but not limited to, violations of Section 5 and Section 17(a) of the Securities Act of 1933, as amended (the "Securities Act"), Section 7(a) of the Investment Company Act of 1940, as amended ("the Investment Company Act"), Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as well as various Financial Industry Regulatory Authority, Inc. ("FINRA") rules, each as further detailed below (capitalized terms used in Section II shall have the meanings ascribed to them in the remainder of the memorandum):

    a. *Unregistered Broker-Dealer Activity*
- Liquidshares' marketing and sale of Series Membership Interests, including the continuous and regular implementation of Markups would likely be viewed as unregistered broker-dealer activity conducted in violation of Section 15(a)(1) of the Exchange Act.
- Linqto Parent's participation in sourcing potential sellers, providing loans to each Series to purchase the Private Securities, and earning interest on such loans,

---

[1] We note that on September 18, 2023, Linqto Investment Management, LLC filed its Form ADV-W, terminating its registration as an investment adviser with the SEC.

would likely be viewed as unregistered broker-dealer activity conducted in violation of Section 15(a)(1) of the Exchange Act.

b. *Excessive Markups*
- By charging large Markups, Liquidshares would likely be found to be in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act as well as Exchange Act Rule 10b-5 ("Rule 10b-5").[2]
- Even if Liquidshares were to restructure the Liquidshares Offerings such that Linqto Capital, LLC ("Linqto Capital"), a registered broker-dealer and FINRA member, charged the Markups, the current and historical size of the Markups would likely be deemed to constitute unfair prices and commissions, in violation of, among other things, FINRA Rules 2010 and 2121.

c. *Fraudulent Securities Offerings*
- By offering each of the Series containing Series Deficiencies, Linqto would likely be viewed as fraudulently offering or selling securities in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, as well as Rule 10b-5.

d. *Non-Exempt Unregistered Securities Offerings*
- Many of the separate Series offerings with respect to a single underlying Private Company would likely be viewed as a single issuance pursuant to the 'integration doctrine.' Therefore, the integrated Series require registration with the SEC. Having failed to register such integrated Series, it is likely that Linqto would be found to be in violation of Section 12(g) of the Exchange Act.

e. *Non-Exempt Unregistered Investment Company Offerings*
- Many of the separate Series offerings with respect to a single underlying Private Company would likely be viewed as a single issuance pursuant to the 'integration doctrine.' Therefore, certain integrated Series offerings would constitute investment companies subject to registration under Section 7(a) of the Investment Company Act. Having failed to register such integrated Series, it is likely that Linqto would be found to be in violation of the Investment Company Act.

Accordingly, we recommend that Linqto take immediate remedial action to prevent further violations of U.S. securities laws, mitigate litigation risks, and to demonstrate it has acted in good faith to alleviate any potential harm caused to investors. Linqto should, at a minimum, (1) immediately cease charging Markups and/or facilitate reduced Markups through Linqto Capital in an amount and manner consistent with FINRA Rule 2121 and FINRA Rule 2010; (2) immediately terminate all pending Rule 506(b) offerings to non-accredited investors and cease any future 506(b) offerings [unless and until the prospectus is properly amended]; (3) remediate the Series Deficiencies through revised offering documentation and disclosure; (4) adjust its Form D filing methodology; and (5) for affected offerings, consider whether it is appropriate to

---

[2] **Note to Linqto**: Pending further details regarding the lending activities of Linqto Parent, it is possible that these same regulatory considerations apply to Linqto Parent.

repurchase investors' securities in a rescission offer or to dissolve each applicable Series and provide a return of capital to investors. Further details and analysis provided below.

### III.  Summary of Facts

Linqto operates an online platform (the "Platform") that provides accredited investors ( "Accredited Investors") and non-accredited investors ("Non-Accredited Investors") the opportunity to purchase securities (the "Series Membership Interests") in one or more series (each a "Series") of Linqto Liquidshares, LLC, a Delaware series limited liability company ( "Liquidshares").[3] The Series Membership Interests offered aim to provide Accredited Investors and Non-Accredited Investors economic exposure to private securities ("Private Securities") of non-public companies (each a "Private Company"). Additionally, Linqto Capital is authorized to operate an alternative trading system (the "ATS"), providing a liquidity venue for the Series Membership Interests.[4]

Linqto Parent sources the supply of underlying Private Securities from current/former employees, early investors, and advisors of the Private Company. Linqto Parent provides funding to each SPV through a loan secured by the underlying Private Securities. Using the loan proceeds, the applicable Series purchases the Private Securities at a negotiated price (the "Initial Purchase Price") directly from the seller(s).[5] The relevant Private Company updates its books and records to reflect the owner of the acquired Private Securities in the name of each Series. The Series then commences an offering of Series Membership Interests relying on either Rule 506(b) or Rule 506(c) under the Securities Act and Section 3(c)(1) under the Investment Company Act (the "Liquidshares Offerings").

---

[3] **Note to Linqto**: We understand that until approximately December 2022 Rainmaker Securities, LLC ( "Rainmaker"), a U.S. Securities and Exchange Commission ("EC") registered broker-dealer and FINRA member, earned a percentage of the sales revenue for its services in connection with the primary Liquidshares Offerings. We understand that Rainmaker provided "supervisory" services, in that it only supervised the activities performed in connection with the Liquidshares Offerings and did not act as a private placement agent for Liquidshares and/or any Series. Further, we note that while Linqto Capital currently facilitates secondary market transactions through the ATS, it does not currently (nor has it ever) facilitate the primary private placement activity described throughout this memorandum. Pursuant to FINRA Rule 5122, the Liquidshares Offerings constitute a member private offering because Liquidshares (and each Series thereof) is under common control with Linqto Capital; however, because Linqto Capital does not offer or sell securities under the Liquidshares Offerings, Rule 5122 filing requirements are not required.

[4] **Note to Linqto**: It is not clear whether the ATS is currently fully operational. Therefore, for the purposes of this memorandum, we have not conducted a comprehensive regulatory analysis of the current or historical ATS activities. However, if the primary securities offerings are deemed non-compliant, secondary trading should be prohibited on the ATS. We further note that once the ATS is operational, there should be a clear distinction between primary offerings and secondary trading activity on the Linqto website. Additionally, Linqto should note that the Series Membership Interests are restricted securities and they have transfer limitations, unless a registration statement is filed or an exemption is available. Under Securities Act Rule 144, a restricted security can be transferred after one (1) year from when the securities were purchased. Please refer to Rule 144 for additional details on this particular exemption at https://www.law.cornell.edu/cfr/text/17/230.144.

[5] **Note to Linqto**: It is unclear to what extent Linqto Parent participates in the facilitation of the Private Securities transactions between the seller and each Series. Additionally, as per Linqto's FAQ section on its website, it appears that the underlying Private Securities are purchased in bulk and sold in smaller quantities to investors, instead of separate transactions between the sellers and the Series.

When a Series offers Series Membership Interests in reliance on Rule 506(b)[6], the offering is "closed" after the Series accepts subscriptions from 35 Non-Accredited Investors.[7] Provided there is demand for additional Series Membership Interests, Linqto creates a new Series to offer additional Series Membership Interests.[8] Concurrently or in short succession thereafter, Linqto also offers Series Membership Interests using general solicitation in reliance on Rule 506(c) to Accredited Investors. In a similar fashion, when a Series offered in reliance on Rule 506(c) reaches 100 Accredited Investors[9], the Series is closed, and a new Series is created. This pattern repeats until Linqto is unable to source additional Private Securities (or if applicable, Linqto depletes its inventory of Private Securities) or until there is no longer investor demand.

We understand that the offering price per Series Membership Interest is based on the following factors: (i) the acquisition price of the Private Securities; (ii) interest owed to Linqto Parent in connection with the loan obtained to purchase the Private Securities; (iii) associated expenses in acquiring the Private Securities, including fees paid to Rainmaker; and (iv) a markup to generate profit for Linqto. In connection with each Liquidshares Offering, an EIN is obtained for each Series and the Form D filings and blue sky notice filings are filed with the SEC and relevant states under a single CIK number. The SPV is "custodied" by Millenium Trust and "SPV #2" is held by Liquidshares under the issuer exemption.[10]

## IV. Regulatory Considerations

### a. Unregistered Broker-Dealer Activity

Section 15(a) of Exchange Act requires "brokers" and "dealers" using interstate commerce, or the facilities of a national securities exchange to effect transactions in securities, to register with the SEC. Section 3(a)(4)(A) of the Exchange Act defines "broker" broadly to mean "any person *engaged in the business* of *effecting transactions* in securities for the *account of others* [emphasis added]."

In order to be "engaged in the business," courts and the SEC have concluded that "some degree of regularity" must be shown in order for a person to be deemed "engaged in a securities business." Neither the Exchange Act nor any of the rules promulgated thereunder define what it means to "effect transactions" in securities. However, the courts and the SEC have regularly

---

[6] Note to Linqto: We understand that on or about September 14, 2023, Linqto began offering Series Membership Interests in reliance on Rule 506(b). For the purposes of this memorandum, we have assumed that no general solicitation was used in connection with these 506(b) offerings.

[7] We note that the "close" of an offering as described above is not equivalent to the "termination" of an offering as the term is defined in Rule 152(d) for the purposes of the integration analysis. Please see below discussion in Section IV(d)(i) on relevant defined terms in Rule 152.

[8] Note to Linqto: It is unclear whether Linqto sources additional Private Securities or if Linqto sources a large quantity of Private Securities which are then sold to each individual Series. Additionally, we are not aware whether Liquidshares attends to necessary corporate formalities such as providing authorization for the creation of each Series and commencing private placements through written member (or manager) consents.

[9] We have assumed that Linqto has instituted a 100 investor threshold for purposes of Liquidshares Offerings made under Rule 506(c) in order to preserve the Section 3(c)(1) exclusion under the Investment Company Act.

[10] Note to Linqto: It is unclear what "SPV #2 Held by Liquidshares under Issuer Exemption" means in the Transaction Flow Chart.

determined that one who *participates* in securities transactions "at key points in the chain of distribution" has "effected transactions" in securities.

However, depending upon the facts and circumstances, the receipt of transaction-based compensation (e.g., commissions) coupled with other activity indicative of being 'engaged in the business,' has led to a determination that registration as a broker is required. For example, the SEC has stated that, "the federal securities laws require that an individual who solicits investments in return for transaction-based compensation be registered as a broker."[11] Perhaps the key considerations for determining whether one is acting as a broker, and thus required to register accordingly, is the receipt of transaction-based compensation. One court has stated, "transaction-based compensation is the hallmark of a salesman."[12]

Given Linqto Parent's investor solicitation and Private Securities financing activities as well as Liquidshares' regular and continuous facilitation of the Series Membership Interest offerings[13] and its continued imposition of significant Markups in connection therewith, there is a high likelihood that the SEC would view the activities of each of these entities as constituting broker-dealer activity, subject to the registration requirements of Section 15(a) of the Exchange Act.[14]

### b. *Excessive Markups*

#### i. *Liquidshares Historical Activity*

Based on the facts outlined in Section III, we understand that Markups regularly equal or exceed 20 – 50% of the underlying value of the Private Company securities ("Markups"). We further understand that neither the basis of the Markups nor the amount of Markups are disclosed to investors.[15] These facts present significant regulatory issues and risks as it relates to potential violations of Section 10(b) of the Exchange Act, Rule 10b-5, as well as Section 17(a) of the Securities Act.

Rule 10b-5 states that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of ay national securities exchange:

---

[11] Securities Exchange Act Release No. 69091 (Mar. 8, 2013); Securities Exchange Act Release No. 69090 (Mar. 8, 2013).

[12] *SEC v. Kramer*, 778 F.Supp.2d 1320, 1334 (M.D. Fla., 2011).

[13] Note to Linqto: It is not clear how the Private Securities financing arrangements work, including how the 'interest' on such financings are calculated, etc. Subject to a full understanding of the underlying facts, Linqto Parent's participation in sourcing Private Securities and earning interest on loans made to each Series could certainly be viewed by the SEC as unregistered broker-dealer activity given, among other things, that it appears that Linqto Parent is paid compensation in connection with the size and occurrence of the Liquidshares Offerings owing to the fact that the loan principal and interest can only be paid upon successful closing of the relevant Liquidshares Offering.

[14] While not explicitly addressed in this memorandum, we understand that Liquidshares may also be performing certain 'buy-back' functions on the ATS – i.e., standing as the buyer of last resort for holders of Series Membership Interests looking to sell their positions. This type of dealer-like activity puts additional pressure on the unregistered broker-dealer analysis detailed herein.

[15] Linqto states in its FAQ section that the Series Membership Interests are sold with a reasonable markup.

(a) To employ any device, scheme, or artifice to defraud,[16]

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.[17]

Similarly, Section 17(a) of the Securities Act makes it unlawful for any person in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(1) To employ any device, scheme, or artifice to defraud, or

(2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.[18]

As a preliminary matter, the SEC generally views markups in excess of 10% of the prevailing market price of a security to be fraudulent, even in the sale of low-priced securities.[19] Liquidshares acquires underlying Private Securities at the Initial Purchase Price. Despite the fact that the Private Securities are not traded on public markets (and therefore a clearly identifiable 'market' price is not discoverable), regulators will likely view the Initial Purchase Price as the prevailing market price for the underlying Private Securities. For this reason, it is highly likely that the SEC would view Linqto's consistent charging of Markups to constitute violations of Rule 10b-5(a) and (c) as well as Section 17(a)(1) and (3) of the Securities Act. Further, given that Markups do not appear to be disclosed to investors, we believe it is also likely that the SEC would view these activities as violations of Rule 10b-5(b) and Section 17(a)(2) of the Securities Act. This is based on the fact that the SEC and courts have consistently held that under Sec. 10(b) of the Exchange Act, a broker-dealer (as a seller of securities) has the duty to disclose the details of a markup if the markup is excessive.[20]

---

[16] To establish a claim of fraud, it must be established that the defendant acted with scienter, which generally means acting with the actual intent to defraud or with recklessness. While there is no definitive definition of what constitutes recklessness, the Second Circuit has held that a failure to review or check information that a defendant had a duty to monitor, or ignored obvious signs of fraud, will demonstrate that the defendant acted recklessly. See *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).
[17] 17 CFR § 240.10b-5.
[18] 15 U.S. Code § 77q.
[19] *See* Sec. & Exch. Comm'n, Initial Decision, *In the Matter of James E. Ryan* (Apr. 5, 1982).
[20] See *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1034 (4th Cir. 1997); Sec. & Exch. Comm'n,

11. *Future Linqto Capital Activity*

If Linqto were to adjust its offering such that Markups were instead charged by Linqto Capital, significant adjustments would need to be made in order for Linqto Capital to satisfy its regulatory obligations. Under FINRA Rule 2121 ("Rule 2121"), broker-dealers are required to buy or sell securities at fair prices, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expenses involved, and the fact that the broker-dealer is entitled to a profit. Although there is no bright line rule on what constitutes fair markups or spreads, FINRA generally determines a markup is a violation of FINRA Rules 2010[21], 2020[22], and 2121 if a broker-dealer enters into a transaction with a customer if the price is not reasonably related to the current market price of the security. Historically, FINRA has applied the "5% Policy" as a guide to determine fairness.[23]

FINRA has historically taken the position that markups in excess of 5% of the prevailing market price are presumed excessive. It is important to note, however, that pursuant to the 5% Policy, markups of less than 5% can also be deemed excessive depending on the application of the relevant analytical factors (see below) to the facts and circumstances at hand. Firms must always be prepared to justify the reasonableness of the markups they charge, particularly if markups approach or exceed 5%.[24] To establish a finding of excessive markups, regulators must first determine the prevailing market price for the securities and then whether the markup was excessive.[25] As cited by FINRA in an enforcement action: "When a dealer is not a market maker, and absent countervailing evidence, the SEC has announced that: 'a dealer's contemporaneous cost is the best evidence of the current market. That standard, which has received judicial approval, reflects the fact that prices paid for a security by a dealer in actual transactions closely related in time to his retail sales are normally a highly reliable indication of prevailing market price.'"[26]

As indicated above, FINRA will likely view the Initial Purchase Price as the prevailing market price for the underlying Private Securities. Presuming that the Initial Purchase Price is determined to be the prevailing market price, we next determine whether the price per Series Membership Interest is excessively marked up in relation to the Initial Purchase Price of the

---

Commission Opinion, *Andrew Gonchar*, Release No. 60506 (Aug. 14, 2009). Sec. & Exch. Comm'n, *In re Lazard Freres*, Securities Act Release No. 41318 (April 21, 1999); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184 (2d Cir. 1998); *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031 (3d Cir. 1987); *Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc.*, 959 F.2d 606 (6th Cir. 1992).

[21] FINRA Rule 2010: A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade.

[22] FINRA Rule 2020: No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance.

[23] While the 5% Policy is a guide rather than a rule, FINRA has historically enforced the 5% Policy as if it were a rule. Despite its name, the 5% Policy should not be interpreted to mean that markups below 5% are acceptable – rather, FINRA has previously determined markups above and below 5% to be excessive pursuant to the 5% Policy. See FINRA, Disciplinary Decision, In re Robert N. Drake, Jul. 25, 2013.

[24] *See* Notice to Members 92-16; *See also* FINRA Rule 2121 Supplementary Material.

[25] Sec. & Exch. Comm'n, Commission Opinion, *In the Matter of Mark David Anderson*, Release Nos. 33-8265, 34-48352, File No. 3-9499 (Aug. 15, 2003).

[26] FINRA, Disciplinary Decision, *In re Sandlapper Securities, LLC* (Nov. 29, 2018) (citing, *Grandon v. Merrill Lynch & Co.*, 147 F.3d. 184,189 (2d Cir. 1998)).

underlying Private Securities. Currently, Liquidshares sells the Series Membership Interests at a marked-up price based on the Initial Purchase Price, costs to acquire the Private Securities, and presumably to afford some measure of profit to Linqto. Whether such Markups are reasonable is contingent on the facts and circumstances and the following relevant factors:[27]

a. <u>type of security involved</u>: some securities customarily carry a higher markup than others, e.g., direct participation programs compared to sales of common stock;
b. <u>availability of the security in the market</u>: inactive or limited markets may require greater efforts and costs in transacting in these markets, which my bear weight in determining whether a markup is fair;
c. <u>the price of the security</u>: while there is no direct correlation between the percentage of the markup and price, generally, lower priced securities may require more handling and expense and therefore warrant a wider spread;
d. <u>the amount of money involved in a transaction</u>: a transaction that involves a relatively lower amount of money may warrant a higher percentage of markup;
e. <u>disclosure</u>: disclosure itself does not justify a commission or markup which is unfair or excess in light of all other circumstances; however, it is an important factor in determining fairness;[28]
f. <u>pattern of mark-ups</u>: each transaction is independently tested as to fairness; however, FINRA will consider a pattern of a broker-dealer's markups in a fairness analysis; and
g. <u>the nature of the member's business</u>: the cost of providing services to customers may be considered in determining the fairness of a broker-dealer's markups.

In light of the relevant factors described above, it would be difficult to justify Markups on Private Securities in excess of 5%. Therefore, in the event Linqto adjusts its offering such that Linqto Capital charges a Markup, instead of Liquidshares, it is recommended that Linqto Capital significantly reduce the value of the Markups in light of FINRA's 5% Policy and the relevant factors described above.

   c. *Integration Doctrine*

There are <u>two separate and distinct</u>, albeit analogous, integration doctrines applicable to the material facts described in Section III. First, under the Securities Act, the integration doctrine provides an analytical framework for determining whether one or more securities offerings should be considered as part of the same continuous offering.[29] Depending on the facts and circumstances, a determination that multiple securities offerings should be integrated can result in violations of Section 12(g) of the Exchange Act for failure to appropriately register the integrated offering. Second, under the Investment Company Act, the integration doctrine provides a framework for the SEC to determine whether separate issuers, in light of the

---

[27] See FINRA (formerly NASD) Notice to Members 92-16.
[28] FINRA has viewed non-disclosure of excessive markups to be a violation of FINRA Rule 2010. See also, Sec. & Exch. Comm'n, Opinion of the Commission, *In re Newport Coast Securities, Inc.* (Oct. 17, 2016).
[29] On November 2, 2020, the SEC released a final rule adopting new Rule 152 and other amendments to rules of the Securities Act (the "<u>2020 Final Rule</u>"); See Sec. & Exch. Comm'n, Release Nos. 33-10884, *Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to Capital in Private Markets* (Nov. 2, 2020).

economic reality, are actually a single issuer. Depending on the facts and circumstances, if a determination is made that multiple issuers constitute a single issuer for purposes of the Investment Company Act, such integrated issuer may constitute an investment company without having appropriately registered as such under Section 7(a) of the Investment Company Act. As discussed below, as it relates to Linqto, it is likely that the SEC would integrate multiple Series offerings <u>both</u> as it relates to the Securities Act as well as the Investment Company Act.

### d. *Securities Act Integration - Rule 152*

The integration doctrine, as more fully described in the 2020 Final Rule, seeks to prevent an issuer from improperly avoiding registration by <u>artificially dividing</u> a single offering into multiple offerings such that Securities Act exemptions would apply to the multiple offerings that would not be available for the combined offering. In determining whether two or more offerings are to be treated as one for the purpose of registration or qualifying for an exemption from registration under the Securities Act, offers and sales will not be integrated if, based on the particular facts and circumstances, the issuer can establish that each offering either complies with the registration requirements of the Securities Act, or that an exemption from registration is available for the particular offering.[30] Of significance, the introductory paragraph of Rule 152, states that one or more offerings, although in technical compliance with the rule, may not avoid integration if the offerings are part of a plan or scheme to evade the registration requirements of the Securities Act.

Subject to the language of Rule 152's introductory paragraph, under Rule 152(b), there are four non-exclusive safe harbors from integration:

   i. Offerings made more than 30 days before the commencement of any other offering, provided that if such an offering prohibits general solicitation and follows an offering that permits general solicitation, the issuer has a reasonable belief that purchasers were not solicited through the use of general solicitation or the issuer (or agents acting on behalf of the issuer) established a substantive relationship prior to the commencement of the offering that prohibits general solicitation;
   ii. Offerings made in compliance with Rule 701, pursuant to an employee benefit plan or in compliance with Regulation S;
   iii. Offerings for which a registration statement has been filed if it is made after: (1) the completion of an exempt offering that prohibits general solicitation; (2) an offering that is made only to qualified institutional buyers and institutional accredited investors if general solicitation is permitted; or (3) an offering for which general solicitation is permitted that is completed 30 days prior to the commencement of the registered offering; or
   iv. Offerings made in reliance on an exemption that permits general solicitation if made subsequent to any completed offering.[31]

---

[30] 17 CFR § 230.152(a).
[31] Under Rule 152(b)(4) there is no 30-day waiting period; however, this is assuming that two or more Rule 506(c) offerings are subsequently offered after the closing/completion of the preceding Rule 506(c) offering.

In addition, a threshold question is whether each Series constitutes a separate issuer and thus an integration analysis is **not** required. The SEC has provided limited guidance as to whether one or more issuers should be integrated as a single issuer in a continuous offering.[32] However, if one or more issuers have a single plan of financing for the same general purpose, the SEC has determined that integration would be appropriate.[33] Additionally, the SEC has previously taken the position that integration, as it relates to the Securities Act, can be appropriate when the securities of separate issuers are not materially different to a reasonable investor qualified to purchase both.[34]

Applied to the facts here, Series Membership Interests in 'Ripple '1 and 'Ripple 2' provide essentially the same economic rights. While the purchase price may be different for each Series, the underlying Private Securities are the same and the fund mechanics are materially identical. To illustrate further, there is no material difference if, notwithstanding the limitations of the Securities Act and the Investment Company Act, the Series Membership Interests were offered by a single issuer versus multiple Series. Therefore, for the Series that offer Series Membership Interests to provide economic exposure in the same Private Securities (e.g., Ripple 1, Ripple 2, etc.), the SEC will likely view all applicable Series as a single issuer because the multiple Series and Series Membership Interests are not materially distinguishable.[35]

If all related Series are considered a single issuer, the question of whether each Series offering should be integrated as a single offering remains. However, there are two safe harbors from integration available under Rule 152(b)(1) and Rule 152(b)(4) which are relevant to Liquidshares, each of which are detailed below.

i. *Rule 152(b)(1)*

Under Rule 152(b)(1), any offering made <u>more than 30 calendar days before the commencement</u>[36] of any other offering, or <u>more than 30 calendar days after the termination or completion</u>[37] <u>of any other offering</u>, will not be integrated with such other offering.

---

[32] *Id.*; See JEG Partners.
[33] *See* Sec. & Exch. Comm'n, No-Action Letter, *JIC Drilling Companies* (Sep. 23, 1976) (the SEC finding that although the two limited partnerships had separate books and records and maintained separate bank accounts as separate legal entities, integration is appropriate because the single plan of financing was to develop the oil and gas leasehold interests owned by the parent company).
[34] Sec. & Exch. Comm'n, No-Action Letter, PBT Covered Option Fund (Feb. 17, 1979) (The SEC determined that because the PBT funds had the same investment objectives, the same types of portfolio securities, and similar risk/return characteristics, a reasonable investor would not consider one partnership materially different from another, thus making it appropriate to integrate the separate funds. The SEC took a similar approach in *Frontier*, finding that separate funds should be integrated because they were not materially distinguishable.).
[35] The SEC has historically declined to articulate a bright line rule as to when one or more issuers should be integrated as a single issuer because the requisite facts for such a determination are more readily available to the issuers and counsel, as opposed to the SEC who is not in a position to ascertain or verify the relevant facts and circumstances (*See* Sec. & Exch. Comm'n, No-Action Letter, *JEG Partners* (Oct. 15, 1975) ("JEG Partners"); Sec. & Exch. Comm'n, No-Action Letter, *Amarex Private Drilling Program, Ltd* (Apr 14, 1977); Sec & Exch Comm'n, No-Action Letter, *Frontier Capital Management Company, Inc.* (Jul. 13, 1989) ("Frontier")).
[36] Rule 152(c) defines "commencement" as the time of the first offer of securities in the offering by the issuer or its agents and provides a non-exclusive list of factors to be considered in determining when an offering is deemed to be commenced. *See* 17 CFR § 230.152(c).
[37] Rule 152(d) defines "termination" or "completion" as when the issuer and its agents cease efforts to make further

[38] It does not appear that Liquidshares instituted any such timing restraints with respect to the Series made available through its platform. Based on our understanding of the facts, it appears that investments in Series with respect to the same underlying Private Companies were offered either concurrently, or immediately after one another.

Further, in order to rely on Rule 152(b)(1) and avoid integration, all marketing activities and sales of securities under a Liquidshares Offering relying on Rule 506(c) must cease at least 30 days prior to the first offer made pursuant to a subsequent Liquidshares Offering relying on Rule 506(b). Unfortunately, it does not appear that Liquidshares Offerings relying on Rule 506(b) were made 30 calendar days after the termination of a prior offering relying on Rule 506(c). In which case, the Rule 152(b)(1) safe harbor would not be available for purposes of such offerings if Liquidshares cannot demonstrate it complied with the rules against general solicitation and whether it had pre-existing substantive relationships with investors in the Rule 506(b) offering.

It appears that Linqto established relationships with Non-Accredited Investors through unconventional means, e.g., Non-Accredited Investors who are initially introduced to Linqto and the Platform through the marketing efforts in connection with the 506(c) offerings but were unable to be verified as Accredited Investors. In the 2020 Final Rule, the SEC made it clear in a footnote that, "**an issuer may not conduct a Rule 506(c) general solicitation in order to identify potential investors for the Rule 506(b) offering.**"[39] In such instances, the proposed 506(b) offering may be deemed "commenced" at the time of the general solicitation for the Rule 506(c) offering under Rule 152(c), making Rule 152(b)(1) unavailable as a safe harbor. Additionally, we are not aware of any procedures or steps Linqto takes to evaluate information collected from investors during the onboarding process, if at all. Even if Liquidshares can demonstrate pre-existing relationships existed, it is unclear whether these relationships were substantive. The SEC generally takes the position that a "substantive" relationship exists if the issuer (or an agent acting on its behalf) has sufficient information to evaluate, and does, in fact, evaluate, a prospective offeree's financial circumstances and sophistication.[40] We are unaware whether Linqto/Liquidshares took steps to evaluate a prospective offeree's financial circumstances and sophistication. As a result, Linqto will likely not be able to rely on the safe harbor provided under Rule 152(b)(1).

In relation to Rule 152(b)(1), in the 2020 Final Rule, the SEC also adopted amendments to Rule 506(b) adding a condition that there may be no more than 35 purchasers of securities from the issuer under 506(b) in any 90-day calendar period.[41]

Please refer to the below for a summary of the Rule 152(b)(1) safe harbor and Rule 506(b)(2) as it may apply to Liquidshares Offerings:

- A Rule 506(b) offering cannot follow a Rule 506(c) offering, unless the following conditions are met:

---

offers to sell the issuer's securities under such offering and provides a non-exclusive list of factors to be considered in determining when an offering is deemed to be terminated. *See* 17 CFR § 230.152(d).

[38] *See* 17 CFR § 230.152(b)(1).
[39] See footnote 75 of Sec. & Exch. Comm'n, Release Nos. 33-10884 (Nov. 2, 2020).
[40] See Sec. & Exch. Comm'n, No-Action Letter, *Citizen VC, Inc.* (Aug. 6, 2015).
[41] See Rule 506(b)(2)(i).

- o The issuer (or its agents) has reasonable belief that the investors in the Rule 506(b) offering were not solicited through general solicitation.
- o The issuer (or its agents) has pre-existing substantive relationships with the investors in the Rule 506(b) offering.
- A Rule 506(b) offering that sells to the maximum number of 35 Non-Accredited Investors cannot be followed by another Rule 506(b) offering that sells to Non-Accredited Investors within a 90-day period.

### ii. *Rule 152(b)(4)*

In order for Linqto to rely on the safe harbor provided under Rule 152(b)(4), Liquidshares must have <u>only</u> relied on Rule 506(c) or any other exemption[42] from registration under the Securities Act that permits general solicitation. Unlike Rule 152(b)(1), Rule 152(b)(4) does not have a 30-day waiting period; instead, a subsequent offering (that permits general solicitation) must simply be commenced <u>only after the preceding offering is complete</u>. It is our understanding that prior to September 14, 2023, Linqto only offered Series Membership Interests to Accredited Investors relying on Rule 506(c). However, it is unclear whether Liquidshares historically commenced offerings with respect to the same underlying Private Securities only after prior offerings had terminated, pursuant to the requirements of Rule 152(c) and (d), or if multiple Series were offered concurrently. If the latter, Liquidshares would <u>not</u> be able to rely on the Rule 152(b)(4) safe harbor for purposes of such offerings.

Please refer to the below for a summary of the Rule 152(b)(4) safe harbor as it may apply to Liquidshares Offerings:

- A Rule 506(c) offering may follow a completed/terminated Rule 506(c) offering.
- A Rule 506(c) offering may follow a completed/terminated Rule 506(b) offering.
- A Rule 506(b) offering may follow a completed/terminated Rule 506(b) offering.
- A Rule 506(b) offering may <u>not</u> follow a completed/terminated Rule 506(c) offering, unless in compliance with Rule 152(b)(1).

In consideration of the above, for all Liquidshares Offerings made prior to September 14, 2023 with respect to the same underlying Private Securities in reliance on Rule 506(c), the Rule 152(b)(4) safe harbor is potentially (albeit unlikely) available owing to the preamble language of Rule 152, which is discussed further below.

### iii. *The Rule 152 Preamble*

The preamble of Rule 152 explicitly states that, <u>even in instances where offerings are made in technical compliance with a particular safe harbor</u>, the safe harbors will <u>not</u> be available if the offerings are part of a plan or scheme to evade the registration requirements of the Securities Act. As discussed below, we believe it is likely that the SEC would view some meaningful portion of the Liquidshares Offerings that relate to the same underlying Private Securities as a plan or scheme to evade the registration requirements of the Securities Act, in which case each

---

[42] e.g., Regulation Crowdfunding and Regulation A.

of the safe harbors would not be available to Liquidshares and relevant Liquidshares Offerings would be integrated.

The question is whether the Liquidshares Offerings could be viewed as part of a plan or scheme to evade the registration requirements under the Securities Act. Whether in the context of the integration doctrine under the Securities Act or the Exchange Act, the SEC has generally viewed two or more offerings as integrated if investor distinctions are artificial, arbitrary, or immaterial.[43] Additionally, SEC staff has previously taken the position that where two or more funds are intended for the same class of investors and have similar structural and operational characteristics, the differences in investment objectives, portfolio composition, and expected levels of risk and return on investment, will be used to evaluate the material differences between the funds.[44]

On its face, each Series appears to be divided to accommodate the investor limitations under the Investment Company Act (further discussed in Section IV.e. below). As a result, there is a significant likelihood that the SEC will view this as an artificial division of investors to avoid registration requirements under the Securities Act and the Investment Company Act. We note that each Liquidshares Offering may have different purchase prices and may be offered at different times due to inventory availability.[45] Despite these differences, the underlying investment objective and investment strategy are the same for each Series, i.e., long-term capital appreciation for pre-IPO private securities. In another matter, the SEC denied no-action relief to a fund manager that created three funds with cosmetically separate investment strategies.[46] The SEC did not agree that the funds were materially different, finding that the funds shared the same investment objective of long-term capital appreciation through a portfolio comprised primarily of common stock.

Put simply, if an investor invests into 'Series 1' and another investor invests in 'Series 2,' if there are no material differences between the investments, Series 1 and Series 2 will likely be viewed as a single offering and unable to rely on the integration safe harbors provided under Rule 152(b). If the risk/return characteristics differed and the investment strategies between each Series were different, there would be a stronger argument that the Series are materially different.[47] For example, if Series 1's investment strategy is to gain capital appreciation through long-term appreciation of securities growth and Series 2's investment strategy is to position the fund for event-driven appreciation, the two Series could argue that the investment programs are materially different. However, given that the underlying Private Securities are all similar and/or identical pre-IPO Private Securities, this argument is difficult to demonstrate in the context of the Liquidshares Offerings.

  e. *Investment Company Act Considerations*

---

[43] Sec. & Exch. Comm'n, No-Action Letter, *Rogers, Casey & Associates, Inc.* (Jun. 16, 1989) ("Rogers").

[44] Sec. & Exch. Comm'n, No-Action Letter, *Shoreline Fund, L.P.* (Apr. 11, 1994) ("Shoreline"). Although the Rogers and Shoreline no-action letters contemplate integration under the Exchange Act, the SEC has generally treated integration issues under the Securities Act in a similar manner; See *Frontier*.

[45] Note to Linqto: We are not aware whether there are different fund mechanics under each Series and have assumed they are materially identical.

[46] Sec. & Exch. Comm'n, No-Action Letter, *Frontier Capital Management Company, Inc.* (Jul. 13, 1988).

[47] Sec. & Exch. Comm'n, No-Action Letter, *Meadow Lane Associates* (May 24, 1989).

Section 3(c)(1) of the Investment Company Act ("Section 3(c)(1)") excludes from the statutory definition of "investment company" a fund whose securities are beneficially owned by not more than 100 persons.[48] Under the integration doctrine, the SEC may, depending on the facts and circumstances, deem two or more apparently separate Section 3(c)(1) funds as a single integrated entity. If two integrated funds together have more than 100 beneficial owners, neither fund could claim the Section 3(c)(1) exclusion, and therefore would be required to register under the Investment Company Act, provided another exception is unavailable. In determining whether it is appropriate to integrate two separate funds with respect to the Investment Company Act, the SEC has stated that the integration doctrine allows the SEC to "look behind ostensibly separate issues, issuers, or transactions to determine if, in economic reality, they are actually a single issue, issuer, or transaction."[49] Based on our analysis below, we believe it is likely that the SEC would integrate a meaningful portion of the Series offerings, which would result in the Series no longer being able to claim the Section 3(c)(1) exclusion from investment company registration.

The SEC has provided limited guidance on integration involving investment companies; however, the prevailing guidance is based on a series of no-action letters[50] providing relief for funds that successfully demonstrated significant differences between individual Section 3(c)(1) funds. In Shoreline, SEC staff (the "Staff") noted that several factors are considered in determining whether integration is appropriate in the context of the investment company act and funds relying on Section 3(c)(1) thereof. Generally, integration is <u>required</u> if a reasonable purchaser would view an interest in one offering as not materially different from another.[51] To assess whether two offerings materially differ, the Staff generally focuses on whether there are distinguishing characteristics of the funds' investments and investment strategies. For example, in Shoreline, although the two funds in question had substantially the same portfolio, the two funds were deemed separate for legitimate purposes because each fund targeted two distinct groups of investors due to differing tax treatment (foreign v. domestic investors).

As it relates to Liquidshares, although some Series may be distinct in that the underlying Private Securities differ, the various Series with the same underlying Private Securities will likely <u>not</u> be viewed as materially different from one another. Additionally, a reasonable investor would likely not differentiate the different Series as separate investments if the underlying Private Securities are the same. For this reason, it is highly likely that the SEC would integrate each Series that has the same underlying Private Securities. This determination would have serious and significant regulatory implications for Linqto's business. Specifically, with over 164 Series created with Ripple Labs Inc. Private Securities underlying each Series, the SEC would likely view each of these Series as part of the same issuance. Therefore, each Series would no longer be able to avail itself of the Section 3(c)(1) exclusion from the definition of "investment company," and Liquidshares would likely be found to have violated the Exchange Act for failing to appropriately register as an investment company under Section 12(g).[52]

---

[48] See 15 U.S. Code § 80a–3(c)(1).
[49] Sec. & Exch. Comm'n, No-Action Letter, Joseph H. Moss (Feb. 27, 1994); Sec. & Exch. Comm'n, No-Action Letter, Santa Barbara Securities (April 8, 1983).
[50] *Id; See also* fn 12.
[51] *Id.*
[52] We note that there appear to be approximately 6,497 investors who have purchased Series Membership Interests in Ripple-related Series.

### f. *Special Purpose Vehicles*

There are a number of fundamental structural and disclosure-driven shortcomings when it comes to each of the relevant Series. Among other things, each Series does not appear to (1) adequately disclose the fact that the underlying Private Securities are being sold to investors pursuant to a significant Markup, (2) adequately detail or contemplate the actual ownership structure of the underlying Private Securities; or (3) respect the corporate formalities in establishing new Series and authorizing each respective Liquidshares Offering (collectively, the "Series Deficiencies"). It is worth highlighting that in a 2022 lawsuit brought by the SEC against Straightpath Venture Partners LLC, et al., ("Straightpath")[53] that presented similar facts, the SEC alleged that the defendants engaged in fraudulent activity owing to the fact that the investment vehicles in question did not own the private company stock the defendants claimed they did, investors were subject to and paid undisclosed fees, and fund assets and the defendants' assets were commingled.[54] Owing to these significant regulatory deficiencies, the SEC alleged that Straightpath had engaged in fraudulent activity in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.

With respect to the corporate formalities observed by Liquidshares, the Delaware Limited Liability Company Act requires that in order to establish a segregated series, Liquidshares must maintain proper books and records and accounting for the assets and liabilities of each Series on a separate basis.[55] Although the SEC has issued limited guidance on this particular issue, without observing corporate formalities, there is risk that the separation of assets and liabilities of each Series will be broken, weakening the assertion that each Series is separate and distinct from any other Series. As a result, Liquidshares should observe corporate formalities to properly establish a Series as separate and distinct from other Series of Liquidshares.

In addition to the Series Deficiencies described above, the loans received by each Series from Linqto Parent impose additional risks. The loans themselves, as well as relevant additional details, are not captured in the offering documents. The lack of disclosure regarding the existence of the loans and the associated interest owed to Linqto Parent would likely be viewed as an omission of a material fact in the Liquidshares Offerings because it, among other things, affects the price per Series Membership Interest. Furthermore, depending on the nature and the amount of the loans and associated interest earned by Linqto Parent, these activities may give rise to lending regulatory considerations as well as potential unregistered broker-dealer activity determinations.

### i. *Markups*

Whether an investor is obtaining indirect exposure to a Private Security at a significant Markup is a material fact relevant to their investment decision and ability to adequately assess the material facts associated with the offering. As indicated in Section IV.b., it is highly likely that the SEC would view Linqto's charging of Markups without adequate disclosure to investors as, at a minimum, constituting violations of Rule 10b-5(b) as well as Section 17(a)(2) of the

---

[53] *Sec. & Exch. Comm'n v. Straightpath Venture Partners LLC, et. al.*, Docket No. 1:22-cv-03897 (S.D.N.Y. 2023) ("Straightpath").
[54] It is noted that the case is still ongoing.
[55] Del. Code, Tit. 6, § 18-215(b).

Securities Act. Given the SEC's particular sensitivity to excessive markups, it is also likely that the SEC would also view these activities as violating Rule 10b-5(a) and (c), as well as Section 17(a)(1) and (3) of the Securities Act.

As indicated in Section IV.b., we recommend that, at a minimum, Linqto adjust its Markup methodology such that (1) Markups are charged by Linqto Capital, and (2) the Markups are reduced to be consistent with FINRA's '5% Policy.'

### ii. Private Securities Ownership

As discussed above, Linqto has presented that each Series purchases Private Securities and the Private Company's books and records reflect the applicable Series as the record holder of the Private Securities. However, it is unclear, whether this is in fact the case, and whether the Series truly "own" the Private Securities, given that Linqto, among other things, sources the Private Securities in large quantities.[56] The offering documents do not appear to adequately contemplate the provision of economic exposure to the underlying Private Securities, whether by virtue of a participation arrangement or any other appropriate structure. Further, while Linqto has indicated that, for certain Series, Millenium Trust has been engaged by Liquidshares to perform certain 'custody' functions – it is not clear exactly how, why or what Millenium Trust is in fact custodying. Regardless, Millenium Trust and its associated activities are not disclosed to Series investors.

Similar to the position that the SEC took with respect to Straightpath, it is very possible that the SEC would, at a minimum, view the ambiguous ownership structure of the Private Securities and the lack of adequate disclosure within the Series offering documents as fraudulent misrepresentations in violation of Rule 10b-5(b) as well as Section 17(a)(2) of the Securities Act.

Based on our current understanding of the relevant facts, we recommend that (1) the ownership structure be rectified such that each Series is either the direct holder and owner of the underlying Private Securities, or relevant participation or other documentation be put in place providing the Series a clear, contractual right to the Private Securities or their economic equivalent; and (2) the relevant Series offering documents be updated to include clear, robust, and expansive disclosures outlining the mechanics (and associated risks) of the Private Securities ownership structure.

### g. Form D and Blue Sky Filings

Limited guidance is available regarding whether an individual series of a series LLC is required to file a Form D in the name of the series or if the master series LLC may file a Form D on behalf of the series. Securities Act Rule 500 requires every <u>issuer</u> to file a Form D within 15 calendar days of the first sale of securities in a particular offering.[57] An issuer is not required to

---

[56] Note to Linqto: As noted above, it appears that Linqto purchases and/or sources large quantities of the Private Securities and sells the Series Membership Interests in smaller quantities to investors. Although Linqto has previously indicated that each Series holds the Private Securities in its own name, there are several inconsistencies in Linqto's materials provided to us as well as on Linqto's FAQ section on its website. In the event Linqto does indeed purchase the Private Securities through Liquidshares or any other entity and subsequently transfers the economics to each Series, the offering documents should disclose the actual terms and mechanics of the transaction(s).

[57] See 17 CFR § 239.500.

update the sales figures, but instead only amend the Form D if there are material changes to the previously filed Form D (e.g., use of a broker-dealer or if the offering is expected to exceed one year).

Failure to properly file Form D filings and state blue sky filing notices have significant repercussions. Under Rule 506(d), the exemptions under Rule 506 are rendered unavailable if any issuer, affiliated issuer, director, executive officer, managing member, promoter, and other individuals with a similar position, are subject to any of the enumerated bad actor disqualifications described therein. The fact that Liquidshares files a Form D in its own name, and not in the name of each Series, contravenes the position that each Series is a separate and distinct offering. Given the facts, it is very possible that the SEC or a state regulator could find that the Series failed to properly make their Form D filings or any associated state blue sky filing notice.

Therefore, it is recommended that Liquidshares obtains a CIK number for each Series and file a separate Form D under the CIK number dedicated to the given Series. Similarly, each Series should file applicable state blue sky filing notices under its dedicated CIK number.

## V. **Mitigatory and Remedial Actions**[58]

To summarize the previously detailed remedial measures, we recommend that Linqto: (1) immediately cease charging Markups and/or facilitate reduced Markups through Linqto Capital in an amount and manner consistent with FINRA Rule 2121 and FINRA Rule 2010, (2) immediately terminate all pending Rule 506(b) offerings to Non-Accredited Investors and cease any future 506(b) offerings;[59] (3) remediate the Series Deficiencies through revised offering documentation and disclosure in connection with future offerings,; and (4) adjust its Form D filing methodology.

In addition, with respect to the Rule 506(b) offerings that have already closed (and potentially with respect to certain existing 506(c) offerings), Linqto should contemplate whether, with respect to each applicable Series, a recission offering or dissolution is appropriate given the significant repercussions of non-compliance with the Securities Act.

A rescission offering is an offer from the issuer to repurchase previously sold securities <u>and</u> an offer to re-sell the security again.[60] Rescission offerings must be done in compliance with the Securities Act, which may require registration with the SEC or otherwise satisfying available exemptions from registration. If a rescission offering is made under the same exemption as the

---

[58] We have highlighted the immediate mitigatory and remedial actions applicable here; however, we note that Linqto should consider all the recommendations described in this memorandum.
[59] In the event Linqto seeks to continue to offer Series Membership Interests relying on Rule 506(b), the issuer is required under Rule 506(b) and Rule 502(b)(2) to provide non-accredited investors robust disclosures of the same kind as required in Part I of a registration statement. The offering documents we have reviewed fall short of this requirement and would need to be significantly revised/updated to comply with Rule 506(b).
[60] *See Meyers v. C&M Petroleum Producers, Inc.*, 476 F.2d 427 (5th Cir. 1973), cert. denied, 414 U.S. 829 (1973). The Court here held that the unregistered rescission offer, despite being an effort to cure in accordance with state law, violated the registration requirements under the Securities Act.

initial offering, despite an attempt to cure the initial offering's non-compliance, a second violation of the U.S. securities laws may occur. Additionally, a rescission offer is typically carried out in accordance with state law. Each state has its own set of securities laws and generally set forth procedures for a rescission offer, including the imposition of statutory interest[61] along with the rescission price.[62]

In lieu of a rescission offer, Liquidshares may also consider whether it is appropriate to dissolve each Series that may have potentially violated securities laws. As provided in Liquidshares' limited liability company agreement (the "Series LLC Agreement"), the managing member of Liquidshares is expressly authorized to take any action it has determined in good faith to be necessary, desirable, or appropriate in order that Liquidshares is not in violation of the Investment Company Act and any other material law or regulation. Under the Series LLC Agreement, such actions include terminating or dissolving any member's interest in Liquidshares or otherwise causing the full or partial withdrawal of any member from Liquidshares.[63] While making Series members "whole" is not an explicit requirement, providing a return of investment may mitigate civil litigation risks.

The benefits and consequences of a rescission offer or a dissolution of the applicable Series are different. A rescission offer provides an avenue for Liquidshares to retroactively correct securities violations and provide proper disclosures and investor protections the Securities Act and related acts intend to provide. However, the upfront cost to compliantly offer a rescission offer is generally higher than the alternative option of dissolving the affected Series because it likely will require Liquidshares to register with the SEC.[64] However, the benefits of registration include a path forward in compliantly offering Series Membership Interests to Accredited Investors and Non-Accredited Investors. Additionally, under state law, many states prevent investors from commencing actions against the issuer if the rescission offer is rejected by investors.

Whether Liquidshares commences a rescission offer or dissolves the applicable Series, it should be aware of the practical ramifications. In each instance, investors may be dissatisfied, having expected to profit from future increases in the value of the underlying Private Securities. This could expose Liquidshares to potential financial risks. An investor who rejects a rescission offer typically waives the right to bring a private action against the issuer; however, if each applicable Series is dissolved, investors may have potential private causes of action against Liquidshares. To mitigate this risk, when dissolving each Series, Liquidshares should attempt, at a minimum, to ensure investors are returned funds equal to their initial investments.

---

[61] State statutory interests vary, but on average is approximately 5%.
[62] Note that although state law may require certain procedures, compliance with state law does not preempt violations and/or liability under the federal securities laws.
[63] Prior to effecting a dissolution and/or liquidation of a Series, Liquidshares should review whether the applicable "Series Schedule" (as that term is defined in the Series LLC Agreement), requires consent of the Series members.
[64] As a reporting company, Liquidshares would be subject to the initial filing obligations as well as the ongoing and periodic filing requirements.