**Privileged and Confidential**
**Attorney Work Product**

# MEMORANDUM

TO: Bill Sarris, Chief Executive Officer

FROM: Jack Drogin, General Counsel
Jodi Jamison, Deputy General Counsel
Susan Woodard, Chief Compliance Officer

DATE: October 25, 2024 (Draft)

SUBJECT: Outstanding Legal and Regulatory Issues for Linqto

---

Set forth below is a list of current legal and regulatory issues that we each believe must be addressed. The federal securities laws issues must be resolved as soon as practicable, particularly in light of the recent SEC request for information and the likely FINRA enforcement actions. The FINRA issues need to be resolved prior to activating Linqto Capital for sales of Liquidshares SPV units. Because one of the federal securities law issues we have identified is the use of an unlicensed, unsupervised sales force to sell SPV units on behalf of Liquidshares, these issues must therefore be addressed and resolved as soon as practicable as well.

## Federal Securities Laws Issues

### Sales Involving MI Team Must be Made through Broker-Dealer

- Persons, including employees of an issuer, engaged in the business of selling securities generally must register as broker-dealers or be licensed and supervised by a registered broker-dealer
- We have been relying on the "issuer exemption" to the above general rule, to allow sales to be solicited by MI members
- The issuer exemption, however, is generally limited to a part-time function or to "passive" activities (i.e. returning calls, clerical or ministerial tasks), and is not available to persons licensed with a broker-dealer such as our MI team members
- Our MI team therefore needs to conduct their activity through, and be supervised by, Linqto Capital or each member risks being deemed to be acting as unregistered broker-dealer

### Potential Dealer Status of Liquidshares/Undisclosed Markups

- A "dealer" is generally defined as a person engaged in the business of baying and selling securities for its own account

例#12

- Liquidshares buys securities with the intention to resell them promptly to affiliated SPV series at a profit as part of a regular business. This risks the SEC asserting Liquidshares is acting as an unregistered dealer
- If the SEC determines Liquidshares is acting as an unregistered dealer, any undisclosed markups exceeding ten percent would be considered inherently fraudulent
- To avoid being accused of violating the antifraud provisions of the federal securities laws, we therefore should impute the costs of purchase and of operating pools to parent and re-sell securities to individual SPVs at cost (including imputed expenses) to SPVs, and ideally disclose these costs to investors
- This issue can therefore be solved through internal recordkeeping and investor disclosures

*Investment Company Integration Issues

- Investment companies are defined generally as entities, more than 40% of whose assets are comprised securities of unaffiliated entities
- Exception to investment company status includes entities with 100 or fewer investors who purchased in a non-public offering
- We attempt to comply with the exception above by limiting each of our SPVs to 95 or fewer investors and selling SPV units in private placements
- Because many of our SPVs own identical underlying securities, the SEC is likely to integrate multiple SPVs and deem the exception from investment company status unavailable (i.e., determining the SPVs are unregistered investment companies). This may be exacerbated by the fact that our Form D filings all list Liquidshares as the issuer as opposed to each SPV having its own Form D filings
- If we are found to be operating unregistered investment companies, the SEC could cause us to cease doing business in our current form
- Company alternatives are limited, but we need to stop selling additional SPVs owning identical underlying securities unless we can develop a method of materially differentiating between SPV series
- We should consider offering rescission to investors in our more widely-held SPVs classes (e.g., Ripple Labs) – although that likely would not cure issue, it may mitigate potential private or regulatory damages if found to be operating unregistered investment companies

*Compliance with Rule 506(c)

- Liquidshares offers sales of SPV units to accredited investors through private placements under Rule 506(c) of Regulation D

**Privileged and Confidential**
**Attorney Work Product**

- We rely on Rule 506(c) because that rule permits general solicitation of offerings to investors
- Rule 506(c) requires issuers to obtain proof of accredited investor status in order to sell securities in reliance on it
- For the past few months, we have been permitting investors to "self-certify" their accredited investor status rather than requiring investors to provide evidence of accredited investor status
- Failure to comply with Regulation D subjects Liquidshares to the risk of selling unregistered securities, which can result in rescission or regulatory fines
- We need to reinstate the requirement to provide evidence of accredited investor status ASAP, and in any event, it must be done prior to selling SPV units through Linqto Capital

Accreditation of Foreign Investors

- All foreign investors need to go through the same accredited investor verification status as US investors to comply with Reg D requirements.
- Need to determine whether we have any licensing/registration requirements in any foreign jurisdictions based on our sales or solicitation activities in those jurisdictions
- Until we've done that review, we should limit emails to existing members in foreign jurisdictions (replenishing purchases)

AML/KYC/CIP

- SEC/FinCEN AML/KYC requirements are risk-based, but our current practice exposes us to significant regulatory penalties. At minimum, we need to
  - Turn off "autofill" on the Plaid ID verification set up – not compliant with FinCEN requirements and we have identified numerous problems with verification – people should be required to enter their own name and social security number.
  - Turn on AML screening
  - Implement transaction monitoring and suspicious activity reporting
- **Violations of AML/KYC requirements can lead to severe civil or even criminal penalties!**
- The recent TD Bank AML case highlights the need to have adequate AML/KYC procedures in place, and several of the FINRA exam findings for Linqto Capital relate to the AML program

Investment Adviser Status

- Managing Member of Liquidshares may be acting as an unregistered investment adviser in connection with its management of the investments made by Liquidshares

3

**Privileged and Confidential**
**Attorney Work Product**

- We therefore should review our decision to withdraw the investment adviser registration.
- Additionally, some of our marketing communications could be construed as "providing investment advice" which would require a registered investment adviser or would need to be done by Linqto Capital "incidental" to its other business.

<u>Form D Filings</u>

- We currently file Form D filings for each SPV unit as a series of Liquidshares under the same CIK number maintained for Liquidshares with Liquidshares identified as the issuer.
    - This practice has led to increased regulatory scrutiny due to the large number of offerings by a single issuer, and
- Should establish a CIK for each series (and not just have one for Liquidshares) and identify each series as the "Issuer" on the Form D Filings instead of Liquidshares

**FINRA Issues**

Each of the below issues must be satisfactorily addressed prior to Linqto Capital being relied on to offer SPV units of Liquidshares to investors.

<u>Management of Linqto Capital</u>

- Decisions about the operations of the BD must be made by designated, licensed officers
- Unlicensed Linqto employees may not be involved in the day-to-day securities or investment banking activities of Linqto Capital.
- We need to appoint a qualified (Series 24) CEO from the business or provide the current CEO with authority to act on behalf of Linqto Capital, including without limitation supervising MI, and supervising the Investment Committee due diligence process

<u>Review and approval process for retail communications</u>

- FINRA requires all communications to 25 or more retail investors must be reviewed and approved by a Series 24 registered principal (Linqto Capital employee) prior to use
- We therefore need to hire an experienced Series 24 principal to review and approve all marketing communications prior to use – automated tools are not allowed to substitute for a natural person Series 24 principal

<u>Marketing/promotional content</u>

- All marketing communications must comply with FINRA/SEC content standards, including antifraud provisions
- Most such content will be filed with FINRA under the Private Placement offering filings; likely to be referred to FINRA Advertising Regulation
- No high-pressure sales tactics (promotions need to be reduced) are permitted
- Communications must be fair and balanced

**Privileged and Confidential**
**Attorney Work Product**

- Communications cannot be false or misleading
- Blogs (and other similar content) may need to be revised to avoid crossing the line into being considered "research reports", triggering additional licensing and disclosure requirements
- In addition to FINRA requirements, many of Linqto's e-communications may also be subject to the CAN-SPAM Act (and accompanying rule) enforced by the FTC, which has similar content requirements as FINRA rules as well as prescriptive disclosure requirements. Each separate violation of the CAN-SPAM Act is subject to penalties up to $51,744

Customer Complaints

- Linqto Capital must file with FINRA written complaints received from customers (including prospective customers); this will likely create a pattern of sales practice, high pressure sales tactic, or incomplete disclosures, causing additional regulatory scrutiny
- Providing forums (like Discord or Telegram) for customers to engage requires the firm to monitor for complaints and treat each as a written complaint, subject to filing. If we continue to maintain and manage these forums, they must be archived as written correspondence and supervised. The costs and risks associated with maintaining these forums are high

Regulation Best Interest

- Any communications that include a "recommendation" must comply with Reg BI
- Reg BI requires that recommendations to customers are in the best interest of the customer, based on the information we have collected, including investment experience and resources, and investment objectives
- We therefore cannot send emails to users who have not completed the Investor Profile section of onboarding that includes the suitability information
- We should tailor emails not to cross the line into recommendations that trigger Reg BI until we have built a systematic means to ensure compliance with Reg BI

Privacy/e-marketing compliance

- Opt-in is required for marketing emails in the EU/UK (and possibly other international jurisdictions). Need to cease sending marketing emails to users in international jurisdictions who have not elected to opt-in.
- The "unsubscribe" function was not previously working. We need to make sure we are not sending marketing emails to anyone who has unsubscribed. While Ilias indicates that the unsubscribe function has been fixed, we received a complaint this week indicating that the issue has not been completely resolved

- Privacy compliance is a hot topic for the SEC, FTC, and global regulators. Non-compliance with privacy laws and regulations comes with significant penalties and reputational risk
- We need to discontinue emails to accounts set up from any web scraping activity we conducted in which the user did not seek out our platform to establish an account.
- The CAN-SPAM Act includes a requirement that opt-out requests be honored promptly and as noted above, each separate violation can be costly

Investment Committee/Due Diligence

- Need to firm up the future of the Investment Committee and the approval process for investments. Critical for requirement that broker-dealer conduct due diligence of Liquidshares – which includes doing due diligence of its investment process. Otherwise FINRA would expect the broker-dealer to conduct due diligence of the underlying investments.
- Linqto Capital must conduct and document its due diligence of the Series/SPVs and document BD approval of each Series (each new Portfolio Company and subsequent Transaction Approval/Monitoring
- The BD will be responsible for reviewing transactions for compliance with requirements and suitability
- A BD principal (Compliance) will require transaction reports to sample

Dynamic pricing

- The use of dynamic pricing also raises concerns of being accused of violating the antifraud provisions as well as disclosure issues. Ceasing the use of dynamic pricing and adopting the pricing disclosure mentioned above would help prevent accusations of antifraud violations
- If we retain dynamic pricing, we need more transparency into the pricing methodology, revise subscription agreement for accuracy
- Having a different pricing for buys and sells could be seen as dealer activity

**Additional Risks and Issues**

Use of AI

- Need an AI Use Policy and to adopt a risk governance framework around such use that addresses, among other things, cybersecurity, privacy/confidentiality, contractual compliance with data licenses, intellectual property issues, disclosures, regulatory risks (e.g., compliance with EU AI Act and state laws) and quality control (which includes ongoing monitoring and testing)

**Privileged and Confidential**
**Attorney Work Product**

- Need to be clear about the use case for each deployment of AI and make sure that we have adequate testing for the viability of the tool for such use case and that we can limit its use to the approved use case
- If we are using consumer data, we will need to assess the privacy and confidentiality risks and ensure we're not violating privacy laws
- If people will be able to use an AI tool we deploy to make investment decisions or the AI tool will be used to generate communications we will need to address FINRA and SEC ramifications. FINRA and the SEC are scrutinizing use of AI tools in the industry. FINRA issued an AI report with guidance and the SEC issued a proposal around use by BDs of predictive analytics that gives some insights into their concerns and expectations
- Need to document what data was used to train the model to make sure we are not violating intellectual property rights of third parties or license terms. The risk governance framework should address the requirement to obtain data legally, as data providers are becoming increasingly resistant to use of their data for unlicensed commercial purposes and, for training large language models, in particular

Data Usage

- Need to understand what data we use and how we use it and confirm we are in compliance with any license requirements. For example, the Pitchbook license agreement says we can only use their data for internal business operations. It does not give us the right to redistribute, and it indicates that certain types of derived data we create using their data will require attribution. No one has been able to explain precisely how we use Pitchbook data to be able to make the assessment of whether we are in compliance with the license terms. This is the case for all other data sources we have been able to identify.
- Provide sourcing and attribution as required – particularly important for our product pages

Uphold Account

- Get account established for Liquidshares – not use W. Sarris's account
- Get an agreement with Uphold to address the API development and usage and any other issues that would be beneficial to formalize, like joint marketing and use of our name/logo. In one of the recent joint marketing efforts we conducted with Uphold, they used content that deviated from what we approved. Additionally, there appear to often be issues stemming from the transfer of digital assets from and to Uphold. We need to have a clear set of terms between the parties to avoid similar incidents

Employee Purchases of Linqto Offerings

- Linqto employees have access to material non-public information relating to the pricing of our offerings, our access to portfolio securities, and our promotional efforts

**Privileged and Confidential**
**Attorney Work Product**

- MI members solicit investment in Liquidshares SPVs
- Due ot the potential for access to material non-public information regarding our offerings and conflicts of interest of our employees, we recommend a general policy prohibiting Linqto employees from investing in Liquidshares SPVs

* * * * *

Please contact any of us with any questions or comments on the above issues.

8