UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORI RAFFA MAXWELL AND ANTHONY DELUCCIA *Individually and on Behalf of All Others Similarly Situated*, Plaintiffs, v. WILLIAM SARRIS, Defendant. | Case No.: 1:25-cv-5643-LAK |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WILLIAM SARRIS' MOTION TO DISQUALIFY JOHN DEATON AS COUNSEL FOR PLAINTIFFS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1
ARGUMENT ........................................................................................................................ 5
    I.      Mr. Sarris and Mr. Deaton Formed an Attorney-Client Relationship. ........................... 6
    II.     The Absence of a Written Engagement Letter is Consistent with the Circumstances of Mr. Deaton's Retention.................................................................................................. 7
    III.    Mr. Deaton Did Not Disclaim an Attorney-Client Relationship. ................................... 8
    IV.   There Is a Substantial Relationship Between the Former Representation and this Case. 9
CONCLUSION ................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AU New Haven, LLC v. YKK Corp.*,
   No. 15-3411, 2016 WL 6820383 (S.D.N.Y. Nov. 18, 2016).......................................................7

*Baird v. Hilton Hotel Corp.*,
   771 F. Supp. 24 (E.D.N.Y. 1991) .....................................................................................5, 6, 10

*Blue Planet Software, Inc. v. Games Int'l, LLC*,
   331 F. Supp. 2d 273 (S.D.N.Y. 2004)..........................................................................................7, 8

*Brandice M.C. v. Wilder*,
   221 A.D.3d 1532, 199 N.Y.S.3d 768 (2023) ...............................................................................6

*Cypress Holdings, III, LP v. Sport-BLX, Inc.*,
   No. 22-1243, 2022 WL 4239937 (S.D.N.Y. Aug. 23, 2022)........................................................6

*Gov't of India v. Cook Indus., Inc.*,
   569 F.2d 737 (2d Cir. 1978)........................................................................................................10

*Hull v. Celanese Corp.*,
   513 F.2d 568 (2d Cir. 1975).........................................................................................................5

*Kuehne & Nagel, Inc. v. A.G.R. Eshcol Overseas, Ltd.*,
   No. 13-8919, 2014 WL 4059821 (S.D.N.Y. Aug. 15, 2014)........................................................1

*Pierce & Weiss, LLP v. Subrogation Partners*,
   *LLC*, 701 F. Supp. 2d 245 (E.D.N.Y. 2010) ...............................................................................7

*Piven v. Harwood Feffer LLP*,
   No. 14-6601, 2015 WL 1268002 (S.D.N.Y. Mar. 11, 2015)........................................................7

*Schairer v. Schairer*,
   192 Misc.2d 155 (Sup. Ct., N.Y. Cnty. 2002) .............................................................................5

*Wei Cheng Chang v. Pi*,
   288 A.D.2d 378 (N.Y. App. Div. 2001) ......................................................................................7

*Williams v. NYC Bd. of Elections*,
   No. 23-5460, 2024 WL 4308289 (S.D.N.Y. Sept. 26, 2024) .......................................................7

**Other Authorities**

N.Y. Comp. Codes R. & Regs. tit. 22, § 1215.2 (2021) ...................................................................8

## **INTRODUCTION**

In his Opposition to this Motion for Disqualification, John Deaton admits that, just a few months ago, he drafted a complaint at Bill Sarris's request, naming Mr. Sarris as a plaintiff, and based on Mr. Sarris's allegations about the regulatory issues at Linqto. Mr. Deaton further admits that he drafted that complaint so Mr. Sarris could use it to threaten litigation against the current Linqto Board. Mr. Deaton agreed that Mr. Sarris would represent to these Linqto directors that Mr. Deaton was prepared to file this lawsuit if they did not agree to his demands. But according to Mr. Deaton's Opposition, this was not a legal service he provided to Mr. Sarris because the complaint he drafted was not "for real." Opp'n at 11.

That is because, according to Mr. Deaton, he never intended to file it and only drafted it for the "non-legal reason" of extracting from the Linqto directors an agreement to appoint him to the Board. *Id.* at 12. The problem with Mr. Deaton's argument is that threatening a lawsuit is a "legal reason" for drafting a complaint. And a practicing attorney who drafts a complaint for the purpose of threatening a lawsuit has provided a legal service, regardless of whether the complaint is ever filed.

Mr. Deaton's other defense to this motion for disqualification is that he allegedly warned Mr. Sarris that he was not acting as his lawyer and may use the information disclosed during their discussions to sue Mr. Sarris in the future. These uncorroborated, self-serving, after-the-fact justifications for Mr. Deaton's misconduct are inherently incredible and at odds with the written record. In Mr. Deaton's telling, every time he spoke on the phone with Mr. Sarris he provided another aggressive warning that their conversations were neither privileged nor confidential and that Mr. Deaton may sue him later. Yet there is not even a hint of such sentiments in the emails exchanged by them during that time. On the contrary, those emails include several references to Mr. Sarris's uncorrected understanding that their communciations were "privileged."

1

Mr. Deaton's fabrications cannot save him from disqualification, and there is no excuse for his breach of loyalty. He should not be permitted to continue as counsel for plaintiffs.

## FACTUAL BACKGROUND

Not long after Mr. Sarris stepped down as CEO of Linqto in January 2025, he became concerned about the security of its customers' investments under his successor as CEO, Dan Siciliano. Supplemental Declaration of William Sarris ("Sarris Supp. Decl.") ¶ 2. In February 2025, without prior notice, Mr. Siciliano shut down all transactions on the platform. *Id*. This was the first time in the Company's nearly five-year existence that Linqto customers were locked out of the platform. *Id*. Linqto then issued a press release, in which it blamed this move on "regulatory issues left unresolved by prior management." *Id.* ¶ 3. Mr. Sarris worried the Company was using these "regulatory issues" as a basis to misappropriate customer assets. *Id*. As the former CEO and a current Board member, Mr. Sarris was committed to using his position to protect Linqto customers and their investments. *Id*.

Mr. Sarris had heard that John Deaton, a Linqto customer with a large online following, shared Mr. Sarris's concerns about the direction of the Company. *Id.* ¶ 4. Mr. Sarris also knew that Mr. Deaton was a litigator who was involved in resisting regulatory action by the SEC against Ripple Labs, the most popular investment on Linqto's platform. Dkt. 8 ¶ 2. Mr. Sarris hoped to find a way to partner with Mr. Deaton to pursue their shared interest in protecting Linqto's customers. *Id.* ¶ 4.

One way for Mr. Deaton to help would be to join the Linqto Board, and Mr. Sarris raised that possibility with Mr. Deaton at the outset of their discussions in March 2025. *Id*. ¶ 5. They also discussed the possibility of Mr. Deaton filing a lawsuit against current management using information provided by Mr. Sarris. *Id.* Mr. Deaton expressed strong interest in both options. *Id*.

2

Mr. Sarris hoped to avoid litigation and believed the best path to resolution with current management was appointing additional Board members like Mr. Deaton, who he thought would prioritize the interests of Linqto's customers. *Id*. By March 23, Mr. Sarris was optimistic Mr. Deaton would soon be appointed. *Id.* ¶ 7. That day Mr. Sarris emailed Mr. Deaton thanking him for his "willingness to serve on the Linqto Board," noting that there was a Board meeting the next day, and asking for the opportunity to speak with Mr. Deaton "before [his] election." Declaration of John Deaton ("Deaton Decl."), Ex. 4. But over the next three days, the Linqto Board met three times—on March 24, March 25, and March 26—and no new directors were appointed during any of the meetings. Sarris Supp. Decl. ¶ 7.

Mr. Sarris felt the Board was stonewalling the changes that were needed and his focus shifted to a strategy involving litigation. *Id*. On March 26, Mr. Sarris sent an email to Mr. Deaton marked "privileged and confidential." Deaton Decl., Ex. 7. The email attached a letter that Victor Jiang, a fellow Linqto Board member, had submitted to the full Board requesting the removal of members of current management, including Mr. Siciliano. Sarris Supp. Decl. ¶ 9. Mr. Sarris had co-signed the letter along with Mr. Jiang and another Linqto Board member, Karim Nurani, who were both aligned with Mr. Sarris in the view that the Company was being mismanaged. *Id*.

A few hours after sending this letter to Mr. Deaton, Mr. Sarris emailed him with an update on the Board's third meeting in three days:

> [W]e just had our [March 26] Board meeting . . . The Board voted to adjourn the meeting until Monday . . . Can you contact Dave Anderson at Sidley tomorrow and see what we may be able to do to protect our assets as we navigate this Board stonewall? If you would like an engagement letter and retainer, [let me know].

Deaton, Decl., Ex. 8. By referencing "this Board stonewall," and offering "an engagement letter and retainer," Mr. Sarris was indicating to Mr. Deaton that he wanted to pivot to the more aggressive litigation strategy they had discussed. *Id*.; Sarris Supp. Decl. ¶ 10.

3

The next morning, March 27, Mr. Sarris sent Mr. Deaton another email marked "privileged and confidential." Dkt. 9-2. Mr. Sarris informed Mr. Deaton that he had spoken to Mr. Jiang and Mr. Nurani and they "would like to have a privileged discussion with you later today." *Id.* Mr. Deaton promptly replied that he could talk at 8:00 p.m. without disputing it would be "a privileged discussion." *Id.* Mr. Sarris sent an invitation for a Zoom meeting titled "PRIVILEGED: Asset protection planning" and invited Mr. Jiang and Mr. Nurani as well. Dkt. 9-3.

During the meeting, Mr. Sarris, Mr. Jiang, and Mr. Nurani informed Mr. Deaton that they believed Linqto must change direction urgently in order to protect Linqto's customers and shareholders and provided background on their dispute with their fellow directors. Sarris Supp. Decl. ¶ 12; Declaration of Victor Jiang ("Jiang Decl.") ¶¶ 2–3.[1] Mr. Deaton recommended a derivative action in Delaware Chancery Court, and he told them he could prepare the complaint quickly. Sarris Supp. Decl. ¶ 13; Jiang Decl. ¶ 3. Mr. Sarris and Mr. Jiang offered to pay Mr. Deaton for the work and asked for an estimate, but Mr. Deaton said he would do it for free in order to protect the investments of Linqto customers. Sarris Supp. Decl. ¶ 13; Jiang Decl. ¶ 3. Mr. Sarris also discussed that, once drafted, he planned to show this complaint to Linqto Board Chairman Adam Henderson in order to convince him to change course, including by appointing Mr. Deaton to the Board. Sarris Supp. Decl. ¶ 14. Mr. Deaton never suggested he was unwilling to proceed with litigation against current management if this threat did not work. *Id.* ¶ 15.

Not during this call, nor in any other conversation, did Mr. Deaton threaten to sue Mr. Sarris, deny that he was providing legal services to him, or suggest that he might use the

---

[1] Mr. Jiang has submitted a declaration in support of this reply to respond to "new material issues" Mr. Deaton raised in opposition—namely, Mr. Deaton's claim that he denied he was representing Mr. Sarris and threatened to sue Mr. Sarris during a call where Mr. Jiang was present. *Kuehne & Nagel, Inc. v. A.G.R. Eshcol Overseas, Ltd.*, No. 13-8919, 2014 WL 4059821, at *4 (S.D.N.Y. Aug. 15, 2014) ("[R]eply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party.").

information Mr. Sarris was providing against him. Sarris Supp. Decl. ¶ 16; Jiang Decl. ¶¶ 4–5. If he had, Mr. Sarris would have cut off further communication with him. Sarris Supp. Decl. ¶ 16.

On March 28, Mr. Deaton emailed Mr. Sarris a draft derivative complaint "as requested." Dkt. 9-4. The named plaintiffs in the complaint were the participants on the Zoom call—Mr. Sarris, Mr. Jiang, and Mr. Nurani—and the named defendants were the other four members of the Linqto Board, including Chairman Henderson. Dkt. 9-1. Mr. Deaton's draft complaint alleged that the defendants breached their fiduciary duties and suggested they "create[d] an impression that the regulatory issues are much more serious than they really are." *Id.* ¶¶ 28, 61-64.

Mr. Sarris met with Mr. Henderson the following day, March 29, with Mr. Deaton's draft complaint in hand. Sarris Supp. Decl. ¶ 17. Mr. Henderson assuaged Mr. Sarris's concerns by promising to take action, including by pushing through the nomination of Mr. Deaton. *Id*. Mr. Henderson's response indicated to Mr. Sarris that the threat of litigation was unnecessary, and Mr. Deaton's complaint was ultimately never filed. *Id*. A couple weeks later, Linqto appointed Mr. Deaton as a Board Observer. Deaton Decl., Ex. 14.

## ARGUMENT

At a minimum, these facts create the "appearance" of a conflict that would have a chilling effect on clients' willingness to speak openly with their lawyers, which is the concern the disqualification rules were created to avoid. *Schairer v. Schairer*, 192 Misc.2d 155, 158 (Sup. Ct., N.Y. Cnty. 2002); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 n.12 (2d Cir. 1975) ("A lawyer should avoid even the appearance of professional impropriety."). Protecting the sanctity and public respect for the attorney-client relationship is why "any doubt is to be resolved in favor of disqualification." *Hull*, 513 F.2d at 571; *see also Baird v. Hilton Hotel Corp.*, 771 F. Supp. 24, 27

5

(E.D.N.Y. 1991) ("[I]f there were any doubt as to the propriety of our action, we would resolve it in favor of disqualification.") (citations omitted).[2]

But the problem with Mr. Deaton's involvement in this case goes beyond mere appearances. This motion is not based on legal technicalities, nor is it a "tactical maneuver."[3] The conflict is substantial and direct. Previously, Mr. Deaton shared Mr. Sarris's view about the best interests of Linqto customers, so he represented Mr. Sarris in a potential lawsuit against current management. Now, Mr. Deaton has decided he agrees with current management's narrative about Mr. Sarris, so he has switched sides. Lawyers cannot change teams in the middle of a legal dispute, and Mr. Deaton cannot be permitted to prosecute this lawsuit against his former client.

**I.    Mr. Sarris and Mr. Deaton Formed an Attorney-Client Relationship.**

During the last week of March 2025, Mr. Sarris and Mr. Deaton formed an attorney-client relationship to threaten and potentially file derivative litigation against members of the Linqto Board. Mr. Sarris sought Mr. Deaton's legal services on March 26 and March 27, when he offered him "an engagement letter and retainer" and requested "a privileged discussion." Sarris Supp. Decl. ¶¶ 10–11; Deaton Decl., Ex. 8. Mr. Deaton then accepted Mr. Sarris's request during their call on March 27, when he advised Mr. Sarris to pursue a derivative lawsuit and agreed to draft the complaint. Sarris Supp. Decl. ¶¶ 12–13; Jiang Decl. ¶ 3. The next day Mr. Deaton delivered the draft, which named Mr. Sarris as a plaintiff, and was based on Mr. Sarris's statements. Dkts. 9-1, 9-4; Sarris Supp. Decl. ¶ 15; Deaton Decl. ¶ 51. At this point, an attorney-client relationship

---

[2] Mr. Deaton cites *Brandice M.C. v. Wilder*, 221 A.D.3d 1532 (2023), for the proposition that "any doubts must be resolved in favor of the attorney's continued representation." Opp'n at 13. That case says the exact opposite: "[A]ny doubts about the existence of a conflict should be resolved in favor of disqualification so as to avoid the appearance of impropriety." *Brandice*, 221 A.D.3d at 1534.

[3] Disqualifying Mr. Deaton "will cause relatively little disruption" because "[t]his case is still at a very early stage, with motions to dismiss yet to be filed and no discovery having taken place." *Cypress Holdings, III, LP v. Sport-BLX, Inc.*, No. 22-1243, 2022 WL 4239937, at *5 (S.D.N.Y. Aug. 23, 2022).

between Mr. Sarris and Mr. Deaton was formed. *Wei Cheng Chang v. Pi*, 288 A.D.2d 378, 380 (N.Y. App. Div. 2001) ("An attorney-client relationship is established where there is an explicit undertaking to perform a specific task.").[4]

According to Mr. Deaton, he never intended that the complaint be filed and only drafted it so Mr. Sarris could show the directors they would have to appoint Mr. Deaton to the Board to "avoid litigation." Deaton Decl. ¶ 44. Mr. Sarris denies that he was bluffing, but even if he was, it would not change the fact that Mr. Deaton was providing a legal service. Sarris Supp. Decl. ¶ 15. Drafting a complaint to extract a concession from a counter-party, rather than to immediately file in court, does not change the fact that an attorney-client relationship was formed. *Williams v. NYC Bd. of Elections*, No. 23-5460, 2024 WL 4308289, at *3 (S.D.N.Y. Sept. 26, 2024) ("There is no requirement that communications must take place after the filing of the underlying lawsuit to be entitled to protection by the attorney-client privilege[.]").[5]

## II. The Absence of a Written Engagement Letter is Consistent with the Circumstances of Mr. Deaton's Retention.

Mr. Deaton's next defense is that he and Mr. Sarris never agreed to a retainer or an engagement letter, but this is not a requirement for an attorney-client relationship, as Mr. Deaton admits. Opp'n at 14. "[A]mple case law makes clear that an attorney [] may be disqualified despite the lack of a formal attorney-client relationship" evidenced by a written agreement. *Blue Planet*

---

[4] Regardless of whether Mr. Jiang or Mr. Nurani formed an attorney-client relationship with Mr. Deaton, the discussions involving Mr. Deaton were nevertheless privileged as all three Board members shared a common interest as potential co-plaintiffs in the derivative action. *See AU New Haven, LLC v. YKK Corp.*, No. 15-3411, 2016 WL 6820383, at *3 (S.D.N.Y. Nov. 18, 2016).

[5] The sole case Mr. Deaton cites for his claim that there is insufficient indicia of an attorney-client relationship contradicts his position. *Pierce & Weiss, LLP v. Subrogation Partners*, LLC, 701 F. Supp. 2d 245 (E.D.N.Y. 2010). In *Pierce*, the attorney was disqualified from the representation despite no evidence client confidences were shared because the rules on disqualification are "in place to avoid even the 'appearance' of representing conflicting interests" and to "encourage[] clients to be completely honest and open with their attorneys." *Id*. at 252–53 (citations omitted).

*Software, Inc. v. Games Int'l, LLC*, 331 F. Supp. 2d 273, 276 (S.D.N.Y. 2004); *Piven v. Harwood Feffer LLP*, No. 14-6601, 2015 WL 1268002, at *1 (S.D.N.Y. Mar. 11, 2015) (Kaplan, J.).[6]

Mr. Sarris offered an engagement letter with a retainer, but it is not surprising Mr. Deaton never prepared one, given that he agreed to do the work for free. Sarris Supp. Decl. ¶ 13. Mr. Deaton admits he refused Mr. Sarris's offer of payment, Deaton Decl. ¶ 46, while at the same time suggesting it is implausible that he would have agreed to represent Mr. Sarris for free. *Id*. ¶ 20.[7] On the contrary, it is entirely consistent with Mr. Deaton's pattern of behavior. He has said his "sole purpose" in interacting with Mr. Sarris in March 2025 was "to try and help innocent Linqto customers," and he claims that he is prosecuting this class action "for free to make [Linqto's] customers whole." *See* Deaton Decl. ¶ 52; Opp'n at 20. Mr. Deaton also represented "[m]any of those same" individuals "for free" in an amicus brief he filed against the SEC. Deaton Decl. ¶¶ 23–24. Given all this free legal work on behalf of Linqto customers, one would expect Mr. Deaton to refuse payment for a derivative lawsuit that was, by Mr. Deaton's own description, intended to "help thousands of [Linqto] customers." *Id*. ¶ 46.

### III. Mr. Deaton Did Not Disclaim an Attorney-Client Relationship.

Mr. Deaton also claims that Mr. Sarris could not have reasonably believed an attorney-client relationship existed because Mr. Deaton repeatedly told Mr. Sarris he was not his attorney, threatened to sue him, and promised to disclose all the information Mr. Sarris shared. Opp'n at 18–19. The frequency and intensity with which Mr. Deaton claims to have made such statements

---

[6] Mr. Deaton points out that New York has a law requiring written agreements for legal work, Opp'n at 14, but he fails to mention that this law has explicit exceptions for unpaid legal work and for out-of-state lawyers who are not providing their services in the state, both of which apply here. N.Y. Comp. Codes R. & Regs. tit. 22, § 1215.2 (2021).

[7] Elsewhere, Mr. Deaton makes the outlandish accusation that Mr. Sarris's offer of a legal retainer was a disguised "bribe." Deaton Decl. ¶ 39. This reflects the carelessness with which Mr. Deaton levels criminal accusations. If Mr. Sarris were so afraid Mr. Deaton might sue him that he would offer a "bribe," he would not continue having confidential discussions with Mr. Deaton about the subject of this potential lawsuit.

8

are striking. Consider, for example, a few of the warnings Mr. Deaton claims to have made to Mr. Sarris—apparently verbatim, given the quotation marks in Mr. Deaton's declaration:

- "If Linqto turns out to be another FTX or Celsius, you're going to personally see just how relentless I can be when it comes to protecting innocent investors." Deaton Decl. ¶ 34.

- "I will not hesitate to sue you Bill and, trust me, I'm a man of my word." *Id.* ¶ 46

- "It's a good thing I'm not your lawyer and that this Complaint isn't for real, because what I emailed would be malpractice." *Id.* ¶ 51.[8]

Mr. Deaton expects this Court to believe that every time he spoke with Mr. Sarris he emphatically disclaimed an attorney-client relationship and threatened that he might sue Mr. Sarris later, while Mr. Sarris ignored the warnings and continued to speak and correspond with him about these sensitive issues. Not only are Mr. Deaton's statements implausible on their face, they are completely absent from Mr. Deaton's replies to the multiple emails in which Mr. Sarris characterizes their discussions as "confidential" and "privileged." Dkt. 9-2.

### IV. There Is a Substantial Relationship Between the Former Representation and this Case.

A side-by-side comparison of Mr. Deaton's draft derivative complaint and Mr. Deaton's assertions in this case leave no doubt that a substantial relationship between the two exists. The

---

[8] *See also, e.g.,* Deaton Decl. ¶ 31 ("I warned Sarris . . . I would be the one who files a lawsuit against him . . . it would be on principle, and I would do it for free."), *id.* ¶ 42 ("I informed Sarris that all I cared about was the protection of customer investments and that I intended to disclose EVERYTHING he told me. I informed him if there was litigation from shareholders, other Linqto Board members, or from Siciliano, I could be called as a witness against him because I am not his lawyer."). Mr. Deaton also claims that Mr. Sarris knew Mr. Deaton might sue him because Mr. Deaton forwarded an email that he had sent to a Linqto manager on March 15 in which he said that Linqto investors had proposed a class action against Linqto executives "past and present." Deaton Decl., Ex. 6. Mr. Sarris obviously did not perceive this as a threat because he replied "thanks John" and then offered Mr. Deaton an engagement letter and retainer 24 hours later. Deaton Decl., Ex. 8. Besides, this message was from before Mr. Sarris and Mr. Deaton had even discussed the issues at Linqto. Sarris Supp. Decl. ¶ 6.

9

same "regulatory issues" that Mr. Deaton dismissed as exaggerated in his derivative complaint, *e.g.*, Dkt. 9-1 ¶ 22, are now the centerpiece of his legal claims here. Dkt. 1. The two actions are not merely related, they assert two mutually exclusive descriptions of the same set of facts.

Mr. Deaton concedes, Opp'n at 17–18, that if a substantial relationship exists between the previous representation and this new matter, Mr. Sarris is "entitled to the benefit of an irrebuttable presumption that confidences were shared." Mot. at 5. This presumption exists to protect a former client like Mr. Sarris from being forced to choose between disclosing privileged information or refraining from moving to disqualify his former lawyer from suing him. *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 740 (2d Cir. 1978). This concern is particularly acute in this case, where Mr. Sarris is responding to inquiries from regulators on the issues he discussed with Mr. Deaton.

In any event, Mr. Deaton admits he "specifically asked Sarris questions regarding the regulatory issues." Opp'n at 5. His defense is not that these issues were never discussed but that "[a]lmost everything Sarris stated to Deaton was not true." *Id.* at 16. That accusation demonstrates Mr. Sarris's point because it is the entire premise of this class action. If Mr. Deaton is permitted to continue, Mr. Sarris will be cross-examined by his former lawyer on the same regulatory issues they discussed in conversations Mr. Sarris designated as "privileged." "The obvious appearance of impropriety coupled with a real danger that the forthcoming trial will be tainted require disqualification." *Baird*, 771 F. Supp. at 27.

## **CONCLUSION**

For the foregoing reasons, Mr. Sarris respectfully requests that the Court grant this Motion to Disqualify.

Case 1:25-cv-05643-LAK   Document 14   Filed 08/07/25   Page 14 of 14

| | |
|---|---|
| Dated: August 7, 2025 | Respectfully submitted,<br><br>/s/ Kevin Rubino<br><br>James Heyworth<br>SIDLEY AUSTIN LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>(212) 839-5300<br>jheyworth@sidley.com<br><br>Kevin Rubino<br>krubino@sidley.com<br><br>*Attorneys for Defendant* |

11