UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORI RAFFA MAXWELL AND ANTHONY DELUCCIA *Individually and on Behalf of All Others Similarly Situated,*<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM SARRIS,<br><br>Defendant. | Case No.: 1:25-cv-5643-LAK<br><br>**SUPPLEMENTAL DECLARATION OF WILLIAM SARRIS IN SUPPORT OF HIS MOTION TO DISQUALIFY OPPOSING COUNSEL** |

I, William Sarris, declare as follows pursuant to 28 U.S.C. § 1746 under penalty of perjury:

1. I reaffirm all the statements in my July 17, 2025 declaration in support of my motion to disqualify John Deaton, which I will not repeat here.

2. Not long after I voluntarily stepped down as CEO of Linqto in January 2025, I became concerned about the direction of the Company and the safety of its customers' investments under my successor as CEO, Dan Siciliano. In February 2025, without any notice to me, Mr. Siciliano suspended all transactions on Linqto's platform. In the almost five years that I was involved in managing Linqto, this was the first time customers were unable to access the platform.

3. On March 14, 2025, Linqto issued a press release that said this decision was due to "regulatory issues left unresolved by prior management." I became worried the Company was using these "regulatory issues" as an excuse to take advantage of Linqto shareholders or misappropriate customer assets. I have always cared deeply about safeguarding Linqto's customers and their investments, and I intended to use my position as former CEO and current Board member to protect those customer investments.

1

4. I knew Mr. Deaton was a longtime Linqto customer with a large social media following among other Linqto customers. I heard he shared my concern about the direction of the Company. Given our common interest in protecting Linqto customer assets, I was looking for opportunities to partner with Mr. Deaton in March 2025.

5. I contacted Mr. Deaton and asked if he would consider joining Linqto's Board of Directors because I thought he would be a helpful advocate for customer's interests on the Board. I also discussed with him the possibility of pursuing litigation against current management, and I told him I could provide him the information he would need to bring such a lawsuit. Mr. Deaton expressed a strong interest in joining the Board and in working with me to pursue litigation.

6. On March 18, I requested that Mr. Deaton speak by phone with Dave Anderson at Sidley Austin. Mr. Anderson had been representing me in connection with the issues at Linqto, and I put them in touch so Mr. Anderson could provide background on recent events at the Company in anticipation that Mr. Deaton might be appointed to the Board or that we might work together to pursue litigation to protect the interests of Linqto customers.

7. By March 23, I thought Mr. Deaton's appointment to the Board may be imminent. But the Board met on March 24, 25, and 26, and no new directors were appointed. The Board also took other steps during those meetings that I did not believe were in the best interests of the Company, its customers, or its shareholders. I felt as though the Board was stonewalling much-needed changes and increasingly thought litigation may be necessary.

8. On March 25, Mr. Deaton forwarded me an email he had sent to Nick Burrafato at Linqto on March 15, the day after Linqto issued a press release announcing they were shutting down the platform. Mr. Deaton's email to Mr. Burrafato mentioned that Linqto investors asked him to "file a class action against Linqto and its executives both past and present." It never

2

occurred to me that Mr. Deaton might bring a class action against me, and I did not understand Mr. Deaton to be threatening litigation against me by forwarding me this email. Based on the discussions he and I had in the days since he sent this email to Mr. Burrafato, I had no reason to believe Mr. Deaton blamed me for the issues facing Linqto, and I understood that he and I generally agreed about the best course forward for the Company.

9. On March 26, I sent an email to Mr. Deaton marked "privileged and confidential." I attached to my email a letter that fellow Board member Victor Jiang had submitted to the full Board advocating for the removal of certain members of current management, including Mr. Siciliano, based on alleged conflicts of interest. I co-signed the letter with Mr. Jiang and another Board member Karim Nurani. Throughout my dispute with new management, Mr. Jiang, Mr. Nurani, and I were aligned in the view that the Company was being mismanaged.

10. I emailed Mr. Deaton a few hours later updating him on the Board's March 26 meeting. I told him that the Board "voted to adjourn the meeting until Monday." I also asked Mr. Deaton to contact Mr. Anderson "tomorrow and see what we may be able to do to protect our assets as we navigate this Board stonewall? If you would like an engagement letter and retainer, LMK." By "LMK," I meant "let me know." I had previously discussed with Mr. Deaton the possibility that litigation against current management might be necessary, and I was communicating to him that we should discuss that possibility again given the recent actions of the Board. I was also communicating to him that I was prepared to formally retain him and pay him for this work.

11. On March 27, I emailed Mr. Deaton with a "privileged and confidential" disclaimer. In this message, I told Mr. Deaton that I had spoken to Mr. Jiang and Mr. Nurani and that the three of us "would like to have a privileged discussion with you later today if you are available."

My intention was to have a conversation with Mr. Deaton about potential litigation against the Company or its management. I sent an invitation for a Zoom meeting to Mr. Deaton, Mr. Jiang, and Mr. Nurani, titled "PRIVILEGED: Asset protection planning" for the time Mr. Deaton proposed.

12. That night, Mr. Jiang, Mr. Nurani, and I all attended the Zoom meeting with Mr. Deaton. During the meeting, we provided Mr. Deaton with an update on our dispute with current management. All three of us told Mr. Deaton we believed the company urgently needed to change direction to protect Linqto's customers, including by removing Mr. Siciliano.

13. Mr. Deaton recommended that we file a derivative action in Delaware Chancery Court, and he said he could prepare the complaint quickly. I offered to pay him a retainer and asked how much it would be. Mr. Deaton said he did not need a retainer. He explained that he wanted to protect the investments of Linqto customers.

14. Mr. Deaton and I agreed that the threat of litigation prosecuted by him might persuade the Board to change their approach, including on the appointment of Mr. Deaton to the Board. I told Mr. Deaton that I was meeting with Linqto Board Chairman Adam Henderson two days later, on the morning of March 29, and I planned to show him Mr. Deaton's complaint to try to convince him to change course. Mr. Deaton guaranteed he would have the draft complaint for me before I met with Mr. Henderson. He said he would work through the night if necessary. He never mentioned that he planned to use AI. There was no doubt in my mind that Mr. Deaton was acting as my attorney at this time.

15. Everyone on the call, including Mr. Deaton, agreed that if we could not convince Mr. Henderson with the threat of legal action, we were prepared to proceed with litigation. Mr. Deaton raised the possibility that another lawyer would file the derivative action he was preparing,

4

and he would follow that filing a couple days later with parallel litigation on behalf of the customers based on the same basic allegations against current management.

16.   In his declaration, Mr. Deaton claims that he made several statements to me that he never said. He never told me he would use the information I shared with him against me. He never told me he might be called as a witness against me. He never told me that he was not my attorney. He never told me he was not providing me with legal services or that the complaint he was drafting for me was not "for real." He never said that he was refusing my offer of payment because he may have to sue me. If he had ever said such things, I would have cut off communication with him.

17.   Mr. Deaton emailed me the draft complaint on March 28. The next day, March 29, I met with Mr. Henderson to try to convince him to change course. I had Mr. Deaton's complaint with me and I was ready to show it to him. Mr. Henderson indicated that he agreed with points I was making. He also agreed to support Mr. Deaton's nomination to the Board and indicated that Mr. Deaton would be nominated at the meeting on Monday, March 31. At that point, I did not think it was necessary to threaten litigation.

18.   The Board meeting on March 31 was postponed. But I ultimately learned in April 2025 that Mr. Deaton was appointed as a Board Observer, with the possibility of formally joining the Board later.

19.   Mr. Deaton's filing of this lawsuit in July came as a shock to me. I understood we both shared the same interest in protecting the Linqto customers and their investments. That remains my primary goal.

20. I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 7, 2025 in Monterey, California.

                                                                   William Sarris