# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.O.H. DRIEDIJK HOLDING B.V. AND JAIMIN BHATT, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM SARRIS, JOSEPH A. ENDOSO, DAVID PAUL, BRIAN MORAN, KARIM NURANI, MARGARET SLEMMER, VICTOR JIANG, ALISON DAVIS, NORMAN REED, ADAM T. HENDERSON, AND RAINMAKER SECURITIES, LLC. <br><br> Defendants. | Case No. 1:25-cv-5643 (LAK) <br><br> CLASS ACTION <br> JURY TRIAL DEMAND |

**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF FEDERAL AND STATE SECURITIES LAWS**

Lead Plaintiffs A.O.H. Driedijk Holding B.V. ("A.O.H.") and Jaimin Bhatt ("Bhatt" and, collectively with A.O.H., "Linqto Investors" or "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based on personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other sources, a review of relevant press releases, marketing materials, web archives, legal memorandum, complaints, interviews with former employees, U.S. Securities and Exchange Commission ("SEC") disclosures, and bankruptcy filings from *In re Linqto Texas, LLC et al.*, No. 25-90186 (Bankr. S.D. Tex. 2025). Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein.

## I. SUMMARY OF THE ACTION

1. This is a federal and state securities class action on behalf of a class (the "Class") consisting of all persons and entities (other than the Defendants, defined herein, and certain related persons and entities) that purchased Series membership interests in one or more Series of Linqto Liquidshares, LLC ("Liquidshares") offered through the Linqto, Inc. ("Linqto" or the "Company") online trading and private equity investment platform (the "Platform") during its operation between February 1, 2020 and March 14, 2025, inclusive (the "Class Period") seeking to recover compensable damages caused by Defendants' violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, Section 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), Section 7(a) of the Investment Company Act of 1940 (the "1940 Act"), the Texas Securities Act, TX Gov't Code Ann. § 4008.051 (2024) ("TSA"), and/or California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (2024) ("UCL"). Defendants are certain former and current officers

1

and directors of Linqto or Liquidshares and an affiliated broker-dealer, including William Sarris, Joseph A. Endoso, David Paul, Brian Moran, Karim Nurani, Margaret Slemmer, Victor Jiang, Alison Davis, Norman Reed, Adam T. Henderson, and Rainmaker Securities, LLC.

2.     Founded in 2010 as a Silicon Valley technology and software development company, by 2020, Linqto had evolved into a financial technology and digital trading platform purporting to offer investors the ability to invest in privately held companies, primarily "unicorns" and mid-to-late-stage startups.  By 2019, the privately held, highly valued startup space had seen tenfold growth in just six years.  There was a fervor for startup investing as private companies like Uber, Spotify, and Doordash reached valuations of over $1 billion before going public.

3.     Historically, private companies only sold shares to large institutional investors and exceptionally wealthy individuals that could invest large chunks of capital at once, with minimum investment thresholds ranging anywhere from tens of thousands to millions of dollars.  Therefore, eager investors wanted the opportunity to invest in these startups, but the vast majority were shut out.

4.     Linqto was supposedly the solution for these investors.  Between February 2020 and March 14, 2025, Linqto operated the "Platform which purported to "allow[] accredited investors to identify, evaluate, invest in, and make liquid investments in the world's leading unicorns and private companies."  Linqto offered low investment minimums, progressively decreasing from the Platform's initial $10,000 minimum to only $1,000, making the Platform even more accessible to investors over time.  Another key feature that Linqto often touted which differentiated it from competitors was the Company's "zero-fee investment management platform" with "no added fees or hidden costs."

2

5. The Platform ostensibly facilitated the purchasing of shares—investments—in privately held companies. Via the smartphone application or web accessible Platform, accredited investors could easily select the listing they desired and "place order[s]" for "shares" from a landing page with a collection of listings of private companies.

6. Linqto rapidly gained popularity, reporting over $170 million, $300 million, and $460 million in investment transactions in December 2022, December 2023, and September 2024, respectively. Linqto's popularity, however, was built on deceiving its customers—also known as investors ("Investors")—who made investments through its Platform.

7. Contrary to the Company's marketing, the Platform was not designed to facilitate the purchasing of shares at all. Instead, Investors were purchasing interests in Linqto Series, special purpose vehicles created by Liquidshares, another Linqto creation, that then held shares of private companies.

8. Additionally, Linqto used flashy marketing tactics and lowered investment minimums to attract investors, regardless of accreditation status, to the Platform and removed several barriers and controls that could have safeguarded against non-accredited investors accessing and investing on the Platform. Linqto welcomed non-accredited investors, whose business generated a handsome profit, onto the Platform, improperly classifying at least 5,000 Investors as "retail investors" to circumvent regulatory requirements.

9. Furthermore, Linqto profited from the Investors it allowed on its Platform by imposing undisclosed, excessive markups and fees. On top of the acquisition price that Linqto paid, Investors unknowingly paid: (i) associated expenses, (ii) supervisory fees, (iii) interest, and (iv) excessive markups. Linqto markups regularly ranged anywhere from 20-60% and sometimes as much as 150% of the acquisition price.

3

10. By October 2023, Defendants were formally put on notice when an outside law firm retained to conduct a regulatory review of Linqto's products and services wrote a memorandum informing the Company that its practices, including selling to non-accredited investors and charging undisclosed, exorbitant markups and fees, as well as its offering structure, violated several federal and state securities laws.

11. Linqto did not address these serious regulatory and compliance deficiencies, and almost exactly a year later, Linqto CEO, Defendant Sarris, received another legal memorandum— this time from Linqto's internal counsel—advising that many of the federal securities law issues raised in the October 2023 memorandum needed to be addressed in light of recent SEC requests and likely Financial Industry Regulatory Authority, Inc. ("FINRA") enforcement actions.

12. Again, Defendants did not listen. In January 2025, turnover at Linqto began to ensue as the Company replaced Sarris as CEO and new management removed several senior executives. Over the next few months, new management uncovered the pervasive securities law violations that had remained unaddressed for years, prompting the Company to shut down the Platform and cease all trading operations on March 13, 2025.

13. As new management conducted internal investigations into Linqto's culture of non-compliance, the Company arrived at the decision to file for bankruptcy on July 7, 2025. Investor accounts have been frozen and Investors have been unable to access their property since the Platform was shut down.

14. As a result of Defendants' wrongful acts and omissions, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

15. The claims asserted in this complaint arise under and pursuant to: (i) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5(a), (b), and (c)

4

promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; (ii) Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e and 77l(1); (iii) Section 7(a) of the 1940 Act, § 80a-7(a); (iv) the TSA, TX Gov't Code Ann. § 4008.051 (2024); and (v) California's UCL, Cal. Bus. & Prof. Code § 17200 *et seq*.

16. The Court has jurisdiction over the subject matter of this action pursuant to (i) 28 U.S.C. § 1331; (ii) Section 27 of the Exchange Act, 15 U.S.C. § 78aa.; (iii) Section 22(a) of the Securities Act, 15 U.S.C. § 77v; (iv) Section 47(b)(1)-(2) of the 1940 Act, § 80a-41; and (v) supplemental jurisdiction for TSA and UCL claims under 28 U.S.C. § 1367.

17. Venue is proper in this District pursuant to (i) 28 U.S.C. §1391(b)-(c); (ii) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (iii) Section 22(a) of the Securities Act, 15 U.S.C. § 77v because Defendants conducted substantial business in this District and many of the acts and practices alleged in this complaint were targeted at Investors in this District.

18. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone and wire communications.

## III. PARTIES

### A. Linqto Investors

19. Lead Plaintiffs A.O.H. and Bhatt, as set forth in their previously filed certifications (ECF No. 23), are Linqto Investors and purchasers of units in one or more Series of Linqto Liquidshares, LLC during the Class Period and suffered damages as a result of Defendants' conduct as alleged herein.

### B. Defendants

20. Defendant William Sarris ("Sarris") served as the founder, Chief Executive Officer ("CEO"), and Executive Chairman of Linqto from 2010 until January 2, 2025. Between 2010 and

the present, Sarris has likewise served on the Linqto Board of Directors (the "Board"). At all relevant times, Sarris served as the CEO, Executive Chairman, or member of the Board. Sarris is a resident of California.

21.     Defendant Joseph A. Endoso ("Endoso") has held several key leadership positions including CEO, Chief Financial Officer ("CFO"), Chief Revenue Officer ("CRO"), Chief Operating Officer ("COO"), and President at Linqto between 2019 and January 2025. Endoso also served on the Board until January 2025. Endoso was a registered agent and broker-dealer of Defendant Rainmaker Securities, LLC between at least 2020 and 2022, for which he was paid sales commissions. Endoso is a resident of California.

22.     Defendant David Paul ("Paul") served as the Chief Financial & Administrative Officer of Linqto Liquidshares, LLC between May 2020 and May 2025. In his role at Liquidshares, Paul signed and submitted Liquidshares Form D filings with the SEC which evidence the Series offerings. Paul is a resident of California.

23.     Defendant Brian Moran ("Moran") served as the Chief Compliance Officer ("CCO") of Linqto between November 2021 and December 2024. Moran was a registered broker-dealer and investment advisor affiliated with Linqto Capital, LLC between December 2022 and December 2024. Moran is a resident of North Carolina.

24.     Defendant Karim Nurani ("Nurani") served as Linqto's Chief Strategy Officer ("CSO") between 2020 and March 2025. Nurani served on the Board from March 2025 through May 2025. Nurani is a resident of California.

25.     Defendant Margaret Slemmer ("Slemmer") served on the Board between October 2020 and February 2025. Slemmer is a resident of California.

26. Defendant Victor Jiang ("Jiang") served on the Board from October 2022 through May 2025. Jiang is a resident of Australia.

27. Defendant Alison Davis ("Davis") served on the Board between April 2024 and January 2025. Davis is the Chairman and Managing Partner of Blockchain Coinvestors Acquisition Corp. I ("BSCA"), a blank-check company formed for the purpose of acquiring or merging with one or more businesses. On April 6, 2024, Linqto and BSCA entered into a Business Combination Agreement, which Linqto terminated on September 26, 2024 for a fee of $5 million. Davis is a resident of California.

28. Defendant Norman Reed ("Reed") has served on the Board since October 2023. Reed is a resident of California.

29. Defendant Adam T. Henderson ("Henderson") has served on the Board since 2022. Henderson is a resident of California.

30. Defendant Rainmaker Securities, LLC ("Rainmaker") is a FINRA registered broker-dealer and Securities Investor Protection Corporation ("SIPC") member. Rainmaker provided supervisory services to Linqto in exchange for a fee. Rainmaker is headquartered in Miami, Florida.

31. Defendants Sarris, Endoso, Paul, Moran, Nurani, Slemmer, Jiang, Davis, Reed, and Henderson are referred to herein together as the "Individual Defendants." The Individual Defendants and Defendant Rainmaker are collectively referred to as "Defendants."

32. Due to the Individual Defendants' high-level positions at the Company, they possessed the power and authority to control the contents of Linqto's website, smartphone application, marketing materials, press releases, offering documents, and communications. Because of their positions within Linqto and their access to material non-public information

7

available to them, but not to Investors, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, but were being concealed from, Investors, and that: (i) Defendants were engaging in a scheme to defraud Investors, (ii) the statements at issue were materially false, misleading, and incomplete when made, and (iii) that Linqto was in violation of several registration requirements.

## IV.   FACTUAL ALLEGATIONS

### A.   Background of Linqto

33.   Sarris founded Linqto, Inc. in 2010 as a technology and software development company specializing in enterprise solutions for the banking and financial industries.  Based in Silicon Valley, during the mid-2010s Linqto released several digital banking software applications and solutions aimed at providing customers with greater access and capabilities.

34.   By 2020, Linqto had evolved into a financial technology and digital trading platform that purported to allow investors to invest in privately held companies with the goal of democratizing private market investments to help smaller, accredited investors build generational wealth.  Its purpose was to make investing in the private market simple, accessible, and affordable so that individual accredited investors could have an opportunity to enter the private equity market.

35.   Linqto was marketed as the solution to shepherd capitally constrained, accredited investors into the previously elusive private market of securities for companies that had not yet undergone an Initial Public Offering ("IPO").  These pre-IPO companies consisted of startups and so called "unicorns."  "Unicorns" are privately held, typically mid-to-late-stage startup companies with a valuation of over $1 billion.  Unicorns are widely regarded as ultra innovative, boasting groundbreaking technology and disruptive business models with extremely high growth potential and market opportunity.  Between 2013 and 2019, the number of so-called "unicorns" rose ten-

8

fold, from around 30 in 2013 to hundreds globally by 2019 as startups began to stay private for longer. Popular unicorns include Uber, Robinhood, Airbnb, and SpaceX, to name a few.

36. Public market investors, which include the vast majority of accredited investors, were largely shut out of unicorn investments. Accredited investor status is a special designation set by the SEC. Accredited investors are individuals or entities that meet specific wealth, income, financial sophistication, or professional criteria. The purpose of delineating between any investor in the public market, also called retail investors, and accredited investors is to protect non-accredited, retail investors from fraud, complex and illiquid investments, and significant financial loss. The classification is designed to safeguard retail investors that lack the financial sophistication to understand the complexity of their investments in the private market which is less transparent due to reduced reporting and disclosure obligations. Accredited investors, however, by virtue of wealth and knowledge, are deemed to have the financial sophistication and capital to handle higher-risk, illiquid private market investments.

37. Although accredited investors are legally permitted to invest in the private market, they have been historically excluded from entry. High minimum investments thresholds, typically beginning around $100,000, made the market inaccessible to most accredited investors. Largely for convenience and risk-related purposes, startups and unicorns favor selling to institutional investors or ultra-high-net-worth individual investors that have enough capital to purchase large chunks of shares at once and bear the illiquidity of their purchases.

38. From February 2020 until March 14, 2025, Linqto operated its Platform to purportedly allow Investors to identify, evaluate, and invest in private companies, with a focus on startups and unicorns. Indeed, Linqto marketed itself as a "technology-enabled investment platform allowing accredited investors to identify, evaluate, invest in, and make liquid investments

9

in the world's leading unicorns and private companies." Linqto's marketing was simple: "Invest in leading startups with affordable minimums[.]"

39. Linqto removed the historically high barriers to entry, offering significantly lower minimum investment thresholds to any accredited investor who wanted to invest in the private market. The largely self-service Platform offered Investors access to a collection of sought-after private companies (called "Listings" on the Platform), typically in the technology and digital assets spaces, that Investors could choose from. All investors had to do was sign up on the Linqto website, provide proof of accredited investor status, connect their bank accounts to deposit the requisite funds, and use the Platform, accessible on Linqto's website or smartphone application, to submit orders for shares of the Listings offered on the Platform. Between 2023 and 2024, the Platform offered alleged access to around 50 mid-to-late-stage private companies, growing to over 100 companies by March 2025.

40. The difference between Linqto's Platform and that of competitors was a prominent selling point for Linqto. Compared to competitors that required a minimum investment of $100,000 and charged a brokerage fee of up to 5%, management fee of 1-2%, administrative fee of .05%, and carried interest of 10-20%, Linqto stressed its "lack" of fees, claiming to charge no brokerage fee, no management fee, no administrative fee, and no carried interest. On its website and in its marketing materials and press releases, Linqto touted its approach to fees, calling itself a "zero-fee investment management platform" with "no hidden fees or costs," "no added fees or hidden costs," and "industry low minimums and no fees."

41. The Company also stressed its low investment minimums. Linqto initially required a $10,000 minimum investment to invest on the Platform. By March 2023, Sarris reduced the entry price point to a $5,000 minimum investment. Again, in December 2023, Sarris lowered the

10

minimum threshold to $2,500.  By the time the Platform was shut down on March 14, 2025, Linqto allowed investors to purchase shares for as little as $1,000.

42.     Linqto's rewards program, called the "Linqto Bucks Referral Program," was another feature that Linqto offered to draw customers to the Platform.  The "Linqto Bucks Referral Program" donned the slogan "1 Referral with 2 Rewards.  As an accredited member, refer friends and you both get Linqto bucks."  "Linqto Bucks" were non-transferrable, non-redeemable for cash, expirable credits offered on the Platform to reward Investors that could be applied as partial payment or a discount to share purchases on the Platform.  Through the Linqto Bucks Referral Program, Investors on the Platform could earn Linqto Bucks for referring new Investors.  Investors would earn Linqto Bucks once the referred Investor had completed their first investment.  Occasionally, Investors would earn Linqto Bucks as a sign-up bonus or as part of a specific promotion.

B.     **Linqto's Practices**

I. **Linqto Did Not Limit Its Customers to Accredited Investors.**

43.     The Linqto Platform was not actually only limited to accredited investors.  Linqto stated on the homepage of its website (www.linqto.com) that, upon signing up to join the Platform, it would "qualify" accredited investors, in part by requiring investors who wished to enroll to submit documentation of proof that they met the minimum requirements promulgated by the SEC to protect investors by ensuring that they are financially sophisticated enough to understand the risks of private, unregistered securities with minimal reporting disclosures and obligations.

44.     These so-called "safeguards" were not well implemented.  According to Investors, Linqto allowed non-accredited investors, who it knew could not qualify as accredited investors, on the Platform as early as 2021.

11

45.     In fact, Linqto's management not only failed to take steps to remove non-accredited investors from the Platform, but they adjusted their controls to make it easier for non-accredited investors, who injected the Company with cash, to join the Platform.

46.     A former employee ("FE") of Linqto, FE-1, recalled that in 2023, Linqto was working on a test to determine an investor's "financial sophistication" called the "FiSo" test. FE-1 was a Product Marketing Lead at Linqto from November 2023 to March 2025 and reported to the VP of Product Marketing and Revenue and then to the VP of Product at Linqto. At all relevant times, FE-1's direct supervisors both either reported to or frequently interacted with Sarris. FE-1 worked on product releases, which included releases for the smartphone application as well as marketing communications promoting Linqto's Listings directly to customers through mass and individual communications.

47.     FE-1 recounted that every morning there were marketing meetings between either the VP of Product Marketing and Revenue or the Chief Revenue Officer and Sarris to discuss which Listings "to push for the day." Linqto used Braze, a customer relationship management platform which housed over one million registered users, including prospective investors and current Investors, and allowed Linqto to blast marketing emails to any registered user without regard for accreditation status.[1]  FE-1 explained that Sarris had access to this Braze.

48.     FE-1 explained that the FiSo test, a Linqto creation deployed by December 2023, used the Company's interpretation of what a "financially sophisticated" investor was. If investors passed the FiSo test, Linqto would consider them financially sophisticated and allow them to join and invest on the Platform, even if they could not otherwise meet accredited investor status by SEC standards. FE-1 explained that, during this time, Linqto had hoped to take the Company

---

[1] FE-1 indicated that records of Linqto's marketing emails and other communications with Investors and prospective investors would be housed in Braze.

public and needed to grow its investor numbers ahead of the IPO. FE-1 was told by his direct supervisors that Sarris repeatedly instructed them that the Company needs to "do whatever it takes *to pump the numbers* because we are hoping to IPO in 2024."

49. In 2023, the Company also removed its accreditation requirements. Instead of requiring prospective investors to provide documentation to prove their accredited investor status, Linqto allowed prospective investors to "self-certify" their accredited investor status by checking a box upon enrollment.

50. In addition to removing traditional accreditation controls, FE-1 explained that Linqto would also classify certain customers as "retail investors" to circumvent the accredited investor requirements in connection with allowing them to invest in certain companies. In particular, FE-1 explained how this worked with the privately owned company "Ripple" (discussed further below). FE-1 recalled that Linqto "let all these Ripple Investors in, classified them as retail investors, and had a huge influx of revenue because of that," it was "the biggest month ever." This proved to be an extremely lucrative strategy for Linqto, since according to FE-1, Ripple Investors made up approximately 60% of Linqto's investor base, although the majority of them were "not accredited."

51. Another strategy devised by Defendant Sarris to drive investors to the Platform that caused non-accredited investors to be able to invest on the Platform was the invention of the "Linqto Buck" and the "Linqto Bucks Reward Referral Program." Wanting to take advantage of the significant discount offered by the Linqto Bucks Reward Referral Program, Investors sent invites to friends and family members, both accredited and non-accredited, which enabled non-accredited investors to flock to the Platform.

52. Linqto's strategy of lowering minimum investment thresholds, removing and attempting to circumvent accreditation controls and requirements, and marketing and selling to non-accredited investors gave rise to the existence of thousands of non-accredited investors on the Platform. Because of Defendants' tactics, by the end of the Class Period, non-accredited investors made up a significant portion of Linqto's Investor base.

53. According to allegations from former Chief Revenue Officer ("CRO") Gene Zawrotny ("Zawrotny")[2], by Spring 2024, 30% of Linqto's 10,000 Investors were non-accredited. Zawrotny alleged that upon arrival he discovered the large presence of non-accredited investors on the Linqto Platform. He stated that he "strongly advised executive management that Linqto should return all non-accredited investors' money and not permit them to invest in the future until they could verify their accreditation," but that he was ignored by executive management.

54. FE-1 reported that Linqto had classified approximately 5,000 Investors as retail investors which were not accredited, as well as several hundreds of other non-accredited investors that had made their way on the Platform via the FiSo test. As FE-1 recalled, the Company was "targeting everyone and anyone to get on the Platform."

## II. Linqto's Platform Design and Ownership Structure Was Not How It Appeared

55. Upon enrollment, prospective investors were able to access the Linqto Platform. On the Platform, they could scroll through an assortment of privately held companies with "shares" available for purchase. The Platform differentiated among Listings, noting that some, like Ripple, were a "top seller," while others, like Kraken, had "limited shares" available. The smartphone application depicted below was also prominently displayed on the homepage of Linqto's website.

---

[2] On October 7, 2024, Zawrotny filed a complaint in the Superior Court of California, County of Santa Clara against Linqto, Sarris, and Endoso pursuant to California Labor Law for wrongful termination, only 107 days after joining Linqto, in retaliation for his complaints about Linqto's lack of compliance controls.

14



56.      As evidenced above and confirmed by Investors who purchased on the smartphone application, while on the smartphone Platform, once an Investor selected which Listing they wished to invest in, they were redirected to a page where they could place an order for the number of "shares" they wished to acquire in the privately held company that they had selected.  The order page listed relevant information such as the price per share, shares owned, and pages providing the Investor information about the startup and its valuation.

57.      But Investors did not actually own "shares" of the private pre-IPO companies. Instead, Sarris designed Linqto to work as follows:

- Linqto or Sarris would purchase and acquire shares in the privately held companies ("Private Securities") that were listed on the Platform.  Linqto then sold the Private

15

Securities it purchased to a Delaware Limited Liability Company called Linqto Liquidshares, LLC, created by Linqto;

- Liquidshares would either hold those Private Securities, or in the alternative, hold equity in a fund that owned the Private Securities. In both instances, Liquidshares was then supposed to allocate an interest in its holdings to a special purpose vehicle ("SPV") that Linqto had created through a Series Limited Liability Company (the "Series"); or

- Alternatively, sometimes instead of allocating the interest from Liquidshares to the Series, Linqto would instead provide funding to each Series through a loan from Linqto, with interest, that was secured by the underlying Private Securities. Using the loan proceeds, the Series would then purchase the Private Securities directly from the seller.

58. Ultimately, this complicated mechanism meant that Linqto Investors were not purchasing unregistered securities in unicorns or startups. Instead, Linqto had purchased in bulk and repackaged the Private Securities into smaller quantities so that the Private Securities could be held in a Series. Then Linqto would sell smaller quantities of membership interests in the Series, which it referred to as Series "units." Instead of purchasing shares in privately held Listings as depicted in the photograph in paragraph 55, Investors were purchasing indirect economic interests in those shares: "units" held and managed by Linqto.

59. The Platform's design thus allowed Linqto to operate as the ultimate market-maker. Linqto handled every aspect of the market from beginning to end: from purchasing the Private Securities, to transforming them into Series interests, and to selling those interests.

### III. Prices, Fees, and Markups Were Hidden Within the Offering Price

60. The prices for units of Series interests (so called "shares" of private companies or Private Securities) were comprised of several components. However, the purchase price per share,

16

also called the offering price, that was prominently displayed on the Platform's ordering page was the only price that Investors saw when placing orders.

61. That price per share consisted of: (i) the acquisition price of the Private Securities that Linqto had paid, (ii) expenses associated with acquiring the Private Securities, (iii) fees paid to supervisory affiliates, (iv) any interest owed to Linqto in connection with the loan amount transferred to the Series to fund the purchase of the Private Securities, and (v) a markup that Linqto charged on top of the acquisition price of the Private Securities.

62. Until at least approximately December 2022, Form D filings with the SEC reflect that Linqto paid a fee to Defendant Rainmaker, a registered broker-dealer and FINRA member, in exchange for "supervisory" services in connection with LiquidShares Series offerings. In connection with Rainmaker's purported work, Linqto paid Rainmaker and brokers 2.5% of sales revenue plus at least a 1.35% sales commission, respectively. Linqto passed these added fees on to Investors.

63. Linqto primarily generated profit from the difference of the price it paid for Private Securities versus the price it sold Series interests to Investors for, referred to as a "markup." Linqto's markup functioned, in practice, as a fee for Linqto's labor, and artificially inflated and overstated the offering price per share. Linqto Investors, however, were not provided with any information regarding the acquisition price, associated expenses, supervisory fees, and interest, or the markup on the Platform's ordering page or in any subsequent documentation. Monthly Account Statements similarly referred to "average cost per share" but did not provide any further breakdown on pricing.

64. The Company thus had a black box pricing system that allowed it to manipulate prices and generate a handsome profit at the expense of Investors. Linqto's markups—set both

17

manually and by algorithm—generally ranged from 20-60% of the purchase price. The former CRO alleged that the "Linqto algorithm was set to automatically increase the price each time a unit was purchased, with the markups starting at 30-35% and going up from there," and he witnessed markups "well above FINRA recommendations and requirements, sometimes exceeding 150%." FINRA's 5% policy is a guideline, suggesting that brokers should not charge markups exceeding 5% to ensure fair pricing for investors. Markups of 5% or below are generally viewed as "reasonable." Similarly, the SEC has taken the view that markups in excess of 10% are *per se* fraudulent if not properly disclosed.

### IV. Linqto's Promotional Marketing Including "Spike Days," Swaps, and Buybacks

65. Linqto engaged in several promotional marketing tactics. FE-1 recalled that during the time Linqto's minimum investment threshold level was set at $5,000, the Company would run specials lowering it to "$1,000 for today." FE-1 also recalled that Linqto would run "bundle" specials, where Investors could "bundle three companies together and get a discount," as well as 10% off and Memorial Day sales. In addition to these flashy, attention-grabbing marketing tactics, Linqto engaged in several marketing efforts targeting Ripple Investors in particular.

66. Ripple Labs, Inc. ("Ripple") is a privately held, blockchain-based digital payment company that created and launched a network and protocol that uses the cryptocurrency "XRP" along with the associated "XRP Ledger." While Ripple created and issued XRP, XRP is distinct from shares of Ripple. Ripple became a unicorn by December 2019. Given the popularity of the XRP digital asset, XRP holders wanted an opportunity to invest in shares of the company that created it. Linqto thus marketed to Ripple enthusiasts who flocked to the Platform for the opportunity to allegedly invest in Ripple. Indeed, by as late as 2025, according to FE-1, over 60% of Linqto's customer base were retail Ripple Investors.

18

67.     Ripple was often the focus of Defendants' marketing gimmicks.  For example, according to the Wall Street Journal, Sarris had a habit of holding "Spike Days," days when Linqto, by any means necessary, tried to achieve at least $1 million in sales of Series interests to investors.

68.     In January 2023, Sarris held a "Spike Day" for Ripple securities (the "January 2023 Ripple Spike Day").  Sarris instructed his subordinates "[t]ake no prisoners.  This is guerrilla warfare."  When we go for a Spike Day (over $1M in sales), we sometimes have to pull out all stops and even sell to the unwashed."  Sarris's motto for a "Spike Day" was to "[t]hrow everything we have at this one targeted date… influencers, marketing, ads, social, calls and smoke signals."  On "Spike Days," at the direction of management, Linqto employees sent out mass emails and individual messages to Investors, falsely claiming that popular Private Securities, such as Ripple, were in short supply.

69.     According to an affidavit from insider and Board observer Mr. John Deaton ("Deaton" and the "Deaton Affidavit"), despite Liquidshares owning tens of thousands of additional Ripple shares, Sarris would advertise that Linqto was trying to acquire more Ripple shares and would warn, if successful, that available shares would be limited and likely sell out very quickly.  A few days after allegedly selling out of Ripple shares, Linqto would announce a sudden, supposedly new availability of Ripple shares.  Similarly, Linqto employees would reach out to Investors individually, claiming that Ripple was out of stock, but that the Company would have more "tomorrow."

70.     In addition to its Spike Days, Linqto marketed "buybacks" and "swaps" as "exclusive," "limited" and in "high demand," hoping to capitalize on Investors' fears of missing out on potentially lucrative opportunities.  Like Spike Days, the purpose of buybacks and swaps was to generate a quick profit for Linqto.

19

71. In December 2023 and January 2024, after learning that Ripple would conduct a tender offer to buy back some of its shares at $61 per share, Linqto ran Ripple swap promotions. Investors could exchange Ripple "shares" at a fixed price of $55 per share for any company on the Platform. The $6 per share difference represented a nearly 11% markup in addition to whatever markup Sarris had initially set when he first sold Investors those units. Investors who participated in these swaps would be charged three penalties in the form of markups: (i) the 11% markup discussed above, (ii) the markup that Linqto had applied to their Ripple purchase price upon acquisition, and (iii) the markup that Linqto had applied to the purchase price for the Listing that the Investor chose to swap their Ripple interests for.

72. In June 2024, Linqto offered another Ripple swap. A June 20, 2024 email to Investors stated that they had been selected to participate in Linqto's "exclusive Ripple trading window." Investors were offered the "exclusive access" to redeem their Ripple interests for an equivalent price of $61.48 per share "by trading for any other offering available on our platform, with a 10% trading fee" up to $54,000. The email noted the Company "expected high demand for this opportunity" and "limited quantities available." Linqto did not disclose in its email that the "Exclusive Ripple Trading Window" offer was so that Linqto could participate in the Ripple tender offer. Ultimately, for Investors that participated in this offer, Linqto not only took a 10% cut in the form of the 10% trading fee, but also a fee in the form of the initial markup that it had imposed when it initially sold the Ripple "share" plus the markup on the share Investors traded for, together, far in excess of FINRA's 5% rule.

20

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

73. Throughout the Class Period, Linqto published a series of materially false and misleading statements on its website[3] and smartphone application, in its press releases, and in various marketing materials, which the Individual Defendants had ultimate control over. Additionally, Defendant Sarris made materially false and misleading statements in press releases.

74. Defendants' misstatements during the Class Period fall into the following categories: (i) materially false and misleading statements about Linqto's accredited investor requirements, (ii) materially false and misleading statements regarding Investor's ownership of Private Securities, (iii) materially false and misleading statements regarding Linqto's pricing and fee structure, and (iv) materially false and misleading statements regarding Ripple securities.

### A. Defendants Made Misstatements Regarding Linqto's Accredited Investor Requirements

75. During the Class Period, Linqto made several false and misleading statements that Linqto's Platform was only available to accredited investors and that Linqto would qualify investors for purposes of investing on the Platform.

76. Those included:

- On the homepage of Linqto's website: "Accessibility. Linqto's digital platform is inclusive, easy-to-use, and fast. *We qualify accredited investors* and provide access to investments in leading tech companies while they're still private." (Linqto's home webpage ("www.linqto.com") on April 4, 2024)[4].

- In its 2023 Press Kit: "*Linqto is a technology-enabled investment platform allowing accredited investors to identify, evaluate, invest in, and make liquid*

---

[3] A review of web.archive.org, a historical web archive that collects and preserves webpages, shows that Linqto made a series of materially false and misleading statements on its website. The dates associated with the misstatements referenced in the paragraphs below from Linqto's webpages are not intended to indicate that that date was the only date that the misstatement appeared on Linqto's webpages. Instead, it is merely intended to provide one date of many on which the misstatement appeared, in the event it is necessary to trace the misstatement back to an exemplary webpage.

[4] Unless specified otherwise emphasis is added.

*investments in the world's leading unicorns and private companies*." (Linqto's 2023 Press Kit).

- On Linqto's Frequently Asked Questions ("FAQ") webpage, which contained a series of questions with optional, expandable, drop-down answers, Linqto included the following question and response:

QUESTION:     "Do I have to be an accredited investor?"

ANSWER:     "*Yes.  As a US based company we are bound by regulations that state you must be accredited or qualified to invest* in private equity based on your local regulations."  (Linqto's FAQ Page ("www.linqto.com/faq") on August 4, 2023 and April 5, 2024 ).[5]

77.     Unfortunately for Investors, the statements bolded above were materially false or misleading when made for numerous reasons:  (1) Linqto was aware that a significant portion of its user base, at least 30% by Spring 2024, were non-accredited investors; (2) Defendants even took action to make it easier for non-accredited investors to join the Platform by eliminating any accreditation auditing or oversight in favor of a FiSo test that ignored SEC accreditation standards and a "self-certify" check box; (3) Linqto actually invited non-accredited investors to sign up and make purchases on the Platform, both by soliciting investors directly, calling them "retail" Investors, and via the Linqto Bucks Referral Rewards program.

**B. Defendants Made Material Misstatements and Omissions Regarding Investors' Ownership**

78.     During the Class Period, Linqto made several materially false and misleading statements regarding Linqto's investment model and the very nature of the offerings on its Platform.

79.     Specifically, Linqto made the statements below on the home page of its website, in its marketing materials, and in its press releases:

---

[5] Because this statement made assurances as to Linqto's compliance with federal regulations when, as described in Section VI, by as late as October 16, 2023, it had been informed by Lowenstein Sandler in a legal memorandum that it was not, it is further false and misleading.

22

- "Private Investing Made Simple.  Linqto helps you identify, evaluate, and *invest in the world's leading Unicorns*."  (www.linqto.com on September 15, 2021).

- "Private Investing Made Simple.  *Invest in top mid to late-stage start-ups* with affordable minimums."  (www.linqto.com on May 17, 2023).

- "Your Access to Private Investment.  *Invest in leading startups* with affordable minimums broadening investment opportunities for all."  (www.linqto.com on December 1, 2023 and August 3, 2024)

- "Linqto is a technology-enabled investment platform allowing accredited investors to identify, evaluate, *invest in, and make liquid investments in the world's leading unicorns and private companies*."  (Linqto's 2023 Press Kit).

- "About Linqto.  Linqto is a global investing platform enabling individual investors to identify and *invest in private companies and unicorns*."  (*Linqto's Trading Platform is Democratizing Private Investing*, September 30, 2024).[6]

- "Linqto is a pioneering fintech company simplifying private market investments for accredited investors. Based in Silicon Valley, our user-friendly platform provides *direct access to private securities in top private companies*."  (Linqto's LinkedIn "About Us" ("www.linkedin.com/company/linqto-inc-") on December 5, 2024 and February 20, 2025)

- "'Business has radically transformed since our founding, uniquely positioning Linqto as a go-to resource for all accredited investors, whether they want to diversify their portfolio during times of economic volatility or are passionate about *investing in companies offered on the platform*,' said Bill Sarris, CEO of Linqto." (*Linqto Introduces Refreshed Brand Identity and New Feature to Provide True Liquidity in Private Market Investing*, July 18, 2023).

80.     Unfortunately for Investors, the above statements were materially false or misleading when made because they represented that Investors were directly investing in private companies and unicorns on the Linqto Platform.  This misled Investors to believe that through the Linqto Platform they were actually "invest[ing] in private companies" when, in reality, the Linqto Platform was not designed to facilitate investments in private companies at all.  All Investors were investing in were Linqto Series—*i.e*., Linqto allowed Investors to invest in Linqto-created SPVs.

---

[6] Several other Linqto press releases contained similar disclosures, such as "Linqto is a leading global financial technology investment platform allowing accredited investors to identify, evaluate, invest in, and make liquid investments in the world's leading unicorns and private companies" including in: (1) *Linqto Surpasses $200M in Total Investments and Announces Lowest Accessible Entry Point in Private Equity*, March 22, 2023; (2) *Linqto Introduces Refreshed Brand Identity and New Feature to Provide True Liquidity in Private Market Investing*, July 18, 2023; (3) *Linqto Soars to 500K Users in Over 110 Countries*, December 12, 2023.

81.     Therefore, by continually stating that Investors could "invest in private companies," Investors were led to believe that they held actual shares of these companies when all they were investing "in" were Linqto Series vehicles holding privately held company shares.

82.     Similarly, the smartphone application, as well as the associated photographs on Linqto's home webpage, indicated that the smartphone application contained a landing page with the slogan "Private Investing Made Simple" where Investors could click on a Listing of a privately-held company which would then direct them to an "order" page where Investors could set the number of shares they wanted to place the order for.  The "order" page also contained information regarding the price of the "share."





---

[7] www.linqto.com on March 1, 2021.
[8] www.linqto.com on July 5, 2023.

24

83.     Both views of the smartphone application depicted a home landing page cataloging the Platform's Listings of privately held companies, such as Coinbase, Ripple, Robinhood, and Bitpay.  The photographs demonstrate that when an Investor selected a Listing from the home landing page, they were then directed to a page for that Listing where they could place an order for shares.  On the ordering page, Investors could set the number of shares they wished to order, and the Platform calculated the total cost or amount of the order by multiplying the displayed price per share times the shares the Investor wished to purchase.  Over time, Linqto appeared to have added features to the smartphone application.  As the application developed, as shown on the smartphone depicting a "Bitpay order" above, Investors were also provided with historical information on the number of "shares owned."  Further, the order pages were updated to include additional information about the privately held company in which Investors were purportedly placing orders for shares.  This additional information included an "about" page, "summary" page, and "valuation" page.

84.     Unfortunately for Investors, the smartphone applications depicted above, as well as the statements made on Linqto's home webpage depicting the smartphone application, were materially false and misleading when made.  By depicting home landing pages containing Listings of popular privately held companies such as Ripple and Bitpay that, when selected, directed Investors to "order" pages where Investors were shown a set price per share and could "review order[s]" and "place order[s]" for "shares," Linqto misled Investors into believing: (i) that they could place orders for shares in these privately held companies via the Platform, and (ii) that when they placed these orders, they would be receiving shares in privately held companies, or Private Securities, in exchange.  In reality, Investors were instead purchasing "units"—not "shares"—of interests in Series that held Private Securities which belonged to Linqto.  Therefore, Investors were

25

purchasing indirect economic interests in shares of Linqto created vehicles, not Listings of the privately held companies displayed on the landing homepage of the smartphone application. The fact that the order page contained a list price per share, without any further information regarding that price, further misled Investors to believe that they were investing directly in the private company and that the listed price per share was the price that the private company was selling their shares for via the Linqto Platform.

85. FE-1, a former Product Marketing Lead at Linqto, confirmed that if a prospective investor had visited the Platform via the website or smartphone application to effectuate a purchase on the Platform without carefully combing through further information, digesting the materials, talking to sales, and "be[ing] careful," "they wouldn't have known" that they were "buying a derivative of an investment."

**C. Defendants' Misstatements Regarding Linqto's Pricing and Fee Structures**

86. During the Class Period, Linqto made several false and misleading statements regarding its pricing and fee structure. Specifically, Linqto made the following misstatements regarding Linqto's fees and costs on its webpage.

- "Affordability. Our private investments are offered at an affordable price. A minimum order is $5,000 with *no added fees or hidden costs*." (www.linqto.com on July 5, 2023).

- "Affordability. Linqto democratizes private investing by offering affordable entry points with low minimums and *no added fees*, making the private market more accessible than ever before. (www.linqto.com on April 20, 2024 and June 26, 2024).

- "At Linqto, we value accessibility, innovation, and security. We believe that private equity investing should be accessible to all who meet SEC requirements, which is why we offer a modest minimum investment of $5,000 and *no hidden fees or costs*." (Linqto 2023 Marketing Press Kit).

- On Linqto's FAQ webpage, which contained a series of questions with optional expandable, drop-down answers, Linqto included the following question and response:

    QUESTION:      "*Are there fees to invest?*

ANSWER: *No! Linqto sources deals and marks them up so that there are no further follow on fees for the investor whatsoever. While fees have historically been high in private markets, we at Linqto, are proud to offer a zero-fee investment management platform. Linqto has no continuing management fees/expenses, no brokerage fees, no carried interest, nothing*." (www.linqto.com/faq on August 4, 2023 and April 4, 2024).

87. Unfortunately for Investors, the statements bolded above were materially false and misleading when made. These statements assured Investors that the purchase price per share that Investors saw when placing orders on the Platform was the price of the Private Security offered by the issuing company and did not include any additional expenses, fees, or costs. In reality, the price that Investors were quoted was a combination of several different fees and costs, including: (i) costs associated with the acquisition of the Private Security, (ii) costs associated with any fees, (iii) costs in the form of interest that the Liquidshares SPV owed to Linqto in connection with the acquisition of the Private Security, and (iv) fees imposed in the form of a massive markup.

88. Contrary to the fee representations made the Amended and Restated Limited Liability Company Operating Agreement of Linqto Liquidshares, LLC, effective January 21, 2020 to January 1, 2024, Liquidshares, a Linqto creation, imposed an annual "management fee" of .5% on each Series which was "equal to one-half of one percent (0.5%) per annum of the total Subscription Amounts in respect of such Series." In December of 2022 and 2023, Linqto reported that it had over $170 and $300 million in investments, respectively, meaning that in 2022 and 2023, Linqto took management fees of at least $850,000 and $1.5 million, respectively. And, according to Form D filings, Investors paid fees in the form of supervisory fees of 2.5% and sales commissions of 1.35% to Rainmaker Securities and Defendant Endoso.

89. These statements were also materially false and misleading because had Linqto charged "no added fees," then the price per share would have solely reflected Linqto's acquisition price. On the ordering page, where Investors select the number of shares they wish to place an

27

order for, a price per share is listed. For example, with respect to the photograph depicting a Ripple transaction in paragraph 82, the smartphone application displays Ripple "Shares at $30.00." In reality, Ripple shares were priced somewhere much lower than $30.00 per share. The $30.00 per share price actually represented the sum of: (i) the acquisition price that Linqto had paid for the Ripple share, (ii) expenses associated with acquiring the Ripple shares, (iii) supervisory fees associated with acquiring the Ripple shares, (iv) any interest owed in connection with the acquisition of the Ripple shares, and (v) the fee imposed, in the form of a markup, on the Ripple share. By design, the Platform misled Investors by failing to disclose and obscuring Linqto's actual fee structure.

90. Specifically, as to the markup, buried in Linqto's FAQ page, Linqto provided the following misleading "disclosure":

> QUESTION: "How does Linqto make money?
>
> ANSWER: Linqto purchases shares in large quantities from founders, employees, and investors, so we're able to get a great price on them. ***We then turn around and sell that equity in smaller quantities to many investors with a reasonable markup***." (www.linqto.com on August 4, 2023 and April 4, 2024).

91. Unfortunately for Investors, the statement bolded above was materially false and misleading. Linqto's markup ranged anywhere from 20-60%, but occasionally climbed as high as 150%. FINRA has guided that "reasonable markup[s]" generally do not exceed 5% and the SEC has found undisclosed markups of more than 10% are inherently fraudulent, which as discussed in Section VI, Lowenstein Sandler emphasized to Linqto, and specifically to Defendant Sarris, by October 16, 2023.

**D. Defendants Made Specific Material Misstatements and Omissions Regarding Ripple**

92. As discussed above, Ripple, a privately held company that had created the XRP digital asset, had a massive following on the Linqto Platform. Defendants capitalized on its

popularity by making it the focus of numerous "Spike Days," swaps, and buy-backs. In connection with those marketing blitzes, Defendants made a number of misstatements. Those included:

- Claiming that Linqto was "out of inventory for Ripple" but that the Company would have more "tomorrow;" and

- That there was an "exclusive trading window" with "exclusive access" because the Company "expected high demand for this opportunity" and "limited quantities available."

93. Unfortunately for Investors, the statements in these mass emails and communications with Investors were false and misleading for several reasons. To begin with, the "limited quantities available" and high demand were entirely fabricated by Defendants to create artificial demand. In fact, Liquidshares owned tens of thousands of additional Ripple shares.

94. Linqto also did not disclose that the "Exclusive Ripple Trading Window" offer was so that Linqto could participate in the Ripple tender offer. Ultimately, for Investors that participated in this offer, Linqto not only took a 10% cut in the form of the 10% trading fee, but also the initial markup that it had imposed when it initially sold the Ripple share and the markup on the share Investors traded for, together, in excess of FINRA's 5% rule.

## VI.    THE TRUTH IS REVEALED

### A.    The First Legal Memo Is Issued

95. Linqto's fraudulent and misleading conduct in violation of several securities laws as well as FINRA rules was first memorialized by October 2023. According to Deaton's Affidavit, on October 16, 2023, Sarris received a legal memorandum from the law firm Lowenstein Sandler LLP (the "2023 Legal Memo").

29

96.     Linqto had retained Lowenstein Sandler, a national law firm with an experienced securities practice, ahead of a potential IPO.  The 2023 Legal Memo informed Sarris that regulators would likely find that Linqto had violated several securities laws and regulations.  These violations included violations of Section 10(b) of the Exchange Act and its associated Rule 10b-5, Sections 5 and 17(a) of the Securities Act, Section 7(a) of the 1940 Act, as well as several FINRA rules.  Lowenstein Sandler "recommend[ed] that Linqto take immediate remedial action to prevent further violations of U.S. securities laws[.]"

97.     The 2023 Legal Memo addressed several serious issues at Linqto.  First, it discussed Linqto's practice of charging excessive and undisclosed markups, noting that "Markups regularly equal or exceed 20 – 50% of the underlying value of the Private Company securities" and "neither the basis of the Markups nor the amount of Markups are disclosed to investors."  Lowenstein Sandler advised Sarris that "it is highly likely that the SEC would view Linqto's charging of Markups without adequate disclosure to investors as, at a minimum, constituting violations of Rule 10b-5(b) as well as Section 17(a)(2) of the Securities Act" and that "[g]iven the SEC's particular sensitivity to excessive markups, it is also likely the SEC would also view these activities as violating Rule 10b-5(a) and (c) as well as Section 17(a)(1) and (3) of the Securities Act."  As a result, Lowenstein Sandler advised that Linqto needed to reduce its markups to be consistent with FINRA's 5% policy and that, after weighing several relevant factors set out by FINRA to determine if a markup may reasonably exceed 5%, "it would be difficult to justify [m]arkups on [Linqto's] Private Securities in excess of 5%."

98.     Second, the 2023 Legal Memo pointed out that Linqto had established relationships with investors that were unable to be verified as accredited investors through Linqto's marketing efforts in connection with its 506(c) offerings.  Linqto did so in direct contradiction with the SEC's

30

2020 Final Rule that "an issuer may not conduct a Rule 506(c) general solicitation in order to identify potential investors for the Rule 506(b) offering."[9] Linqto Series membership interests offered in reliance of Rule 506(b) could offer subscriptions to an unlimited number of accredited investors but capped subscriptions at 35 non-accredited investors, while offerings in reliance of Rule 506(c) may be offered to any number of accredited investors as long as the offering company takes steps to verify their accredited status.

99. Third, the 2023 Legal Memo pointed out Linqto's plan or scheme to evade the registration requirements of both the Securities Act and the 1940 Act. To comply with Section 3(c)(1) of the 1940 Act, and thus exempt itself from registration requirements, Linqto structured its Series to accommodate for the 100-person investment limit for non-investment companies. Once a Series reached 100 investors, Linqto would create another Series for the next 100 investors. This way, Linqto could exclude itself from the statutory definition of an "investment company" under Section 3(c)(1) of the 1940 Act and Rule 506(c). The 2023 Legal Memo informed Sarris that although Linqto had created various Series to hold the Private Securities in order to comply with federal registration laws, the SEC would likely view, for example, each of the 164 Series created with Ripple shares as each part of the same issuance since each Series so closely resembled each other.[10] Thus "each Series would no longer be able to avail itself of the Section 3(c)(1) exclusion from the definition of 'investment company,'" and Liquidshares would likely be found

---

[9] Former CRO Zawrotny confirmed this practice in his complaint, alleging that "Linqto artificially created 'new' funds – that are identical in all but name – to circumvent the SEC's Rule 506(b) of the Regulation D 'safe harbor,' and routinely violated the 30-day relationship requirement thereunder."

[10] Linqto Liquidshares, LLC filed several Form D filings with the SEC using the same Filer ID Number ("CIK") for various Series all bearing similar naming conventions. For example, the Series that purportedly held shares of Ripple were named variations of "Linqto Liquidshares LLC – Ripple – XXX" with "XXX" referring to a number that Linqto would build on chronologically every time it added another Series. So, if the Series was the 120th that was created, it would bear the designation "Linqto Liquidshares LLC – Ripple – 120."

to have violated the Exchange Act for failing to appropriately register as an investment company under Section 12(g) since its offering structure would be viewed as a scheme to evade registration.

100. Fourth, Lowenstein Sandler found that Linqto's Series and associated documentation were deficient. The Series failed to "(1) adequately disclose the fact that the underlying Private Securities [were] being sold to investors pursuant to a significant Markup, (2) adequately detail or contemplate the actual ownership structure of the underlying Private Securities; or (3) respect the corporate formalities in establishing new Series[.]" In addition to the Series deficiencies, Lowenstein Sandler raised alarms regarding the loans that Linqto provided to each Series to purchase securities, noting that "[t]he lack of disclosure regarding the existence of the loans and the associated interest owed to Linqto [] would likely be viewed as an omission of a material fact in the Liquidshares Offerings because it, among other things, affects the price per Series Membership Interests."

101. Finally, Lowenstein Sandler found that it was "very possible that the SEC or a state regulator could find that the Series failed to properly make their Form D filings or any associated state blue sky filing notice[s]" due to the Series structure and nomenclature described in footnote 10.

102. Lowenstein Sandler advised Sarris that "Linqto should, at a minimum, (1) immediately cease charging Markups and/or facilitate reduced Markups through Linqto Capital[11] in an amount and manner consistent with FINRA Rule 2121 and FINRA Rule 2010; (2) immediately terminate all pending Rule 506(b) offerings to non-accredited investors and cease any future 506(b) offerings []; (3) remediate the Series Deficiencies through revised offering documentation and disclosure; (4) adjust its Form D filing methodology; and (5) for affected

---

[11] Linqto Capital, LLC ("Linqto Capital") is a Linqto-affiliated registered broker-dealer and FINRA member; however, it never facilitated any private placement activity described in the 2023 Legal Memo.

offerings, consider whether it is appropriate to repurchase investors' securities in a recission offer or to dissolve each applicable Series and provide a return of capital to investors."

103. Individual Defendants disregarded Lowenstein Sandler's legal advice. Linqto, under the direction of Individual Defendants, ultimately did not address the substantial violations of federal and state law laid out in the 2023 Legal Memo. Even after receiving the 2023 Legal Memo, Linqto continued to engage in deceptive and fraudulent practices in violation of federal and state law. A year later, Linqto's regulatory violations and fraudulent marketing tactics remained unaddressed and had caught the attention of the SEC's Division of Enforcement. By October 2024, the SEC had notified Linqto that it was investigating whether the Company had violated federal securities laws.

### B. The Second Legal Memo Is Issued

104. Around this time, Sarris received another plea to stop violating federal laws, this time from internal counsel at Linqto. An October 25, 2024 internal legal memo ("the 2024 Legal Memo"), addressed to Sarris from Jack Drogin (General Counsel), Jodi Jamison (Deputy General Counsel), and Susan Woodard (Chief Compliance Officer) (collectively, the "Legal Team"), alerted Sarris again to the outstanding legal and regulatory issues at Linqto.

105. The Legal Team advised Sarris that "[t]he federal securities law issues must be resolved as soon as practicable, particularly in light of the recent SEC request for information and the likely FINRA enforcement actions." Over an entire year later, it appeared that Linqto had done little to address several of the outstanding violations of federal and state securities laws, including the issue of undisclosed, excessive markups and the regulatorily deficient nature of Linqto Series' structure.

106. The Legal Team explained to Sarris that if the SEC determined that Liquidshares was acting as an unregistered dealer, which the 2023 Legal Memo strongly advised it would, then

the SEC would deem any undisclosed markups exceeding ten percent as inherently fraudulent. To address this, the Legal Team recommended that Linqto alter its fee structure and instead impute the cost of purchase and operation to Linqto and sell the securities at cost while disclosing those costs to investors.

107. Also, echoing the 2023 Legal Memo, the 2024 Legal Memo put Sarris and the other Individual Defendants on notice, again, that the SEC would likely find that Linqto could not rely on the exemption from Investment Company Status due to the set-up of the Series structures. The Legal Team warned Sarris, "[i]f we are found to be operating unregistered investment companies, the SEC could cause us to cease doing business in our current form" so "we need to stop selling additional SPVs owning identical underlying securities unless we can develop a method of materially differentiating between SPV series." The Legal Team proposed that Linqto should consider offering a recission to Investors in the more popular Series classes such as Ripple to avoid SEC scrutiny.

108. Memorialized in the 2024 Legal Memo, the Legal Team also expressed concern to Sarris that Linqto had been allowing Investors to "self-certify" their accredited investor status for several months rather than requiring Investors to provide evidence of accredited investor status. The Legal Team warned Sarris that such practices put Linqto at risk of selling unregistered securities, which could result in recission or regulatory action, and that Linqto needed to reinstate the documentation requirement for accredited investor status "ASAP."

109. The 2024 Legal Memo raised several additional compliance concerns, including that:

- many Linqto employees had been inappropriately relying on an "issuer exemption" and thus risked being deemed to be acting as an unregistered broker-dealer;

- Linqto's Anti-Money Laundering ("AML") and Know Your Customer ("KYC") policies were deficient. The Legal Team noted "our current practice exposes us to significant regulatory penalties." For example, the Platform used Plaid ID verification, a service that helps businesses verify the identity of their customers to prevent fraud and ensure compliance;

- Linqto's Plaid ID set up had "autofill" turned on which, in practice, allowed users to "autofill" their name and social security number, which is not compliant with FinCEN requirements; and,

- Linqto needed to "[i]mplement transaction monitoring and suspicious activity reporting."

110. The Legal Team advised Sarris to stop high-pressure sales tactics and reduce the number of promotions Linqto was running, reminding him that communications must be fair and balanced and cannot be false or misleading. The Individual Defendants ignored the Legal Team's advice.

### C. Resignations and Turnovers Ensue at Linqto

111. The true extent of Linqto's fraud only became apparent after Dan Siciliano ("Siciliano") replaced Sarris as Linqto's CEO on January 2, 2025, although it doesn't appear that this news became public until March 14, 2025.[12] Endoso was replaced in January 2025 as well.

112. Following Sarris's and Endoso's departures, the depths of Linqto's mismanagement came to light. New leadership under Siciliano became increasingly concerned that prior management under Sarris had known about serious, pervasive securities law violations beginning as early as 2020, but had failed to adequately address them. As a result, over the

---

[12] Sarris, however, remained on the Linqto Board of Directors at that time.

following months, Siciliano removed several senior executives and announced a new Chief Operating Officer and Chief Administrative Officer for Linqto as well as a CEO and General Counsel for Linqto Capital.  Paul served as CFO at Linqto until May 2025.

113.    During the first half of 2025, in an effort to implement cost-saving efforts and to combat the Company's liquidity crisis due to the bankruptcy described further below, Linqto reduced its full-time employee headcount from 87 to 28, representing a 68% decrease.

**D.    Linqto Files for Bankruptcy**

114.    On or around February 27, 2025, new management froze client accounts and paused operations on the Platform to address the serious operational and compliance deficiencies that they had uncovered since Sarris had stepped down as CEO.

115.    By March 13, 2025, it had become clear to new management that Linqto's model was structured in such a non-compliant way that Linqto could not continue to operate without risking the business, Investor funds, and further violating securities laws.  According to Linqto's new management, the culture of non-compliance at Linqto was pervasive, had persisted and remained unaddressed for years, and went far beyond small or common compliance and regulatory failures.  Linqto shut down the Platform and ceased all trading operations that day.

116.    Over the next few months, Linqto's new management continued its internal probe into previous management's misconduct.

117.    In a June 23, 2025 summary of Linqto's June 17, 2025 town hall update to Investors, Linqto stated that the "regulatory problems were deep" and that "[t]he most pressing concern is the ongoing investigation by the SEC's Division of Enforcement, which is not a mere routine examination."  Linqto further explained that "[i]nternal reviews have found possible evidence of *serious regulatory violations* by previous management, potentially including issues with pricing disclosures and *misleading claims around share ownership*."  Linqto further stated

36

that "Liquidshares was not properly structured as a series limited liability company, shares purchased by Liquidshares were never transferred to the series, and the series were never properly created." In a July 16, 2025 affidavit, Defendant Jiang, a former Board member, acknowledged that Linqto had regulatory issues that he and the other Individual Defendants needed to resolve.

118. On July 7, 2025, Linqto filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy"), citing structural and ownership deficiencies as well as SEC and FINRA investigations.

119. On August 4, 2025, Linqto published a letter to the Linqto community. The letter stated that "[t]he new Linqto management team – upon arrival in early 2025 – discovered serious operational challenges, including alleged securities law violations under investigations by the SEC and other regulators, as well as major defects in Linqto's corporate structure that raised questions about customer ownership." Further, Linqto's new management explained that so far it had "delivered hundreds of thousands of documents and remain in regular contact" with the Enforcement Division of the SEC and other regulators.

120. On August 21, 2025, Siciliano published another letter to the Linqto community, detailing the "*shocking misconduct that systematically defrauded customers and was built into the platform itself*" that new management uncovered. Siciliano further wrote that Linqto's documents, including communications with regulators, corporate documents, internal emails, and marketing materials showed "*a despicable and intentional pattern of lies and in many cases, clear-cut fraud, which was ongoing for years*." Siciliano told Linqto Investors that "prior management never created the proper structure to hold your investments." The "'SPVs' that prior management said they had created to hold your investments were simply not established" and that "the Linqto platform was operating completely outside of legal norms."

37

121. The Bankruptcy primarily involves new management's attempts to rectify Defendants' and Linqto's historical non-compliance with securities laws, including by cooperating with relevant regulatory bodies and exploring compliant structures for Investors to access investments and realize returns from those investments, although Investors have not been able to access their investments since the Platform shut down.

## VII. UNDISCLOSED ADVERSE FACTS

122. As a result of Defendants' fraudulent scheme detailed herein and the materially false and/or misleading statements, and/or failures to disclose, detailed herein, Linqto sold Series interests to Investors at artificially inflated, overstated, and manipulated prices. Plaintiffs and other Investors, relying on Linqto's "share prices" and other information relating to or contained on the Platform, purchased Series interests—disguised as "shares"—on the Platform and have been damaged thereby.

123. During the Class Period, Defendants engaged in a fraudulent scheme and made material misrepresentations and omissions, particularized in this Complaint, that directly caused or were a substantial contributing cause of damages sustained by Plaintiffs and other Investors. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and misrepresented the Platform's offerings as alleged herein.

124. During the Class Period, Defendants engaged in a fraudulent scheme and made materially false and misleading statements and/or omissions to generate profit, at the expense of Investors, that had the effect of driving Investors, including non-accredited Investors, to make purchases on the Platform, thus causing Investors to pay artificially inflated, overstated, and manipulated prices at all times. Defendants' fraudulent scheme and materially false and misleading statements and/or omissions, which resulted in Plaintiffs and other Investors

38

purchasing Series interests at artificially inflated, overstated, and manipulated prices, caused the damages complained of herein.

## VIII. LOSS CAUSATION

125. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and other Investors. During the Class Period, Plaintiffs and other Investors purchased or otherwise acquired units of Series interests at artificially inflated, overstated, and manipulated prices far exceeding the Private Securities' acquisition price.

126. As a result of Defendants' fraudulent scheme and their materially false and misleading statements and/or omissions, Investors were falsely led to believe they were purchasing Private Securities and paid artificially inflated, overstated, and manipulated prices in the form of undisclosed markups and fees and were damaged thereby.

127. In addition, Plaintiffs are also aware of at least one instance of the unauthorized sale of assets. In connection with Ripple's December 2024 tender offer, Sarris authorized the improper sale of approximately 3.1% of customer-linked Ripple shares for approximately $18 million without informing Investors or seeking their approval. On November 5, 2025, Ripple was valued at approximately $40 billion. Ripple's valuation directly bears upon the damages caused to Investors by the unauthorized sale of 3.1% of Ripple shares, approximately 141,000 shares.

128. Linqto has reported that the sale generated approximately $18 million, which is being used to pay for Bankruptcy costs. On information and belief, Sarris sold Ripple shares for $60 and $100 per share. With an approximate average share price of $80 and approximately 141,000 shares involved in the unauthorized sale, Linqto Ripple Investors have lost nearly $24 million in value due to that unauthorized sale alone.

## IX.    DEFENDANTS' SCIENTER

129.    By virtue of their positions, the relatively small size of the Company, the significant influence that Individual Defendants had over the day-to-day activities of the Company, the Company's blatant and visible marketing, and the Company's intention and activities undertaken in order to prepare to go public, the Individual Defendants were aware of and participated in significant compliance issues at Linqto.  Additionally, all Defendants had access to Linqto's website, smartphone application, press releases, and marketing materials.

### A.    Financial Motive

130.    Defendants had financial motive to charge Investors excessive, undisclosed markups and fees and to welcome anyone onto the Platform.  Linqto, a private company, is not required by law and therefore does not publish information on its financials, including any information on insider selling, equity, salary, or bonuses.  Thus, Defendants could impose whatever excessive, manipulated markups and undisclosed fees they wanted in order to generate a profit for Linqto and themselves.

131.    For example, according to SEC Form D Filings that Defendant Paul prepared, signed, and submitted, Liquidshares paid Defendant Rainmaker a supervisory services fee in the amount of 2.5% of the offering amount and an additional sales commission of 1.35% the offering amount.  Defendant Endoso, listed as a previously registered broker-dealer affiliated with Rainmaker Securities between November 2020 and January 2023 according to FINRA, received the additional sales commission.  While Rainmaker's relationship with Linqto and the Individual Defendants is unclear, both Rainmaker and the Individual Defendants profited from inflated and manipulated Series offerings.

132.    Even a relatively "small" markup dollar-wise was lucrative for Defendants.  For example, according to the Wall Street Journal, in 2022, Sarris urged a manager to increase the

price of PolySign securities, one of Linqto's most popular offerings, from $3 to $3.25 per share (an 8.33% markup). That $.25 increase had the effect of boosting Linqto's revenue by $600,000 on top of the illicit revenue that Defendants already undoubtedly enjoyed from the initial markup.

### B. Additional Allegations of Scienter as to Defendant Sarris

133. According to insiders and the Wall Street Journal, Linqto employees called Sarris "The Wizard of Oz." Sarris was known to take a heavy-handed and extremely involved approach to management at Linqto. Sarris behaved as if he could run the Platform however he wanted, with little regard for Investors or securities laws. With respect to the PolySign markup, Sarris had even commented "[w]e can turn it into a Unicorn via our platform."

134. According to FE-1, Sarris and Linqto's Chief Architect built the Platform and Sarris had direct access to the Platform and its back-end system. FE-1 stated that the back-end system of the Platform reflected the price that Investors would pay. FE-1 recalled through conversations with his direct supervisor that Sarris would go into the Platform and "frequently change" the price per share that Investors would pay, "mark[ing] up shares however he wanted to" "beyond the regulated amount." FE-1 also recalled that Sarris would "get mad" at his team regarding the marketing around product releases. FE-1 recalled that his team had implemented a methodology on the Platform that automatically sorted best-selling companies at the top of the Platform's Listing page. Sarris, however, wanted "to be able to pick" the companies that would appear first or at the top of the Platform's Listing page and regularly chose to promote companies he liked.

135. According to FE-1, Sarris would pressure FE-1's direct supervisor to send out specific emails to customers to invest in particular companies listed on the Platform to "create FOMO."[13] FE-1 also reported that on several occasions, Sarris threated to fire FE-1's direct

---

[13] "FOMO" stands for "fear of missing out."

supervisor because he "wasn't abiding by" Sarris's instructions.  FE-1 recalled seeing messages on his direct supervisor's Microsoft Teams account from Sarris saying, "if you don't do this, I'll get rid of you on Monday."  FE-1's direct supervisor advised him to "steer clear" of Sarris and ultimately left due to "pressure from Sarris."

136.    Sarris certainly received and reviewed both the 2023 and 2024 Legal Memos, outlining the extremely high likelihood that regulatory authorities would find that Linqto's undisclosed and excessive fee practices, offerings and structure, and communications with non-accredited investors, in addition to numerous other compliance failures, violated federal and state securities laws.

137.    Although several employees raised concerns to Sarris regarding Linqto's illegal and misleading practices, Sarris largely ignored them and told employees to "[f]orget what legal says" and that "[i]f I think legal should be overridden, I will tell you."  As FE-1 recounted, the general sentiment was to "steer clear" of and not question Sarris because "if you got in his way, he would fire you."

**C.    Defendants Knew of or Recklessly Disregarded Material Undisclosed Information**

138.    Defendants knew of and/or recklessly disregarded material undisclosed information regarding Linqto's offerings, its investor base, and the Company's significant compliance concerns.  This knowledge is demonstrated in several ways.

139.    First, former employees explain Individual Defendants' involvement in the scheme. FE-2 was a Marketing Manager and later Brand Manager at Linqto from 2022 to April 2024.  As a Marketing Manager, FE-2 worked with the Revenue Team and Marketing Teams as a liaison, lining up communications.  As a Brand Manager, FE-2 worked on marketing campaigns and communications.  In those roles, FE-2 worked directly under the Chief Revenue Officer, Chief

42

Marketing Officer, and Head of Brand. FE-2 stated not only that Linqto's marketing emails contained "inflammatory language and total hyperbole," but that the practice of marking up shares was "fairly well known in the Company" and there appeared to be a "proactive stance to make sure it wasn't communicated" to Investors since it was conveniently excluded from marketing materials, "at the top of funnel," and to Investors in the smartphone application.

140. Additionally, according to FE-1, Linqto often received customer complaints regarding its prices and Investors frequently asked about prices through the Company's online form. In particular, FE-1 recalled a customer complaint about a price per share for a company that was higher than the price per share listed on Forge, a competitor platform, which Linqto differentiated itself from in its 2023 Press Kit.

141. FE-2 recalled that in Spring 2023, Linqto did a "full rebrand" and "deep dive" with a consulting company to determine the Company's current "audience." The deep dive found that Linqto Investors were not mature investors with experience investing. According to FE-2, the director of the consulting company "would fly out and meet on site with C-Suite members." Ultimately, the findings were incorporated into Linqto's brand book, which everyone at the Company had access to.

142. Furthermore, management, including Individual Defendants, knew of and/or recklessly disregarded serious compliance concerns. According to FE-2, Linqto's Compliance team, which consisted solely of Defendant Moran, the Chief Compliance Officer, often insisted that marketing remove language in the fine print about Linqto's accredited investor requirements, causing tension between Compliance and Marketing.

143. Second, Former CRO Zawrotny alleged that when he joined Linqto in January 2024, he quickly became aware of and repeatedly called to the attention of Linqto's leadership significant compliance issues within the Company.

144. Zawrotny alleged that he convened weekly compliance meetings to discuss these issues at Linqto. When he learned about non-accredited investors on the Platform, Zawrotny alleged that during one meeting he "strongly advised executive management that Linqto should return all unaccredited investors' money and not permit them to invest in the future until they could verify their accreditation." Individual Defendants did nothing to correct the problem.

145. The former CRO alleged that he also rang the alarm bells as to Linqto's smartphone application design and undisclosed markups. His recommendation that "Linqto's marketing stop referring to 'shares' and instead refer to 'units' that represent shares on a 1:1 ratio" was ignored, as was his suggestion that Linqto reduce markups and use a carried interest model to make up for lost profits "because Linqto's executives did not want to defer the company's profits until the underlying investment had exited, assuming it ever did."

146. The former CRO alleged that these issues, as well as other compliance and broker licensing issues, led him to convene a weekly "Risk Meeting" with top executives, including Defendants Endoso and Moran, to discuss. The former CRO alleged that he was ultimately terminated in retaliation for bringing these issues up to management.

147. Third, the 2023 and 2024 Legal Memos expressly evince Individual Defendants' knowledge of the falsity of their statements. The 2023 Legal Memo informed Individual Defendants that: (i) Linqto's undisclosed mark-ups, "which regularly equaled or exceeded 20-50%" of the acquisition price, violated the Securities Act, (ii) Linqto could not rely on exemptions to registration under Rule 506(c) and/or 506(b) because it had been impermissibly forming

44

relationships with non-accredited investors, (iii) the SEC would likely view Liquidshares' offering structure as a scheme to evade registration, (iv) the Series and associated documentation were deficient, and (v) the SEC or a state regulator would likely find that the Series failed to properly make Form D and associated state filings.

148.    The 2024 Legal Memo reiterated and informed Individual Defendants as to many of the regulatory violations addressed in the 2023 Legal Memo as well as additional compliance concerns, advising Individual Defendants that "[t]he federal securities law issues must be resolved as soon as practicable, particularly in light of the recent SEC request for information and the likely FINRA enforcement actions."  The 2024 Legal Memo warned that: (i) Linqto needed to alter its fee structure and disclose costs to investors because "the SEC would deem any undisclosed markups exceeding ten percent as inherently fraudulent," (ii) Linqto needed to correct its Series structure so that the Company wasn't found to be "operating unregistered investment companies," (iii) Linqto needed to stop allowing Investors to "self-certify" their accredited investor status, (iv) Linqto employees risked being deemed to be acting as unregistered broker-dealers, (v) Linqto's AML and KYC policies were deficient, and (vi) Linqto needed to implement transaction monitoring and suspicious activity reporting.

149.    In April 2024, Linqto announced plans to enter into a definitive business combination agreement with BCSA.  According to BSCA's April 9, 2024 8-K filing with the SEC, Linqto was approached by BSCA in late 2023 for an IPO and "[a]fter months of review" Linqto and BSCA entered into an agreement.  As previously described, this "review" included the regulatory review that Lowenstein Sandler conducted and memorialized in its 2023 Legal Memorandum.  According to FE-1, sometime in 2024, Linqto engaged Deloitte for an audit, likely in connection with the proposed IPO.  FE-1 learned this from their direct supervisor, the VP of

Product, who had spoken to Siciliano about the audit. FE-1 believed that, at some point before Siciliano joined in December 2024, the audit was communicated to Siciliano, and that the purpose was to look at Linqto's financials, how fast the Company was growing, and how the Company acquired customers. Given that review of a company's operations and financials and subsequent Board approval is typically required to enter into agreements of this sort, Defendants were likely made aware of Linqto's non-compliance with securities laws through these reviews, if not earlier.

150. FE-1 recalled that in November 2024, an email marketing manager, who had stepped in for his direct supervisor, informed FE-1 of a conversation that he had with Sarris. Sarris had told him that the "Board or Company" said "we need to shut everything down, we are getting sued" and that "the Board told Sarris to stop marketing because they were getting sued."

## X.     CLASS ACTION ALLEGATIONS

151. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all Investors who purchased Series membership interests in one or more Series of Linqto Liquidshares, LLC during the Class Period (the "Class"). Excluded from the Class are Defendants and their immediate families as well as any entity in which Defendants have or had a controlling interest.

152. The members of the Class are so numerous that joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time and will only be ascertained with appropriate discovery, Plaintiffs believe there are approximately 13,000-14,000 members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and records produced in the bankruptcy action *In re Linqto Texas LLC*, No. 25-90186, (Bankr. S.D. Tex. July 7, 2025) and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

46

153. Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of state and federal laws as alleged herein.

154. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained competent counsel experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

155. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Common questions of law and fact include:

a) whether Defendants violated federal securities laws;

b) whether Defendants engaged in a scheme to defraud Investors;

c) whether Defendants were required to register securities with the Securities Exchange Commission;

d) whether Defendants participated in the offer, sale, and/or delivery of unregistered securities in violation of federal securities laws;

e) whether the statements alleged herein to be actionable were materially false, incomplete, or misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

f) whether Defendants acted knowingly or recklessly in issuing false or misleading statements and/or omissions;

g) whether the offer and sale of multiple series of Linqto Liquidshares, LLC should be integrated into a single offer and sale;

47

h) whether Defendants participated in the offer, sale, and/or delivery of unregistered securities by an unregistered investment company;

i) whether Defendants violated securities registration requirements of Texas state law;

j) whether Defendants violated California's Unfair Competition laws; and

k) whether members of the Class have sustained damages and, if so, the proper measure of damages.

156. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation may make it impossible for them to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. NO SAFE HARBOR

157. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be untrue or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omission alleged herein. To the extent any statements that are alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the forward-looking statements.

158. To the extent that the statutory safe harbor is found to apply to any forward-looking statements pled herein, Defendants are still liable for those false or misleading forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that it was materially false or misleading, or the statement was authorized

48

or approved by a Defendant who knew that the statement was materially false or misleading when made.

## XII.  CLAIMS FOR RELIEF

### COUNT I
### Violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c)
### Against Defendants

159.    Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

160.    This Count is asserted against Defendants and is based upon § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c), 17 CFR §§ 240.10b-5(a) and 240.10b-5(c), promulgated thereunder by the Securities Exchange Commission. § 10(b) and its attendant regulations prohibit fraud connected with the purchase or sale of a security.

161.    During the Class Period, Defendants engaged in fraudulent acts and participated in a scheme to defraud Plaintiffs and Class members by use of the means or instrumentalities of interstate commerce in order to sell securities at artificially inflated and manipulated prices without disclosing unlawful markups to investors.

162.    As part of their scheme to defraud investors, Defendants, among other things: (i) permitted non-accredited investors to purchase Private Securities on the Platform; (ii) authorized undisclosed markups in excess of 5% on Series interests of Linqto Liquidshares, LLC; (iii) failed to disclose sales of securities linked to Class members' investments in series of Linqto Liquidshares, LLC; (iv) misrepresented the actual ownership of Private Securities and failed to disclose the actual ownership structure of the Private Securities; (v) directed noncompliance with

49

certain rules promulgated by the Financial Industry Regulatory Authority; and (vi) failed to implement adequate anti-money laundering and know-your-customer procedures.

163. Defendants' fraudulent acts in furtherance of the scheme were intended to and did: (a) deceive the investing public, including Plaintiffs and other Class members; (b) artificially inflate, manipulate, and overstate the price of Series Membership Interests through undisclosed markups and fees; and (c) cause Plaintiffs and other Class members to purchase or otherwise acquire Series Membership Interests at artificially inflated, manipulated, and overstated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants together and individually took the actions set forth herein.

164. Defendants acted with scienter throughout the Class Period in that they affirmatively and knowingly or with reckless disregard participated in the scheme to defraud Investors. In addition, Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendants had actual knowledge of their violations of § 10(b) of the Securities Act of 1933 through the 2023 and 2024 Legal Memos detailing the extent of their illegal activities and their potential liabilities. Defendants engaged in this misconduct to, among other things, charge artificially inflated and overstated prices of Series interests of Linqto Liquidshares, LLC by concealing the structure of actual ownership of the Private Securities that Linqto acquired and sell those Private Securities without authorization or disclosure.

165. During the Class Period, the Series Membership Interests were sold on the Platform to accredited and non-accredited Investors. Plaintiffs and other Class members, relying on the materially false and misleading statements described herein—which Defendants made, issued, or

caused to be disseminated—purchased or otherwise acquired the Series Membership Interests at artificially inflated, overstated, and manipulated prices under the false pretense that they were purchasing Private Securities directly from the issuing companies. Had Plaintiffs and members of the Class known the truth, they would not have purchased or otherwise acquired such interests through the Platform and/or would not have purchased or otherwise acquired them at the inflated, overstated, and manipulated prices that were paid.

166.    By virtue of the foregoing, Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages attributable to the fraud alleged herein in connection with their respective purchases of Series Membership Interests.

**COUNT II**
**Violations of §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and**
**Rule 10b-5(b)**
**Against Individual Defendants**

167.    Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

168.    This Count is asserted against Individual Defendants and is based upon § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 CFR § 240.10b-5(b), promulgated thereunder by the Securities Exchange Commission.

169.    During the Class Period, Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Individual Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b)

51

in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

170.     Among other things, Individual Defendants made untrue statements, or omitted to state material facts necessary in order to make the statements made not misleading, through: (i) communicating false and misleading information in connection with the marketing, offer, sale, and/or delivery of securities; (ii) failing to disclose written complaints from customers; and (iii) failing to disclose federal regulatory investigations to Investors.

171.     Plaintiffs and other Class members, relying on the materially false and misleading statements described herein—which the Individual Defendants made, issued, or caused to be disseminated—purchased or otherwise acquired the Series Membership Interests at artificially inflated prices and with an understanding that ownership of shares in the Series Membership Interests was tied to ownership of shares in pre-IPO Companies.  Had Plaintiffs and members of the Class known the truth, they would not have purchased or otherwise acquired such securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.

172.     As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases of Series Membership Interests during the Class Period.  By virtue of the foregoing, Individual Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) promulgated thereunder.

**COUNT III**
**Violations of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)**
**Against Individual Defendants**

173.     Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

52

174.     The Individual Defendants (in this count, collectively the "Control Person Defendants") are liable as control persons under § 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a), for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

175.     At all relevant times, the Control Person Defendants were controlling persons within the meaning of § 20(a) of the Exchange Act.  During the Class Period, Defendant William Sarris was a principal executive of Linqto, serving as its CEO, Executive Chairman, and as a member of the Board.  During the Class Period, Defendant Endoso was a principal executive of Linqto serving as CEO, CFO, CRO, COO, and President, as well as a member of the Board. During the Class Period, Defendant David Paul was the principal financial officer of Linqto, serving as its Chief Financial and Administrative Officer.  During the Class Period, Defendant Moran was the principal compliance officer of Linqto, serving as the Chief Compliance Officer between November 2021 and December 2024 and a registered broker dealer and investment advisor affiliated with Linqto Capital, LLC between December 2022 and December 2024. Defendant Nurani was the principal chief strategy officer, serving as Linqto's Chief Strategy Officer between 2020 and 2025 and as a Board member from March 2025 through May 2025. Defendant Slemmer served as a member of the Board from October 2020 to February 2025, during Linqto's plans to IPO.  Defendant Jiang served on the Board from October 2022 through May 2025, during Linqto's plans to IPO.  Defendant Davis served on the Board from April 2024 and January 2025 and is the Chairman and Managing Partner of BCSA, the blank-check company that Linqto had planned to IPO with.  Defendant Reed has served on the Board since October 2023, during Linqto's plans to IPO.  Defendant Henderson has served on the Board since 2022, during Linqto's plans to IPO.

176. During the Class Period, each of the Control Person Defendants participated in the day-to-day operation and management of Linqto, had supervision and oversight over Linqto's business and financial affairs, including the reviews conducted in preparation for Linqto's desired IPO, directed Linqto's investment strategies, purchasing, and decisions, and participated in the marketing and sales activities of Linqto. Defendants Sarris, Endoso, Paul, Moran, and Nurani were intimately involved in preparing, reviewing, approving, and/or disseminating the contents of all public statements, communications, press releases, investor materials, financial statements, SEC filings, and other disclosures issued by the Company, including the materially false and misleading statements described herein.

177. Each of the Control Person Defendants were therefore controlling persons within the meaning of § 20(a) of the Exchange Act. Each of the Control Person Defendants possessed the power and authority to control and direct the actions of Linqto, and they each exercised their power and authority to cause Linqto to engage in the unlawful conduct and wrongful acts complained of herein. In this capacity, each of the Control Person Defendants participated in the unlawful conduct alleged, which led to the offer, sale, and/or delivery of unregistered securities at outrageously marked-up prices to improper investors.

178. By virtue of the foregoing, the Control Person Defendants are liable under § 20(a) for the violations committed by Defendants under § 10(b) of the Exchange Act.

## COUNT IV
### Violations of §§ 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and § 77e(c)
### Against Individual Defendants

179. Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

180. Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, prohibits the sale and delivery of securities without a registration statement filed with the Securities and Exchange

54

Commission. Under § 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l(1), a purchaser of a security that is unregistered in violation of § 5 of the Securities Act of 1933 may sue to recover consideration paid for such security, including interest. If such purchaser no longer owns the security, they may recover damages.

181. Linqto offered for sale securities in one or more Series of Linqto Liquidshares, LLC, which aimed to provide Investors economic exposure to Private Securities of non-public companies. These offers were made without a registration statement or applicable exemption.

182. Persons may violate § 5 of the Securities Act of 1933 even if they themselves do not offer or sell securities, provided they were necessary participants in the unregistered distribution. A necessary participant is one whose acts were a substantial factor in the sale transaction. The Individual Defendants directed the offer and sale of securities without a registration statement or applicable exemption. The Individual Defendants had the ability to and/or did control the pricing of the securities, managed marketing, and sales activities. Defendant Sarris funded sales through personal loans.

183. The Individual Defendants made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect.

184. The Individual Defendants, for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect.

185. The Individual Defendants made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

186. Plaintiffs and Class members purchased unregistered securities offered for sale by the Individual Defendants. Plaintiffs and Class members were harmed by the Individual Defendants' sale of unregistered securities and seek relief in the form of rescission plus interest, as well as damages.

**COUNT V**
**Violations of § 7(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a-7**
**Against Individual Defendants**

187. Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

188. Section 7(a) of the Investment Company Act of 1940, U.S.C. § 80a-7(a), prohibits the offer, sale, or delivery of securities by investment companies that are not registered with the Securities Exchange Commission. The Individual Defendants have violated § 7(a) of the 1940 Act through the offer, sale, and delivery of securities without registering the offeror as an investment company.

189. By offering to sell, selling, and/or delivering securities in separate Series of Linqto Liquidshares, LLC, the Individual Defendants attempted to skirt requirements under § 7(a). § 3(c)(1) of the Investment Company Act of 1940, 15 U.S.C. § 80a-3(c)(1), exempts certain persons from the definition of an investment company and therefore from § 7(a)'s registration requirement. Included among the exempted are entities whose outstanding securities are beneficially owned by not more than one hundred persons. The multiple Series of Linqto Liquidshares, LLC's securities offered, sold, and/or delivered by the Individual Defendants should be integrated and considered a single offering for the reasons set forth above. After integrating these transactions, it is clear that there were more than one hundred beneficial owners of securities of Linqto Liquidshares, LLC, thereby triggering registration requirements under § 7(a).

190.    The Individual Defendants directed the sale of securities by an unregistered investment company in violation of § 7(a) of the Investment Company Act of 1940.

191.    Plaintiffs and Class members suffered damages as a result of the Individual Defendants' violations of § 7(a) of the Investment Company Act of 1940 and seek rescission.

## COUNT VI
## Violations of the Texas Securities Act
## Against Individual Defendants

192.    Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

193.    The Texas Securities Act, TX Gov't Code Ann. § 4008.051 (2024), establishes that persons who offer or sell securities in violation of certain other provisions of the TSA are liable to purchasers of such securities from the offeror or seller.  Among the provisions establishing liability are the requirements under § 4003.001(a) and § 4004.051 to, respectively, obtain a permit qualifying securities for sale and register as an offeror or seller of such securities.

194.    The TSA § 4008.052(a) provides that "a person who offers or sells a security and from whom another person buys the security is liable to the buyer of the security… if the person offers or sells the security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading."

195.    Plaintiffs, Class members, and Defendants are each a "person" as defined by TSA § 4008.052(a).  Individual Defendants, along with Linqto, offered for sale and sold securities in Texas and are therefore subject to the requirements of the TSA.  Upon information and belief, Linqto has over 1,000 Investors in Texas.  Out of the approximately 100 companies offered on the Platform, five are headquartered in Texas and an additional 76 have Texas operations or employees.  Linqto Texas, LLC is a Linqto affiliated entity and filed for Bankruptcy along with

57

Linqto and other related companies in the United States Bankruptcy Court for the Southern District of Texas.

196. The TSA § 4008.055(a) establishes liability for "a person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 4008.051, 4008.052, 4008.053, or 4008.054 jointly and severally with the seller, buyer, or issuer and to the same extent as the seller, buyer, or issuer."

197. No permit was obtained to sell securities in series of Linqto Liquidshares, LLC as required by § 4003.001(a), and no person registered to be able to sell such securities as required by § 4004.051. The Individual Defendants were required to provide complete, accurate, and truthful information to Plaintiffs and Class members in connection with their solicitation and sale of Linqto Liquidshares securities as required by § 4008.052(a).

198. The Individual Defendants directly or indirectly controlled the issuance of securities of Linqto Liquidshares, LLC. The offer and/or sale of such securities violated registration requirements under §§ 4008.051 and 4008.052 of the TSA. The Individual Defendants knew the offer of unregistered securities violated registration requirements under § 4003.051(a) of the TSA and knew they were required to register as offerors or sellers of such securities under § 4008.051. The Individual Defendants knew or should have known that they made misleading and materially false statements in connection with the offer and sale of such securities in violation of § 4008.052(a). Defendants are liable under § 4008.055(a) of the TSA as control persons of the offerors and/or sellers of Linqto Liquidshares, LLC securities during the relevant time period.

199. Plaintiffs and Class members have suffered damages due to the unlawful offering and sale of unregistered securities by unregistered offerors and/or sellers and are entitled to rescission or damages under the TSA. Plaintiffs and Class members have suffered damages due

58

to the false and misleading statements made in connection with the offer and/or sale of such securities and are entitled to rescission or damages under the TSA.

**COUNT VII**
**Violations of California's Unfair Competition Law (UCL)**
**Cal. Bus. & Prof. Code § 17200** *et seq.*
**Against Defendants**

200.    Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

201.    Plaintiffs and Defendants are each a "Person" as defined by California Business and Professions Code § 17201.  California Business and Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

202.    Defendants Sarris, Endoso, Paul, Nurani, Slemmer, Davis, Reed, and Henderson have their primary place of residence in California.  Non-party Linqto, Inc., was headquartered in California during the Class Period, and Defendant Rainmaker provided services for Linqto during the Class Period.

203.    "Unfair competition" is defined by California Business and Professions Code § 17200 as encompassing several types of business "wrongs," including (a) an "unlawful" business act or practice; (b) an "unfair" business act or practice; (c) a "fraudulent" business act or practice; and (d) "unfair, deceptive, untrue or misleading advertising."  The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

204.    By and through Defendants' conduct alleged herein, Defendants engaged in conduct which constitutes unlawful and/or unfair business practices as prohibited by California's UCL.

59

**A.      "Unlawful" Prong**

205.     California Business and Professions Code § 17200 *et seq.* treats violations of other laws, when committed pursuant to a business activity, as independently actional unlawful practices.

206.     Defendants have violated the Securities Act of 1933, the Securities Exchange Act of 1934, and/or the Investment Company Act of 1940 and thus, pursuant to California Business and Professions Code § 17200 *et seq.*, have engaged in a pattern of "unlawful" business practices within the meaning of California's UCL.

207.     As alleged herein, Defendants participated in a scheme to offer, sell and/or deliver unregistered securities to Investors; marked up the costs of unregistered securities without disclosing the amount of the mark up; misled customers about the nature of their investments; participated in the offer, sale, and/or delivery of securities sold by an unregistered investment company; failed to abide by anti-money laundering and know-your-customer rules; failed to disclose sales of Private Securities to customers who believed their investments to be connected to such companies; and failed to disclose to customers investigations by federal regulators.

208.     Defendants committed and have been committing unlawful and unfair acts, including those described herein, by engaging in a pattern of "unlawful" business practices within the meaning of California Business and Professions Code § 17200 *et seq.* by violating federal securities and investment company laws.

209.     As a result of Defendants' decision to violate federal securities laws, Plaintiffs' investments have lost substantial value and Plaintiffs and Class members were induced to purchase instruments they would not have otherwise purchased or would have purchased for a lower price.

210.     Therefore, as a direct and proximate result of Defendants' prohibited unlawful business practices that took place in California, Plaintiffs and the Class have suffered injury in fact

and have lost and will continue to lose substantial value and suns of money in an amount to be proven at trial.

### B. "Unfair" Prong

211. Defendants also committed unfair acts as prohibited by California Business and Professions Code § 17200 *et seq.*

212. A business act or practice is "unfair" under the UCL if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, where that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

213. As alleged herein, Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct. Furthermore, neither Plaintiffs nor the putative Class could reasonably have avoided being injured by Defendants' conduct as alleged herein, and there were reasonably available alternatives to further Defendants' legitimate business interests other than the unfair and unlawful violations of securities laws and failure to disclose material information about the nature of Plaintiffs' and Class members' investments.

### C. Remedies Provided for Under the UCL

214. The UCL provides that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. Plaintiffs and the Class pray for relief as set forth below and are entitled to restitution and injunctive relief as set forth herein.

215. Through its unfair and unlawful acts and practices, Defendants have improperly obtained money from Plaintiffs and the Class. As such, Plaintiffs request that this Court cause

Defendants to restore this money to Plaintiffs and all Class members and to enjoin Defendants from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Plaintiffs and the Class will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

216. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiffs also seek the recovery of attorneys' fees; a reward which is available to a prevailing Plaintiff in a class action such as this, whether statutorily, from a common fund recovered for the benefit of others, or as otherwise provided by law or equity.

217. Plaintiffs reserve the right to allege further conduct that constitutes other unlawful and/or unfair business acts or practices.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief and judgment as follows:

A. That the Court determine this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B. That the Court adjudge and decree that the acts, omissions, and practices of the Defendants are illegal, unlawful, and constitute violations § 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a)-(c) promulgated thereunder by the Securities Exchange Commission; § 20(a) of the Securities Exchange Act of 1934; § 5 of the Securities Act of 1933; § 15(a)(1) of the Securities Exchange Act of 1934; § 7(a) of the Investment Company Act of 1940; TSA, TX Gov't Code Ann. § 4008.051 (2024); and/or the California UCL, Cal. Bus. Prof. Code § 17200 *et seq.*;

62

C.   That Judgment be entered against Defendants and in favor of Plaintiffs and the Class for the amount of damages sustained by Plaintiffs and the Class as allowed by law, equity, and/or recission, together with costs of the action, including reasonable attorneys' fees and pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

D.   That the Court award Plaintiffs and members of the Class such other and further relief, whether injunctive, equitable or otherwise, as the case may require, and the Court may deem just and proper under the circumstance.

## XIV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 17, 2025

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/      Amanda Lawrence*
Amanda Lawrence
Lana Levin (admitted *pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
alawrence@scott-scott.com
llevin@scott-scott.com

**DILWORTH PAXSON LLP**
Catherine Pratsinakis (admitted *pro hac vice*)
Mariah Heinzerling (admitted *pro hac vice*)
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215)-575-7000
cpratsinakis@dilworthlaw.com

mheinzerling@dilworthlaw.com

*Counsel for Plaintiffs A.O.H. Driedijk Holding B.V., Jaimin Bhatt, and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*s/ Amanda Lawrence*
Amanda Lawrence