Treanor Declaration - Exhibit B

**Exhibit B**

United States Courts
Southern District of Texas
F I L E D

MAY 1 1 2026

Nathan Ochsner, Clerk of Court

*Amended and Restated*

## *Limited Liability Company Operating Agreement*

*of*

## LINQTO LIQUIDSHARES LLC

*January 21, 2020*

THE MEMBERSHIP INTERESTS EVIDENCED BY THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OF AMERICA OR NON-U.S. JURISDICTION, AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE U.S. FEDERAL, STATE, AND NON-U.S. SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

## TABLE OF CONTENTS

**Page**

ARTICLE I GENERAL PROVISIONS ........................................................................................ 1

    1.1    Definitions ................................................................................................. 1
    1.2    Company Name ........................................................................................ 1
    1.3    Office; Registered Agent ......................................................................... 1
    1.4    Purpose of the Company. ........................................................................ 2
    1.5    Liability of the Members ......................................................................... 2
    1.6    Admission of Members ............................................................................ 3

ARTICLE II MANAGEMENT AND OPERATIONS ..................................................................... 3

    2.1    Management Generally ........................................................................... 3
    2.2    Authority of the Managing Member ....................................................... 3
    2.3    Other Authority of the Managing Member ............................................. 6
    2.4    Borrowing by the Company. ................................................................... 6
    2.5    Placement Agents ................................................................................... 7
    2.6    Other Activities ....................................................................................... 7
    2.7    Books and Records; Accounting Methods; Fiscal Year ............................ 7
    2.8    Certain Tax Matters ................................................................................ 8
    2.9    Confidentiality. ....................................................................................... 9
    2.10   Member Meeting .................................................................................... 10
    2.11   Reliance by Third Parties ......................................................................... 10
    2.12   Managing Member Withdrawal .............................................................. 10
    2.13   Outside Interests; Conflicts .................................................................... 11

ARTICLE III INVESTMENTS; CLASSES AND SERIES ............................................................... 11

    3.1    Company Investments Generally ............................................................ 11
    3.2    Investment Limitations ........................................................................... 11

ARTICLE IV EXPENSES; FEES ............................................................................................... 11

    4.1    Management Fee ..................................................................................... 11
    4.2    Company Expenses ................................................................................. 11
    4.3    Reimbursement of the Managing Member and its Affiliates .................. 13
    4.4    Responsibility for Certain Company Expenses among the Series and
            the Members ........................................................................................... 13

ARTICLE V CAPITAL CONTRIBUTIONS AND SUBSCRIPTION AMOUNT ................................. 13

    5.1    Capital Contributions; Subscription Amount .......................................... 13

ARTICLE VI CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS ...................................... 14

    6.1    Distributions ........................................................................................... 14
    6.2    Tax Advances .......................................................................................... 14
    6.3    Withholding of Certain Amounts ............................................................ 15
    6.4    Amounts Held in Reserve ........................................................................ 15
    6.5    LLC Act .................................................................................................... 15

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 6.6 | Capital Accounts; Allocations | 15 |
| 6.7 | Tax Allocations | 17 |
| 6.8 | Special Allocations | 17 |
| 6.9 | Other Allocation Rules | 18 |

ARTICLE VII REPORTS TO MEMBERS ... 19

| | | |
|---|---|---|
| 7.1 | Reports | 19 |

ARTICLE VIII EXCULPATION AND INDEMNIFICATION ... 19

| | | |
|---|---|---|
| 8.1 | Exculpation and Indemnification | 19 |

ARTICLE IX COMPANY DURATION; DISSOLUTION ... 21

| | | |
|---|---|---|
| 9.1 | Duration. | 21 |
| 9.2 | Dissolution | 21 |
| 9.3 | Liquidation of Company. | 22 |
| 9.4 | Distribution upon Dissolution of the Company. | 22 |
| 9.5 | Withdrawal, Death or Incompetence of a Member | 22 |

ARTICLE X TRANSFERABILITY OF INTERESTS ... 22

| | |
|---|---|
| Transferability of Membership Interests | 22 |
| Expenses of Transfer; Indemnification | 23 |
| Recognition of Transfer; Substitute Members | 23 |
| Transfers During a Fiscal Year. | 24 |

ARTICLE XI MISCELLANEOUS PROVISIONS ... 24

| | | |
|---|---|---|
| | Amendments; Waivers | 24 |
| | Certificates of Membership Interests | 25 |
| | Investment Representation | 25 |
| | Successors; Counterparts; Beneficiaries | 26 |
| | Further Assurance | 26 |
| | Governing Law; Severability. | 26 |
| | Authorization. | 26 |
| | Necessary Filings. | 26 |
| | Power of Attorney | 27 |
| 11.10 | No Bill for Company Accounting | 27 |
| 11.11 | Goodwill | 27 |
| 11.12 | Notices | 27 |
| 11.13 | Headings | 28 |
| 11.14 | Counsel to the Company. | 28 |
| 11.15 | Conflicts | 28 |

| | |
|---|---|
| Appendix A DEFINITIONS | A-1 |
| Appendix B SUBSCRIBER REPRESENTATIONS | B-1 |
| Appendix C CERTAIN DISCLOSURES | C-1 |

# AMENDED AND RESTATED LIMITED

## LIABILITY COMPANY OPERATING AGREEMENT

### OF

### LINQTO LIQUIDSHARES LLC

This Amended and Restated Limited Liability Company Operating Agreement of Linqto Liquidshares LLC, a Delaware series limited liability company (the "**Company**"), is made effective as of January 21, 2020 by and among Linqto Liquidshares Manager LLC, as managing member of the Company (the "**Managing Member**"), and the Persons who have subscribed or will subscribe for limited liability company membership interests in the Company and who, consequently, have been designated as Members in the books and records of the Company.

**WHEREAS**, the Company was previously formed by the Managing Member under the LLC Act;

**WHEREAS**, the Company is currently governed by the initial Limited Liability Company Operating Agreement, dated as of January 21, 2020 (the "**Initial Operating Agreement**"); and

**WHEREAS**, the parties hereto desire to amend and restate in its entirety the Initial Operating Agreement in order to, among other things, admit certain Members to the Company and provide for the respective rights and obligations of the parties set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing premises, the covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Initial Operating Agreement is hereby amended and restated in its entirety as follows:

## ARTICLE 1
## GENERAL PROVISIONS

1.1 *Definitions.* Capitalized terms used but not defined herein have their respective meanings set forth in Appendix A attached hereto or, with respect to any Series, in any Series Schedule, as applicable.

*Company Name.* The name of the Company is Linqto Liquidshares LLC.

*Office; Registered Agent.*

(a) The name and address of the Company's registered agent in the State of Delaware is: Incorporating Services, Ltd, 3500 S DuPont Hwy, Dover, Delaware 19901. The Company shall maintain a registered office in the State of Delaware at the same address. The Managing Member, in its sole discretion, may change the registered agent of the Company at any time for any or no reason.

(b) The business address of the Managing Member is 717 Market Street, Ground Floor, San Francisco, CA 94103, or such other place as the Managing Member, in its sole discretion, shall determine.

If the Managing Member shall determine to change its business address, it shall notify the Members of such change as soon as practicable thereafter.

### 1.4 Purpose of the Company.

(a)    The primary purpose of the Company is (a) to identify potential Company Investments on behalf of each Series of the Company; (b) to acquire, hold, manage, and dispose of Company Investments on behalf of each Series of the Company; and (c) to hold, invest, and manage funds in the possession of the Company on behalf of each Series of the Company, in each case in accordance with the terms of this Operating Agreement and consistent with the investment objectives and investment strategy applicable to each such Series, as described in the offering documents applicable to such Series, as they may be amended or supplemented from time to time and/or set forth in schedules to this Operating Agreement (each, a "**Series Schedule**"). A Series Schedule may amend or supersede any provision of this Operating Agreement. To the extent that any term of a Series Schedule conflicts with this Operating Agreement, the Series Schedule shall govern, solely with respect to the applicable Series. For U.S. federal income tax purposes, unless otherwise provided in a Series Schedule, references in this Operating Agreement to the "Company" apply to each Series. The purpose of each Series is to invest its assets in accordance with its investment objective and strategy, as set forth in the Series Schedule applicable to such Series.

(b)    The Company shall have the power to do any and all acts necessary, appropriate, desirable, incidental, or convenient to or in furtherance of the purposes described in Section 1.4(a), including, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Managing Member pursuant to this Operating Agreement. Except as otherwise expressly provided to the contrary in this Operating Agreement, the purpose and scope of the Company shall also include any other lawful action or activity permitted by a limited liability company formed pursuant to the LLC Act.

(a)    Except as otherwise provided in this Operating Agreement or the LLC Act, no Member (or former Member) shall be liable for the obligations of any Series for any amounts in excess of the amount of its Subscription Amount to such Series, *plus* such Member's share of the undistributed profits of such Series, *plus*, to the extent required by law, or as otherwise described in this Operating Agreement, any amounts distributed by such Series to such Member; provided, that the foregoing shall not be construed in any way to alleviate a Member's obligations to a Series.

(b)    Notwithstanding anything in this Operating Agreement to the contrary, in order to satisfy any liability of a Series (including, without limitation, any Indemnification Obligation), each Member (or former Member) may, in the sole and absolute discretion of the Managing Member, and on not less than ten (10) Business Days' advance written notice, be required to return distributions from such Series up to, but in no event in excess of, the aggregate amount of distributions actually received by each such Member (or former Member) from such Series (less any such amounts already recalled and not redistributed); provided that the Managing Member may not require such returns of distributed amounts after the third (3rd) anniversary of the date on which the applicable distribution was made by the Company, unless prior to such third (3rd) anniversary, the Managing Member has given written notice to the Members of such potential for recall.

(c)     The Company is a series limited liability company, duly formed in accordance with the LLC Act. Separate and distinct records will be maintained for each Series of the Company, and the assets associated with each such Series shall be held in such separate and distinct accounts (directly or indirectly, including through a nominee or otherwise) and accounted for in such separate and distinct records separately from the other assets of the Company, or any other Series thereof. In furtherance thereof, and pursuant to the LLC Act, the debts, liabilities, obligations, and expenses of each Series shall be enforceable against the assets of such Series only, and not against the Company generally or against any other Series of the Company, whether currently existing or established subsequent to the date of this Operating Agreement. Except as otherwise provided in this Operating Agreement, none of the debts, liabilities, obligations, or expenses incurred, contracted for, or otherwise existing with respect to the Company generally will be enforceable against the assets of any particular Series.

1.6     *Admission of Members.*

(a)     The Members of each Series shall be set forth in the register of Members for that Series.

(b)     The Managing Member may establish, designate, and issue Interests in one or more Series of the Company at such times and subject to such terms and conditions as the Managing Member, in its sole and absolute discretion, may determine.

## ARTICLE 2
## MANAGEMENT AND OPERATIONS

2.1     *Management Generally.* Except as expressly provided otherwise herein, the management and control of the Company shall be vested exclusively in the Managing Member and the Managing Member has ultimate authority and responsibility for the management, operations, and investment decisions of the Company, provided that the Managing Member shall have the right to delegate all or a portion of its responsibilities under this Operating Agreement to one or more of its Affiliates. The Members shall have only the powers expressly enumerated in this Operating Agreement, and shall take no part in the management or control of the Company's business, shall not transact business for the Company, and shall have no power to act for, to bind, or to otherwise obligate the Company in any way.

2.2     *Authority of the Managing Member.* The Managing Member shall have the power on behalf of and in the name of the Company to carry out any and all of the objects and purposes of the Company in accordance with, and subject to the limitations contained in, this Operating Agreement, and to perform all acts that the Managing Member, in its sole and absolute discretion, may deem necessary, desirable, or appropriate in connection therewith and with the business and operations of the Company, including, without limitation, the power to:

(a)     identify investment opportunities for the Company;

(b)     acquire, hold, manage, own, sell, transfer, convey, assign, exchange, pledge or otherwise dispose of any Company Investment; and any other security, instrument or other investment that may be consistent with the investment program of the Company, as set forth in any Series Schedule. For the avoidance of doubt, the Company may enter into any of the transactions

-3-

contemplated by this Section 2.2(b) with any party, including, without limitation, Affiliates of the Managing Member;

(c)     retain Persons, including Affiliates of the Managing Member, to perform management, consulting, and due diligence services for the Company or for any Company Investment;

(d)     open, maintain, and close accounts with banks, brokers, custodians, or other financial institutions, and deposit, maintain, and withdraw funds, securities, instruments, and other interests in the name of the Company and draw checks or other orders from Company accounts for the payment of monies;

(e)     enter into, and take any action under, any contract, agreement, or other instrument as the Managing Member, in its sole and absolute discretion, shall determine to be necessary, desirable, or appropriate to further the purposes of the Company, including granting or refraining from granting any waivers, consents, or approvals with respect to any of the foregoing and any matters incident thereto;

(f)     bring and defend actions and Proceedings at law or in equity and before any governmental, administrative, or other regulatory agency, body, or commission, to retain legal counsel in connection therewith, and to have the Company pay all liabilities and expenses, including attorneys' fees, incurred in connection therewith, and to settle or compromise claims by the Company against third parties and to compromise, settle, or accept judgment with respect to claims against the Company;

(g)     employ, engage, terminate, or replace any and all financial advisers, underwriters, attorneys, accountants, consultants, appraisers, administrators, brokers, custodians of the assets of the Company, or other agents, on such terms and for such compensation as the Managing Member, in its sole and absolute discretion, may determine, whether or not any such Person is an Affiliate of the Managing Member;

(h)     make all elections, investigations, evaluations, and decisions binding the Company thereby that may, in the sole and absolute discretion of the Managing Member, be necessary, desirable, or appropriate for the acquisition, holding, management, ownership, or disposition of Company Investments;

(i)     subject to Section 2.4, borrow money, guarantee any obligation, or arrange financing for or on behalf of the Company, on such terms as the Managing Member, in its sole and absolute discretion, determines, to pay Company Expenses or to make Company Investments;

(j)     incur Company Expenses and other obligations, and make payments on behalf of the Company in its own name and/or in the name of the Company, including the payment of Company Expenses with respect to the services referred to in Sections 2.2(c) and 2.2(g);

(k)     establish reserves for contingencies and for any other Company purpose in accordance with this Operating Agreement;

(l) make distributions to Members in cash or in kind or as otherwise provided herein;

(m) prepare and cause to be prepared reports, statements, and other information for distribution to the Members;

(n) prepare and file all necessary U.S. and, if appropriate, non-U.S. tax returns and statements, pay all taxes, assessments, and other impositions applicable to the Company or the assets of the Company, and withhold amounts with respect thereto from funds otherwise distributable to any Member;

(o) maintain records and accounts of all operations and expenditures of the Company;

(p) determine the accounting methods and conventions to be used in the preparation of any accounting or financial records of the Company;

(q) convene meetings of the Members, if any, for any purpose;

(r) effect a dissolution of the Company in accordance with Section 9.1(b);

(s) form and structure legal entities, including, without limitation, entities owned in whole or in part by the Company, for the purpose of acquiring, maintaining, or financing Company Investments or facilitating investment in the Company, as described in Section 3.1;

(t) create additional classes or Series of Interests in the Company;

(u) amend the certificate of formation of the Company as provided herein; and

(v) do any and all acts and things on behalf of the Company as the Managing Member deems necessary, desirable, or advisable in connection with the business and operations of the Company (including those related to the maintenance and administration thereof) and in relation to the Company Investments including, without limitation (i) lend, either with or without security, any investments, funds, or other properties of the Company and, from time to time, without limit as to the amount, borrow or raise funds and secure the payment of obligations of the Company by mortgage on, or pledge or hypothecation of, or guarantee of, all or any part of the property of the Company; (ii) open, maintain, and close accounts with Persons that are Affiliates of the Managing Member, which power shall include the authority to issue all instructions and authorizations to Persons regarding the Company Investments and/or money therein; (iii) pay or authorize the payment and reimbursement of, commission, fees, and other charges to Persons who execute transactions for the account of the Company; (iv) enter into contracts of insurance that the Managing Member deems necessary and proper for the protection of the Company and for the conservation of its assets and properties (including, without limitation, managing member liability insurance, errors and omissions insurance, and other insurance with respect to the Company's business and affairs); provided, that the Managing Member shall have no obligation to enter into any such contracts or obtain any such insurance; (v) cause the Company to engage in agency, agency cross, and principal transactions with Affiliates, to the extent permitted by applicable laws; (vi) facilitate compliance with the applicable laws,

rules, regulations, and ordinances, and to obtain at the expense and in the name of the Company such licenses, permits, and approvals, as are required in the business of the Company; (vii) retain brokers, custodians, agents, independent contractors, attorneys, accountants, consultants, investment bankers, or such other Persons; (viii) supply the service providers to the Company with such information and instructions as may be necessary to enable such Person or Persons to perform their duties with respect to the Company; (ix) exercise all rights of the Company with respect to its interest in any Person, firm, corporation, partnership, company, or other entity, including, without limitation, the voting of Company Investments, participation in arrangements with creditors, the institution and settlement or compromise of Proceedings, and other like or similar matters; (x) value the Company's investment portfolio; and/or (xi) authorize any member, employee, or other agent of the Managing Member or agent of the Company to act for and on behalf of the Company in all matters incidental to the foregoing provisions of this Section 2.2.

2.3 *Other Authority of the Managing Member.*

(a)     The Managing Member is hereby authorized (but not required) to take any action it has determined in good faith to be necessary, desirable, or appropriate in order that (i) the Company not be in violation of the Investment Company Act; (ii) the Managing Member not be in violation of the Advisers Act; (iii) each of the Company, the Members and the Managing Member not be subject to a material adverse effect as a result of their Interest in the Company or services provided to the Company, as applicable; or (iv) each of the Company, the Members and the Managing Member, or any of their respective Affiliates, not be in violation of any other material law or regulation applicable to such Persons, including, without limitation:

(i)     making structural, operating or other changes in the Company by amending this Operating Agreement; provided that any such amendment pursuant to this Section 2.3(a)(i) may be made only if in the reasonable discretion of the Managing Member (A) the making of such amendment is necessary to cure such violation or treatment, and (B) such amendment would not be expected to have a material adverse effect on any Member as a result of such Member's Interest in the Company;

(ii)     requiring the sale in whole or in part of any Member's Interest in the Company or otherwise causing the full or partial withdrawal of any Member from the Company; and

(b)     Any action taken by the Managing Member pursuant to Section 2.3(a) shall not require the approval of any Member. The Managing Member shall promptly notify the Members of any action taken by the Managing Member pursuant to Section 2.3(a).

2.4 *Borrowing by the Company.* Subject to the terms and conditions set forth in any Series Schedule, the Managing Member, in its sole and absolute discretion, may, with the prior written consent of not less than fifty percent (50%) in interests (based on subscription amounts) of the Members of a Series, borrow money in respect of such Series in circumstances if the Managing Member believes it is in the best interests of the Company, including, without limitation, in connection with any Company Investment. Subject to the terms and conditions set forth in any Series Schedule, the Managing Member, or an Affiliate thereof, may receive a fee from the Company in connection with any such borrowing.

2.5    *Placement Agents.* The Managing Member, on behalf of the Company, may enter into arrangements with one or more placement agents providing for payments to such placement agents of a flat fee, a budgeted fee attributable to a Company Investment or a one-time or ongoing fee based on a percentage of any incentive fees, distributions, or allocations, as the case may be, attributable to the Interest of a Member introduced by such placement agent, and/or a sales charge based on a percentage of a Member's Subscription Amount to the Company. If a Member is introduced to the Company through a placement agent, any arrangement with such placement agent shall be disclosed to such Member prior to any investment by such Member.

2.6    *Other Activities.*

(a)    The Managing Member and each other Member acknowledge and agree that in addition to transactions specifically contemplated by this Operating Agreement, the Company, the Managing Member, and any of their respective Affiliates are each hereby authorized to purchase property or obtain services from, to sell property or provide services to, or otherwise enter into any transaction with the Managing Member or any of its Affiliates, any Member, any entity underlying any Company Investment or any Affiliate of any of the foregoing Persons.

(b)    No provision of this Operating Agreement shall be deemed to limit in any respect the ability of any Member (or Affiliate thereof), in its individual capacity, and in addition to its capacity as a Member of the Company, to make investments in any entity in which the Company has an interest or otherwise, or from providing financing thereto.

(c)    Except as otherwise expressly provided by this Operating Agreement, no provision of this Operating Agreement shall be deemed to limit in any respect the ability of the Managing Member to make other investments or participate in other business activities, including, without limitation:

(i)    activities that are the same as, or substantially similar to, the activities of the

(ii)    ventures that are determined to be unsuitable for the Company.

(d)    For the avoidance of doubt, the Managing Member shall devote such time and efforts to the business of the Company as it determines are reasonably required to carry out the business of the Company.

*Books and Records; Accounting Methods; Fiscal Year.*

(a)    The Managing Member shall keep or cause to be kept at the address of the Managing Member (or at such other place as the Managing Member shall advise the other Members in writing) full and accurate books of account and financial records of the Company. Each Member shall be shown as a Member of the Company on such books and records. Subject to Section 2.9(b), such books and records shall be available, upon reasonable notice, to the Managing Member, for inspection at the offices of the Managing Member (or such other location designated by the Managing Member, in its sole and absolute discretion) at reasonable times during ordinary business hours on any Business Day by each Member or its duly authorized agents or representatives for a purpose reasonably related

to such Member's Interest in the Company. Each Member agrees that (i) such books and records contain confidential information relating to the Company and its affairs; and (ii) the Managing Member shall have the right, except as prohibited by the LLC Act, to prohibit or otherwise limit in its reasonable discretion the making of any copies of such books and records (it being understood that the Managing Member shall exercise such reasonable discretion in a manner consistent with its obligations under Section 2.9).

(b)     Except as otherwise expressly set forth in this Operating Agreement, or as may be required by any applicable law, rule, or regulation, the Company's books of account shall be kept in a manner determined by the Managing Member, in its sole and absolute discretion.

(c)     Unless otherwise required by law, the taxable year of the Company for U.S. federal income tax purposes shall end on December 31st. Except as otherwise determined by the Managing Member in its reasonable discretion, the fiscal year of the Company for purposes of its financial statements shall be the same as the taxable year of the Company for U.S. federal income tax purposes; provided, however, that the initial fiscal year of the Company may begin on the date of formation of the Company and end on December 31st of the applicable year.

(d)     The assets and liabilities of the Company (including all Company Investments) shall be valued in accordance with the Company's valuation policies and procedures, as may be modified from time to time. All values assigned to the assets of the Company by the Managing Member shall be final and conclusive as to the Company and all of the Members.

(e)     The Managing Member shall cause to be prepared and shall timely file all U.S. and non-U.S. tax returns required to be filed for the Company. The Managing Member, in its sole and absolute discretion, may make, or refrain from making, any income or other tax elections for the Company that it deems necessary, desirable, or appropriate; provided, that none of the Company, the Managing Member, or any Member shall take any action that is inconsistent with the treatment of the Company as a partnership for U.S. federal income tax purposes. Each Member shall be responsible for preparing and filing all tax returns required to be filed by such Member. Upon request of the Managing Member, each Member agrees to provide to the Managing Member information regarding its adjusted tax basis in its Interest in the Company along with documentation substantiating such amount.

(f)     The Managing Member or such other Person as may be designated by the Managing Member in its sole discretion shall be designated, in the manner prescribed by applicable law, as the Company's "partnership representative" within the meaning of Code Section 6223 (the Managing Member and/or such other Person, the "**Partnership Representative**"). With respect to any period in which any non-individual is the Partnership Representative, the Managing Member shall, provided there in excess of 100 partners in the Series LLC, cause the Company to appoint an individual eligible to be a "designated individual" under the new audit rules ("**New Audit Rules**") as defined in the Bipartisan Budget Act 2015 (the "**Designated Individual**," and collectively with the Partnership Representative, the "**Tax Representative**") through whom the Partnership Representative will act for all purposes of the New Audit Rules. In exercising its authority as Tax Representative under the New Audit Rules, the Tax Representative shall at all times be subject to the direction of the Managing Member. The Managing Member is specifically directed and authorized to take whatever steps the Managing Member, in its sole

-8-

and absolute discretion, deems necessary or desirable to perfect such designations, including filing any forms or documents with the Internal Revenue Service, and taking such other action as may from time to time be required under U.S. Treasury Regulations. Expenses of any administrative proceedings undertaken by the Managing Member in its capacity as the Tax Representative shall be Company Expenses.

(a) Promptly following the written request of the Tax Representative, the Company shall, to the fullest extent permitted by law, reimburse and indemnify the Tax Representative for all reasonable, documented, out-of-pocket expenses, including reasonable legal and accounting fees, claims, liabilities, losses, and damages incurred by the Tax Representative (in its capacity as such) in connection with any administration or judicial proceedings (i) with respect to the tax liability of the Company and/or (ii) with respect to the tax liability of the Members in connection with the operations of the Company.

(b) The provisions of this Section 2.8 shall survive the termination of the Company or the termination of any Interests and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company or the Members (relating to the operations of the Company).

2.9 *Confidentiality.*

(a) Each Member agrees not to make any use of (other than for purposes reasonably related to its Interest in the Company or for purposes of filing such Member's tax returns or for other routine matters required by law) or to disclose to any Person (other than such Member's employees, agents, accountants, advisors (including financial advisors), or representatives responsible for matters relating to the Company who agree to be bound by the confidentiality provisions described in this Operating Agreement), and to keep confidential any information or matter relating to the Company and its affairs, including, without limitation, the identities of the other Members, all offering materials used in connection with the marketing and private placement of Interests in the Company (including, without limitation, this Operating Agreement, the Subscription Agreement, and any related marketing and other disclosure documents), and any information or matter related to any Company Investment or the business and operations of the Company, including, without limitation, financial information, valuations, information regarding potential investments, trade secrets, and other confidential and/or proprietary information.

(b) The Managing Member may, to the maximum extent permitted by applicable law, keep confidential from any Member any information, including information requested by such Member pursuant to Section 2.7 and the identity of one or more Members, the disclosure of which (i) the Company, the Managing Member, or any of its respective Affiliates, is required by law, agreement, or otherwise to keep confidential; or (ii) the Managing Member reasonably believes may have an adverse effect on (A) the ability to contemplate, negotiate, or consummate any potential Company Investment, or any transaction directly or indirectly related to, or giving rise to, such Company Investment; (B) the Company, the Managing Member, or any of its respective Affiliates; or (C) any entity (or any Affiliate of such entity) that is the subject of a Company Investment or potential Company Investment. Without limiting the effect of the foregoing, the Managing Member may, pursuant to clause (i) or (ii) of the immediately preceding sentence, and subject to applicable law, exclude from any report, statement, or other document referred to in Section 7.1 delivered or made available to any Member,

-9-

the valuations of one or more Company Investments, or other information relating to any entities underlying such Company Investments, until such time as the Managing Member, in its sole and absolute discretion, may determine. The Managing Member may elect to exercise its right to withhold information pursuant to this Section 2.9(b) with respect to any or all Members.

2.10    *Member Meeting.*

(a)    The Managing Member may call a meeting of the Members at such times as it determines, in its sole and absolute discretion.

(b)    If, with respect to any matter for which the Managing Member has requested the written consent of such Persons, the Managing Member does not receive, prior to the date specified in any request to such Persons for such consent, any notice from any such Person indicating its approval or disapproval, such Person shall be deemed, for purposes of calculating the percentage required for such consent, not to have indicated any approval or disapproval, and such Person's percentage-in-interest shall be excluded from the numerator and denominator when calculating whether the required percentage for approval has been obtained; provided that the affirmative vote or written consent by a majority or other requisite percentage-in-interest of such Persons as provided in this Operating Agreement shall be required to pass such matter.

2.11    *Reliance by Third Parties.* Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Managing Member (and any Person to whom the Managing Member has delegated any such power and authority pursuant to Section 2.1), as set forth in this Operating Agreement.

(a)    The Managing Member may withdraw voluntarily as a managing member of the Company at the end of a fiscal year (i) upon at least ninety (90) days' prior written notice to the Company and all of the Members; or (ii) at any time with the prior written consent of not less than fifty percent (50%) in interests (based on value of Subscription Amounts) of the Members.

(b)    The withdrawal of the Managing Member pursuant to Section 2.12(a) shall cause the dissolution of the Company, unless within ninety (90) days after the date of the withdrawal of the Managing Member, all of the Members elect by written agreement to continue the Company and designate a substitute managing member of the Company. Upon any such withdrawal pursuant to this Section 2.12, the Managing Member's Interest in the Company will be treated as a Membership Interest therein; provided, however, that the Managing Member shall be entitled to receive any incentive distributions or allocations, as the case may be, with respect to all Company Investments made prior to the effectiveness of such withdrawal.

(c)    Notwithstanding any provision of Section 2.12(b) to the contrary, the Managing Member may at any time substitute an Affiliate of the Managing Member as the managing member of the Company, effective at the time specified in a written notice to the Members. Any such substitution shall not be treated as a withdrawal of the Managing Member for purposes of Section 2.12(b).

2.13    *Outside Interests; Conflicts.*

-10-

(a)    Subject to the terms and conditions set forth in any Series Schedule, nothing in this Operating Agreement shall limit the right of any Member (including the Managing Member) to engage or invest, directly or indirectly, in any other present or future venture or activity of any nature or description, whether competitive with the Company or otherwise, or to possess any interest therein, independently or with others.

(b)    Without limiting the foregoing, any Member (including the Managing Member), and its partners, members, employees, and Affiliates, may organize, participate in, control, invest in, advise, or provide services to another Person that also purchases, sells, holds, or deals with investments of the type held by the Company, or otherwise engage in activities competitive with, similar to or the same as, the activities of the Company. Each Member acknowledges that Affiliates of the Managing Member may manage investments for other pooled investment vehicles and managed accounts, and may do so during the term of the Company.

(c)    Neither the Company nor any Member shall have any right to participate in or to receive the benefits of any such other activity or ventures of any other Member as a result of this Operating Agreement or being a Member in the Company.

## ARTICLE 3
### INVESTMENTS; CLASSES AND SERIES

3.1    *Company Investments Generally.* Subject to Section 3.2 and ARTICLE 6, the Managing Member may make Company Investments, in its sole and absolute discretion.

3.2    *Investment Limitations.* The terms applicable with respect to any Series investment limitations are set forth in the applicable offering documents and/or the Series Schedule applicable to that Series.

## ARTICLE 4
### EXPENSES; FEES

4.1    *Management Fee.* In consideration for the services being rendered by the Managing Member, in respect of each year during its existence, each Series shall pay to the Managing Member an annual fee (the "**Management Fee**") equal to one-half of one percent (0.5%) per annum of the total Subscription Amounts in respect of such Series. The Management Fee shall be a Company Expense and shall be payable quarterly in arrears as and from the date of commencement of the relevant Series.

(a)    In addition to the Management Fee, without limiting the other provisions of this Operating Agreement, each Member understands that the Company or a particular Series, as applicable, shall pay each of the following ("**Company Expenses**"):

(i)    all expenses and fees incurred in connection with an actual or proposed Company Investment, including without limitation, professional fees, brokerage commissions, transfer taxes, and costs related to any of the foregoing (including third-party research, data, analytics,

-11-

modeling, structuring, pricing, execution and other third-party information systems, software, and service fees (including data feeds, subscriptions, reports and similar items));

(ii)     direct expenses, including, without limitation, investment advisory fees and expenses, interest and fees associated with any borrowing, insurance premiums and expenses (including, without limitation, with respect to directors' and officers' liability insurance, errors and omissions insurance and other policies), travel and related expenses, and taxes;

(iii)     other administrative and operating expenses, including legal, accounting, bookkeeping, and auditing expenses (if any);

(iv)     costs and expenses associated with Member communications and reports and the delivery thereof to Members;

(v)     taxes, fees, and other governmental charges payable by the Company;

(vi)     expenses incurred in the collection of monies owed to the Company;

(vii)     wind-up, liquidation, termination and dissolution expenses;

(viii)     costs, fees and expenses related to registration, qualification and/or exemption under any applicable U.S. federal, state, local or foreign laws, rules or regulations, including blue sky fees and other securities and/or investment-related filing expenses;

(ix)     any extraordinary expenses (including indemnification and contribution expenses, including the amount of any judgment or settlement paid in connection therewith);

(x)     all expenses (including reasonable attorneys' fees) incurred in connection with any threatened, pending or anticipated litigation, Internal Revenue Service examination or audit, or other proceeding,

(xi)     marketing expenses payable to an Affiliate of the Managing Member or third parties designated by the Managing Member (including travel, hotels and other travel-related expenses in connection with investor and prospective investor meetings, and costs related to attendance at industry conferences and seminars);

(xii)     all costs and expenses incurred in connection with any consultants designated by the Managing Member;

(xiii)     all expenses associated with the preparation and delivery of financial statements, tax returns, and Schedules K-1, if any; and

(xiv)     all other expenses and liabilities incurred in connection with or arising out of the business of the Company or the organization of the Company and each Series, including initial fees associated with an offering of Interests, and fees for the periodic updating of offering documents, marketing materials, organizational documents, operating documents and similar materials, and for continuing any offering of Interests, including, without limitation, the costs of qualifying, reproducing,

-12-

amending, supplementing, mailing and distributing offering materials, including telephone and other communications and transmittal costs.

(b) Additional Company Expenses payable by any Series shall be set forth in the Series Schedule applicable to such Series.

4.3 *Reimbursement of the Managing Member and its Affiliates.* To the extent that the Managing Member incurs any Company Expenses on behalf of the Company, it shall be reimbursed by the Company.

4.4 *Responsibility for Certain Company Expenses among the Series and the Members.*

(a) The Managing Member shall have the right to charge any Member, and not treat as a Company Expense, any expense attributable to a single Member or a small group of Members. In addition, for so long as the Company has more than one Series of Company Interest, the Managing Member shall allocate Company Expenses to the appropriate Series. Expenses or claims that relate to a particular Series or its investments shall be allocated solely to such Series. General administrative expenses and other expenses or claims that do not relate to a particular Series shall be allocated proportionally among the Series.

(b) Notwithstanding the foregoing, the Managing Partner may, in its sole discretion, waive, limit or reduce the expenses payable by a Member or Series of Members pursuant to this Section 4.4 without any obligation to obtain the consent or provide notice to any other Member. Any expense or portion thereof waived pursuant to this Section 4.4(b) shall be borne by the Managing Partner and shall not serve to increase the expenses payable by the other Members under this Section 4.4. In addition, notwithstanding anything in this Operating Agreement to the contrary, the Managing Member may determine that any Company Expense shall be funded by the Members on a basis other than as provided in this Operating Agreement; provided that such alternative basis shall be more equitable than the basis that would otherwise apply pursuant to this Operating Agreement, as determined by the Managing Member in its good faith and reasonable discretion.

## ARTICLE 5
## CAPITAL CONTRIBUTIONS AND SUBSCRIPTION AMOUNT

(a) Upon admission to a Series, each Member will contribute 100% of the subscription amount set forth in such Member's Subscription Agreement with regard to such Series (the **"Subscription Amount"**).

(b) Unused Capital Contributions in respect of a Series may be returned by the Company to the Members at such times as the Managing Member may determine, in its sole and absolute discretion.

(c) Distributions may be recalled as set forth in Section 1.5.

## ARTICLE 6
## CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS

6.1    *Distributions.*

(a)    Distributions to Members may be made from time to time, in cash or in kind, in the sole discretion of the Managing Member. The timing and amount of distributions made by a Series will be determined by the Managing Member in its sole discretion.

(b)    Other than, and subsequent to, tax distributions that may be made in the sole discretion of the Managing Member from time to time, distributions from a Series of Net Proceeds of such Series will initially be allocated to the Members holding Interests in such Series pro rata in proportion to their respective Subscription Amounts with respect to such Series. The share initially allocated to each Member will be further allocated and distributed to such Member and the Managing Member as set forth below:

(i)    first, one hundred percent (100%) to such Member until such time as such Member has received distributions equal to its aggregate Capital Contributions to such Series through the date of distribution; and

(ii)    thereafter, ninety-five percent (95%) to such Member and five percent (5%) to the Managing Member (all distributions made to the Managing Member pursuant to this clause (b), the **"Carried Interest"**).

(c)    Notwithstanding the provisions of this Section 6.1 to the contrary, the Managing Member retains full discretion to make any distribution in cash, securities or other property of a Series.

6.2    *Tax Advances.* Prior to making distributions under Section 6.1, and subject to the maintenance of reasonable cash reserves, a Series may distribute to the Managing Member, prior to the due date for making quarterly federal and state estimated income tax payments, amounts that, in the aggregate, approximate the income taxes payable by the Managing Member (or any Person whose tax liability is determined by reference to the income of the Managing Member) with respect to taxable income or gain allocated to the Managing Member by reason of Section 6.1(b), determined by using the combined marginal federal, state and local income tax rates then applicable to an individual resident of San Francisco, California, taking into account the type of income allocated and any previously allocated taxable losses that may offset later taxable income. Any payment made under this Section 6.2 shall be treated as an advance against distributions otherwise to be made to the Managing Member under Sections 6.1(b) or 9.4 and shall reduce, dollar-for-dollar, amounts to be distributed to the Managing Member under such Sections. Any amounts not so reimbursed after the liquidation of the Company or applicable Series and the application of Section 9.4 shall be repaid by the Managing Member to the Company or Series, as applicable.

6.3    *Withholding of Certain Amounts.* The Managing Member, in its sole discretion, may, without duplication, (a) withhold from any distribution of cash or property in kind to any Member pursuant to this Operating Agreement, and/or (b) require a Member to pay to the Company, the following amounts: (i) any amounts due from such Member to the Company or to the Managing Member pursuant to this Operating Agreement to the extent not otherwise paid; and (ii) any amounts required

-14-

to pay, or to reimburse (on a net after-tax basis) any Indemnified Party for the payment of any taxes (including withholding taxes) and related expenses that the Managing Member in good faith determines to be properly attributable to such Member incurred in respect thereof, including interest, penalties, and additions to tax, except to the extent that any such interest, penalties, or additions to tax result from the violation of the standard for indemnification of such Indemnified Party as set forth in Section 8.1. All amounts withheld pursuant to this Section 6.2 shall be applied by the Managing Member to discharge the obligation in respect of which such amounts were withheld. All amounts withheld by the Managing Member pursuant to this Section 6.2 or otherwise, and all amounts that the Managing Member determines in good faith to be properly withheld or otherwise paid by any Person on behalf of any Member pursuant to the Code or any provision of any non-U.S., state or local tax law, shall be treated as if such amounts were realized and recognized by the Company and distributed to such Member pursuant to Section 6.1. For purposes of this Operating Agreement, any amounts contributed by a Member pursuant to this Section 6.2 shall not be treated as Capital Contributions of such Member.

6.4    *Amounts Held in Reserve.* In addition to the rights set forth in Section 6.2, the Managing Member, in its sole and absolute discretion, shall have the right to withhold proceeds otherwise distributable by the Company to the Members in order to maintain the Company in a sound financial and cash position, and to make such provision for any and all liabilities and obligations, contingent or otherwise, of the Company (including, without limitation, any anticipated Company Expenses) as deemed necessary, desirable, or appropriate by the Managing Member, in its sole and absolute discretion, or if following such distribution to a Member, the balance of such Member's Capital Account would be less than zero (0).

6.5    *LLC Act.* Notwithstanding anything in this Operating Agreement to the contrary, the Company shall not make any distributions, except to the extent permitted under the LLC Act and other applicable law.

(a)    A capital account ("**Capital Account**") shall be established and maintained for each Member on a Series-by-Series basis in accordance with the following provisions.

(i)    To each Member's Capital Account in respect of a Series, there shall be credited the following amounts (in each case in respect of such Series): such Member's Capital Contributions made to such Series, such Member's distributive share of Profits of such Series as determined pursuant to this Section 6.6(b), any items in the nature of income or gain that are specially allocated pursuant to this Operating Agreement, the amount of any liabilities of such Series that are assumed by such Member or that are secured by any assets of such Series distributed to such Member, and, in the case of all existing Members at the time of admission of an additional member, to the extent permitted, the amount of any interest charges specially allocated to the Capital Account of such Member.

(ii)    To each Member's Capital Account in respect of a Series, there shall be debited the following amounts (in each case in respect of such Series): the amount of cash and the fair market value of any assets of such Series distributed to such Member pursuant to any provision of this Operating Agreement, such Member's distributive share of Losses, as determined pursuant to Section 6.6(b), any items in the nature of expenses or losses that are specially allocated pursuant to this

-15-

Operating Agreement, and the amount of any liabilities of such Member assumed by such Series or that are secured by any property contributed by such Member to such Series.

(iii) If ownership of any Interest in a Series is assigned in accordance with the terms of this Operating Agreement, the assignee shall succeed to the Capital Account of the assignor to the extent it relates to the assigned Interest.

(iv) In determining the amount of any liability for purposes of Sections 6.6(a)(i) and 6.6(a)(ii) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and U.S. Treasury Regulations.

(v) Notwithstanding anything else contained in this Section 6.6, Company Expenses funded by or for the account of any Member pursuant to Section 4.3 shall be debited from the Capital Account of such Member in respect of the applicable Series.

(vi) The foregoing Sections 6.6(a)(i) through 6.6(a)(v) above and the other provisions of this Operating Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704 of the Code and U.S. Treasury Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such regulations. The Company shall make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet as computed for book purposes in accordance with U.S. Treasury Regulation Section 1.704-1(b)(2)(iv)(q), including adjustments from a revaluation of property as described in U.S. Treasury Regulation Section 1.704-1(b)(2)(iv)(f).

(b) After giving effect to the special allocations set forth in this Operating Agreement and Sections 6.8 and 6.9, Profits (or Losses) for each Accounting Period shall be allocated to the Members in such amounts as will increase (or decrease) the Capital Account balance of each Member in respect of each Series to the amount that each such Member would be entitled to receive under this ARTICLE 6 if there were an amount available for distribution in respect of such Series equal to the sum of (i) the aggregate Capital Account balances of the Members in respect of such Series before the allocation pursuant to this Section 6.6(b); and (ii) the amount of such Profit (or Loss) to be so allocated, such Profit (or Loss) to retain its character.

(c) Allocations may be adjusted as determined by the Managing Member, in its sole discretion, in connection with legal, regulatory, and tax considerations.

(d) Allocations of Profit and Loss in connection with the disposition of Company Investments shall be made upon such disposition, or at such other times as deemed necessary, desirable, or appropriate by the Managing Member, in its sole discretion, to the extent necessary to give effect to the intent of the distribution provisions of this ARTICLE 6 and ARTICLE 9.

6.7 *Tax Allocations.*

(a) For U.S. federal, state and local and non-U.S. income tax purposes, each item of income, gain, loss, expense, and deduction of the Company shall be allocated among the Capital Accounts of the Members as nearly as possible in the same manner as the corresponding item of

income, gain, loss, expense, and deduction are allocated pursuant to the other provisions of this ARTICLE 96.

(b)  All items of income, gain, loss, expense, and deduction actually recognized by the Company for each fiscal year are to be allocated for income tax purposes among the Capital Accounts of the Members pursuant to the principles of U.S. Treasury Regulations issued under Sections 704(b) and 704(c) of the Code, based upon amounts of the Company's book income and loss allocated to each Member's Capital Account for the current and prior fiscal years.

### 6.8  Special Allocations.

(a)  *Minimum Gain Chargeback.* Except as otherwise provided in U.S. Treasury Regulation Section 1.704-2(f), notwithstanding any other provision of this ARTICLE 6, if there is a net decrease in Company Minimum Gain in respect of a Series during any Accounting Period, each Member and transferee shall be specially allocated Profits (or, if necessary, items of income and gain) for such Accounting Period (and, if necessary, subsequent Accounting Periods) in an amount equal to such Member's and transferee's share of the net decrease in Company Minimum Gain, determined in accordance with U.S. Treasury Regulation Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member and transferee pursuant thereto. The Profits (or items of income or gain) to be so allocated shall be determined in accordance with U.S. Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 6.8(a) is intended to comply with the minimum gain chargeback requirement in U.S. Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)  *Member Nonrecourse Debt Minimum Gain Chargeback.* Except as otherwise provided in U.S. Treasury Regulation Section 1.704-2(i)(4), notwithstanding any other provision of this ARTICLE 6, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Accounting Period in respect of a Series, each Member and transferee who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with U.S. Treasury Regulation Section 1.704-2(i)(5), shall be specially allocated Profits (or, if necessary, items of income and gain) for such Accounting Period (and, if necessary, subsequent Accounting Periods) in an amount equal to such Member's and transferee's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with U.S. Treasury Regulation Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The Profit (or items of income or gain) to be so allocated shall be determined in accordance with U.S. Treasury Regulation Section 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.8(b) is intended to comply with the minimum gain chargeback requirement in U.S. Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)  *Qualified Income Offset.* In the event that in any Accounting Period a Member and/or transferee unexpectedly receives any adjustments, allocations or distributions described in U.S. Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) so as to cause or create an Adjusted Capital Account Deficit in respect of a Series, Profits (or, if necessary, items of income and gain) shall be specially allocated to the Member and/or transferee in such Accounting Period (and subsequent Accounting Periods, if necessary) in an amount and manner

-17-

sufficient to eliminate, to the extent required by the U.S. Treasury Regulations, such Adjusted Capital Account Deficit of the Member as quickly as reasonably possible; provided, however, that an allocation pursuant to this subsection shall be made only if and to the extent such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section have been tentatively made as if this subsection were not a part of the Agreement.

(d)    *Gross Income Allocation*. In the event that any Member and/or transferee has a deficit Capital Account at the end of any Accounting Period of the Company in respect of a Series which is in excess of the sum of (i) the amount that such Member and/or transferee is obligated to restore and (ii) the amount that such Member and/or transferee is deemed to be obligated to restore pursuant to the penultimate sentences of U.S. Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), such Member and/or transferee shall be specially allocated Profits (or items of income and gain) in the amount of such excess as quickly as possible; provided, however, that an allocation pursuant to this subsection shall be made only if and to the extent such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section have been tentatively made as if this subsection were not a part of the Agreement.

(e)    *Nonrecourse Deductions*. Nonrecourse Deductions for any Accounting Period shall be specially allocated between the Members and/or transferees, in the same manner that Profits and Losses are allocated under this ARTICLE 6.

(f)    *Member Nonrecourse Deductions*. Any Member Nonrecourse Deductions for any Accounting Period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with U.S. Treasury Regulation Section 1.704-2(i)(1).

(g)    *Regulatory Allocations*. The allocations set forth in Sections 6.8(a) through 6.8(f) hereof (the "**Regulatory Allocations**") are intended to comply with certain requirements of the U.S. Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 6.8. Therefore, notwithstanding any other provision of this Operating Agreement (other than the Regulatory Allocations), the Managing Member shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's and/or transferee's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Operating Agreement and all Company items were allocated pursuant to Section 6.6(b) hereof.

6.9    *Other Allocation Rules*.

(a)    For purposes of determining the Profits, Losses, or any other items allocable to any Accounting Period in respect of a Series, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Section 706 of the Code and the U.S. Treasury Regulations thereunder.

-18-

(b)     Notwithstanding the other provisions of this ARTICLE 6, the Managing Member is authorized to make any adjustment in the allocation of Profits or Losses provided for in such Article if the Managing Member considers in good faith that the adjustment is necessary and equitable to correct errors in allocations caused by errors in unaudited financial information or to correct inequities that may arise under this Operating Agreement, including those that may result from there being multiple Accounting Periods during a single fiscal year or during the term of this Operating Agreement rather than a single Accounting Period.

(c)     All matters concerning the allocation of expenses, profits, gains, and losses among the Members, Series and classes, and accounting procedures not specifically and expressly provided for by the terms of this Operating Agreement, shall be determined and implemented in good faith by the Managing Member, whose determination shall be final and binding upon all of the Members.

## ARTICLE 7
## REPORTS TO MEMBERS

7.1     *Reports.*

(a)     The Company shall furnish Members with tax information regarding the Company for completion of such Members' U.S. tax returns.

(b)     The Company also may provide additional reports or information to Members from time to time, as determined by the Managing Member.

(c)     Notwithstanding the foregoing provisions of this Section 7.1, the Managing Member may, pursuant to Section 2.9(b), keep confidential from any Member information otherwise required to be delivered to such Member pursuant to this Section 7.1.

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1     *Exculpation and Indemnification.*

(a)     To the fullest extent permitted by law, none of the Managing Member, any of their respective Affiliates, or any of their respective members, partners, officers, directors, managers, representatives, employees, or agents (each, an "**Indemnified Party**"), shall be liable, in damages or otherwise, to any Member or the Company, and the Company shall indemnify, defend, and hold harmless each Indemnified Party from and against any and all costs, losses, claims, damages, liabilities, actions, expenses (including, without limitation, reasonable legal and other professional fees and disbursements, and all expenses reasonably incurred in investigating, preparing, or defending against any claim whatsoever), judgments, fines, and settlements (collectively, "**Indemnification Obligations**") suffered or sustained by such Indemnified Party by reason of any acts, omissions, or alleged acts or omissions of such Indemnified Party in connection with, or in any way relating to, the Company's business or affairs (including, without limitation, in connection with any holding vehicle used in connection with the investment or operations of the Company) and matters relating to Company Investments, except in the case of all Indemnified Parties, acting in such capacity, where attributable to the fraud, willful misconduct, or gross negligence (which shall not include acts or

-19-

omissions that are honest mistakes or errors of judgment made or omitted by an Indemnified Party in good faith, unless such acts or omissions constitute gross negligence) of the Indemnified Party.

(b)     The termination of a Proceeding by settlement or upon a plea of *nolo contendere*, or its equivalent, shall not, of itself, create a presumption that any Indemnified Party's conduct constituted fraud, willful misconduct, or gross negligence. Expenses (including legal fees and other professional fees and disbursements) incurred in any Proceeding shall be paid by the Company as incurred and in advance of the final disposition of such Proceeding upon receipt of an undertaking by or on behalf of such Indemnified Party to repay such amount if it will ultimately be determined that such Indemnified Party is not entitled to be indemnified by the Company as authorized hereunder.

(c)     No provision of this Operating Agreement shall be construed to provide for the indemnification of an Indemnified Party for any liability to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but instead shall be construed so as to effectuate the provisions thereof to the fullest extent permitted by law.

(d)     Each Indemnified Party may consult with legal counsel, accountants, consultants, or other advisors in respect of the Company's business or affairs, and shall be fully protected from liability to the Company or the Members and justified in any action or inaction that is taken or omitted in good faith, in reliance upon and in accordance with the opinion or advice of such counsel, accountants, consultants, or other advisors; provided that such counsel, accountants, consultants, and other advisors shall have been selected and monitored with reasonable care. Each Indemnified Party shall, to the fullest extent permitted by applicable law, be treated as having acted in good faith and with the requisite degree of care if each such Indemnified Party has relied on reports and written statements of the directors, officers, employees, agents, stockholders, members, investment managers, and partners of an entity (or Affiliate of such entity) that is the subject of a Company Investment, unless such Indemnified Party had reason to believe that such reports or statements were not true and complete.

(e)     Except as expressly set forth in this ARTICLE 8, in the event that any Member initiates any Proceeding against the Company or any Indemnified Party, and a judgment or order not subject to further appeal or discretionary review is rendered in respect of such Proceeding for the Company or such Indemnified Party, as the case may be, such Member shall be solely liable for all costs and expenses of the Company or such Indemnified Party, as the case may be, attributable thereto.

(f)     The provisions of this Operating Agreement, to the extent that they restrict or eliminate the duties and liabilities or rights and powers of any Indemnified Party otherwise existing at law or in equity, are agreed by the Members to replace such other duties, liabilities, rights, and powers of such Indemnified Party; provided that, notwithstanding anything in this Operating Agreement to the contrary, no provision of this Operating Agreement shall constitute a waiver or limitation of any Member's rights under the U.S. federal or state securities laws.

(g)     The Managing Member may, but shall not be required to, cause the Company to purchase and maintain insurance coverage (including, without limitation, directors and officers insurance, if any) reasonably satisfactory to the Managing Member that provides the Company with coverage with respect to losses, claims, damages, liabilities, and expenses that would otherwise be Indemnification Obligations. The fees and expenses incurred in connection with obtaining and

-20-

maintaining any such insurance policy or policies, including any commissions and premiums, shall be Company Expenses. For the avoidance of doubt, the indemnification provided by this ARTICLE 8 shall not be deemed to be exclusive of any other rights to which any Indemnified Party may be entitled under any agreement, or as a matter of law, or otherwise, and shall inure to the benefit of the heirs, successors, and administrators of each Indemnified Party.

## ARTICLE 9
## COMPANY DURATION; DISSOLUTION

9.1     *Duration.*

(a)     The Company shall continue until dissolved upon the earliest to occur of (i) the termination or expiration of term of each Series of the Company; (ii) the election of the Managing Member, in its sole and absolute discretion, to commence liquidation and winding-up of the Company or any Series; or (iii) the occurrence of any event that would make unlawful its continued existence. Additional provisions with respect to the termination of any Series will be set forth in the offering documents and/or the applicable Series Schedule.

(b)     Upon the expiration of the term or the earlier dissolution of the Company or any Series as set forth in Section 9.1(a), the Managing Member (or a liquidator appointed by the Managing Member) will work to effect an orderly liquidation of the Company or the Series, as applicable, will provide for the satisfaction of the Company's or the Series' creditors, and establish appropriate reserves, to the extent available, and then shall distribute any remaining balance of the Company's or the Series' assets in accordance with the distribution provisions provided for in Section 6.1.

9.2     *Dissolution.* Subject to the LLC Act, the Company, and to the extent applicable, each Series thereof, shall be dissolved and its affairs shall be wound up upon the earliest to occur of:

(a)     the expiration of the term of the Company or any Series thereof as provided pursuant to Section 9.1;

(b)     at any time that there are no Members of the Company or, with respect to any Series, any Series thereof, unless the business of the Company or such Series is continued in accordance with the LLC Act; and

(c)     the entry of a decree of judicial dissolution pursuant to the LLC Act.

9.3     *Liquidation of Company.* Upon dissolution, the Managing Member shall be the liquidator, or shall appoint a liquidator in its reasonable discretion, to wind up the affairs of the Company or, in the case of any Series, such Series, pursuant to this Operating Agreement. In performing its duties subject to the LLC Act, the liquidator is authorized to sell, distribute, exchange, or otherwise dispose of the assets of the Company or, in the case of any Series, such Series (including all remaining Company Investments) in any reasonable manner that the liquidator shall determine to be in the best interest of the applicable Members. The liquidator shall use reasonable efforts to effect an orderly liquidation of the Company's or, in the case of any Series, such Series' remaining assets, which may include without limitation the sale of all or any portion of the Company's assets or, in the case of any

-21-

Series, such Series' assets (including all remaining Company Investments) to Affiliates of the Managing Member.

9.4 *Distribution upon Dissolution of the Company.*

(a) The liquidator, when effecting the liquidation of the Company pursuant to Section 9.3, shall first provide for the satisfaction of the Company's creditors and for the establishment and/or maintenance of appropriate reserves to the extent available, and then shall distribute any remaining balance of the Company's assets (including all remaining Company Investments) in cash or in kind in accordance with the applicable distribution provisions of ARTICLE 6; provided that the liquidator may, if requested by a Member, continue to hold and manage, on the terms set forth herein, the Company Investments in the Company attributable to such requesting Members' Interests, in lieu of distributing to such requesting Members the value of their Interests in cash or in kind.

(b) Each Member shall look solely to the assets of Series of the Company in which any such Member was invested for the return of all amounts invested in Company Investments in respect of such Member with respect to such Series, and no Member therein shall have priority over any other Member therein as to the return of such amounts invested in Company Investments.

9.5 *Withdrawal, Death or Incompetence of a Member.* Except as otherwise provided in any Series Schedule or ARTICLE 10, no Member shall have the right to withdraw from the Company prior to its dissolution and winding up. Upon the death or incompetence of an individual Member, such Member shall not be entitled to receive the fair value of its Interest in the Company in accordance with the LLC Act. At the Managing Member's election, and in its sole and absolute discretion, upon the death or incompetence of an individual Member, such Member's personal representative may exercise all of such Member's rights for the purpose of settling such Member's estate or administering such Member's property. Except as expressly provided in this Operating Agreement, no other event affecting a Member (including bankruptcy or insolvency) shall, in and of itself, affect his, her or its obligations under this Operating Agreement or affect the Company.

## ARTICLE 10
### TRANSFERABILITY OF INTERESTS

10.1 *Transferability of Membership Interests.* Subject to Section 9.5 and this ARTICLE 10, Membership Interests in a Series will be freely transferrable.

10.2 *Expenses of Transfer; Indemnification.* Transfers will be subject to a transfer fee equal to the greater of (i) 5% of the gross sale price of the Membership Interests or (ii) $500. Such fee shall be payable to the Placement Agent by the transferring Member or such Member's transferee (any such transferee, when admitted and shown as such on the books and records of the Company, being a "**Substitute Member**"). In addition, the transferring Member and such transferee shall indemnify the Company and the Managing Member in a manner satisfactory to the Managing Member against any losses, claims, damages, or liabilities to which the Company or the Managing Member may become subject arising out of, related to, or in connection with any false representation or warranty made by, or breach or failure to comply with any covenant or agreement of, such transferring Member or such transferee.

10.3    *Recognition of Transfer; Substitute Members.*

(a)    No purchaser, assignee, or other recipient of all or any portion of a Member's Interest in the Company may be admitted to the Company as a Substitute Member until such Person, as a condition to its admission as a Member, executes and acknowledges such instruments (including a counterpart of this Operating Agreement), in form and substance satisfactory to the Managing Member, as the Managing Member reasonably deems necessary, desirable, or appropriate to effectuate such admission and to confirm the agreement of such Person to be bound by all the terms and provisions of this Operating Agreement with respect to the Interest in the Company acquired by such Person.

(b)    The Company shall not (subject to Section 9.5) recognize for any purpose any purported Transfer of all or any part of a Member's Interest in the Company, and no purchaser, assignee, transferee, or other recipient of all or any part of such Interest shall become a Substitute Member hereunder unless:

(i)    the provisions of Sections 10.1, 10.2, and 10.3(a) shall have been complied with;

(ii)    the Managing Member shall have been furnished with the documents effecting such Transfer, in form reasonably satisfactory to the Managing Member (including, without limitation, the provision of representations by the purchaser, assignee, transferee or other recipient consistent with those obtained from the seller, assignor or transferor at the time the seller, assignor or transferor first subscribed for Interests and such information establishing that the Company will not have a requirement to withhold under Section 1446(f) of the Code as a result of such Transfer), executed and acknowledged by both the seller, assignor, or transferor and the purchaser, assignee, transferee, or other recipient;

(iii)    such purchaser, assignee, transferee, or other recipient shall have represented that such Transfer was made in accordance with all applicable laws and regulations;

(iv)    all necessary governmental consents and acknowledgments shall have been obtained in respect of such Transfer;

(v)    to the extent required by the Managing Member, in its sole discretion, the Member provides documents satisfactory in form and substance to the Managing Member, to the effect that the transferee is an accredited investor (as defined in Regulation D under the U.S. Securities Act of 1933, as amended) ("**Accredited Investor**") and that such Transfer will not violate the U.S. Securities Act of 1933, as amended, or any other applicable securities laws, including the Investment Company Act;

(vi)    the Managing Member believes, in its sole discretion, that such Transfer (alone or together with other Transfers) will not cause the Company to be taxable as a corporation for U.S. federal tax purposes;

(vii)    the books and records of the Company shall have been changed (which change shall be made as promptly as practicable) to reflect the admission of such Substitute Member as a Member of the Company; and

)

        (viii)    all necessary instruments reflecting such admission shall have been filed in each jurisdiction in which such filing is necessary in order to qualify the Company to conduct business or to preserve the limited liability of the Members.

        (c)    Upon the satisfaction of the conditions set forth in this Section 10.3, any such purchaser, assignee, or other recipient shall become a Substitute Member.

    10.4    *Transfers During a Fiscal Year.* If any Transfer (other than a pledge or hypothecation) of a Member's Interest in the Company shall occur at any time other than the end of the Company's fiscal year, the distributive shares of the various items of Company income, gain, loss, expense, and deduction as computed for tax purposes and the related cash distributions shall be allocated between the transferor and the transferee on such proper basis as the transferor and the transferee shall agree consistent with applicable requirements under Section 706 of the Code; provided that no such allocation shall be effective unless (a) the transferor and the transferee shall have given the Company written notice, prior to the effective date of such Transfer, stating their agreement that such allocation shall be made on such proper basis; (b) the Managing Member shall have consented to such allocation, which consent may be withheld by the Managing Member, in its sole and absolute discretion; and (c) the transferor and the transferee shall have agreed to reimburse the Managing Member for any incremental accounting fees and other expenses incurred by the Managing Member in making such allocation. If the transferor and transferee fail to give notice to the Company in accordance with the proviso to the immediately preceding sentence, all allocations shall be made in accordance with any permissible method under Section 706 of the Code and the Regulations thereunder, as determined by the Managing Member in its sole and absolute discretion.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

    11.1    *Amendments; Waivers.*

        (a)    Except as otherwise expressly provided in this Operating Agreement, any provision of this Operating Agreement may be amended, in whole or in part, or waived with the prior written consent of the Managing Member and Members representing a majority of the Interests affected by such amendment (*e.g.*, an amendment to a Series Schedule shall require the prior written consent of the Managing Member and the Members representing a majority of the Interests in such Series). Notwithstanding the foregoing:

        (i)    each provision of this Operating Agreement in which a percentage is specified as being required for any action or approval of the Members may not be amended or waived without the prior written consent of the Managing Member and Members having the requisite interest representing in aggregate at least such specified percentage;

        (ii)    no amendment shall directly reduce the Capital Account of any Member without the written consent of such Member; and

        (iii)    any provision of this Operating Agreement may be amended by written instrument executed by the Managing Member and without the consent of the Members pursuant to and consistent with Section 2.3, or in order to: (A) change the name of the Company; (B) reflect changes

-24-

in the Members of the Company and the Subscription Amount of any Member; (C) admit one or more additional members or Substitute Members, or remove one or more Members, in accordance with the terms of this Operating Agreement; (D) make changes to ensure that the Company shall not be treated as an association taxable as a corporation or a "publicly traded partnership" for U.S. federal income tax purposes; (E) ensure that the Placement Fees and any incentive fees, incentive allocation, or incentive distributions, conform to any applicable requirements of law (whether pursuant to a requirement of the Securities and Exchange Commission or another regulatory authority, or otherwise); (F) cure any manifest errors or ambiguity in the terms of this Operating Agreement, including amendments to correct typographical errors, eliminate ambiguities, or make other changes that the Managing Member determines in good faith not to be adverse to the Members; (G) ensure that the Company's tax allocations comply with certain tax requirements; (H) prevent the Company from becoming an investment company required to be registered under the Investment Company Act; (I) accommodate the creation of any holding vehicle for the purpose of facilitating Company Investments, investments by Members, or otherwise in connection with the operations and affairs of the Company; (J) add to the representations, duties, or obligations of the Managing Member, or surrender any right or power (but not responsibilities) granted to the Managing Member in this Operating Agreement; (K) make any changes required by any governmental body or agency or to comply with any applicable requirements of law that are deemed by the Managing Member to be for the benefit or protection of the Members; and (L) make any other amendments that, in the reasonable discretion of the Managing Member, would not be materially adverse to the Members.

11.2    *Certificates of Membership Interests.* The Managing Member, in its sole and absolute discretion, may issue certificates for any Interests, which certificates, if issued, shall evidence a Member's Interest. In such event, each such certificate shall bear such legends as may be required by applicable U.S. federal or state laws, or as may be deemed by the Managing Member in its sole and absolute discretion to be necessary, desirable, or appropriate.

11.3    *Investment Representation.*

(a)    Each Member, by executing this Operating Agreement, represents and warrants that its Interest in the Company has been acquired by its own account or for the account of an institutional investor previously specified in writing to the Company, with respect to whom it has full investment discretion, for investment and not with a view to resale or distribution thereof and that it is fully aware that in agreeing to admit it as a Member, the Managing Member and the Company are relying on the truth and accuracy of such representation and warranty; and

(b)    Each Member acknowledges (i) that is has carefully reviewed and understands (y) the representations, warranties and covenants contained in Appendix B attached hereto, and (z) the disclosures related to an investment in the Company contained in Appendix C attached hereto, and (ii) that the representations, warranties and covenants made by such Member in Appendix B will be relied upon by the Company and the Managing Member in determining whether to accept or reject such Member's subscription. Each Member shall promptly notify the Company in the event any representation, warranty or covenant made in Appendix B of this Operating Agreement is no longer accurate or ceases to be true.

11.4    *Successors; Counterparts; Beneficiaries.* This Operating Agreement (a) shall be binding as to the executors, administrators, estates, heirs, and legal successors of the Members; and (b) may be

executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart. Except as otherwise set forth in Section 8.1, no provision of this Operating Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

11.5    *Further Assurance.* Each Member, upon the request of the Managing Member, agrees to perform all further acts and to execute, acknowledge, and deliver any documents that may reasonably be necessary to carry out the provisions of this Operating Agreement.

11.6    *Governing Law; Severability.* THIS OPERATING AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS THEREOF. In particular, it shall be construed to the maximum extent possible to comply with all of the terms and conditions of the LLC Act. If it shall be determined by a court of competent jurisdiction that any provision or wording of this Operating Agreement shall be invalid or unenforceable under the LLC Act or other applicable law, such invalidity or unenforceability shall not invalidate the entire Operating Agreement, in which case this Operating Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of applicable law, and, in the event such term or provision cannot be so limited, this Operating Agreement shall be construed to omit such invalid or unenforceable provisions.

11.7    *Authorization.* The execution and delivery by the Managing Member and the performance by the Managing Member of their respective obligations under this Operating Agreement have been duly authorized by all necessary company action on the part of such Persons. Such Persons have the requisite company power and authority to execute, deliver, and perform their respective obligations under this Operating Agreement. This Operating Agreement has been duly executed and delivered by the Managing Member, constitutes a valid and binding agreement of the Managing Member, and is enforceable against the Managing Member, in its capacity as managing member of the Company, in accordance with its terms.

11.8    *Necessary Filings.* The Managing Member shall promptly prepare, following the execution and delivery of this Operating Agreement, any documents required to be filed and recorded, or, which are in the Managing Member's sole and absolute discretion, appropriate for filing and recording, under the LLC Act, and the Managing Member shall promptly cause each such document to be filed and recorded in accordance with the LLC Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each State in which the Company may hereafter establish a place of business. The Managing Member shall also promptly cause to be filed, recorded, and published such statements of fictitious business name and other notices, certificates, statements, or other instruments required by any provision of any applicable law of the U.S. or any State that governs the conduct of its business from time to time.

11.9    *Power of Attorney.*

(a)    Each Member does hereby constitute and irrevocably appoint the Managing Member and its officers as its true and lawful representative and attorney-in-fact, in its name, place, and stead to make, execute, sign, deliver, and file (i) a Certificate of Limited Company of the Company and any amendment thereof required because of an amendment to this Operating Agreement or in order to effectuate any change in the membership of the Company; (ii) any amendments to this

Operating Agreement in accordance with Section 11.1; and (iii) all such other instruments, documents, and certificates that may from time to time be required by the laws of the U.S., the State of Delaware, or any other State, or any political subdivision or agency thereof, to effectuate, implement, and continue the valid and subsisting existence of the Company or any Series thereof, or to dissolve the Company or any Series thereof; provided that the power of attorney granted pursuant to this Section 11.9 may only be used if such use is consistent with the other provisions of this Operating Agreement, including, without limitation, with respect to any amendment or waiver of this Operating Agreement if (but only if) any prior approval required to be obtained under this Operating Agreement shall have been obtained. Such representatives and attorneys-in-fact shall not have any right, power, or authority to amend or modify this Operating Agreement when acting in such capacities.

(b)     The power of attorney granted pursuant to this Section 11.9 is coupled with an interest and shall (i) survive and not be affected by the subsequent death, incapacity, disability, dissolution, termination, or bankruptcy of the Member granting such power of attorney or the transfer of all or any portion of such Member's Interest in the Company; and (ii) extend to such Member's successors, assigns, and legal representatives.

11.10   *No Bill for Company Accounting.* Subject to mandatory provisions of law applicable to a Member and to circumstances involving a breach of this Operating Agreement, each of the Members covenants that it will not (except with the prior written consent of the Managing Member) file a bill for Company accounting.

11.11   *Goodwill.* No value shall be placed on the name or goodwill of the Company.

*11.12   Notices.*

(a)     Each notice relating to this Operating Agreement shall be in writing and delivered in person, by registered or certified mail, by Federal Express or similar overnight courier service, by electronic mail (e-mail) or by facsimile. Notwithstanding the foregoing, all notices to the Company or the Managing Member shall be delivered in hard copy to:

Linqto Liquidshares LLC
c/o Linqto Liquidshares
Manager LLC
717 Market Street, San Francisco, CA 94103

*with a copy to:*

Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA
United States of America
Attn: Tony Jeffries, Esq.

(b)     All notices addressed to a Member shall be addressed to such Member at the

address set forth on the books and records of the Company. Any Member may designate a new address by notice to that effect given to the Company. Unless otherwise specifically provided in this Operating

Agreement, a notice shall be deemed to have been effectively given when delivered personally, if delivered on a Business Day; the next Business Day after personal delivery if delivered personally on a day that is not a Business Day; four (4) Business Days after being deposited in the mail, postage prepaid, return receipt requested, if mailed; on the next Business Day after being deposited for next day delivery with Federal Express or similar overnight courier; when sent, if e-mailed on a Business Day; the next Business Day following the day on which the e-mail is sent if e-mailed on a day that is not a Business Day; when receipt is acknowledged, if facsimiled on a Business Day; and the next Business Day following the day on which receipt is acknowledge if facsimiled on a day that is not a Business Day.

11.13 *Headings.* Section and other headings contained in this Operating Agreement are for reference only and are not intended to describe, interpret, define or limit the scope or intent of this Operating Agreement or any provision hereof.

11.14 *Counsel to the Company.* Counsel to the Company may also be counsel to the Managing Member or any of its Affiliates. The Managing Member may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the applicable rules of professional conduct in any jurisdiction. Each Member acknowledges that the counsel to the Company does not represent any Member with respect to the Company.

11.15 *Conflicts.* In the event of conflict between the provisions of this Operating Agreement, the provisions of the Subscription Agreement and the provisions of any other documents evidencing the Company, the provisions of this Operating Agreement shall prevail.

*Member Signature Page to Amended and Restated Limited Liability Company Operating Agreement of Linqto Liquidshares*

**Appendix A**

**DEFINITIONS**

"Accounting Period" means the following fiscal periods: the initial Accounting Period shall commence on the day on which a Certificate of Formation of the Company is filed with the Secretary of State of the State of Delaware. Each subsequent Accounting Period shall commence immediately after the close of the immediately preceding Accounting Period. Each Accounting Period shall close at the close of business on the first to occur of (a) the last day of a fiscal year of the Company; (b) the effective date of the withdrawal of a Member (as such withdrawal is permitted pursuant to this Operating Agreement); or (c) the date of the Company's liquidation.

"Accredited Investor" means an "accredited investor," as defined in Regulation D under the U.S. Securities Act of 1933, as amended).

"Adjusted Capital Account Deficit" means, with respect to a Member, the deficit balance, if any, in its Capital Account as of the end of the relevant Accounting Period, after giving effect to the following adjustments:

      (i)      credit to such Capital Account any amounts that the Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of U.S. Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

      (ii)      debit to such Capital Account the items described in U.S. Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of U.S. Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Advisers Act" means the U.S. Investment Advisers Act of 1940, as amended.

"Affiliate" of any Person means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Business Day" means any day except a Saturday, Sunday, or other day on which commercial banks in New York City are authorized by law to close.

"Capital Account" has the meaning set forth in Section 6.6(a).

"Capital Contribution" means, with respect to any Member and any Series as of any date of determination, the total amount of money and the fair market value of any property other than money contributed by such Member to such Series, pursuant to the terms of this Operating Agreement.

"Carried Interest" has the meaning set forth in Section 6.1(b)(ii).

A-1

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the preamble to this Operating Agreement and, as applicable, in Section 1.4(a).

"Company Expenses" has the meaning set forth in Section 4.2(a).

"Company Investments" means, without limitation, any and all securities, instruments, and other interests in which the Company may invest, as modified by any Series Schedule.

"Company Minimum Gain" has the meaning set forth in U.S. Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Dollar" or "$" means the lawful currency of the United States of America.

"Indemnification Obligations" has the meaning set forth in Section 8.1(a).

"Indemnified Party" has the meaning set forth in Section 8.1(a).

"Initial Operating Agreement" has the meaning set forth in the recitals to this Operating Agreement.

"Interest" means a membership interest in the Company.

"Investment Company Act" means the U.S. Investment Company Act of 1940, as amended.

"LLC Act" means the Delaware Limited Liability Company Act, 6 Del.C. § 18-101, et seq., as amended and restated from time to time.

"Management Fee" has the meaning set forth in Section 4.1.

"Managing Member" has the meaning set forth in the preamble to this Operating Agreement.

"Member" means, at any time, any Person who is at such time a member of the Company and shown as such on the books and records of the Company, in such Person's capacity as a member of the Company.

"Member Nonrecourse Debt" has the meaning set forth in U.S. Treasury Regulation Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" has the meaning set forth in U.S. Treasury Regulation Section 1.704-2.

"Member Nonrecourse Deductions" has the meaning set forth in U.S. Treasury Regulation Sections 1.704-2(i)(1) and 1.704-2(i)(2).

A-2

"Net Proceeds" means the gross proceeds received by a Series from its investments less actual or contingent obligations, liabilities and reserves of the Series, as the Managing Member may determine are necessary or advisable.

"Nonrecourse Deductions" has the meaning set forth in U.S. Treasury Regulation Section 1.704-2(b)(1).

"Operating Agreement" means this Amended and Restated Limited Liability Company Operating Agreement of the Company, as may be amended and/or restated from time to time.

"Partnership Representative" has the meaning set forth in Section 2.8(b).

"Person" means any individual, partnership, corporation, limited liability company, trust or other entity.

"Proceeding" means any action, claim, suit, investigation or proceeding by or before any court, arbitrator, governmental body or other agency.

"Profits" and "Losses" means, for each Accounting Period, an amount equal to the applicable Series' taxable income or loss for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i) any income of the Series that is exempt from U.S. federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii) any expenditures of the Series described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to U.S. Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii) depreciation, amortization and other cost recovery deductions shall be adjusted in accordance with U.S. Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(iv) if property is distributed in kind to the Members, immediately prior to such distribution in kind, the Series shall be treated as having sold the distributed property at its fair market value at such time; and

(v) to the extent an adjustment to the adjusted tax basis of any asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required pursuant to U.S. Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses.

A-3

Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 6.8 of this Operating Agreement shall not be taken into account in computing Profits or Losses. The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to this Operating Agreement shall be determined by applying rules analogous to those set forth in this definition.

"Regulatory Allocations" has the meaning set forth in Section 6.8(g).

"Series" means any series of the Company.

"Series Schedule" has the meaning set forth in Section 1.4(a).

"Subscription Agreement" means the Subscription Agreements of the Company as executed by each of the Members and accepted by the Managing Member.

"Subscription Amount" has the meaning set forth in Section 5.1(a).

"Substitute Member" has the meaning set forth in Section 10.2.

"Transfer" means a transfer of Membership Interests pursuant to Section 10.1.

"U.S." means the United States of America.

"U.S. Treasury Regulations" means the treasury regulations promulgated under the Code, as such treasury regulations may be amended from time to time.

A-4

**Appendix B**

**SUBSCRIBER REPRESENTATIONS**

The individual or entity that will be the beneficial owner of the Interest (defined below) (the "**Subscriber**") desires to subscribe for and purchase an Interest to be issued by the applicable Series the Company. The Interest will be issued in the manner and subject to the terms and conditions set forth herein and in the Company's Amended and Restated Operating Agreement, as amended and supplemented from time to time, including without limitation, by the applicable Series Schedule with respect to the applicable Series (the "**Operating Agreement**"). Unless otherwise defined, capitalized terms used herein are as defined in the Operating Agreement.

In furtherance of the foregoing, and in order to induce the Managing Member to accept the Subscriber's subscription, the Subscriber agrees as follows:

PART I – GENERAL REPRESENTATIONS AND COVENANTS

1. The Subscriber, if a U.S. person, shall complete an Internal Revenue Service Form W-9 "Request for Taxpayer Identification Number and Certification". If not a U.S. person for United States federal income tax purposes, the Subscriber shall: (a) complete an Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI, W-8EXP or W-8IMY (and all required attachments), as applicable, and (b) contact the Managing Member.

2. Each prospective investor that is an entity shall provide the Managing Member with: (a) a copy of its constitutional documents (e.g., certificate of incorporation, by-laws, partnership agreement, or trust agreement); (b) evidence that such constitutional documents permit it to make investments in securities, such as the membership interests of the Company (the "**Interests**"); and (c) evidence that all appropriate action has been taken by it to authorize the investment.

3. Subject to the acceptance of this subscription by the Managing Member on behalf of the applicable Series, the Subscriber, either directly or through its nominee, hereby irrevocably subscribes for and agrees to purchase an Interest for the total subscription amount indicated in the prospective investor's subscription booklet.

4. The Subscriber irrevocably represents and warrants to the applicable Series, the Company, and the Managing Member that:

(a) the Subscriber qualifies as determined by the Managing Member in its absolute discretion as an "accredited investor," as defined in Regulation D under the U.S. Securities Act of 1933, as amended) ("**Accredited Investor**"), or is otherwise a suitable investor and has such knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of the investment, for one or more of the following reasons:

(i) The Subscriber is a natural person whose individual net worth (or combined net worth with the Subscriber's spouse if the Subscriber is married) as of the date hereof exceeds One Million Dollars ($1,000,000). For the purposes of this document, in calculating a person's net worth, (i) a person's primary residence shall not be included as an asset; (ii) indebtedness that is secured by the

B-1

person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of Interests, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of the sale of Interests exceeds the amount outstanding sixty (60) days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (iii) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of Interests shall be included as a liability.

(ii)    The Subscriber is a natural person who had an individual "income" exceeding Two Hundred Thousand Dollars ($200,000) during both of the two (2) most recently completed calendar years (or a joint income with the Subscriber's spouse in excess of Three Hundred Thousand Dollars ($300,000) in each of those years) and who has a reasonable expectation of reaching the same income level in the current calendar year. For purposes of this document, the term "income" shall mean adjusted gross income reported or to be reported on a federal income tax return, increased by (i) any deductions for long-term capital gains; (ii) any deductions for depletion (pursuant to section 611 et seq. of the Code); (iii) any exclusions of interest (pursuant to section 103 of the Code); (iv) any losses of a partnership allocated to the Subscriber as an individual limited partner (as reported on Schedule E of Form 1040); (v) amounts contributed to an Individual Retirement Account or Keogh retirement plan; (vi) alimony paid; and (vii) elective contributions to a cash or deferred arrangement under section 401(k) of the Code.

(iii)    The Subscriber is a director, executive officer, or Managing Member of the Series.

(iv)    The Subscriber is a "business development company," as defined in Section 2(a)(48) of the Investment Company Act.

(v)    The Subscriber is a trust with total assets in excess of Five Million Dollars ($5,000,000) that was not formed for the specific purpose of acquiring the securities offered hereby, and the investment decisions for which are made by a sophisticated person capable of evaluating the merits and risks of the proposed investment.

(vi)    The Subscriber is a revocable trust that may be amended or revoked at any time by the grantors thereof, and all of the grantors are accredited investors.

(vii)    The Subscriber is a Small Business Investment Company licensed by the United States Small Business Administration under Section 301(c) or Section 301(d) of the Small Business Investment Act of 1958.

(viii)    The Subscriber is a "private business development company" as defined in Section 202(a)(22) of the Investment Advisers Act (the "**Advisers Act**").

(ix)    The Subscriber is a non-profit organization of the type described in section 501(c)(3) of the Code, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of Five Million Dollars ($5,000,000).

(x)     The Subscriber is an "employee benefit plan" (within the meaning of Title I of ERISA) and either: (i) the decision to invest in the Series was made by a plan fiduciary that is a bank, savings and loan association, insurance company, or registered investment adviser; (ii) the plan has total assets exceeding Five Million Dollars ($5,000,000); or (iii) if a self-directed plan, investment decisions are made solely by persons who, if executing this document, would be able to initial one or more of the boxes above.

(xi)     The Subscriber is a plan established and maintained by a State, its political subdivisions, or an agency or instrumentality of a State or its political subdivisions, for the benefit of its employees, and such plan has assets in excess of Five Million Dollars ($5,000,000).

(xii)     The Subscriber is an entity, and each of the Subscriber's equity investors, if executing this document, would be able to initial one or more of the boxes above.

(b)     if a corporation or other entity, the Subscriber: (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation; (ii) has full power and authority to enter into, and perform in accordance with the respective terms of, the Operating Agreement; (iii) is bound and obligated by the Operating Agreement, which are valid and enforceable against it in accordance with their respective terms; and (iv) has authorized, by all necessary corporate or other action, the execution, delivery, and performance of the Operating Agreement, the terms of which will not violate any contract, restriction, or commitment of, or applicable to, the Subscriber or any of its affiliates, or, to the best of the Subscriber's knowledge, any applicable law or government regulation;

(c)     the Subscriber is a natural person, corporation, or other entity and is not a Benefit Plan Investor (as defined below). For these purposes, a "Benefit Plan Investor," as defined under Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and any regulations promulgated thereunder, includes (a) an "employee benefit plan" that is subject to the provisions of Title I of ERISA; (b) a "plan" that is not subject to the provisions of Title I of ERISA, but that is subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**"), such as individual retirement accounts and certain retirement plans for self-employed individuals; and (c) a pooled investment fund whose assets are treated as "plan assets" under Section 3(42) of ERISA and any regulations promulgated thereunder because "employee benefit plans" or "plans" hold twenty five percent (25%) or more of any class of equity interest in such pooled investment fund;

(d)     the Subscriber is acquiring the Interest for its own account for long-term investment and not with a view to resale, transfer, or other disposition thereof, in whole or in part;

(e)     the Subscriber (or the person making the investment decision on behalf of the Subscriber) is an Accredited Investor as defined in the Operating Agreement and has such knowledge and experience in financial and business matters that he, she, or it is capable of evaluating the merits and risks of this investment;

(f)     the Subscriber has received a copy of, and its authorized representative has read and understands, the Operating Agreement. The Subscriber understands that there are substantial risks involved in an investment in the Series. The Subscriber has had an opportunity to review the Operating Agreement and to ask questions of and receive answers from the Managing Member concerning the

B-3

Series, the terms and conditions of this offering, and such additional information as he, she, or it considers necessary to evaluate appropriately an investment in the Series;

(g)     the Subscriber realizes that because of the inherently speculative nature of an investment program of the kind engaged in by the Series (as described in the Operating Agreement), the results of the Series' operations may be expected to vary from month to month and from period to period, and that Series investments generally will involve a high degree of financial, market, and other risk that can result in a complete loss of the Subscriber's investment in the Series. The Subscriber's acquisition of an Interest is based upon its own analysis of the benefits of an investment in the Series; he, she, or it is and will be able to bear the economic risk of its investment in an Interest, and its investment in the Series will not adversely affect its overall need for diversification and liquidity;

(h)     the Subscriber, in connection with its investment in the Series, has obtained and complied with all necessary and appropriate legal and tax advice, registrations, declarations and filings with, and licenses, approvals and authorizations of, governmental authorities;

(i)     the Subscriber understands: (i) the investment objective and policies of the Series; (ii) the manner in which profits and losses will be allocated; and (iii) the risks associated with the method of allocating income to the Managing Member under the Operating Agreement;

(j)     the Subscriber understands that the Managing Member, in its sole and absolute discretion, may require a Member to withdraw from the Series (as described in the Operating Agreement). Further, he, she, or it understands the limited withdrawal rights granted to the Members (as described in the Operating Agreement);

(k)     the Subscriber understands that Wilson Sonsini Goodrich & Rosati LLP acts as counsel to the Company and as counsel to the Managing Member and certain of its affiliates. The Subscriber also understands that, in connection with this offering of Interests and subsequent advice to the Company, Wilson Sonsini Goodrich & Rosati LLP will not be representing investors in the Series, including the Subscriber, and no independent counsel has been retained to represent investors in the Series.

5.     The subscriber further irrevocably represents and warrants to the applicable Series, the Company, and the Managing Member that:

(a)     The Subscriber acknowledges that the Managing Member is not registered as an investment adviser pursuant to the Investment Advisers Act of 1940, as amended;

(b)     the Subscriber acknowledges and understands that the Interests are not registered for sale to the public under the Securities Act of 1933, as amended (the "**Securities Act**"), or the laws of any state or other jurisdiction. The Subscriber understands that the Interests have not been registered under the Securities Act in reliance on an exemption thereunder for transactions not involving a public offering, and will not be so registered. The Subscriber acknowledges that the offer and sale of an Interest to the Subscriber has not been accomplished by any form of general solicitation or general advertising, including, without limitation, (i) any advertisement, article, notice, or other communication published in any newspaper, magazine, or similar media, or broadcast over television or radio, and (ii) any seminar or meeting whose attendees have been invited by any general solicitation or advertising;

(c)     the Subscriber shall not permit any other person to have a beneficial interest in the Subscriber's interest in the Series, and the Subscriber shall not sell, assign, transfer, convey, encumber, or otherwise dispose of all or any portion of the Subscriber's interest in the Series except (i) in accordance with the Operating Agreement, and (ii) in compliance with the registration requirements of the Securities Act and applicable state securities or "blue sky" laws (unless an exemption from registration under the Securities Act or such state laws is available);and

(d)     the Subscriber acknowledges and understands that if the Subscriber is a U.S. tax-exempt entity, it may experience adverse U.S. federal income tax consequences as a result of an investment in the Series, since the Series may generate "unrelated business taxable income" ("**UBTI**"), upon which federal income tax would be levied. The Subscriber acknowledges and understands the additional representation in PART IX;

(e)     the Subscriber acknowledges and understands that if the Subscriber is a non-U.S. person, an investment in the Series may cause the Subscriber to be treated as being engaged in a U.S. trade or business for U.S. tax purposes. Were this to occur, a non-U.S. Subscriber would be subject to tax on its share of the Series' income treated as "effectively connected" with the conduct of such a U.S. trade or business, and would be subject to U.S. federal income tax return filing requirements. The Subscriber has consulted or has had an opportunity to consult with its tax advisors with respect to these issues;

(f)     the Subscriber acknowledges and understands that if the Subscriber is a "disregarded entity" for U.S. federal income tax purposes, that the representations and warranties made by the Subscriber herein are also true and correct as to the Subscriber's (direct or indirect) sole owner; and

(g)     the Subscriber represents and warrants that if the Subscriber is a partnership, grantor trust, S corporation, or other flow-through entity for U.S. federal income tax purposes (each, a "Flow-Through Entity"), that (i) substantially all of the value of any beneficial owner's interest in the Flow-Through Entity is not attributable to the Flow-Through Entity's interest in the Series, and (ii) a principal purpose of the Flow-Through Entity is not to permit the Series to satisfy the one-hundred (100) partner limitation in Section 1.7704-1(h)(1)(ii) of the Treasury Regulations.

6.     The Subscriber was not formed for the specific purpose of investing in the Series.

7.     The Subscriber hereby agrees to become a Member in the Series on the terms and conditions set forth in the Operating Agreement. The Subscriber hereby ratifies, adopts, accepts, and agrees to be bound by all of the terms and provisions of the Operating Agreement, and to perform all obligations therein imposed upon a Member with respect to the Interest purchased. Upon acceptance of the Subscriber's proposed investment in the Series by the Managing Member, and by virtue of the Subscriber's subscription, the Subscriber shall be deemed to have executed the Operating Agreement and shall become a Member of the Series.

8.     The Subscriber is making an investment in the fund relying solely on the facts and terms set forth herein and in the Operating Agreement, all of which were received and reviewed by the Subscriber, and neither the Managing Member, nor any other person or entity, has made any representation of any kind or nature to induce the Subscriber to enter into the Operating Agreement, except as specifically set forth in the Operating Agreement. The Subscriber has not relied on any

B-5

representations, other than those in the offering materials provided by the Managing Member. The Subscriber is not relying on the Managing Member with respect to the individual or partnership tax consequences associated with an investment in the Series.

9. If the Subscriber is a corporation, partnership or trust, and is not itself an employee benefit plan, then no more than twenty-four and nine-tenths percent (24.9%) of the value of any class of equity interests in the Subscriber is held by "benefit plan investors" within the meaning of the U.S. Department of Labor Final Regulation Relating to the Definition of Plan Assets, 29 CFR Parts 2509, 2510, and 2550.

10. The information submitted by the Subscriber to the Series is complete and accurate as of the date hereof and may be relied upon by the Series. The Subscriber will notify the Series in writing immediately of any change in such information. The Subscriber will notify the Series in writing immediately of any change to the information provided herein, and/or if any of the representations or warranties contained herein becomes untrue.

11. The Subscriber understands that the Series may require additional documentation (including tax forms and information), and the Series reserves the right to request such documentation at any time.

12. The Subscriber understands that the Series or its agent will inform the Subscriber whether its proposed subscription has been accepted. The Subscriber acknowledges that the Managing Member reserves the right, in its absolute discretion, to reject the subscription amount proposed by the Subscriber, in whole or in part.

13. The Subscriber understands that, as described in the Operating Agreement, the Subscriber may be required to pay certain amounts representing all, or any portion, of its subscription amount, pursuant to directions set forth in notices distributed by the Managing Member.

14. The Subscriber hereby represents that it will provide, at the request of the Series or the Managing Member, information needed for the Series and any of its affiliates to comply with the U.S. Foreign Account Tax Compliance Act ("FATCA") information reporting and withholding requirements (as set forth in sections 1471 through 1474 of the Code, and the Treasury Regulations promulgated thereunder). The Subscriber acknowledges and agrees that its failure to provide information needed for the Series to comply with FATCA information reporting and withholding requirements may result in the Subscriber being subject to thirty percent (30%) withholding tax.

15. The Subscriber represents that neither the Subscriber nor any Covered Person (as defined below) has experienced a "Bad Actor" disqualification event, pursuant to Rule 506(d)(1) of Regulation D under the Securities Act (any such event, a "Disqualifying Event"). A "Disqualifying Event" includes, but is not limited to, the Subscriber or any Covered Person being the subject of: (i) a conviction of any felony or misdemeanor, within ten (10) years before the date of the Subscriber's investment in the Series (such date of subscription, the "Applicable Date"), in connection with the purchase or sale of a security, involving the making of a false filing with the Securities and Exchange Commission (the "SEC") or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities; (ii) any order, judgment, or decree of any court of competent jurisdiction, entered within five (5) years before the

Applicable Date, that restrains or enjoins the Subscriber or Covered Person from engaging or continuing to engage in any conduct or practice (A) in connection with the purchase or sale of a security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser, or paid solicitor of purchasers of securities; (iii) a final order from a state securities commission (or agency or officer of a state performing like functions), a state authority that supervises or examines banks, savings associations, or credit unions, a state insurance commission (or agency or officer of a state performing like functions), an appropriate federal banking agency, the Commodity Futures Trading Commission, or the National Credit Union Administration that (A) bars the Subscriber or Covered Person from associating with an entity regulated by such commission, authority, agency, or officer, engaging in the business of securities, insurance or banking, or engaging in savings association or credit union activities, or (B) constitutes a final order based on violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten (10) years before the Applicable Date; (iv) certain SEC disciplinary orders relating to brokers, dealers, municipal securities dealers, investment companies and investment advisers and their associated persons; (v) an SEC cease-and-desist order entered within five (5) years before the Applicable Date related to violations of certain anti-fraud provisions and registration requirements of the federal securities laws; (vi) suspension or expulsion from membership in, or suspension or bar from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission constituting conduct inconsistent with just and equitable principles of trade; (vii) SEC stop orders or refusal orders (including an order suspending a Regulation A exemption) issued within five (5) years before the Applicable Date or an investigation or proceeding to determine whether a stop order or suspension order should be issued; or (viii) a U.S. Postal Service false representation order entered within five (5) years before the Applicable Date or on the Applicable Date a temporary restraining order or preliminary injunction with respect to conduct alleged by the U.S. Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations. "Covered Person" means: (x) any director, executive officer, general partner, or managing member of the Subscriber; and (y) any person who would, through the Subscriber's ownership of Interests, be deemed to beneficially own twenty percent (20%) or more of the outstanding voting equity securities of the Series (for purposes of this clause (y), beneficial ownership is interpreted in the same manner as in Rule 13d-3 and Rule 13d-5 of the Securities Exchange Act of 1934, as amended). In the event that the Subscriber or any Covered Persons becomes subject to a Disqualifying Event subsequent to the Applicable Date, the Subscriber shall promptly notify the Series.

## PART II - INVESTMENT COMPANY ACT REPRESENTATIONS

1.      The Subscriber understands that the Series will not register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act") and, for purposes of the provisions of Section 3(c)(1) thereof, does not presently propose to make a public offering of its securities within the United States. The Subscriber understands that the Series intends to rely upon the exemption afforded by Section 3(c)(1) of the Investment Company Act, which provides that Interests may not be beneficially owned by more than one hundred (100) investors. In that connection, the Subscriber hereby certifies that, EXCEPT AS INDICATED SEPARATELY TO THE MANAGING MEMBER:

(a)      it was not formed for the purpose of investing in the Series;

(b)      it is not investing forty percent (40%) or more of its total assets in the Series,

(c)      each of its beneficial owners participates in investments made by the Subscriber pro rata in accordance with its interest in the Subscriber and, accordingly, its beneficial owners cannot opt-in or opt-out of investments made by the Subscriber;

(d)      each of its beneficial owners participates in investments made by the Subscriber pro rata in accordance with its interest in the Subscriber and, accordingly, its beneficial owners cannot opt-in or opt-out of investments made by the Subscriber;

(e)      if the Subscriber is subscribing to purchase an Interest in excess of ten percent (10%) of the voting securities of the Series, the Subscriber is not a registered investment company pursuant to the Investment Company Act and the Subscriber does not rely upon Section 3(c)(1) or 3(c)(7) of the Investment Company Act as a basis for being excluded from the definition of an investment company; and

(f)      the Subscriber is not aware of any other circumstances that would require the Series to treat it as more than "one person" for purposes of Section 3(c)(1) of the Investment Company Act.

<u>PART III – POWER OF ATTORNEY</u>

1.      The Subscriber, as principal, hereby irrevocably appoints any one officer or director of the Managing Member as its true and lawful representative and attorney-in-fact, in his, her, or its name, place, and stead, to make, execute, sign, acknowledge, swear to, and file:

(a)      any partnership certificate, business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose, and objectives of the Series, or required by any applicable federal, state, local, or foreign law;

(b)      the Operating Agreement, and any amendment duly approved as provided therein; and

(c)      any and all instruments, certificates, and other documents that may be deemed necessary or desirable to effect the winding-up and termination of the Series.

This power of attorney is intended to secure a proprietary interest, and the obligations of the Subscriber hereunder are irrevocable, and shall survive and shall not be affected by the subsequent disability, incompetency, termination, bankruptcy, insolvency, or dissolution of the Subscriber; provided, however, that this power of attorney shall terminate upon the substitution of another Member for all of the Subscriber's investment in the Series, or upon the total withdrawal of the Subscriber from the Series, to the extent applicable.

<u>PART IV – ANTI-MONEY LAUNDERING REPRESENTATIONS</u>

1.      The Subscriber represents that all evidence of identity provided in connection with its subscription for an Interest is genuine, and all related information furnished is accurate.

B-8

2.      The Subscriber agrees to provide any information deemed necessary by the Managing Member, in its sole and absolute discretion, to comply with any applicable anti-money laundering and anti-terrorist financing program(s) and related responsibilities.

3.      The Subscriber represents that either (a) or (b) below is true:

(a)      If the Subscriber is acquiring the Interest for its own account, risk, and beneficial interest, then the Subscriber represents that it:

- is not acting as agent, representative, intermediary/nominee, or in any similar capacity, for any other person;

- does not have any intention or obligation to sell, distribute, assign, or transfer all or a portion of the Interest to any other person; and

- no other person will have a beneficial or economic interest in the Interest.

(b)      If the Subscriber is an investor intermediary investing in its own name on behalf of other investors, which, for these purposes, may include, without limitation, an introducing firm, an asset aggregator, a nominee, or a fund of funds, then the Subscriber represents that it:

- is subscribing for an Interest as a record owner in its capacity as either an agent, representative, or nominee on behalf of one or more investors ("Underlying Investors"), and agrees that the representations, warranties, and covenants made herein are made by it on behalf of itself and the Underlying Investors; and

- (i) has all requisite power and authority from the Underlying Investors to execute and perform the obligations hereunder; (ii) has carried out investor identification procedures with regard to all Underlying Investors; and (iii) has established the identity of all Underlying Investors, holds evidence of such identities, and will make such information available to the Managing Member upon request.

4.      The Subscriber understands that the Series prohibits any investment in the Series by or on behalf of the following persons (each, a "**Prohibited Investor**"):

- A person, country, territory, or entity whose name appears on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control;

- A foreign shell bank (a bank without a physical presence in any country and as otherwise defined in the USA PATRIOT Act);

B-9

- A senior foreign political figure,*** or any immediate family member**** or close associate***** of a senior foreign political figure; and

- Any other person or entity that the Managing Member, in its sole and absolute discretion, determines to be a Prohibited Investor.

The Subscriber represents and covenants that neither the Underlying Investor, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is a Prohibited Investor. The Subscriber agrees to promptly notify the Managing Member of any change in information affecting this representation and covenant.

5.    The Subscriber acknowledges that if the Underlying Investor is, or the Managing Member reasonably believes that the Underlying Investor is, a Prohibited Investor, the Managing Member may be obligated to freeze its investment, either by prohibiting additional investments, declining any withdrawal requests, and/or segregating the assets constituting the investment in accordance with applicable regulations, or its investment may be immediately withdrawn by the Series, and neither the Subscriber nor the Underlying Investor shall have any claim against the Managing Member or any of its affiliates for any form of damages as a result of the aforementioned actions. The Subscriber further acknowledges that as part of the Series' responsibility for protection against money laundering, the Series and its appointed agents may require additional information including detailed verification of the identity of the Subscriber. The Subscriber agrees that, upon request of the Series, it will provide such information as the Series may require to satisfy applicable anti-money laundering laws and regulations, including, without limitation, the Subscriber's anti-money laundering policies and procedures, background documentation relating to its directors, trustees, settlors, and beneficial owners, and audited financial statements, if any.

## PART V – CERTAIN ADDITIONAL EMPLOYEE BENEFIT PLAN REPRESENTATIONS

1.    THE SUBSCRIBER SHALL IDENTIFY ITS STATUS AS A BENEFIT PLAN INVESTOR (AS DEFINED HEREIN), IF APPLICABLE, TO THE MANAGING MEMBER. If the Subscriber becomes a Benefit Plan Investor subsequent to the date of its initial investment in the Series, the Subscriber shall promptly disclose to the Managing Member in writing such fact and also the percentage of such Subscriber's equity interests held by Benefit Plan Investors. For these purposes, a "**Benefit Plan Investor**", as defined in Section 3(42) of ERISA, and any regulations promulgated thereunder, includes: (i) an "employee benefit plan" that is subject to the provisions of Title I of ERISA; (ii) a "plan" that is subject to the prohibited transaction provisions of section 4975 of the Code, such as individual retirement accounts and certain retirement plans for self-employed individuals; and (iii) a pooled investment fund whose

---

***    A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military, or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business, or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

****   "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children, and in-laws.

*****  A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

B-10

assets are treated as "plan assets" pursuant to Section 3(42) of ERISA and any regulations promulgated thereunder because Benefit Plan Investors hold twenty five percent (25%) or more of any class of equity interest in such pooled investment fund. The Subscriber agrees to notify the Managing Member promptly in writing if there is any change in the percentage of the Subscriber's assets that are treated as "plan assets" for the purpose of Department of Labor Regulations Section 2510.3-101 and Section 3(42) of ERISA and any regulations promulgated thereunder. The Subscriber represents that if the Subscriber is not an employee benefit plan subject to Title I of ERISA or a plan that is subject to section 4975 of the Code, but is subject to provisions under other U.S. federal, state, local, non-U.S. or other laws or regulations that are similar to those provisions contained in ERISA and/or the Code (collectively "Other Plan Laws"), the Subscriber has determined that an investment in the Series is in accordance with the terms of the Subscriber's governing instruments and complies with all applicable Other Plan Laws.

2.      If the Subscriber is a Benefit Plan Investor, the fiduciary effecting this investment in the Series on behalf of the Benefit Plan Investor (the "Fiduciary") irrevocably represents and warrants to the Series that:

(a)      the Fiduciary is a "fiduciary" of such Benefit Plan Investor and trust and/or custodial account within the meaning of Section 3(21) of ERISA, and/or section 4975(e)(3) of the Code and such person is authorized to invest in the Series;

(b)      unless otherwise indicated in writing to the Managing Member, the Benefit Plan Investor is not a participant-directed defined contribution plan;

(c)      unless otherwise indicated in writing to the Managing Member, the Benefit Plan Investor's commitment to purchase the Interest does not, in the aggregate, constitute more than ten percent (10%) of the fair value of the Benefit Plan Investor's assets;

(d)      the Fiduciary has considered a number of factors with respect to the Benefit Plan Investor's investment in the Interest and has determined that, in view of such considerations, the purchase of the Interest is consistent with the Fiduciary's responsibilities under ERISA. Such factors include, but are not limited to:

(i)      the role such investment or investment course of action plays in that portion of the Benefit Plan Investor's portfolio managed by the Fiduciary;

(ii)      whether the investment or investment course of action is reasonably designed (as part of that portion of the portfolio managed by the Fiduciary) to further the purposes of the Benefit Plan Investor, taking into account both the risk of loss and the opportunity for gain that could result therefrom;

(iii)      the composition of that portion of the portfolio managed by the Fiduciary with regard to diversification;

(iv)      the liquidity and current rate of return of that portion of the portfolio managed by the Fiduciary relative to the anticipated cash flow requirements of the Benefit Plan Investor;

(v)     the projected return of that portion of the portfolio managed by the Fiduciary relative to the funding objectives of the Benefit Plan Investor;

(vi)     whether an investment in the Series is permissible under the documents governing the Benefit Plan Investor and the Fiduciary;

(vii)     whether an investment in the Series is appropriate in light of the Benefit Plan Investor's investment and diversification guidelines; and

(viii)     the risks associated with an investment in the Series and the fact that the Benefit Plan Investor will be restricted from withdrawing its interest in the Series for an indefinite period of time;

(e)     the Fiduciary:

(i)     is responsible for the decision to invest in the Series;

(ii)     is independent of the Series and each of its affiliates;

(iii)     understands the fee arrangements applicable to investments in the Series, including the Management Fee (as defined in the Operating Agreement), understands how the application of fees may impact overall investment returns, and has determined that the Benefit Plan Investor is eligible under applicable U.S. Department of Labor guidelines to participate in a performance-based fee arrangement;

(iv)     is qualified to make such investment decision; and

(v)     has not relied on, and is not relying on, the investment advice of the Managing Member or any of its employees or affiliates with respect to the Benefit Plan Investor's investment in the Series, and neither the Managing Member nor any of its employees or affiliates, has any investment discretion with respect to the assets of the Benefit Plan Investor which will be used to purchase the Interest;

(f)     to the extent applicable, the disclosures contained in the Operating Agreement and in other information provided to the Fiduciary regarding the investment in the Series constitute notice to the Fiduciary pursuant to Section 408(b)(2) of ERISA and regulations issued thereunder;

(g)     the investment in the Series has been duly authorized under, and conforms in all respects to, the documents governing the Benefit Plan Investor and the Fiduciary;

(h)     the Fiduciary has delivered to the Series, and from time to time hereafter will deliver to the Series, in writing, all of the information that the Series may request in order to avoid violations of any provision of ERISA or any other law applicable to the Subscriber, and promptly will notify the Series, in writing, of any change in the information so furnished; and

(i)     unless otherwise indicated on the Subscriber Identification Statement annexed hereto, the Subscriber is not an insurance company that is investing the assets of its general account (or the assets of a wholly owned subsidiary of its general account) in the Series. The Subscriber agrees to

B-12

promptly notify the Managing Member in writing if there is a change in the percentage of the general account's assets that constitute "plan assets" within the meaning of Section 401(c) of ERISA and shall disclose such new percentage ownership.

3.      The Subscriber acknowledges and agrees that:

(a)      the Subscriber's Fiduciary, who must have no affiliation with the Managing Member or any of its affiliates or employees, must review the terms of the Series and decide whether to invest in the Series solely and independently, and without relying on any recommendation of the Managing Member or any of its affiliates or employees as a primary basis for its decision; and

(b)      any on-going evaluation of the Series as an investment in the Subscriber's overall portfolio must be made solely and independently by a Fiduciary, as described above, and such fiduciary must make such evaluation and decision without relying on any recommendation of the Managing Member or any of its affiliates or employees as a primary basis for such decision.

<u>PART VI - ELECTRONIC DELIVERY OF ACCOUNT INFORMATION</u>

1.      The Subscriber hereby agrees and consents to have the Series and/or the Managing Member deliver electronically all current and future account statements, the Operating Agreement (including all supplements and amendments thereto), notices (including privacy notices), letters to investors, all financial statements including the annual financial statements, regulatory communications, information relating to taxation (including Schedule K-1) and other information, documents, data and records related to the Subscriber's investment in the Series (collectively, "Account Communications"). The Subscriber acknowledges and agrees that electronic communication from the Series and/or the Managing Member will include, among other things, e-mail delivery as well as the electronic provision of Account Communications pertaining to the Subscriber via the Managing Member's web site, if applicable. The Subscriber acknowledges and agrees that it is the Subscriber's affirmative obligation to notify the Managing Member in writing of any changes to the Subscriber's e-mail address on file with the Series. Account Communications will be sent to the e-mail address provided to the Series on the date of application for subscription, unless the Subscriber affirmatively notifies the Managing Member in writing of any changes to the Subscriber's e-mail address or additional addresses. The Subscriber should contact the Managing Member to change the Subscriber's e-mail address or to provide additional addresses.

2.      The Subscriber may revoke or restrict its consent to electronic delivery of Account Communications at any time by notifying the Managing Member, in writing, of the Subscriber's intention to do so. This consent shall remain in effect until revoked or restricted. Within a reasonable period of time after the Managing Member's receipt of the Subscriber's restriction or revocation of consent, it will send written confirmation of (i) its receipt of the revocation or restriction of consent, and (ii) the date on which such revocation or restriction takes effect (the "<u>Effective Date</u>"). Restriction or revocation of consent does not apply to an Account Communication furnished electronically prior to the Effective Date. If the Subscriber does not consent to electronic delivery, or revokes its consent to electronic delivery, of Account Communications, including Schedule K-1, the Subscriber will be provided Account Communications in paper format. Unless otherwise notified, Account Communications will continue to be provided to the Subscriber electronically. With the exception of restriction or revocation of consent in the manner described above, there are no other conditions under

B-13

which the Series and/or the Managing Member will discontinue distributing Account Communications electronically.

3.    The Series and the Managing Member shall not be liable for any interception by any third party of Account Communications. The Subscriber acknowledges and agrees that, although none of the Series and the Managing Member will charge additional amounts for electronic delivery, the Subscriber may incur charges from its internet service provider or other third parties in connection with the delivery and receipt of Account Communications delivered electronically. In addition, the Subscriber understands that there are risks associated with electronic delivery of Account Communications, including the risk of system outages or interruptions, which risks may, among other things, inhibit or delay the Subscriber's receipt of Account Communications.

4.    If the Subscriber desires a specific Account Communication, including a specific Schedule K-1, in paper form, the Subscriber may contact the Managing Member. A request for a specific Account Communication in paper form will not be treated as a withdrawal of consent to electronic delivery of Account Communications generally. The Subscriber should note that the Schedule K-1 may be required to be printed and attached to a federal, state or local income tax return.

<u>PART VII - ADDITIONAL REPRESENTATIONS BY TAX-EXEMPT INVESTORS</u>

5.    The Subscriber understands that:

(a)    the Series, in its discretion, may accept an investment from a U.S. tax-exempt investor in certain circumstances. However, neither the provisions hereof nor the acceptance of any subscription hereunder shall be deemed in any way to be legal or tax advice or any representation or warranty by the Series or the Managing Member, or any representative or affiliate of any of the foregoing, or to imply in any way, that an investment in the Series is suitable for any investor;

(b)    if the Subscriber is a private foundation, an investment in the Series may subject the Subscriber to significant excise taxes; and

(c)    if the Subscriber is a charitable remainder trust, the receipt of any UBTI by the Subscriber in respect of its interest in the Series will be subject to a one-hundred percent (100%) excise tax.

6.    The Subscriber has consulted, or has had an opportunity to consult with, its own tax advisors with respect to these issues.

<u>PART VIII - MISCELLANEOUS PROVISIONS</u>

1.    The Operating Agreement (including all Appendices thereto), and the rights, powers, and duties set forth herein, shall bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and permitted assigns of the parties hereto.

2.    The Operating Agreement and any side letter or similar separate agreement represent the entire agreement of the parties with respect to the subject matter hereof and may not be changed or terminated orally.

3.      No waiver by any party of any breach of any term of the Operating Agreement (including all Appendices thereto) shall be construed as a waiver of any subsequent breach of that term or of any other term of the same or of a different nature.

4.      The Subscriber understands that a misrepresentation or breach of any warranty or agreement made by the Subscriber in the Operating Agreement (including all Appendices thereto) could subject the Series to significant damages and expenses. The Subscriber hereby agrees to indemnify, defend, and hold harmless the Series, the Managing Member, and their respective affiliates from and against any loss, liability, damage, cost, or expense (including legal fees and expenses in the defense or settlement of any demands, claims, or lawsuits) actually and reasonably incurred arising from the Subscriber's misrepresentation or breach of any warranty or agreement contained herein.

5.      The representations, warranties, agreements, and indemnification obligations of the Subscriber contained in the Operating Agreement (including all Appendices thereto, and further including any additional documentation provided by the Subscriber upon the request of the Series or its agent) shall survive indefinitely.

6.      The name, address, email address and related information of the Subscriber have been provided to the Managing Member. When such information changes, the Subscriber shall immediately notify the series of such change.

7.      The Subscriber hereby acknowledges that once the Managing Member has accepted the Subscriber's proposed subscription to the Series, the Subscriber shall be deemed to have signed, and shall be bound by, the Operating Agreement, shall be admitted to the Series as a Member, effective as of such acceptance of this proposed subscription to the Series, and shall be entitled to the rights and privileges, and subject to the responsibilities set forth in the Operating Agreement.

B-15

**Appendix C**

**CERTAIN DISCLOSURES**

<u>CONFLICTS OF INTEREST</u>

1.      <u>Other Activities of the Managing Member</u>. The Managing Member may be involved in other business activities, including the management of other investment funds and accounts. While it intends to devote such time to the business of the Company and each Series as considered necessary, conflicts may arise in the allocation of time among various business activities.

2.      <u>Conflicts with Other Funds and Accounts Being Managed</u>. The Managing Member may also advise other funds and accounts that may use a similar investment strategy as the Company. The Managing Member may face a conflict in allocating investment opportunities among the funds and accounts being managed.

3.      <u>No Independent Counsel</u>. Prospective investors in the Company have not been separately represented by counsel.

C-1

## RISK FACTORS

An investment in the Company or any Series (collectively referred to herein as the "Fund") will involve risks not associated with other investment alternatives. Although the Managing Member may seek to reduce the risks associated with the Fund's investments, prospective investors should carefully consider, among other factors, the risks described below. Such risk factors are not meant to be an exhaustive listing of all potential risks associated with an investment in the Fund. There can be no assurance that the Fund's investment objective will be achieved, or that there will be any return of capital. Membership Interests are potentially suitable investments only for sophisticated investors for whom an investment in the Fund does not represent a complete investment program and who, in consultation with their own investment and tax advisors, fully understand and are capable of assuming the risks of an investment in the Membership Interests, including the potential risk of losing all of their invested capital.

      1.     **General**. The Fund will be subject to numerous risks generally related to investing in securities and other investments, and the additional risks associated with investing in non-marketable securities and non-public companies. The securities or other interests acquired by the Fund will have restrictions on resale and, even in the absence of such restrictions, may not be marketable. The ability of the Fund to profit from its investments will be highly dependent upon the ability of its investments to generate income or appreciate in value. Numerous factors may impede or prevent an investment from reaching this point, including inadequate capital, unfavorable competitive developments, and adverse legislation at the national, state or local level. The Fund's investments may face significant capital shortfalls for a wide variety of reasons. For example, resource development may prove more expensive, or take more time, than anticipated, and the growth in revenues may be slower than expected. In any such event, the Fund may be asked to provide additional capital. If the Fund is unable or refuses to provide the additional capital, the investment may obtain the needed funds from another source (including co-investments from one or more Members or affiliates of any Members, or the Managing Member and/or its affiliates), diluting, potentially substantially, the earlier investment by the Fund. However, in the event that an investment is unable to obtain any needed financing, the inability to obtain funds may result in the failure of such investment and a loss of the Fund's investment therein.

      2.     **Limited Operating History**. The Fund has no previous operating history and no prior performance or results of the Managing Member can be relied upon or expected to be indicative of the Fund. The Fund will be entirely dependent upon the Managing Member, which in turn will rely on its personnel. No guarantees can be made that the Managing Member and its personnel will be able to operate effectively or that the respective efforts of such persons will be beneficial to the Fund. Moreover, no assurance can be made that any or all of such persons will remain employed by the Managing Member.

      3.     **No Assurance of Investment Return**. The task of identifying investment opportunities and managing such investments is difficult. Many organizations operated by persons of competence and integrity have been unable to make such investments successfully. There is no assurance that the Fund's investment objectives will be attained, or that the value of the investments will not decline, or that there will be any return of capital.

C-2

4. **Projections.** The Fund may rely upon projections developed by the Managing Member, a portfolio fund or an operating company, concerning the portfolio company's or fund's performance and potential cash flows. Projections are inherently subject to uncertainty and factors beyond the control of the Managing Member or any portfolio company. The inaccuracy of certain assumptions, the failure to satisfy certain financial requirements or the occurrence of other unforeseen events could impair the ability of a portfolio company, and hence the Fund, to realize projected values and cash flow.

5. **Emerging Growth Company Investments.** In general, financial and operating risks confronting both early- and developmental-stage companies, as well as more mature expansion-stage companies are significant. Many emerging growth companies go out of businesses every year. It is difficult to know how companies will grow, if at all, or what changes may occur in the market. While potential returns should reflect the perceived level of risk in any investment situation, there can be no assurance that the Fund will be adequately compensated for risks taken. A loss of an investor's entire investment is possible and no profit may be realized.

Early-stage and development-stage companies often experience unexpected problems in the areas of product development, manufacturing, marketing, financing and general management, which, in some cases, cannot be adequately solved. In addition, such companies may require substantial amounts of financing which may not be available through institutional private placements or the public markets. In addition, the markets that such companies target are highly competitive and in many cases the competition consists of larger companies with access to greater resources. The percentage of companies that survive and prosper is small.

Investments in more mature companies in the expansion or profitable stage involve substantial risks. Such companies typically have obtained capital in the form of debt and/or equity to expand rapidly, reorganize operations, acquire other businesses, or develop new products and markets. These activities by definition involve a significant amount of change in a company and could give rise to significant problems in sales, manufacturing, and general management of these activities.

6. **Lack of Company Information.** The information made available to the Fund and/or the Members regarding the companies the Fund will invest in is very limited. Privately held companies are not subject to the same disclosure and reporting obligations of publicly traded companies. In making a decision to invest in the Fund, a Member may not be provided with financial, operational, or other information that may be important in making an investment decision. In most cases, the valuation of the companies in which the Fund may invest at the time of the investment and/or the Fund's ownership percentage in such companies will not be known to the Members and such ownership percentage can be reduced significantly for a number of reasons. The Managing Member does not assume any responsibility for the accuracy of completeness of such information.

7. **Lack of Information for Monitoring and Valuing the Fund's Assets.** The Managing Member may only be able to obtain limited information about the companies in which it invests and, in some cases, may not be able to obtain information beyond the information that is publicly available. The companies in which the Fund invests will determine the best way to keep the investment community updated on the progress of the business so the Managing Member may not be aware of material adverse changes that have occurred with respect to certain of its investments. The value of the Fund's investments could be significantly negatively affected by any such event. Further, the Managing

C-3

Member may have to make valuation determinations without the benefit of an adequate amount of relevant information. Prospective investors should be aware that as a result of these difficulties, as well as other uncertainties, any valuation made by the Managing Member may not represent the fair market value of the securities acquired by the Fund.

8. **Lack of Control over Investments**. The Fund will acquire non-controlling interests in its investments. While the Fund may be granted certain contractual rights to protect any such investments (which may be set forth in a shareholders agreement or other similar agreement and may include redemption and registration rights, placement of a designee on the boards of directors or as a board observer of a portfolio company, and/or information and access rights), the Fund will not have control over such investments. In such cases, the Fund runs the risk of refusal of management or other shareholders or equity holders of such investments to adopt the recommendations of the Fund, and any resulting negative impact on the value of the investment or the Fund's ability to exit from such investment at a profit.

9. **General Market Factors**. General fluctuations in the economy may affect the value of investments held by the Fund. The prices of the Fund's investments can be volatile and price movements may be influenced by, among other factors, changing supply and demand relationships (including, among other factors, labor-market conditions, increases or decreases in wages and changes in oil prices), political and economic events and/or changes in related policies, and adverse regulatory developments. Many of the companies in which the Fund intends to make investments may be susceptible to economic slowdowns or recessions. An economic slowdown may affect the ability of a company to repay loans or engage in a liquidity event such as a sale, recapitalization, or initial public offering. The amount of nonperforming assets may increase and the value of the Fund's portfolio may decrease during these periods. These conditions could lead to financial losses to the Fund's portfolio and overall assets.

10. **Concentration of Investments**. The Fund's investments are expected to be concentrated in a small number of investments. This concentration of investments may expose the Fund to greater risk than if its investments were spread across a larger number of opportunities. In the event of business failure of one or more of such investments, the Fund's overall returns may be impacted much more negatively than they would be if its investments were spread more broadly. Moreover, the value of securities of middle-market issuers can be more volatile than that of larger issuers.

11. **Timing of Investment Returns**. The Fund may not always be able to realize upon its investments in a manner that produces the maximum return on such investments. A fund may elect or be required to remain invested in a manner that does not maximize returns on a given investment because of the inherent unpredictability involved in evaluating the point at which such returns are maximized.

12. **Long-Term Investment**. Given the investment objectives of the Fund, its investments will be long-term investments. An investment in the securities offered hereby is therefore only appropriate for investors with a long-term investment horizon and a capacity to absorb a loss of some or all of their investment.

13. **Limitations on Ability to Exit Investments.** The Managing Member expects to exit from its investments in two principal ways: (i) private sales (including acquisitions of its portfolio companies) and (ii) initial and secondary public offerings. At any particular time, one or both of these avenues may not be open to the Fund, or timing with respect to these exit mechanisms may be inopportune. As such, the ability to exit from and liquidate portfolio holdings may be constrained at any particular time.

14. **Contingent Liabilities on Disposition of Investments.** In connection with the disposition of the Fund's investments in certain companies, the Fund may be required to make representations about the business and financial affairs of such companies typical of those made in connection with the sale of a business. The Fund may be required to indemnify the purchasers of such investment to the extent that any such representations are inaccurate. These arrangements may result in the incurrence of contingent liabilities for which the Managing Member may establish reserves and escrows. In that regard, distributions may be delayed or withheld until such reserve is no longer needed or the escrow period expires.

15. **Absence of Liquidity and Public Markets.** The Fund's investments will be private, illiquid holdings. As such, there will be no public markets for the securities held by the Fund and no readily available liquidity mechanism at any particular time for any of the investments held by the Fund. The Managing Member expects that most, if not all, of its investments in private companies will be subject to transfer restrictions that will prohibit or restrict their transferability to secondary buyers while such companies remain private. In addition, the realization of value from any investments will not be possible or known with any certainty until the Managing Member elects, in its sole discretion, to sell the Fund's investments and subsequently distribute the proceeds to its investors or to distribute securities to investors in lieu of cash.

16. **Dependence on the Managing Member.** All management decisions will be made by the Managing Member. Accordingly, no person should invest in the Fund unless he, she, or it is willing to entrust all aspects of the management and investment of the Fund to the Managing Member, who will have considerable discretion in the types of companies and/or securities in which the Fund will invest. The Fund will be dependent upon the skill, judgment and expertise of the Managing Member and its members, managers, partners, employees and affiliates.

17. **No Right to Control Fund Operations**. The Members will have no opportunity to control the day-to-day operations of the Fund, including investment and disposition decisions of the Fund. In order to safeguard their limited liability for the liabilities and obligations of the Fund, the Members must rely entirely on the Managing Member to conduct and manage the affairs of the Fund.

18. **Illiquidity of the Interests**. The Membership Interests will be issued in reliance upon certain exemptions from registration or qualification under applicable federal and state securities laws and so may be subject to certain restrictions on transferability. There will be no public market for the Membership Interests and none is expected to develop. In addition, Members will not be entitled to withdraw their capital contributions. Accordingly, the Membership Interests constitute highly illiquid investments. Voluntary withdrawals of the Interests are not permitted except under certain limited circumstances for legal and regulatory reasons.

C-5

19. **Risk of Cross Series Liabilities.** The Fund is a Delaware series limited liability company and the Membership Interests represent membership interests in a particular Series having a separate and distinct portfolio of investments. Assuming that the assets and liabilities of each Series are segregated from one another, as a general matter of Delaware law, the assets of one Series should not be available to meet the liabilities of another Series. However, Series do not constitute distinct legal entities, and there is a risk that the assets of one Series may be applied to meet the liabilities of another Series whose assets are exhausted, including, without limitation, in the event that the assets and liabilities of each Series within the Fund are not adequately segregated from one another, or in certain jurisdictions that may not recognize such segregation as a legal matter. In addition, there can be no guarantee that each Series will be treated as a separate and distinct legal entity for purposes of the laws of the State of Delaware, ERISA, bankruptcy laws, or otherwise.

20. **Possible Adverse Tax Consequences.** The Fund should be classified as a partnership for U.S. federal income tax purposes, and not as an association taxable as a corporation. No representation or warranty of any kind is made with respect to the tax consequences of an investment in the Fund, or the allocation of taxable income or loss, as provided in the Operating Agreement. Potential investors are advised to consult their own tax advisors with respect to the tax consequences to them of an investment in the Fund, including if the Fund is treated as other than a partnership for tax purposes.

In certain circumstances, to the extent permitted by the terms of the Operating Agreement, the Managing Member may decide not to make distributions of certain of the Fund's profits, but to retain such profits for Fund expenses or re-investments. Since the Fund generally does not separately pay taxes, subject to the New Audit Rules (discussed below, each Member is required to report such Member's ratable share of the taxable income and losses of the Fund and to pay any taxes resulting therefrom. Accordingly, a Member may be required to pay taxes on his, her, or its share of the Fund's taxable income, even though he, she, or it has not received any cash from the Fund with which to cover such liability. Moreover, the recognition of income, gains, and losses in any year for tax purposes may not match the economic performance of the Fund.

Members that qualify as tax-exempt entities may experience adverse federal income tax consequences as a result of an investment in the Fund. In particular, an investment in the Fund may generate "unrelated business taxable income" ("UBTI") with respect to a tax-exempt entity, upon which federal income tax may be levied. UBTI generally would arise if (a) the Fund (or a partnership or other "pass-through" entity in which it invests) were to utilize leverage in its activities or were engaged in a trade or business unrelated to the exempt purposes of the relevant tax-exempt entity, or (b) the tax-exempt entity were to leverage its investment in the Fund. A non-U.S. investor may be treated as engaged in a trade or business in the United States, be taxed on his, her, or its share of income that is treated as effectively connected with such U.S. trade or business, and be subject to U.S. tax return filing obligations. As such, U.S. tax-exempt and non-U.S. investors are advised to consult their own tax advisors with respect to issues involving unrelated business taxable income and income effectively connected with a U.S. trade or business.

See "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS" below.

21. **Indemnification of Certain Persons.** The Operating Agreement contains broad indemnification and exculpation provisions that limit the right of a Member to maintain an action

against the Managing Member and its affiliates to recover losses or costs incurred by the Fund as a result of such persons' actions or failures to act.

22. **Third Party Litigation**. The Fund's investment activities subject it to the normal risks of becoming involved in litigation initiated by third parties. This risk is somewhat greater where the Fund exercises control or influence over a company's direction. The expense of defending against claims by third parties and paying any amounts pursuant to settlements or judgments would, absent fraud, willful misconduct or gross negligence by the Managing Member, be borne by the Fund (to the extent not borne by the portfolio companies) and would reduce net assets or could require Members to return to the Fund distributed capital and earnings. The Managing Member and others are indemnified in connection with such litigation, subject to certain conditions.

23. **Recall of Distributions**. Distributions (or, returns of unused capital contributions, which will be made in the Managing Member's sole and absolute discretion) to Members, may be recalled from time to time from such Members, subject to certain limitations, which may adversely affect the return of the investments in the Fund made by the investors. Such recalled distributions may be used, pursuant to Delaware law, to satisfy unpaid debts of the Fund that were in existence at the time the distributions were made.

24. **The Managing Member's Carried Interest**. In general, the Managing Member will receive a portion of the net income and gains that would otherwise be allocated to a Member if allocations were based strictly upon capital accounts. The return received by the Member will be reduced as a result of the allocation to the Managing Member of its carried interest. This performance-based method of compensating the Managing Member may cause the Managing Member to engage in a higher risk strategy than might be the case in the absence of such a compensation arrangement, since the Managing Member is incentivized to produce high returns to benefit itself. In addition, the Fund's capital gain eligible investments are required to be held for more than three (3) years prior to their disposition in order for long-term capital gain tax rates to apply to the carried interest with respect to any such disposition. This requirement may create an incentive for the Managing Member to delay the disposition of certain types of investments in an effort to minimize the amount of tax imposed on the carried interest.

25. **Use of Borrowed Funds**. Subject to the limitations set forth herein and in the Operating Agreement, the Fund may for liquidity purposes enter into one or more lines of credit secured by available Capital Commitments of the Members, in an aggregate amount not to exceed aggregate Capital Commitments of the Members. Such borrowing increases both the possibilities for profit and the risk of loss. The amount of borrowings by the Fund and the interest rates on such borrowings, which may fluctuate, could have a significant effect on the Fund's profitability.

26. **Mandatory Transfer and Withdrawal**. Under certain circumstances, Members may be required to transfer their Membership Interests to another person or completely or partially withdraw from the Fund to the extent that the Managing Member determines it to be necessary or desirable in order to comply with applicable law or regulations, or to avoid a material adverse effect on the Fund, the other Members or the Managing Member.

27. **Disposition of Investments**. Part or all of one or more investments made by the Fund (including the Fund's investments in other pooled investment vehicles) may not be completely

C-7

disposed of prior to the dissolution and liquidation of the Fund, in the event of which the Fund may make in-kind liquidation distributions to the Members of securities in the Fund's portfolio that have not been disposed of.

28.     **Business Continuity and Disaster Recovery**. The business operations of the Managing Member, its affiliates, the Fund and their portfolio companies may be vulnerable to disruption in the case of catastrophic events such as fires, natural disaster (e.g., tornadoes, floods, hurricanes and earthquakes), terrorist attacks or other circumstances resulting in property damage, network interruption and/or prolonged power outages. Although the Managing Member, and/or its affiliates have implemented, or expect to implement, measures to manage risks relating to these types of events, there can be no assurances that all contingencies can be planned for. These risks of loss can be substantial and could have a material adverse effect on the Fund and the Members' investments therein.

29.     **Cyber Security Breaches and Identity Theft**. The information and technology systems of the Managing Member, its affiliates, the Fund and their service providers and their portfolio companies may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons, other security breaches and/or usage errors by their respective professionals. The techniques used to obtain unauthorized access to data, disable or degrade service, or sabotage systems change frequently and may be difficult to detect for long periods of time. Hardware or software acquired from third parties may contain defects in design or manufacture or other problems that could unexpectedly compromise information security.

Although the Managing Member and/or its affiliates have implemented, or expect to implement, measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Managing Member, its affiliates, the Fund, their service providers and/or their portfolio companies may have to make a significant investment to fix or replace them. The failure of these systems for any reason could cause significant interruptions in such parties' operations and/or a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors). Such a failure could harm the reputation of the Managing Member, its affiliates, the Fund and/or their portfolio companies, subject any such entity and their respective affiliates to legal claims and/or otherwise affect their business and financial performance. Specifically, cyberattacks and the failure of such systems may interfere with the processing of Member subscriptions or withdrawals, impact the Fund's ability to value its assets, cause the release of confidential information and/or subject the Fund to regulatory fines, penalties or financial losses, reimbursement or other compensation costs, and/or additional compliance costs. The Fund also may incur substantial costs for cyber- security risk management to prevent any cyber incidents in the future. The Fund and the Members could be negatively impacted as a result.

30.     **Delayed Schedules K-1**. The Fund may be unable to provide the final Schedule K-1 to Members for any given fiscal year until after April 15 of the following year. The Managing Member will endeavor to provide Members with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but the final Schedule K-1 may not be available until completion of the Fund's annual audit. Members may be required to obtain extensions of the filing date for their income tax returns at the federal, state, and local levels.

C-8

31.     **Business and Regulatory Risks of Private Investments Funds**. The regulatory environment for private funds is evolving, and changes in the regulation of private funds and their investing activities may adversely affect the ability of the Fund to pursue its investment program and the value of the investments held by the Fund. There has been an increase in governmental, as well as self-regulatory, scrutiny of the alternative investment industry in general. It is impossible to predict whether changes in regulations may occur, but any regulations that restrict the Fund's activities could have a material adverse effect on the Fund's investments, including, without limitation, changes to regulatory and tax matters that may have an adverse impact on the Fund's investment activities. In addition, regulatory scrutiny may increase the Fund's exposure to potential liabilities and to legal, compliance and other related costs. Increased regulatory oversight may also impose additional administrative burdens on the Managing Member, including, but not limited to, responding to investigations and implementing new policies and procedures. Such burdens may divert such persons' time, attention, and resources from the Fund's activities.

32.     **ERISA Considerations**. In order to avoid holding "plan assets" within the meaning of ERISA (as defined below), the Fund may be restricted or precluded from making certain investments. In addition, it could be necessary for the Managing Member to liquidate the Fund's investments at a disadvantageous time in order to avoid holding ERISA "plan assets," resulting in lower proceeds to the Fund than might have otherwise been the case. If the assets of the Fund are deemed to include ERISA plan assets, there may be certain negative consequences to the Fund. See "EMPLOYEE BENEFIT PLAN CONSIDERATIONS" below.

33.     **Future Regulatory Developments**. This document cannot address or anticipate every possible current or future regulation that may affect the Managing Member, the Fund, or their respective businesses and operations. Such regulations may have a significant impact on the Fund, including but not limited to, restricting the types of investments the Fund may make, or requiring the Fund to disclose certain confidential information regarding its terms, investments, or the Members. The Managing Member, in its sole discretion, may cause the Fund to be subject to certain regulations if it believes that an investment or business activity is in the Fund's interest, even if such regulations may have a detrimental effect on one or more Members. Prospective investors are encouraged to consult their own advisors regarding an investment in the Fund.

34.     **Diverse Member Group**. The Members may have conflicting investment, tax and other interests with respect to their investments in the Fund. The conflicting interests of Members may relate to or arise from, among other matters, the acquisition or structuring of investments and the timing and disposition of investments. As a consequence, certain decisions made by the Managing Manager may be more beneficial for some Members than for others. The Fund may also make investments that have a negative impact on investments made by one or more Members separately from the Fund. While the Managing Member plans, subject to the requirements of the Operating Agreement, to consider the investment and tax objectives of the Fund and the Members as a group, rather than the investment, tax or other objectives of any Member individually, the Managing Member may enter into separate agreements with Members which require the Managing Member to take actions to address the separate interests of these Members which may adversely affect the interest of other Members.

\* \* \* \* \*

The foregoing risk factors do not purport to be a complete enumeration or explanation of the risks involved in an investment in the Interests. Prospective investors should read the Operating Agreement and the Subscription Documents in their entirety, and consult with their own advisors prior to making any decision to invest in the Fund.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain aspects of U.S. federal income taxation of the Fund and its Members that should be considered by a potential purchaser of Interests. The summary is based on the assumption that the Fund is owned, managed, and operated as set forth herein. Investors should appreciate that the tax consequences for certain investors and the Fund may be other than as stated below. Investors should consult their professional advisors regarding the possible tax consequences of their subscribing for, purchasing, holding, selling or redeeming Interests. *In view of the complexities of the tax laws applicable to partnerships and securities transactions, and since no attempt is made herein to mention all of the tax considerations that should be taken into account in evaluating a potential investment in the Fund or to provide a complete explanation of those issues that are summarized, a person considering investing in the Fund should consult his, her, or its own tax advisor in order to understand fully the federal, state, local, and foreign tax consequences of such investment to his, her, or its particular situation.* No representation is made as to the tax consequences of the operation of the Fund.

The following discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury Regulations promulgated thereunder, including temporary and proposed regulations ("Treasury Regulations"), judicial decisions, current published administrative rulings of the Internal Revenue Service (the "Service"), and other applicable authority currently in effect as of the date hereof. The Fund does not intend to request any rulings from the Service. A court may reach a contrary conclusion with respect to the issues addressed if the matter were contested. In addition, future legislative or administrative changes (including changes scheduled to occur in the future pursuant to existing legislative phase-in and "sunset" provisions) or court decisions may significantly change the conclusions expressed herein, and any such changes or decisions may have a retroactive effect.

*This discussion does not purport to deal with all tax considerations applicable to any particular investor. Except where otherwise specified, this discussion relates to U.S. federal income taxation of the Fund and its Members that are taxable U.S. persons for U.S. federal income tax purposes and not U.S. state and/or local tax consequences, foreign tax consequences, or non-income tax consequences. This summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a prospective investor in light of its personal investment circumstances or to certain types of prospective investors subject to special treatment under the Code (unless otherwise specifically discussed below), such as tax-exempt entities, and non-U.S. persons. No Fund document shall be deemed in any way to be legal or tax advice or any representation or warranty by the Fund, the Managing Member, or any representative or affiliate of any of the foregoing, or to imply in any way, that an investment in the Fund is suitable for any investor.*

1.      Classification of the Fund. The Fund is a limited liability company that should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation. Under section 7704 of the Code, a publicly traded partnership ("PTP") is treated as a corporation for U.S. federal income tax purposes. For this purpose, a partnership is "publicly traded" if its interests are either (i) traded on an established securities market or (ii) readily traded on a secondary market (or the substantial equivalent thereof). Based upon the anticipated operations of the Fund, the Interests should not be treated as publicly traded and, therefore, the Fund should not be treated as a PTP taxable as a corporation. No ruling has been or will be requested from the Service on this issue, and no assurance can be given that the Service or a court will concur with the conclusions herein. If the

C-11

Fund were to be treated as a corporation, rather than as a partnership for U.S. federal income tax purposes, its income would be subject to U.S. federal corporate income tax. In addition, distributions made by the Fund would be taxed as dividends or otherwise treated as corporate distributions, and there would be no flow-through of items of income, gain, loss and deduction.

The discussion below assumes that the Fund will not be a PTP and will be treated as a partnership for U.S. federal income tax purposes.

2. Taxation of Fund Operations — General. As an entity that is classified as a partnership for federal income tax purposes, the Fund itself generally will not be subject to federal income tax. The New Audit Rules (defined below) will in certain circumstances impose liability for income taxes (and related penalties and interest) upon the Fund, rather than its Members. The Fund will file an annual partnership information return, which will report the results of its operations. Each Member will be required to report separately on his, her, or its own income tax return his, her, or its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income (including dividends and interest received) or deduction, and various other categories of income, gain, loss, deduction, and credit. The Fund believes that its allocations of partnership tax items among the various Members will be upheld under the provisions of the Code and Treasury Regulations dealing with tax allocations by partnerships. However, if it were determined that an allocation made by the Fund with respect to a particular item did not have "substantial economic effect" (within the meaning of the Code and Treasury Regulations) and was not in accordance with the Members' interests in the Fund, taking into account all the facts and circumstances, that item could be allocated, for tax purposes, in a different manner. In some circumstances, this could result in a Member recognizing a greater or lesser amount of loss, deduction, gain, or income than he, she, or it would have recognized under the allocation made by the Fund or in such Member recognizing an amount of loss, deduction, gain, or income at a different time than he, she, or it would have recognized such amount under the allocation made by the Fund.

3. Each Member will be subject to tax on his, her, or its distributive share of the Fund's taxable income or loss regardless of whether he, she, or it has received, or will receive, any distribution of cash from the Fund. A non-corporate partner may be eligible for a twenty percent (20%) deduction with respect to such partner's distributive share of "qualified business income" from a partnership that constitutes a "qualified trade or business" of that partner.

4. Generally, any vehicle in which the Fund invests will be classified for federal income tax purposes either as a partnership or a corporation, and the Fund will be required to report on its own tax return its distributive shares of net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or deduction, and various other categories of income, gain, loss, deduction, and credit of each partnership in which it invests. Such items will be allocated to each Member as described above. Generally, the Fund will not have to report on its own tax return any portion of income, gain, loss, deduction, and credit of any corporation in which the Fund invests. The Fund, however, will have to report distributions of money or property from any such corporation, which distributions generally will be treated either as dividends or as capital gains or losses that in each case will be allocated to the Members as described above.

5. Pursuant to various "anti-deferral" provisions of the Code, such as the "Subpart F," and "passive foreign investment company" provisions, investments by the Fund in certain

C-12

foreign corporations may cause a Member (i) to recognize taxable income prior to the Fund's receipt of distributable proceeds; (ii) to pay an interest charge on receipts that are deemed as having been deferred; or (iii) to recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain. See "Investing in Foreign Entities" below.

6.     Taxation of Company Operations — Investments. The taxation of investment transactions is extremely complex and no attempt is made herein to describe fully the various tax rules that apply to such transactions or to explain in complete detail those rules that are mentioned. However, some general points may be noted.

7.     The Fund will file its tax returns on the basis that, for tax purposes, it is not a "dealer" with respect to its securities transactions. Generally, the gains and losses recognized by a taxpayer other than a dealer on the sale of securities are capital gains and losses, and the Fund expects that its gains and losses with respect to securities transactions will, in general, be so treated. These capital gains and losses may be long-term or short-term or a combination of both, depending on the length of time the particular investment position has been maintained and, in some cases, the nature of the transaction. It is possible that the Service could disagree and characterize the Fund as a dealer, in which case its gains or losses would in whole or in part be characterized as ordinary income.

8.     The net long-term capital gains of non-corporate taxpayers are taxed at preferential rates. Certain "qualified dividend income" received by non-corporate taxpayers is subject to the same preferential rates as net long-term capital gains. Generally, "qualified" dividends are those paid from domestic corporations and from certain foreign corporations. A dividend from a foreign corporation generally is qualified if (i) the corporation is incorporated in a U.S. possession; (ii) the corporation is eligible for benefits under certain income tax treaties; or (iii) the stock on which the dividend is paid is readily tradable on an established securities market in the U.S. A dividend paid by a foreign corporation cannot be qualified if, in the taxable year in which the dividend is paid or the preceding taxable year, the corporation is a passive foreign investment company. Several other types of dividends cannot be qualified, including (a) dividends on certain stock held for not more than sixty (60) days (ninety (90) days for certain preferred stock); (b) dividends on stock to the extent that the holder is required to make related payments with respect to positions in similar property (for example, pursuant to a short sale); (c) payments in lieu of dividends (such as with respect to stock lent by a broker pursuant to a short sale); (d) dividends electively treated as investment income offset by the deduction for investment interest; and (e) dividends paid by certain tax-exempt organizations.

9.     In addition, individuals, estates and trusts are subject to a tax of three and eight-tenths percent (3.8%) on "net investment income" (or undistributed "net investment income," in the case of estates and trusts) for each such taxable year, with such tax applying to the lesser of such income or the excess of such person's adjusted gross income (with certain adjustments) over a specified amount. The specified amount is Two Hundred Fifty Thousand Dollars ($250,000) for married individuals filing jointly, One Hundred Twenty-Five Thousand Dollars ($125,000) for married individuals filing separately, Two Hundred Thousand Dollars ($200,000) for other individuals and the dollar amount at which the highest income tax bracket for estates and trusts begins. Net investment income includes net income from interest, dividends, annuities, royalties and rents and net gain attributable to the disposition of investment property. It is anticipated that net income and gain attributable to an investment in the Fund will be included in an investor's "net investment income" subject to this tax.

C-13

10. The capital losses of a noncorporate taxpayer will offset capital gains. Any excess of capital losses over capital gains will offset ordinary income to the extent of Three Thousand Dollars ($3,000) per year, with the unused capital losses being carried forward to other years, subject to certain limitations.

11. For corporate taxpayers, all net capital gains, whether long-term or short-term, are taxed at the corporation's regular rate. There are no special rules for qualified dividends. For such taxpayers, capital losses may offset only capital gains, but unused capital losses may be carried both backward and forward to other years, subject to certain limitations.

12. Restrictions on Deductions and Losses. A Member cannot deduct its distributive share of losses and deductions from the Fund in an amount greater than the adjusted tax basis in the Member's Membership Interest (discussed below), determined as of the end of the Fund's taxable year. Any excess losses and deductions generally may be deducted by a Member in subsequent tax years to the extent that the adjusted tax basis of the Member's Membership Interest exceeds zero (0).

13. Members that are U.S. persons and are individuals or certain types of corporations, estates and trusts may be further limited in their ability to deduct losses or expenses of the Fund under the "at risk" limitations in section 465 of the Code, the passive activity loss limitations in section 469 of the Code, and other provisions of the Code. Non-corporate Members' deductions for "investment interest" generally will be limited to "net investment income" as defined in section 163(d) of the Code. In addition, the expenses of an individual paid or incurred for the production of income (such as certain investment expenses) are not deductible for any taxable year beginning after December 31, 2017 and before January 1, 2026. For taxable years beginning on or after January 1, 2026, the ability of an individual Member to deduct his or her share of investment expenses (other than interest expense) of the Fund and any underlying investments generally will be limited to the extent that such deductions do not exceed two percent (2%) of the Member's adjusted gross income. Moreover, for taxable years beginning on or after January 1, 2026, there is a limitation on the deductibility of investment expenses in excess of two percent (2%) of an individual Member's adjusted gross income to the extent such excess expenses (along with certain other itemized deductions) do not exceed the lesser of (i) three percent (3%) of the excess of such individual Partner's adjusted gross income over the specified amount or (ii) eighty percent (80%) of the amount of certain itemized deductions otherwise allowable for the taxable year. For alternative minimum tax purposes, miscellaneous itemized deductions are not deductible. Some or all of the expenses incurred by the Fund may be treated as investment expenses subject to such limitations, to the extent that the Fund is not considered being engaged in a trade or business. If the Fund is considered being engaged in a trade or business, the general and administrative expenses it incurs in connection with its activities would not be subject to the above limitations. It also should be noted that future Treasury Regulations might provide that even if the Fund, but not an individual Member, is deemed to be engaged in a trade or business, some or all of the above limitations would still apply to that Member with respect to his or her share of the Fund expenses.

14. Section 163(j) of the Code significantly reduces the deductibility of interest paid or accrued by partnerships that are engaged in a trade or business (i.e., "business interest") for taxable years beginning after December 31, 2017, including interest paid on existing indebtedness. The deduction for business interest is generally limited to the sum of business interest income plus thirty percent (30%) of adjusted taxable income. For this purpose, adjusted taxable income is determined at

C-14

the entity level for partnerships and generally is earnings before interest, taxes, depreciation, and amortization ("EBITDA") for taxable years beginning before 2022 and earnings before interest and taxes ("EBIT") for taxable years thereafter.

15.     To the extent the Fund is subject to this limitation and any business interest of the Fund is not allowed as a deduction, such disallowed business interest will be allocated to the Members, reducing each Member's basis in its Membership Interests (but not below zero (0)) by the amount of such allocation. This excess business interest may be carried forward indefinitely by a Member, but is deductible only against a Member's distributive share of the Fund's "excess taxable income" (i.e., the amount that bears the same ratio to the Fund's adjusted taxable income as (i) the excess (if any) of thirty percent (30%) of the Fund's adjusted taxable income over the amount (if any) by which the Fund's business interest exceeds its business income, bears to (ii) thirty percent (30%) of the Fund's adjusted taxable income). In the event a Member disposes of its Interests prior to deducting the full amount of the carryforward, the Member's basis in its Interests will be increased, immediately before the disposition, by any such amount remaining. In addition, the limitation may apply to the business interest of certain portfolio companies in which the Fund invests, which may increase the after-tax cost of certain debt financings.

16.     The limitation imposed on business interest under section 163(j) of the Code does not impact the deductibility of investment interest, which continues to be subject to the rules set forth under Section 163(d) of the Code (discussed above).

17.     <u>Withholding; Credit for Taxes Paid</u>. The Fund may withhold taxes attributable to any Member to the extent required under the Code or Treasury Regulations, or under any state, local or other tax law (including foreign law). Any taxes so withheld by the Fund shall be deemed to be a distribution or payment to such Member and shall reduce the amount otherwise distributable to each Member pursuant to the Operating Agreement.

18.     It is possible that certain dividends received by the Fund, from sources within foreign countries, will be subject to withholding taxes imposed by such countries. In addition, the Fund may also be subject to capital gains taxes in some of the foreign countries where it purchases and sells securities. Tax treaties between certain countries and the United States may reduce or eliminate such taxes.

19.     A Member may be entitled to deduct (subject to the limitations generally applicable to deductions) or claim a credit (subject to various limitations on foreign tax credits) for its share of the foreign taxes paid or incurred by the Fund in computing its federal income taxes. A Member that is tax-exempt will not ordinarily benefit from such credit or deduction.

20.     <u>Contributions, Distributions, and Dispositions of Interests</u>. No gain or loss generally will be recognized by a Member upon the acquisition of an Interest for cash. However, if appreciated property is contributed to the Fund, and if the Fund were deemed to be an "investment company" within the meaning of section 721(b) of the Code, gain would be recognized to the contributing Member at the time of the contribution. Prospective investors should consult their own tax advisors concerning this issue. Even if no gain were required to be recognized by a Member on the contribution of appreciated property to the Fund, on a subsequent recognition of that appreciation by the Fund due to a taxable disposition of the property, the amount of such appreciation generally would

be taxed to the contributing Member for income tax purposes. The amount of such gain also could be taxed to the contributing Member if the appreciated property were subsequently distributed by the Fund to a Member other than the contributing Member, or if other property were distributed by the Fund to the contributing Member.

21.     Typically, no gain or loss would be recognized by a Member on the receipt of a distribution from the Fund. However, gain (but not loss) would be recognized to the extent the Fund distributed an amount of money (or in certain circumstances, marketable securities) that exceeded the Member's adjusted basis for his, her, or its Interest immediately before the distribution, after taking into account all allocations, including, in the case of a withdrawing Member, any allocations (including special allocations for tax purposes) for the accounting period in which the withdrawal occurred. This gain would have the same character as would gain realized by a Member upon a sale or exchange of an Interest. See below. A loss, if any, would be recognized by a Member only upon a distribution in liquidation of his, her, or its Interest. Certain special rules would apply if the Fund were to distribute property rather than cash.

22.     If a Member were to sell his, her, or its interest in the Fund, then, with certain exceptions, any resulting gain or loss would be treated as a capital gain or capital loss.

23.     The closing of the Fund's taxable year would occur with respect to a Member who terminates his, her, or its entire interest. As a result, all income attributable to long-term appreciation of a Member's interest over several years could be taxable to that Member in the taxable year of such termination.

24.     Basis Adjustment Election. Pursuant to the terms of the Operating Agreement, the Managing Member is authorized, but not required, to cause the Fund to elect under section 754 of the Code to have the basis of its assets adjusted in the event of a distribution of money or property to a Member, or in the event of a transfer of an Interest by sale or exchange, or as a result of the death of a Member. If made, such election could be revoked only with the consent of the Service. Until revoked, the election would apply to all such transactions during the year in which the election was made and for subsequent taxable years. In the event that the Fund were to have a substantial "built-in loss," the basis adjustment is mandatory and would occur even if the Fund does not make a Section 754 election. A substantial built-in loss exists if (i) the Fund's basis in its property exceeds by more than Two Hundred Fifty Thousand Dollars ($250,000) the fair value of the property or (ii) the transferee of an Interest would be allocated a net loss in excess of Two Hundred Fifty Thousand Dollars ($250,000) upon a hypothetical disposition by the Fund of all of its assets in a fully taxable transaction for cash equal to the asset's fair market value, immediately after the transfer. Additionally, the Fund is generally required to adjust its tax basis in its assets in cases of distributions that result in a "substantial basis reduction" (i.e., in excess of Two Hundred Fifty Thousand Dollars ($250,000)) in respect of the Fund's property. For this reason, the Fund will require (i) a Member who receives a distribution from the Fund in connection with a complete withdrawal; (ii) a transferee of an Interest (including a transferee in case of death); and (iii) any other Member in appropriate circumstances to provide the Fund with information regarding his, her, or its adjusted tax basis in its Interest.

25.     Investing in Foreign Entities. The Fund may make investments in foreign partnerships, "passive foreign investment companies" ("PFICs"), or "controlled foreign corporations" ("CFCs"), as those terms are defined under the Code. Investing in a foreign partnership will cause the

C-16

Fund to take into account its allocable share of all of the items of the foreign partnership's income, gain, loss, deduction, and credit, regardless of whether the Fund has received any distributions from the foreign partnership. Thus, the Members will be required to take into account all such items of income, gain, loss, deduction, and credit on a current basis.

26.     Generally, investing in a PFIC may result in adverse tax consequences for any "United States person" (other than a "United States person" exempt from U.S. federal income taxation) that is a Member in the Fund. The PFIC rules apply to impose an additional tax at the time of any "excess distribution" and with respect to any gain upon disposition of the shares of the PFIC. This tax is determined at the time of an actual distribution or disposition. If the PFIC regime applied, Member's distributions would be subject to U.S. federal income tax at the highest rates applicable to ordinary income.

27.     The PFIC rules provide that U.S. shareholders in a PFIC must pay U.S. federal income tax, plus an interest charge based on the value of the tax deferral, at the time the shareholder disposes of his PFIC investment or upon the receipt of an "excess distribution". The onerous PFIC rules, however, do not apply to a U.S. investor if the Fund makes an election to treat the PFIC as a "qualified electing fund" ("QEF"). If the Fund makes a QEF election, the Members generally would be taxed currently on their proportionate share of the ordinary earnings and net long-term capital gains of the PFIC whether or not the earnings or gains were distributed. Other U.S. federal income tax consequences can arise from a QEF election. While relief from the PFIC rules is available by making a QEF election, in certain cases such election may not be able to be made because the information required to make such an election is not obtainable.

28.     A Member in the Fund may also suffer adverse U.S. federal income tax consequences if the Fund makes investments in a foreign corporation that constitutes a CFC. Generally, an investment in a CFC may cause the Member to recognize taxable income prior to the Fund's receipt of distributable income. In addition, if the Fund invests in either a foreign partnership or foreign corporation and the Fund owns at least ten percent (10%) of such foreign partnership or ten percent (10%) of the stock of the foreign corporation, the Fund will be required to file an information return with the Service disclosing its investment. Investors may also be subject to additional reporting requirements with respect to the Fund's investments in foreign entities.

29.     Foreign and Other Special Investors. Any foreign person or entity and any person or entity subject to special tax treatment that is considering acquiring an interest in the Fund should consult his, her, or its own tax advisors with respect to the federal, state, and local tax consequences of an investment in the Fund, and in the case of a foreign person or entity, the consequences of an investment in the Fund under the laws of any jurisdictions in which such person or entity is subject to tax.

30.     The Fund may sell Interests to non-U.S. corporations, trusts and estates, and individuals who are neither citizens nor residents of the United States (collectively, "foreign investors"). The U.S. federal income tax treatment of a foreign investor's capital contribution to the Fund is complex and will vary depending upon the particular circumstances of the foreign investor and the activities of the Fund. Each foreign investor is urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income tax treatment of its investment in the Fund.

31.     In general, the tax treatment of a foreign investor will depend on whether the foreign investor and/or the Fund are deemed to be engaged in a U.S. trade or business. The following discussion assumes that a foreign investor is not otherwise engaged in a U.S. trade or business. For the Fund, such determination is dependent upon the activities of the Fund (or any pass-through entity in which the Fund invests) and if such activities constitute a U.S. trade or business, and further, if such activities do constitute a U.S. trade or business, whether certain exceptions provided for in the Code are applicable. If the Fund were not deemed to be engaged in a U.S. trade or business from the perspective of the foreign investor, then, subject to any application of FATCA (defined below) and as further described below, the Fund generally would not be required to withhold tax on gain from the sale of portfolio securities and would not be required to withhold tax on portfolio interest. However, the Fund would be required to withhold tax at the current rate of thirty percent (30%) or lower treaty rate on other interest, dividends and income, if applicable, and special rules apply with respect to dispositions of "United States real property interests" which can include stock in a corporation.

32.     The withholding tax generally does not apply to: (i) original issue discount on U.S. Treasury bills and other debt obligations having a maturity of 183 days or less; (ii) commercial bank deposits; (iii) gains on capital assets, unless the foreign investor (in the case of an individual) is present in the United States for 183 days or more during the taxable year; and (iv) interest income attributable to U.S. Treasury obligations and other debt obligations in "registered form" (or otherwise subject to U.S. federal income tax), if the foreign investor provides the Fund with the appropriate Internal Revenue Form W-8BEN or W-8BEN-E.

33.     If the Fund, or a pass-through entity in which the Fund invests, is deemed to be engaged in a U.S. trade or business, a foreign investor may be subject to U.S. federal income tax, at regular graduated rates, on such "effectively connected income" and would be required to file U.S. federal income tax returns. Gain or loss on the disposition of an Interest in the Fund will be treated as effectively connected income and subject to U.S. federal graduated income tax rates to the extent the Fund is engaged in the conduct of a U.S. trade or business. In addition, the transferee of an Interest subject to this provision will be required to withhold a tax equal to ten percent (10%) of the amount realized on the disposition of such Interest. If the transferee in an amount equal to the amount the transferee failed to withhold, the Fund will be required to withhold from the distributions to the transferee in an amount equal to the amount the transferee failed to withhold, plus interest.

34.     Additionally, it is possible that the Foreign Account Tax Compliance Act ("FATCA") could impose a withholding tax of up to 30% on payments of dividends, interest, and certain other income, unless a foreign investor satisfies certain information and reporting requirements. Foreign investors should consult their tax advisors regarding the possible implications of this legislation on their investment in the Fund.

35.     Tax-Exempt Investors. Generally, a tax-exempt entity is exempt from federal income tax on its passive investment income, such as dividends, interest and capital gains, whether realized by the entity directly or indirectly through a partnership in which it is a partner (with certain exceptions, tax-exempt entities which are private foundations are subject to a federal excise tax on their "net investment income"). This type of income is exempt even if it is realized from securities trading activity which constitutes a trade or business. Where a tax-exempt entity owns an interest in a partnership, the activities of the partnership are attributed to it for purposes of determining whether

C-18

the tax-exempt entity's distributive share of partnership income is unrelated business taxable income ("UBTI").

36.     This general exemption from tax does not apply to the UBTI of a tax-exempt entity. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived (either directly or through partnerships) from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the entity's exempt purpose or function. UBTI also includes "unrelated debt-financed income," which generally consists of (i) income derived by an exempt entity (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year, and (ii) gains derived by an exempt entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the twelve (12)-month period ending with the date of such disposition.

37.     A potential investor that is a tax-exempt entity, including a Code section 501(c)(3) organization, an individual retirement account, Keogh Plan, or a retirement plan qualified under ERISA, should consider, and discuss with its own tax advisors, the possibility that all or a portion of its distributive share of Fund's income or gain could be subject to the special tax imposed by the Code on the UBTI of a tax-exempt entity. The imposition of such a tax could reduce materially the effective return that a tax-exempt investor would derive from an investment in the Fund. A tax-exempt entity should consider in particular the extent to which it will be deemed to have (i) UBTI by reason of the Fund's investments in pass-through entities; or (ii) "unrelated debt-financed income" by reason of any borrowing done by the Fund or by the tax-exempt entity to finance its investment in the Fund.

38.     A tax-exempt entity's share of the income or gains of the Fund which is treated as UBTI may not be offset by losses of the tax-exempt entity either from the Fund or otherwise, unless such losses are treated as attributable to an unrelated trade or business.

39.     To the extent that the Fund generates UBTI, the applicable federal tax rate for such a Member generally would be either the corporate or trust tax rate depending upon the nature of the particular tax-exempt entity. A tax-exempt entity may be required to support, to the satisfaction of the Service, the method used to calculate its UBTI. The Fund will be required to report to a Member which is a tax-exempt entity information as to the portion, if any, of its income and gains from the Fund for each year which will be treated as UBTI. The Fund reserves the right to charge any such Member for the expenses incurred in providing such information. The calculation of such amount with respect to transactions entered into by the Fund is highly complex, and there is no assurance that the Fund's calculation of UBTI will be accepted by the Service.

40.     In general, if UBTI is allocated to a tax-exempt entity, the portion of the Fund's income and gains which is not treated as UBTI will continue to be exempt from tax, as will the entity's income and gains from other investments which are not treated as UBTI. Therefore, the possibility of realizing UBTI from its investment in the Fund generally should not affect the tax-exempt status of such a tax-exempt entity. While the presence of UBTI will not cause a charitable remainder trust to lose its tax-exempt status, a one hundred percent (100%) excise tax will be imposed on the amount of any UBTI allocable to the charitable remainder trust. In addition, a tax-exempt entity with UBTI from multiple trades or businesses may no longer be able to net losses from one unrelated trade or business (*e.g.*, UBTI derived from an investment in the Fund) against income from a different unrelated trade or

business. A prospective investor should consult its tax advisor with respect to the tax consequences of receiving UBTI from the Fund.

41.     Fund Audits. The Service may audit income tax returns of the Fund. For taxable years beginning after 2017, the U.S. federal income tax rules relating to adjustments of items of entities treated as partnerships have been replaced with new rules (the "New Audit Rules").

42.     The New Audit Rules generally provide that adjustments to tax items of entities, such as the Fund, treated as partnerships for U.S. federal income tax purposes, or to the partners' relative allocable shares of such tax items, will be determined at the entity level, with all partners generally being bound by that determination. Where an adjustment is made, the New Audit Rules generally provide that the entity, in the year for which the adjustment is finalized (the "adjustment year"), rather than the partners of the entity in the year to which the adjustment relates (the "reviewed year"), will be liable for income taxes (as determined by rules that may effectively overstate the income subject to tax or apply a higher rate than would have applied had the relevant tax items passed-through to the entity's partners) and related interest and penalties with respect to the adjustment, unless the entity elects application of an alternative procedure described below. This imposition of tax at the entity level can adversely affect net asset value and has the potential to significantly affect economic returns to the partners, especially if there have been interim changes in ownership, so that the burden of the tax is not wholly borne by those persons who were direct or indirect partners during the reviewed year

43.     As an alternative to the entity-level tax rules described above, the entity generally can elect to distribute to those persons who were partners in the reviewed year a revised statement, reflecting the adjustment, of their allocable share of the entity's tax items. Where this election is made, the partners from the reviewed year are required to pay tax for the year in which they receive the revised statement that reflects the adjustment, along with interest (generally from the time U.S. federal income tax was due for the reviewed year) at the standard tax underpayment rates plus two (2) percentage points and a share of the associated penalties, additions to tax or additional amounts (which will be determined at the entity level).

44.     The New Audit Rules introduce the concept of a "partnership representative" that will have substantial control over tax audits and similar proceedings. The partnership representative can be any person with a substantial presence in the United States. If the entity treated as a partnership for U.S. federal income tax purposes does not appoint a partnership representative, then the Service may appoint one. The Operating Agreement provides that initially the Managing Member will act as the partnership representative of the Fund.

45.     Substantial aspects of the New Audit Rules have been left to be addressed in subsequent administrative guidance. Accordingly, there are currently substantial uncertainties regarding the manner in which the New Audit Rules will operate. Prospective investors are encouraged to discuss the potential impact of the New Audit Rules with their own tax advisors.

46.     Disclosure Regarding Tax Shelters. Certain transactions classified as "reportable transactions" must be disclosed to the Service by certain taxpayers on Form 8886 (Reportable Transaction Disclosure Statement) and by certain "material advisors" on Form 8918 (Material Advisor Disclosure Statement). In addition, Treasury Regulations impose a requirement on

C-20

certain "material advisors" to maintain a list of persons participating in such transactions, which list must be furnished to the Service upon written request. A transaction may constitute a reportable transaction even if it would not be considered a "tax shelter" in the conventional sense. Consequently, it is possible that such disclosure may be required by the Fund, the Members, or both if the Fund incurs a significant loss on certain types of transactions (computed without regard to offsetting gains or other income). Failure to disclose could result in the imposition of penalties.

47.     Information. The Fund will furnish to each Member (a) annual audited financial statements; and (b) a Schedule K-1 for each year during which such Member is a Member of the Fund following the close of the taxable year. The timing of delivery of Schedules K-1 by the Fund may require the Members to file extensions for the completion of their tax returns.

## **EMPLOYEE BENEFIT PLAN CONSIDERATIONS**

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") IS BASED UPON ERISA, JUDICIAL DECISIONS, U.S. DEPARTMENT OF LABOR REGULATIONS, RULINGS AND OPINIONS IN EXISTENCE ON THE DATE HEREOF, ALL OF WHICH ARE SUBJECT TO CHANGE. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ISSUE THAT MAY BE APPLICABLE TO THE FUND OR TO A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE FUND AND THE INVESTOR.

The following is a summary of certain considerations associated with an investment in the Fund by employee benefit plans that are subject to ERISA, individual retirement accounts ("IRAs") and other arrangements that are subject to Section 4975 of the Code or provisions under any other federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

1.      General Fiduciary Matters. ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (an "ERISA Plan") and prohibit certain transactions involving the assets of an ERISA Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of an ERISA Plan or the management or disposition of the assets of an ERISA Plan, or who renders investment advice for a fee or other compensation to an ERISA Plan, is generally considered to be a fiduciary of the ERISA Plan.

2.      In considering an investment in the Fund of a portion of the assets of any Plan, a fiduciary should determine, particularly in light of the risks and lack of liquidity inherent in an investment in the Fund, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law relating to a fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws. Furthermore, absent an exemption, the fiduciaries of a Plan should not invest in the Fund with the assets of any Plan if the Managing Member or any of its affiliates is a fiduciary with respect to such assets of the Plan. Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code. The acquisition and/or ownership of Interests by an ERISA Plan with respect to which the Fund is considered a party in interest or a disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the U.S. Department of Labor (the "DOL") has issued prohibited transaction class exemptions, or "PTCEs," that may apply to the acquisition and holding of investments in the Fund. These class exemptions include, without limitation, PTCE 84-14 respecting transactions approved by independent qualified professional asset managers, PTCE 90-1 respecting insurance company pooled separate accounts, PTCE 91-38 respecting bank collective investment funds, PTCE 95-60 respecting life insurance company general accounts and PTCE 96-23 respecting transactions determined by in-house asset managers.

C-22

3. The Managing Member will require a fiduciary of a Plan which proposes to invest in the Fund to represent that such fiduciary is aware of and understands the investment objectives, policies and strategies of the Fund, and that the decision to invest in the Fund was made with appropriate consideration of relevant investment factors with regard to the Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA and/or the Code.

4. <u>Plan Assets</u>. Under ERISA and the regulations promulgated thereunder (the "Plan Asset Regulations"), when an ERISA Plan acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless it is established either that less than 25% of the total value of each class of equity interests in the entity is held by "benefit plan investors" as defined in Section 3(42) of ERISA (the "25% Test") or that the entity is an "operating company," as defined in the Plan Asset Regulations. For purposes of the 25% Test, the assets of an entity will not be treated as "plan assets" if, immediately after the most recent acquisition of any equity interests in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "benefit plan investors," excluding equity interests held by persons (other than benefit plan investors) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof. The term "benefit plan investors" is generally defined to include employee benefit plans subject to Part 4 of Title I of ERISA or Section 4975 of the Code (including "Keogh" plans and IRAs), as well as any entity whose underlying assets include plan assets by reason of a plan's investment in such entity (e.g., an entity of which 25% or more of the total value of any class of equity interests is held by benefit plan investors and which does not satisfy another exception under ERISA). Thus, absent satisfaction of another exception under ERISA, if 25% or more of the total value of any class of equity interests of the Fund were held by benefit plan investors, an undivided interest in each of the underlying assets of the Fund would be deemed to be "plan assets" of any ERISA Plan that invested in the Fund.

5. <u>Plan Asset Consequences</u>. If the assets of the Fund were deemed to be "plan assets" under ERISA, this would result, among other things, in (i) the application of the prudence and other fiduciary responsibility standards of ERISA to investments made by the Fund and (ii) the possibility that certain transactions in which the Fund might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the Managing Member and/or any other fiduciary that has engaged in the prohibited transaction could be required to (i) restore to the ERISA Plan any profit realized on the transaction and (ii) reimburse the ERISA Plan for any losses suffered by the ERISA Plan as a result of the investment. In addition, each disqualified person (within the meaning of Section 4975 of the Code) involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. ERISA Plan fiduciaries who decide to invest in the Fund could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Fund or as co-fiduciaries for actions taken by or on behalf of the Fund or the Managing Member. With respect to an IRA that invests in the Fund, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, would cause the IRA to lose its tax-exempt status.

C-23

6. The Managing Member will use reasonable efforts to limit equity participation by benefit plan investors in the Fund to less than 25% of the total value of each class of equity interests in the Fund as described above so that the underlying assets of the Fund should not constitute "plan assets" of any ERISA Plan which invests in the Fund. However, there can be no assurance that, notwithstanding the reasonable efforts of the Managing Member, the underlying assets of the Fund will not otherwise be deemed to include ERISA plan assets.

7. Under the Operating Agreement, the Managing Member will have the power to take certain actions to avoid having the assets of the Fund characterized as "plan assets," including, without limitation, the right to cause a Member that is a benefit plan investor to withdraw all or a part of its Interest from the Fund. While the Managing Member and the Fund do not expect that the Managing Member will need to exercise such power, neither the Managing Member nor the Fund can give any assurance that such power will not be exercised.

8. Reporting of Indirect Compensation. The descriptions contained herein of fees and compensation, including the amounts distributable to the Managing Member, are intended to satisfy the disclosure requirements for "eligible indirect compensation" for which the alternative reporting option on Schedule C of Form 5500 Annual Return/Report may be available.

9. DOL Fiduciary Rule. On April 8, 2016, the DOL issued regulations (known as the "Fiduciary Rule") which significantly expanded the definition of "fiduciary" investment advice under ERISA, including certain interactions between investment fund sponsors and benefit plan investors. Although the Fiduciary Rule has been vacated and is no longer effective, it is possible that the DOL or other regulators, such as the U.S. Securities and Exchange Commission or state securities regulators, may adopt other fiduciary rules or similar laws or regulations that could affect the Managing Member and/or the Fund. In this regard, the Managing Member may at any time restrict or condition investments in the Fund in order to avoid acting as a fiduciary to any benefit plan investor.

\* \* \* \* \*

**The foregoing discussion is general in nature and is not intended to be all-inclusive. Each Plan fiduciary should consult with his, her, or its legal advisor concerning the considerations discussed above before making an investment in the Fund. As indicated above, Similar Laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their advisors, should consider the impact of their respective laws and regulations on an investment in the Fund and the considerations discussed above, if applicable.**

**Acceptance of subscriptions on behalf of a benefit plan investor or other plan is in no respect a representation by the Managing Member, the Fund or any other party related to the Managing Member or the Fund that this investment meets the relevant legal requirements with respect to investments by any particular benefit plan investor or plan or that this investment is appropriate for any particular benefit plan investor or plan.**

C-24

## MISCELLANEOUS INFORMATION

### Fiscal Year

The Company will close its fiscal year on December 31 of each calendar year.

### Counsel

Wilson Sonsini Goodrich & Rosati LLP ("**Wilson Sonsini**") has acted as legal counsel to the Company in connection with the offering of Membership Interests and acts as legal counsel to the Company, the Managing Member and their respective affiliates, in connection with the on-going operations of the Company. Conflicts could arise due to these multiple representations. In connection with the offering and subsequent advice provided to the Company, neither Wilson Sonsini nor any other counsel representing the Company, the Managing Member or any of their respective affiliates, will represent Members of the Company, and no independent legal counsel has been retained to represent the Members of the Company.

In connection with its representation of the Company, the Managing Member and their respective affiliates, Wilson Sonsini and all other counsel act as counsel solely in respect of the specific matters on which they have been consulted, and their involvement with respect to any particular matter is limited by the actual knowledge of such attorneys who provide substantive attention to that matter. No counsel to the Company is involved in or has discretion with respect to the Company's business, investments, management or operations, such as responsibility for the Company's compliance. In preparing this document, counsel has relied upon information furnished to it by the Company, the Managing Member and/or their respective affiliates.

### Additional Information

The Managing Member will make available to any prospective Member such additional information as it may possess, or as it can acquire without unreasonable effort or expense, to verify or supplement the information set forth herein.

IN WITNESS WHEREOF, the undersigned have hereto set their hands as of the day and year first above written.

MANAGING MEMBER:

LINQTO LIQUIDSHARES Manager LLC

By:     *William Sarris*
        **Name:  William  Sarris**
        **Title: CEO**