Treanor Declaration - Exhibit H

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| LINQTO TEXAS, LLC, *et al.*,[1] | ) | |
| | ) | Case No. 25-90186 |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' WITNESS AND EXHIBIT LIST
## FOR HEARINGS ON OCTOBER 3, 2025

Linqto Texas, LLC and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned Chapter 11 cases, hereby file this witness and exhibit list (the "**Witness and Exhibit List**") for the virtual hearing scheduled for **October 3, 2025, at 11:00 a.m. (Prevailing Central Time)** (the "Hearing"). Public copies of the Exhibits may be accessed through the Debtors' case website at https://dm.epiq11.com/case/linqto/info.

### WITNESSES

The Debtors may call any of the following witnesses at the Hearing:

1.      Jeffrey S. Stein, Chief Restructuring Officer;

2.      Tom Studebaker, Managing Director, Portage Point Partners;

3.      Ryan Hamilton, Jefferies LLC;

4.      Any witness called by any other party; and

5.      Rebuttal witnesses.

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Linqto, Inc. [0332]; Linqto Liquidshares, LLC [8976]; Linqto Liquidshares Manager, LLC [8214]; and Linqto Texas, LLC [5745]. The location of the Debtors' service address is: 101 Metro Drive, Suite 335, San Jose, CA 95110.

The Debtors reserve the right to call rebuttal witnesses as necessary. The Debtors reserve the right to call any witness identified or called by another party or by the Court. The Debtors reserve the right not to call any witness identified herein. The Debtors reserve the right to supplement this witness list.

## EXHIBITS

| No. | Description | Offered | Objection | Admitted |
|---|---|---|---|---|
| 1. | Declaration of Jeffrey S. Stein in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 16-1] | | | |
| 2. | Declaration of Ryan Hamilton in support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 16-2] | | | |
| 3. | Declaration of Jeffrey S. Stein Support of Debtors' Motion for Entry of an Order (I) Authorizing the Use of Estate Proceeds Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Determining that the Ripple Sale Proceeds are Assets of the Bankruptcy Estate, and (III) Granting Related Relief [Docket No. 79-1] | | | |
| 4. | Declaration Of Jeffrey S. Stein In Support Of: (A) Debtors' Motion For Entry Of An Order (I) Authorizing The Use Of Estate Proceeds Free And Clear Of All Liens, Claims, Interests, And Encumbrances, (II) Determining That The Ripple Sale Proceeds Are Assets Of The Bankruptcy Estate, And (III) Granting Related Relief; and | | | |

2

| No. | Description | Offered | Objection | Admitted |
|---|---|---|---|---|
| | (B) Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense [Docket No. 619] | | | |
| 5. | Declaration Of Thomas Studebaker In Support Of Debtors' Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To Obtain Postpetition Secured Financing, (II) Granting Liens And Providing Superpriority Administrative Expense Claims, (III) Modifying The Automatic Stay, (IV) Scheduling A Final Hearing, And (V) Granting Related Relief [Docket No. 617] | | | |
| 6. | Declaration Of Jeffrey S. Stein In Support Of Debtors' Emergency Motion for Entry of an Order (I) Approving Settlement Between the Debtors, the Official Committee of Unsecured Creditors, and the Deaton Parties Regarding Ripple Tender Proceeds, DIP Financing, and Customer Treatment Pursuant to Bankruptcy Rule 9019, and (II) Granting Related Relief [Docket No. 620] | | | |
| 7. | Settlement Stipulation Regarding Ripple Tender Proceeds, DIP Financing, Customer Treatment, and Related Relief and Debtor-UCC Customer Securities Treatment Term Sheet [Docket No. 505-1] | | | |
| 8. | Budget | | | |
| 9. | Proposed Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, and (III) Granting Related Relief, with attachments [Docket No. 618] | | | |
| 10. | Second Amended and Restated Limited Liability Company Operating Agreement of Linqto Liquidshares, LLC with amendments | | | |
| 11. | Ripple Labs, Inc. Stock Certificates | | | |
| 12. | Ripple Tender Transaction Documents FILED UNDER SEAL [Docket No. 622] | | | |

| No. | Description | Offered | Objection | Admitted |
|---|---|---|---|---|
| 13. | Purchase Agreement between Linqto Liquidshares LLC, Ripple Labs, Inc., and seller dated July 5, 2022<br>FILED UNDER SEAL [Docket No. 623] | | | |
| 14. | Stock Transfer Agreement between Linqto Liquidshares LLC, Ripple Labs, Inc., and seller dated June 9, 2023<br>FILED UNDER SEAL [Docket No. 624] | | | |
| 15. | Stock Transfer Agreement between Linqto Liquidshares LLC, Ripple Labs, Inc., and seller dated April 1, 2020<br>FILED UNDER SEAL [Docket No. 625] | | | |
| 16. | Stock Transfer Agreement between Linqto Liquidshares LLC, Ripple Labs, Inc., and seller dated September 12, 2024<br>FILED UNDER SEAL [Docket No. 626] | | | |
| 17. | Amended and Restated Voting Agreement - Ripple Labs, Inc. - Series C | | | |
| 18. | Amended and Restated First Refusal and Co-Sale Agreement - Ripple Labs, Inc. - Series C | | | |
| 19. | Subscription Agreement dated 5/29/2024<br>FILED UNDER SEAL [Docket No. 627] | | | |
| 20. | Subscription Agreement dated 8/29/2024<br>FILED UNDER SEAL [Docket No. 628] | | | |
| 21. | Cerebras Systems, Inc. Engagement and Share Transfer Agreement dated 6/5/2024<br>FILED UNDER SEAL [Docket No. 629] | | | |
| 22. | Cerebras Systems, Inc. Stock Transfer Agreement dated 7/2/2024<br>FILED UNDER SEAL [Docket No. 630] | | | |
| 23. | Axiom Space, Inc. Series C Preferred Stock Purchase Agreement dated 1/18/2023<br>REDACTED | | | |
| 24. | Alchemy Insights, Inc. Stock Transfer Agreement dated 12/12/2022<br>REDACTED | | | |
| 25. | Scale AI Engagement Agreement and Share Transfer Agreement dated 10/9/2024 | | | |

| No. | Description | Offered | Objection | Admitted |
|-----|-------------|---------|-----------|----------|
| | FILED UNDER SEAL [Docket No. 631] | | | |
| 26. | Subscription Agreement re Scale AI, Inc. dated 10/18/2024 REDACTED | | | |
| 27. | RigUpInc. (a.k.a. Workrise Technologies, Inc.) Purchase Agreement dated 12/30/2021 FILED UNDER SEAL [Docket No. 632] | | | |
| 28. | Form of Subscription Agreement dated 1/20/2025 | | | |
| 29. | Sample Subscription Agreement dated 1/2/2025 | | | |
| 30. | Sample Subscription Agreement dated 11/1/2024 | | | |
| 31. | Sample Subscription Agreement dated 2/22/2024 | | | |
| 32. | Sample Subscription Agreement dated 1/19/2024 | | | |
| 33. | Sample Subscription Agreement dated 1/1/2024 | | | |
| 34. | Sample Subscription Agreement dated 10/20/2023 | | | |
| 35. | Sample Subscription Agreement dated 10/19/2021 | | | |
| 36. | Sample Subscription Agreement dated 9/7/2021 | | | |
| 37. | Sample Subscription Agreement dated 7/12/2021 | | | |
| 38. | Sample Subscription Agreement dated 2/10/2021 | | | |
| 39. | Sample Subscription Agreement dated 11/12/2020 | | | |
| 40. | Sample Subscription Agreement dated 9/11/2020 | | | |
| 41. | Subscription Agreement of George Fetko dated 3/19/2024 [Exhibit A to the SPV Unitholders' Pro Se Limited Objection to and Request for an Adjournment in Respect of the Debtors' Bankruptcy Rule 9019 Settlement Motion Subject to Appointment of an Independent Manager for Linqto Liquidshares, LLC and the Series LLCs] | | | |
| 42. | Any exhibit introduced by any other party | | | |
| 43. | Rebuttal or impeachment exhibits as necessary | | | |
| 44. | Any document or pleading filed in the above captioned Chapter 11 Cases | | | |

Public copies of the Debtors' Exhibits may be accessed through the Debtors' case website at https://dm.epiq11.com/case/linqto/info. Parties who wish to view Exhibits filed under seal may obtain a copy from Debtors' counsel upon execution of a confidentiality agreement.

The Debtors reserve the right to supplement, amend, or remove any witnesses and/or exhibits prior to the Hearing. The Debtors reserve the right to cross-examine any witness called by any other party. The Debtors also reserve the right to use any exhibits presented by any other party and to ask the Court to take judicial notice.

Dated: September 30, 2025
Houston, Texas

Respectfully submitted,

**SCHWARTZ PLLC**

*/s/ Gabrielle A. Hamm*
Gabrielle A. Hamm (TX Bar No. 24041047)
Veronica A. Polnick (TX Bar No. 24079148)
Renee D. Wells (TX Bar No. 24013731)
Athanasios E. Agelakopoulos (admitted *pro hac vice*)
440 Louisiana Street, Suite 1055
Houston, Texas 77002
Telephone:    (713) 900-3737
Facsimile:    (702) 442-9887
Email:    ghamm@nvfirm.com
    vpolnick@nvfirm.com
    rwells@nvfirm.com
    aagelakopoulos@nvfirm.com

Samuel A. Schwartz (admitted *pro hac vice*)
601 East Bridger Avenue
Las Vegas, Nevada 89101
Telephone:    (702) 385-5544
Facsimile:    (702) 442-9887
Email:    saschwartz@nvfirm.com

*Counsel for the Debtors and Debtors in Possession*

### Certificate of Service

I certify that on September 30, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Gabrielle A. Hamm*
Gabrielle A. Hamm

PROFESSIONAL EYES ONLY

**Membership Interests**

_____

**SUBSCRIPTION AGREEMENT**

PROFESSIONAL EYES ONLY

## SUBSCRIPTION AGREEMENT INSTRUCTIONS

1. This Subscription Agreement contains the following sections, which must be read and agreed to if you wish to invest in the membership interests (the "**Interests**") of Linqto Liquidshares LLC –

(the "Series") in accordance with the provisions of the Amended and Restated Limited Liability Company Operating Agreement between Linqto Liquidshares LLC ("The **Company**") and Linqto Liquidshares Manager LLC ("the **Managing Member**") for the Series (the "**Operating Agreement**"):

2. Prospective investors must agree to all relevant sections of this Subscription Agreement.  Failure to do so may result in a delay of acceptance of a prospective investor's subscription until a properly completed Subscription Booklet has been received, processed, and approved.

3. Prospective investors should review this Subscription Agreement and accompanying exhibits carefully before making a decision to invest in Interests. If you have any questions regarding any of the above (including agreement with any of this Subscription Agreement and exhibits), please contact Linqto Liquidshares Manager LLC.

4. In the event of conflict between the provisions of this Subscription Agreement, the provisions of the Operating Agreement and the provisions of any other documents evidencing the Company, the provisions of the Operating Agreement shall prevail.

5. Once you have completed your subscription as set out above, and then once accepted by the Series and/or the Managing Member, you will automatically become the holder of an Interest in the Series and will thereupon be designated as a Member in the books and records of the Series.

PROFESSIONAL EYES ONLY

## LINQTO LIQUIDSHARES LLC

### SUBSCRIBER IDENTIFICATION STATEMENT

| | | |
|---|---|---|
| (1) | Subscription Date: | |
| (2) | Total Subscription Amount (USD): | |
| (3) | Name(s) in which the Interest is to be registered: | |
| (4) | Account Designation (if entity not individual subscriber): | |
| (5) | Contact person (if Entity not individual subscriber): | |
| (6) | Address of registered owner(s): | |
| (7) | Date of birth of registered owner(s) (if individual(s)): | |
| (8) | Mailing address to be used when furnishing reports or tax information: | |
| (9) | E-mail address: | |
| (10) | Contact Telephone Number: | |

2

PROFESSIONAL EYES ONLY

(11)    **Indicate type of Subscriber (and any applicable sub-category):**

        (a)   Individual

☐  (b)   Joint Tenants

☐  (c)   Tenants in Common

☐  (d)   Trust

☐  (e)   Partnership or limited liability Company

☐  (f)   Corporation

☐  (g)   Employee Benefit Plan

          ☐  Corporate pension plan

          ☐  Governmental plan

          ☐  Non-U.S. plan

          ☐  Church plan

          ☐  Insurance account

☐  (h)  Individual retirement account (IRA) or individual retirement annuity,

☐  (i)  Keogh plan or similar plan. If "Yes", indicate the type of plan and the plan sponsor:

☐  (j)  Non-profit corporation, endowment or Foundation

☐  (k)  Other (describe):

(12)    If Subscriber checked either a, b, c, d, or h in Item (11) above, provide the birth dates of any natural person beneficial owner(s):

(13)    Taxpayer identification number(s) or social security number(s):

(14)    Contact for additional information          Name:

                                            Telephone:

The Subscriber represents that the following individual or individuals are authorized to act on behalf of the Subscriber to give and receive instructions between the Series (or its representatives) and the Subscriber.  Such individuals are the only persons so authorized until further written notice, signed by one or more of such individuals, sent to the Managing Member.

3

PROFESSIONAL EYES ONLY

**Entity Name**

☐

**Name**                                               **Specimen Signature**

☐                                               ☐

The Subscriber agrees that all or any funds payable to the Subscriber (including distribution proceeds) may be deposited to the Subscriber's designated bank account.

PROFESSIONAL EYES ONLY

## LINQTO LIQUIDSHARES LLC

## SUBSCRIBER QUESTIONNAIRE

## (CONFIDENTIAL)

**(A)    General**

*Please initial one of the two lines below and complete the blanks:*

|  |  |
|---|---|
| (Initial) | (1)  If the Subscriber is an individual or beneficial ownership of the Subscriber is held by an individual (for example, an Individual Retirement Account or Keogh Plan), such individual is of legal age and is a resident of: |

Name(s) of individual(s) making the investment decision on behalf of the Subscriber:

OR

|  |  |
|---|---|
| (Initial) | (2)  If the Subscriber is an employee benefit plan, an endowment, a foundation, a corporation, a partnership, a trust or other legal entity, it is: |

- organized under the laws of:

- and has its principal place of business in:

Linqto Capital, LLC is an SEC-registered broker-dealer and a FINRA and SIPC member broker-dealer ("Linqto Capital"). Subscriber has entered into this Agreement in Subscriber's sole discretion, and not as a result of any influence, advice, call to action, or recommendation made by Linqto, RMS, or their respective representatives.

Does such person have sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks associated with investing in the Series?

Yes   ☒        No   ☐

5

**(B)**     **Confirmation of Subscriber Status as an Accredited Investor**

*Please initial one or more of the boxes below that describe the Subscriber:*

<div style="border:1px solid"> </div>
(Initial)     The undersigned is a natural person whose individual net worth (or combined net worth with the undersigned's spouse if the undersigned is married) as of the date hereof exceeds

One Million Dollars ($1,000,000).[1]

<div style="border:1px solid"> </div>
(Initial)     The undersigned is a natural person who had an individual "income" exceeding Two Hundred Thousand Dollars ($200,000) during both of the two (2) most recently completed calendar years (or a joint income with the undersigned's spouse in excess of Three Hundred Thousand Dollars ($300,000) in each of those years) and who has a

reasonable expectation of reaching the same income level in the current calendar year.[2]

<div style="border:1px solid"> </div>
(Initial)     The undersigned is a director, executive officer, or Managing Member of the Series.

<div style="border:1px solid"> </div>
(Initial)     The undersigned is a "business development company," as defined in Section 2(a)(48) of the USA Investment Company Act.

<div style="border:1px solid"> </div>
(Initial)     The undersigned is a trust with total assets in excess of Five Million Dollars ($5,000,000) that was not formed for the specific purpose of acquiring the securities offered hereby, and the investment decisions for which are made by a sophisticated person capable of evaluating the merits and risks of the proposed investment.

<div style="border:1px solid"> </div>
(Initial)     The undersigned is a revocable trust that may be amended or revoked at any time by the grantors thereof, and all of the grantors are accredited investors.

---

[1] For the purposes of this document, in calculating a person's net worth, (I) a person's primary residence shall not be included as an asset; (II) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of Interests, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of the sale of Interests exceeds the amount outstanding sixty (60) days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (III) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of Interests shall be included as a liability.

[2] For purposes of this document, the term "income" shall mean adjusted gross income reported or to be reported on a federal income tax return, increased by (I) any deductions for long-term capital gains; (II) any deductions for depletion (pursuant to section 611 et seq. of the Code); (III) any exclusions of interest (pursuant to section 103 of the Code); (IV) any losses of a partnership allocated to the undersigned as an individual limited partner (as reported on Schedule E of Form 1040); (V) amounts contributed to an Individual Retirement Account or Keogh retirement plan; (VI) alimony paid; and (VII) elective contributions to a cash or deferred arrangement under section 401(k) of the Code.

6

PROFESSIONAL EYES ONLY

| | |
|---|---|
| ☐ (Initial) | The undersigned is a Small Business Investment Company licensed by the United States Small Business Administration under Section 301(c) or Section 301(d) of the Small Business Investment Act of 1958. |
| ☐ (Initial) | The undersigned is a "private business development company" as defined in Section 202(a)(22) of the USA Investment Advisers Act (the "Advisers Act"). |
| ☐ (Initial) | The undersigned is a non-profit organization of the type described in section 501(c)(3) of the Code, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of Five Million Dollars ($5,000,000). |
| ☐ (Initial) | The undersigned is an "employee benefit plan" (within the meaning of Title I of ERISA) and either: (i) the decision to invest in the Series was made by a plan fiduciary that is a bank, savings and loan association, insurance company, or registered investment adviser; (ii) the plan has total assets exceeding Five Million Dollars ($5,000,000); or (iii) if a self-directed plan, investment decisions are made solely by persons who, if executing this document, would be able to initial one or more of the boxes above. |
| ☐ (Initial) | The undersigned is a plan established and maintained by a State, its political subdivisions, or an agency or instrumentality of a State or its political subdivisions, for the benefit of its employees, and such plan has assets in excess of Five Million Dollars ($5,000,000). |
| ☐ (Initial) | The undersigned is an entity, and each of the undersigned's equity investors, if executing this document, would be able to initial one or more of the boxes above. |
| ☐ (Initial) | The undersigned is not an accredited investor. |

\*       \*       \*       \*       \*       \*       \*

**[Signature page follows]**

7

PROFESSIONAL EYES ONLY

**SIGNATURE PAGE**

By its signature below, the undersigned hereby agrees that effective as of the date of its admission to the Series as a Member thereof, it shall become a party to and be bound by each and every term and provision of the Operating Agreement, as the same may be amended from time to time.

*If an individual:*

By:

Name:

Date:

*If an Entity:*

**Name of Entity:**

By:

Name:

Title:

Date:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ACCEPTED ON BEHALF OF:**

**LINQTO LIQUIDSHARES LLC**

By: **Linqto LIQUIDSHARES MANAGER LLC**, its Managing Member

Name: *Joseph Endoso*
Joseph Endoso

Title: CEO

Date:

PROFESSIONAL EYES ONLY

**SUBSCRIPTION AGREEMENT**

The individual or entity that will be the beneficial owner of the membership interests (the "Interests") in the applicable series (the "Series") of Linqto Liquidshares LLC, a Delaware series limited liability company (the "Company") to be issued in the manner and subject to the terms and conditions set forth in this subscription agreement, including the exhibits annexed hereto (this "Subscription Agreement"), the Company's limited liability company agreement, as amended and supplemented from time-to-time (the "Operating Agreement"), and the applicable Series schedule attached thereto (the "Series Schedule"). The Company and each Series will be managed by the Company's managing member, Linqto Liquidshares Manager LLC (the "Managing Member"). Unless otherwise defined, capitalized terms used herein are as defined in the Operating Agreement.

The Series' sole investment (the "Series Investment") will be an investment in the operating company set forth in the Series Schedule (the "Portfolio Company") by: (i) directly purchasing and/or acquiring equity interests in the Portfolio Company; or (ii) investing in a passive investment in a special purpose vehicle ("SPV") that will significantly invest all of its capital in the Portfolio Company.

In furtherance of the foregoing, and in order to induce the Managing Member to accept the Subscriber's subscription, the Subscriber agrees as follows:

**PART I – SUBSCRIPTION FOR INTERESTS**

1. The undersigned Subscriber hereby subscribes for and agrees to purchase Interests in the Series as set forth in the Series Schedule and the Subscriber Identification Statement attached in the amount accepted by the Managing member, which amount may be, in the Managing Member's sole discretion, less than the amount set forth on the signature page hereto by the Subscriber. The Subscriber acknowledges that this subscription (a) is irrevocable, and (b) is conditioned upon acceptance by the Managing Member on behalf of the Series may be accepted or rejected in whole or in part by the Managing Member in its sole discretion. The Subscriber agrees to be bound by all the terms and provisions of the Operating Agreement, including the Series Schedule.

**PART II – GENERAL REPRESENTATIONS AND COVENANTS**

2. The Subscriber, if a U.S. person, shall complete an Internal Revenue Service Form W-9 "Request for Taxpayer Identification Number and Certification". If not a U.S. person for United States federal income tax purposes, the Subscriber shall: (a) complete an Internal Revenue Service Form W-8BEN, W-8BEN-E, W-8ECI, W-8EXP or W-8IMY (and all required attachments), as applicable, and (b) contact the Managing Member.

3. Each prospective investor that is an entity shall provide the Managing Member with: (a) a copy of its constitutional documents (*e.g.*, certificate of incorporation, by-laws, partnership agreement, or trust agreement); (b) evidence that such constitutional documents permit it to make investments in securities, such as an investment in the Interests; and (c) evidence that all appropriate action has been taken by it to authorize the investment.

4. Subject to the acceptance of this subscription by the Managing Member on behalf of the applicable Series, the Subscriber, either directly or through its nominee, hereby irrevocably

PROFESSIONAL EYES ONLY

subscribes for and agrees to purchase an Interest for the total subscription amount indicated in the prospective investor's subscription booklet.

5.    The Subscriber irrevocably represents and warrants to the applicable Series, the Company, and the Managing Member that:

(a)    the Subscriber qualifies as an "accredited investor," as defined in Regulation D under the U.S. Securities Act of 1933, as amended) ("Accredited Investor"), for one or more of the following reasons set forth in the Subscriber Questionnaire and will provide documentary evidence of such status as requested by the Managing Member.

(b)    the Subscriber is acquiring the Interests for its own account for long-term investment and not with a view to resale, transfer, or other disposition thereof, in whole or in part;

(c)    the Subscriber has such knowledge and experience in financial and business matters that he, she, or it is capable of evaluating the merits and risks of this investment;

(d)    the Subscriber has received a copy of, and its authorized representative has read and understands, the Operating Agreement. The Subscriber understands that there are substantial risks involved in an investment in the Series. The Subscriber has had an opportunity to review the Operating Agreement and to ask questions of and receive answers from the Managing Member concerning the Series, the terms and conditions of this offering, and such additional information as he, she, or it considers necessary to evaluate appropriately an investment in the Series;

(e)    the Subscriber realizes that because of the inherently speculative nature of an investment like the kind engaged by the Series, the results of the Series' operations may be expected to vary from month to month and from period to period, and that Series Investment generally involves a high degree of financial, market, and other risk that can result in a complete loss of the Subscriber's investment in the Interests. The Subscriber's acquisition of an Interest is based upon its own analysis of the benefits of an investment in the Series; he, she, or it is and will be able to bear the economic risk of its investment in an Interest, and its investment in the Interests will not adversely affect its overall need for diversification and liquidity. Additionally, the Subscriber acknowledges it has read and understands the risk factors described in Exhibit A attached hereto;

(f)    the Subscriber, in connection with its investment in the Interests, has obtained and complied with all necessary and appropriate legal and tax advice, registrations, declarations and filings with, and licenses, approvals and authorizations of, governmental authorities;

(g)    the Subscriber understands: (i) the investment objective and policies of the Series; (ii) the manner in which profits and losses will be allocated; and (iii) the risks associated with the method of allocating income to the Managing Member under the Operating Agreement;

(h)    the Subscriber understands that the Managing Member, in its sole and absolute discretion, may require a Member to withdraw from the Series (as described in the Operating Agreement). Further, he, she, or it understands the limited withdrawal rights

C-2

PROFESSIONAL EYES ONLY

granted to the Members (as described in the Operating Agreement);

(i)    the Subscriber understands that Lowenstein Sandler LLP acts as counsel to the Series, the Company, and to the Managing Member and certain of its affiliates. The Subscriber also understands that, in connection with this offering of Interests and subsequent advice to the Series, Lowenstein Sandler LLP will not be representing investors in the Series, including the Subscriber, and no independent counsel has been retained to represent investors in the Series.

6.    The Subscriber further irrevocably represents and warrants to the applicable Series, the Company, and the Managing Member that:

(a)    the Subscriber acknowledges that the Managing Member is not registered as an investment adviser pursuant to the Investment Advisers Act of 1940, as amended;

(b)    the Subscriber acknowledges and understands that the Interests are not registered for sale to the public under the Securities Act of 1933, as amended (the "Securities Act"), or the laws of any state or other jurisdiction. The Subscriber understands that the Interests have not been registered under the Securities Act in reliance on an exemption thereunder for transactions not involving a public offering and will not be so registered. Subscriber further acknowledges that the Subscriber is purchasing Interests without being furnished any offering literature or prospectus other than the Operating Agreement and this Subscription Agreement;

(c)    the Subscriber is aware that: (i) the Subscriber must bear the economic risk of investment in the Interests for an indefinite period of time, possibly until final winding up of the Series; (ii) because the Interests have not been registered under the Securities Act, there is currently no public market therefor; (iii) the Subscriber may not be able to avail itself of the provisions of Rule 144 of the Securities Act with respect to the Interests; and (iv) the Interests cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available. The Subscriber understands that neither the Managing Member nor the Company (or the Series) is under any obligation, and it is not their intention to effect any such registration at any time. The Subscriber further understands that sales or transfers of the Interests are further restricted by the provisions of the Operating Agreement and, as applicable, the securities laws of other jurisdictions and the states of the United States.

(d)    the Subscriber shall not permit any other person to have a beneficial interest in the Subscriber's Interests, and the Subscriber shall not sell, assign, transfer, convey, encumber, or otherwise dispose of all or any portion of the Subscriber's Interests except (i) in accordance with the Operating Agreement, and (ii) in compliance with the registration requirements of the Securities Act and applicable state securities or "blue sky" laws (unless an exemption from registration under the Securities Act or such state laws is available); and

(e)    the Subscriber acknowledges and understands that if the Subscriber is a U.S. tax- exempt entity, it may experience adverse U.S. federal income tax consequences as a result of an investment in the Series, since the Series may generate "unrelated business taxable

income" ("UBTI"), upon which federal income tax would be levied. The Subscriber acknowledges and understands the additional representation in PART IX;

(f)    the Subscriber acknowledges and understands that if the Subscriber is a non-U.S. person, an investment in the Series may cause the Subscriber to be treated as being engaged in a U.S. trade or business for U.S. tax purposes. Were this to occur, a non-U.S. Subscriber would be subject to tax on its share of the Series' income treated as "effectively connected" with the conduct of such a U.S. trade or business, and would be subject to U.S. federal income tax return filing requirements. The Subscriber has consulted or has had an opportunity to consult with its tax advisors with respect to these issues;

(g)    the Subscriber acknowledges and understands that if the Subscriber is a "disregarded entity" for U.S. federal income tax purposes, that the representations and warranties made by the Subscriber herein are also true and correct as to the Subscriber's (direct or indirect) sole owner;

(h)    the Subscriber represents and warrants that if the Subscriber is a partnership, grantor trust, S corporation, or other flow-through entity for U.S. federal income tax purposes (each, a "Flow- Through Entity"), that (i) substantially all of the value of any beneficial owner's interest in the Flow- Through Entity is not attributable to the Flow-Through Entity's interest in the Series, and (ii) a principal purpose of the Flow-Through Entity is not to permit the Series to satisfy the one-hundred (100) partner limitation in Section 1.7704-1(h)(1)(ii) of the Treasury Regulations; and

(i)    The Subscriber was not formed for the specific purpose of investing in the Interests.

7.    The Subscriber hereby agrees to become a Member in the Series on the terms and conditions set forth in the Operating Agreement. The Subscriber hereby ratifies, adopts, accepts, and agrees to be bound by all of the terms and provisions of the Operating Agreement, and to perform all obligations therein imposed upon a Member with respect to the Interests purchased. Upon acceptance of the Subscriber's proposed investment in the Series by the Managing Member, and by virtue of the Subscriber's subscription, the Subscriber shall be deemed to have executed the Operating Agreement and shall become a Member of the Series.

8.    The Subscriber is making an investment in the Series relying solely on the facts and terms set forth in this Subscription Agreement and in the Operating Agreement, all of which were received and reviewed by the Subscriber, and neither the Managing Member, nor any other person or entity, has made any representation of any kind or nature to induce the Subscriber to enter into the Operating Agreement, except as specifically set forth in this Subscription Agreement and the Operating Agreement. The Subscriber has not relied on any representations, other than those in this Subscription Agreement and the Operating Agreement provided by the Managing Member. The Subscriber is not relying on the Managing Member with respect to the individual or partnership tax consequences associated with an investment in the Series.

9.    If the Subscriber is a corporation, partnership or trust, and is not itself an employee benefit plan, then no more than twenty-four and nine-tenths percent (24.9%) of the value of any class of equity interests in the Subscriber is held by "benefit plan investors" within the meaning of the U.S. Department of Labor Final Regulation Relating to the Definition of Plan Assets, 29 CFR Parts

C-4

PROFESSIONAL EYES ONLY

2509, 2510, and 2550.

10.     The information submitted by the Subscriber to the Series is complete and accurate as of the date hereof and may be relied upon by the Series. The Subscriber will notify the Series in writing immediately of any change in such information. The Subscriber will notify the Series in writing immediately of any change to the information provided herein, and/or if any of the representations or warranties contained herein becomes untrue.

11.     The Subscriber understands that the Series may require additional documentation (including tax forms and information), and the Series reserves the right to request such documentation at any time.

12.     The Subscriber understands that the Series or its agent will inform the Subscriber whether its proposed subscription has been accepted. The Subscriber acknowledges that the Managing Member reserves the right, in its absolute discretion, to reject the subscription amount proposed by the Subscriber, in whole or in part.

13.     The Subscriber understands that, as described in the Operating Agreement, the Subscriber may be required to pay certain amounts representing all, or any portion, of its subscription amount, pursuant to directions set forth in notices distributed by the Managing Member.

14.     The Subscriber hereby represents that it will provide, at the request of the Series or the Managing Member, information needed for the Series and any of its affiliates to comply with the U.S. Foreign Account Tax Compliance Act ("FATCA") information reporting and withholding requirements (as set forth in sections 1471 through 1474 of the Code, and the Treasury Regulations promulgated thereunder). The Subscriber acknowledges and agrees that its failure to provide information needed for the Series to comply with FATCA information reporting and withholding requirements may result in the Subscriber being subject to thirty percent (30%) withholding tax.

15.     The Subscriber represents that neither the Subscriber nor any Covered Person (as defined below) has experienced a "Bad Actor" disqualification event, pursuant to Rule 506(d)(1) of Regulation D under the Securities Act (any such event, a "Disqualifying Event"). A "Disqualifying Event" includes, but is not limited to, the Subscriber or any Covered Person being the subject of: (i) a conviction of any felony or misdemeanor, within ten (10) years before the date of the Subscriber's investment in the Series (such date of subscription, the "Applicable Date"), in connection with the purchase or sale of a security, involving the making of a false filing with the Securities and Exchange Commission (the "SEC") or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities; (ii) any order, judgment, or decree of any court of competent jurisdiction, entered within five (5) years before the Applicable Date, that restrains or enjoins the Subscriber or Covered Person from engaging or continuing to engage in any conduct or practice (A) in connection with the purchase or sale of a security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser, or paid solicitor of purchasers of securities; (iii) a final order from a state securities commission (or agency or officer of a state performing like functions), a state authority that supervises or examines banks, savings associations, or credit unions, a state insurance commission (or agency or officer of a state

C-5

PROFESSIONAL EYES ONLY

performing like functions), an appropriate federal banking agency, the Commodity Futures Trading Commission, or the National Credit Union Administration that (A) bars the Subscriber or Covered Person from associating with an entity regulated by such commission, authority, agency, or officer, engaging in the business of securities, insurance or banking, or engaging in savings association or credit union activities, or (B) constitutes a final order based on violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten (10) years before the Applicable Date; (iv) certain SEC disciplinary orders relating to brokers, dealers, municipal securities dealers, investment companies and investment advisers and their associated persons; (v) an SEC cease-and- desist order entered within five (5) years before the Applicable Date related to violations of certain anti- fraud provisions and registration requirements of the federal securities laws; (vi) suspension or expulsion from membership in, or suspension or bar from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission constituting conduct inconsistent with just and equitable principles of trade; (vii) SEC stop orders or refusal orders (including an order suspending a Regulation A exemption) issued within five (5) years before the Applicable Date or an investigation or proceeding to determine whether a stop order or suspension order should be issued; or (viii) a U.S. Postal Service false representation order entered within five (5) years before the Applicable Date or on the Applicable Date a temporary restraining order or preliminary injunction with respect to conduct alleged by the U.S. Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations. "Covered Person" means: (x) any director, executive officer, general partner, or managing member of the Subscriber; and (y) any person who would, through the Subscriber's ownership of Interests, be deemed to beneficially own twenty percent (20%) or more of the outstanding voting equity securities of the Series (for purposes of this clause (y), beneficial ownership is interpreted in the same manner as in Rule 13d-3 and Rule 13d-5 of the Securities Exchange Act of 1934, as amended). In the event that the Subscriber or any Covered Persons becomes subject to a Disqualifying Event subsequent to the Applicable Date, the Subscriber shall promptly notify the Series.

16.     The Subscriber understands and acknowledges that an affiliate of the Company, on a principal basis, initially purchased the underlying securities (the "Underlying Securities") that the Series intends to acquire as part of its investment strategy. Subscriber further understands and acknowledges that the Interests represent the economic rights in the Underlying Securities but no voting rights in the securities. Additionally, Subscriber understands and acknowledges that the Series is selling Interests at a price representing a mark-up from the fair market value of the Underlying Securities as of the date of Subscriber's purchase. The Managing Member shall determine the fair market value of the Underlying Securities in its sole discretion. Subscriber understands and agrees that it has had the opportunity to obtain more information about the fair market value of the Underlying Securities and the mark-up earned by the Company or its affiliates (taking into account the Managing Member's expenses) by contacting the Managing Member.

## PART III - INVESTMENT COMPANY ACT REPRESENTATIONS

1.     The Subscriber understands that the Company and the Series will not register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Subscriber understands that the Company and the Series intend to rely upon the exemption afforded by Section 3(c)(1) of the Investment Company Act, which provides that Interests may not

PROFESSIONAL EYES ONLY

be beneficially owned by more than 100 investors who qualify as Accredited Investors. Subscriber understands further that the Managing Member is not acting as a fiduciary with respect to the securities owned by the Series, but rather is limiting its actions to administering the assets owned by each Series in accordance with each Member's specific instructions in accordance with this Agreement.

## PART IV - POWER OF ATTORNEY

1. The Subscriber, as principal, hereby irrevocably appoints any one officer or director of the Managing Member as its true and lawful representative and attorney-in-fact, in his, her, or its name, place, and stead, to make, execute, sign, acknowledge, swear to, and file:

    (a) any partnership certificate, business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose, and objectives of the Series, or required by any applicable federal, state, local, or foreign law;

    (b) the Operating Agreement, and any amendment duly approved as provided therein; and

    (c) any and all instruments, certificates, and other documents that may be deemed necessary or desirable to effect the winding-up and termination of the Series.

    This power of attorney is intended to secure a proprietary interest, and the obligations of the Subscriber hereunder are irrevocable, and shall survive and shall not be affected by the subsequent disability, incompetency, termination, bankruptcy, insolvency, or dissolution of the Subscriber; provided, however, that this power of attorney shall terminate upon the substitution of another Member for all of the Subscriber's investment in the Series, or upon the total withdrawal of the Subscriber from the Series, to the extent applicable.

## PART V – ANTI-MONEY LAUNDERING REPRESENTATIONS

1. The Subscriber represents that all evidence of identity provided in connection with its subscription for an Interest is genuine, and all related information furnished is accurate. The Subscriber agrees to provide any information deemed necessary by the Managing Member, in its sole and absolute discretion, to comply with any applicable anti-money laundering and anti-terrorist financing program(s) and related responsibilities.

2. The Subscriber represents that either (a) or (b) below is true:

    (a) If the Subscriber is acquiring the Interest for its own account, risk, and beneficial interest, then the Subscriber represents that it:

    - is not acting as agent, representative, intermediary/nominee, or in any similar capacity, for any other person;
    - does not have any intention or obligation to sell, distribute, assign, or transfer all or a portion of the Interest to any other person; and
    - no other person will have a beneficial or economic interest in the Interest.

PROFESSIONAL EYES ONLY

(b)     If the Subscriber is an investor intermediary investing in its own name on behalf of other investors, which, for these purposes, may include, without limitation, an introducing firm, an asset aggregator, a nominee, or a fund of funds, then the Subscriber represents that it:

- is subscribing for an Interest as a record owner in its capacity as either an agent, representative, or nominee on behalf of one or more investors ("Underlying Investors"), and agrees that the representations, warranties, and covenants made herein are made by it on behalf of itself and the Underlying Investors; and
- (i) has all requisite power and authority from the Underlying Investors to execute and perform the obligations hereunder; (ii) has carried out investor identification procedures with regard to all Underlying Investors; and (iii) has established the identity of all Underlying Investors, holds evidence of such identities, and will make such information available to the Managing Member upon request.

3.      The Subscriber understands that the Series prohibits any investment in the Series by or on behalf of the following persons (each, a "Prohibited Investor"):

- A person, country, territory, or entity whose name appears on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control;
- A foreign shell bank (a bank without a physical presence in any country and as otherwise defined in the USA PATRIOT Act);
- A senior foreign political figure,*** or any immediate family member**** or close associate***** of a senior foreign political figure; and
- Any other person or entity that the Managing Member, in its sole and absolute discretion, determines to be a Prohibited Investor.

The Subscriber represents and covenants that neither the Underlying Investor, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is a Prohibited Investor. The Subscriber agrees to promptly notify the Managing Member of any change in information affecting this representation and covenant.

4.      The Subscriber acknowledges that if the Underlying Investor is, or the Managing Member reasonably believes that the Underlying Investor is, a Prohibited Investor, the Managing Member may be obligated to freeze its investment, either by prohibiting additional investments, declining any withdrawal requests, and/or segregating the assets constituting the investment in accordance with applicable regulations, or its investment may be immediately withdrawn by the Series, and neither the Subscriber nor the Underlying Investor shall have any claim against the Managing Member or any of its affiliates for any form of damages as a result of the aforementioned actions. The Subscriber further acknowledges that as part of the Series' responsibility for protection against money laundering, the Series and its appointed agents may require additional information including detailed verification of the identity of the Subscriber.

---

*** A "senior foreign political figure" is defined as a senior official in the executive, legislative,

administrative, military, or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business, or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

\*\*\*\* "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children, and in-laws.

\*\*\*\*\* A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

The Subscriber agrees that, upon request of the Series, it will provide such information as the Series may require to satisfy applicable anti-money laundering laws and regulations, including, without limitation, the Subscriber's anti-money laundering policies and procedures, background documentation relating to its directors, trustees, settlors, and beneficial owners, and audited financial statements, if any.

### PART VI – CERTAIN ADDITIONAL EMPLOYEE BENEFIT PLAN REPRESENTATIONS

1.  THE SUBSCRIBER SHALL IDENTIFY ITS STATUS AS A BENEFIT PLAN INVESTOR (AS DEFINED HEREIN), IF APPLICABLE, TO THE MANAGING MEMBER. If the Subscriber becomes a Benefit Plan Investor subsequent to the date of its initial investment in the Series, the Subscriber shall promptly disclose to the Managing Member in writing such fact and also the percentage of such Subscriber's equity interests held by Benefit Plan Investors. For these purposes, a "Benefit Plan Investor", as defined in Section 3(42) of ERISA, and any regulations promulgated thereunder, includes: (i) an "employee benefit plan" that is subject to the provisions of Title I of ERISA; (ii) a "plan" that is subject to the prohibited transaction provisions of section 4975 of the Code, such as individual retirement accounts and certain retirement plans for self-employed individuals; and (iii) a pooled investment fund whose assets are treated as "plan assets" pursuant to Section 3(42) of ERISA and any regulations promulgated thereunder because Benefit Plan Investors hold twenty five percent (25%) or more of any class of equity interest in such pooled investment fund. The Subscriber agrees to notify the Managing Member promptly in writing if there is any change in the percentage of the Subscriber's assets that are treated as "plan assets" for the purpose of Department of Labor Regulations Section 2510.3-101 and Section 3(42) of ERISA and any regulations promulgated thereunder. The Subscriber represents that if the Subscriber is not an employee benefit plan subject to Title I of ERISA or a plan that is subject to section 4975 of the Code, but is subject to provisions under other U.S. federal, state, local, non-U.S. or other laws or regulations that are similar to those provisions contained in ERISA and/or the Code (collectively "Other Plan Laws"), the Subscriber has determined that an investment in the Series is in accordance with the terms of the Subscriber's governing instruments and complies with all applicable Other Plan Laws.

2.  If the Subscriber is a Benefit Plan Investor, the fiduciary effecting this investment in the Series on behalf of the Benefit Plan Investor (the "Fiduciary") irrevocably represents and warrants to the Series that:

    (a)  the Fiduciary is a "fiduciary" of such Benefit Plan Investor and trust and/or custodial

C-9

account within the meaning of Section 3(21) of ERISA, and/or section 4975(e)(3) of the Code and such person is authorized to invest in the Series;

(b) unless otherwise indicated in writing to the Managing Member, the Benefit Plan Investor is not a participant-directed defined contribution plan;

(c) unless otherwise indicated in writing to the Managing Member, the Benefit Plan Investor's commitment to purchase the Interest does not, in the aggregate, constitute more than ten percent (10%) of the fair value of the Benefit Plan Investor's assets;

(d) the Fiduciary has considered a number of factors with respect to the Benefit Plan Investor's investment in the Interest and has determined that, in view of such considerations, the purchase of the Interest is consistent with the Fiduciary's responsibilities under ERISA. Such factors include, but are not limited to:

(i) the role such investment or investment course of action plays in that portion of the Benefit Plan Investor's portfolio managed by the Fiduciary;

(ii) whether the investment or investment course of action is reasonably designed (as part of that portion of the portfolio managed by the Fiduciary) to further the purposes of the Benefit Plan Investor, taking into account both the risk of loss and the opportunity for gain that could result therefrom;

(iii) the composition of that portion of the portfolio managed by the Fiduciary with regard to diversification;

(iv) the liquidity and current rate of return of that portion of the portfolio managed by the Fiduciary relative to the anticipated cash flow requirements of the Benefit Plan Investor;

(v) the projected return of that portion of the portfolio managed by the Fiduciary relative to the funding objectives of the Benefit Plan Investor;

(vi) whether an investment in the Series is permissible under the documents governing the Benefit Plan Investor and the Fiduciary;

(vii) whether an investment in the Series is appropriate in light of the Benefit Plan Investor's investment and diversification guidelines; and

(viii) the risks associated with an investment in the Series and the fact that the Benefit Plan Investor will be restricted from withdrawing its interest in the Series for an indefinite period of time;

(e) the Fiduciary:

(i) is responsible for the decision to invest in the Series;

(ii) is independent of the Series and each of its affiliates;

(iii) understands the fee arrangements applicable to investments in the Series, including the Management Fee (as defined in the Operating Agreement), understands how the application of fees may impact overall investment returns, and has determined that the Benefit Plan Investor is eligible under applicable U.S. Department of Labor guidelines to participate in a performance-based fee arrangement;

(iv) is qualified to make such investment decision; and

(v) has not relied on, and is not relying on, the investment advice of the Managing Member or any of its employees or affiliates with respect to the Benefit Plan Investor's investment in the Series, and neither the Managing Member nor any of its employees or affiliates, has any investment discretion with respect to the

C-10

PROFESSIONAL EYES ONLY

assets of the Benefit Plan Investor which will be used to purchase the Interest;

(f)     to the extent applicable, the disclosures contained in the Operating Agreement and in other information provided to the Fiduciary regarding the investment in the Series constitute notice to the Fiduciary pursuant to Section 408(b)(2) of ERISA and regulations issued thereunder;

(g)     the investment in the Series has been duly authorized under, and conforms in all respects to, the documents governing the Benefit Plan Investor and the Fiduciary;

(h)     the Fiduciary has delivered to the Series, and from time to time hereafter will deliver to the Series, in writing, all of the information that the Series may request in order to avoid violations of any provision of ERISA or any other law applicable to the Subscriber, and promptly will notify the Series, in writing, of any change in the information so furnished; and

(i)     unless otherwise indicated on the Subscriber Identification Statement annexed hereto, the Subscriber is not an insurance company that is investing the assets of its general account (or the assets of a wholly owned subsidiary of its general account) in the Series. The Subscriber agrees to promptly notify the Managing Member in writing if there is a change in the percentage of the general account's assets that constitute "plan assets" within the meaning of Section 401(c) of ERISA and shall disclose such new percentage ownership.

3.     The Subscriber acknowledges and agrees that:

(a)     the Subscriber's Fiduciary, who must have no affiliation with the Managing Member or any of its affiliates or employees, must review the terms of the Series and decide whether to invest in the Series solely and independently, and without relying on any recommendation of the Managing Member or any of its affiliates or employees as a primary basis for its decision; and

(b)     any on-going evaluation of the Series as an investment in the Subscriber's overall portfolio must be made solely and independently by a Fiduciary, as described above, and such fiduciary must make such evaluation and decision without relying on any recommendation of the Managing Member or any of its affiliates or employees as a primary basis for such decision.

**PART VII - ELECTRONIC DELIVERY OF ACCOUNT INFORMATION**

1.     The Subscriber hereby agrees and consents to have the Series and/or the Managing Member deliver electronically all current and future account statements, the Operating Agreement (including all supplements and amendments thereto), notices (including privacy notices), letters to investors, all financial statements including the annual financial statements, regulatory communications, information relating to taxation (including Schedule K-1) and other information, documents, data and records related to the Subscriber's investment in the Series (collectively, "Account Communications"). The Subscriber acknowledges and agrees that electronic communication from the Series and/or the Managing Member will include, among other things, e-mail delivery as well as the electronic provision of Account Communications pertaining to the Subscriber via the Managing Member's web site, if applicable. The Subscriber acknowledges and agrees that it is the Subscriber's affirmative obligation to notify the Managing Member in writing of any changes to the Subscriber's e- mail address on file with the Series. Account

Communications will be sent to the e-mail address provided to the Series on the date of application for subscription, unless the Subscriber affirmatively notifies the Managing Member in writing of any changes to the Subscriber's e-mail address or additional addresses. The Subscriber should contact the Managing Member to change the Subscriber's e-mail address or to provide additional addresses.

2.  The Subscriber may revoke or restrict its consent to electronic delivery of Account Communications at any time by notifying the Managing Member, in writing, of the Subscriber's intention to do so. This consent shall remain in effect until revoked or restricted. Within a reasonable period of time after the Managing Member's receipt of the Subscriber's restriction or revocation of consent, it will send written confirmation of (i) its receipt of the revocation or restriction of consent, and (ii) the date on which such revocation or restriction takes effect (the "Effective Date"). Restriction or revocation of consent does not apply to an Account Communication furnished electronically prior to the Effective Date. If the Subscriber does not consent to electronic delivery, or revokes its consent to electronic delivery, of Account Communications, including Schedule K-1, the Subscriber will be provided Account Communications in paper format. Unless otherwise notified, Account Communications will continue to be provided to the Subscriber electronically. With the exception of restriction or revocation of consent in the manner described above, there are no other conditions under which the Series and/or the Managing Member will discontinue distributing Account Communications electronically.

3.  The Series and the Managing Member shall not be liable for any interception by any third party of Account Communications. The Subscriber acknowledges and agrees that, although none of the Series and the Managing Member will charge additional amounts for electronic delivery, the Subscriber may incur charges from its internet service provider or other third parties in connection with the delivery and receipt of Account Communications delivered electronically. In addition, the Subscriber understands that there are risks associated with electronic delivery of Account Communications, including the risk of system outages or interruptions, which risks may, among other things, inhibit or delay the Subscriber's receipt of Account Communications.

4.  If the Subscriber desires a specific Account Communication, including a specific Schedule K-1, in paper form, the Subscriber may contact the Managing Member. A request for a specific Account Communication in paper form will not be treated as a withdrawal of consent to electronic delivery of Account Communications generally. The Subscriber should note that the Schedule K-1 may be required to be printed and attached to a federal, state, or local income tax return.

**PART VIII - ADDITIONAL REPRESENTATIONS BY TAX-EXEMPT INVESTORS**

1.  The Subscriber understands that:

(a)  the Series, in its discretion, may accept an investment from a U.S. tax-exempt investor in certain circumstances. However, neither the provisions hereof nor the acceptance of any subscription hereunder shall be deemed in any way to be legal or tax advice or any representation or warranty by the Series or the Managing Member, or any representative or affiliate of any of the foregoing, or to imply in any way, that an investment in the Series is suitable for any investor;

(b)  if the Subscriber is a private foundation, an investment in the Series may subject the

C-12

PROFESSIONAL EYES ONLY

Subscriber to significant excise taxes; and

(c)     if the Subscriber is a charitable remainder trust, the receipt of any UBTI by the Subscriber in respect of its interest in the Series will be subject to a one-hundred percent (100%) excise tax.

2.     The Subscriber has consulted, or has had an opportunity to consult with, its own tax advisors with respect to these issues.

## PART IX - MISCELLANEOUS PROVISIONS

1.     The Operating Agreement (including all Appendices thereto), and the rights, powers, and duties set forth herein, shall bind and inure to the benefit of the heirs, executors, administrators, legal representatives, successors, and permitted assigns of the parties hereto.

The Operating Agreement and any side letter or similar separate agreement represent the entire agreement of the parties with respect to the subject matter hereof and may not be changed or terminated orally. No waiver by any party of any breach of any term of the Operating Agreement (including all Appendices thereto) shall be construed as a waiver of any subsequent breach of that term or of any other term of the same or of a different nature.

2.     The Subscriber understands that a misrepresentation or breach of any warranty or agreement made by the Subscriber in the Operating Agreement (including all Appendices thereto) could subject the Series to significant damages and expenses. The Subscriber hereby agrees to indemnify, defend, and hold harmless the Series, the Managing Member, and their respective affiliates from and against any loss, liability, damage, cost, or expense (including legal fees and expenses in the defense or settlement of any demands, claims, or lawsuits) actually and reasonably incurred arising from the Subscriber's misrepresentation or breach of any warranty or agreement contained herein.

3.     The representations, warranties, agreements, and indemnification obligations of the Subscriber contained in the Operating Agreement (including all Appendices thereto, and further including any additional documentation provided by the Subscriber upon the request of the Series or its agent) shall survive indefinitely.

4.     The name, address, email address and related information of the Subscriber have been provided to the Managing Member. When such information changes, the Subscriber shall immediately notify the series of such change.

5.     This Subscription Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. A facsimile or other reproduction of this Subscription Agreement may be executed by the Subscriber and/or the Managing Member, and an executed copy of this Subscription Agreement may be delivered by the Subscriber and/or the Managing Member by facsimile or similar electronic transmission device pursuant to which the signature or signatures and questionnaire responses can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, the Subscriber and the Managing Member agree to execute an original of this Subscription Agreement as well as any facsimile or other reproduction hereof.

PROFESSIONAL EYES ONLY

C-14

6.  The Subscriber hereby acknowledges that once the Managing Member has accepted the Subscriber's proposed subscription to the Series, the Subscriber shall be deemed to have signed, and shall be bound by, the Operating Agreement, shall be admitted to the Series as a Member, effective as of such acceptance of this proposed subscription to the Series, and shall be entitled to the rights and privileges, and subject to the responsibilities set forth in the Operating Agreement.

*[The remainder of this page intentionally left blank]*

PROFESSIONAL EYES ONLY

**EXHIBIT A**
**RISK FACTORS**

An investment in the Series will involve risks not associated with other investment alternatives. Although the Managing Member may seek to reduce the risks associated with the Series Investment, prospective investors should carefully consider, among other factors, the risks described below. Such risk factors are not meant to be an exhaustive listing of all potential risks associated with an investment in the Series. There can be no assurance that the Series' investment objective will be achieved, or that there will be any return of capital. Membership Interests are potentially suitable investments only for sophisticated investors for whom an investment in the Series does not represent a complete investment program and who, in consultation with their own investment and tax advisors, fully understand and are capable of assuming the risks of an investment in the Membership Interests, including the potential risk of losing all of their invested capital.

I.    **GENERAL RISKS**

1.    **General.** The Series will be subject to numerous risks generally related to investing in securities and other investments, including potentially, the additional risks associated with investing in non-marketable securities and non-public companies, including, as applicable, through an SPV. Many of the risks associated with an investment in the Series will also apply to the Series' investment in the Series Investment. The securities or other interests acquired by the Series will have restrictions on resale and, even in the absence of such restrictions, may not be marketable. The ability of the Series to profit from its investments will be highly dependent upon the ability of its investments to generate income or appreciate in value. Numerous factors may impede or prevent an investment from reaching this point, including inadequate capital, unfavorable competitive developments, and adverse legislation at the national, state, or local level. The Series may face significant capital shortfalls for a wide variety of reasons. For example, resource development may prove more expensive, or take more time, than anticipated, and the growth in revenues may be slower than expected. In any such event, the Series may be asked to provide additional capital. If the Series is unable or refuses to provide the additional capital, the investment may obtain the needed funds from another source (including co-investments from one or more Members or affiliates of any Members, or the Managing Member and/or its affiliates), diluting, potentially substantially, the earlier investment by the Series. However, in the event that an investment is unable to obtain any needed financing, the inability to obtain funds may result in the failure of such investment and a loss of the Series Investment therein.

2.    **Limited Operating History.** The Company and each Series were formed within the last five years. The Company has limited operating history upon which a prospective Member may evaluate to determine whether to purchase an Interest in the Series. The Portfolio Company and/or the SPV may be newly established with little to no operating history or have limited public information available upon which the Managing Member may rely on prior to making the Series Investment. As a result, no prior performance or results of the Managing Member and the Portfolio Company and/or the SPV can be relied upon or expected to be indicative of the Series Investment. The Series will be dependent upon the Managing Member, which in turn will rely on its personnel and, if applicable, the SPV's management team. No guarantees can be made that the Managing Member and its personnel will be able to operate effectively or that the respective efforts of such persons will be beneficial to the Series. Moreover, no assurance can be made that any or all of such persons will remain employed by the Managing Member.

3.    **Emerging Growth Series Investments.** The Series Investment will be an investment in the

C-15

PROFESSIONAL EYES ONLY

Portfolio Company, an emerging growth company, either on a direct basis or through an SPV. In general, financial and operating risks confronting both early- and developmental-stage companies, as well as more mature expansion- stage companies are significant. Many emerging growth companies go out of businesses every year. It is difficult to know how companies will grow, if at all, or what changes may occur in the market. While potential returns should reflect the perceived level of risk in any investment situation, there can be no assurance that the Series will be adequately compensated for risks taken. A loss of an investor's entire investment is possible, and no profit may be realized.

Early-stage and development-stage companies often experience unexpected problems in the areas of product development, manufacturing, marketing, financing, and general management, which, in some cases, cannot be adequately solved. In addition, such companies may require substantial amounts of financing which may not be available through institutional private placements or the public markets. In addition, the markets that such companies target are highly competitive and in many cases the competition consists of larger companies with access to greater resources. The percentage of companies that survive and prosper is small.

Investments in more mature companies in the expansion or profitable stage involve substantial risks. Such companies typically have obtained capital in the form of debt and/or equity to expand rapidly, reorganize operations, acquire other businesses, or develop new products and markets. These activities by definition involve a significant amount of change in a company and could give rise to significant problems in sales, manufacturing, and general management of these activities.

4.      **General Market Factors.** General fluctuations in the economy may affect the value of the Series Investment. The value of the Series Investment can be volatile and price movements may be influenced by, among other factors, changing supply and demand relationships (including, among other factors, labor-market conditions, increases or decreases in wages and changes in oil prices), political and economic events and/or changes in related policies, and adverse regulatory developments. The Portfolio Company may be susceptible to economic slowdowns or recessions. An economic slowdown may affect the ability of the Portfolio Company to repay loans or engage in a liquidity event such as a sale, recapitalization, or initial public offering. The amount of nonperforming assets may increase and the value of the Series Investment may decrease during these periods. These conditions could lead to financial losses to the Portfolio Company and the Series Investment.

## II.     SERIES AND INVESTMENT RISKS

5.      **Risks Related to Series Limited Liability Companies.** Each Series of the Company has been established to treat each Series as a separate entity. Therefore, the debts, liabilities, obligations, and expenses of a Series cannot be enforced against another Series of the Company or against the Company as a whole. Generally, a Series may hold its own assets in its own name, have its own Members, and conduct its own business; however, there is regulatory uncertainty as to whether jurisdictions other than where the Company has been formed will recognize the legal separation between each Series and the Company. As a result, although the legally separate and distinct assets of the Company and each Series may be recognized in the State of Delaware, there is no guarantee that such treatment will be afforded under a different jurisdiction. There is also uncertainty as to how the Internal Revenue Service will treat the separation of the assets of the Company and each Series for tax purposes. It is possible that the debts, liabilities, and other obligations of one Series of the Company may lead to action against another Series of the Company. If such an event were to occur, there would be a materially adverse impact on the Company if one or more Series of the Company are not treated as separate entities.

PROFESSIONAL EYES ONLY

6.     **Risks Inherent in Investing in Private Companies.** The Series' only investment will be either directly in the Portfolio Company set forth in the Series Schedule, or, alternatively, a passive investment in the SPV that will significantly invest all of its capital in the Portfolio Company. The Portfolio Company is a private emerging growth company. Investment into the Portfolio Company and/or the SPV involves a high degree of risk. Many emerging growth companies go out of business every year and it is difficult to know whether companies will grow, if at all, or what factors may impact their performance. There can be no assurance that the Series will be adequately compensated for risks taken and it is possible for a Subscriber to lose his or her entire investment. It is also difficult to understand the timing of profit realization and it is likely that the Series will incur losses before it has an opportunity to realize a profit, if at all.

7.     **Lack of Diversification and Concentration of Investment.** The Series' investment portfolio will be highly concentrated, and its aggregate return may be affected substantially by the performance of the Portfolio Company, or the SPV (which is dependent on the performance of the Portfolio Company). The Series' direct, or indirect investment into the Portfolio Company may expose the Series to greater risk than if its investments were spread across a larger number of opportunities. Additionally, its investments may become susceptible to fluctuations in value resulting from adverse business or economic conditions affecting a particular industry, industry segment or region. The Series will not provide investors with a broad investment portfolio and adverse events in the Portfolio Company's industry will have a disproportionately adverse effect on the portfolio companies in comparison with a broadly diversified portfolio.

8.     **Lack of Information for Monitoring and Valuing the Series Investment.** The Managing Member may only be able to obtain limited information about the Portfolio Company and, in some cases, may not be able to obtain information beyond the information that is publicly available. Generally, the Portfolio Company will determine the best way to keep the investment community informed on the progress of the business so the Managing Member may not be aware of any adverse changes that have occurred with respect to certain of its investments. Additionally, privately held companies are not subject to the same disclosure and reporting obligations of publicly traded companies. The value of Series Investment could be significantly negatively affected by any such event. Further, the Managing Member may have to make valuation determinations without the benefit of an adequate amount of relevant information. Prospective investors should be aware that as a result of these difficulties, as well as other uncertainties, any valuation made by the Managing Member may not represent the fair market value of the Series Investment. The Managing Member does not assume any responsibility for the accuracy of completeness of such information.

9.     **Minority Investment.** The Series Investment will be a minority stake in the Portfolio Company or in the SPV, which will have a minority stake in the Portfolio Company. As is the case with minority holdings in general, such minority stake will not have control or valuation premiums commonly associated with majority or controlling stakes. The Series will not have the right to exert any influence over the Portfolio Company or the SPV. Likewise, the Series or the SPV will not have the right to appoint a director of the Portfolio Company or otherwise exert significant influence over the Portfolio Company. The Series will be reliant on the management team for the Portfolio Company or, if applicable, the SPV, which will be reliant on the existing management and board of directors of the Portfolio Company, which may include investors with whom the Series or the SPV (as applicable) is not affiliated with and whose interests may conflict with the interests of the Series.

C-17

10. **No Reserve; Dilution Risk.** The Series Investment may be subject to direct and/or indirect dilution. In the event the Series Investment is in an SPV, the SPV does not intend to reserve capital for follow-on investments in the Portfolio Company and therefore may be unable to take advantage of attractive follow-on or other investment opportunities or to protect its existing investments from dilutive or other punitive terms associated with "pay-to-play" or similar provisions. Therefore, if the SPV's investment in the Portfolio Company is diluted, the Series Investment may depreciate in value. Similarly, in the event the SPV raises additional equity funding in the future, the SPV may issue new membership interests in the SPV to new investors and the percentage of membership interests owned by the Series may decline. If the Series does not fund a follow-on investment made by the SPV, the Series' membership interests in the SPV will be subject to proportional dilution relative to SPV members who do fund such amounts. Any new SPV membership interests may also allow for certain preferential rights. If such rights are exercised by new investors this may work to the Series' disadvantage. If the Portfolio Company grants options (or similar rights to acquire membership interests) to employees, service providers, or certain other parties or individuals then the Series Investment may be subject to dilution. Likewise, if the Portfolio Company takes similar action, the Series' direct investment in the Portfolio Company may experience similar dilution.

11. **No Assurance of Investment Return.** The task of identifying investment opportunities and managing such investments is difficult. Many organizations operated by persons of competence and integrity have been unable to make such investments successfully. The Series Investment includes private securities where there is no publicly traded market and there is no guarantee that the underlying private securities will increase in value. An investment in the Series is long-term in nature and it may take many years before a return is realized, if at all. An investment in the securities offered hereby is therefore only appropriate for investors with a long-term investment horizon and a capacity to absorb a loss of some or all of their investment. There is no assurance that the Series' investment objectives will be attained, or that the value of the investments will not decline, or that there will be any return of capital. The Series may not always be able to realize upon its investments in a manner that produces the maximum return on such investments. The Series or the SPV (as applicable) may elect or be required to remain invested in a manner that does not maximize returns on a given investment because of the inherent unpredictability involved in evaluating the point at which such returns are maximized.

12. **Limitations on Ability to Exit Investments.** The Managing Member expects to exit from its investments in two principal ways: (i) private sales (including acquisitions of the Portfolio Company) and (ii) initial and secondary public offerings. At any particular time, one or both of these avenues may not be open to the Series, or timing with respect to these exit mechanisms may be inopportune. As such, the ability to exit from and liquidate portfolio holdings may be constrained at any particular time.

13. **Absence of Liquidity and Public Markets; Illiquidity of the Interests.** The Series Investment will be a private, illiquid holding in the Portfolio Company or an SPV that holds private, illiquid holdings in the Portfolio Company. As such, there will be no public markets for the securities held by the Series and no readily available liquidity mechanism at any particular time for any of the investments held by the Series. The Managing Member expects that the Series Investment will be subject to transfer restrictions that will prohibit or restrict their transferability to secondary buyers while the Portfolio Company or the SPV, if applicable, remains private. In addition, the realization of value from any investments will not be possible or known with any certainty until the Managing Member elects, in its sole discretion, to sell the Series Investment and subsequently distribute the proceeds to its investors or to distribute securities to investors in lieu of cash. In addition, Members will not be entitled to withdraw their capital contributions. Accordingly, the Interests constitute highly illiquid investments. Voluntary

C-18

withdrawals of the Interests are not permitted except under certain limited circumstances for legal and regulatory reasons.

14.     **Recall of Distributions.** Distributions (or, returns of unused capital contributions, which will be made in the Managing Member's sole and absolute discretion) to Members, may be recalled from time to time from such Members, subject to certain limitations, which may adversely affect the return of the investments in the Series made by Subscribers. Such recalled distributions may be used, pursuant to Delaware law, to satisfy unpaid debts of the Series that were in existence at the time the distributions were made.

15.     **Use of Borrowed Funds.** Subject to the limitations set forth herein and in the Operating Agreement, the Series may for liquidity purposes enter into one or more lines of credit secured by available Capital Commitments of the Members, in an aggregate amount not to exceed aggregate Capital Commitments of the Members. Such borrowing increases both the possibilities for profit and the risk of loss. The amount of borrowings by the Series and the interest rates on such borrowings, which may fluctuate, could have a significant effect on the Series' profitability. Similarly, if applicable, the SPV may enter into similar arrangements that could have a material adverse impact on the Series Investment.

16.     **Mandatory Transfer and Withdrawal.** Under certain circumstances, Members may be required to transfer their Membership Interests to another person or completely or partially withdraw from the Series to the extent that the Managing Member determines it to be necessary or desirable in order to comply with applicable law or regulations, or to avoid a material adverse effect on the Series, the other Members or the Managing Member.

17.     **Disposition of Investments.** Part or all of one or more investments made by the Series (including the Series Investment) may not be completely disposed of prior to the dissolution and liquidation of the Series, in the event of which the Series may make in-kind liquidation distributions to the Members of securities in the Series' portfolio that have not been disposed of.

18.     **Mark-up Fees.** As disclosed in this Subscription Agreement, the Series Investment includes a mark-up of the underlying investment acquired from its affiliate. It is possible that an investment in another vehicle may result in a greater return for investors than an investment in the Series, which includes the mark-up on the underlying securities of the Portfolio Company or SPV membership interests, if applicable. Prospective investors should consider whether alternative investments are available prior to purchasing Interests in the Series.

III.     **RISKS ASSOCIATED WITH INVESTING IN AN SPV, IF APPLICABLE**

19.     **Risks Related to Indirect Investments in the Portfolio Company.** If the Interests represent an indirect interest in the Portfolio Company's securities, through an investment in the SPV, there is likely limited public information available on the financial operations and capitalization of the Portfolio Company. Although the Managing Manager received limited information from the SPV it holds an interest in, a prospective investor should not subscribe for Interests unless it is a sophisticated investor, capable of completing its own research and analysis of the Portfolio Company and this offering. By purchasing Interests in the Series, Members will not be equity holders of the Portfolio Company and will have no direct interest in the Portfolio Company. Accordingly, Members will not have any voting rights in the Portfolio Company or standing or recourse against a Portfolio Company. Additionally, the Series nor any Member will have the right to participate in the control, management, or operations of the Portfolio

PROFESSIONAL EYES ONLY

Company, or have any discretion over the management of the Portfolio Company by reason of investment in the SPV or in the Series.

20.      **Additional SPV Contributions.** In the event the Series Investment is in an SPV, then subject to certain limitations set forth in the SPV limited liability company agreement (the "SPV LLCA"), each SPV member is obligated to make additional contributions in excess of such member's initial contribution for the purposes of funding company expenses. The failure by a member to fund additional capital contributions may result in the imposition of significant remedies against such SPV member.

21.      **SPV Management Fees.** In the event the Series Investment is in an SPV, the SPV's general partner, manager, or their affiliates, may be entitled to receive an annual management fee and may receive a carried interest (collectively, "SPV Fees"), pursuant to the terms of the SPV LLCA, which may create an incentive for the SPV's manager to make more speculative investments on behalf of the SPV than it would otherwise make in the absence of such performance-based compensation. The SPV Fees were set by the SPV's manager without negotiations with any third-party. It is possible that an investment in another vehicle may result in a greater return for investors than an investment in the Series, which includes the mark-up on the SPV membership interests and the SPV Fees. Prospective investors should consider whether alternative investments are available prior to purchasing Interests in the Series.

22.      **Contingent Liabilities on Disposition of Investments.** In connection with the disposition of the Series Investment, if applicable, the SPV may be required to make representations about the business and financial affairs of such company typical of those made in connection with the sale of a business. The SPV may be required to indemnify the purchasers of such investment to the extent that any such representations are inaccurate. These arrangements may result in the incurrence of contingent liabilities for which the SPV's manager may establish reserves and escrows. In that regard, distributions may be delayed or withheld until such reserve is no longer needed or the escrow period expires.

## IV.      BUSINESS AND INDUSTRY RISKS

23.      **Financial Crises and Effects on Global Financial Markets.** World financial markets have in the past experienced and may in the future experience extraordinary market conditions, including, among other things, extreme losses and volatility in securities markets and the failure of credit markets to function. In reaction to these events, regulators in the U.S. and several other countries previously have taken and may in the future take regulatory actions. However, global financial markets may remain volatile, and it is uncertain whether regulatory actions will be able to prevent losses and volatility in securities markets. It is possible that regulatory actions might increase the possibility of future volatility. Regulations may increase market fragmentation and decrease the global flow of capital as it may be too difficult for the Series and other market participants to comply with multiple regulatory regimes. There may be significant new regulations that could limit the Series' activities and investment opportunities or change the functioning of capital markets, and there is the possibility of regional and/or worldwide economic downturn. Consequently, the Series may not be capable of, or successful at, preserving the value of its assets, generating positive investment returns or effectively managing its risks.

24.      **Cyber Security Breaches and Identity Theft.** The information and technology systems of the Managing Member, its affiliates, the Company, the Series, and their service providers and their portfolio companies may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons, other security breaches and/or usage errors by their respective professionals. The techniques used to obtain

unauthorized access to data, disable or degrade service, or sabotage systems change frequently and may be difficult to detect for long periods of time. Hardware or software acquired from third parties may contain defects in design or manufacture or other problems that could unexpectedly compromise information security.

Although the Managing Member and/or its affiliates have implemented, or expect to implement, measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Managing Member, its affiliates, the Company, the Series, their service providers and/or their portfolio companies may have to make a significant investment to fix or replace them. The failure of these systems for any reason could cause significant interruptions in such parties' operations and/or a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors (and the beneficial owners of investors). Such a failure could harm the reputation of the Managing Member, its affiliates, the Series and/or their portfolio companies, subject any such entity and their respective affiliates to legal claims and/or otherwise affect their business and financial performance. Specifically, cyberattacks and the failure of such systems may interfere with the processing of Member subscriptions or withdrawals, impact the Series' ability to value its assets, cause the release of confidential information and/or subject the Series to regulatory fines, penalties or financial losses, reimbursement, or other compensation costs, and/or additional compliance costs. The Series also may incur substantial costs for cyber- security risk management to prevent any cyber incidents in the future. The Series and the Members could be negatively impacted as a result.

**25.** **Business Continuity and Disaster Recovery.** The business operations of the Managing Member, its affiliates, the Company, the Series, and the Portfolio Company (and if applicable, the SPV) may be vulnerable to disruption in the case of catastrophic events such as fires, natural disaster (e.g., tornadoes, floods, hurricanes and earthquakes), terrorist attacks or other circumstances resulting in property damage, network interruption and/or prolonged power outages. Although the Managing Member, and/or its affiliates have implemented, or expect to implement, measures to manage risks relating to these types of events, there can be no assurances that all contingencies can be planned for. These risks of loss can be substantial and could have a material adverse effect on the Series and the Members' investments therein.

**26.** **Risk of Financial Counterparty Distress Events.** The Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for each of Silicon Valley Bank and Signature Bank in March 2023 and for First Republic Bank in May 2023 following a major outflow of deposits at each bank. The failures of these banks underscore the risk that one or more of the Series' and/or its investments' financial counterparties (such as banks or lenders) (each, a "Financial Counterparty") may fail to perform their obligations in a timely manner or experience bankruptcy or another financial adverse event or difficulty (each, an "Distress Event"), similar to those experienced by Silicon Valley Bank, Signature Bank and First Republic Bank. Many factors may trigger a Distress Event, including large bank withdrawals, negligence and market issues. If a Financial Counterparty experiences a Distress Event, the Managing Member, the Series and/or one or more of its investments may not be able to access their deposits, borrowing facilities or other services from such Financial Counterparty for an indeterminate amount of time. Although assets held by regulated Financial Counterparties in the United States are often insured for a certain amount by, for example, the FDIC in the case of U.S. banks, amounts in excess of the respective insured amount are subject to risk of total loss, and any non-U.S. Financial Counterparties that are not subject to similar regimes are also subject to increased risk of loss. Neither the Managing Member nor the portfolio companies are obligated to maintain account balances at or below the relevant insured

C-21

amounts or utilize a minimum number of Financial Counterparties.

Distress Events could negatively impact the Managing Member's ability to manage the Series and the Series Investment, and the ability of the Managing Member, the Series and any investment to maintain operations. Financial Counterparties often require that their customers maintain a certain amount or percentage of their respective accounts or assets with the Financial Institution, which heightens the risks that could be borne by the Managing Member, the Series and/or an investment associated with a Distress Event. A Distress Event could result in the inability of the Series to acquire or dispose of investments at a fair value or fulfill one or more of its contractual obligations. A Distress Event could also result in the inability for in investment to fulfill one or more of its obligations (including, but not limited to, the ability to meet payroll, place orders for supplies, fulfill product orders, consummate financial transactions, and/or to meet other financial obligations). If a Distress Event leads to a partial or total loss of access to a Financial Counterparty's services, the Series, the Managing Member and/or an investment may have to seek alternative services, and there may be delays in procuring such services and/or such services may be on less favorable terms than the terms entered into with the prior Financial Counterparty. Furthermore, if a Financial Counterparty utilized by Members or one of the Series' non-financial counterparties becomes subject to a Distress Event, such Distress Event could have a material adverse effect on the Series and its investments. Although the Managing Member intends to exercise any available contractual remedies under agreements with Financial Counterparties in the event of a Distress Event, there can be no assurance that such remedies will be successful or avoid losses or delays.

27.     **Delayed Schedules K-1.** The Series may be unable to provide the final Schedule K-1 to Members for any given fiscal year until after April 15 of the following year. The Managing Member will endeavor to provide Members with estimates of the taxable income or loss allocated to their investment in the Series on or before such date, but the final Schedule K-1 may not be available until completion of the Series' annual audit, if an audit is performed. Members may be required to obtain extensions of the filing date for their income tax returns at the federal, state, and local levels.

28.     **Diverse Member Group.** The Members may have conflicting investment, tax and other interests with respect to their investments in the Series. The conflicting interests of Members may relate to or arise from, among other matters, the acquisition or structuring of investments and the timing and disposition of investments. As a consequence, certain decisions made by the Managing Manager may be more beneficial for some Members than for others. The Series may also make investments that have a negative impact on investments made by one or more Members separately from the Series. While the Managing Member plans, subject to the requirements of the Operating Agreement, to consider the investment and tax objectives of the Series and the Members as a group, rather than the investment, tax or other objectives of any Member individually, the Managing Member may enter into separate agreements with Members which require the Managing Member to take actions to address the separate interests of these Members which may adversely affect the interest of other Members.

## V.     MANAGEMENT RISKS

29.     **Dependence on the Management.** All management decisions will be made by the Managing Member. Accordingly, no person should invest in the Series unless he, she, or it is willing to entrust all aspects of the management and investment of the Series to the Managing Member, who will have considerable discretion in the types of companies and/or securities in which the Series will invest. The Series will be dependent upon the skill, judgment and expertise of the Managing Member and its members, managers, partners, employees, and affiliates. Additionally, the Series Investment is subject to

PROFESSIONAL EYES ONLY

the management discretion of the Portfolio Company with all aspects of the management of the Portfolio Company or, if applicable, the SPV's management team with all aspects of the management of the SPV. As a result, an investment in the Series will also be dependent on the skill, judgment, and expertise of the Portfolio Company or, if applicable, the SPV's management team.

30.     **Projections.** The Series may rely upon projections developed by the Managing Member, the SPV, or the Portfolio Company, concerning the Portfolio Company's or SPV's performance and potential cash flows. Projections are inherently subject to uncertainty and factors beyond the control of the Managing Member or the Portfolio Company. The inaccuracy of certain assumptions, the failure to satisfy certain financial requirements or the occurrence of other unforeseen events could impair the ability of a portfolio company, and hence the Series, to realize projected values and cash flow.

31.     **Lack of Control.** Members will have no opportunity to control the day-to-day operations of the Series, including investment and disposition decisions of the Series. In order to safeguard their limited liability for the liabilities and obligations of the Series, the Members must rely entirely on the Managing Member to conduct and manage the affairs of the Series. Likewise, if the Series Investment is in the SPV, the Series will have no opportunity to control the day-to-day operations of the SPV, including its investment-related decisions. While the Series may be granted certain contractual rights to protect any such investments (which may be set forth in a shareholders agreement or other similar agreement and may include redemption and registration rights and/or information and access rights), the Series will not have control over such investments. In such cases, the Series runs the risk of refusal of management or other shareholders or equity holders of such investments to adopt the recommendations of the Series, and any resulting negative impact on the value of the investment or the Series' ability to exit from such investment at a profit.

32.     **Indemnification of Certain Persons.** The Operating Agreement contains broad indemnification and exculpation provisions that limit the right of a Member to maintain an action against the Managing Member and its affiliates to recover losses or costs incurred by the Series as a result of such persons' actions or failures to act. Additionally, if applicable, pursuant to the SPV LLCA, the SPV is required to indemnify the SPV's manager, investment adviser, and certain of the owners, principals, and affiliates for liabilities incurred in connection with the affairs of the SPV. Such liabilities may be material and have an adverse effect on the Series' investment in the SPV. If the assets of the SPV are insufficient to satisfy such indemnification obligations, the SPV's manager may require the return of distributions previously received by the Series.

33.     **Third Party Litigation.** The Series' investment activities are subject to the normal risks of becoming involved in litigation initiated by third parties. The expense of defending against claims by third parties and paying any amounts pursuant to settlements or judgments would, absent fraud, willful misconduct, or gross negligence by the Managing Member, be borne by the Series (to the extent not borne by the Portfolio Company or the SPV, if applicable) and would reduce net assets or could require Members to return to the Series distributed capital and earnings. The Managing Member and others are indemnified in connection with such litigation, subject to certain conditions.

## VI.     REGULATORY RISKS

34.     **Business and Regulatory Risks of Private Investments Funds.** The regulatory environment for private funds is evolving, and changes in the regulation of private funds and their investing activities may adversely affect the ability of the Series to pursue its investment program and the

value of the investments held by the Series. There has been an increase in governmental, as well as self-regulatory, scrutiny of the alternative investment industry in general. It is impossible to predict whether changes in regulations may occur, but any regulations that restrict the Series' activities could have a material adverse effect on the Series Investment, including, without limitation, changes to regulatory and tax matters that may have an adverse impact on the Series' investment activities. In addition, regulatory scrutiny may increase the Series' exposure to potential liabilities and to legal, compliance and other related costs. Increased regulatory oversight may also impose additional administrative burdens on the Managing Member, including, but not limited to, responding to investigations and implementing new policies and procedures. Such burdens may divert such persons' time, attention, and resources from the Series' activities.

35. **ERISA Considerations.** In order to avoid holding "plan assets" within the meaning of ERISA (as defined below), the Series may be restricted or precluded from making certain investments. In addition, it could be necessary for the Managing Member to liquidate the Series Investment at a disadvantageous time in order to avoid holding ERISA "plan assets," resulting in lower proceeds to the Series than might have otherwise been the case. If the assets of the Series are deemed to include ERISA plan assets, there may be certain negative consequences to the Series. See "EMPLOYEE BENEFIT PLAN CONSIDERATIONS" below.

36. **The Company and Each Series are not Registered Funds.** The Company and each Series is not expected to be registered under the Investment Company Act, pursuant to an exception from registration set forth in Section 3(c)(1) thereunder. The Investment Company Act provides certain protections to investors and impose certain restrictions on registered investment companies, none of which apply to the Series. The Series cannot assure that, if there is a change in circumstances or in the law, that the Series may not become subject to the Investment Company Act or related regulations, which may have a material effect on the performance of the Series.

37. **The Company, the Series, and the Managing Member are not Registered as Investment Advisers.** Neither the Company, the Series, nor the Managing Member or their respective affiliates are registered with the Securities and Exchange Commission as an investment adviser under the Investment Advisers Act of 1940, as amended. The Company, the Series, and/or the Managing Member may be required to register as an investment adviser in the future.

38. **Future Regulatory Developments.** This document cannot address or anticipate every possible current or future regulation that may affect the Managing Member, the Company, the Series, or their respective businesses and operations. Such regulations may have a significant impact on the Series, including but not limited to, restricting the types of investments the Series may make, or requiring the Series to disclose certain confidential information regarding its terms, investments, or the Members. The Managing Member, in its sole discretion, may cause the Series to be subject to certain regulations if it believes that an investment or business activity is in the Series Investment, even if such regulations may have a detrimental effect on one or more Members. Prospective investors are encouraged to consult their own advisors regarding an investment in the Series.

39. **Possible Adverse Tax Consequences.** The Series should be classified as a partnership for U.S. federal income tax purposes, and not as an association taxable as a corporation. No representation or warranty of any kind is made with respect to the tax consequences of an investment in the Series, or the allocation of taxable income or loss, as provided in the Operating Agreement. Potential investors are advised to consult their own tax advisors with respect to the tax consequences to them of an investment

PROFESSIONAL EYES ONLY

in the Series, including if the Series is treated as other than a partnership for tax purposes.

In certain circumstances, to the extent permitted by the terms of the Operating Agreement, the Managing Member may decide not to make distributions of certain of the Series' profits, but to retain such profits for Series expenses or re-investments. Since the Series generally does not separately pay taxes, subject to the New Audit Rules (discussed below, each Member is required to report such Member's ratable share of the taxable income and losses of the Series and to pay any taxes resulting therefrom. Accordingly, a Member may be required to pay taxes on his, her, or its share of the Series' taxable income, even though he, she, or it has not received any cash from the Series with which to cover such liability. Moreover, the recognition of income, gains, and losses in any year for tax purposes may not match the economic performance of the Series.

Members that qualify as tax-exempt entities may experience adverse federal income tax consequences as a result of an investment in the Series. In particular, an investment in the Series may generate "unrelated business taxable income" ("UBTI") with respect to a tax-exempt entity, upon which federal income tax may be levied. UBTI generally would arise if (a) the Series (or a partnership or other "pass-through" entity in which it invests) were to utilize leverage in its activities or were engaged in a trade or business unrelated to the exempt purposes of the relevant tax-exempt entity, or (b) the tax-exempt entity were to leverage its investment in the Series. A non-U.S. investor may be treated as engaged in a trade or business in the United States, be taxed on his, her, or its share of income that is treated as effectively connected with such U.S. trade or business, and be subject to U.S. tax return filing obligations. As such, U.S. tax-exempt and non-U.S. investors are advised to consult their own tax advisors with respect to issues involving unrelated business taxable income and income effectively connected with a U.S. trade or business. See "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS" below.

\* \* \* \* \*

The foregoing risk factors do not purport to be a complete enumeration or explanation of the risks involved in an investment in the Interests. Prospective investors should read the Operating Agreement and this Subscription Agreement in their entirety, and consult with their own advisors prior to making any decision to invest in the Series.

### CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain aspects of U.S. federal income taxation of the Series and its Members that should be considered by a potential purchaser of Interests. The summary is based on the assumption that the Series is owned, managed, and operated as set forth herein. Investors should appreciate that the tax consequences for certain investors and the Series may be other than as stated below. Investors should consult their professional advisors regarding the possible tax consequences of their subscribing for, purchasing, holding, selling, or redeeming Interests. In view of the complexities of the tax laws applicable to partnerships and securities transactions, and since no attempt is made herein to mention all of the tax considerations that should be taken into account in evaluating a potential investment in the Series or to provide a complete explanation of those issues that are summarized, a person considering investing in the Series should consult his, her, or its own tax advisor in order to understand fully the federal, state, local, and foreign tax consequences of such investment to his, her, or its particular situation. No representation is made as to the tax consequences of the operation of the Series.

The following discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury Regulations promulgated thereunder, including temporary and proposed regulations ("Treasury Regulations"), judicial decisions, current published administrative rulings of the Internal Revenue Service (the "Service"), and other applicable authority currently in effect as of the date hereof. The Series does not intend to request any rulings from the Service. A court may reach a contrary conclusion with respect to the issues addressed if the matter were contested. In addition, future legislative or administrative changes (including changes scheduled to occur in the future pursuant to existing legislative phase-in and "sunset" provisions) or court decisions may significantly change the conclusions expressed herein, and any such changes or decisions may have a retroactive effect.

**This discussion does not purport to deal with all tax considerations applicable to any particular investor. Except where otherwise specified, this discussion relates to U.S. federal income taxation of the Series and its Members that are taxable U.S. persons for U.S. federal income tax purposes and not U.S. state and/or local tax consequences, foreign tax consequences, or non-income tax consequences. This summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a prospective investor in light of its personal investment circumstances or to certain types of prospective investors subject to special treatment under the Code (unless otherwise specifically discussed below), such as tax-exempt entities, and non-U.S. persons. No Series document shall be deemed in any way to be legal or tax advice or any representation or warranty by the Series, the Managing Member, or any representative or affiliate of any of the foregoing, or to imply in anyway, that an investment in the Series is suitable for any investor.**

1.      Classification of the Series. The Company is a Delaware series limited liability company and each Series should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation. Under section 7704 of the Code, a publicly traded partnership ("PTP") is treated as a corporation for U.S. federal income tax purposes. For this purpose, a partnership is "publicly traded" if its interests are either (i) traded on an established securities market or (ii) readily traded on a secondary market (or the substantial equivalent thereof). Based upon the anticipated operations of the Series, the Interests should not be treated as publicly traded and, therefore, the Series should not be treated as a PTP taxable as a corporation. No ruling has been or will be requested from the Service on this issue, and no assurance can be given that the Service or a court will concur with the conclusions herein. If the Series were to be treated as a corporation, rather than as a partnership for U.S. federal income tax purposes, its income would be subject to U.S. federal corporate income tax. In addition, distributions made by the Series would be taxed as dividends or otherwise treated as corporate distributions, and there would be no flow-through of items of income, gain, loss and deduction.

The discussion below assumes that the Series will not be a PTP and will be treated as a partnership for U.S. federal income tax purposes.

2.      Taxation of Series Operations — General. As an entity that is classified as a partnership for federal income tax purposes, the Series itself generally will not be subject to federal income tax. The New Audit Rules (defined below) will in certain circumstances impose liability for income taxes (and related penalties and interest) upon the Series, rather than its Members. The Series will file an annual partnership information return, which will report the results of its operations. Each Member will be required to report separately on his, her, or its own income tax return his, her, or its distributive share of the Series' net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income (including dividends and interest received) or deduction, and various other categories of income, gain,

loss, deduction, and credit. The Series believes that its allocations of partnership tax items among the various Members will be upheld under the provisions of the Code and Treasury Regulations dealing with tax allocations by partnerships. However, if it were determined that an allocation made by the Series with respect to a particular item did not have "substantial economic effect" (within the meaning of the Code and Treasury Regulations) and was not in accordance with the Members' interests in the Series, taking into account all the facts and circumstances, that item could be allocated, for tax purposes, in a different manner. In some circumstances, this could result in a Member recognizing a greater or lesser amount of loss, deduction, gain, or income than he, she, or it would have recognized under the allocation made by the Series or in such Member recognizing an amount of loss, deduction, gain, or income at a different time than he, she, or it would have recognized such amount under the allocation made by the Series.

Each Member will be subject to tax on his, her, or its distributive share of the Series' taxable income or loss regardless of whether he, she, or it has received, or will receive, any distribution of cash from the Series. A non-corporate partner may be eligible for a twenty percent (20%) deduction with respect to such partner's distributive share of "qualified business income" from a partnership that constitutes a "qualified trade or business" of that partner.

Generally, any vehicle in which the Series invests will be classified for federal income tax purposes either as a partnership or a corporation, and the Series will be required to report on its own tax return its distributive shares of net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or deduction, and various other categories of income, gain, loss, deduction, and credit of each partnership in which it invests. Such items will be allocated to each Member as described above. Generally, the Series will not have to report on its own tax return any portion of income, gain, loss, deduction, and credit of any corporation in which the Series invests. The Series, however, will have to report distributions of money or property from any such corporation, which distributions generally will be treated either as dividends or as capital gains or losses that in each case will be allocated to the Members as described above.

Pursuant to various "anti-deferral" provisions of the Code, such as the "Subpart F," and "passive foreign investment company" provisions, investments by the Series in certain foreign corporations may cause a Member (i) to recognize taxable income prior to the Series' receipt of distributable proceeds; (ii) to pay an interest charge on receipts that are deemed as having been deferred; or (iii) to recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain. See "Investing in Foreign Entities" below.

3.  Taxation of Series Operations — Investments. The taxation of investment transactions is extremely complex and no attempt is made herein to describe fully the various tax rules that apply to such transactions or to explain in complete detail those rules that are mentioned. However, some general points may be noted.

4.  The Series will file its tax returns on the basis that, for tax purposes, it is not a "dealer" with respect to its securities transactions. Generally, the gains and losses recognized by a taxpayer other than a dealer on the sale of securities are capital gains and losses, and the Series expects that its gains and losses with respect to securities transactions will, in general, be so treated. These capital gains and losses may be long-term or short-term or a combination of both, depending on the length of time the particular investment position has been maintained and, in some cases, the nature of the transaction. It is possible that the Service could disagree and characterize the Series as a dealer, in which case its gains or losses would in whole or in part be characterized as ordinary income.

C-27

PROFESSIONAL EYES ONLY

The net long-term capital gains of non-corporate taxpayers are taxed at preferential rates. Certain "qualified dividend income" received by non-corporate taxpayers is subject to the same preferential rates as net long-term capital gains. Generally, "qualified" dividends are those paid from domestic corporations and from certain foreign corporations. A dividend from a foreign corporation generally is qualified if (i) the corporation is incorporated in a U.S. possession; (ii) the corporation is eligible for benefits under certain income tax treaties; or (iii) the stock on which the dividend is paid is readily tradable on an established securities market in the U.S. A dividend paid by a foreign corporation cannot be qualified if, in the taxable year in which the dividend is paid or the preceding taxable year, the corporation is a passive foreign investment company. Several other types of dividends cannot be qualified, including (a) dividends on certain stock held for not more than sixty (60) days (ninety (90) days for certain preferred stock); (b) dividends on stock to the extent that the holder is required to make related payments with respect to positions in similar property (for example, pursuant to a short sale); (c) payments in lieu of dividends (such as with respect to stock lent by a broker pursuant to a short sale); (d) dividends electively treated as investment income offset by the deduction for investment interest; and (e) dividends paid by certain tax-exempt organizations.

In addition, individuals, estates and trusts are subject to a tax of three and eight- tenths percent (3.8%) on "net investment income" (or undistributed "net investment income," in the case of estates and trusts) for each such taxable year, with such tax applying to the lesser of such income or the excess of such person's adjusted gross income (with certain adjustments) over a specified amount. The specified amount is Two Hundred Fifty Thousand Dollars ($250,000) for married individuals filing jointly, One Hundred Twenty-Five Thousand Dollars ($125,000) for married individuals filing separately, Two Hundred Thousand Dollars ($200,000) for other individuals and the dollar amount at which the highest income tax bracket for estates and trusts begins. Net investment income includes net income from interest, dividends, annuities, royalties and rents and net gain attributable to the disposition of investment property. It is anticipated that net income and gain attributable to an investment in the Series will be included in an investor's "net investment income" subject to this tax.

The capital losses of a noncorporate taxpayer will offset capital gains. Any excess of capital losses over capital gains will offset ordinary income to the extent of Three Thousand Dollars ($3,000) per year, with the unused capital losses being carried forward to other years, subject to certain limitations.

For corporate taxpayers, all net capital gains, whether long-term or short-term, are taxed at the corporation's regular rate. There are no special rules for qualified dividends. For such taxpayers, capital losses may offset only capital gains, but unused capital losses may be carried both backward and forward to other years, subject to certain limitations.

5.      Restrictions on Deductions and Losses. A Member cannot deduct its distributive share of losses and deductions from the Series in an amount greater than the adjusted tax basis in the Member's Membership Interest (discussed below), determined as of the end of the Series' taxable year. Any excess losses and deductions generally may be deducted by a Member in subsequent tax years to the extent that the adjusted tax basis of the Member's Membership Interest exceeds zero (0).

Members that are U.S. persons and are individuals or certain types of corporations, estates and trusts may be further limited in their ability to deduct losses or expenses of the Series under the "at risk" limitations in section 465 of the Code, the passive activity loss limitations in section 469 of the Code, and other provisions of the Code. Non-corporate Members' deductions for "investment interest" generally

will be limited to "net investment income" as defined in section 163(d) of the Code. In addition, the expenses of an individual paid or incurred for the production of income (such as certain investment expenses) are not deductible for any taxable year beginning after December 31, 2017 and before January 1, 2026. For taxable years beginning on or after January 1, 2026, the ability of an individual Member to deduct his or her share of investment expenses (other than interest expense) of the Series and any underlying investments generally will be limited to the extent that such deductions do not exceed two percent (2%) of the Member's adjusted gross income. Moreover, for taxable years beginning on or after January 1, 2026, there is a limitation on the deductibility of investment expenses in excess of two percent (2%) of an individual Member's adjusted gross income to the extent such excess expenses (along with certain other itemized deductions) do not exceed the lesser of (i) three percent (3%) of the excess of such individual Partner's adjusted gross income over the specified amount or (ii) eighty percent (80%) of the amount of certain itemized deductions otherwise allowable for the taxable year. For alternative minimum tax purposes, miscellaneous itemized deductions are not deductible. Some or all of the expenses incurred by the Series may be treated as investment expenses subject to such limitations, to the extent that the Series is not considered being engaged in a trade or business. If the Series is considered being engaged in a trade or business, the general and administrative expenses it incurs in connection with its activities would not be subject to the above limitations. It also should be noted that future Treasury Regulations might provide that even if the Series, but not an individual Member, is deemed to be engaged in a trade or business, some or all of the above limitations would still apply to that Member with respect to his or her share of the Series expenses.

Section 163(j) of the Code significantly reduces the deductibility of interest paid or accrued by partnerships that are engaged in a trade or business (i.e., "business interest") for taxable years beginning after December 31, 2017, including interest paid on existing indebtedness. The deduction for business interest is generally limited to the sum of business interest income plus thirty percent (30%) of adjusted taxable income. For this purpose, adjusted taxable income is determined at the entity level for partnerships and generally is earnings before interest, taxes, depreciation, and amortization ("EBITDA") for taxable years beginning before 2022 and earnings before interest and taxes ("EBIT") for taxable years thereafter.

To the extent the Series is subject to this limitation and any business interest of the Series is not allowed as a deduction, such disallowed business interest will be allocated to the Members, reducing each Member's basis in its Membership Interests (but not below zero (0)) by the amount of such allocation. This excess business interest may be carried forward indefinitely by a Member, but is deductible only against a Member's distributive share of the Series' "excess taxable income" (i.e., the amount that bears the same ratio to the Series' adjusted taxable income as (i) the excess (if any) of thirty percent (30%) of the Series' adjusted taxable income over the amount (if any) by which the Series' business interest exceeds its business income, bears to (ii) thirty percent (30%) of the Series' adjusted taxable income). In the event a Member disposes of its Interests prior to deducting the full amount of the carryforward, the Member's basis in its Interests will be increased, immediately before the disposition, by any such amount remaining. In addition, the limitation may apply to the business interest of certain portfolio companies in which the Series invests, which may increase the after-tax cost of certain debt financings.

The limitation imposed on business interest under section 163(j) of the Code does not impact the deductibility of investment interest, which continues to be subject to the rules set forth under Section 163(d) of the Code (discussed above).

6.      Withholding; Credit for Taxes Paid. The Series may withhold taxes attributable to any

Member to the extent required under the Code or Treasury Regulations, or under any state, local or other tax law (including foreign law). Any taxes so withheld by the Series shall be deemed to be a distribution or payment to such Member and shall reduce the amount otherwise distributable to each Member pursuant to the Operating Agreement.

It is possible that certain dividends received by the Series, from sources within foreign countries, will be subject to withholding taxes imposed by such countries. In addition, the Series may also be subject to capital gains taxes in some of the foreign countries where it purchases and sells securities. Tax treaties between certain countries and the United States may reduce or eliminate such taxes.

A Member may be entitled to deduct (subject to the limitations generally applicable to deductions) or claim a credit (subject to various limitations on foreign tax credits) for its share of the foreign taxes paid or incurred by the Series in computing its federal income taxes. A Member that is tax-exempt will not ordinarily benefit from such credit or deduction.

7.      Contributions, Distributions, and Dispositions of Interests. No gain or loss generally will be recognized by a Member upon the acquisition of an Interest for cash. However, if appreciated property is contributed to the Series, and if the Series were deemed to be an "investment company" within the meaning of section 721(b) of the Code, gain would be recognized to the contributing Member at the time of the contribution. Prospective investors should consult their own tax advisors concerning this issue. Even if no gain were required to be recognized by a Member on the contribution of appreciated property to the Series, on a subsequent recognition of that appreciation by the Series due to a taxable disposition of the property, the amount of such appreciation generally would be taxed to the contributing Member for income tax purposes. The amount of such gain also could be taxed to the contributing Member if the appreciated property were subsequently distributed by the Series to a Member other than the contributing Member, or if other property were distributed by the Series to the contributing Member.

Typically, no gain or loss would be recognized by a Member on the receipt of a distribution from the Series. However, gain (but not loss) would be recognized to the extent the Series distributed an amount of money (or in certain circumstances, marketable securities) that exceeded the Member's adjusted basis for his, her, or its Interest immediately before the distribution, after taking into account all allocations, including, in the case of a withdrawing Member, any allocations (including special allocations for tax purposes) for the accounting period in which the withdrawal occurred. This gain would have the same character as would gain realized by a Member upon a sale or exchange of an Interest. See below. A loss, if any, would be recognized by a Member only upon a distribution in liquidation of his, her, or its Interest. Certain special rules would apply if the Series were to distribute property rather than cash.

If a Member were to sell his, her, or its interest in the Series, then, with certain exceptions, any resulting gain or loss would be treated as a capital gain or capital loss.

The closing of the Series' taxable year would occur with respect to a Member who terminates his, her, or its entire interest. As a result, all income attributable to long-term appreciation of a Member's interest over several years could be taxable to that Member in the taxable year of such termination.

8.      Basis Adjustment Election. Pursuant to the terms of the Operating Agreement, the Managing Member is authorized, but not required, to cause the Series to elect under section 754 of the Code to have the basis of its assets adjusted in the event of a distribution of money or property to a Member, or in the event of a transfer of an Interest by sale or exchange, or as a result of the death of a

C-30

Member. If made, such election could be revoked only with the consent of the Service. Until revoked, the election would apply to all such transactions during the year in which the election was made and for subsequent taxable years. In the event that the Series were to have a substantial "built-in loss," the basis adjustment is mandatory and would occur even if the Series does not make a Section 754 election. A substantial built-in loss exists if (i) the Series' basis in its property exceeds by more than Two Hundred Fifty Thousand Dollars ($250,000) the fair value of the property or (ii) the transferee of an Interest would be allocated a net loss in excess of Two Hundred Fifty Thousand Dollars ($250,000) upon a hypothetical disposition by the Series of all of its assets in a fully taxable transaction for cash equal to the asset's fair market value, immediately after the transfer. Additionally, the Series is generally required to adjust its tax basis in its assets in cases of distributions that result in a "substantial basis reduction" (i.e., in excess of Two Hundred Fifty Thousand Dollars ($250,000)) in respect of the Series' property. For this reason, the Series will require (i) a Member who receives a distribution from the Series in connection with a complete withdrawal; (ii) a transferee of an Interest (including a transferee in case of death); and (iii) any other Member in appropriate circumstances to provide the Series with information regarding his, her, or its adjusted tax basis in its Interest.

9.     Investing in Foreign Entities. The Series may make investments in foreign partnerships, "passive foreign investment companies" ("PFICs"), or "controlled foreign corporations" ("CFCs"), as those terms are defined under the Code. Investing in a foreign partnership will cause the Series to take into account its allocable share of all of the items of the foreign partnership's income, gain, loss, deduction, and credit, regardless of whether the Series has received any distributions from the foreign partnership. Thus, the Members will be required to take into account all such items of income, gain, loss, deduction, and credit on a current basis.

Generally, investing in a PFIC may result in adverse tax consequences for any "United States person" (other than a "United States person" exempt from U.S. federal income taxation) that is a Member in the Series. The PFIC rules apply to impose an additional tax at the time of any "excess distribution" and with respect to any gain upon disposition of the shares of the PFIC. This tax is determined at the time of an actual distribution or disposition. If the PFIC regime applied, Member's distributions would be subject to U.S. federal income tax at the highest rates applicable to ordinary income.

The PFIC rules provide that U.S. shareholders in a PFIC must pay U.S. federal income tax, plus an interest charge based on the value of the tax deferral, at the time the shareholder disposes of his PFIC investment or upon the receipt of an "excess distribution". The onerous PFIC rules, however, do not apply to a U.S. investor if the Series makes an election to treat the PFIC as a "qualified electing fund" ("QEF"). If the Series makes a QEF election, the Members generally would be taxed currently on their proportionate share of the ordinary earnings and net long-term capital gains of the PFIC whether or not the earnings or gains were distributed. Other U.S. federal income tax consequences can arise from a QEF election. While relief from the PFIC rules is available by making a QEF election, in certain cases such election may not be able to be made because the information required to make such an election is not obtainable.

A Member in the Series may also suffer adverse U.S. federal income tax consequences if the Series makes investments in a foreign corporation that constitutes a CFC. Generally, an investment in a CFC may cause the Member to recognize taxable income prior to the Series' receipt of distributable income. In addition, if the Series invests in either a foreign partnership or foreign corporation and the Series owns at least ten percent (10%) of such foreign partnership or ten percent (10%) of the stock of the foreign corporation, the Series will be required to file an information return with the Service disclosing its investment. Investors may also be subject to additional reporting requirements with respect to the Series'

C-31

PROFESSIONAL EYES ONLY

investments in foreign entities.

10. <u>Foreign and Other Special Investors</u>. Any foreign person or entity and any person or entity subject to special tax treatment that is considering acquiring an interest in the Series should consult his, her, or its own tax advisors with respect to the federal, state, and local tax consequences of an investment in the Series, and in the case of a foreign person or entity, the consequences of an investment in the Series under the laws of any jurisdictions in which such person or entity is subject to tax.

The Series may sell Interests to non-U.S. corporations, trusts and estates, and individuals who are neither citizens nor residents of the United States (collectively, "<u>foreign investors</u>"). The U.S. federal income tax treatment of a foreign investor's capital contribution to the Series is complex and will vary depending upon the particular circumstances of the foreign investor and the activities of the Series. Each foreign investor is urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income tax treatment of its investment in the Series.

In general, the tax treatment of a foreign investor will depend on whether the foreign investor and/or the Series are deemed to be engaged in a U.S. trade or business. The following discussion assumes that a foreign investor is not otherwise engaged in a U.S. trade or business. For the Series, such determination is dependent upon the activities of the Series (or any pass-through entity in which the Series invests) and if such activities constitute a U.S. trade or business, and further, if such activities do constitute a U.S. trade or business, whether certain exceptions provided for in the Code are applicable. If the Series were not deemed to be engaged in a U.S. trade or business from the perspective of the foreign investor, then, subject to any application of FATCA (defined below) and as further described below, the Series generally would not be required to withhold tax on gain from the sale of portfolio securities and would not be required to withhold tax on portfolio interest. However, the Series would be required to withhold tax at the current rate of thirty percent (30%) or lower treaty rate on other interest, dividends and income, if applicable, and special rules apply with respect to dispositions of "United States real property interests" which can include stock in a corporation.

The withholding tax generally does not apply to: (i) original issue discount on U.S. Treasury bills and other debt obligations having a maturity of 183 days or less; (ii) commercial bank deposits; (iii) gains on capital assets, unless the foreign investor (in the case of an individual) is present in the United States for 183 days or more during the taxable year; and (iv) interest income attributable to U.S. Treasury obligations and other debt obligations in "registered form" (or otherwise subject to U.S. federal income tax), if the foreign investor provides the Series with the appropriate Internal Revenue Form W-8BEN or W-8BEN-E.

If the Series, or a pass-through entity in which the Series invests, is deemed to be engaged in a U.S. trade or business, a foreign investor may be subject to U.S. federal income tax, at regular graduated rates, on such "effectively connected income" and would be required to file U.S. federal income tax returns. Gain or loss on the disposition of an Interest in the Series will be treated as effectively connected income and subject to U.S. federal graduated income tax rates to the extent the Series is engaged in the conduct of a U.S. trade or business. In addition, the transferee of an Interest subject to this provision will be required to withhold a tax equal to ten percent (10%) of the amount realized on the disposition of such Interest. If the transferee in an amount equal to the amount the transferee failed to withhold, the Series will be required to withhold from the distributions to the transferee in an amount equal to the amount the transferee failed to withhold, plus interest.

C-32

Additionally, it is possible that the Foreign Account Tax Compliance Act ("FATCA") could impose a withholding tax of up to 30% on payments of dividends, interest, and certain other income, unless a foreign investor satisfies certain information and reporting requirements. Foreign investors should consult their tax advisors regarding the possible implications of this legislation on their investment in the Series.

11.     Tax-Exempt Investors. Generally, a tax-exempt entity is exempt from federal income tax on its passive investment income, such as dividends, interest and capital gains, whether realized by the entity directly or indirectly through a partnership in which it is a partner (with certain exceptions, tax-exempt entities which are private foundations are subject to a federal excise tax on their "net investment income"). This type of income is exempt even if it is realized from securities trading activity which constitutes a trade or business. Where a tax-exempt entity owns an interest in a partnership, the activities of the partnership are attributed to it for purposes of determining whether the tax-exempt entity's distributive share of partnership income is unrelated business taxable income ("UBTI").

This general exemption from tax does not apply to the UBTI of a tax-exempt entity. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived (either directly or through partnerships) from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the entity's exempt purpose or function. UBTI also includes "unrelated debt-financed income," which generally consists of (i) income derived by an exempt entity (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year, and (ii) gains derived by an exempt entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the twelve (12)- month period ending with the date of such disposition.

A potential investor that is a tax-exempt entity, including a Code section 501(c)(3) organization, an individual retirement account, Keogh Plan, or a retirement plan qualified under ERISA, should consider, and discuss with its own tax advisors, the possibility that all or a portion of its distributive share of Series' income or gain could be subject to the special tax imposed by the Code on the UBTI of a tax-exempt entity. The imposition of such a tax could reduce materially the effective return that a tax-exempt investor would derive from an investment in the Series. A tax-exempt entity should consider in particular the extent to which it will be deemed to have (i) UBTI by reason of the Series' investments in pass-through entities; or (ii) "unrelated debt-financed income" by reason of any borrowing done by the Series or by the tax-exempt entity to finance its investment in the Series.

A tax-exempt entity's share of the income or gains of the Series which is treated as UBTI may not be offset by losses of the tax-exempt entity either from the Series or otherwise, unless such losses are treated as attributable to an unrelated trade or business.

To the extent that the Series generates UBTI, the applicable federal tax rate for such a Member generally would be either the corporate or trust tax rate depending upon the nature of the particular tax-exempt entity. A tax-exempt entity may be required to support, to the satisfaction of the Service, the method used to calculate its UBTI. The Series will be required to report to a Member which is a tax-exempt entity information as to the portion, if any, of its income and gains from the Series for each year which will be treated as UBTI. The Series reserves the right to charge any such Member for the expenses incurred in providing such information. The calculation of such amount with respect to transactions entered into by the Series is highly complex, and there is no assurance that the Series' calculation of UBTI will be accepted by the Service.

C-33

In general, if UBTI is allocated to a tax-exempt entity, the portion of the Series' income and gains which is not treated as UBTI will continue to be exempt from tax, as will the entity's income and gains from other investments which are not treated as UBTI. Therefore, the possibility of realizing UBTI from its investment in the Series generally should not affect the tax-exempt status of such a tax-exempt entity. While the presence of UBTI will not cause a charitable remainder trust to lose its tax-exempt status, a one hundred percent (100%) excise tax will be imposed on the amount of any UBTI allocable to the charitable remainder trust. In addition, a tax-exempt entity with UBTI from multiple trades or businesses may no longer be able to net losses from one unrelated trade or business (e.g., UBTI derived from an investment in the Series) against income from a different unrelated trade or business. A prospective investor should consult its tax advisor with respect to the tax consequences of receiving UBTI from the Series.

12.     Series Audits. The Service may audit income tax returns of the Series. For taxable years beginning after 2017, the U.S. federal income tax rules relating to adjustments of items of entities treated as partnerships have been replaced with new rules (the "New Audit Rules").

The New Audit Rules generally provide that adjustments to tax items of entities, such as the Series, treated as partnerships for U.S. federal income tax purposes, or to the partners' relative allocable shares of such tax items, will be determined at the entity level, with all partners generally being bound by that determination. Where an adjustment is made, the New Audit Rules generally provide that the entity, in the year for which the adjustment is finalized (the "adjustment year"), rather than the partners of the entity in the year to which the adjustment relates (the "reviewed year"), will be liable for income taxes (as determined by rules that may effectively overstate the income subject to tax or apply a higher rate than would have applied had the relevant tax items passed-through to the entity's partners) and related interest and penalties with respect to the adjustment, unless the entity elects application of an alternative procedure described below. This imposition of tax at the entity level can adversely affect net asset value and has the potential to significantly affect economic returns to the partners, especially if there have been interim changes in ownership, so that the burden of the tax is not wholly borne by those persons who were direct or indirect partners during the reviewed year.

As an alternative to the entity-level tax rules described above, the entity generally can elect to distribute to those persons who were partners in the reviewed year a revised statement, reflecting the adjustment, of their allocable share of the entity's tax items. Where this election is made, the partners from the reviewed year are required to pay tax for the year in which they receive the revised statement that reflects the adjustment, along with interest (generally from the time U.S. federal income tax was due for the reviewed year) at the standard tax underpayment rates plus two (2) percentage points and a share of the associated penalties, additions to tax or additional amounts (which will be determined at the entity level).

The New Audit Rules introduce the concept of a "partnership representative" that will have substantial control over tax audits and similar proceedings. The partnership representative can be any person with a substantial presence in the United States. If the entity treated as a partnership for U.S. federal income tax purposes does not appoint a partnership representative, then the Service may appoint one. The Operating Agreement provides that initially the Managing Member will act as the partnership representative of the Series.

Substantial aspects of the New Audit Rules have been left to be addressed in subsequent administrative guidance. Accordingly, there are currently substantial uncertainties regarding the manner

C-34

PROFESSIONAL EYES ONLY

in which the New Audit Rules will operate. Prospective investors are encouraged to discuss the potential impact of the New Audit Rules with their own tax advisors.

13.     Disclosure Regarding Tax Shelters. Certain transactions classified as "reportable transactions" must be disclosed to the Service by certain taxpayers on Form 8886 (Reportable Transaction Disclosure Statement) and by certain "material advisors" on Form 8918 (Material Advisor Disclosure Statement). In addition, Treasury Regulations impose a requirement on certain "material advisors" to maintain a list of persons participating in such transactions, which list must be furnished to the Service upon written request. A transaction may constitute a reportable transaction even if it would not be considered a "tax shelter" in the conventional sense. Consequently, it is possible that such disclosure may be required by the Series, the Members, or both if the Series incurs a significant loss on certain types of transactions (computed without regard to offsetting gains or other income). Failure to disclose could result in the imposition of penalties.

14.     Information. The Series will furnish to each Member (a) annual audited financial statements; and (b) a Schedule K-1 for each year during which such Member is a Member of the Series following the close of the taxable year. The timing of delivery of Schedules K-1 by the Series may require the Members to file extensions for the completion of their tax returns.

---

C-35

PROFESSIONAL EYES ONLY

## EMPLOYEE BENEFIT PLAN CONSIDERATIONS

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") IS BASED UPON ERISA, JUDICIAL DECISIONS, U.S. DEPARTMENT OF LABOR REGULATIONS, RULINGS AND OPINIONS IN EXISTENCE ON THE DATE HEREOF, ALL OF WHICH ARE SUBJECT TO CHANGE. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ISSUE THAT MAY BE APPLICABLE TO THE SERIES OR TO A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE SERIES AND THE INVESTOR.

The following is a summary of certain considerations associated with an investment in the Series by employee benefit plans that are subject to ERISA, individual retirement accounts ("IRAs") and other arrangements that are subject to Section 4975 of the Code or provisions under any other federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code (collectively, "Similar Laws"), and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan").

1.      General Fiduciary Matters. ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan subject to Title I of ERISA or Section 4975 of the Code (an "ERISA Plan") and prohibit certain transactions involving the assets of an ERISA Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of an ERISA Plan or the management or disposition of the assets of an ERISA Plan, or who renders investment advice for a fee or other compensation to an ERISA Plan, is generally considered to be a fiduciary of the ERISA Plan.

In considering an investment in the Series of a portion of the assets of any Plan, a fiduciary should determine, particularly in light of the risks and lack of liquidity inherent in an investment in the Series, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA, the Code or any Similar Law relating to a fiduciary's duties to the Plan including, without limitation, the prudence, diversification, delegation of control and prohibited transaction provisions of ERISA, the Code and any other applicable Similar Laws. Furthermore, absent an exemption, the fiduciaries of a Plan should not invest in the Series with the assets of any Plan if the Managing Member or any of its affiliates is a fiduciary with respect to such assets of the Plan. Section 406 of ERISA and Section 4975 of the Code prohibit ERISA Plans from engaging in specified transactions involving plan assets with persons or entities who are "parties in interest," within the meaning of ERISA, or "disqualified persons," within the meaning of Section 4975 of the Code. The acquisition and/or ownership of Interests by an ERISA Plan with respect to which the Series is considered a party in interest or a disqualified person may constitute or result in a direct or indirect prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code, unless the investment is acquired and is held in accordance with an applicable statutory, class or individual prohibited transaction exemption. In this regard, the U.S. Department of Labor (the "DOL") has issued prohibited transaction class exemptions, or "PTCEs," that may apply to the acquisition and holding of investments in the Series. These class exemptions include, without limitation, PTCE 84-14 respecting transactions approved by independent qualified professional asset managers, PTCE 90-1 respecting insurance company pooled separate accounts, PTCE 91-38 respecting bank collective investment funds, PTCE 95- 60 respecting life insurance company general accounts and PTCE 96-23 respecting transactions determined by in-house asset managers.

The Managing Member will require a fiduciary of a Plan which proposes to invest in the Series to

C-36

represent that such fiduciary is aware of and understands the investment objectives, policies and strategies of the Series, and that the decision to invest in the Series was made with appropriate consideration of relevant investment factors with regard to the Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA and/or the Code.

2.    Plan Assets. Under ERISA and the regulations promulgated thereunder (the "Plan Asset Regulations"), when an ERISA Plan acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity unless it is established either that less than 25% of the total value of each class of equity interests in the entity is held by "benefit plan investors" as defined in Section 3(42) of ERISA (the "25% Test") or that the entity is an "operating company," as defined in the Plan Asset Regulations. For purposes of the 25% Test, the assets of an entity will not be treated as "plan assets" if, immediately after the most recent acquisition of any equity interests in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "benefit plan investors," excluding equity interests held by persons (other than benefit plan investors) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof. The term "benefit plan investors" is generally defined to include employee benefit plans subject to Part 4 of Title I of ERISA or Section 4975 of the Code (including "Keogh" plans and IRAs), as well as any entity whose underlying assets include plan assets by reason of a plan's investment in such entity (e.g., an entity of which 25% or more of the total value of any class of equity interests is held by benefit plan investors and which does not satisfy another exception under ERISA). Thus, absent satisfaction of another exception under ERISA, if 25% or more of the total value of any class of equity interests of the Series were held by benefit plan investors, an undivided interest in each of the underlying assets of the Series would be deemed to be "plan assets" of any ERISA Plan that invested in the Series.

3.    Plan Asset Consequences. If the assets of the Series were deemed to be "plan assets" under ERISA, this would result, among other things, in (i) the application of the prudence and other fiduciary responsibility standards of ERISA to investments made by the Series and (ii) the possibility that certain transactions in which the Series might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the Managing Member and/or any other fiduciary that has engaged in the prohibited transaction could be required to (i) restore to the ERISA Plan any profit realized on the transaction and (ii) reimburse the ERISA Plan for any losses suffered by the ERISA Plan as a result of the investment. In addition, each disqualified person (within the meaning of Section 4975 of the Code) involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. ERISA Plan fiduciaries who decide to invest in the Series could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Series or as co-fiduciaries for actions taken by or on behalf of the Series or the Managing Member. With respect to an IRA that invests in the Series, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, would cause the IRA to lose its tax-exempt status.

The Managing Member will use reasonable efforts to limit equity participation by benefit plan investors in the Series to less than 25% of the total value of each class of equity interests in the Series as described above so that the underlying assets of the Series should not constitute "plan assets" of any

ERISA Plan which invests in the Series. However, there can be no assurance that, notwithstanding the reasonable efforts of the Managing Member, the underlying assets of the Series will not otherwise be deemed to include ERISA plan assets.

Under the Operating Agreement, the Managing Member will have the power to take certain actions to avoid having the assets of the Series characterized as "plan assets," including, without limitation, the right to cause a Member that is a benefit plan investor to withdraw all or a part of its Interest from the Series. While the Managing Member and the Series do not expect that the Managing Member will need to exercise such power, neither the Managing Member nor the Series can give any assurance that such power will not be exercised.

4.      Reporting of Indirect Compensation. The descriptions contained herein of fees and compensation, including the amounts distributable to the Managing Member, are intended to satisfy the disclosure requirements for "eligible indirect compensation" for which the alternative reporting option on Schedule C of Form 5500 Annual Return/Report may be available.

5.      DOL Fiduciary Rule. On April 8, 2016, the DOL issued regulations (known as the "Fiduciary Rule") which significantly expanded the definition of "fiduciary" investment advice under ERISA, including certain interactions between investment fund sponsors and benefit plan investors. Although the Fiduciary Rule has been vacated and is no longer effective, it is possible that the DOL or other regulators, such as the U.S. Securities and Exchange Commission or state securities regulators, may adopt other fiduciary rules or similar laws or regulations that could affect the Managing Member and/or the Series. In this regard, the Managing Member may at any time restrict or condition investments in the Series in order to avoid acting as a fiduciary to any benefit plan investor.

* * * * *

The foregoing discussion is general in nature and is not intended to be all-inclusive. Each Plan fiduciary should consult with his, her, or its legal advisor concerning the considerations discussed above before making an investment in the Series. As indicated above, Similar Laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their advisors, should consider the impact of their respective laws and regulations on an investment in the Series and the considerations discussed above, if applicable.

Acceptance of subscriptions on behalf of a benefit plan investor or other plan is in no respect a representation by the Managing Member, the Series or any other party related to the Managing Member or the Series that this investment meets the relevant legal requirements with respect to investments by any particular benefit plan investor or plan or that this investment is appropriate for any particular benefit plan investor or plan.

PROFESSIONAL EYES ONLY

## EXHIBIT D

**FORM W-9**
**REQUEST FOR TAXPAYER IDENTIFICATION NUMBER AND CERTIFICATION**

For U.S. persons. See attached.

PROFESSIONAL EYES ONLY

D-1

PROFESSIONAL EYES ONLY

Membership Interests

---------------------------------

SUBSCRIPTION AGREEMENT

PROFESSIONAL EYES ONLY

PROFESSIONAL EYES ONLY

## SUBSCRIPTION AGREEMENT INSTRUCTIONS

1.      This Subscription Agreement contains the following sections, which must be read and agreed to if you wish to invest in the membership interests (the "**Interests**") of Linqto Liquidshares LLC –       (the "**Series**") in accordance with the provisions of the Amended and Restated Limited Liability Company Operating Agreement between Linqto Liquidshares LLC ("The **Company**") and Linqto Liquidshares Manager LLC ("the **Managing Member**") for the Series (the "**Operating Agreement**"):

2.      Prospective investors must agree to all relevant sections of this Subscription Agreement. Failure to do so may result in a delay of acceptance of a prospective investor's subscription until a properly completed Subscription Booklet has been received, processed, and approved.

3.      If you have any questions regarding any of the above (including agreement with any of this Subscription Agreement and exhibits), please contact Linqto Liquidshares Manager LLC.

4.      In the event of conflict between the provisions of this Subscription Agreement, the provisions of the Operating Agreement and the provisions of any other documents evidencing the Company, the provisions of the Operating Agreement shall prevail.

5.      Once you have completed your subscription as set out above, and then once accepted by the Company, you will automatically become the holder of an Interest in the Company and will thereupon be designated as a Member in the books and records of the Company.

PROFESSIONAL EYES ONLY

**LINQTO LIQUIDSHARES LLC**

**SUBSCRIBER IDENTIFICATION STATEMENT**

(1)    **Subscription Date:**

(2)    **Total Subscription Amount (USD):**

(3)    **Name(s) in which the Interest is to be registered:**

(4)    **Account Designation (if entity not individual subscriber):**

(5)    **Contact person (if Entity not individual subscriber):**

(6)    **Address of registered owner(s):**

(7)    **Date of birth of registered owner(s) (if individual(s)):**

(8)    **Mailing address to be used when furnishing reports or tax information:**

(9)    **E-mail address:**

(10)    **Contact Telephone Number:**

2

PROFESSIONAL EYES ONLY

**(11)  Indicate type of Subscriber (and any applicable sub-category):**

    (a)  Individual

☐  (b)  Joint Tenants

☐  (c)  Tenants in Common

☐  (d)  Trust

☐  (e)  Partnership or limited liability Company

☐  (f)  Corporation

☐  (g)  Employee Benefit Plan

      ☐  Corporate pension plan

      ☐  Governmental plan

      ☐  Non-U.S. plan

      ☐  Church plan

      ☐  Insurance account

☐  (h)  Individual retirement account (IRA) or individual retirement annuity,

☐  (i)  Keogh plan or similar plan. If "Yes", indicate the type of plan and the plan sponsor:

☐  (j)  Non-profit corporation, endowment or Foundation

☐  (k)  Other (describe):

**(12)  If Subscriber checked either a, b, c, d, or h in Item (11) above, provide the birth dates of any natural person beneficial owner(s):**

**(13)  Taxpayer identification number(s) or social security number(s):**

**(14)  Contact for additional information**

Name:

Telephone:

The Subscriber represents that the following individual or individuals are authorized to act on behalf of the Subscriber to give and receive instructions between the Series (or its representatives) and the Subscriber.  Such individuals are the only persons so authorized until further written notice, signed by one or more of such individuals, sent to the Managing Member.

PROFESSIONAL EYES ONLY

**Entity Name**

**Name**                                         **Specimen Signature**


The Subscriber agrees that all or any funds payable to the Subscriber (including distribution proceeds) may be deposited to the Subscriber's designated bank account.

4

PROFESSIONAL EYES ONLY

## LINQTO LIQUIDSHARES LLC

## SUBSCRIBER QUESTIONNAIRE

## (CONFIDENTIAL)

**(A)    General**

*Please initial one of the two lines below and complete the blanks:*

(1)    If the Subscriber is an individual or beneficial ownership of the Subscriber is held by an individual (for example, an Individual Retirement Account or Keogh Plan), such individual is of legal age and is a resident of:

(Initial)

Has the Subscriber ever invested in private equity funds, hedge funds, investment partnerships or other investment funds, venture capital funds, arbitrage transactions, real estate syndications, research and development companies, equipment leasing programs, oil and gas drilling programs, or other non-marketable or restricted securities?

Yes    ☒    No    ☐

Indicate the frequency of the Subscriber's investments in non-marketable securities:

(*check appropriate answer*)

Often    ☒    Occasional    ☐    Seldom    ☐

Name(s) of individual(s) making the investment decision on behalf of the Subscriber:

OR

(2)    If the Subscriber is an employee benefit plan, an endowment, a foundation, a corporation, a partnership, a trust or other legal entity, it is:

(Initial)

- organized under the laws of:

- and has its principal place of business in:

5

PROFESSIONAL EYES ONLY

Joe Endoso and Chris Frasier ("Registered Agents") are principals of Linqto, Inc. ("Linqto") and registered agents of Rainmaker Securities, LLC a FINRA and SIPC member broker-dealer ("RMS"). RMS and Linqto have entered into that certain Broker-Dealer Agreement dated on or about November 9, 2020, in which RMS agreed to register and supervise the brokerage activities of the Registered Agents in consideration for a Supervisory Fee. The Supervisory Fee for each Linqto securities transaction is equal to the product of 2.5% multiplied by the transaction value for the respective transaction. This fee is paid by Linqto Liquidshares LLC and is included in Subscriber's per unit cost.

Subscriber has entered into this Agreement in Subscriber's sole discretion, and not as a result of any influence, advice, call to action, or recommendation made by Linqto, RMS, or their respective representatives.

Does such person have sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks associated with investing in the Series?

Yes ☒     No ☐

**(B)     Confirmation of Subscriber Status as an Accredited Investor**

*Please initial one or more of the boxes below that describe the Subscriber:*

☐
(Initial)        The undersigned is a natural person whose individual net worth (or combined net worth with the undersigned's spouse if the undersigned is married) as of the date hereof exceeds One Million Dollars ($1,000,000).[1]

☐
(Initial)        The undersigned is a natural person who had an individual "income" exceeding Two

---

[1] For the purposes of this document, in calculating a person's net worth, (i) a person's primary residence shall not be included as an asset; (ii) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of Interests, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of the sale of Interests exceeds the amount outstanding sixty (60) days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (iii) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of Interests shall be included as a liability.

PROFESSIONAL EYES ONLY

Hundred Thousand Dollars ($200,000) during both of the two (2) most recently completed calendar years (or a joint income with the undersigned's spouse in excess of Three Hundred Thousand Dollars ($300,000) in each of those years) and who has a reasonable expectation of reaching the same income level in the current calendar year.[2]

(Initial) The undersigned is a director, executive officer, or Managing Member of the Series.

(Initial) The undersigned is a "business development company," as defined in Section 2(a)(48) of the USA Investment Company Act.

(Initial) The undersigned is a trust with total assets in excess of Five Million Dollars ($5,000,000) that was not formed for the specific purpose of acquiring the securities offered hereby, and the investment decisions for which are made by a sophisticated person capable of evaluating the merits and risks of the proposed investment.

(Initial) The undersigned is a revocable trust that may be amended or revoked at any time by the grantors thereof, and all of the grantors are accredited investors.

(Initial) The undersigned is a Small Business Investment Company licensed by the United States Small Business Administration under Section 301(c) or Section 301(d) of the Small Business Investment Act of 1958.

(Initial) The undersigned is a "private business development company" as defined in Section 202(a)(22) of the USA Investment Advisers Act (the "Advisers Act").

(Initial) The undersigned is a non-profit organization of the type described in section 501(c)(3) of the Code, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of Five Million Dollars ($5,000,000).

---

[2] For purposes of this document, the term "income" shall mean adjusted gross income reported or to be reported on a federal income tax return, increased by (i) any deductions for long-term capital gains; (ii) any deductions for depletion (pursuant to section 611 et seq. of the Code); (iii) any exclusions of interest (pursuant to section 103 of the Code); (iv) any losses of a partnership allocated to the undersigned as an individual limited partner (as reported on Schedule E of Form 1040); (v) amounts contributed to an Individual Retirement Account or Keogh retirement plan; (vi) alimony paid; and (vii) elective contributions to a cash or deferred arrangement under section 401(k) of the Code.

PROFESSIONAL EYES ONLY

<table>
<tr><td>☐<br>(Initial)</td><td>The undersigned is an "employee benefit plan" (within the meaning of Title I of ERISA) and either: (i) the decision to invest in the Series was made by a plan fiduciary that is a bank, savings and loan association, insurance company, or registered investment adviser; (ii) the plan has total assets exceeding Five Million Dollars ($5,000,000); or (iii) if a self-directed plan, investment decisions are made solely by persons who, if executing this document, would be able to initial one or more of the boxes above.</td></tr>
<tr><td>☐<br>(Initial)</td><td>The undersigned is a plan established and maintained by a State, its political subdivisions, or an agency or instrumentality of a State or its political subdivisions, for the benefit of its employees, and such plan has assets in excess of Five Million Dollars ($5,000,000).</td></tr>
<tr><td>☐<br>(Initial)</td><td>The undersigned is an entity, and each of the undersigned's equity investors, if executing this document, would be able to initial one or more of the boxes above.</td></tr>
</table>

\*     \*     \*     \*     \*     \*     \*

**[Signature page follows]**

8

## SIGNATURE PAGE

By its signature below, the undersigned hereby agrees that effective as of the date of its admission to the Series as a Member thereof, it shall become a party to and be bound by each and every term and provision of the Operating Agreement, as the same may be amended from time to time.

### *If an individual:*

By:

Name:

Date:

### *If an Entity:*

### *Name of Entity:*

By:

Name:

Title:

Date:

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**ACCEPTED ON BEHALF OF:**

**LINQTO LIQUIDSHARES LLC**

By:   **Linqto LIQUIDSHARES MANAGER LLC**, its Managing Member

| | |
|---|---|
| | *William Sarris* |
| Name: | **William Sarris** |
| Title: | **CEO** |
| Date: | |

[SIGNATURE PAGE TO SUBSCRIPTION BOOKLET]

PROFESSIONAL EYES ONLY

## EXHIBIT A

**FORM W-9**

**REQUEST FOR TAXPAYER IDENTIFICATION NUMBER AND CERTIFICATION**

For U.S. persons.  See attached.

PROFESSIONAL EYES ONLY

A-1

PROFESSIONAL EYES ONLY

**Form W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

**6** City, state, and ZIP code

**7** List account number(s) here (optional)

*Print or type.*
*See Specific Instructions on page 3.*

### Part I — Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

__ __ __ – __ __ – __ __ __ __

or

**Employer identification number**

__ __ – __ __ __ __ __ __ __

### Part II — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**
Signature of U.S. person ▶
Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)