UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X

A.O.H. DRIEDIJK HOLDING B.V. and JAIMIN BHATT,
Individually and on Behalf of All Others Similarly Situated,

                Plaintiffs,

           – against –

WILLIAM SARRIS, JOSEPH A. ENDOSO, DAVID PAUL,
BRIAN MORAN, KARIM NURANI, MARGARET
SLEMMER, VICTOR JIANG, ALISON DAVIS, NORMAN
REED, ADAM T. HENDERSON, and RAINMAKER
SECURITIES, LLC,

                Defendants.

------------------------------------------------------------------------------X

Case No. 1:25-cv-5643
(LAK) (BCM)

## MEMORANDUM OF LAW IN SUPPORT OF THE MOVING DEFENDANTS' CONSOLIDATED MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

| | |
|---|---|
| TREANOR DEVLIN BROWN PLLC<br>Timothy J. Treanor<br>Arlo Devlin-Brown<br>John J. Lavelle<br>230 Park Avenue, Suite 450<br>New York, NY 10169<br>*Counsel for Defendant William Sarris* | PIERSON FERDINAND LLP<br>Aurora Cassirer<br>Alicia N. Washington<br>1270 Avenue of the Americas<br>7th Floor – 1050<br>New York, NY 10020<br>*Counsel for Defendant Joseph Endoso* |
| LAW OFFICE OF WILLIAM H. KIMBALL<br>William H. Kimball<br>803 Hearst Avenue<br>Berkeley, CA 94710<br>*Counsel for Defendant David Paul* | CHIESA SHAHINIAN & GIANTOMASI PC<br>Lee Vartan<br>11 Times Square, 34th Floor<br>New York, New York 10036<br>*Counsel for Defendant Brian Moran* |
| EHRLICH & CRAIG LLP<br>Alexander Setzepfandt<br>803 Hearst Avenue<br>Berkeley, California 94710<br>*Counsel for Defendant Karim Nurani* | KOPECKY SCHUMACHER ROSENBURG LLC<br>David Slovick<br>James L. Kopecky<br>120 N. LaSalle Street, Suite 200<br>Chicago, IL 60602<br>*Counsel for Defendant Rainmaker Securities, LLC* |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 5

    A.    Linqto, the Platform, and the Series Structure ...................................................... 5

    B.    The Defendants ..................................................................................................... 6

    C.    The Transaction Documents ................................................................................. 7

    D.    The Alleged Misconduct ....................................................................................... 8

    E.    New Management's Shutdown, the Bankruptcy, and the Injury Alleged ........................ 10

    F.    The Lead Plaintiffs, Procedural History, and the Seven Counts ..................................... 11

LEGAL STANDARD ............................................................................................................ 12

ARGUMENT ......................................................................................................................... 14

    I.    THE EXCHANGE ACT CLAIMS (COUNTS I–III) FAIL BECAUSE THE
        TRANSACTION DOCUMENTS AND THE FAC'S OWN ALLEGATIONS PLEAD
        NO ACTIONABLE MISSTATEMENT OR OMISSION ................................................. 14

        A.    The Alleged Ownership Theory Is Contradicted by the Investment Documents and
            the Public Record ................................................................................................ 15

        B.    The Deceptive Pricing Theory Fails on the Documents and the Pleadings .............. 17

        C.    The Liquidshares Operating Agreement Authorized the Ripple Tender Sale the FAC
            Calls Unauthorized .............................................................................................. 21

        D.    The Allegations About Non-Accredited Investors Do Not State a Claim ................ 21

        E.    The Marketing Statements Alleged Are Too Vague To Be Actionable, and the
            Ripple Scarcity Messages Caused No Harm ........................................................ 22

        F.    The Omission Claims Fail Because No Defendant Had a Duty to Disclose ............ 24

    II.    EVERY COUNT OF THE COMPLAINT FAILS BECAUSE THE FAC PLEADS
        COLLECTIVELY WHAT THE LAW REQUIRES IT TO PLEAD DEFENDANT BY
        DEFENDANT ........................................................................................................... 26

        A.    The Exchange Act Claims Fail Under the PSLRA and Rule 9(b) ............................ 26

            1.    No Challenged Statement Is Attributed to Any Defendant (Count II). ............ 26

            2.    Count I Fails to Allege any Individual Deceptive Act or Actionable Scheme. 29

            3.    No Individual Defendant's State of Mind Is Pleaded. ..................................... 32

            4.    Title Alone Does Not Plead Control (Count III). ........................................... 33

         B.    Each Remaining Count Suffers the Same Defect and Must Be Dismissed .............. 35

    III.    THE EXCHANGE ACT CLAIMS (COUNTS I-III) FAIL BECAUSE THE FAC FAILS
        TO PLEAD RELIANCE ............................................................................................. 35

    IV.    THE EXCHANGE ACT CLAIMS (COUNTS I-III) FAIL BECAUSE THE FAC DOES
        NOT PLEAD A STRONG INFERENCE OF *SCIENTER* ........................................... 38

        A.    The Pleading Standard ........................................................................................ 39

        B.    The FAC Pleads No Motive, and Its Own Allegations Cut the Other Way ............ 40

        C.    The FAC Does Not Plead Strong Circumstantial Evidence of *Scienter* ................ 41

V.  THE EXCHANGE ACT CLAIMS (COUNTS I–III) FAIL BECAUSE THE FAC DOES NOT PLEAD LOSS CAUSATION OR COGNIZABLE ECONOMIC LOSS ............... 45

    A.  An Allegedly Inflated Purchase Price Is Not Cognizable Economic Loss ............... 46

    B.  The FAC Itself Pleads That Intervening Decisions of New Management Caused Investors' Claimed Losses, Not the Alleged Fraud ................................................... 47

    C.  The Ripple Tender Sale Allegations Do Not Plead Loss Causation ........................ 49

VI.  THE REMAINING COUNTS FAIL ON THEIR OWN TERMS ................................... 50

    A.  The Rescission Claims (Count IV) Plead No Statutory Seller, and Almost All Are Time-Barred ........................................................................................................... 50

    B.  Count V Must Be Dismissed Because There Is No Private Right of Action Under the ICA ........................................................................................................................ 52

    C.  The State-Law Claims (Counts VI and VII) Fail ....................................................... 53

        1.  The Texas Securities Act Does Not Apply ......................................................... 53

        2.  California's Unfair Competition Law Does Not Apply .................................... 54

CONCLUSION ................................................................................................................................ 55

# TABLE OF AUTHORITIES

**Cases**                                                                                                        **Page(s)**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292 (S.D.N.Y. 2009)..................... 29

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ......................................... 38

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022).................. 41

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 12, 35

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ................................. passim

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019)............................................... 52

*Barnes v. SWS Fin. Servs., Inc.*, 97 S.W.3d 759 (Tex. App.—Dallas 2003, no pet.) ................... 54

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)........................................................................... 24, 37

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................................................... 12

*Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007)....................................................... 53

*Betz v. Trainer Wortham & Co.*, 829 F. Supp. 2d 860 (N.D. Cal. 2011)....................................... 55

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) .................................................... 50

*Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469 (S.D.N.Y. 2021).............................................. 32

*Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777 (2004) ........................................................ 54

*Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212
    (2d Cir. 2010) ....................................................................................................................... 16, 43

*Capri v. Murphy*, 856 F.2d 473 (2d Cir. 1988)............................................................................. 52

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)....................................................... 16

*Chiarella v. United States*, 445 U.S. 222 (1980).......................................................................... 24

*Citizens Ins. Co. v. Daccach*, 217 S.W.3d 430 (Tex. 2007) ......................................................... 53

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008)................... 42

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ...... 24

*Collingwood USA, Inc. v. Morgan Stanley & Co., LLC*, No. 05-24-00629-CV, 2026 WL 978579
    (Tex. App.—Dallas Apr. 10, 2026, no pet. h.) (mem. op.)................................................. 53

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)............................................ 13

*Cress v. Nexo Fin. LLC*, No. 23-cv-00882-TSH (N.D. Cal. Oct. 10, 2023) ................................. 54

*Davis v. MSR Holdings, LLC*, No. 01-22-00451-CV, 2024 WL 3237623 (Tex. App.—Houston
    [1st Dist.] June 28, 2024, pet. denied) (mem. op.).............................................................. 54

*Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204 (S.D.N.Y. 2009) ....................... 28, 29

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198 (2d Cir. 1999) ............................... 25

*Diskin v. Lomasney & Co.*, 452 F.2d 871 (2d Cir. 1971) .............................................................. 51

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987)............................. 35

*Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228 (S.D.N.Y. 2012)..................................... 42

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ............................................................... 45, 46

*ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)
    ....................................................................................................................... 22, 39, 40, 41

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189 (2d Cir. 2003) ..... 36, 47

*Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952 (2002) ...................................................... 55

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ........................................................................ 39

*Evolution Fast Food One, LP v. HVFG, LLC*, 720 F. Supp. 3d 251 (S.D.N.Y. 2024)................. 55

*Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)........................................................................................................................................ 54

*Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) .................................................................................................. 43

*FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*, 608 U.S. ___, No. 24-345 (June 11, 2026)......................................................................................................................... 52

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ..................................................... 40

*Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992)................................................................. 24

*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184 (2d Cir. 1998) ................................................... 20

*Greenwald v. ORB Commc'ns & Mktg., Inc.*, 192 F. Supp. 2d 212 (S.D.N.Y. 2002)................... 47

*Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410 (2d Cir. 2009)..................................................... 25

*Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258 (2014)....................................................... 15

*Hou Liu v. Intercept Pharms., Inc.*, No. 17-cv-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020), *aff'd*, 2022 WL 2165621 (2d Cir. 2022)................................................ 13, 15, 32

*Hunt v. Alliance N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723 (2d Cir. 1998).............................. 17

*Hunter v. Navy Fed. Credit Union*, No. 3:24-cv-0788-D, 2024 WL 3094610 (N.D. Tex. June 20, 2024) ......................................................................................................................................... 25

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759 (2d Cir. 1991) ............... 17

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................. 29, 30, 34

*In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201 (S.D.N.Y. 2023).......................................... 44

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................ 28, 29, 32

*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009)............................. 32

*In re Lions Gate Entertainment Corp. Secs. Litig.*, 165 F. Supp. 3d 1 (S.D.N.Y. 2016) .............. 43

*In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506 (S.D.N.Y. 2024)................................... 40

*In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ......................................................................................................................................... 42

*In re New Energy Sys. Secs. Litig.*, 66 F. Supp. 3d 401 (S.D.N.Y. 2014) ............................... 46, 48

*In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888 (N.D. Cal. 2018) ................................. 55

*In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y. 2004).................................................. 40

*In re Nurture Baby Food Litig.*, No. 21-cv-01217 (MKV), 2025 WL 918927 (S.D.N.Y. Mar. 26, 2025) ......................................................................................................................................... 55

*In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681 (S.D.N.Y. 2008).............................................. 43

*In re Parmalat Secs. Litig.*, 383 F. Supp. 2d 616 (S.D.N.Y. 2005) ................................... 15, 20, 29

*In re Parmalat Secs. Litig.*, 479 F. Supp. 2d 332 (S.D.N.Y. 2007) ......................................... 28, 29

*In re PXRE Group, Ltd., Secs. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009).............................. 43

*In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152 (S.D.N.Y. 2012)........................ 34

*In re Turquoise Hill Resources Ltd. Secs. Litig.*, 625 F. Supp. 3d 164 (S.D.N.Y. 2022) .............. 29

*In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................... 43

*Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020) (per curiam) ...................................................... 33

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).............. 2, 26, 27, 28

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001).................................................................. 40

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003)................................ 55

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ................................................ 16

*Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444 (Tex. App.—Houston [1st Dist.] 2018, pet. denied)........................................................................................................................ 53

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ................................... 45, 48, 49

*Lau v. Opera Ltd.*, 527 F. Supp. 3d 537 (S.D.N.Y. 2021) .................................................. 43

*Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531 (2d Cir. 1997) .......................... 36

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ...................................... passim

*Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006) ......................................... 48, 49

*Lorenzo v. SEC*, 587 U.S. 71 (2019) ................................................................................. 26

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986)................................................................... 28

*Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440 (2005)............................................... 55

*Marlin v. Moody Nat'l Bank, N.A.*, No. H-04-4443, 2006 WL 2382325 (S.D. Tex. Aug. 16, 2006) ........................................................................................................................ 25

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016) ..... 24, 25, 29

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993)........................................... 35

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)........................................................... passim

*Oklahoma Firefighters Pension & Ret. Sys. v. Integral Ad Science Holding Corp.*, No. 25-cv-0847 (LAK), 2026 WL 575379 (S.D.N.Y. Mar. 2, 2026) ............................. 13, 16, 19, 21

*Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002)........................................... 53

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99 (2d Cir. 2019) ................................ 53

*Pinter v. Dahl*, 486 U.S. 622 (1988) .......................................................................... 51, 52

*Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021) ........................................................................................................................ 26, 31

*Police & Fire Retirement Sys. City of Detroit v. Argo Group Int'l Holdings, Ltd.*, No. 22-cv-8971 (LAK), 2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ............................................... passim

*Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999)................................... 20

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)............................................................. 15

*RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) ................................................................................................................ 43

*Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018) .......................................................................................................................... 32

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ......................................... 33

*SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022)........................................................ 29, 30

*Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204 (2d Cir. 2020)................................ 39

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) .................................... 39, 40

*Siegal v. Gamble*, 2016 WL 1085787 (N.D. Cal. Mar. 21, 2016)..................................... 54

*Slayton v. American Express Co.*, 604 F.3d 758 (2d Cir. 2010)........................................ 43

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ................................... 55

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401 (S.D.N.Y. 2014) .............................................................................................................. 44

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) .......................... 45

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015) .................................................. 24

*SUN, A Series of E Squared Inv. Fund, LLC v. Sundial Growers Inc.*, No. 20-cv-3579 (ALC), 2021 WL 4482276 (S.D.N.Y. Sept. 30, 2021) ................................................................ 40

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190 (2d Cir. 2008) ................................................................................................................................... 33, 44

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).............................. 3, 15, 39, 44

*UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695 (9th Cir. 2018) .................................. 53

*Underwood v. Coinbase Global, Inc.*, 654 F. Supp. 3d 224 (S.D.N.Y. 2023), *rev'd in part on other grounds sub nom. Oberlander v. Coinbase Global Inc.*, No. 23-184-cv, 2024 WL 1478773 (2d Cir. Apr. 5, 2024) (summary order) ............................................................ 51

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008) ......................................................... 20, 25

*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017).............................................................. 38

*Wen v. NYC Regional Center, LLC*, 695 F. Supp. 3d 517 (S.D.N.Y. 2023).................................. 13

*Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024) ....................................................................... 51

*Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124 (2d Cir. 1989) ......................... 51

*Zakinov v. Ripple Labs, Inc.*, No. 18-cv-06753 (PJH), 2020 WL 922815 (N.D. Cal. Feb. 26, 2020) ........................................................................................................................... 54

**Statutes and Rules**                                                                        **Page(s)**

15 U.S.C. § 77m........................................................................................................................ 51

15 U.S.C. § 78u-4(b)(1) ........................................................................................................ 15, 26

15 U.S.C. § 78u-4(b)(2)(A).................................................................................................. 32, 39, 44

15 U.S.C. § 78u-4(b)(4) ............................................................................................................ 45

17 C.F.R. § 240.12b-2 ................................................................................................................ 33

Act of May 21, 2019, 86th Leg., R.S., ch. 491 (H.B. 4171)........................................................ 53

Cal. Bus. & Prof. Code § 17200 ................................................................................................ 54

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 12

Fed. R. Civ. P. 23(b)(3) .............................................................................................................. 38

Fed. R. Civ. P. 9(b) .............................................................................................................. passim

Investment Company Act of 1940 § 47(b).................................................................................. 52

Investment Company Act of 1940 § 7(a).................................................................... 12, 35, 52, 53

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ............................................................................... passim

Securities Act of 1933 § 12(a)(1)....................................................................................... 12, 50, 51

Securities Act of 1933 §§ 5(a), 5(c).................................................................................. 12, 35, 50

Securities Act Release No. 4552, 27 Fed. Reg. 11316 (Nov. 6, 1962) ........................................ 51

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b)................................................. passim

Securities Exchange Act of 1934 § 20(a), 15 U.S.C. § 78t(a) ................................................ 12, 33

Tex. Gov't Code § 4008.051 ................................................................................................. 53, 54

Tex. Gov't Code § 4008.052(a) ............................................................................................ 53, 54
Tex. Gov't Code § 4008.055(a) ............................................................................................ 53, 54
Tex. Rev. Civ. Stat. art. 581-33 ................................................................................................. 53

**PRELIMINARY STATEMENT**

This First Amended Complaint ("FAC")[1] was filed by two investors whose holdings in special-purpose vehicles ("Series") of Linqto Liquidshares LLC ("Liquidshares") are tied up in the bankruptcy of Linqto, Inc. ("Linqto" or the "Company") and its affiliates due to the actions of the Company's current management, not actions of the defendants who bring this motion to dismiss (the "Moving Defendants").[2] For five years, Linqto's online investment platform offered accredited investors something that is difficult to access: exposure in small denominations to pre-public offering, sought-after, privately held companies like Ripple, Coinbase, and Robinhood. (*See* FAC ¶¶ 4, 39, 83.) To secure these investments, investors like the plaintiffs signed subscription agreements to obtain membership interests ("Interests") in Series that held shares of the private companies; they agreed to be bound by the terms and conditions of the Liquidshares operating agreement; they agreed the investments were speculative and illiquid; and they held their positions as the underlying assets appreciated, some often greatly. (*Id.* ¶¶ 7, 57–58, 127; Decl. Ex. B, App. B ¶¶ 4(g), 7-8; Decl. Ex. H.)  Then, in early 2025, weeks after founder William Sarris stepped down from his position as CEO, Linqto's new management froze customer accounts, shut the platform down, and by July put Linqto into Chapter 11, where its new stewards have kept investors from their holdings ever since. (*See* FAC ¶¶ 111, 114–15, 118.)

Based on the FAC's own allegations, these were the acts of identified non-parties. (*See id.* ¶¶ 12, 114–15.) Yet plaintiffs have sued the former CEO, four former officers, five outside

---

[1] Citations to "Decl. Ex. __" are to the exhibits to the accompanying Declaration of Timothy J. Treanor, dated July 30, 2026, submitted with this motion. Citations to "ECF No. __" are to filings in this action. Citations to "Bk. Dkt. __" are to filings in the Linqto Chapter 11 proceeding, *In re Linqto Texas, LLC, et al.*, No. 25-90186 (Bankr. S.D. Tex.) An exhibit that is also a filing of record is cited by both its exhibit designation and docket number (e.g., Decl. Ex. E (ECF No. 23-2) (Principal Loss Analysis)).

[2] The "Moving Defendants" on this consolidated motion are William Sarris, Joseph Endoso, David Paul, Brian Moran, Karim Nurani and Rainmaker Securities, LLC ("Rainmaker").

directors, and a one-time supervising broker-dealer for securities fraud. They have done so because investors cannot reach what they bought from a company none of the Moving Defendants has since had a role in running. However styled, each of the FAC's seven counts fails on settled law—most in multiple ways. The fraud claims that are at the FAC's core suffer from five fatal defects, each of which is addressed in Points I through V:

First, the FAC's central theories rest on misrepresentation and concealment—that investors were not told they were acquiring units in a Series rather than shares of the underlying companies, and that the price they paid included a markup. (*Id.* ¶¶ 78–90.) But the documents each investor received and signed, and Liquidshares' public filings with the SEC, disclosed exactly those facts. Point I describes these documents and their terms, and where they contradict the FAC's characterizations, the documents control on this motion to dismiss.

Second, the FAC pleads against the eleven defendants as an undifferentiated group, and in doing so states a claim against none of them. The securities laws assign liability to identified speakers, sellers, and actors, yet every potentially actionable statement—about ownership, price, fees, and marketing—is attributed either to Linqto itself or to "Defendants" collectively, never to the person who made it, as required by the Supreme Court in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S. Ct. 2296, 2302 (2011). Point II demonstrates that this mode of pleading fails as to every count.

Third, the FAC pleads no reliance, actual or presumed. The plaintiffs do not plead actual reliance: neither identifies a single statement he saw, read, or considered before purchasing, and both are self-described sophisticated investors who represented in writing that they invested on their own analysis. (Decl. Ex. B, App. B ¶¶ 4(g).)  And no presumption of class-wide reliance is available: the Series interests never traded in an efficient market—Linqto set every price

2

unilaterally on its own platform—and the complaint rests on affirmative misstatements, not omissions. (*Id.* ¶ 59.)  Point III addresses these failures.

Fourth, the FAC pleads no strong inference that any defendant acted with the requisite fraudulent intent, and its own narrative supplies the more compelling, nonculpable explanation that the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 127 S. Ct. 2499, 2508 (2007), requires this Court to weigh. It alleges no insider sales and no personal profit tied to any misstatement, only the ordinary incentives of employment and corporate growth that the law deems insufficient. And the supposed architect of the fraud is never alleged to have sold any shares while the portfolio appreciated; he stepped down, and it was new management that then froze accounts, shut the platform down, and filed for Chapter 11. (*See id.* ¶¶ 111, 114–15, 118.) Point IV addresses the failure to plead *scienter*.

Fifth, on the FAC's own allegations, no one lost money because of the alleged fraud. The only loss actually pleaded is overpayment at the moment of purchase—a theory the Supreme Court and the Second Circuit have rejected for two decades. The FAC identifies no moment at which any Interest declined in value; it alleges instead that Ripple, the company underlying the largest share of the named plaintiffs' purchases, had increased in value to roughly $40 billion months after the class period ended, and plaintiffs' own loss chart records every unit they bought as still held. (*Id.* ¶ 127; Decl. Ex. E (ECF No. 23-2).) Plaintiffs' inability to reach investments that still exist, and have only grown in value, is a grievance against the new management that froze accounts and filed for bankruptcy, not a securities-fraud loss caused by defendants. Point V develops these defects.

Finally, as Point VI shows, the remaining counts invoke statutes that give the plaintiffs no claim. The Securities Act rescission claim (Count IV) is time-barred as to every purchase plaintiff A.O.H. Driedijk Holding B.V. made, and some that were made by plaintiff Jaimin Bhatt, and no

3

Individual Defendant was a statutory seller who passed title to, or solicited, either plaintiff. The Investment Company Act claim (Count V) fails at the threshold: the Supreme Court held just weeks ago that the Act gives private plaintiffs no right of action of the kind asserted here. The Texas Securities Act claim (Count VI) pleads no Texas connection to either plaintiff's purchases and no privity with any defendant. And California's unfair-competition statute (Count VII) does not apply to securities transactions at all.

The FAC, in short, misidentifies its defendants, misstates its injury, and misapplies its cited statutes. Its theory belongs, if anywhere, in the disputes now being administered in Linqto's Chapter 11—where the assets sit, where those responsible for the freeze and shutdown remain in control of the Company, and where the confirmed plan provides for each investor's investment to be converted into interests in investment vehicles through which its value is to be distributed or returned. *See* Bk. Dkt. 1522 (First Amended Joint Chapter 11 Plan), Arts. III-IV; Bk. Dkt. 1598 (Confirmation Order). In fact, both named plaintiffs have filed proofs of claim to recover their investments in the bankruptcy, and plaintiffs' counsel also has filed proofs of claim on behalf of the purported class. (Decl. Ex. D; Bk. Dkt. Claims Nos. 14822, 14825, 14830, 14831.)  The Court should dismiss the FAC in its entirety as to the Moving Defendants, with prejudice, since plaintiffs have amended once already and no further pleading can change the documents they signed, the appreciation on most of their investments as the own filings concede, or the law that forecloses claims under the statutes they invoke.

**STATEMENT OF FACTS**

The facts outlined below are drawn from the allegations of the FAC, without conceding their accuracy, except as otherwise indicated.[3]

**A.      Linqto, the Platform, and the Series Structure**

Linqto, Inc. was founded in 2010, and by 2020, had evolved into a financial technology and digital trading platform. (FAC ¶¶ 2, 33–34.) From February 2020 through March 14, 2025, Linqto operated an online Platform that marketed to accredited investors the ability to identify, evaluate, and invest in "the world's leading unicorns and private companies," including Ripple, Coinbase, and Robinhood. (*Id.* ¶¶ 1, 4, 38–39, 83.) Linqto differentiated itself by removing barriers to private-market investing: while competitors required minimums around $100,000 and charged layers of fees plus a carried interest, Linqto offered a "zero-fee investment management platform" with minimums that, over time, fell from $10,000 to $1,000. (*Id.* ¶¶ 3-4, 37, 40–41.)

Investors on the Platform did not receive shares of Ripple, Coinbase, or any other portfolio company. (*Id.* ¶¶ 7, 57.) Rather, Linqto acquired shares of the private companies (the "Private Securities") and transferred them to Liquidshares, a Delaware series limited liability company created by Linqto. (*Id.* ¶ 57.) Linqto organized Liquidshares into individual "Series," which are special-purpose vehicles, each holding the Private Securities associated with it. (*Id.* ¶¶ 7, 57–58.) Investors who purchased membership interests in a particular Series acquired "indirect economic interests in those shares: 'units' held and managed by Linqto." (Id. ¶ 58.) The FAC describes market for those interests apart from Linqto itself: "Linqto handled every aspect of the market from beginning to end: from purchasing the Private Securities, to transforming them into Series

---

[3] This Statement of Facts relies on documents incorporated by reference in, or integral to, the FAC, and on public records subject to judicial notice—each of which may be considered on a motion to dismiss without converting it into one for summary judgment. The governing standards and authorities are set out in the Legal Standard section below.

interests, and to selling those interests," such that the Platform's design "allowed Linqto to operate as the ultimate market-maker." (*Id.* ¶ 59.) The putative class consists of "all persons and entities" that "purchased Series membership interests in one or more Series" of Liquidshares from February 1, 2020 toMarch 14, 2025—an estimated 13,000 to 14,000 members. (*Id.* ¶¶ 1, 151–52.)

## B.    The Defendants

The FAC names ten "Individual Defendants" and one broker-dealer defendant (*id.* ¶¶ 20-30), but does not sue Linqto itself, which has been in Chapter 11 proceedings since July 2025 (*id.* ¶¶ 13, 118). William Sarris founded Linqto and allegedly served as its CEO and Executive Chairman from 2010 until January 2, 2025, and as a member of its board of directors. (*Id.* ¶ 20.) Four other officers are named: Joseph Endoso, who allegedly held a series of senior positions, including CEO, CFO, CRO, COO, and President, between 2019 and January 2025; David Paul, the Chief Financial & Administrative Officer of Liquidshares, who signed the Form D filings evidencing the Series offerings; Brian Moran, Linqto's Chief Compliance Officer from November 2021 to December 2024; and Karim Nurani, the Chief Strategy Officer from 2020 to March 2025. (*Id.* ¶¶ 21–24.)

Five outside directors are named and identified by board tenure: Margaret Slemmer (October 2020–February 2025), Victor Jiang (October 2022–May 2025), Alison Davis (April 2024–January 2025), Norman Reed (since October 2023), and Adam Henderson (since 2022). (*Id.* ¶¶ 25–29.) No individualized conduct is pleaded as to any of those five. The eleventh defendant, Rainmaker Securities, LLC, is a FINRA-registered broker-dealer alleged to have provided "supervisory" services to Linqto for a fee. (*Id.* ¶ 30.) The allegations against the Individual Defendants arise from their positions: "Due to [their] high-level positions at the Company," all ten

6

are alleged to have "possessed the power and authority to control the contents" of Linqto's communications. (*Id.* ¶ 32.)

## C.     The Transaction Documents

Every purchase the FAC describes was made under a standard set of transaction documents that are before the Court as exhibits to the Declaration of Timothy J. Treanor. To make an investment, an investor executed a subscription agreement on the Linqto platform which provided that the investment was in "the membership interests (the 'Interests')" of a named Liquidshares Series and that the Interest was acquired "in accordance with the provisions of" the Liquidshares operating agreement (the "Operating Agreement"). (Decl. Ex. H (subscription agreements) at Instructions ¶ 1.) The Liquidshares Operating Agreement (quoted in the FAC at ¶ 88) defines an "Interest" as "a membership interest in the Company" (meaning Liquidshares), discloses the fees and expenses charged within the pricing structure, establishes the Managing Member's authority over Series assets, and reflects each subscriber's written acknowledgment that a Series investment is speculative, carries a risk of total loss, and is made on the subscriber's own analysis. (Decl. Ex. B (Amended and Restated Limited Liability Company Operating Agreement of Liquidshares, effective January 21, 2020) at App. A (definition of "Interest"), App. B Part 1 ¶ 4(g) (investor reps and warrants on assumption of risk).) Authority over Series assets is also addressed in Amendment No. 1 to the operating agreement, effective August 7, 2024, which defines the Managing Member's power to dispose of a Series' assets, including in connection with a third-party tender offer. (Decl. Ex. C (Amendment No. 1) at 1 (amending operating agreement §§ 2.2(b) and 2.4(b)).)

Each successful purchase also generated records confirming some of the same facts. When a purchase was completed, Liquidshares issued to the investor a membership certificate certifying that the holder "holds the number of units in the Series that represents the equivalent number of

7

shares" of the named underlying company, identified by the named Series. (Decl. Ex. D at 6-9 (A.O.H. Driedijk membership certifications). The order confirmation the investor received stated the same: "*You are purchasing the number of units in the Series that represents the equivalent number of shares identified above." (Decl. Ex. D at 11-18 (A.O.H. Driedijk order confirmations).)

The markup was disclosed publicly as well. Linqto's website FAQs as quoted in the FAC informed investors that Linqto "purchases shares in large quantities" and "then turn[s] around and sell[s] that equity in smaller quantities to many investors with a reasonable markup." (FAC ¶ 90; Decl. Ex. G (Linqto website FAQ) at 3 ("How does Linqto make money?").) The structure was likewise a matter of public record. For each Series the plaintiffs purchased, Liquidshares filed a Form D with the SEC. Each Form D identifies the issuer of the securities as Linqto Liquidshares LLC, a Delaware limited liability company, and describes what was offered as an interest in the named Series—a "Unit/LLC interest" in the earlier filings and "Pooled Investment Fund Interests" in the later ones—rather than shares of the underlying company. (Decl. Ex. F (SEC Form Ds).) The Form D filed for the Ripple Series 5 in April 2022, which plaintiff A.O.H invested in, also disclosed the markup, stating that "the SPV pays for services and capital by marking up the cost basis of stock it holds and selling its units against the marked up basis on a fully disclosed basis." (Decl. Ex. F (Ripple -5 Form D filed Apr. 11, 2022) at Item 16; *see also* Decl. Ex. E (ECF No. 23-1 at 4; ECF No. 23-2 at 2) (showing A.O.H. investment in Ripple – 5).)

## D.    The Alleged Misconduct

The FAC's core theory is that investors overpaid for their investments. The only price an investor saw was "the purchase price per share, also called the offering price," displayed on the Platform's ordering page. (FAC ¶ 60.) And that displayed price allegedly did not reveal what it bundled: Linqto's own acquisition cost for the underlying shares, the expenses of acquiring them,

fees paid to supervisory affiliates, interest owed to Linqto on amounts advanced, and a markup. (*Id.* ¶¶ 9, 61–62.) The markups, set "both manually and by algorithm," are generally alleged to have ranged from 20% to 60% of the purchase price and at times to have reached 150%. (*Id.* ¶¶ 9, 63–64.) All the while, the FAC alleges, Linqto marketed itself as a "zero-fee investment management platform," advertising "no added fees or hidden costs." (*Id.* ¶¶ 4, 40, 86.)

All of the challenged statements are alleged to have been published by Linqto itself on its website and smartphone application, in its press releases and 2023 press kit, on its FAQ page, and in mass emails, but they are connected to the Individual Defendants only by the collective allegation that they "had ultimate control over" those media. (*Id.* ¶¶ 73, 76, 86, 90, 92.) The challenged statements fall into three principal categories.[4]

The first category is ownership. The FAC quotes statements such as "Private Investing Made Simple. Linqto helps you identify, evaluate, and invest in the world's leading Unicorns," and points to application pages that displayed "Listings" of private companies and invited investors to "place order[s]" for "shares" at a displayed price per share. (*Id.* ¶¶ 5, 78–79, 82–83.) By these statements and displays, the FAC alleges, "[i]nvestors were led to believe that they held actual shares of these companies when all they were investing 'in' were Linqto Series vehicles holding privately held company shares." (*Id.* ¶¶ 81, 84.)

The second category is price. The FAC quotes the "Affordability" representations on Linqto's website—"Our private investments are offered at an affordable price," with "no added fees or hidden costs"—and alleges they were false because of the bundled components described

---

[4] A fourth set of statements—that the Platform was open only to accredited investors, e.g., that Linqto would "qualify accredited investors"—is allegedly false because Linqto replaced accreditation auditing with a "self-certify" checkbox and admitted non-accredited investors, who by spring 2024 were at least 30% of its users.  (FAC ¶¶ 45–51, 75-77.)

above. (*Id.* ¶¶ 86–89.) It also quotes the disclosure on the website's FAQ page that Linqto "purchases shares in large quantities" and resells them "with a reasonable markup." (*Id.* ¶ 90.)

The third category is marketing. The FAC challenges Linqto's scarcity and urgency messaging about Ripple: mass emails and messages claiming the Company was "out of inventory for Ripple" but would have more "tomorrow," and promoting an "exclusive trading window" with "limited quantities available." (*Id.* ¶¶ 69, 92.) The FAC alleges that this was misleading because Liquidshares in fact held "tens of thousands of additional Ripple shares." (*Id.* ¶¶ 69, 93.) The messaging accompanied concentrated single-day sales pushes focused on Ripple. (*Id.* ¶¶ 67–68.)

**E.    New Management's Shutdown, the Bankruptcy, and the Injury Alleged**

The FAC alleges that the events that cut investors off from their holdings were the acts of new management, months after Mr. Sarris stepped down as CEO of the Company. Dan Siciliano replaced Mr. Sarris in that role on January 2, 2025; Mr. Endoso was replaced the same month. (*Id.* ¶ 111.) On or around February 27, 2025, new management "froze client accounts and paused operations on the Platform." (*Id.* ¶ 114.) On March 13, 2025, having concluded that Linqto "could not continue to operate without risking the business, Investor funds, and further violating securities laws," new management "shut down the Platform and ceased all trading operations." (*Id.* ¶ 115.)

On July 7, 2025, Linqto filed for Chapter 11 protection in the United States Bankruptcy Court for the Southern District of Texas (*id.* ¶¶ 13, 118); the Bankruptcy Court confirmed a Chapter 11 plan for Linqto on February 13, 2026. (*See* Bk. Dkt. 1598 (order confirming restructuring plan), *In re Linqto Texas, LLC, et al.*, No. 25-90186 (Bankr. S.D. Tex. Feb. 13, 2026).) The confirmed plan provides for each investor's investment to be converted into interests in a new investment vehicle through which its value will be distributed. (Bk. Dkt. 1522 (First Amended Joint Chapter 11 Plan), Arts. III and IV, confirmed by Bk. Dkt. 1598 (confirmation

order)).  The FAC alleges that investors suffered economic loss by paying inflated prices for their Series interests at the time of purchase. (FAC ¶¶ 122–26.)  Investors have been unable to access their holdings since the March 2025 shutdown. (*Id.* ¶¶ 13, 121.)

**F.      The Lead Plaintiffs, Procedural History, and the Seven Counts**

Lead plaintiffs are A.O.H. Driedijk Holding B.V., a Netherlands holding company, and Jaimin Bhatt, a New Jersey resident who previously filed certifications in connection with their lead plaintiff designations. (*Id.* ¶ 19; Decl. Ex. E (ECF No. 23-1) (plaintiff certifications).) Those certifications and the accompanying loss analysis identify eleven relevant purchases: A.O.H. made four purchases across two Series in December 2022—Ripple Series 5 ($200,025) and Polysign Series 13 ($100,004), and Bhatt made seven purchases totaling $42,489 between August 10, 2023, and December 8, 2024, five identifying their Series and two identifying an issuer but no Series. (Decl. Ex. E (ECF Nos. 23-1) (plaintiff certifications), 23-2 (principal loss analysis).) A.O.H.'s December 2022 purchases are also documented in the order confirmations attached to its proof of claim filed in the Linqto bankruptcy. (Decl. Ex. D at 11-18 (A.O.H. Driedijk order confirmations).)

In their Joint Declaration, plaintiffs describe themselves as "sophisticated investors." (Decl. Ex. E (ECF No. 23-3) (Joint Declaration) ¶ 13.) Mr. Driedijk, director and sole owner of A.O.H., is "a sophisticated technology entrepreneur and accredited investor since 2005 with over 15 years of experience investing," who created a technology company in 2000 and sold it in 2010 for nearly €5 million. (*Id.* (Joint Declaration) ¶ 3.) Mr. Bhatt has "owned and operated a hospitality business for approximately twenty years," and has "more than 15 years of experience investing in the stock market." (*Id.* (Joint Dec ¶ 4.) The original complaint was filed on July 9, 2025, naming Mr. Sarris as the sole defendant. (ECF No. 1.) The current plaintiffs filed the FAC on November

17, 2025 following their appointment as lead plaintiffs, adding the ten additional defendants. (ECF No. 46.)

The FAC pleads seven claims for relief: "scheme" liability under § 10(b) of the Securities Exchange Act and Rule 10b-5(a) and (c) against all Defendants (Count I); misstatement liability under § 10(b) of the Securities Exchange Act and Rule 10b-5(b) against the Individual Defendants (Count II); control person liability under § 20(a) of the Securities Exchange Act against the Individual Defendants (Count III); unregistered securities liability under §§ 5(a) and 5(c) of the Securities Act, invoking the remedy of § 12(a)(1), against the Individual Defendants (Count IV); unregistered investment company liability under § 7(a) of the Investment Company Act against the Individual Defendants (Count V); seller liability under the Texas Securities Act against the Individual Defendants (Count VI); and unfair-competition liability under California's Unfair Competition Law against all Defendants (Count VII). (FAC ¶¶ 159–217.)

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). The Court must accept plaintiffs' well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Police & Fire Retirement Sys. City of Detroit v. Argo Group Int'l Holdings, Ltd.*, No. 22-cv-8971 (LAK), 2024 WL 5089970, at *4 (S.D.N.Y. Dec. 12, 2024).

12

In resolving the motion, the Court may also consider, among other things, "'any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.'" *Hou Liu v. Intercept Pharms., Inc., No. 17-cv-7371 (LAK)*, 2020 WL 1489831, at *4 (S.D.N.Y. Mar. 26, 2020) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)), *aff'd*, 2022 WL 2165621 (2d Cir. 2022). This includes documents "upon which the complaint 'relies heavily' for their 'terms and effect,' rendering them 'integral' to the complaint." *Oklahoma Firefighters Pension & Ret. Sys. v. Integral Ad Science Holding Corp., No. 25-cv-0847* (LAK), 2026 WL 575379, at *9 (S.D.N.Y. Mar. 2, 2026) (citation omitted). In private-placement cases such as this one, therefore, the Court may consider the offering materials, subscription agreements, operating agreements, and other transaction documents on which the claims depend. *See, e.g.*, *Wen v. NYC Regional Center, LLC*, 695 F. Supp. 3d 517, 533-35 (S.D.N.Y. 2023) (citation omitted). "Should an incorporated or integral document contradict an allegation in the complaint, the document would control."[5] *Oklahoma Firefighters*, 2026 WL 575379, at *9. "In such circumstances, '[i]nsofar as the complaint relies on the terms of [an] agreement, . . . [courts] need not accept [a plaintiff's] description of those terms, but may look to the agreement itself.'" *Wen*, 695 F. Supp. 3d at 535 (citation omitted).

---

[5] The Second Circuit has emphasized that, where a securities fraud plaintiff "chooses not to attach to the complaint or incorporate by reference" a document "upon which it solely relies and which is integral to the complaint," the defendant may introduce it "when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). Indeed, in many cases where a court considers integral documents on a motion to dismiss, "'the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason – usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim – was not attached to the complaint.'" *Wen*, 695 F. Supp. 3d at 533–35 (citation omitted).

13

**ARGUMENT**

**I.      THE EXCHANGE ACT CLAIMS (COUNTS I–III) FAIL BECAUSE THE TRANSACTION DOCUMENTS AND THE FAC'S OWN ALLEGATIONS PLEAD NO ACTIONABLE MISSTATEMENT OR OMISSION**

The plaintiffs' various fraud claims cannot survive the record on which they are built because, in every instance, the allegations either conflict with key transactional documents they rely upon, conflict with other allegations in the FAC, or are simply deficient. The central theories of the FAC are that investors were misled about what they were buying and about what they were paying for, but the documents each investor received and signed, and Liquidshares' own public filings, disclosed both. (FAC ¶¶ 78–85, 87.) The FAC's theory that Ripple shares were sold without authority collides with the operating agreement, which authorized the sale. (*Id.* ¶¶ 127–28.) Where the FAC does not allege concealment, its own allegations defeat it: the practices it says rendered Linqto's accreditation statements false are pleaded as beginning in 2023, years after the class period opened and after A.O.H. made every purchase at issue. (*Id.* ¶¶ 46, 48–49.) What remains of the additional fraud allegations is simply not actionable: general marketing statements no reasonable investor could rely upon, an accreditation theory that pleads no injury to these plaintiffs, scarcity messages pleaded without a sender, date, or recipient and without any resulting loss, and omissions that no Defendant had a duty to disclose. Whether measured under the misstatement provision or the scheme provisions of Rule 10b-5, and under the heightened pleading standards that govern both, the FAC identifies no actionable misstatement or omission.

To state a claim based on misstatements, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica*

14

*P. John Fund*, 573 U.S. 258, 267, 134 S. Ct. 2398, 2407 (2014) (internal citation omitted); *accord Intercept Pharms.*, 2020 WL 1489831, at *5. Under Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); *accord Argo*, 2024 WL 5089970, at *3. The PSLRA additionally requires that the complaint "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" as to each defendant. *Id.* § 78u-4(b)(2)(A); *see Tellabs*, 551 U.S. at 321, 127 S. Ct. at 2508. To the extent that a fraudulent scheme claim does not involve a false or misleading statement, Rule 9(b) still requires the complaint to state "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *In re Parmalat Secs. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005).

## A.    The Alleged Ownership Theory Is Contradicted by the Investment Documents and the Public Record

A central theory of fraud alleged by the plaintiffs in the FAC is that investors "were led to believe that they held actual shares" of the underlying companies—Ripple, Coinbase, and the like—rather than membership interests in Delaware series SPVs that provided only an indirect economic interest in the underlying companies. (FAC ¶¶ 78–85.) The investment documents that every investor received and signed and public filings refute the allegation on its face because they disclosed exactly those facts. These documents are properly before the Court because the FAC relies upon them or they are integral to its allegations, are filings in this action, or are public records subject to judicial notice. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.

15

2002); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 325–29, 336 (S.D.N.Y. 2009) (Kaplan, J.) (taking judicial notice of documents filed in bankruptcy court and dismissing securities fraud action).

The subscription agreement that each investor signed states, in its opening paragraphs, that the investment is in "the membership interests (the 'Interests')" of a named Liquidshares Series, and that on acceptance the subscriber "will automatically become the holder of an Interest in [Liquidshares] and will thereupon be designated as a Member in the books and records of [Liquidshares]." (Decl. Ex. H (subscription agreements) Instructions ¶¶ 1, 5.) The operating agreement, which the subscription agreement incorporates, defines an "Interest" as "a membership interest in [Liquidshares]" and identifies Liquidshares as a "series limited liability company" in which the applicable Series, and not the investor, holds the underlying investments. (Decl. Ex. B (operating agreement) §§ 1.4(a), 1.5(c), App. A (definitions).)[6] These core transactional documents are integral to the plaintiffs' theory because they create the Series membership interests that the FAC uses to define the putative class.  (FAC ¶¶ 1, 151.) They clearly identify the investment as an indirect economic interest through an investment vehicle, not shares in an underlying private company itself. Where a document properly before the Court contradicts the complaint's characterization of it, the document governs. *See Oklahoma Firefighters*, 2026 WL 575379, at *9.

The true nature of the Series investment was reiterated in the membership certificates and order confirmations each investor received upon making an investment, which say the same thing as the subscription agreements and the operating agreement. The membership certificates identify

---

[6] The subscription agreement also provides that "the provisions of the Operating Agreement shall prevail." (Decl. Ex. H (subscription agreements) Instructions ¶ 4.) Thus, to the extent that any other company document conflicts with the operating agreement, the operating agreement controls.

Liquidshares as the issuer "of the discreet Series identified above" and identify the specific Series invested in; for example, "Linqto Liquidshares LLC - Ripple - 5." (Decl. Ex. D at 6-9 (A.O.H. Driedijk membership certificates).) The membership certificates also certify "that the member named above is a member of [Liquidshares] and holds the number of units in the Series that represents the equivalent number of shares identified above in the [underlying company]," and that the member "is entitled to the full benefits of membership of Linqto Liquidshares LLC, subject to the membership duties and obligations set forth in the Linqto Liquidshares LLC Operating Agreement." (*Id.*) Further, the order confirmations received by investors stated: "*You are purchasing the number of units in the Series that represents the equivalent number of shares identified above." (Decl. Ex. D at 11-18 (A.O.H. Driedijk order confirmations).)

The public record further confirms these facts. For each Series the plaintiffs purchased, Liquidshares filed a Form D with the SEC identifying the issuer of the securities as Linqto Liquidshares LLC and describing what was being offered as an interest in the named Series—a "Unit/LLC interest" in the earlier filings and "Pooled Investment Fund Interests" in the later ones—not shares of the underlying company. (Decl. Ex. F (SEC Form Ds).)  A statement cannot have misled an investor about what he was buying when the documents he signed—and the public record that predated his purchase—disclosed that he was acquiring an interest in an investment vehicle, not the underlying shares. *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762-63 (2d Cir. 1991) (prospectus disclosures); *Hunt v. Alliance N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728–29 (2d Cir. 1998) (same).

### B.    The Deceptive Pricing Theory Fails on the Documents and the Pleadings

The plaintiffs' deceptive pricing theory is similarly refuted by the very documents on which it rests because they disclose the allegedly concealed pricing approach. The FAC's theory is that

17

Linqto's "zero-fee" marketing led investors to believe the price they paid was simply the price of the underlying security, with no markup or added cost. (FAC ¶ 87.) But the very answer to an FAQ that the FAC describes as materially false and misleading disclosed the markup. Where the FAQ asked, "Are there fees to invest?" Linqto answered: "No! Linqto sources deals and marks them up so that there are no further follow on fees for the investor whatsoever. . . . [W]e, at Linqto, are proud to offer a zero-fee investment management platform. Linqto has no continuing management fees/expenses, no brokerage fees, no carried interest, nothing." (FAC ¶ 86; Decl. Ex. G at 4.) That answer disclosed precisely what the FAC says was hidden: that Linqto marks up the shares it purchases, and that "zero-fee" meant only that no separate fee would be added on top of the cost of the investment, not that the price equaled Linqto's own cost. That clearly contradicts the FAC's premise that "no added fees" meant the price "solely reflected Linqto's acquisition price." (FAC ¶ 89.) A second FAQ answer provided the same information, telling investors that Linqto "purchases shares in large quantities" and then "turn[s] around and sell[s] that equity in smaller quantities to many investors with a reasonable markup." (*Id.* ¶ 90; Decl. Ex. G at 3 (response to FAQ: "How does Linqto make money?").)

The rest of the record discloses the same expense economics. The operating agreement disclosed in detail the fees and expenses included in the investment structure. (Decl. Ex. B at Art. IV (titled "Expenses; Fees").) It provided that "each Member understands that [Liquidshares] or a particular Series, as applicable, shall pay each of the following ('Company Expenses')," and then enumerates fourteen expense categories. (Decl. Ex. B § 4.2(a).)[7] Those categories include "[a]ll

---

[7] The operating agreement's body omits the section heading for § 4.2, so the enumerated Company Expenses appear as subsections (a) and (b) following § 4.1. The agreement's table of contents and its own definition of "Company Expenses"—which cross-references "Section 4.2(a)"—confirm the numbering used here.

18

expenses and fees incurred in connection with an actual or proposed [investment];" the costs of investment structuring, pricing, and execution; brokerage commissions; interest and fees on loans; taxes; legal, accounting, and auditing expenses; marketing expenses; and "all other expenses and liabilities incurred in connection with or arising out of the business of [Liquidshares] or the organization of [Liquidshares] and each Series." (Decl. Ex. B § 4.2(a)(i)-(xiv).) At times, the pricing approach also was disclosed in public Form D filings with the SEC. For one of the Series that A.O.H. invested in (Ripple - 5), the Form D states that "the SPV pays for services and capital by marking up the cost basis of stock it holds and selling its units against the marked up basis on a fully disclosed basis." (Decl. Ex. F (Ripple – 5 Form D, dated Apr. 11, 2022); (ECF No. 23-1 at 4) (identifying A.O.H.'s investment in Series Ripple - 5).) Thus, the claim that Linqto concealed its pricing is refuted by the very documents on which the plaintiffs rely to support their theory. Once again, where a document properly before the Court contradicts the complaint's characterization of it, the document governs. *See Oklahoma Firefighters*, 2026 WL 575379, at *9.

The FAC's remaining pricing theory, that Linqto falsely described its markup as "reasonable," also fails on the FAC's own terms. (FAC ¶¶ 90–91.) The only measure of reasonableness the FAC offers is a regulatory one: it alleges that "FINRA's 5% policy is a guideline, suggesting that brokers should not charge markups exceeding 5%," and that "the SEC has taken the view that markups in excess of 10% are per se fraudulent if not properly disclosed." (*Id.* ¶ 64.) But as the FAC itself states, both standards apply only to markups that were not disclosed. As addressed above, Linqto's markup was in fact disclosed in the transactional documents and the FAQs cited by plaintiffs. In any event, views expressed by the SEC and FINRA are not rules of fraud. The Second Circuit has rejected bright-line markup thresholds, at the SEC's own urging, in favor of a case-by-case assessment that accounts for the expense of effecting the

transaction, the profit fairly earned by the seller, and the availability of the product in the market: "A ten percent markup on a T-bill might be virtually always excessive. A ten percent mark-up on an instrument that is difficult to obtain and priced accordingly might not be." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534–35 (2d Cir. 1999). And a markup is measured against the "prevailing market price" of the security sold, not against what the seller paid. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 189-90 (2d Cir. 1998). The security sold here was a membership interest in a named Series—an instrument Liquidshares created and that existed nowhere else— and the FAC alleges that Linqto "handled every aspect of the market from beginning to end." (FAC ¶ 59.) There was thus no prevailing market price against which the percentages the FAC pleads could show that any markup was excessive, let alone that Linqto's description of it was false.[8]

Plaintiffs also do not supply the transaction-level facts needed to test any of this. The FAC pleads platform-wide ranges (markups that "generally ranged from 20-60%" and at times exceeded 150%) but never identifies the markup on any single purchase, including the purchases that A.O.H. and Bhatt itemize in their certifications and loss chart. (FAC ¶¶ 9, 63–64; Decl. Ex. E (ECF Nos. 23-1, 23-2) at 4 (A.O.H transactions), 7 (Bhatt transactions), 9 (principal loss analysis).) A securities-fraud claim that depends on a predicate course of conduct must plead that conduct with particularity, and platform-wide averages do not supply the markup on any of the plaintiffs' purchases. *See In re Parmalat*, 383 F. Supp. 2d at 622 (Kaplan, J.).

---

[8] The implied-representation doctrine that polices dealer markups presupposes both a dealer-customer relationship and a prevailing market price. It rests on "an implied representation that the prices charged are reasonably related to the prices charged in an open and competitive market," and it reaches broker-dealers selling to their customers. *Grandon*, 147 F.3d at 189–90, 192; *see United States v. Finnerty*, 533 F.3d 143, 147–49 (2d Cir. 2008). Neither predicate is pleaded here. A seller's contemporaneous cost is the "best evidence" of the prevailing market price "[w]hen a dealer is not a marketmaker, and absent countervailing evidence," *Grandon*, 147 F.3d at 189, and the FAC alleges that Linqto operated as "the ultimate market-maker" in the Series interests it created and priced. (FAC ¶ 59.) Nor is any Defendant alleged to have sold those interests as a dealer making a market-price representation. Rainmaker is alleged only to have provided "supervisory" services for a fee *(id.* ¶¶ 30, 62), and the FAC's dealer allegation as to Liquidshares is expressly conditioned on a determination the SEC has not made *(id.* ¶ 106.)

20

**C.    The Liquidshares Operating Agreement Authorized the Ripple Tender Sale the FAC Calls Unauthorized**

Like the FAC's misstatement and concealment allegations, the Ripple tender allegations depend on another premise the governing documents refute: that the sale required investor authorization. The FAC claims that Sarris caused Ripple shares to be sold in a third-party tender "without informing Investors or seeking their approval." (FAC ¶¶ 127–28.) But the operating agreement that governs the Series interests does not require investor approval for a tender sale. Amendment 1 to the Second Amended and Restated Operating Agreement, effective August 7, 2024, (before the December 2024 Ripple tender) specifically amended Section 2.4(b) to permit the managing member to dispose of the investments of a Series without member approval when the disposition is made "in connection with a merger or acquisition, *tender offer*, initial public offering, or other transaction that otherwise results in liquidity involving the Company Investment initiated by a third party over which the Manager has no control." (Decl. Ex. C § 2.4(b) (emphasis added).) The sale of shares initiated by third-party Ripple is exactly that, and it required no investor approval. As stated above, where the governing document contradicts the complaint, the document controls. *See Oklahoma Firefighters*, 2026 WL 575379, at *9.

**D.    The Allegations About Non-Accredited Investors Do Not State a Claim**

The FAC's unaccredited investor theory is that Linqto held itself out as available only to accredited investors, advertising that it would "qualify accredited investors and provide access to investments in leading tech companies while they're still private," even as it admitted investors who were not accredited. (FAC ¶¶ 75–77.) The threshold problem with the plaintiffs' theory is that they do not identify any injury. Even if Linqto did admit non-accredited investors despite saying

21

it did not, the FAC never explains how that harmed anyone, least of all these plaintiffs, neither of whom claims to be unaccredited. (Decl. Ex. E (ECF No. 23-3) ¶ 3.)

The Second Circuit dismissed precisely this kind of claim in *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, where the complaint did not "show how the fact that the Shaar Fund was not an accredited investor caused any loss." 493 F.3d at 106–07. The theory also fails on the FAC's own chronology. The practices that allegedly made the statements false date only from 2023. The "FiSo" financial-sophistication test was "deployed by December 2023." (*Id.* ¶¶ 46, 48.) The "self-certify" checkbox was adopted "[i]n 2023." (*Id.* ¶ 49.) For statements made from 2020 through 2022—the majority of the class period and the entire period in which A.O.H. purchased its units—the FAC pleads no contemporaneous falsity at all. Throughout the period, each subscriber also represented in the subscription documents that it was an accredited investor or was otherwise a suitable investor able to evaluate the investment's merits and risks. (Decl. Ex. H (subscription agreements).) Either way, these allegations plead no injury to plaintiffs and state no claim.

### E. The Marketing Statements Alleged Are Too Vague To Be Actionable, and the Ripple Scarcity Messages Caused No Harm

The FAC also challenges a set of general marketing statements—for example, that Linqto advertised "Private Investing Made Simple," told investors it "help[ed] you identify, evaluate, and invest in the world's leading Unicorns," offered investments "at an affordable price," and said it "democratizes private investing." (FAC ¶¶ 78-79, 86.) Statements this vague and general cannot mislead a reasonable investor about anything, and the FAC never explains how they caused an investor to lose money. Courts dismiss such statements because they are "too general to cause a reasonable investor to rely upon them." *ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *accord Argo*, 2024 WL 5089970, at *11.

22

The FAC also challenges a set of "scarcity" messages about Ripple. It alleges that mass emails advised investors that Linqto was "out of inventory for Ripple" but would have more "tomorrow," and that an "Exclusive Ripple Trading Window" offered "limited quantities available." (FAC ¶¶ 67-70, 92-94.) These messages fail for the basic reason that the plaintiffs never allege that the statements caused any economic loss. There is no allegation that the urgency of a purchase changed the price an investor paid or the value of what it received; to the contrary, plaintiffs alleged that Ripple increased in value to approximately $40 billion months after the class period. (*Id.* ¶ 127.) A securities-fraud claim requires an economic loss caused by the alleged misstatement, and the FAC pleads none.

The scarcity allegations also fail because they are not pleaded with particularity. The FAC identifies no scarcity communication—no sender, no date, no recipient, and no text of any email— that either named plaintiff received or read. (*Id.* ¶¶ 67-70, 92-94.) Rule 9(b) requires a fraud complaint to "state where and when the statements were made," and the PSLRA also requires particularity for each statement. *Argo*, 2024 WL 5089970, at *3. Nor does the FAC allege what inventory existed on the day any email issued. The assertion that the "limited quantities" statement was false because Liquidshares held "tens of thousands of additional Ripple shares" rests entirely on the improper affidavit of John Deaton. (FAC ¶¶ 69, 93.)[9]

---

[9] The FAC's allegations about the Ripple inventory rest on the affidavit of attorney John Deaton, who filed the original complaint. (FAC ¶¶ 69, 93.) Reliance on his statements is entirely improper because of Deaton's conflicts of interest. Deaton represented Sarris as counsel in the very matters at issue here before turning around to sue him as counsel for the plaintiffs on the original complaint. Sarris moved to disqualify him. (ECF No. 6.) At argument, Magistrate Judge Barbara Moses observed that the "objective facts" were that Deaton had "accepted confidential and privileged communications" from Sarris and had "prepared a draft derivative complaint for Mr. Sarris against various Linqto executives and directors," describing these facts as "the Rule 1.9 problem that you have." Deaton then withdrew as class counsel. (ECF No. 40; Tr. of Oct. 30, 2025 Hr'g.)

**F.      The Omission Claims Fail Because No Defendant Had a Duty to Disclose**

Finally, the FAC scatters a series of omission theories across its counts. It faults the Individual Defendants for "failing to disclose written complaints from customers" and "failing to disclose federal regulatory investigations to Investors." (FAC ¶ 170.) It alleges, as part of the claimed scheme, that Defendants "failed to implement adequate anti-money laundering and know-your-customer procedures" and "failed to disclose the actual ownership structure of the Private Securities." (*Id.* ¶ 162.) It repeats those theories under California law. (*Id.* ¶ 207.) None states a claim, because "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 987 n.17 (1988).

A duty to disclose does not arise from the mere possession of material information. It arises only in certain circumstances, such as where a statute or regulation compels disclosure, where the defendant stands in a fiduciary or similar relationship of trust and confidence with the plaintiff, or where disclosure is necessary to make an affirmative statement not misleading. *See Chiarella v. United States*, 445 U.S. 222, 228, 100 S. Ct. 1108, 1115 (1980) (fiduciary duty); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("'corporate insider trad[ing] on confidential information,' a 'statute or regulation requiring disclosure,' or a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'") (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)). Plaintiffs do not allege that defendants owed them any duty or stood in any relationship with them of trust and confidence. They identify no statement rendered misleading by a claimed omission, asserting only the conclusion that defendants "omitted to state material facts necessary in order to make the statements made . . . not misleading." (FAC ¶¶ 169–70.)

Furthermore, no Defendant had a duty to disclose a regulatory investigation. To hold otherwise "would be to subject corporations to a preemptive duty to 'confess' as soon as a

24

regulatory agency begins an investigation." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 582 (S.D.N.Y. 2016); *see City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession. . . ."). Such a duty arises only where a defendant has chosen to speak on the subject; the question is "not whether [the company] had an independent duty to announce the . . . Investigation," but whether "the statements [it] chose to make were materially misleading" in light of it. *Menaldi*, 164 F. Supp. 3d at 584. Nothing of that kind is pleaded here. Linqto filed no periodic reports (FAC ¶ 130), and the FAC identifies no statement by any defendant in any filing, on the Platform, or anywhere else that concerns regulatory proceedings, pending or anticipated. The only investigation the FAC alleges arose at the very end of the Class Period when the SEC notified Linqto of an investigation in October 2024, roughly five months before the period closed. (FAC ¶¶ 1, 103.) The customer-complaint theory is weaker still. Its only factual support appears in the FAC's *scienter* section, rests on a single confidential former employee, describes an online inquiry form, and never alleges that any complaint was written or that any Individual Defendant saw one.  (*Id.* ¶ 140.)

The remaining fraud theories are not misstatements or omissions at all. The anti-money-laundering and FINRA's know-your-customer allegations plead a failure to implement regulatory procedures, not a failure to disclose anything.  (*Id.* ¶¶ 162(vi), 207.) There is no private right of action for violation of anti-money laundering procedures under the Bank Secrecy Act ("BSA") or know your customer regulations issued by FINRA,[10] because the only duty under such regulations "is to the government rather than some remote victim." *Marlin v. Moody Nat'l Bank, N.A.*, No. H-

---

[10] *See, e.g.*, *Hunter v. Navy Fed. Credit Union*, No. 3:24-cv-0788-D, 2024 WL 3094610, at *5 (N.D. Tex. June 20, 2024) (there is "no private right of action under the Bank Secrecy Act" and defendants "owe private individuals no duty of care pursuant to it"); *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 208 (2d Cir. 1999) (no "private right of action available under the Securities Exchange Act . . . to challenge an exchange's failure to follow its own rules"); *Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 413–14 (2d Cir. 2009) (summary order).

25

04-4443, 2006 WL 2382325, at *7 (S.D. Tex. Aug. 16, 2006). Moreover, the Second Circuit has clearly held that the violation of a regulatory rule "does not establish securities fraud in the civil context" under § 10(b). *United States v. Finnerty*, 533 F.3d 143, 151 (2d Cir. 2008). A claim that a company's compliance program was deficient is a regulatory grievance, not securities fraud, and a company is "under no obligation to self-report its growing suspicions" about its own anti-money-laundering compliance. *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021).

## II.   EVERY COUNT OF THE COMPLAINT FAILS BECAUSE THE FAC PLEADS COLLECTIVELY WHAT THE LAW REQUIRES IT TO PLEAD DEFENDANT BY DEFENDANT

The FAC sues eleven defendants but pleads its case against them only as a group. It fails to identify specific false statements or omissions or deceptive acts that specific individual defendants made to the named plaintiffs in connection with the specific securities they purchased from Linqto. That pleading defect is fatal to all Counts.

### A.   The Exchange Act Claims Fail Under the PSLRA and Rule 9(b)

The FAC names eleven defendants but says virtually nothing about what any one of them is alleged to have said or done that would violate the Exchange Act. It is a blatant exercise in collective pleading, alleging simply that "Defendants together and individually took the actions set forth herein." (FAC ¶ 163.) That does not suffice.

#### 1.   No Challenged Statement Is Attributed to Any Defendant (Count II).

A misstatement claim under the Exchange Act (Count II) runs against the statement's "maker," specifically "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it," *Janus*, 564 U.S. at 142, 131 S. Ct. at 2302, or one who disseminates it, *Lorenzo v. SEC*, 587 U.S. 71, 139 S. Ct. 1094 (2019). The PSLRA

26

requires the complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

The FAC does not even try. It asserts in one conclusory sentence that "Defendant Sarris made materially false and misleading statements in press releases." (FAC ¶ 73.) Yet it attributes exactly one challenged statement to him specifically: a blurb from a July 2023 press release ("Business has radically transformed since our founding"), presented as one of an undifferentiated block of seven website, marketing, and press-release statements. (*Id.* ¶¶ 79–80.) The FAC never explains what was false about it. Defendant Paul, the Chief Financial & Administrative Officer of Liquidshares, allegedly "prepared, signed, and submitted" Series LLC Form D filings (*id.* ¶¶ 22, 131), but the FAC nowhere claims that anything in those filings was false; indeed, the filings disclosed the sales commissions the FAC elsewhere calls concealed (*id.* ¶ 131). Defendant Moran, Linqto's compliance officer, allegedly "insisted that marketing remove language in the fine print about Linqto's accredited investor requirements" (*id.* ¶ 142). But one who "prepares or publishes a statement on behalf of another," who can "merely suggest what to say," is not its maker. *Janus*, 564 U.S. at 142.

That is the complete inventory. No other alleged misstatement is attributed to any other named defendant. In fact, all of the potentially actionable statements identified in the complaint — those going to ownership of the securities, price, fees, and the marketing claims alleged to constitute the fraud — are attributed only to Linqto itself or, in some cases, to "Defendants" writ large as an undifferentiated group. (*See, e.g.*, FAC ¶¶ 73–76, 86, 90, 92.) No statement is particularly alleged to have been made to, or received by, either named plaintiff.

Instead, the FAC substitutes generalities. It pleads only that, "[d]ue to" their "high-level positions," the Individual Defendants "possessed the power and authority to control the contents

27

of Linqto's website, smartphone application, marketing materials, press releases, offering documents, and communications." (*Id.* ¶ 32.) It pleads that the Individual Defendants "disseminated or approved the false statements specified above." (*Id.* ¶ 169.) And it pleads that five of them were "intimately involved in preparing, reviewing, approving, and/or disseminating" the contents of "all public statements." (*Id.* ¶ 176.) Not one allegation specifies which defendant handled which statement, in what role, at what time, or with what authority; each treats every Individual Defendant as responsible for all of Linqto's investor communications and marketing.

Plaintiffs cannot cure these deficiencies by invoking the group pleading doctrine, a narrow exception to individualized pleading that is of dubious continuing validity after *Janus*, which would not apply to this complaint in any event. At its broadest, the doctrine permits a plaintiff, for pleading purposes only, to presume that "statements in prospectuses, registration statements, annual reports, press releases, or other group-published information[] are the collective work of those individuals with direct involvement in the everyday business of the company." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005). But it is confined to those circumstances. The Second Circuit has applied it to statements in an offering memorandum where the defendants were "insiders or affiliates participating in the offer of the securities in question," even as it held that collective allegations about representations made outside that document "lack[ed] the 'particulars' required by Rule 9(b)." *Luce v. Edelstein*, 802 F.2d 49, 54–55 (2d Cir. 1986). The exception "applies only to prospectuses, registration statements, annual reports, press releases, or other group-published information"; it "does not apply to oral statements"; and it does not reach a defendant "alleged only to have been involved in sales, not with running the everyday business of the company." *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 213–14 (S.D.N.Y.

2009).[11] The FAC challenges statements in website copy, application screens, a marketing FAQ, a 2023 press kit, and mass emails. (FAC ¶¶ 73, 76, 86, 90, 92.) Not one is a prospectus, a registration statement, an annual report, or an SEC filing.[12] Count II should thus be dismissed.

### 2. Count I Fails to Allege any Individual Deceptive Act or Actionable Scheme.

The scheme liability claims in Count I fare no better. To state a claim based on a scheme, a plaintiff must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with *scienter*, and (4) reliance." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005); *accord Menaldi*, 164 F. Supp. 3d at 576–77. In the Second Circuit, "an actionable scheme liability claim also requires something beyond misstatements and omissions." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005)). A plaintiff must allege with particularity that a defendant "performed an inherently deceptive act that was distinct from an alleged misstatement." *Argo*, 2024 WL 5089970, at *14 (dismissing scheme count where complaint failed to allege "facts that show a scheme by defendants as distinct from their alleged misstatements and omissions").[13] The plaintiff "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *In re Parmalat*, 383 F. Supp. 2d at 622. The group pleading doctrine (whatever vitality it retains as to certain

---

[11] Relatedly, in *In re Parmalat Securities Litigation*, the Court held that "[a]lleging direct involvement in the company's everyday business is critical to support the presumption," so that allegations that a defendant "was simply 'an affiliate and contracted to perform work' or even that it 'own[ed] and control[led]' the identified speaker will be insufficient." 479 F. Supp. 2d 332, 340 (S.D.N.Y. 2007).

[12] On top of this, the presumption reaches only a "corporate insider or affiliate with direct involvement in the daily affairs of the company." *BISYS*, 397 F. Supp. 2d at 440–41. That excludes the five outside directors, as to whom the FAC pleads a title and a date range and nothing else. (FAC ¶¶ 25–29, 175.)  It excludes Rainmaker, an outside broker-dealer paid a fee for supervisory services. (*Id.* ¶ 30); *see Parmalat*, 479 F. Supp. 2d at 340; *Defer*, 654 F. Supp. 2d at 213–14.

[13] *See also In re Turquoise Hill Resources Ltd. Secs. Litig.*, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022).

corporate statements) has never applied to deceptive acts. *See Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 315 (S.D.N.Y. 2009) (the doctrine is "a limited exception is allowed where defendants have collaborated on or approved a document together and the document is the basis for the liability").

Count I enumerates six acts alleged to constitute the scheme: (i) permitting non-accredited investors to purchase on the Platform; (ii) authorizing undisclosed markups in excess of 5%; (iii) failing to disclose sales of securities linked to class members' investments; (iv) misrepresenting the actual ownership of the Private Securities; (v) directing noncompliance with FINRA rules; and (vi) failing to implement adequate anti-money-laundering and know-your-customer procedures. (FAC ¶ 162.) Three of the six acts are the misstatement case under another name. Two of these three — the undisclosed markups and the undisclosed sales of securities linked to class members' investments, (*id.* ¶ 162(ii)–(iii)) — are the pricing representations Count II challenges, restated as conduct (*see id.* ¶¶ 86–91). The third does not even change the vocabulary: it alleges that Defendants "misrepresented the actual ownership of Private Securities." (Id. ¶ 162(iv); *see* ¶¶ 78–85.) Because reading the scheme liability provisions broadly enough to reach relabeled misstatements "might allow private litigants to repackage their misstatement claims as scheme liability claims to 'evade the pleading requirements imposed in misrepresentation cases,'" courts have "prohibited plaintiffs from recasting their pleadings in this way." *Rio Tinto*, 41 F.4th at 55 (quoting *In re Alstom*, 406 F. Supp. 2d at 475). This Court dismissed a scheme count on precisely that ground in *Argo*, 2024 WL 5089970, at \*14.

The three acts that remain fail at the threshold, because the FAC does not allege that any defendant performed them. It never says who admitted an unaccredited investor, or when. It never identifies a FINRA rule, an instruction to disregard one, or the person who gave it. The FAC makes

30

scattered references to FINRA concerning Rainmaker's registration, FINRA's published guidance on markups, and what outside counsel warned might happen, but never an act by any defendant directing non-compliance. And regulatory anti-money-laundering and know-your-customer procedures appear nowhere in the complaint except as line items in a list of concerns raised with the Company. (FAC ¶¶ 109, 148.) Furthermore, as set forth in Section I.F above, these regulations create no private right of action or duty of care to plaintiffs and violation of such regulations "does not establish securities fraud." *Finnerty*, 533 F.3d 143 at 151.

Each allegedly deceptive act is charged to "Defendants" in gross.[14] Indeed, for Rainmaker, Nurani, and the five outside directors, the FAC alleges no act of any kind (putting aside whether it is part of the alleged scheme at all). The FAC as to them is bare beyond titles, tenures, and a broker's disclosed fee. (*Id.* ¶¶ 24–30, 175–76.) The Second Circuit rejected this kind of pleading in *Danske Bank*, where purchasers of securities alleged that Danske Bank and four former officers and directors had concealed a vast money-laundering scandal at the bank's Estonian branch. *See* 11 F.4th at 95. The scheme count "rest[ed] upon the incorporation of the previous 140 pages of the pleading" and a conclusory assertion that the defendants "carried out a common plan, scheme, and unlawful course of conduct." *Id.* at 105. The Second Circuit affirmed dismissal as to the bank and every officer because the plaintiffs failed to "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Id.* Count I's summary allegation that "Defendants together and individually took the actions set forth herein" (FAC ¶ 163) is materially indistinguishable from the cursory scheme allegations rejected in *Danske Bank.* Sorting the alleged misconduct into six conclusory categories, and then

---

[14] Nor does the FAC explain how any of the alleged acts deceived a purchaser or that any purchase relied on them. Admitting unaccredited investors to the Linqto platform did not mislead these plaintiffs about anything, and neither plaintiff alleges that it was unaccredited. *See supra* Point I.D.

assigning responsibility to all six to "Defendants" in gross, does not satisfy the standard for specifically pleading who did what, when, or in connection with which transaction applied in *Danske Bank*. Count I thus pleads a scheme with no identified schemers, and no deceptive act aimed at either of the two investors who actually brought this suit.

### 3. No Individual Defendant's State of Mind Is Pleaded.

The PSLRA requires the pleading of particularized facts "with respect to each act or omission alleged to violate this chapter" that give rise to a strong inference that "the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). That requirement is individual, and the group pleading doctrine does not replace it. *See BISYS*, 397 F. Supp. 2d at 440 (the doctrine "has no effect on the PSLRA's *scienter* requirement" and "does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made"). It is the law of this Circuit that in a case "involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for *scienter* for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *Intercept Pharms.,* 2020 WL 1489831, at *14 ("Particularized facts supporting an inference of *scienter* must be pled as to each Individual Defendant.").

The FAC's entire *scienter* case is little more than a sentence: "Defendants acted with *scienter* throughout the Class Period . . . ." (FAC ¶ 164.) Nowhere does the FAC say what any individual knew, when they learned it, or how. For six of the ten Individual Defendants the FAC pleads nothing at all beyond a title and a date range. (*Id.* ¶ 175.) That has never been enough: "[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead *scienter*." *Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 757 (S.D.N.Y.), *aff'd*, 752 F. App'x 56 (2d Cir. 2018)

(citation and quotation marks omitted); *see also Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 493 (S.D.N.Y. 2021) (stating that mere "allegations of circumstantial evidence," such as that a defendant held "senior positions," are not "sufficient to plead *scienter*").

The *scienter* case against Rainmaker, the sole entity among the Moving Defendants, fails for a further reason. A corporation has no state of mind except through people: to plead *scienter* against an entity, the complaint must plead facts creating a strong inference "that someone whose intent could be imputed to the corporation acted with the requisite *scienter*," and "the most straightforward way to raise such an inference" is "to plead it for an individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see Jackson v. Abernathy*, 960 F.3d 94, 98–99 (2d Cir. 2020) (*per curiam*). The FAC identifies no Rainmaker principal, employee, or agent alleged to have said, done, known, or intended anything in Rainmaker's name.[15]

### 4.  Title Alone Does Not Plead Control (Count III).

The lack of particularized pleading also dooms Count III, which asserts that all ten Individual Defendants are liable as "control persons" of Linqto under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for the primary violations alleged in Counts I and II.  (FAC ¶¶ 174, 178.) Control means "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). Pleading requires more than merely identifying titles. "Conclusory allegations of

---

[15] The nearest it comes is Endoso, described as a registered broker-dealer "affiliated with Rainmaker Securities" until January 2023. But plaintiffs plead no statement or act by Endoso in that capacity, and the affiliation ended before either legal memorandum existed. (FAC ¶¶ 21, 131.) Absent the rare corporate statement so "dramatic" that intent may be inferred without an identified agent, a complaint that cannot connect a person to a culpable state of mind has not pleaded a corporation's state of mind. *See Jackson*, 960 F.3d at 98–99.

control are insufficient as a matter of law," because "officer or director status alone does not constitute control"; the complaint must allege that the defendant "exercised actual control over the matters at issue." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166–67 (S.D.N.Y. 2012) (citations and internal quotation marks omitted); *see In re Alstom*, 406 F. Supp. 2d at 487 (Section 20(a) defendant "must not only have actual control over the primary violator, but have 'actual control over the transaction in question'").

The FAC pleads the opposite of individualized facts. Its control allegations consist only of the titles-and-tenures inventory (FAC ¶ 175) followed by two sentences of conclusions: one, identical for all ten individuals, that each "participated in the day-to-day operation and management of Linqto," with "supervision and oversight" of its affairs; the other, that five officers were "intimately involved" in all of Linqto's public statements (*id.* ¶ 176). The court in *Smith Barney* dismissed a control claim pleaded exactly this way: allegations that the defendant controlled the misstatements "by virtue of his high-level positions" failed because they went to the defendant's "control person status" rather than any "actual control over the matters at issue." 884 F. Supp. 2d at 166. The same result applies here.

The FAC's references to decisions Sarris made at Linqto do not change the analysis. Those allegations describe how the Linqto was run: morning meetings about which listings to promote, access to the platform and the prices it displayed, choices about which companies appeared first, and pressure on subordinates about marketing emails. (FAC ¶¶ 47, 134–35.) But the issue is not who is alleged to have run operations generally but "actual control over the matters at issue"—the particular statements or transactions alleged to constitute the primary violation. *Smith Barney*, 884 F. Supp. 2d at 166–67; *accord Alstom*, 406 F. Supp. 2d at 487 (requiring "actual control over the transaction in question" and "an individualized, fact-sensitive analysis"). On that question the

34

FAC alleges on the same two conclusory sentences it offers for all ten Individual Defendants, which is to say no allegation of individual control at all. (FAC ¶ 176.)

### B.    Each Remaining Count Suffers the Same Defect and Must Be Dismissed

The state-law claims (Count VI, under the Texas Securities Act, and Count VII, under California's Unfair Competition Law) also sound in the same fraud, and Rule 9(b) "is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'" *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *accord DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

The remaining counts are not fraud claims, but even under ordinary notice pleading, a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The registration claim under Sections 5(a) and 5(c) of the Securities Act (Count IV) rests on exactly one such recital: ¶ 182 asserts that the ten Individual Defendants collectively "directed the offer and sale," controlled "pricing," and "managed marketing." The claim under Section 7(a) of the Investment Company Act (Count V) fails before its inadequate pleading even enters the picture, because the statute gives private plaintiffs no right of action at all. *See infra* Point VI.B. I

### III.    THE EXCHANGE ACT CLAIMS (COUNTS I-III) FAIL BECAUSE THE FAC FAILS TO PLEAD RELIANCE

Even if a challenged statement were to survive scrutiny against the facts disclosed in the transaction documents and public filings, the fraud claims fail because the FAC does not adequately allege reliance, an element of any private action under Section 10(b) and Rule 10b-5. *ATSI*, 493 F.3d at 105. The complaint must allege misstatements "upon which the plaintiff relied," such that, "but for the claimed misrepresentations or omissions, the plaintiff would not have

35

entered into the detrimental securities transaction." *Id.* at 105–06. The FAC fails to adequately plead reliance under any theory.

First, the FAC fails to plead facts showing individualized reliance by either named plaintiff on any particular marketing statement, let alone reasonable reliance. The FAC's only allegation about plaintiffs' purchases is that plaintiffs bought their interests "as set forth in their previously filed certifications" to become lead plaintiffs in this action. (FAC ¶ 19.) But those certifications identify only purchases, not statements. Neither plaintiff attests to any specific misrepresentation that they specifically saw, read, considered, or investigated in making a purchase. (ECF No. 23-1.). The FAC points to no advertisement that either plaintiff specifically viewed, no email that either received, and no webpage or promotion that either read. The only reliance allegation is a class-wide recital that "Plaintiffs and other Class members, relying on the materially false and misleading statements described herein . . . purchased or otherwise acquired the Series Membership Interests." (FAC ¶ 171.) That boilerplate recites the element without pleading a fact, and Rule 9(b) and the PSLRA require more. *Argo*, 2024 WL 5089970, at *3–4.

In any event, the disclosures made in the same subscription documents and public filings which refute the plaintiffs' theories of alleged misstatements (see supra Point I) also defeat any claim that reliance on extra-contractual marketing statements could have been reasonable. Reasonable reliance is judged on "the entire context of the transaction," including the parties' sophistication and "the content of any agreements between them," and those facts are disclosed in the complaint and the signed agreements, the question may be resolved on the pleadings. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195–96 (2d Cir. 2003); *accord Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997).

As detailed above in the Statement of Facts Section F, each named plaintiff is a sophisticated and experienced investor. (Decl. Ex. E (ECF No. 23-3) (Joint Declaration) ¶¶ 3-4, 13.) Each plaintiff acknowledged in writing that they relied on their "own analysis of the benefits" of investing in the Series, not on Linqto's marketing. (Decl. Ex. B, App. B ¶ 4(g).) And both plaintiffs acquired their first Series Interests pursuant to the same Liquidshares operating agreement effective as of January 2020, in which the subscriber representations state that their "acquisition of an Interest is based upon its own analysis of the benefits of an investment in the Series;" that the investment is of an "inherently speculative nature" that "can result in a complete loss"; and that the subscriber had "received a copy of, and . . . read and understands, the Operating Agreement." (Decl. Ex. B, App. B ¶ 4(f)–(g)); *see ATSI*, 493 F.3d at 105 ("Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation.").

Second, plaintiffs cannot plead reliance on a class-wide basis because there is no public market for Linqto's privately issued, non-exchange-traded SPV units, and no presumption of reliance is available under these circumstances. Because the Series membership interests never traded on an efficient market, the fraud-on-the market presumption does not apply under *Basic v. Levinson*. In that decision, the Supreme Court recognized a rebuttable presumption of class-wide reliance based on the efficient market hypothesis: where a security trades in an efficient market, the market price incorporates all public information, including misrepresentations, and investors are presumed to have relied on the integrity of that market price. *See Basic*, 485 U.S. at 241-47. Here, the Series membership interests were privately issued Regulation D offerings. As non-exchange-traded instruments with no secondary market, no market makers, no trading volume, and

no analyst coverage, they are by definition incapable of trading in an efficient market price. The FAC itself alleges that Linqto set every price unilaterally on its own platform, which is the opposite of a price formed by an efficient market.[16] (FAC ¶ 59.)

Plaintiffs similarly cannot invoke the alternative presumption under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54, 92 S. Ct. 1456, 1472 (1972), which allows plaintiffs to forgo proof of reliance in cases "involving primarily a failure to disclose" rather than affirmative misstatements. But the Second Circuit has held that the *Affiliated Ute* presumption does not apply where plaintiffs allege "numerous affirmative misstatements." *Waggoner v. Barclays PLC*, 875 F.3d 79, 95-97 (2d Cir. 2017). The FAC is replete with affirmative misstatements — specific website statements, press release language, FAQ responses, smartphone application interfaces, and Ripple-specific marketing emails. (*See* FAC ¶¶ 75-94.) Any alleged omissions are simply tethered to these affirmative misstatements, not freestanding omissions. The *Affiliated Ute* presumption accordingly does not apply. *See Waggoner*, 875 F.3d at 95-97.

## IV.    THE EXCHANGE ACT CLAIMS (COUNTS I-III) FAIL BECAUSE THE FAC DOES NOT PLEAD A STRONG INFERENCE OF *SCIENTER*

A private plaintiff under the Exchange Act must plead *scienter* with particularized facts, statement by statement and defendant by defendant. The FAC never does. As shown at Point

---

[16] Without the *Basic* presumption, every putative class member must individually establish, among other facts, that he or she: (i) was exposed to the specific misrepresentation at issue; (ii) actually read or heard it; (iii) found it material; and (iv) relied upon it in making his or her investment decision. These are quintessentially individual inquiries that vary based on each investor's sophistication, exposure to different marketing statements (website, smartphone app, press releases, Ripple-specific emails), timing of their investments, purchase of specific Series interests, independent investigation of the investment, price they paid per unit, and whether the underlying private security has increased in value. Because this necessarily will require separate mini-trials for each of the approximately 13,000-14,000 investors in the putative class (FAC ¶ 152), each of whom invested over a five-year period across more than 100 different company Series listings, individual reliance issues will overwhelmingly predominate any common questions, thus precluding certification under Rule 23(b)(3). These predominantly individualized claims are more appropriately addressed in the ongoing bankruptcy proceedings.

II.A.3, *supra*, it pleads *scienter* only collectively, a failure that is dispositive by itself. But even if its collective averments were read against each defendant individually, the FAC comes up empty.

### A.    The Pleading Standard

*Scienter* is "a mental state embracing intent to deceive, manipulate, or defraud" and an essential element of a private claim under Section 10(b) and Rule 10b-5. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 n.12 (1976). Recklessness can satisfy the element only for conduct that is "highly unreasonable," representing "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," and reflecting "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Setzer v. Omega Healthcare Investors, Inc.*, 968 F.3d 204, 214–15 (2d Cir. 2020). And *scienter* is not a free-floating state of mind: it must attach to the particular statement or act alleged to be fraudulent. *See* 15 U.S.C. § 78u-4(b)(2)(A) (*scienter* must be alleged "with respect to each act or omission"); *Novak v. Kasaks*, 216 F.3d 300, 308–09 (2d Cir. 2000).

Pleading *scienter* in a general sense is never enough. The PSLRA requires particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The inference is measured comparatively: a complaint survives "only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. A plaintiff can raise that inference two ways: "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *accord ECA*, 553 F.3d at 198. The FAC does neither.

39

### B.    The FAC Pleads No Motive, and Its Own Allegations Cut the Other Way

To demonstrate motive a plaintiff must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000) (quoting *Shields*, 25 F.3d at 1130). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see Novak*, 216 F.3d at 307–08 ("motives possessed by virtually all corporate insiders" do not count); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 28 (S.D.N.Y. 2004) (same).

Measured against these standards, the FAC fails. *See Argo*, 2024 WL 5089970, at *12. It alleges no legally cognizable motive at all and, at its broadest, suggests that Defendants charged too much because they wanted Linqto to earn higher profits. But maximizing the company's profits is the engine of every lawful business, not a badge of fraud: a motive "common to most corporate officers" that "do[es] not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198.

The allegation that Mr. Sarris told employees to "do whatever it takes to pump the numbers because we are hoping to IPO in 2024" (FAC ¶ 48), an account FE-1 attributes to his supervisors, is another motive common to corporate management.[17] The desire to increase a company's value in anticipation of a public offering is not a "concrete and personal benefit," and courts have routinely rejected allegations of motive "in the context of public offerings where defendants would benefit from a higher share price." *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 554 (S.D.N.Y. 2024); *see Kalnit*, 264 F.3d at 139. A motive to "complete the IPO sooner rather than

---

[17] The FAC also points to sales commissions. (FAC ¶ 131.) But commissions were disclosed in the Form D filings themselves and are not alleged to have been unusual in amount, contingent on any challenged statement, or enlarged by the alleged fraud. A disclosed, ordinary-course commission is not "a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139.

40

later" does not plead *scienter* where defendants "are not alleged to have sold the shares." *SUN, A Series of E Squared Inv. Fund, LLC v. Sundial Growers Inc.*, No. 20-cv-3579 (ALC), 2021 WL 4482276, at *9 (S.D.N.Y. Sept. 30, 2021).

Plaintiffs' theory that the object of the fraud was extraction—selling at excessive markups for Defendants' enrichment—also undercuts any improper motive. Across five years, no Defendant is alleged to have sold a share, taken a distribution, or extracted anything from the Series at all. In *Argo*, the fact that no individual defendant "significantly capitalized" on the company's position during the class period, and two "even increased their positions," indicated that "they also did not expect to have to adjust downward the company's financial outlook." 2024 WL 5089970, at *13.  So too here. A five-year extraction scheme in which no defendant extracted anything is not evidence of motive but its refutation. Where even defendants who sold shares do not act with bad motive absent "unusual" trading, *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022), defendants who sold nothing are in the clear.

## C.    The FAC Does Not Plead Strong Circumstantial Evidence of *Scienter*

Plaintiffs likewise cannot plead *scienter* by alleging strong circumstantial evidence of conscious misbehavior or recklessness. Where improper motive is absent, "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 198–99. Recklessness ordinarily requires the defendant to have known or have access to specific facts contradicting an identified statement to investors. *Novak*, 216 F.3d at 308–09. The FAC does not plead such facts.  It alleges only three things: Mr. Sarris was closely involved in running Linqto, two legal memoranda were addressed to him, and a set of vague accounts borrowed from others. Each indicates something other than knowledge that a challenged statement was false.

The FAC alleges that Mr. Sarris met with the marketing team to decide which listings to promote, that he at times set the prices Linqto charged, and that he pressed his team hard to

41

perform. (FAC ¶¶ 47, 134–35.) These allegations merely describe a founder working to increase revenue. It simply "is not enough for a post-*Tellabs* plaintiff to allege that, because executives . . . were 'closely involved' in [the company's] business, one can strongly infer that they" knew of the facts said to make its statements false; "the issue is whether . . . [they] were furnished with information that would have allowed them to discern that" what was said was wrong. *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473–74 (S.D.N.Y. 2008) (declining to infer *scienter* of defendants by "virtue of their purported status as 'hands on' senior executives."). Similarly, allegations that a company's founder would "dip[] in and out of daily affairs," and that "his fingerprints are all over the company's policies and principles," failed to plead *scienter* for the same reason. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 584 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *see also Novak*, 216 F.3d at 309, 314.

Allegations relating to memoranda from outside counsel on various regulatory issues are equally uncompelling. First, of the ten Individual Defendants, only Mr. Sarris is alleged to have received either document. (FAC ¶¶ 95, 104.) A complaint invoking internal warnings must "specifically identify the reports or statements containing" the contrary information, *Novak*, 216 F.3d at 309, and must allege that the particular defendant actually received them, *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 249 (S.D.N.Y. 2012). For nine of the ten Individual Defendants, the relevance of the memos ends there.

As to Mr. Sarris, the memoranda fail on their own terms. They allegedly contained counsel's assessment of how regulators would "likely" view Linqto's practices, with a request that the issues "be resolved as soon as practicable." (FAC ¶¶ 96–110, 148.) Notice of regulatory risk and a recommendation to remediate is not knowledge that any identified statement to any investor was false. If anything, seeking counsel's assessment on compliance issues is "a prudent course of

action that weakens rather than strengthens an inference of *scienter*." *Slayton v. American Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (internal quotation marks omitted). Moreover, a defendant's "generalized awareness" of concerns about the company's practices does not make it reckless to stand by what the company said, *In re PXRE Group, Ltd., Secs. Litig.*, 600 F. Supp. 2d 510, 539 (S.D.N.Y. 2009), and even knowledge of a government investigation, without more, establishes neither a duty to speak nor an intent to deceive, *In re Lions Gate Entertainment Corp. Secs. Litig.*, 165 F. Supp. 3d 1, 12, 24 (S.D.N.Y. 2016).

The other sundry allegations relating to intent are not pleaded on plaintiffs' own information at all. The allegations about Mr. Sarris's pricing are taken from a newspaper and a product marketing employee relaying information his supervisor allegedly told him. The allegations about internal warnings derive from a terminated executive's own wrongful-termination suit. (FAC ¶¶ 53, 132–34, 143–46.) Each claim carries little weight. "Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (Kaplan, J.) (quoting *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007)). A source at two removes is not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *see*, 635 F. Supp. 2d at 335 (dismissing claims where no witness had "contact with" defendants), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).   Information relayed upward through supervisors before reaching a witness are likewise "inherently not derived from [the former] employees' 'personal knowledge.'" *Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 222 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).   And "unproven allegations

43

in another case provide no support for an inference of *scienter* in this case." *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 558 (S.D.N.Y. 2021); *see also RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010).

Finally, even if the memoranda or other circumstances could be read to suggest some generalized bad intent, that would not constitute *scienter*. The PSLRA requires the strong inference "with respect to each act or omission," statement by statement, defendant by defendant. 15 U.S.C. § 78u-4(b)(2)(A); *supra* Point II.A.3. Plaintiffs must plead particularized facts making it at least as likely as any innocent explanation that a particular statement by a particular defendant was made with the requisite fraudulent intent. *Tellabs*, 551 U.S. at 324; *Novak*, 216 F.3d at 309; *see Dynex Capital, Inc.*, 531 F.3d at 196 (no *scienter* where plaintiffs' "broad reference to raw data" did not allege that the data "had been collected into reports" showing the statements were inaccurate). The FAC never attempts the connection.

Nor do the statements of managers who replaced Mr. Sarris supply what the FAC lacks. Linqto is not a defendant here, and successor management's characterizations in 2025 (published as they froze customer accounts and placed the company into Chapter 11) are not admissions of any defendant. Statements made "retrospectively with the benefit of hindsight," by speakers who "do not state that they knew at the time" that a problem existed, do not establish contemporaneous intent. *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 246 (S.D.N.Y. 2023). And the speed of a successor's supposed discovery of alleged fraud creates no inference about a predecessor's state of mind. A contention that new management "quickly unearthed the fraud, and thus it was easily discoverable," is one that "suffers from hindsight bias," particularly where a change in control was "crucial to the discovery" of it. *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 434 (S.D.N.Y. 2014).

44

Properly weighed as *Tellabs* requires, the inference of fraud is not "cogent and at least as compelling" as that competing account; it is the weaker of the two. 551 U.S. at 324. Mr. Sarris, the supposed architect of the fraud, sold nothing while the underlying portfolio appreciated, retired, left all his equity in the business, and then lost it all when a new CEO he selected shut down the Platform and filed for Chapter 11. This is the portrait of a man who thought that he had built a successful business that would grow in value after he left the helm, not a man looking to bilk the customers whose loyalty the business depended upon. As for the other Individual Defendants, barely mentioned in the FAC, the overwhelming inference is that they served as officers and directors of a company that they believed was properly offering an interest in private securities to retail investors that had previously been out of their reach.

## V.     THE EXCHANGE ACT CLAIMS (COUNTS I–III) FAIL BECAUSE THE FAC DOES NOT PLEAD LOSS CAUSATION OR COGNIZABLE ECONOMIC LOSS

The PSLRA also requires a plaintiff to plead and prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4); *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338, 125 S. Ct. 1627, 1629 (2005); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157, 128 S. Ct. 761, 768 (2008). The private action exists "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms.*, 544 U.S. at 345. Loss causation is "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (quoting *Lentell*, 396 F.3d at 172). The plaintiff must allege both that the loss was a foreseeable consequence of the alleged fraud and that it was "caused by the materialization of the . . . risk" that the fraud concealed. *Lentell*, 396 F.3d at 173. A misrepresentation may be the proximate cause of an investment loss

45

only "'if the risk that caused the loss was within the zone of risk concealed by the misrepresentations'" alleged. *Lattanzio*, 476 F.3d at 157 (*quoting Lentell*, 396 F.3d at 173).

Here, the FAC does not adequately plead loss causation because it fails to allege that Linqto's purportedly fraudulent statements, and not other factors, proximately caused an actual economic loss. Plaintiffs assert that Linqto misrepresented that fees and markups were bundled into the purchase price, that investors were purchasing membership interests in a Series LLC rather than shares in private companies, that other investors may not have been accredited, and that Linqto had limited quantities of membership interests in Ripple securities available for sale. (FAC ¶¶ 74–94; 125-26.) But the FAC does not plead a sufficient causal link between those statements and either of the two theories of loss asserted by plaintiffs.

### A.    An Allegedly Inflated Purchase Price Is Not Cognizable Economic Loss

The FAC's core theory of loss is that investors "purchased or otherwise acquired units of Series interests at artificially inflated, overstated, and manipulated prices far exceeding the Private Securities' acquisition price." (FAC ¶ 125; *see id.* ¶¶ 122–26.) The Supreme Court rejected this theory of loss in *Dura Pharmaceuticals,* holding that a plaintiff may not sufficiently plead loss causation "simply by alleging in the complaint and subsequently establishing that 'the price' of the security 'on the date of purchase was inflated because of the misrepresentation.'" 544 U.S. at 338 (citation omitted). Payment of a higher price at the moment of purchase, without allegations that the fraud subsequently was revealed to the market and that the revelation caused a decline in the value of the security, fails to allege loss causation. *Id.* at 342–46; *see In re New Energy Sys. Secs. Litig.*, 66 F. Supp. 3d 401, 405 (S.D.N.Y. 2014) (Kaplan, J.).

The Second Circuit applied the same rule to private, non-market transactions similar to those at issue here. In *Emergent Capital*, 343 F.3d at 197–98, the court held that allegations of

46

"purchase-time value disparity" — paying more in a private placement than the interest was worth — cannot alone establish loss causation. A purchase-time disparity "explains why a particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment." *Lentell*, 396 F.3d at 174. A plaintiff must allege that "'the *subject* of the fraudulent statement or omission was the cause of the actual loss.'" *Id.* at 175 (citation omitted); *see Greenwald v. ORB Commc'ns & Mktg., Inc.*, 192 F. Supp. 2d 212, 226–27 (S.D.N.Y. 2002) (dismissing a private-placement § 10(b) claim "devoid of allegations regarding any losses" the plaintiff "suffered in connection with the purchase").

The FAC does not allege facts showing that any Series interest was worth less than the price paid when bought, only that the price embedded a markup over Linqto's acquisition cost. (FAC ¶¶ 61–64, 125–26.). The FAC likewise fails to allege any "corrective disclosure" that revealed the truth of the price markups, SPV ownership structure, or investor qualification failures to investors, causing a decline in the value of their holdings. Instead, the alleged "loss" is the difference between what investors paid (inclusive of markups) and what the investment was "really worth" when purchased. That is not a loss caused by the revelation of purported fraud but rather an assertion that the initial purchase price was inflated. The FAC's conclusory loss-causation allegations (FAC ¶¶ 125-26) therefore plead only price inflation at purchase and not loss causation.

## B.    The FAC Itself Pleads That Intervening Decisions of New Management Caused Investors' Claimed Losses, Not the Alleged Fraud

Plaintiffs' second theory of loss is that investors lost access to membership Interests when new management froze accounts, shut down the Platform, and put Linqto into Chapter 11. (FAC ¶¶ 13, 111–26.) But Plaintiffs do not allege that this loss was caused by any undisclosed markup, mislabeled "share," or investor accreditation practice attributable to defendants. On the contrary, the FAC on its face alleges that *new management* under Dan Siciliano "froze client accounts and

47

paused operations" in late February 2025, causing a "liquidity crisis" that led to staff reductions and other cost-savings (*id.* ¶¶ 113-14); that *new management* "shut down the Platform and ceased all trading operations" on March 13, 2025, after concluding in its judgment the business should not continue operating (*id.*114–15); and then "the Company arrived at the decision to file for bankruptcy" on July 7, 2025 (*id.* ¶¶ 13, 118). Every one of those decisions post-dated Mr. Sarris's January 2, 2025 replacement as CEO (*id.* ¶ 111), and several post-dated the departures of other Moving Defendants (*id.* ¶¶ 111–13).

Where, as here, the complaint itself discloses other salient or intervening causes for the loss, the plaintiff "must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *Lentell*, 396 F.3d at 177; *see ATSI*, 493 F.3d at 106–07. The FAC does neither: it narrates the freezing of accounts, the liquidity crisis, the shutdown of the platform, and the bankruptcy, then asserts in conclusory fashion that the "fraud" caused investors' loss. (FAC ¶¶ 122–26.)  Courts have recognized that "loss causation cannot be alleged plausibly in so conclusory a fashion." *In re New Energy*, 66 F. Supp. 3d at 406 (finding complaint that "simply yokes" a loss "to allegations of earlier malfeasance" failed to state a claim).

The FAC does not allege that the platform's closure or the bankruptcy was a necessary consequence of defendants' alleged misrepresentations. *See Lattanzio*, 476 F.3d at 157; *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006). It alleges instead that successor managers "arrived at the decision" to take those steps (FAC ¶ 13), rather than continuing to remediate Linqto's compliance practices, to negotiate resolutions of ongoing regulatory investigations, or to pay rescission damages to any investors who actually wanted their money back. A complaint does

48

not adequately plead loss causation where the claimed loss resulted from intervening events and other causes, rather than from the materialization of a risk concealed by the allegedly fraudulent statements themselves. *See Lattanzio*, 476 F.3d at 157; *Lentell*, 396 F.3d at 174–77 (affirming dismissal where complaint failed to allege that concealed risk, not other causes, produced loss).

Indeed, the issues allegedly concealed — the Series structure, the fees and markup, the illiquidity of a private placement — were in fact disclosed in the subscription instruments every investor signed. (*See infra* Point I.) The FAC also alleges no decline in the price value of any Series interest when successor management discussed those subjects in mid-2025 (FAC ¶¶ 117, 119), only that plaintiffs "have not been able to access their investments since the Platform shut down," while management explores alternative "structures for Investors to access investments and realize returns from those investments" in the bankruptcy (*id.* ¶ 121). Plaintiffs' inability to access their holdings is a function of new management's decisions in 2025 and the automatic bankruptcy stay, not the result of a disclosure of any concealed fee or markup that decreased the price of an investor's Series interest. *See* Lattanzio, 476 F.3d at 157 (affirming motion to dismiss where "plaintiffs alleged an insufficient connection between [defendant's] misstatements and the bankruptcy"); *see also Leykin*, 423 F. Supp. 2d at 246 (alleging that absent fraud issuer "would not have had to file for bankruptcy" is "too general and conclusory" to plead loss causation).

### C.     The Ripple Tender Sale Allegations Do Not Plead Loss Causation

Plaintiffs also alleged that they suffered a loss of "nearly $24 million in value" when, "[i]n connection with Ripple's December 2024 tender offer," Mr. Sarris authorized the sale of approximately 3.1% of the Ripple shares held by the Series (roughly 141,000 shares, for approximately $18 million) "without informing Investors or seeking their approval." (FAC ¶¶ 127–28.) This allegation fails to plead loss causation for several reasons.

First, as demonstrated above in Section I.C., the premise that the Ripple tender sale was unauthorized is refuted by the Liquidshares Operating Agreement, which expressly permitted a sale in response to a tender offer without obtaining investor approval.  A tender sale authorized by investment documents signed and acknowledge by plaintiffs cannot be the "fraud" that caused anyone's loss. Plaintiffs' objection that the tender proceeds are "being used to pay for Bankruptcy costs" (FAC ¶ 128) is a complaint about the administration of Linqto's estate — supervised by another court, under a confirmed bankruptcy plan — not a § 10(b) economic loss proximately caused by any alleged misstatement of any Moving Defendant.

Second, plaintiffs can state no claim for damages for violation of Rule 10b-5 because they did not own and did not actually buy or sell the Ripple shares tendered. Under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–33, 95 S. Ct. 1917, 1923–24 (1975), standing to bring a private damages action is limited only to "purchasers and sellers of securities," expressly excluding investors who "suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5," *id.* at 737–38. Here, putative class members purchased Series Interests in Liquidshares.  Liquidshares owned the underlying Ripple shares, and Liquidshares actually sold them to Ripple in the December 2024 tender, not plaintiffs. Plaintiffs therefore have no standing to assert a direct claim for damages, because any loss from the tender sale would fall on the Series. At most, plaintiffs would have a "derivative action" on behalf of the entity.  *See id.* at 738.

## VI.    THE REMAINING COUNTS FAIL ON THEIR OWN TERMS

### A.    The Rescission Claims (Count IV) Plead No Statutory Seller, and Almost All Are Time-Barred

Count IV seeks rescission under Securities Act § 12(a)(1) for the sale of unregistered securities in violation of § 5. The claim fails for at least two reasons: a one-year statute of

limitations eliminates nearly every purchase the named plaintiffs claim, and § 12(a)(1) reaches only a buyer's actual seller or solicitor, which no Individual Defendant is alleged to be.

A § 12(a)(1) claim cannot be brought more than one year after the violation, 15 U.S.C. § 77m, and for an illegal-offer or solicitation claim that one-year period begins when the plaintiff acquires the security. *Williams v. Binance*, 96 F.4th 129, 140–43 (2d Cir. 2024); *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875–76 (2d Cir. 1971). The original complaint was filed July 9, 2025, and the FAC added nine Individual Defendants on November 17, 2025. Every purchase before July 9, 2024, is therefore barred as to Mr. Sarris, and every purchase before November 17, 2024, is barred as to the other defendants. Plaintiff A.O.H.'s four purchases closed in December 2022, and thus it has no timely claim against anyone. Of Bhatt's seven certified purchases, six survive against Sarris ($40,231.14 in total), and only four made in December 2024 ($20,178.94) survive against other defendants.  (ECF Nos. 23-1, 23-2.)[18]

Even if some claims are not time-barred, liability under Section 12(a)(1) applies only to the person who passed title to the buyer and the person who "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647, 108 S. Ct. 2063, 2076, 2078 (1988). Participation short of that is not enough: "[c]ollateral participants who do not solicit sales" are not § 12 sellers, *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989), and an officer's role in a platform's general promotion is not the "direct and active participation in the solicitation of the immediate sale" the statute requires, *Underwood v. Coinbase Global, Inc.*, 654

---

[18] In an effort to avoid this, the FAC suggests that all ninety-odd Series offerings "should be integrated" and treated as one large, non-exempt public offering. (FAC ¶¶ 99, 155(g), 181; *see also id.* ¶ 189 (the ICA variant, "integrating" the Series into a single unregistered investment company, which fails with Count V below).) Integration polices an issuer's artificial division of its own offering in a particular security. Securities Act Release No. 4552, 27 Fed. Reg. 11316 (Nov. 6, 1962). Plaintiffs cite no authority for fusing the offerings of some ninety different issuers, each selling a different security, into one.

51

F. Supp. 3d 224, 238 (S.D.N.Y. 2023), *rev'd in part on other grounds sub nom. Oberlander v. Coinbase Global Inc.*, No. 23-184-cv, 2024 WL 1478773 (2d Cir. Apr. 5, 2024) (summary order); *see Capri v. Murphy*, 856 F.2d 473, 478–79 (2d Cir. 1988). No Individual Defendant passed title because the counterparty to every subscription was the Series itself, and none is alleged to have solicited either plaintiff. The FAC never alleges that any defendant, Mr. Sarris included, specifically communicated with A.O.H. or Bhatt at all. It offers only the group-pleaded assertion that all ten "directed the offer and sale of securities" and "managed marketing, and sales activities." (FAC ¶ 182.) The Supreme Court in *Pinter* rejected that theory, holding that § 12 does not reach "participants collateral to the offer or sale," and it declined the SEC's invitation to extend liability to those who "participate in soliciting the purchase." 486 U.S. at 650–51 & n.27. Allegations that defendants participated by directing sales and managing marketing at a general level therefore fail to state a claim. *Compare Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357–58 (S.D.N.Y. 2019) (officers who personally promoted offering while it ran were sellers at pleading stage).

**B.    Count V Must Be Dismissed Because There Is No Private Right of Action Under the ICA**

Count V fails at the threshold because no private plaintiff may enforce ICA § 7(a). The Supreme Court recently held that § 47(b)—the sole basis for private enforcement the FAC identifies, *see* FAC ¶ 16—"does not impliedly empower private parties to sue for rescission of contracts that allegedly violate the Act," observing that "Congress's decision to create a comprehensive agency enforcement scheme supports the conclusion that private parties generally cannot enforce the ICA." *FS Credit Opps. Corp. v. Saba Capital Master Fund, Ltd.*, 608 U.S. ___, No. 24-345, slip op. at 7 (June 11, 2026) (abrogating *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99 (2d Cir. 2019)). Section 7(a) supplies no right to sue either: it commands that "[n]o investment company" shall engage in interstate commerce absent registration—language focused

"on the person regulated rather than the individuals protected"—and so lacks the rights-creating language any implied right requires.[19]

### C.    The State-Law Claims (Counts VI and VII) Fail

### 1.  The Texas Securities Act Does Not Apply

Count VI pleads that the Individual Defendants sold unregistered securities, made misleading statements in violation of the Texas Securities Act, Tex. Gov't Code §§ 4008.051, 4008.052(a), and controlled those who did, *id. § 4008.055(a). (*FAC ¶¶ *193–98.)*[20] The Act reaches a claimant's transaction only on a showing that Texas law applies to it because the selling conduct in the claimant's own purchase emanated from Texas.[21] Neither plaintiff meets this standard. Plaintiff A.O.H. is a Netherlands holding company, Bhatt is a New Jersey resident, and nothing in the FAC connects either one's purchases to Texas. The Texas allegations (FAC ¶ 195) — a conclusory assertion that Defendants "offered for sale and sold securities in Texas," a count of Texas investors, the geography of portfolio companies, and Linqto's bankruptcy venue — say nothing about the sale of anything to A.O.H. or Bhatt. And plaintiffs have already pleaded where this conduct happened, one count over: the "prohibited unlawful business practices . . . took place in California." (FAC ¶ 210.) Count VI fails for want of any Texas nexus.

---

[19] *Accord UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695, 698–700 (9th Cir. 2018) (ICA registration provisions "do not have rights-creating language"); *see also Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 432–36 (2d Cir. 2002); *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116–17 (2d Cir. 2007).

[20] The Texas Securities Act was recodified without substantive change as Title 12 of the Texas Government Code, effective January 1, 2022. *See* Act of May 21, 2019, 86th Leg., R.S., ch. 491 (H.B. 4171); *Collingwood USA, Inc. v. Morgan Stanley & Co., LLC*, No. 05-24-00629-CV, 2026 WL 978579, at *4 n.5 (Tex. App.—Dallas Apr. 10, 2026, no pet. h.) (mem. op.). Decisions construing the former statute, Tex. Rev. Civ. Stat. art. 581-33, therefore apply with equal force.

[21] *Citizens Ins. Co. v. Daccach*, 217 S.W.3d 430, 440, 442–47 (Tex. 2007) (claimant invoking the Act bears the burden of showing that Texas law governs his transaction); *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 471–76 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Act applied to non-resident investors where the selling conduct occurred in Texas — Texas-based operations, Texas-governed agreements, and a Houston closing).

Even with a Texas nexus, the claim would fail. Both provisions Count VI invokes require privity. Section 4008.051 makes an offeror or seller liable only "to a person who buys the security from the offeror or seller," and § 4008.052(a) reaches only a person who "offers or sells a security and from whom another person buys the security." Tex. Gov't Code §§ 4008.051(a), 4008.052(a). That is "a privity provision, allowing a buyer to recover from his offeror or seller," *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 383–84 (Tex. App.—Houston [14th Dist.] 2000, pet. denied), or from a solicitor who directly communicated with the buyer, *Davis v. MSR Holdings, LLC*, No. 01-22-00451-CV, 2024 WL 3237623, at *10–11 (Tex. App.—Houston [1st Dist.] June 28, 2024, pet. denied) (mem. op.); the Series passed title, and no Individual Defendant is alleged to have communicated with either plaintiff. *Supra Part A.* Control-person liability (FAC ¶¶ 196, 198), now Tex. Gov't Code § 4008.055(a), requires general control over the primary violator plus the power to control the specific transaction, *Frank*, 11 S.W.3d at 384; *Barnes v. SWS Fin. Servs., Inc.*, 97 S.W.3d 759, 763–64 (Tex. App.—Dallas 2003, no pet.) — and the FAC pleads neither, only board titles and one undifferentiated sentence about all ten defendants at once.

## 2. California's Unfair Competition Law Does Not Apply

Count VII invokes California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, treating the alleged securities-law violations as "unlawful" business practices. (FAC ¶¶ 200–17.) But "section 17200 does not apply to securities transactions." *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 788, 790 (2004).[22] The rule spares only conduct tangentially related to a securities transaction, *Betz v. Trainer Wortham & Co.*, 829 F. Supp. 2d 860, 866 (N.D. Cal. 2011),

---

[22] Federal courts applying California law dismiss UCL claims predicated on securities offerings. *See, e.g.*, *Cress v. Nexo Fin. LLC*, No. 23-cv-00882-TSH, slip op. at 23–24 (N.D. Cal. Oct. 10, 2023); *Zakinov v. Ripple Labs, Inc.*, No. 18-cv-06753 (PJH), 2020 WL 922815, at *22–23 (N.D. Cal. Feb. 26, 2020); *Siegal v. Gamble*, 2016 WL 1085787, at *7–8 (N.D. Cal. Mar. 21, 2016).

and nothing at the heart of this count is tangential: the gravamen of ¶¶ 205–08 — the offer, sale, and delivery of the Series Interests, the markups on those sales, and the statements made to induce them — is the purchase and sale of securities. Even if it were not, Count VII would still fail: a defendant's UCL liability "must be based on his personal participation in the unlawful practices and unbridled control over the practices," *Evolution Fast Food One, LP v. HVFG, LLC*, 720 F. Supp. 3d 251, 267 (S.D.N.Y. 2024) (quoting *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002)), and the FAC pleads neither for any defendant — only ¶ 176's undifferentiated group sentence. The UCL, moreover, affords only restitution and injunctive relief, *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144–45 (2003), and Count VII seeks only those. (¶¶ 214–15.) Restitution fails at the threshold, because the FAC traces none of plaintiffs' money "to money or property within the defendant's possession." *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 953 (N.D. Cal. 2018).[23]

## CONCLUSION

For the reasons set forth herein, each count of the Complaint should be dismissed as against each Defendant, with prejudice.

---

[23] Neither remedy would be available in any event. Plaintiffs plead damages claims at law for the same sums, and so cannot "establish that [they] lack[] an adequate remedy at law." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *accord In re Nurture Baby Food Litig.*, No. 21-cv-01217 (MKV), 2025 WL 918927, at *16–17 (S.D.N.Y. Mar. 26, 2025). And an injunction requires facts showing "another incident is likely to occur," *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 465 (2005) — the platform ceased operations in March 2025, and Linqto is in Chapter 11. (¶¶ 13, 118, 121.)

Dated: New York, New York
         July 30, 2026

                                             Respectfully submitted,

TREANOR DEVLIN BROWN PLLC          PIERSON FERDINAND LLP
*/s/ Timothy J. Treanor*               */s/ Aurora Cassirer*
Timothy J. Treanor                 Aurora Cassirer
Arlo Devlin-Brown                  Alicia N. Washington
John J. Lavelle                    1270 Avenue of the Americas
230 Park Avenue, Suite 450         7th Floor – 1050
New York, NY 10169                 New York, NY 10020
Telephone: +1 (212) 858-9080       aurora.cassirer@pierferd.com
ttreanor@tdblaw.com                alicia.washington@pierferd.com
arlo@tdblaw.com                    *Counsel for Defendant Joseph Endoso*
jlavelle@tdblaw.com
*Counsel for Defendant William Sarris*

LAW OFFICE OF WILLIAM H. KIMBALL   CHIESA SHAHINIAN & GIANTOMASI PC
*/s/ William H. Kimball*               */s/ Lee Vartan*
William H. Kimball                 Lee Vartan
803 Hearst Avenue                  11 Times Square, 34th Floor
Berkeley, CA 94710                 New York, New York 10036
Telephone: (510) 704-1400          Telephone: (212) 973-0572
wkimball@wkimball.com              lvartan@csglaw.com
*Counsel for Defendant David Paul*     *Counsel for Defendant Brian Moran*

EHRLICH & CRAIG LLP                KOPECKY SCHUMACHER ROSENBURG
*/s/ Alexander Setzepfandt*            LLC
Alexander Setzepfandt              */s/ David Slovick*
803 Hearst Avenue                  David Slovick
Berkeley, California 94710         James L. Kopecky
Telephone: (510) 548-3600          120 N. LaSalle Street, Suite 200
Fax: (510) 291-3060                Chicago, IL 60602
alex@ehrlich-craig.com             Telephone: (312) 380-6552
*Counsel for Defendant Karim Nurani*   dslovick@ksrlaw.com
                                   jkopecky@ksrlaw.com
                                   *Counsel for Defendant Rainmaker Securities,*
                                   *LLC*

56

**CERTIFICATON PURSUANT TO LOCAL RULE 7.1(c)**

I certify that this memorandum of law complies with Local Rule 7.1(c), this Court's

Stipulation and Order Extending Page Limits for Briefing on Motions to Dismiss the First

Amended Complaint, ECF No. 119, and this Court's Individual Rules.  The brief is 55 pages, not

including the caption, signature blocks, and this certification.


*/s/ Timothy J. Treanor*
Timothy J. Treanor

58

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Timothy J. Treanor*
Timothy J. Treanor