**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.O.H. DRIEDIJK HOLDING B.V. AND JAIMIN BHATT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM SARRIS, JOSEPH A. ENDOSO, DAVID PAUL, BRIAN MORAN, KARIM NURANI, MARGARET SLEMMER, VICTOR JIANG, ALISON DAVIS, NORMAN REED, ADAM T. HENDERSON, AND RAINMAKER SECURITIES, LLC.<br><br>Defendants. | Case No. 1:25-cv-5643 (LAK)<br><br>CLASS ACTION<br>JURY TRIAL DEMAND |

**PLAINTIFFS' OPPOSITION TO MOVING DEFENDANTS' CONSOLIDATED MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

BRIEF SUMMARY OF THE ALLEGATIONS ..... 2

I. LINQTO'S BACKGROUND AND CREATION ..... 2

II. THE PLATFORM ALLEGEDLY ALLOWED INVESTORS TO BUY "SHARES" OF PRIVATE COMPANIES ..... 4

III. DEFENDANTS MARKETED LINQTO AS A WAY TO INVEST IN PRIVATE SECURITIES WITH NO ADDED FEES OR HIDDEN COSTS ..... 4

IV. LINQTO DID NOT ACTUALLY OPERATE AS IT PURPORTED TO ..... 4

A. Linqto Allowed Non-Accredited Investors on Its Platform ..... 5

B. Linqto Did Not Offer Investors Private Securities ..... 5

C. Linqto Hid Prices, Fees, and Markups Within the Offering Price ..... 5

D. Linqto Used Misleading Promotional Tactics to Induce Investors to Purchase on the Platform ..... 6

V. THE TRUTH BEGINS TO EMERGE ..... 6

VI. POST-FILING DEVELOPMENTS ..... 8

PROCEDURAL BACKGROUND ..... 9

LEGAL STANDARD ..... 10

ARGUMENT ..... 11

I. EXCHANGE ACT CLAIMS ..... 11

A. The Complaint Adequately Alleges Scheme Liability ..... 11

B. Defendants Made False and Misleading Statements ..... 15

1. Plaintiffs Do Not Impermissibly Group Plead ..... 16

2. Defendants' "Ownership Statements" Are Actionable ..... 17

3. Actionable Statements Concerning Linqto's Pricing and Markups ..... 19

4. Defendants' Statements About Accredited Investors Are Actionable ..... 21

5. Defendants Made Actionable Statements About Inventory and Ripple Stock ..... 22

C. Defendants Omitted Material Information They Had A Duty to Disclose ..... 23

D. The Complaint Alleges a Cogent and Compelling Inference of Scienter ..... 24

1. Defendants' Knowledge Supports Scienter ..... 25

2. Circumstantial Evidence Adds to the Inference of Scienter ............... 26

3. Defendants' Scienter Arguments Are Baseless. ................................ 28

E. Reliance is Established ..................................................................... 31

F. Plaintiffs Plead Loss Causation ........................................................... 34

1. A Final Determination On Loss Causation Is Inappropriate at This Early Stage of Litigation ....................................................... 34

2. Plaintiffs Adequately Plead Loss Causation Under Materialization of the Risk and Corrective Disclosure Theories ................................ 35

3. Linqto's Bankruptcy Is a Direct Result of Defendants' Actions ........ 37

4. Defendants' Loss Causation Arguments Are Baseless ....................... 37

G. Plaintiffs' Adequately Allege Control Under §20(a) ............................... 41

II. SECURITIES ACT CLAIMS ............................................................................ 42

A. Plaintiffs State a Claim Under §12(a)(1) of the Securities Act ................ 42

1. Whether Certain Claims Are Time-Barred Is Not Dispositive on a Motion to Dismiss ..................................................................... 42

2. Individual Defendants Are Statutory Sellers .................................... 43

3. Solicitation Is a Factual Question ..................................................... 45

III. PLAINTIFFS' TEXAS SECURITIES ACT CLAIM.......................................... 46

A. Whether Absent Class Members May Assert Texas Claims Is a Question for Class Certification, Not a Basis for Dismissal ................. 47

B. The Complaint Pleads a Substantial Texas Nexus................................... 47

C. Defendants Are Liable under the TSA as Sellers and as Control Persons.......................................................................... 48

IV. THE CALIFORNIA UNFAIR COMPETITION LAW ...................................... 50

CONCLUSION........................................................................................................ 53

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbey v. 3F Therapeutics, Inc.*,
2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009) ....................34

*Anwar v. Fairfield Greenwich Ltd.*,
306 F.R.D. 134 (S.D.N.Y. 2015) ....................31, 32, 33

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)....................46

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ....................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................10

*Audet v. Fraser*,
332 F.R.D. 53 (D. Conn. 2019)....................32

*Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340 (S.D.N.Y. 2019)....................43, 44

*Baliga v. Link Motion, Inc.*,
2022 WL 16707361 (S.D.N.Y. Nov. 4, 2022)....................33

*Baxter v. MongoDB, Inc.*,
832 F. Supp. 3d 214 (S.D.N.Y. 2026)....................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................10

*Betz v. Trainer Wortham & Co.*,
829 F. Supp. 2d 860 (N.D. Cal. 2011) ....................51

*Born v. Quad/Graphics, Inc.*,
521 F. Supp.3d 469 (S.D.N.Y. 2021)....................29

*Brown v. Cole*,
155 Tex. 624, 291 S.W.2d 704 (1956)....................49

*Camofi Master LDC v. Riptide Worldwide, Inc.*,
2011 WL 1197659 (S.D.N.Y. Mar. 25, 2011) ....................16

*Capri v. Murphy*,
856 F.2d 473 (2d Cir. 1988)....................43, 44

*DeFrees v. Kirkland*,
2012 WL 12885065 (C.D. Cal. Aug. 10, 2012)....................52

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)....................27

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).................... *passim*

*Elliott Assocs., L.P. v. Hayes*,
141 F. Supp. 2d 344 (S.D.N.Y. 2000)....................16

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003)....................34, 37

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)....................29

*Evolution Fast Food One, LP v. HVFG, LLC*,
720 F. Supp. 3d 251 (S.D.N.Y. 2024)....................52

*Fed. Hous. Fin. Agency for Fed. Nat'l Morg. Ass'n v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)....................43

*Frank v. Bear, Stearns & Co.*,
11 S.W.3d 380 (Tex. App. 2000)....................49

*FS Credit Opps. Corp. v. Saba Cap. Master Fund, Ltd.*,
608 U.S. 608 (2026)....................1

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)....................19, 20

*Gimpel v. The Hain Celestial Grp., Inc.*,
156 F.4th 121 (2d Cir. 2025) ....................15

*Grandon v. Merrill Lynch & Co.*,
147 F.3d 184 (2d Cir. 1998)....................20

*Gruber v. Gilbertson*,
2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ....................24

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)....................27

*Hardin v. TRON Found.*,
2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024)....................43, 47

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010)....................16, 41

*In re Ambac Fin. Corp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................29

*In re Arqit Quantum Inc. Sec. Litig.*,
774 F. Supp. 3d 505 (E.D.N.Y. 2025)....................44

*In re ASML Holding N.V. Sec. Litig.*,
825 F. Supp. 3d 208 (S.D.N.Y. 2026)....................18, 22

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................26, 28

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)....................31

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
2025 WL 965265 (S.D.N.Y. Mar. 31, 2025)....................26, 27

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y.2005)....................26

*In re Cannavest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018)....................16

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012)....................47

*In re Dentsply Sirona, Inc. Sec. Litig.*,
816 F. Supp. 3d 449 (S.D.N.Y. 2026)....................14, 15, 27

*In re Didi Global Inc. Sec. Litig.*,
2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024)....................29

*In re: EZCorp, Inc. Sec. Litigations*,
181 F. Supp. 3d 197 (S.D.N.Y. 2016)....................21

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013)....................33

*In re ForceField Energy, Inc. Sec. Litig.*,
2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ....................12, 14

*In re Glob. Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004)....................41

*In re Lottery.com, Inc. Sec. Litig.*,
765 F. Supp. 3d 303 (S.D.N.Y. 2025)....................17

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)....................11, 43

*In re Myland N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ....................26

*In re New Energy Sys. Secs. Litig.*,
66 F. Supp. 3d 401 (S.D.N.Y. 2014)....................37, 38

*In re Nexus 6P Prods. Liab. Litig.*,
293 F. Supp. 3d 888 (N.D. Cal. 2018) ....................52

*In re NTL Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004)....................10

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)....................35

*In re Oxford Health Plans, Ins. Sec. Litig.*,
51 F. Supp. 2d 290 (S.D.N.Y. 1999)....................27

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ....................27

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 472 (S.D.N.Y. 2005)....................13

*In re Pretium Res. Inc. Sec. Litig.*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)....................23, 27

*In re ProNetLink Sec. Litig.*,
403 F. Supp. 2d 330 (S.D.N.Y. 2005)....................13

*In re PXRE Group, Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)....................31

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)....................31

*In re Scot. Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007)....................11

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)....................30

*In re Stillwater Cap. Partners Inc. Litig.*,
853 F. Supp. 2d 441 (S.D.N.Y. 2012)....................20

*In re Tronox, Inc. Sec. Litig.*,
769 F. Supp. 2d 202 (S.D.N.Y. 2011)....................41

*In re Turquoise Hill Res. Ltd*.,
2024 WL 4711185 (S.D.N.Y. Nov. 7, 2024)....................18

*In re Vivendi, S.A. Sec. Litig*.,
838 F.3d 223 (2d Cir. 2016)....................23, 40

*In re Zeta Global Holdings Corp. Sec. Litig.*,
2026 WL 1971169 (S.D.N.Y. July 8, 2026)....................12, 13, 41

*Jackson v. Abernathy*,
960 F. 3d 94 (2nd Cir. 2020)....................29

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011).................... *passim*

*Janus. City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................16

*Kalin v. Xanboo, Inc*,
526 F. Supp. 2d 392 (S.D.N.Y. 2007)....................23

*Langan v. Johnson & Johnson Consumer Cos.*,
897 F.3d 88 (2d Cir. 2018)....................47

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
10 F. Supp. 3d 504 (S.D.N.Y. 2014)....................34

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)....................35, 39

*Leone v. ASP Isotopes Inc.*,
811 F. Supp. 3d 563 (S.D.N.Y. 2025)....................20

*Lorenzo v. SEC*,
587 U.S. 71 (2019)....................12

*Louros v. Kreicas*,
367 F. Supp. 2d 572 (S.D.N.Y. 2005)......15

*Maltz v. Union Carbide Chemicals & Plastics Co.*,
992 F. Supp. 286 (S.D.N.Y. 1998)......52

*Marini v. Adamo*,
995 F. Supp. 2d 155 (E.D.N.Y. 2014)......18, 21, 38, 39

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018)......23

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*,
801 F. Supp. 2d 41 (E.D.N.Y. 2011)......21

*McDonald v. Coldwell Banker*,
543 F.3d 498 (9th Cir. 2008)......50

*McKell v. Wash. Mut., Inc.*,
142 Cal. App. 4th 1457 (2006)......50

*Menaldi v. Och-Ziff Capital Management Group, LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016)......15

*Meyer v. Jinkosolar Holdings Co*.,
761 F.3d 245 (2d Cir. 2014)......23

*Novak v. Kasaks*,
216 F.3d 300 (2nd Cir. 2000)......24, 25

*Okla. Firefighters Pension & Ret. Sys. v. Musk*,
779 F. Supp. 3d 396 (S.D.N.Y. Mar. 28, 2025)......13, 25

*Osberg v. Foot Locker, Inc*.,
2014 WL 5800501 (S.D.N.Y. Nov. 7, 2014)......33

*Overstock.com, Inc. v. Gradient Analytics, Inc.*,
151 Cal. App. 4th 688 (2007)......51

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)......30

*Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021)......14

*Police and Fire Retirement System City of Detroit v. Argo Group Int'l Holdings LTD*,
2024 WL 5089970 (S.D.N.Y. Dec. 1, 2024)......14, 30

*Rio Grande Oil Co. v. State*,
539 S.W.2d 917 (Tex. Civ. App. 1976) ....48, 49

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ....30

*S.E.C. v. Constantin*,
939 F. Supp. 2d 288 (S.D.N.Y. 2013) ....20

S.*E.C. v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996) ....20

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024) ....27, 29

*SEB Investment Management AB v. Wells Fargo & Co.*,
742 F. Supp. 3d 1003 (N.D. Cal. 2024) ....31

*SEC v. Farnsworth*,
692 F. Supp. 3d 157 (S.D.N.Y. 2023) ....13, 28

*SEC v. Fiore*,
416 F. Supp. 3d 306 (S.D.N.Y. 2019) ....13

*SEC v. Sayid*,
2018 WL 357320 (S.D.N.Y. Jan. 10, 2018) ....10

*SEC v. Sugarman*,
2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ....14

*Set Cap. LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021) ....30

*Sharette v. Credit Suisse Int'l*,
127 F. Supp. 3d 60 (S.D.N.Y. 2015) ....30

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
545 F. Supp. 3d 120 (S.D.N.Y. 2021) ....34, 35

*Slack v. Shreve*,
2024 WL 4644610 (Tex. App. Oct. 31, 2024) ....49

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ....27

*Steamfitters Local 449 Pension & Retirement Security Funds v. Extreme Networks, Inc.*,
824 F. Supp. 3d 983 (S.D.N.Y. 2026) ....13

*Strigliabotti v. Franklin Resources, Inc.*,
2005 WL 645529 (N.D. Cal. 2005) ....................51

*Suez Equity Investors, L.P. v. Toronto–Dominion Bank*,
250 F.3d 87 (2d Cir. 2001)....................38, 39

*Summers v. WellTech, Inc.*,
935 S.W.2d 228 (Tex. App. 1996)....................49

*Szulik v. Tagliaferri*,
966 F. Supp. 2d 339 (S.D.N.Y. 2013)....................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................25, 29

*Texas Cap. Sec., Inc. v. Sandefer*,
58 S.W.3d 760 (Tex. App. 2001)....................49

*Tseng v. De Vries*,
2023 WL 8073087 (2d Cir. Nov. 21, 2023)....................44

*U.S. SEC v. Brown*,
740 F. Supp. 2d 148 (D.D.C. 2010) ....................13

*Valentini v. Citigroup, Inc.*,
837 F. Supp. 2d 304 (S.D.N.Y. 2011)....................17, 52

*Van Dongen v. CNinsure, Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013)....................27

*Vtech Holdings Ltd. v. PricewaterhouseCoopers LLP*,
348 F. Supp. 2d 255 (S.D.N.Y. 2004)....................10

*Whiteside v. Hover-Davis, Inc.*,
995 F.3d 315 (2d Cir. 2021)....................42

*Williams v. Binance*,
96 F.4th 129 (2d Cir. 2024) ....................42, 47

*Yannes v. SCWorx Corp.*,
2021 WL 2555437 (S.D.N.Y. June 21, 2021) ....................27

## STATUTES

Cal. Bus. & Prof. Code §17200 ....................50, 51

Securities Exchange Act of 1933
15 U.S.C. §77....................42

Securities Exchange Act of 1934
15 U.S.C. §78j ........ *passim*

Texas Securities Act, Tex. Gov't Code §4008 ........ *passim*

**Other Authorities**

17 C.F.R. §240.10b ........ 11

Fed. R. Civ. P. 15(a) ........ 52

Fed, R. Civ. P. 41(a)(1)(A)(i) ........ 9

Rule 10(b)5 ........ *passim*

Rule 12 ........ *passim*

Rule 23 ........ 47

Lead Plaintiffs A.O.H. Driedijk Holding B.V. and Jaimin Bhatt ("Plaintiffs") hereby respond to the Memorandum of Law in Support of Moving Defendants' Consolidated Motion to Dismiss the First Amended Complaint (ECF No. 131) ("Motion" or "Mot.").[1]

**INTRODUCTION**

The existence of a fraud cannot seriously be disputed here. The SEC and FINRA agree. Quite simply, Defendants wanted to take their investment platform public and did whatever it took to accomplish that: from outright lying about ownership interests and accreditation standards, to concealing excessive fees and markups, to blatantly ignoring securities regulation requirements. Ultimately, the scheme was unsuccessful and rather than go public, the company shut down, filed for bankruptcy, and became the subject of intensive regulatory investigations and guilty pleas.

In their Motion, Defendants blame anyone but themselves—new management, the bankruptcy, investors themselves. But the detailed facts alleged show that the buck squarely stops at Defendants' feet. The allegations detail acts taken by Defendants in furtherance of the scheme, their misstatements and omissions made with scienter, and the losses suffered by investors whose investments have been literally frozen. On top of securities law violations, Plaintiffs also allege violations of both Texas and California state law.[2]

Defendants' five supposedly "fatal" defects with the allegations simply do not exist. ***First***, Defendants attempt to rely upon a veritable laundry list of documents from outside the four corners of the complaint which is patently impermissible. ***Second***, they harp on "group pleading" while ignoring that any such pleading is permitted in precisely these circumstances. ***Third***, again relying

---

[1] "Moving Defendants" are William Sarris, Joseph Endoso, David Paul, Brian Morian, Karim Nurani, and Rainmaker Securities, LLC ("Rainmaker") and when discussed together, referred to herein as "Defendants." Linqto, Inc. ("Linqto" or the "Company") is not named as a defendant given its bankruptcy status.

[2] Plaintiffs voluntarily dismiss their claim under the Investment Company Act in light of the Supreme Court's recent decision in *FS Credit Opps. Corp. v. Saba Cap. Master Fund, Ltd.*, 608 U.S. 608 (2026).

largely on extraneous documents, they claim there is no reliance and at the same time compare this case to those of a publicly traded company. *Fourth*, they completely overlook the detailed, explicit allegations of actual knowledge (or at a minimum recklessness) and instead fixate on the fact that no Defendant sold stock—*when there was no publicly traded stock to even be sold.* *Fifth*, they perplexingly somehow claim that investors might have gained, rather than lost money. This could not be further from the truth as investors' money has been frozen, they paid exorbitant fees and markups, and they will never recoup even close to their losses in the bankruptcy proceedings.

Therefore, none of Defendants' arguments succeed. They also fail to appreciate both how egregious the conduct here was and how this case differs from those they cite in that it is a private company and the company itself—given its bankruptcy filing—cannot be named. In the end, this is an outright case of fraud and none of Defendants' excuses, scapegoats, or finger-pointing should be countenanced. For the reasons stated herein, Defendants' Motion should be denied.

## BRIEF SUMMARY OF THE ALLEGATIONS

Plaintiffs allege that throughout the Class Period (February 1, 2020 through March 14, 2025), Defendants engaged in a scheme to defraud investors and regulators and made a series of materially misleading statements and omissions all in violation of federal and state laws.

### I. LINQTO'S BACKGROUND AND CREATION

Linqto began as a technology and software development company and, by 2020, had evolved into a financial technology and digital trading company offering an online trading and private equity investment platform (the "Platform"). ¶¶33–34.[3] Linqto purported to facilitate investments in privately-held, pre-IPO companies—primarily startups and "unicorns" that were

[3] All "¶" references are to paragraphs in the First Amended Complaint (ECF No. 46) (the "Complaint").

historically inaccessible to smaller investors, in part due to high minimum investment thresholds, typically starting around $100,000. ¶¶35–37.

Linqto capitalized on an era where the number of unicorns had multiplied dramatically and market investors (both retail and accredited) wanted a stake in them. ¶35. Linqto purported to offer investors with accredited status (i.e., those that met the SEC's specific wealth, income, sophistication, or professional criteria) the opportunity to do so at low minimum investment thresholds that paled in comparison to historical amounts. ¶36. The SEC views "retail" investors as lacking the financial sophistication to understand the complexity and bear the illiquidity of private market investments given the private market's reduced reporting and disclosure obligations. ¶¶36, 76 ("As a US based company we are bound by regulations that state you must be accredited or qualified to invest.").

For accredited investors, Linqto purportedly provided access to popular private securities with low barriers to entry. Indeed, Linqto championed itself as "democratiz[ing]" private investing, and "allowing accredited investors to identify, evaluate, invest in, and make liquid investments in the world's leading unicorns and private companies" with "affordable minimums[.]" ¶38. Compared to competitors that offered $100,000 investment minimums, Linqto initially only required a $10,000 minimum, lowering that minimum to $2,500 by December 2023 and to only $1,000 by the end of the Class Period. ¶¶40–41.

Ripple Labs, Inc. ("Ripple") was one of Linqto's most popular listings. ¶66. Ripple is a privately held blockchain-based digital payments company that created the "XRP" digital asset and related network. *Id.* Ripple had achieved unicorn status by December 2019 and the popularity of XRP generated investor interest. *Id.* According to Former Employee ("FE") 1, a former Product

Marketing Lead at Linqto, by 2025, more than 60% of Linqto's customer base had invested in Ripple. ¶¶46, 66.

## II. THE PLATFORM REPRESENTED THAT INVESTORS COULD BUY "SHARES" OF PRIVATE COMPANIES

Linqto's Platform was accessible via its webpage and smartphone application. ¶5. On the Platform's homepage, Linqto catalogued its "listings" of privately held companies with "shares" available for purchase. ¶55. Once investors selected which listing they wanted to purchase, they were redirected to a page where they could place an order for "shares" of that company. ¶56. That page listed an investor's potential investment amount as a function of shares purchased multiplied by the price per "share" as well as "shares owned" in that company and information about the company, including valuation information. *Id.*

## III. DEFENDANTS MARKETED LINQTO AS A WAY TO INVEST IN PRIVATE SECURITIES WITH NO ADDED FEES OR HIDDEN COSTS

Linqto claimed it would "qualify accredited investors" because only accredited investors were allowed to invest on the Platform. ¶76. Once on the Platform, Linqto explained investors could "invest *in* the world's leading Unicorns" and "[I]nvest *in* top mid-to late-stage start-ups" using their "user-friendly platform [which] provide[d] *direct access* to private securities[.]" ¶77 (emphasis added). Linqto also promised in its press materials that an investment carried "no hidden fees or costs." ¶86. Buried on Linqto's expandable drop-down page of FAQs, Defendants answered the question "[a]re there fees to invest?" by stating "No! Linqto sources deals and marks them up so that there are no further follow on fees for the investor whatsoever." *Id.*

## IV. LINQTO DID NOT OPERATE AS IT PURPORTED TO

Linqto's operations differed materially from how Defendants represented them to investors.

### A. Linqto Allowed Non-Accredited Investors on Its Platform

Defendants allowed, failed to remove, and adjusted controls to make it easier for non-accredited investors to purchase on the Platform. For example, in 2023, Linqto allegedly permitted prospective investors to "self-certify" and implemented its own "FiSo test" based on the Company's interpretation of what constituted a "financially sophisticated" investor. ¶¶48–49.

In some instances, Linqto ignored accreditation requirements altogether. For example, to permit prospective Ripple purchasers who could not otherwise qualify as accredited investors to participate, Linqto "classified them as retail investors[.]" ¶50. FE-1 recalled that the majority of Ripple investors were not accredited, but their influx spiked Company revenue. *Id.*

### B. Linqto Did Not Offer Investors Direct Ownership in Private Securities

While the Platform represented that investors were placing orders for "shares" in listings, investors never actually owned those shares. *See* ¶¶55, 82. Instead, Defendants purchased shares in the private companies listed on the Platform and sold them to Linqto Liquidshares, LLC ("Liquidshares"). ¶ 57. Liquidshares then allocated interests in those shares to special purpose vehicles ("SPVs") which Linqto created through a Series Limited Liability Company ("Series"). *Id.* Ultimately, therefore, Linqto sold investors interests, called "units," in these Linqto-created SPVs. *Id.* Thus, far from purchasing shares of unicorns, investors purchased indirect economic interests in those shares, which were held and managed by Linqto. ¶58.

### C. Linqto Hid Prices, Fees, and Markups Within the Offering Price

While the only price that investors saw on the Platform was the "share" price, the true price paid for units of Series interests was comprised of the acquisition price, associated expenses, fees paid to supervisory affiliates, interest charges, and an undisclosed markup. ¶61. Linqto did therefore have "hidden fees." For example, until at least approximately December 2022, Linqto

paid a fee to Defendant Rainmaker (and its affiliated brokers) for "supervisory" services which consisted of 2.5% of sales revenue plus at least a 1.35% sales commission. ¶62.

Linqto profited handsomely from the difference between the acquisition price versus the price Linqto sold Series interests to investors. These hidden markups, ranging from 20–150% of the acquisition price, were set both manually and by algorithm to manipulate prices and take advantage of the lack of oversight at the expense of investors. ¶64. As FE-2, a former Linqto Brand Manager alleged, Linqto's markup practice was "fairly well known in the Company" and there appeared to be a "proactive stance to make sure it wasn't communicated" to investors. ¶139.[4]

### D. Linqto Used Misleading Promotional Tactics to Induce Investors to Purchase on the Platform

Linqto ran fraudulent promotional marketing tactics to pump sales. For example, Linqto held "Spike Days" whereby it tried to achieve at least $1 million in sales and sent out mass emails falsely claiming that popular listings, like Ripple, were limited, in short supply, and would likely sell out very quicky. ¶¶67–68. Linqto went as far as claiming that companies were out of stock, when really Defendants were intentionally holding back supply. ¶¶68–69.

## V. THE TRUTH BEGINS TO EMERGE

In October 2023, the law firm Lowenstein Sandler LLP, which was retained in connection with a potential IPO, circulated a memorandum (the "2023 Legal Memo"). ¶95. The 2023 Legal Memo concluded that regulators were likely to find that Linqto had violated securities laws and FINRA rules. In particular, the 2023 Legal Memo warned that, given Linqto's high markups without disclosure, it was "highly likely" the SEC would find violations of law. The 2023 Legal

[4] This set up further allowed Linqto to charge investors two or three times using various promotions. For example, in December 2023 and January 2024, when Ripple announced to shareholders it would conduct a tender to repurchase its shares at $61 per share, Linqto ran a swap promotion. Through this swap promotion, Linqto offered to purchase back investors' Ripple "shares" at a fixed price of $55 per share that investors could "swap" with another Platform Listing. Through this crafty exchange, Linqto could profit from the 11% markup on the swap, plus the initial two markups on the Ripple purchase plus the markup on the listing that the Investor "swapped" for. ¶71.

Memo also explained that Linqto's accreditation controls were deficient, allowing non-accredited investors on the Platform. With respect to Linqto's ownership structure, it advised that the SEC would likely view Linqto's SPV set-up as a means to evade securities registration requirements and likely find inadequate disclosure of ownership structures. ¶100.

Then, in April 2024, Linqto announced its plans to IPO by entering into a definitive business combination with BlockChain Coinvestors Acquisition Corp. I ("BCSA") following "months of review[.]" ¶149. However, on September 26, 2024, Linqto terminated that agreement and paid a termination fee of $5 million. ¶27. Shortly after, in October 2024, the SEC notified Linqto that it was investigating potential violations of federal securities laws. Around the same time, a memorandum from Linqto's internal counsel (the "2024 Legal Memo") was issued. ¶¶102–04. It echoed the issues laid out in the 2023 Legal Memo, including that Linqto's ownership structure and lack of accreditation controls could likely result in regulatory action. ¶107. The 2024 Legal Memo raised additional concerns regarding Linqto's inappropriate reliance on issuer exemptions and deficiencies in its Anti-Money Laundering ("AML") and Know Your Customer ("KYC") policies. ¶109. The 2024 Legal Memo explained that "[t]he federal securities law issues must be resolved as soon as practicable, particularly in light of the recent SEC request for information and the likely FINRA enforcement actions." ¶107.

On January 2, 2025, Dan Siciliano ("Siciliano") replaced Defendant Sarris as CEO. ¶111. Over the next few months, Defendants Endoso and Paul, along with several other senior executives, were replaced. ¶112. Less than two months after joining and after becoming increasingly concerned that prior management had known about systemic securities laws violations, new management froze client accounts and paused operations on the Platform. ¶¶112,

114. Two weeks later, Linqto's new management shut down the Platform, ceasing all trading operations. ¶115.

By June 2025, Linqto confirmed the violations in the legal memos had not been rectified. ¶117. Linqto explained that the "regulatory problems were deep" and "[t]he most pressing concern is the ongoing investigation by the SEC's Division of Enforcement, which is not a mere routine examination." *Id.* On July 7, 2025, Linqto filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of Texas, citing structural and ownership deficiencies as well as SEC and FINRA investigations. ¶118.

## VI. POST-FILING DEVELOPMENTS

Linqto remains in bankruptcy and, as a result, investors have not been able to access or realize returns from investments. However, whether or not investors have access to those investments has little bearing on and is distinct from the harm caused by the legal violations alleged in this case. Recently, the U.S. Attorney for the Southern District of New York unsealed an indictment charge against Defendant Sarris for the very same conduct and indicated that in August 2026, Defendant Endoso pled guilty to securities and broker-dealer fraud.[5]

[5] *See* Plaintiffs' Request for Judicial Notice filed concurrently herewith, at Exs. A, B.

## PROCEDURAL BACKGROUND

This Complaint brings claims against:[6]

| Defendant | Role |
|---|---|
| William Sarris ("Sarris") | Linqto founder, Chief Executive Officer ("CEO"), Executive Chairman, and member of the Board of Linqto ("Board") from 2010 until January 2, 2025. ¶20. |
| Joseph A. Endoso ("Endoso") | CEO, Chief Financial Officer ("CFO"), Chief Revenue Officer ("CRO"), Chief Operating Officer ("COO"), President, and Board member between 2019 and January 2025. Defendant Endoso was a registered agent and broker-dealer of Rainmaker between at least 2020 and 2022. ¶21. |
| David Paul ("Paul") | Chief Financial & Administrative Officer ("CFAO") of Linqto Liquidshares, LLC between May 2020 and May 2025. ¶22. |
| Brian Moran ("Moran") | Chief Compliance Officer ("CCO") of Linqto between November 2021 and December 2024. ¶23. |
| Karim Nurani ("Nurani") | Chief Strategy Officer ("CSO") between 2020 and March 2025, and member of the Board from March 2025 through May 2025. ¶24. |
| Margaret Slemmer ("Slemmer") | Board member between October 2020 and February 2025. ¶25. |
| Victor Jiang ("Jiang")[7] | Board member from October 2022 through March 2025. ¶26. |
| Norman Reed ("Reed") | Board member since October 2023. ¶28. |
| Adam T. Henderson ("Henderson") | Board member since 2022. ¶29. |
| Rainmaker Securities, LLC ("Rainmaker")[8] | FINRA registered broker-dealer that provided supervisory services to Linqto in exchange for a fee. ¶30. |

On July 9, 2025, Plaintiffs Lori Raffa Maxwell and Anthony Deluccia, represented by attorney John Deaton, initiated this Action. ECF No. 1. Plaintiffs moved for appointment to serve

[6] On July 14, 2026, pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Plaintiffs voluntarily dismissed without prejudice all claims against Defendant Alison Davis. ECF No. 139.

[7] Since December 2025, Plaintiffs have attempted to serve Defendant Jiang, who lives in Australia. On May 19, 2026, Plaintiffs filed an Affidavit of Service for Defendant Jiang attaching proof of non-service at two of his last known business addresses, proof of email service, and proof of request for Hague intervention. ECF No. 100. Defendant Jiang has not yet appeared in this action.

[8] Rainmaker filed a separate Motion to Dismiss (ECF No. 132) and any specific arguments made therein are addressed in the separate opposition to it filed concurrently. Those arguments are also incorporated fully by reference in this brief. Similarly, Defendants Reed, Henderson, and Slemmer all filed separate motions to dismiss. Board-specific arguments that may have been raised therein are addressed in a separate brief.

as Lead Plaintiffs (ECF Nos. 23–24) and were appointed as such on September 17, 2025. ECF No. 26. Plaintiffs filed the Complaint on November 17, 2025 and Moving Defendants filed their Motion on July 30, 2026. ECF No. 126.

## **LEGAL STANDARD**

To survive on a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *SEC v. Sayid*, 2018 WL 357320, at *3 (S.D.N.Y. Jan. 10, 2018) (quoting *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011)).

Although a complaint must contain sufficient factual matter to render the asserted claims plausible, the court does not weigh competing inferences or determine whether Plaintiffs ultimately will prove their allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *In re NTL Sec. Litig.*, 347 F. Supp. 2d 15, 21 (S.D.N.Y. 2004) (Kaplan, J.). Rather, the court must accept well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. At this stage, Plaintiffs need only plead facts sufficient to permit a reasonable inference of liability; factual disputes and competing explanations are matters for discovery and, where appropriate, trial. *In re NTL Sec.*, 347 F. Supp. 2d at 21; *Vtech Holdings Ltd. v. PricewaterhouseCoopers LLP*, 348 F. Supp. 2d 255, 261 (S.D.N.Y. 2004) (Kaplan, J.).

Claims sounding in fraud must satisfy Rule 9(b), which requires that "the circumstances constituting fraud ... shall be stated with particularity." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Loss causation, however, is not subject to the heightened pleading standard applicable to falsity and scienter. Rather, consistent with *Dura*, ordinary pleading

principles govern whether Plaintiffs have adequately alleged that Defendants' misconduct caused an economic loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005).

The heightened particularity requirements also do not apply to Plaintiffs' claims which do not sound in fraud. With regards to Plaintiffs' claim under §20(a) of the Exchange Act, "at the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard and a short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required." *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) (citation modified). Similarly, Plaintiffs' claim under §§5 and 12(a)(1) of the Securities Act "need not allege scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

## ARGUMENT

## I. EXCHANGE ACT CLAIMS

Plaintiffs assert claims against all Defendants for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C.§§ 78j(b), 78t(a)) and Rule 10b-5, including for scheme liability, misrepresentations and omissions, and control person liability. Defendants challenge all elements of the Exchange Act claims, but their arguments are baseless and fail to appreciate the differences inherent in this case involving a non-public company *and* a company that has filed for bankruptcy and thus is not a named defendant. Neither of these realities, though, can shield Defendants from liability for their own misstatements.

### A. The Complaint Adequately Alleges Scheme Liability

Plaintiffs plead a strong claim for scheme liability under Rule 10b-5(a) and (c), which make it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. §240.10b-

5(a) and (c). To state a scheme claim, a plaintiff must allege that the defendant: "(1) committed a deceptive or manipulative act; (2) with scienter; that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale; and (4) defendants' actions caused the plaintiffs' injuries." *In re ForceField Energy, Inc. Sec. Litig.*, 2017 WL 1319802 at *7 (S.D.N.Y. Mar. 29, 2017). The Supreme Court has observed that "scheme liability" captures "a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019).

This case is a paradigmatic scheme case. Defendants cling to the examples of scheme conduct listed in one paragraph, but the Complaint is actually replete with actions taken in furtherance of a scheme to pump up interests and investors while dodging regulations. These include, *inter alia*: the very operation of the Platform, lowering investment minimums to attract investors (¶8), welcoming non-accredited investors (¶8), implementing and maintaining the "Linqto Bucks" program (¶42), blast marketing emails (¶47), creating the FiSo test (¶48), falsely classifying customers as "retail investors" (¶50), removing accreditation controls and requirements (¶52), designing and maintaining the convoluted web of ownership and entities (¶57), imposing markups and creating the algorithm to automatically increase them (¶64), having "spike days," buybacks, swaps and exclusives (¶70), and evading registration requirements. ¶99. In fact, this scheme was later described by management as "shocking misconduct that systematically defrauded customers and was built into the platform itself." ¶120. And, the recent developments make it more than clear this was a classic scheme. The DOJ press release states that Defendant Sarris "engaged in a scheme to defraud the customers of Linqto" and that he accomplished his "scheme" by exploiting a lack of visibility into the securities on the Platform.

Cases repeatedly find scheme liability in far less brazen situations. For example:

- Recently, in *In re Zeta Global Holdings Corp. Sec. Litig.*, 2026 WL 1971169, at *14 (S.D.N.Y. July 8, 2026), the court found a scheme from a "web of trusts and LLCs" to

divest shares while defendants simultaneously mislead investors. Here, too, Defendants had a "web" of LLCs whereby Linqto bought shares to list on the Platform, which it then sold to a related LLC, who created SPVs. ¶57.

- Courts routinely find scheme liability in "pump and dump" schemes. *See, e.g. In re ProNetLink Sec. Litig.*, 403 F. Supp. 2d 330, 332–33 (S.D.N.Y. 2005) (pump and dump scheme revealed through a bankruptcy filing upheld). That exists here. Indeed, Sarris stated they needed to "do whatever it takes to pump the numbers because we are hoping to IPO in 2024." ¶48.
- In *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 190 (S.D.N.Y. 2023), the court found a scheme to artificially restrict rates. It stated that "resetting customers' passwords or subjecting them to ticket-verification procedures under false pretenses is conduct that creates a false impression…" Similar actions were taken here to give a false impression of the Platform and the "securities" purchased.
- Similarly, this year in *Steamfitters Local 449 Pension & Retirement Security Funds v. Extreme Networks, Inc.*, 824 F. Supp. 3d 983 (S.D.N.Y. 2026), the court found the complaint alleged a scheme by describing efforts to inflate revenue and backlog by concealing manipulative sales practices. So, too, here, Defendants concealed their manipulative sales tactics and the false demand.
- A failure to file required forms or reports often leads to scheme liability because it "signals falsely to investors that there is no such ownership to disclose" and amounts to "something extra" beyond misstatements alone. *Okla. Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 418–421 (S.D.N.Y. Mar. 28, 2025) (failure to file Schedule 13D). *See also U.S. SEC v. Brown*, 740 F. Supp. 2d 148, 172 (D.D.C. 2010) (failure to file reports required supported scheme liability).

Defendants make three anemic arguments surrounding this clear scheme. _*First*_, they again home in on six isolated categories of actions, pick them apart, and claim they are all related to the misstatements at issue. Mot. at 30. This argument is flawed for countless reasons. Again, the list is far longer than six. Then, actions in furtherance of a scheme need not be totally divorced from the misstatements. In fact, Defendants' case, *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005) (Kaplan, J.), demonstrates this. There, this Court found scheme liability when the claims were predicated upon the false public statements, as it was "impossible to separate the deceptive nature of the transactions from the deception actually practiced upon Parmalat's investors." *See also Zeta*, 2026 WL 1971169, at *14 ("The Second Circuit has held that 'misstatements and omissions can form *part* of a scheme liability claim...'"); *SEC v. Fiore*, 416 F.

Supp. 3d 306, 321 (S.D.N.Y. 2019) (scheme involving both market manipulation and misstatements); *In re Dentsply Sirona, Inc. Sec. Litig.*, 816 F. Supp. 3d 449, 487 (S.D.N.Y. 2026) (scheme arose out of the same set of facts as those alleged for Rule 10(b)5-(b)).[9] Therefore, rather than merely repackaging the misstatement allegations, the scheme here was to induce investors to purchase on the Platform so Defendants could charge the markups, receive fees and commissions, and ultimately go public.

*Second*, Defendants contend that the Complaint does not identify who actually "performed" the deceptive acts. Mot. at 30. This is just wrong as it plausibly alleges that all Defendants played a key role in orchestrating the scheme by allowing low investment minimums and unaccredited investors, creating the various LLCs and SPVs, and failing to comply with registration regulations. All Defendants—the CEO, CFO, Board members—were required for the scheme to work. *See ForceField*, 2017 WL 1319802, at *10. And there is no requirement to allege that all defendants "participated in each and every aspect of the fraudulent scheme" to plead primary scheme liability. *SEC v. Sugarman,* 2020 WL 5819848, at *9 (S.D.N.Y. Sept. 30, 2020).

*Third,* Defendants claim the scheme allegations are made "in gross." Mot. at 31. This is simply a repackaging of their "performance" argument discussed above. And, their key case, *Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021), is distinguishable. There, plaintiffs never articulated specific acts in furtherance of any scheme but merely incorporated their misrepresentation claims. Moreover, the "scheme" alleged

---

[9] *Police and Fire Retirement System City of Detroit v. Argo Group Int'l Holdings LTD*, 2024 WL 5089970, at *14 (S.D.N.Y. Dec. 1, 2024) (Kaplan, J.) is readily distinguished. There, the complaint contained simply one statement without any facts demonstrating a scheme distinct from alleged misstatements and omissions and the complaint, unlike here, did not even mention the word "scheme" throughout.

there was money laundering at a single bank branch as opposed to the Company-wide scheme here.[10]

In sum, Plaintiffs have alleged a viable claim for scheme liability against all Defendants.

### B. <u>Defendants Made Actionable False and Misleading Statements</u>

The Complaint alleges actionable misstatements and omissions concerning: (1) investors' ownership interests; (2) Linqto's pricing structure and the imposition of various fees, expenses and markups; (3) Linqto's compliance with accreditation requirements; and (4) alleged demand.

To plead falsity, a plaintiff must allege that a challenged statement "was materially false or misleading." *Dentsply*, 816 F. Supp. 3d at 470. And, here, Defendants do not explicitly contest the materiality of the misstatements alleged. Therefore, Plaintiffs' burden is only to show either "(1) a false statement, i.e., 'an actual statement ... that is ... untrue outright,' [or] (2) a half-truth, i.e., a 'representation[ ] that state[s] the truth only so far as it goes, while omitting critical qualifying information.'" *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 138 (2d Cir. 2025) (*citing In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016)). As this Court has explained, "[t]he purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure"—among other things—"that buyers of securities get what they think they are getting[.]" *Louros v. Kreicas*, 367 F. Supp. 2d 572, 588 (S.D.N.Y. 2005) (Kaplan, J.) (citing *Chemical Bank v. Arthur Andersen & Co*., 726 F.2d 930 (2d Cir. 1984)). The Complaint satisfies this standard for each category of misstatement.

---

[10] Defendants' argument that the Complaint fails to adequately plead scienter with respect to Plaintiffs' scheme liability is unfounded. For the same reasons that Plaintiffs have adequately pled scienter under 10b-5(b), they have also adequately pled scienter for subsections (a) and (c). *See Menaldi v. Och-Ziff Capital Management Group, LLC,* 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (holding that scheme liability claims are subject to same scienter requirements).

**1. Plaintiffs Do Not Impermissibly Group Plead**

As a threshold matter, Defendants' arguments on "group pleading" fail. Mot. at 26. "[T]he group pleading doctrine allows Plaintiffs to 'circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent.'" *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 529–30 (S.D.N.Y. 2010) (*citing In re BISYS Sec. Litig*., 397 F. Supp. 2d 430, 438 (S.D.N.Y.2005).[11] The Second Circuit has established that "where the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a [published company document], plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the fraud without the benefit of any discovery." *Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344, 354 (S.D.N.Y. 2000), *aff'd*, 26 F. App'x 83 (2d Cir. 2002).

Indeed, to the extent Plaintiffs invoke the group pleading doctrine here, they do so with respect to written, "group-published" materials where there can be no attributable speaker. Press releases and other marketing materials are the types of publications that the doctrine was designed for. *Camofi Master LDC v. Riptide Worldwide, Inc*., 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011) (presumption applies to "press releases[] or group-published information").

Defendants argue that the group pleading presumption does not apply because Plaintiffs do not challenge statements in "a prospectus, a registration statement, an annual report, or an SEC filing." Mot. at 29. But Linqto was a private company and therefore did not publish the same range of public-company filings. The relevant question is whether the Complaint adequately

[11] While Defendants cite to *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), many Courts have concluded the group pleading doctrine is "alive and well" after *Janus*. *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) ("[M]ost judges in this District have continued to conclude that group pleading is alive and well."); *See also In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 241 (S.D.N.Y. 2018) (same).

attributes each challenged statement under the governing standards, not whether Linqto issued a particular type of public-company document. Here, Linqto published, and investors relied on, press releases and other group-authored work, which Defendants concede is subject to the group pleading presumption. Mot. at 28 (group pleading doctrine applies to "press releases, or other group-published information[.]"). Defendants, therefore, cannot escape the group pleading presumption for Linqto's collectively authored works.

### 2. Defendants' "Ownership Statements" Are Actionable

As to the first category of misstatements, Defendants repeatedly made false and misleading statements relating to investors' ownership in the securities offered and purchased on the Platform. ¶79. For example, press releases and marketing materials claimed:

- "Linqto is a technology-enabled investment platform allowing accredited investors to identify, evaluate, ***invest in, and make liquid investments in the world's leading unicorns and private companies***." ¶79
- "Linqto is a global investing platform enabling individual investors to identify and ***invest in private companies and unicorns***." ¶79

These statements represented to investors that they were investing *"in"* the private companies listed on the Platform. In reality, investors were investing *in* Linqto-created SPVs. Accordingly, statements that the Platform allowed investors to "make liquid investments in the world's leading unicorns and private companies" were false and misleading because Linqto-created SPV units were not, by definition, "liquid" as there is no market for them. Both the "literal truth" of the statements and "context and manner of presentation" of Linqto's ownership statements in conjunction with omissions on the Platform's purchasing page "mislead prospective buyers." *In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 335 (S.D.N.Y. 2025).

Furthermore, courts in this Circuit have held that statements misrepresenting aspects of an investment or its liquidity are actionable. *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 313 (S.D.N.Y. 2011) (statements that misrepresented the safety level and risks of structured notes were

actionable misrepresentations); *Marini v. Adamo*, 995 F. Supp. 2d 155, 189 (E.D.N.Y. 2014), *aff'd,* 644 F. App'x 33 (2d Cir. 2016), and *aff'd*, 644 F. App'x 33 (2d Cir. 2016) (material misrepresentation to state "assets were liquid" when evidence showed liquidity didn't exist).

In the face of this clear law, Defendants inappropriately marshal evidence before the Court and point to a few lines of fine-print buried in "investment documents." Mot. at 15–16. This tactic fails for multiple, independent reasons.

*First,* the "investment documents" that Defendants rely on are not properly before the Court and should not be considered. *See,* Plaintiffs' Motion to Strike filed concurrently herewith; *see also In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *10 (S.D.N.Y. Nov. 7, 2024) ("[T]he allegation by Plaintiffs that Defendants were provided one form of information does not permit Defendants to attach to a motion to dismiss all other pieces of information that might be considered to contradict or contextualize Plaintiffs' allegations.").

*Second,* these documents at best raise an issue of fact as to whether investors "received and signed" them prior to or concurrent with purchase. Mot. at 15–16. Defendants even concede that investors received certificates and order confirmations "upon [*i.e.*, after] making an investment[.]" *Id*. The Complaint alleges that investors selected a listing on the Platform to purchase, used a sliding scale to set the number of "shares" to "order," and submitted the order. ¶¶55–56. At a minimum, this creates a factual question as to whether investors "received and signed" these documents prior to or after placing a purchase on the Platform as "[t]he falsity of a statement is evaluated at the time the challenged statement was made." *In re ASML Holding N.V. Sec. Litig.*, 825 F. Supp. 3d 208, 229 (S.D.N.Y. 2026). That at some point, investors *may* have received information in conflict with the information available at the time of investment does not render

statements regarding prospective "invest[ments] in private companies" any less false and misleading.

*Third*, even assuming investors received those documents before purchase or were expected to scour the public record to locate Linqto's Form D filings, Defendants' representations were still misleading. Defendants' argument appears to raise a fact-intensive truth-on-the-market defense. *See* Mot. at 17. But that affirmative defense is inappropriate here. *Ganino v. Citizens Utilities Co*., 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."). And Defendants do not argue, nor can they, that Linqto's investment documents or Form D filings imbued investors "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.*

### 3. Actionable Statements Concerning Linqto's Pricing and Markups

The second category of misstatements concern Linqto's pricing practices. For example, Defendants made the following representations regarding investments on the Platform:

- "we offer a modest minimum investment of $5,000 and ***no hidden fees or costs***."
- "Our private investments are offered at an affordable price. A minimum order is $5,000 with ***no added fees or hidden costs***."
- "[W]e, at Linqto, are proud to offer a zero-fee investment management platform. Linqto has no continuing management fees/expenses, no brokerage fees, no carried interest, nothing."

These statements blatantly deny the existence of fees, costs, and markups when in reality "added fees," "costs," and markups were uniform. ¶86. Those fees included: (1) acquisition fees, (ii) supervisory fees, (iii) interest fees, and (iv) markups ranging from 20%–150%. ¶61. Defendants' "no added fees" representations (¶86) "taken together and in context [with the representations depicting only a "share" price on Linqto's Platform] would have misled a reasonable investor" as to the existence and amount of fees, costs, and markups that investors were

required to pay. *Leone v. ASP Isotopes Inc.*, 811 F. Supp. 3d 563, 593–94 (S.D.N.Y. 2025); *In re Stillwater Cap. Partners Inc. Litig.*, 853 F. Supp. 2d 441, 459 (S.D.N.Y. 2012) (finding statements that omit the amount of management fees an investor would pay actionable).

Contrary to Defendants' contention, Linqto's "reasonable markup" disclosure buried in expandable FAQ pages (and not accessible through the Platform's purchasing page) does not render the numerous representations that investments carried "no hidden fees or costs" non-actionable. The "reasonable markup" disclosure says nothing about the acquisition, supervisory, interest, management, legal, accounting, auditing, and marketing fees that investors unknowingly paid.[12] ¶¶61–62, 88; Mot. at 19. Disclosing a markup while omitting other fees renders statements touting "no hidden fees or costs" or only a "reasonable markup" actionable. *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 363 (S.D.N.Y. 2013) (statement of fees charged to plaintiffs were "materially misleading in failing to disclose other fees that plaintiffs were paying[.]").

Defendants were also required to disclose the dollar or percentage amount of the actual markup charged. *Ganino*, 228 F.3d at 163 ("[A] seller has a duty to disclose the details of a markup if the markup is 'excessive.'") (citation modified); *S.E.C. v. Constantin*, 939 F. Supp. 2d 288, 307 (S.D.N.Y. 2013) (§10(b) violation to "charge[] customers retail prices that include an undisclosed, excessive markup"). Although there is no bright-line definition for "excessive," Linqto's markups—"ranging anywhere from 20–60% and sometimes as much as 150% of the acquisition price"—are well above levels courts have treated as presumptively excessive. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 190 (2d Cir. 1998) ("markups for equity securities generally should not exceed five percent of the prevailing market price."); S*.E.C. v. First Jersey Sec., Inc.*,

---

[12] Defendants' argument that Form D filings disclosed Linqto's "pricing approach" is equally unconvincing. Because the Platform's ordering page was devoid of any indication that investors were purchasing SPV series, it would have been impossible for investors to know that these Form D filings related to their prospective purchase.

101 F.3d 1450, 1467 (2d Cir. 1996) ("An undisclosed markup of more than 10%...has been held to constitute fraud per se."); *Marini*, 995 F. Supp. 2d at 189 (markups over 100% were excessive).[13]

#### 4. Defendants' Statements About Accredited Investors Are Actionable

The third category of materially false and misleading statements claimed:

- "As a US based company we are bound by regulations that state you must be an accredited or qualified to invest[.]"
- "Linqto is a technology-enabled investment platform allowing accredited investors to identify, evaluate, invest in, and make liquid investments in the world's leading unicorns and private companies." ¶92.

But as early as 2021, Linqto permitted non-accredited investors to make purchases. ¶44. Throughout the Class Period, Defendants systematically eliminated accreditation safeguards by replacing traditional auditing and qualification oversight with a Linqto-created "FiSo" test that didn't comport with SEC accreditation standards and opting for a "self-certify box." ¶¶46, 48. Linqto also attempted to circumvent its own controls entirely by classifying certain customers as "retail investors." ¶50. FEs reported that during the Class Period, anywhere between 3,000 and 5,000 Investors were actually non-accredited. ¶¶53–54.[14]

Defendants' "threshold" argument is that Plaintiffs allege no injury. Plaintiffs' injury theory is simple: the presence of non-accredited investors harmed *all* investors. These statements falsely reassured investors that Linqto complied with U.S. regulations, and therefore wasn't at risk of violations, when in reality Defendants had opened the floodgates to permit non-accredited

[13] Defendants' last-ditch argument that Plaintiffs must "supply the transaction-level facts" to "test" and identify whether any particular markup on a single purchase was excessive is beyond the scope of what is required on a motion to dismiss. Mot. at 20; *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 54 (E.D.N.Y. 2011) (no requirement to "plead the specific details of each purchase" as long as plaintiffs provide "details concerning which statements are alleged to be fraudulent and why.").

[14] Statements concerning Linqto's accreditation practices also bear on the Company's regulatory compliance. ¶76 ("As US based company we are bound by regulations that state you must be an accredited or qualified to invest."). Courts have found actionable misstatements where a company falsely claims it complies with regulations and has implemented safeguards. *In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 206 (S.D.N.Y. 2016) ("statements describing [defendant's] existing practices as compliant with regulatory and industry best practices qualify as misrepresentations.").

investors to purchase risky, illiquid investments that the SEC reserves for only financially sophisticated parties. Defendants' case law argument also fails because the accreditation statements at issue in *ATSI Communications v. Shaar Fund, Ltd*., failed to allege how the *defendant* being a non-accredited investor caused any loss. 493 F.3d at 106–07. Here, Plaintiffs' allegations relate to the safeguards in compliance with U.S. regulations that Linqto purported to employ—not whether Defendants or Linqto were accredited investors or not.

#### 5. Defendants Made Actionable Statements About Inventory and Ripple Stock

Defendants' fourth category of actionable misstatements were made in mass marketing emails and communications to investors regarding the availability and supply of Platform securities. ¶92. For example, these messages often stated that:

- Linqto was "out of inventory for Ripple" but that the Company would have more "tomorrow[.]"
- There was an "exclusive trading window" with "exclusive access" because the Company "expected high demand for this opportunity" and "limited quantities available."

Statements that Linqto either had or would imminently face inventory shortages were entirely fabricated to create artificial demand. ¶93. Statements falsely attribute demand solely to market desire are patently actionable. *ASML*, 825 F. Supp. 3d at 233 (materially misleading to allege demand was "continuing to be strong" considering "allegations relating to inorganic [] demand").

Defendants' argument that because Ripple stock increased in value, investors suffered no harm ignores two major issues: (1) any increase in Ripple securities is irrelevant as investors purchased SPV units, not Ripple stock; and (2) any increase in Ripple securities is unrelated to the harm caused by Linqto's systemically undisclosed fees, costs, and excessive markups.

Defendants also incorrectly argue that the marketing statements have "no sender, no date, no recipient, and no text of any email" and thus are not pled with particularity. Mot. at 23. But the Complaint satisfies the pleading requirements by alleging that Defendants, during the Class Period, sent the quoted "text of [the referenced] email[s]" to investors. *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 475 (S.D.N.Y. 2017), aff'd sub nom; *Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) ("[A] complaint need only apprise a defendant of the general time period of any alleged misstatements."); *Kalin v. Xanboo, Inc*, 526 F. Supp. 2d 392, 401 (S.D.N.Y. 2007) (particularity satisfied even where complaint "does not provide direct quotations, [because] it sufficiently specifies the content of the fraudulent statements such that [defendant] can identify the statements alleged to be misleading.").

### C. <u>Defendants Omitted Material Information They Had A Duty to Disclose</u>

In addition to the trove of misstatements, Defendants also failed to disclose necessary required material information. "Rule 10b–5(b) makes it unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Macquarie Infrastructure Corp. v. Moab Partners*, L. P., 601 U.S. 257, 263, 144 S. Ct. 885, 890, 218 L. Ed. 2d 214 (2024) (citation omitted). "[E]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id*. "[A]t the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim." *Vivendi*, 838 F.3d at 258.

For each category of actionable misstatements, Defendants chose to speak and in doing so "had a duty to be both accurate and complete." *Meyer v. Jinkosolar Holdings Co*., 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)). For

example: (1) after touting "no hidden fees" or "added costs," Defendants were required to disclose the amount of a markup and the fees and added costs; (2) Defendants failed to disclose the thousands of unaccredited investors on the Platform and the false "FiSO" test and self-certifications employed; (3) Defendants failed to mention that any rush for Ripple and other such securities was imaginary or created artificially; and (4) Defendants never told investors that they were not even remotely in compliance with FINRA and SEC registration requirements.[15] *See, e.g., Gruber v. Gilbertson,* 2018 WL 1418188, at *11 (S.D.N.Y. Mar. 20, 2018) (found duty to update statements when "the omitted facts tell a radically different story….")

The Complaint therefore alleges actionable half-truths and omissions. Defendants themselves characterize the case's "central theories" as "misrepresentation and concealment." Mot. at 2.

### D. The Complaint Alleges a Cogent and Compelling Inference of Scienter

"Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew, or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks,* 216 F.3d 300, 308 (2nd Cir. 2000). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking gun' genre, or even the most 'plausible of competing inferences,'" but need only be "at least as compelling" as any

---

15 Defendants argue the Complaint "idenitf[ies] no statement rendered misleading by a claimed omission." Mot. at 24. This is simply incorrect. The Complaint explicitly alleges statements that were rendered misleading by Defendants' repeated choice to "omit[] information [] necessary to prevent existing disclosures from being misleading." *Baxter v. MongoDB, Inc*., 832 F. Supp. 3d 214, 246 (S.D.N.Y. 2026) (citation modified) (Defendants "omitted to state material facts necessary in order to make the statements made not misleading, through: (i) communicating false and misleading information in connection with the marketing, offer, sale, and/or delivery of securities; (ii) failing to disclose written complaints from customers; and (iii) failing to disclose federal regulatory investigations to Investors.").

opposing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007). "The court's job is not to scrutinize each allegation in isolation," but to assess whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 313, 322–23. "At the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Musk*, 779 F. Supp. 3d at 422.

This is not a case where Defendants can credibly claim even a "tie." Instead, the Complaint sets forth overwhelming evidence demonstrating that Defendants not only had actual knowledge of the alleged statements' falsity, but that they themselves orchestrated and directed the scheme with the stated intent to deceive the market. Plaintiffs have thus successfully alleged Defendants knew or were reckless in not knowing the true state of affairs at Linqto and with the Platform.

**1. Defendants' Knowledge Supports Scienter**

The Complaint sets forth detailed allegations demonstrating that Defendants' statements were made with knowledge of their falsity or at least recklessness as Defendants either explicitly knew facts or had access to information or failed to check information they had a duty to monitor. *Novak,* 216 F.3d at 311. This is shown in multiple ways. To begin with, the former Chief Revenue Officer ("CRO") provides a concrete list of instances of actual knowledge including:

- that he "strongly advised executive management" to quit permitting non-accredited investors on the Platform (¶53);
- that he attended weekly compliance meetings, including one where he advised executive management about non-accredited investors (¶144); and,
- weekly "Risk Meetings" with top executives to discuss markups and other relevant issues. ¶146.

Then, other FEs also demonstrate Defendants' knowledge or recklessness. FE-1 recalls daily marketing meetings with the CRO and CEO to discuss "pushes for the day" (¶47), regular customer complaints (¶140), and a November 2024 conversation between Sarris and a marketing manager where Sarris specifically said the "Board or Company" said to shut everything down and stop marketing because they were getting sued. ¶150. Then, FE-2 describes that the practice of

marking up shares was "fairly well known in the Company" (¶139) and recalls meetings between a consulting company and "C-suite" members where the inexperience and immaturity of investors was highlighted. ¶141. Former employee allegations are routinely found to show actual knowledge. *See, e.g.*, *In re Axsome Therapeutics, Inc. Sec. Litig.,* 2025 WL 965265, at *9 (S.D.N.Y. Mar. 31, 2025); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004) (Confidential Witness ("CW") statements showed well known issues at company); *In re BISYS,* 397 F. Supp. 2d at 442.

Not only do FE accounts demonstrate actual knowledge, but two scathing legal memos do the same. These memos expressly warned of and discussed violations of securities laws and regulations, excessive and undisclosed markups, and non-accredited investors. ¶¶ 96–98. Despite these memos, Defendants continued their scheme and to make misrepresentations. Finally, the Complaint asserts that management itself adjusted platform controls to make it easier for non-accredited investors to join the Platform. ¶45. Given these allegations, it "requires no stretch of the imagination to infer [Defendants] knew facts or had access to information suggesting that their public statements… were not accurate." *In re Myland N.V. Sec. Litig.,* 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018).

### 2. Circumstantial Allegations Further Support Scienter

The Complaint also pleads circumstantial facts that, considered together with the direct knowledge allegations, add to the inference of scienter.

<u>Later Statements.</u> New management made statements revealing that Defendants were aware of the pervasive and fraudulent issues alleged in the Complaint. For example, they stated that there were "major defects in Linqto's corporate structure that raised questions about customer ownership" and that "prior management never created the proper structure to hold your

investments." ¶¶ 119–120. *Axsome Therapeutics*, 2025 WL 965265 at *10 (post class period statements and events pointed to Defendants' knowledge).

Executive Departures. The numerous departures of management, including the majority of the Defendants, contribute to an inference of scienter. ¶112. Recently, in *Dentsply*, 816 F. Supp. 3d at 485, the court found that the three executive departures just as the scheme was becoming evident added to the inference of scienter. *See also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ("resignation and retirement of company insiders alleged to have been involved in the scheme… all contribute to the inference of scienter."); *In re Pareteum Sec. Litig.,* 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (timing of personnel change may pose strong inference of scienter "approaching recklessness or even conscious malfeasance"); *Dentsply,* 732 F. Supp. 3d at 322 (there are "too many departures to say that they were coincidental with a straight face[.]").

Investigations. Courts have found that investigations, like those launched here by FINRA and the SEC, also contribute to an inference of scienter. *See Hall*, 580 F. Supp. 2d at 233 (SEC investigation was "probative of scienter"); *In re Oxford Health Plans, Ins. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (same).

Magnitude of Fraud and Core Operations. "[K]nowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company…." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012) (Kaplan, J.). "The doctrine can provide supplemental support for allegations of scienter if it cannot establish scienter independently." *Pretium*, 256 F. Supp. 3d at 474; *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021); *Stadium Cap. LLC v. Co-*

*Diagnostics, Inc.*, 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024); *In re Atlas Air Worldwide Holdings*, 324 F. Supp. 2d at 491 (CFO "had a duty to familiarize himself with the facts relevant to the core operations of the company"); *SEC v. Farnsworth*, 692 F. Supp. 3d at 186 (executives have a duty to "familiarize [themselves] with the core operations of the company" and CEO of a subsidiary not shielded from liability given critical role in overall operations). Here, the statements and scheme related to the *entire* business of the Company.

### 3. Defendants' Scienter Arguments Are Baseless

Against these robust allegations, Defendants make several arguments that all fail to overcome the holistic inference of scienter at the pleading stage.

First, they claim that the scienter allegations are somehow "group pleading." Mot. at 32–33. But this minimizes and glosses over the actual particularized allegations, which are far more than a "sentence" and include:

| Defendant | Allegations |
|---|---|
| Sarris | CEO, founder, Executive Chairman, and member of the Board (¶20), known as the "Wizard of Oz" who was extremely involved in the day-to-day operations (¶133); personally both purchased shares (¶57) and reduced the entry price points (¶41) multiple times; devised the Linqto Bucks program (¶51) and "spike days" (¶68); according to the Wall Street Journal, personally urged a manager to increase prices (¶132) and according to Deaton, personally sent out Ripple share advertisements (¶105); and FE-1 recounted he told workers to "forget what legal says." ¶137. |
| Endoso | CEO, CFO, CRO, COO, and President as well as a Board member; a registered agent and broker-dealer of Rainmaker who benefitted from the fees Linqto paid to Rainmaker (¶¶ 21, 62); attended weekly "Risk Meetings" to discuss markups (¶146); and recently pled guilty to securities fraud, broker-dealer fraud, conspiracy to commit securities fraud, and conspiracy to defraud the United States. |
| Paul | CFAO of Liquidshares, who therefore was aware of the "web" of LLCs (*see* ¶57) and fees charged (¶88); and signed Form D filings with the SEC. ¶22. |
| Moran | CCO of Linqto (¶23) who attended weekly risk meetings with top executives to discuss markups (¶146); and, according to FE-2, insisted that marketing remove language in the fine print about Linqto's accredited investor requirements. ¶142 |
| Nurani | CSO and Board member (¶24); Jiang later filed an affidavit about the Board's knowledge (¶118); and Board was involved in the potential BCSA combination that led to the 2023 Memo and retention of Deloitte. ¶149.[16] |

[16] The scienter of Board members is further discussed in the opposition to the briefs of Defendants Henderson,

These are clear individualized scienter allegations. As to Sarris, Defendants cannot credibly argue he did not act with scienter so they focus on one allegation about being "closely involved" and sweep the remainder under the rug. Mot. at 41. But, that he orchestrated the fraud "would give [him] actual knowledge." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024). *See also Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (scienter supported when "high level managers discouraged questions" and "complaints fell on deaf ears."). It is also exceedingly unlikely that the remaining high-level executives were not aware of the fraud given their positions and the list of allegations above. *See, e.g.*, *In re Ambac Fin. Corp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 268 (S.D.N.Y. 2010) (it "strains credulity that a CFO could remain ignorant… while the CEO and other senior managers were aware of them").[17] The executives were explicitly warned by the CRO (and at weekly compliance and risk meetings) about permitting non-accredited investors on the Platform and disclosure of markups (¶¶44, 46, 53) and attended meetings with a consulting company to discuss investor issues (¶141). Meanwhile, the practice of marking up shares was "fairly well known in the Company" (¶139) and two legal memos specifically called out the ongoing legal and compliance violations. ¶¶ 96–98.

*__Second__*, Defendants rely on motive even though motive is not required to establish scienter, particularly when a complaint, as here, pleads strong evidence of conscious misbehavior or recklessness. *In re Didi Global Inc. Sec. Litig.*, 2024 WL 1119483, at *15 (S.D.N.Y. Mar. 14,

---

Reed, and Slemmer (citation) and incorporated fully herein.

[17] Defendants' cases on this point are readily distinguishable. In *Jackson v. Abernathy*, 960 F. 3d 94, 98 (2nd Cir. 2020), three lower-level employees knew of problems with a product, but plaintiff did not connect that product to the misstatements at all. Then, in *Born v. Quad/Graphics, Inc.*, 521 F. Supp.3d 469, 493–94 (S.D.N.Y. 2021), the motive to inflate stock prior to an acquisition was non-sensical as the fraud continued after said acquisition. Furthermore, plaintiffs there provided no evidence that any defendant had access to information contrary to their statements.

2024); *Tellabs,* 551 U.S. at 325. And, there is in fact a strong motive pled here. To begin with, Linqto generated profit by rigging the difference between the price the Company paid for securities versus the price it sold them to investors—*i.e.*, the markup. ¶64. To keep this delta high, it was necessary to lure unaccredited investors, hide markups, and create convoluted LLC webs. But, even more, the Complaint makes clear that Linqto's goal was to go public, and Defendants were motivated to grow its investor numbers ahead of any IPO. Indeed, Sarris stated the Company needed to "do whatever it takes to pump the numbers because we are hoping to IPO in 2024." ¶48. *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 81 (2d Cir. 2021) (motive alleged by scheme that allowed bank to realize strategic goal); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 95–96 (S.D.N.Y. 2015) (motive to improve access to a market); *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (motive was to inflate stock price to acquire another company). And, the DOJ has made it crystal clear that at least Sarris had an additional motive, writing: "Sarris pursued this scheme because it stood to make him wealthy. He had a sizeable stake in Linqto and was hunting for a way to cash out."[18]

*Third*, Defendants engage in the proverbial death by a thousand cuts which the law forbids. For example, for the damning FE allegations, they claim they somehow lack specificity or direct contact with every Defendant. Mot. at 43–44. But the FEs are described in the required detail and there is no baseline requirement for contact with each. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (rejecting argument that scienter fails where CWs do not allege a document showing any of the defendants participated in the fraud);

---

[18] *Argo* and *Bristol Myers* are distinguishable. *First*, in *Argo Group Int'l Holdings LTD*, 2024 WL 5089970 (S.D.N.Y. Dec. 1, 2024) (Kaplan, J.), scienter was based almost entirely on the later creation of a task force, while it was also highly fact dependent as it involved predicting loss reserves, "an inherently inexact and speculative task." *Then*, in *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 (2d Cir. 2022), not only was no motive alleged, but plaintiffs pointed to nothing to show an industry consensus definition existed or was known by defendants at all.

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) ("there is no baseline requirement of [direct] contact" between CWs and individual defendants); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) ("The notion that CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law."). They also claim that the two memos somehow do not contain enough details. Mot. at 42. But the memos set out a majority of the elements of the scheme and fraud alleged. Nothing more is required, making this case at odds with *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) where plaintiff did not allege that defendants even had access to information informing them of the falsity of statements and were only aware of "general" concerns.[19] Mot. at 43. Indeed, FEs, articles, investigations, and memos are all regularly credited as pieces of the scienter puzzle. And importantly, when considered holistically (as they must be), there can be no doubt that the Complaint pleads a cogent and compelling inference of scienter.[20]

In conclusion, the Complaint contains both direct evidence of Defendants' knowledge of the fraud—or at least their recklessness in not knowing of it—which is buttressed by circumstantial evidence and motive allegations. The inference of scienter is both cogent and compelling.

### E. <u>Reliance Is Established</u>

The Complaint pleads reliance on Defendants' misrepresentations and omissions in connection with purchasing securities on the Platform. Courts in this circuit allow Plaintiffs to

---

[19] Notably, the inference of scienter derived from the memos is applicable to all named Defendants. As in *SEB Investment Management AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1021 (N.D. Cal. 2024), it is "highly likely" that all Defendants would have been aware of these memos given their roles in the company.

[20] Defendants half-heartedly suggest an innocent explanation of the "portrait of a man" and of executives earnestly trying to get a business off the ground. Mot. at 45. Given the depth and breadth of the actions, statements, and allegations of knowledge, though, Plaintiffs' allegations of scienter are far more compelling. *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016) ("when the competing inferences rest in equipoise, the tie…goes to the plaintiff").

plead reliance by "either [] the presumption identified in *Affiliated Ute* [], or otherwise." *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 144 (S.D.N.Y. 2015). "[C]ommon evidence can show reliance by the class…based on the evidence … that each individual plaintiff relied on the defendants' uniform representations." *Id.* (citation modified); *see also Audet v. Fraser*, 332 F.R.D. 53, 78 (D. Conn. 2019) (citing *In Re U.S. Foodservice Inc.*, 729 F.3d at 120) ("[T]here remain cases in which the presumptions do not apply where "circumstantial proof of reliance" may be established on a class-wide basis through common evidence. The absence of a presumption …does not dictate the nature of that proof, *i.e.*, whether it is general and circumstantial or individualized and direct."). Courts have found that "in the context of a financial transaction…payment alone may constitute circumstantial proof of reliance upon a financial representation." *Id*

At a minimum here, each investor relied on the Platform's uniform representations purporting to represent the "price" it would cost investors to purchase "shares" of the listed private securities. ¶¶55–56, 82–83. Bolstering the false representations and omissions inherent in the Platform were Defendants' "uniformly misleading" curated misstatements relating to Linqto's touted "no fee" or "cost" pricing policies and direct ownership structure. ¶¶78–83, 86–89; *Anwar*, 306 F.R.D. at 145 ("[E]ven assuming Defendants' claims that certain 'communications to class members may not have been uniform, they allegedly were uniformly misleading. The variations are therefore immaterial and will not defeat class certification.'"). In *Audet v. Fraser*, the court found plaintiffs established reliance (at class certification) based on representations to prospective purchasers "on the Companies' websites and in statements printed in widely read industry publications[.]" 332 F.R.D. at 79. And, like here, the "common inference of reliance" in *Audet* was bolstered by the fact that Defendants' "products were financial investments that Plaintiffs made in hopes they would prove profitable." *Id.* Based on Defendants' representations and

omissions, investors purchased Defendants' financial instruments. That is enough at this stage to plead reliance.

Additionally, Plaintiffs also plead reliance under the *Affiliated Ute* theory due to Defendants' omissions. The *Affiliated Ute* presumption "applies in cases involving primarily—not solely—a failure to disclose[.]" *Baliga v. Link Motion, Inc.*, 2022 WL 16707361, at *11 (S.D.N.Y. Nov. 4, 2022). Contrary to Defendants' arguments, the presence of misstatements does not automatically render *Affiliated Ute* inapplicable. *Anwar*, 306 F.R.D. at 146 (*Affiliated Ute* "is not undermined simply because a defendant makes misstatements at the same time it omits material information."). That Defendants' misstatements, which were made to bolster omissions, would protect them from a reliance finding under *Affiliated Ute* because Defendants made misstatements *and* omissions echoes the same "semantic argument" that the *Anwar* court rejected on the basis that Defendants "withheld the same material information from all of their clients or investors[.]" *Id.* at 147; *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013) (finding *Affiliated Ute* applicable despite existence of false statements); *Osberg v. Foot Locker, Inc.*, 2014 WL 5800501 (S.D.N.Y. Nov. 7, 2014) (same).[21]

Defendants attempt to take advantage of the fact that Linqto was not publicly traded to escape liability, but this should not be countenanced. Nor should Defendants' attempt to again rely on extraneous investment documents be allowed. For the reasons previously explained and further set out in Plaintiffs' motion to strike, the Complaint does not allege, and Defendants do not argue, that Plaintiffs received these documents at any time prior to or concurrent with their

[21] Defendants' reliance on *Waggoner v. Barclays PLC* to argue that Plaintiffs cannot invoke the *Affiliate Ute* presumption due to the Complaint's inclusion of misstatements is inapposite. 875 F.3d 79, 95–97 (2d Cir. 2017). In *Waggoner*, which concerned plaintiffs' motion for class certification, the Court found that *Affiliated Ute* did not apply, in part, because plaintiffs' "focus[ed] their claims on those affirmative misstatements" in their class certification argument, as opposed to focusing their claims on omissions.

purchases. Defendants' argument that these documents comprise the "context of the transaction" or represent an "integrated agreement" sufficient to preclude reliance is also squarely a question of fact. *Abbey v. 3F Therapeutics, Inc.*, 2009 WL 4333819, at *12 (S.D.N.Y. Dec. 2, 2009) ("[P]laintiff's reliance on alleged misrepresentations is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss.").

### F. Plaintiffs Plead Loss Causation

Particularly given the permissive pleading standard at the motion to dismiss stage, Plaintiffs have met their burden to adequately plead loss causation under both the materialization-of-risk and corrective-disclosure theories. Defendants mischaracterize the Complaint as bare allegations of an "inflated price," attempt to divorce Linqto's bankruptcy from the actions taken by previous management, and underplay the role that materialization of concealed regulatory and compliance risks played in harming investors.

#### 1. A Final Determination on Loss Causation Is Inappropriate at This Early Stage of Litigation

Loss causation need only be pled, not proved, to survive dismissal, and the pleading burden is deliberately modest. A plaintiff "need only plead a short and plain statement that provides defendants with some indication of the loss and the causal connection that the plaintiff has in mind." *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021). Proving loss causation is a fact-intensive inquiry requiring the benefit of discovery. *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 519 (S.D.N.Y. 2014) ("Loss causation is a fact-based inquiry."); *see also Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (even where an intervening event may have contributed to a plaintiff's loss, such is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss").

Defendants nonetheless contend that 'other factors,' particularly the decisions of new management, intervened and caused Plaintiffs' losses. Mot. at 46. This is precisely the type of argument the Second Circuit has held must await a developed record. "At the motion to dismiss stage, the complaint need not rule out all competing theories for the drop in stock price; that is an issue to be determined by the trier of fact on a fully developed record." *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d 227, 233 (2d Cir. 2014) (cleaned up). Indeed, in *Carpenters*, the Second Circuit held that the district court erred by concluding that the plaintiffs had failed to plead loss causation, because the defendants' competing-causation arguments involved inappropriate questions of fact. *Id.* at 235. The same holds true here.

#### 2. Plaintiffs Adequately Plead Loss Causation Under Materialization of the Risk and Corrective Disclosure Theories

Plaintiffs may allege *either* (1) cause-in-fact of the loss following a negative market reaction to a corrective disclosure; or (2) the loss was foreseeable and caused by the materialization of the risk concealed by the misrepresentation or omission. *Id.* at 232–33; *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 512 (2d Cir. 2010); *Sjunde AP-Funden*, 545 F. Supp. 3d at 146. Plaintiffs have met their pleading burden under both theories.

Materialization of risk. Under the materialization of risk theory, a plaintiff pleads loss causation by alleging that the very risk concealed by the fraud came to pass and caused the loss. This Circuit requires "both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk[.]" *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). That is exactly what the Complaint here alleges. The concealed risks were that Linqto's business was riddled with extensive and serious statutory and regulatory violations (*e.g.*, ¶¶95–103, 105–10, 117–20), that its offering structure was defective and included SPVs that "were simply not established" (¶120), and that investors were paying undisclosed markups up to 150%.

¶64. These exact risks materialized: trading on the Platform was suspended and the Platform was subsequently shut down because "Linqto's model was structured in such a non-compliant way that Linqto could not continue to operate without risking the business, Investor funds, and further violating securities laws." ¶115. Linqto ultimately collapsed into bankruptcy as a result.

The losses suffered by investors were also foreseeable, and Defendants do not suggest otherwise. At least as early as October 2023, the 2023 Memo explicitly warned Linqto it was violating securities laws. Among other regulatory failures, it advised against Linqto's practice of charging excessive and undisclosed markups, Linqto's practice of selling to unaccredited investors, Linqto's scheme to avoid registration requirements of securities laws, and deficiencies surrounding the creation of the Series. ¶¶95–103. Linqto's then-current directors and officers did not course-correct, and almost exactly one year later, internal counsel at Linqto memorialized the substantially same concerns in the 2024 Memo. ¶¶104–10.

Corrective disclosure. Plaintiffs also independently plead loss causation under the corrective disclosure theory, which requires a disclosure of the fraud correcting publicly available information causing a negative market reaction. *Carpenters*, 750 F.3d at 233. Beginning in early 2025, Linqto's new management progressively revealed the truth that prior management concealed. In June 2025, Linqto held a town hall, stating that "the regulatory problems were deep," that internal reviews found "possible evidence of serious regulatory violations by previous management, possibly including issues with pricing disclosures and misleading claims around share ownership," and that Linqto "was not properly structured as a series limited liability company." ¶117. On August 21, 2025, Siciliano published another letter disclosing the "shocking misconduct that systematically defrauded customers and was built into the platform itself," describing "a despicable and intentional pattern of lies and in many cases, clear-cut fraud, which

was ongoing for years," and confirming that the "SPVs that prior management said they had created to hold your investments were simply not established." ¶120. Investors have been unable to access or realize the value of their investments since the Platform was shut down.

### 3. Linqto's Bankruptcy Is a Direct Result of Defendants' Actions

It is immaterial that Linqto's bankruptcy proceedings were initiated by Siciliano. That decision was made explicitly due to the regulatory missteps, misrepresentations, and omissions detailed in the Complaint. Linqto's publications and communications to investors following the bankruptcy filing foreclose any argument that the decision to bring Linqto into bankruptcy was independent of Defendants' action. For example, new management explained it discovered "serious operational challenges" at the Company. ¶ 119. These included alleged securities law violations under regulatory investigation, "major defects in Linqto's corporate structure that raised questions about customer ownership[,]" and "a despicable and intentional pattern of lies and [] clear-cut fraud." ¶¶ 119–20. The bankruptcy was thus the logical outgrowth of the statutory and regulatory violations perpetrated. ¶121. An intervening actor who responds to fraud is not responsible for the fraud and does not unlink the causal chain.[22]

### 4. Defendants' Loss Causation Arguments Are Baseless

*__First__*, Defendants mischaracterize Plaintiffs' theory of loss as allegations of inflated prices and claim these allegations are similar to the purchase-time disparity allegations in *Dura* and *In re New Energy Sys. Secs. Litig.*, 66 F. Supp. 3d 401 (S.D.N.Y. 2014). Mot. at 46. But this is a fundamental misunderstanding of the allegations, which include substantially more than the limited and somewhat perfunctory allegations in *Dura* and *New Energy.*

---

[22] Additionally, whether an intervening event defeats loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital*, 343 F.3d at 197; *Carpenters*, 750 F.3d at 233.

The holdings in *Dura* and *New Energy* regarding the sufficiency of loss causation allegations are also relatively narrow: a plaintiff cannot plead loss causation simply by alleging that the price of the security on the date of purchase was inflated. *Dura*, 544 U.S. at 338; *New Energy*, 66 F. Supp. 3d at 405. Plaintiffs here allege much more than price inflation that had yet to manifest a loss. Plaintiffs' overpayment is the *direct result* of undisclosed markups charged by Defendants. ¶¶90–91, 97, 126. *Marini*, 995 F. Supp. 2d at 155, is instructive. In *Marini*, plaintiff purchased rare coins—deemed securities—from defendant, believing that defendant would only charge a small commission. In fact, defendant charged undisclosed markups. Following a bench trial, the court concluded that plaintiff had adequately proved loss causation. "[T]he value of the security was always lower than [defendant] claimed, and his misrepresentations inflated how much plaintiffs should have paid for that security. Therefore, the value of plaintiffs' investments did not drop after a corrective disclosure; it dropped immediately upon purchase." *Marini*, 995 F. Supp. 2d at 196.

Similarly, in *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), defendants solicited plaintiffs' investment in a healthcare financing venture which subsequently failed. Defendants provided plaintiffs with a report detailing the experience of the venture's founder. Plaintiffs alleged that the report omitted important negative events in the founder's business and financial history, including a bankruptcy and several lawsuits against him. On appeal, plaintiffs argued that the misrepresentations in the report led plaintiffs to appraise the value of the securities incorrectly by assuming the competency of the founder. This Circuit held that loss causation is demonstrated if "defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction." *Id.* at 97–98. The *Suez Equity* plaintiffs also demonstrated loss causation related to the eventual

failure of the business venture because defendants could have foreseen that the founder's concealed lack of skill "would cause the company's eventual liquidity problems." *Id.* at 98.

Likewise, here, the loss occurred at the time of Plaintiffs' purchase because the misrepresentation regarding the value and nature of investment was necessarily manifested by the purchase itself. Linqto misled investors into believing that they were purchasing the private stock itself, not interests in an SPV (let alone an improperly formed SPV) and did so at artificially inflated prices due to improper, undisclosed markups. ¶¶87, 97, 100–01, 125–26.

*Second*, Defendants' reliance on the absence of a 'corrective disclosure' ignores the nature of the securities at issue. Linqto is a private company not subject to the same level of financial and regulatory disclosure as public companies. Further, the securities were in private companies, which are notoriously financially opaque. Investors, by the nature of the transactions at issue, necessarily relied on Linqto's representations about cost and markup and, quite literally, had nothing else on which to rely. In this setting, the fraud is not that a public price was later corrected, but that investors were induced to overpay for interests worth less than the price at the time of sale, which is precisely the realized loss *Marini* and *Suez Equity* hold is cognizable.

*Third*, Defendants' arguments rest on an erroneous assumption that Plaintiffs must identify a conventional public market price decline to plead loss causation. Nothing in *Dura* or this Circuit's loss-causation jurisprudence imposes such a requirement. The relevant inquiry is whether "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity,* 250 F.3d at 95; *see also Lentell*, 396 F.3d at 173–74.

That causal connection is pleaded here. Plaintiffs allege Defendants misrepresented both the nature and value of the Series interests, concealed substantial markups and fees, and hid serious regulatory defects. ¶¶64, 87, 95–110, 117–20, 125–26. These concealed facts impaired the value

of Plaintiffs' investments from the moment of purchase and ultimately resulted in the suspension of trading, shutdown of the Platform, inability of investors to access or monetize their investments, and the bankruptcy. Plaintiffs thus allege an actual economic loss, not an abstract allegation of price inflation. Plaintiffs paid money for investments whose true value, legal structure, liquidity, and regulatory viability were materially different from what Defendants represented. When the concealed regulatory defects materialized and the truth emerged, Plaintiffs were left unable to realize the represented value of their investments. No public exchange or observable daily stock price was necessary for that economic injury to occur.[23]

*Fourth*, Defendants cannot artificially separate Linqto's disclosures from the consequences those disclosures revealed. Whether the truth emerged in a single announcement, through a series of management disclosures, or through the Platform shutdown and bankruptcy does not alter the causal analysis. At the pleading stage, Plaintiffs need only plausibly allege that the concealed truth emerged and produced the claimed loss. They have done so.

The Second Circuit has also made clear that "corrective disclosure" and "materialization of risk" are not rigidly separate doctrinal boxes. *Vivendi*, 838 F.3d at 261–62. The relevant inquiry is whether the truth concealed by the alleged fraud came to light and caused the loss. The truth may emerge through an express corrective announcement or through events that constructively disclose the concealed risk. *Id.* That principle fits these allegations precisely. Plaintiffs allege a progressive series of events revealing what Defendants had concealed: Linqto suspended trading; the Platform ceased operations; new management disclosed extensive regulatory violations and

---

[23] Nor does *Dura* require a different result. *Dura* rejected a complaint alleging only that a publicly traded security was overpriced on the date of purchase without alleging that the concealed truth ever produced an economic loss. *Dura*, 544 U.S. at 342–47. Here, Plaintiffs allege both: that they overpaid as a direct result of undisclosed markups and misrepresentations concerning the investments themselves, and that the concealed regulatory and structural risks subsequently materialized, rendering their investments inaccessible, illiquid, and impaired.

deficiencies in Linqto's structure; and Linqto ultimately entered bankruptcy. ¶¶115, 117, 120. The events did not merely occur contemporaneously with Plaintiffs' loss. They revealed and materialized the very regulatory, structural, and valuation risks Defendants allegedly concealed.

### G. Plaintiffs Adequately Allege Control Under §20(a)

The Complaint meets the standard for pleading control under §20(a) with respect to the violations of the securities laws. "To establish a prima facie case…a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Zeta*, 2026 WL 1971169 at *12 (citation modified). A defendant has control if they had "the power to direct or cause the direction of the management and policies of a person[.]" *Id.* (citation modified). The determination of whether an individual defendant was a controlling person is a "fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Tronox, Inc. Sec. Litig.,* 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011). "A plaintiff must only show some indirect means of discipline…to plead control." *In re Am. Int'l Grp.,* 741 F. Supp. 2d at 535.

Defendants attempt to escape §20(a) liability here by arguing that the Complaint's control allegations are title only. Even if that were accurate, and it's not, courts in this circuit have allowed control claims to proceed based on a "presumption of control that follows from these defendants' extremely high ranks within the company." *In re Glob. Crossing, Ltd. Sec. Litig*., 322 F. Supp. 2d 319, 351 (S.D.N.Y. 2004); *see also Zeta*, 2026 WL 1971169, at *13 (control alleged where defendants held "high positions" and had "authority"). Defendants here are either highly placed executives or Board members who had authority and oversight at the Company.

The Complaint includes numerous allegations that suggest all Defendants had control. Not only were they highly placed executives, but they attended weekly risk meetings and meetings

with consultants, and FEs confirm that these executives set the price of investments, while Defendant Paul signed Form Ds.

## II. SECURITIES ACT CLAIMS

### A. Plaintiffs State a Claim Under §12(a)(1) of the Securities Act

The Complaint alleges in detail that Defendants designed, priced, marketed, and drove the sale of the unregistered Series interests for their own financial interests. This is sufficient under §12(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.§ 77l(1). Defendants seek dismissal on two theories: (1) that the majority of Plaintiffs' purchases are somehow time-barred by a one-year statute of limitations; and (2) no Defendant meets §12(a)(1)'s definition of a statutory seller because none "passed title" to Plaintiffs and none is alleged to have "specifically communicated with [either Plaintiff]." Mot. at 52. Both arguments read the claims too narrowly and misconstrue the law.

#### 1. Whether Certain Claims Are Time-Barred Is Not Dispositive on a Motion to Dismiss

Defendants' statute of limitations argument does not support dismissal. A court may only dismiss a claim on statute of limitations grounds at the pleadings stage "if the complaint clearly shows the claim is out of time." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021). Defendants cannot make this showing here because their own argument admits that at least a portion of the claim is timely. Mot. at 51–52 (conceding that at least six purchases survive against Defendant Sarris, and four survive against other Defendants).

The one-year period for a §12(a)(1) claim runs from the plaintiff's purchase of an unregistered security, not from the offer. This Circuit recently reaffirmed that the one-year statute of limitations "does not begin to run on an illegal offer until the plaintiff acquires the security." *Williams v. Binance*, 96 F.4th 129, 141 (2d Cir. 2024) (quoting *Diskin v. Lomasney & Co.*, 452

F.2d 871, 875–76 (2d Cir. 1971)). Plaintiffs may maintain claims where the last purchase of the security occurred within a year of filing an initial complaint. *See Hardin v. TRON Found.*, 2024 WL 4555629, at *10 (S.D.N.Y. Oct. 23, 2024) (dismissal of §12(a)(1) claim denied because plaintiff purchased the security within a year of filing the complaint and the claim did not accrue until purchase). As Defendants admit, certain of Plaintiffs' purchases easily fall within the year prior to filing the Complaint. Mot. at 51–52. If anything, the partial time-bar Defendants argue goes to the *scope* of recovery, not to whether Plaintiffs may recover at all.

**2. Individual Defendants Are Statutory Sellers**

Section 12(a)(1) creates a private right of action for purchasers against sellers in any transaction that violates §§5(a) or (c) and includes the right to sue for damages or rescission. *See, e.g.*, *Fed. Hous. Fin. Agency for Fed. Nat'l Morg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017) ("A buyer who retains ownership over the security may sue under Section 12 for equitable rescission."). As the Supreme Court held in *Pinter v. Dahl*, strict contractual privity is not required to maintain a §12(a)(1) claim—solicitation may form the basis for liability. 486 U.S. 622, 647 (1988); *see In re Morgan Stanley*, 592 F.3d at 359; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988). "Liability does not require that the defendant actually passed title of the security; rather, any person who engaged in steps necessary to the distribution of the unregistered security is liable." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (citation modified). Solicitation, the Supreme Court explained in *Pinter*, "is perhaps the most critical stage of the selling transaction" because "solicitation is the stage at which an investor is most likely to be injured." 486 U.S. at 646.

The Complaint here alleges precisely the conduct contemplated by the Supreme Court and this Circuit when determining whether a person may be held primarily liable for violations of §12(a)(1). Plaintiffs allege that Defendants directed the offer and sale of securities without a

registration statement or applicable exemption by controlling the pricing, marketing, and sales of such unregistered securities. ¶182. Contrary to Defendants' arguments, these are not the acts of collateral bystanders, but the acts of people who ran the entire selling scheme and operation.

Case law confirms this conclusion. For example, in *Balestra*, two defendants were co-founders and officers of the defendant company. 380 F. Supp. 3d at 358. The court denied individual defendants' motion to dismiss under §12(a)(1), finding that allegations that defendants were personally involved in the publicization of unregistered securities was sufficient to adequately plead primary liability. *Id*. And while the court in *Garnett v. RLX Technology Inc.* ultimately dismissed plaintiffs' claims on other grounds, it still found that plaintiffs had adequately alleged defendant was a statutory seller. 632 F. Supp. 3d 574, 615 (S.D.N.Y. 2022), *aff'd sub nom; Tseng v. De Vries*, 2023 WL 8073087 (2d Cir. Nov. 21, 2023).[24] *See also In re Arqit Quantum Inc. Sec. Litig.*, 774 F. Supp. 3d 505, 540 (E.D.N.Y. 2025) (alleging defendants "actively solicited the exchange of [securities] for their own financial benefit[,]" and made statements in the form of press releases and investor presentations was sufficient).

The allegations in *Balestra* and *Garnett* are substantially similar to those here. Plaintiffs specifically allege that Defendant Sarris designed Linqto's trading structure and Platform, set the price investors paid, chose what private companies would appear first on the Platform's listing page, and marked up shares at will. ¶¶57, 134. Additionally, Sarris met with other Linqto executives to decide what to 'push for the day' and he had direct access to Linqto's customer relationship management platform. ¶47. Plaintiffs specifically allege that Defendant Endoso earned commission on sales of Series Membership Interests based on his affiliation as a broker-

[24] *Garnett* addresses claims under §12(a)(2). This Circuit has held that 'statutory seller' has the same meaning under §§12(a)(1) and 12(a)(2). *See Capri*, 856 F.2d at 473 (determining that 'statutory seller' had the same meaning in §§12(1) and 12(2), the predecessors to §§12(a)(1) and 12(a)(2)).

dealer of Defendant Rainmaker. ¶¶21, 88. As Chief Financial and Administrative Officer of Liquidshares, Defendant Paul signed and submitted Liquidshares Form D filings with the SEC. ¶22. In sum, the Complaint alleges each Defendant "participated in the marketing and sales activities of Linqto" and was "intimately involved in preparing, reviewing, approving, and/or disseminating" materials and communications used to solicit investments. ¶176.

Defendants' cases do little to support their arguments. *Wilson v. Saintine Expl. & Drilling Corp.* examined whether a law firm whose participation in the sale of securities was limited to "the ministerial act of mailing a copy of the private placement memorandum to [plaintiff]" could be termed a statutory seller. 872 F.2d 1124, 1126 (2d Cir. 1989). The court determined that it could not only because the firm had not benefited from any of the memorandum's misrepresentations and was only performing its "usual professional functions." *Id.* In *Underwood v. Coinbase Global, Inc.*, plaintiffs' allegations that defendants engaged in mere promotional marketing were insufficient to allege defendants actively solicited sales. 654 F. Supp. 3d 224, 239 (S.D.N.Y. 2023). The Complaint here alleges substantially more than mere marketing efforts or ministerial acts, despite Defendants' attempt to paint its allegations as "general promotion." Mot. at 51. Furthermore, Defendants cite no authority for the supposed requirement that the statutory seller and purchaser have direct contact. Such a requirement is not found in *Pinter* or its progeny. Moreover, the Complaint sufficiently alleges financial motivation, as discussed above. At the pleading stage, these allegations are more than sufficient to support the inference that Defendants' solicitation activity was undertaken to further their own financial interests. Plaintiffs have adequately pled Defendants are statutory sellers under §12(a)(1).

### 3. Solicitation Is a Factual Question

Nor is a motion to dismiss the appropriate stage to resolve factual questions as to whether Defendants qualify as statutory sellers under §12(a)(1). Defendants' insistence that they did not

solicit Plaintiffs is precisely the kind of factual dispute that must await a developed record. The prematurity of Defendants' demand is especially acute here because Linqto is a private company, and was not required to make certain public disclosures. The fact that Linqto sold interests in SPVs holding securities of private startups adds a second layer of privacy and obfuscation. There are no public filings, prospectuses, or market data through which Plaintiffs could reconstruct (prior to filing the Complaint) precisely which Defendant directed which communication. The law does not punish this asymmetry. As here, where the facts are uniquely within Defendants' possession and control, courts allow claims to proceed on a motion to dismiss. *See, e.g.*, *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (permitting a plaintiff to plead facts on information and belief "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible"). Plaintiffs have done more than plead information and belief. For the foregoing reasons, the Motion should be denied as to Plaintiffs' §12(a)(1) claim.

## III. PLAINTIFFS' TEXAS SECURITIES ACT CLAIM

Count VI alleges that Defendants offered and sold unregistered Series interests in Texas without a permit or dealer registration, made materially misleading statements in connection with those sales, and controlled the sellers and issuer of those securities in violation of the Texas Securities Act ("TSA"), Tex. Gov't Code §§4008.051, 4008.052(a), and 4008.055(a).[25] Defendants' argument for dismissing Count VI rests on three premises: (1) the TSA cannot reach the conduct alleged in the Complaint because no named Plaintiff's purchase is connected to Texas, (2) the TSA requires privity and Defendants were not in privity with Plaintiffs, and (3) Defendants were not control persons. None of these assertions support dismissal.

---

[25] Defendants correctly note that the TSA was recodified without substantive change effective January 1, 2022. Mot. at 53 n.20.

**A. <u>Whether Absent Class Members May Assert Texas Claims Is a Question for Class Certification, Not a Basis for Dismissal</u>**

Defendants' first argument—that Plaintiffs cannot invoke the TSA because their purchases lack a Texas connection (Mot. at 53)—is not properly decided on a motion to dismiss. It is settled in this Circuit that "as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3)" to be resolved after the motion to dismiss stage. *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 93 (2d Cir. 2018). Plaintiffs' standing is not in doubt. The only question raised is whether the class may reach Texas investors whose transactions may differ from Plaintiffs' own. That is a Rule 23 inquiry, not a Rule 12 inquiry.

This Circuit reached the same conclusion in *Williams v. Binance*. There, the district court dismissed absent class members' claims under Blue-Sky statutes of states where named plaintiffs did not reside based upon "an insufficient nexus between the allegations and those jurisdictions." 96 F.4th at 135, *cert. denied sub nom. Binance v. Anderson*, 145 S. Ct. 1048, 220 L. Ed. 2d 380 (2025). The Second Circuit determined that such dismissal was improper and vacated dismissal of absent class members' claims. *Id.* at 145. *See also Hardin*, 2024 WL 4555629 at *13 (declining to address standing or merits arguments regarding state law claims for states where plaintiffs did not reside as were better suited for class certification); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 214 (S.D.N.Y. 2012) (same). The Court should defer determination on Defendants' nexus challenge to class certification and deny the Motion as to Count VI.

**B. <u>The Complaint Pleads a Substantial Texas Nexus</u>**

Should the Court reach the nexus question, the Complaint sufficiently alleges connection between Texas and the challenged conduct. The TSA reaches sales that emanate from Texas, and

Texas courts construe that reach broadly. The Supreme Court of Texas, in *Citizens Ins. Co. of America v. Daccach*, held that the relevant section of the TSA was intended to "prohibit the unregistered sale of securities from Texas, even when the purchasers are nonresidents." 217 S.W.3d 430, 446 (Tex. 2007). Other Texas courts have made clear that "the Texas Securities Act applies if any act in the selling process of securities covered by the Act occurs in Texas," notwithstanding the residency of plaintiffs or where purchases occurred. *Rio Grande Oil Co. v. State*, 539 S.W.2d 917, 921–22 (Tex. Civ. App. 1976), *writ refused NRE* (Dec. 1, 1976).

A "significant aggregation" of contacts to alleged activities is sufficient to form the basis for application of the TSA. *See Daccach*, 217 S.W.3d at 447. The Complaint here adequately pleads such contacts. Plaintiffs allege that Linqto had more than 1,000 investors in Texas; that of the roughly 100 companies offered on the Platform, five were headquartered in Texas and 76 more had Texas operations or employees; and that a Linqto affiliate, Linqto Texas, LLC, filed for bankruptcy alongside Linqto and its related companies in the United States Bankruptcy Court for the Southern District of Texas. ¶195. Those allegations are corroborated by the bankruptcy record. Linqto Texas, LLC (a Texas limited liability company formed shortly prior to the initiation of the bankruptcy) is the lead debtor in the jointly administered cases in the Southern District of Texas, even though the parent, Linqto, Inc., is a Delaware corporation with its headquarters in California. Linqto's deliberate creation and use of a Texas entity to anchor its own restructuring in a Texas forum confirms the very Texas nexus Defendants claim is lacking.

### C. <u>Defendants Are Liable under the TSA as Sellers and as Control Persons</u>

Defendants next contend that they cannot be held liable under the TSA because none passed titled to or solicited either named Plaintiff. Mot. at 54. But Defendants' interpretation of 'seller' requires a narrowed and strained reading of Texas law. Texas courts have repeatedly held that the TSA applies if the seller of an unregistered security is "any link in the chain of the selling

process." *Slack v. Shreve*, 2024 WL 4644610, at *4 (Tex. App. Oct. 31, 2024); *see also Texas Cap. Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 775 (Tex. App. 2001); *Rio Grande Oil*, 539 S.W.2d at 922; *Brown v. Cole*, 155 Tex. 624, 629, 291 S.W.2d 704, 708 (1956). "As used in the Texas Securities Act, the terms 'sale' and 'offer for sale' or 'sell' shall include every disposition, or attempt to dispose of a security for value." *Sandefer*, 58 S.W.3d at 775. This history confirms that the TSA is to be read broadly, and clearly covers the conduct alleged in the Complaint.

The Complaint alleges Defendants offered for sale and sold Series interests, controlled pricing and marketing for the Series interests, and conducted themselves in a way that directly led to the offer and sale of unregistered securities at highly inflated prices. *See, e.g.*, ¶¶47, 67–70, 73, 86–87. These allegations place each Defendant as links in the selling chain—sales of Series interests did not occur in a vacuum.

Defendants are also liable as control persons under §4008.055(a) of the TSA, which establishes liability for "a person who directly or indirectly controls a seller, buyer, or issuer of a security" jointly and severally with the seller, buyer, or issuer. Generally, control person liability requires control over the seller and control over the "specific transaction or activity upon which the primary violation is predicated." *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App. 2000). Defendants are directors and officers of Linqto, the issuer of the securities relevant to this case. ¶¶20–29. Persons in these positions are explicitly the type of person the statute contemplates as liable under § 4008.055(a). *See Summers v. WellTech, Inc.*, 935 S.W.2d 228, 231 (Tex. App. 1996) (persons who controlled the finances, management, and marketing of an issuer were deemed control persons for liability under the TSA); *Frank*, 11 S.W.3d at 384 ("[A]…director is a "control person" for purposes of the statute."). A rule requiring control persons to be in privity with purchasers would render § 4008.055(a) meaningless. The purpose of

control person liability is to allow plaintiffs to seek redress from individuals who stand behind the issuers of securities, especially where there is no relief to be had from the issuer itself. For these reasons, Defendants' motion to dismiss Count VI should be denied.

## IV. THE CALIFORNIA UNFAIR COMPETITION LAW

Plaintiffs allege Defendants Sarris, Endoso, Paul, Nurani, Slemmer, Reed, and Henderson, whose primary place of residence is California, acted unlawfully, unfairly *and* perpetrated a fraud using Silicon Valley tech company Linqto. ¶¶ 20–24, 28–29. Their misconduct is precisely the type of misconduct California's Unfair Competition Law seeks to redress. Cal. Bus. & Prof. Code § 17200 *et seq.* (2024) ("UCL").

The UCL defines "unfair competition" as encompassing several types of business "wrongs," including (a) an "unlawful" business act or practice; (b) an "unfair" business act or practice; (c) a "fraudulent" business act or practice; and (d) "unfair, deceptive, untrue or misleading advertising." *Id.* The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

California's UCL broadly prohibits any unlawful, unfair, or fraudulent business act or practice, with each category establishing distinct grounds for liability. *See* Cal. Bus. & Prof. Code §17200; *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006). A business act or practice is "unfair" if it offends public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers without any corresponding benefit. *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008). Defendants' alleged misconduct falls into all four categories of wrongdoing under the UCL and is not limited to securities fraud.

The Complaint alleges that Defendants created, advertised, and operated a Platform that failed to abide by federal laws and FINRA rules. ¶¶7–13, 57. Investors were also misled into opening accounts and transferring funds to a Platform claiming to offer interests in sought-after

private companies. ¶¶57–58. Defendants lowered investment minimums to attract investors, regardless of accreditation status, and removed several controls meant to safeguard against non-accredited investors on the Platform. ¶¶43–54. Defendants knew of Linqto's compliance deficiencies as the Board was regularly advised by its legal and compliance advisors. ¶¶95–110. Defendants ignored its compliance issues for over four years, while seeking to take public an unregistered, unlicensed marketplace that charged excessive markups on every transaction executed on the Platform. ¶6. Regulators stepped in, the Platform was shut down in 2025, Linqto filed for bankruptcy, and Sarris and Endoso were criminally indicted. The assortment of unlawful business practices within the meaning of § 17200 *et seq*. of the California Business and Professions Code precede any securities transaction.

Relying on *Bowen v. Ziasun Techs., Inc.*, Defendants' primary response is that the UCL does not apply to "securities transactions." 116 Cal. App. 4th 777, 788, 790 (2004). But the *Bowen* holding is limited to the buying or selling of a security, while the UCL claim goes beyond securities transactions. Defendants created and operated an unregistered, illegal, non-compliant marketplace to entice and pressure ordinary individuals to deposit funds into Platform accounts. The UCL claims do not strictly target the securities transactions themselves, but more broadly the illegal online marketplace that wooed unsuspecting individuals into opening accounts and transferring funds. *See, e.g.*, *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 715 (2007) (claims arising from allegedly defamatory stock reports sustained under the UCL); *Strigliabotti v. Franklin Resources, Inc.*, 2005 WL 645529 (N.D. Cal. 2005) (claims arising from alleged scheme to overcharge investors in the management of securities); *Betz v. Trainer Wortham & Co*., 829 F. Supp. 2d 860, 866 (N.D. Cal. 2011). Thus, an intended downstream securities transaction does not necessarily convert every antecedent commercial transaction into a securities transaction.

Defendants also claim the Complaint fails to allege their personal participation in the misconduct. But "[i]t is black-letter law that a corporation can only act through its officers, directors and employees." *Maltz v. Union Carbide Chemicals & Plastics Co.*, 992 F. Supp. 286, 305 (S.D.N.Y. 1998); *DeFrees v. Kirkland*, 2012 WL 12885065, at *5 (C.D. Cal. Aug. 10, 2012) (same). Beyond the detailed allegations of Defendants' participation, Defendants personally participated "in the unlawful practices" because through their positions as officers and directors they had "unbridled control over the practices." *Evolution Fast Food One, LP v. HVFG, LLC*, 720 F. Supp. 3d 251, 267 (S.D.N.Y. 2024) (quoting *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 960 (2002)). The Complaint adequately alleges Defendants' personal wrongdoing in connection with the UCL claim, and the precise contours will require discovery.

Defendants' final assertion is that Plaintiffs fail to trace Plaintiffs' money "to money or property within the defendant's possession," relying on *In re Nexus 6P Prods. Liab. Litig*., 293 F. Supp. 3d 888, 953 (N.D. Cal. 2018). *Nexus* is inapposite as it involved the purchase of faulty cell phones from third-party companies and did not trace purchase money back to the retailer. Here, Plaintiffs created accounts and deposited funds on the Platform, an illegal marketplace that Defendants created and/or managed. Thus, there is no third party requiring the need to trace Plaintiffs' money. This Court should deny the Motion as to the California UCL claim.

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss should be denied.[26]

Dated: October 1, 2026

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

By: /s/ Amanda F. Lawrence
Amanda F. Lawrence
156 South Main Street
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
alawrence@scott-scott.com

Lana V. Levin
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Hemsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax: (212) 223-6334
llevin@scott-scott.com

Catherine Pratsinakis (admitted *pro hac vice*)
Mariah Heinzerling (admitted *pro hac vice*)
**DILWORTH PAXSON LLP**
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215)-575-7000
cpratsinakis@dilworthlaw.com
mheinzerling@dilworthlaw.com

*Counsel for Lead Plaintiffs*

[26] Should the Court find that Plaintiffs have failed to meet any particular pleading standard to state a claim for relief for any reason, Plaintiffs respectfully request that leave to amend be granted pursuant to Fed. R. Civ. P. 15(a) to remedy perceived deficiencies. *Valentini,* 837 F. Supp. 2d at 317 ("Leave to amend shall be freely given when justice so requires.") (citation omitted).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st of October, 2026, I caused the foregoing Opposition to be electronically served on all counsel of record via the CM/ECF electronic filing system.

/s/ Amanda F. Lawrence
Amanda F. Lawrence