**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.O.H. DRIEDIJK HOLDING B.V. AND JAIMIN BHATT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM SARRIS, JOSEPH A. ENDOSO, DAVID PAUL, BRIAN MORAN, KARIM NURANI, MARGARET SLEMMER, VICTOR JIANG, ALISON DAVIS, NORMAN REED, ADAM T. HENDERSON, AND RAINMAKER SECURITIES, LLC.<br><br>Defendants. | Case No. 1:25-cv-5643 (LAK)<br><br>CLASS ACTION<br>JURY TRIAL DEMAND |

**PLAINTIFFS' OPPOSITION TO THE MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT BY DEFENDANTS REED, HENDERSON, AND SLEMMER**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BRIEF RELEVANT FACTS........................................................................................2

I. COMPANY BACKGROUND ....................................................................2

II. DEFENDANTS' SCHEME AND CAMPAIGN OF MISSTATEMENTS AND OMISSIONS ..................................................................2

III. TWO LEGAL MEMORANDA OUTLINE DEEP REGULATORY VIOLATIONS ..........................................................................3

IV. THE TRUTH EMERGES AND THE PLATFORM IS SHUT DOWN..................4

FILING OF COMPLAINT ..........................................................................................5

ARGUMENT ...............................................................................................................6

I. THE COMPLAINT ALLEGES SCHEME LIABILITY AS TO ALL THREE BOARD DEFENDANTS ..................................................7

II. THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS WITH RESPECT TO HENDERSON, REED, AND SLEMMER ..........................8

III. THE COMPLAINT ALLEGES A COGENT INFERENCE OF SCIENTER AS TO BOARD DEFENDANTS ..................................11

A. Board Defendants Were at a Minimum Reckless .....................................11

B. The Magnitude of the Fraud Adds to the Inference of Scienter ................13

C. Board Defendants Had a Duty to Monitor ................................................15

D. The Inference of Scienter Is More Plausible.............................................16

IV. BOARD DEFENDANTS SOLD OR SOLICITED SHARES ..............................17

V. LOSS CAUSATION IS ESTABLISHED ..........................................................18

VI. REED, HENDERSON, and SLEMMER WERE CONTROL PERSONS ............21

VII. STATE LAW CLAIMS ..............................................................................22

CONCLUSION...........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Altshares Event-Driven ETF v. Endeavor Group Holdings, Inc.*,
2026 WL 1848123 (C.D. Cal. June 23, 2026) ....15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....6

*Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340 (S.D.N.Y. 2019)....18

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)....22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....6

*Billitteri v. Sec. Am., Inc.*,
2010 WL 6785484 (N.D. Tex. July 26, 2010)....23

*Bowen v. Ziasun Techs., Inc.*,
116 Cal. App. 4th 777 (2004)....23

*Brown v. Cole*,
155 Tex. 624 (1956)....23

*Burstyn v. Worldwide Xceed Group, Inc.*,
2002 WL 31191741 (S.D.N.Y. Sep. 30, 2002)....14

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)....19

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)....10

*CompuDyne Corp. v. Shane*,
453 F. Supp. 2d 807 (S.D.N.Y. 2006)....22

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989)....14

*DeAngelis v. Corzine*,
17 F. Supp. 3d 270 (S.D.N.Y. 2014)....10

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....6

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....11

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003)....19

*Empl's Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)....15

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)....21

*Gruber v. Gilbertson*,
2018 WL 1418188 (S.D.N.Y. March 20, 2018) ....12, 13, 16, 17

*People ex rel. Harris v. Sarpas*,
225 Cal. App. 4th 1539 (2014) ....24

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ....8

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ....22

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)....14

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000)....18

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....14

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)....13, 15

*In re Cannavest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018)....10

*In re Carter-Wallace, Inc., Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000)....11, 13

*In re Complete Mgmt. Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001)....12

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ....................16

*In re Firstenergy Corp.*,
2022 WL 681320 (S.D. Ohio. Mar. 7, 2022) ....................12

*In re Gas Reclamation, Inc. Sec. Litig.*,
741 F. Supp. 1094 (S.D.N.Y. 1990) ....................18

*In re Glob. Cord Blood Corp. Sec. Litig.*,
820 F. Supp. 3d 221 (S.D.N.Y. 2026) ....................8

*In re JUUL Labs, Inc., Mktg., Sales Pracs., and Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) ....................23

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2021 WL 4482151 (S.D.N.Y. Sep. 30, 2021) ....................16

*In re Lehman Bros. Sec. and ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011) ....................13

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), ....................13

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ....................8

*In re NTL Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004) ....................6

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ....................19

*In re Philip Servs. Corp. Sec. Litig.*,
383 F. Supp. 2d 463 (S.D.N.Y. 2004) ....................8, 10

*In re Quintel Ent. Sec. Litig.*,
72 F. Supp. 2d 283 (S.D.N.Y. 1999) ....................22

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
915 F. Supp. 2d 450 (S.D.N.Y. 2013) ....................13

*In re ShengdaTech Sec. Litig.*,
2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) ....................10

*In re Smith Barney Transfer Agent Litig.*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012) ....................22

*In re Spiegel, Inc. Sec. Litig.*,
382 F. Supp. 2d 989 (N.D. Ill. 2004) ....................14

*In re Symbol Techs., Inc. Sec. Litig.*,
2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ....................14

*In re Tronox, Inc. Sec. Litig.*,
769 F. Supp. 2d 202 (S.D.N.Y. 2011)....................21

*In re Zeta Glob. Holdings Corp. Sec. Litig.*,
2026 WL 1971169 (S.D.N.Y. July 8, 2026) ....................7, 21

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)....................10

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
10 F. Supp. 3d 504 (S.D.N.Y. 2014)....................18

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)....................19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)....................20

*Mabon, Nugent & Co. v. Borey*,
127 B.R. 727 (S.D.N.Y. 1991)....................17

*Marini v. Adamo*,
995 F.Supp.2d 155 (E.D.N.Y. 2014) ....................20

*Matson v. Bd. of Educ.*,
631 F.3d 57 (2d Cir. 2011)....................6

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ....................14

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....................12

*O'Connor v. Uber Techs., Inc.*,
2013 WL 6354534 (N.D. Cal. Dec. 5, 2013) ....................23

*Oklahoma Firefighters Pension and Ret. Sys. v. Musk*,
779 F. Supp. 3d 396 (S.D.N.Y. 2025)....................11

*Ouaknine v. MacFarlane*,
897 F.2d 75 (2d Cir. 1990)....................17

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)....................13

*Rio Grande Oil Co. v. State*,
539 S.W.2d 917 (Tex. Ct. App. 1976)....................23

*S.E.C. v. Tecumseh Holdings Corp.*,
2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009)....................18

*Schnall v. Annuity and Life Re (Holdings), Ltd.*,
2004 WL 231439 (D. Conn. Feb. 4, 2004)....................8, 21

*SEC v. Sayid*,
2018 WL 357320 (S.D.N.Y. Jan. 10, 2018)....................6

*SEC v. Sugarman*,
2020 WL 5819848 (S.D.N.Y. Sep. 30, 2020)....................8

*Selzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020)....................13

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
545 F. Supp. 3d 120 (S.D.N.Y. 2021)....................18, 19

*Slack v. Shreve*,
2024 WL 4644610 (Tex. Ct. App. Oct. 31, 2024)....................23

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)....................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................11

*Texas Cap. Sec., Inc. v. Sandefer*,
58 S.W.3d 760 (Tex. Ct. App. 2001)....................23

*Valentini v. Citigroup, Inc.*,
837 F. Supp. 2d 304 (S.D.N.Y. 2011)....................24

*Yi Xiang v. Inovalon Holdings, Inc.*,
254 F. Supp. 3d 635 (S.D.N.Y. 2017)....................17

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
792 F. Supp. 3d 407 (S.D.N.Y. 2025), *reconsideration denied*, 2025 WL 2962772 (S.D.N.Y. Oct. 21, 2025)....................22

**STATUTES, RULES, & REGULATIONS**

8 Del. C. §251(b)....................9

15 U.S.C. §78t(a) ....................6, 22

Cal. Bus. & Prof. Code §17200 ....................23

Fed. R. Civ. P. 15(a) ....................24

Securities Exchange Act of 1933
15 U.S.C. §77....................7, 17

Securities Exchange Act of 1934
15 U.S.C. §78....................9

Tex. Gov. Code §§4008.051–052 ....................23

Lead Plaintiffs A.O.H. Driedijk Holding B.V. and Jaimin Bhatt ("Plaintiffs") hereby respond to both the Memorandum of Law in Support of Defendants Reed and Henderson's Motion to Dismiss the First Amended Complaint (ECF No. 137) ("RH Mot.") and the Memorandum of Law in Support of Defendant Slemmer's Motion to Dismiss the First Amended Complaint (ECF No. 129) ("Slemmer Mot.") (collectively, the "Motions").

## INTRODUCTION

This case concerns an outright fraud. From February 1, 2020 through March 14, 2025 (the "Class Period"), Defendants—various officers, directors, and related parties of Linqto, Inc. ("Linqto" or the "Company")—engaged in a scheme whereby they undertook various actions to lure unsophisticated investors to their investment platform, tricked them into investing in vehicles owned by the Company, charged exorbitant hidden fees and markups, and evaded basically any and all registration requirements under the federal securities laws and FINRA rules. What's more, Defendants continued this conduct even after two separate legal memoranda explicitly told them the Securities and Exchange Commission ("SEC") would likely find these actions illegal. Not surprisingly, the fraud came crashing down, the SEC and FINRA launched investigations, investments were frozen, the Company filed for bankruptcy, and two executives are facing charges of fraud (one has pled guilty).

Defendants named in the Complaint have now moved to dismiss the robust, detailed, and scathing allegations against them.[1] In copious pages of briefing, Defendants all basically claim they did nothing and knew nothing. Board Defendants are no exception. This argument is not

[1] "Defendants" as used herein refers to Defendants William Sarris ("Sarris"), Joseph A. Endoso ("Endoso"), David Paul ("Paul"), Brian Moran ("Moran"), Karim Nurani ("Nurani"), Margaret Slemmer ("Slemmer"), Adam T. Henderson ("Henderson"), Norman Reed ("Reed"), and Rainmaker Securities, LLC ("Rainmaker"). "Board Defendants" refers solely to Defendants Slemmer, Henderson, and Reed. Defendants Henderson and Reed remain on the Linqto Board of Directors, and Slemmer was a director until February 2025.

only implausible and absurd, but outright ignores detailed allegations showing Board Defendants were part and parcel of the scheme or, at a minimum, buried their heads in the sand and let it happen. They cannot avoid liability under either federal or state laws.

## BRIEF RELEVANT FACTS

### I. COMPANY BACKGROUND

Linqto is a financial technology and digital trading company that offered an online trading platform (the "Platform"). ¶34.[2] It purported to facilitate investments in privately-held, pre-IPO companies that were historically inaccessible to smaller investors, in part due to high minimum investment thresholds. ¶¶35–37. It also purported to offer investors with accredited status (i.e., those that met the SEC's specific wealth, income, sophistication, or professional criteria) the opportunity to do so at low minimum investment thresholds. ¶36. Compared to competitors that offered $100,000 investment minimums, Linqto initially only required a $10,000 minimum, lowering that minimum to only $1,000 by the end of the Class Period. ¶¶40–41.

### II. DEFENDANTS' SCHEME AND CAMPAIGN OF MISSTATEMENTS AND OMISSIONS

Investors were told they could "invest *in* the world's leading Unicorns" and "[I]nvest *in* top mid to late-stage start-ups" using Linqto's "user-friendly platform [which] provide[d] *direct access* to private securities[.]" ¶79 (emphasis added). But investors purchased no such thing. Instead, Defendants purchased shares in the privately held companies listed on the Platform and then sold those securities to Linqto Liquidshares, LLC ("Liquidshares"), a Defendant-created entity. ¶57. Liquidshares then allocated an interest in these shares to a special purpose vehicle ("SPV"), another entity that Linqto created through Series Limited Liability Companies ("Series").

[2] All "¶_" references are to paragraphs in the First Amended Complaint (ECF No. 46) (the "Complaint"), filed on November 17, 2025.

*Id.* Ultimately, therefore, Linqto sold investors Series interests, called "units," in these Linqto-created SPVs. ¶¶57–58. This was a far cry from purchasing shares of unicorns.

Linqto's press materials likewise stated that an investment carried "no hidden fees or costs." ¶86. The only price investors saw on the Platform was the "share" price (¶¶55, 82), but the true price paid was comprised of the acquisition price, associated expenses, fees paid to management and supervisory affiliates, interest charges, and an undisclosed markup. ¶61. These hidden markups, ranging from 20–150% of the acquisition price, were set to manipulate prices and take advantage of the lack of oversight at the expense of investors. ¶64.

Linqto's statements—and federal regulations—also mandated that only accredited investors invest on the Platform. But Defendants allowed, failed to remove, and adjusted controls to make it easier for non-accredited investors to purchase on the Platform. For example, in 2023, Linqto took several measures to circumvent accreditation requirements, including by allowing prospective investors to "self-certify" and implementing its own "test" based on the Company's own interpretation of what a "financially sophisticated" investor was. ¶¶48–49.

Meanwhile, Defendants also never told investors that they were not even remotely in compliance with FINRA and SEC registration requirements. In fact, Defendants deficiently structured the Series in a blatant attempt to evade the registration requirements of an investment company and oversight associated therewith. ¶99.

## III. TWO LEGAL MEMORANDA OUTLINE DEEP REGULATORY VIOLATIONS

Linqto retained a law firm to conduct a regulatory review ahead of a potential IPO. ¶96. That law firm circulated a memorandum in October 2023 (the "2023 Memo") finding that regulators would likely find that Linqto had violated securities laws and FINRA rules. In particular, the 2023 Memo warned that, given Linqto's high markups without disclosure, it was "highly likely" the SEC would find violations of law. The 2023 Memo also explained that Linqto's

accreditation controls were deficient, allowing non-accredited investors on the Platform. With respect to Linqto's ownership structure, it advised that the SEC would likely view Linqto's SPV set-up as a means to evade securities registration requirements and likely find inadequate disclosure of ownership structures. ¶¶97, 100.

Then, in April 2024, Linqto announced its plans to IPO by entering into a definitive Business Combination Agreement ("BCA") with BlockChain Coinvestors Acquisition Corp. I ("BCSA") following "months of review[.]" ¶149. However, on September 26, 2024, Linqto terminated that agreement, paying a $5 million termination fee to BCSA for the failed IPO attempt. Shortly after, in October 2024, the SEC notified Linqto it was investigating potential violations of federal securities laws. Around the same time, a memorandum from Linqto's internal counsel (the "2024 Memo") was issued. ¶¶102–04. It echoed the issues laid out in the 2023 Memo, including that Linqto's ownership structure and lack of accreditation controls could likely result in regulatory action. ¶107. The 2024 Memo raised additional concerns regarding Linqto's inappropriate reliance on issuer exemptions and deficiencies in its Anti-Money Laundering ("AML") and Know Your Customer ("KYC") policies. ¶109.

## IV. THE TRUTH EMERGES AND THE PLATFORM IS SHUT DOWN

On January 2, 2025, Dan Siciliano replaced Sarris as CEO. ¶111. Less than two months later, concerned that prior management had known about systemic securities law violations, new management froze client accounts and paused operations on the Platform. ¶¶112, 114. Two weeks later, all trading activities on the Platform were ceased. ¶115.

By June 2025, Linqto confirmed the violations in the Legal Memos were never rectified, explaining that the "regulatory problems were deep" and "[t]he most pressing concern is the ongoing investigation by the SEC's Division of Enforcement, which is not a mere routine examination." ¶117. On July 7, 2025, Linqto filed for Chapter 11 bankruptcy protection, citing

structural and ownership deficiencies as well as SEC and FINRA investigations. ¶118. Recently, the U.S. Attorney for the Southern District of New York unsealed an indictment charge against Defendant Sarris for the very same conduct and stated that in August 2026, Defendant Endoso pled guilty to securities and broker-dealer fraud.[3]

## **FILING OF COMPLAINT**

Plaintiffs filed the Complaint on November 17, 2025, bringing claims against:

| Defendant | Role |
|---|---|
| Sarris | Linqto founder, Chief Executive Officer ("CEO"), Executive Chairman, and member of the Board of Linqto ("Board") from 2010 until January 2, 2025. ¶20. |
| Endoso | CEO, Chief Financial Officer ("CFO"), Chief Revenue Officer ("CRO"), Chief Operating Officer ("COO"), President, and Board member between 2019 and January 2025. Defendant Endoso was a registered agent and broker-dealer of Rainmaker between at least 2020 and 2022. ¶21. |
| Paul | Chief Financial & Administrative Officer of Linqto Liquidshares, LLC between May 2020 and May 2025. ¶22. |
| Moran[4] | Chief Compliance Officer of Linqto between November 2021 and December 2024. ¶23. |
| Nurani | Chief Strategy Officer ("CSO") between 2020 and March 2025, and member of the Board from March 2025 through May 2025. ¶24. |
| Slemmer | Board member between October 2020 and February 2025. ¶25. |
| Reed | Board member since October 2023. ¶28. |
| Henderson | Board member since 2022. ¶29. |
| Victor Jiang ("Jiang")[5] | Board member from October 2022 through March 2025. ¶26. |
| Rainmaker[6] | FINRA registered broker-dealer that provided supervisory services to Linqto in exchange for a fee. ¶30. |

---

[3] *See* Plaintiffs' Request for Judicial Notice filed concurrently herewith, at Exs. A, B.

[4] Defendants Moran, Endoso, Nurani, and Paul also filed additional motions to dismiss. *See* ECF Nos. 127, 133–135. These briefs do not raise any additional arguments and so are addressed in Plaintiffs' opposition to Moving Defendants' motion to dismiss (the "Omnibus Opposition") filed concurrently herewith.

[5] Plaintiffs have attempted to serve Defendant Jiang since December 2025, and filed an Affidavit of Service on May 19, 2026 (ECF No. 100). Defendant Jiang has not yet appeared in this action.

[6] Rainmaker filed a separate Motion to Dismiss (ECF No. 132) and any specific arguments made therein are addressed in the separate opposition to it filed concurrently and incorporated fully by reference in this brief.

Defendants filed a bevy of motions to dismiss on July 30, 2026. Relevant to this brief, Defendants Reed and Henderson together filed a motion to dismiss, while Defendant Slemmer filed her own. Other Board members (Sarris, Endoso, and Nurani) joined in the consolidated motion to dismiss. ECF No. 131. Therefore, there is overlap in the arguments made in the Omnibus Opposition and this brief. Each are incorporated and adopted fully within each other.

**ARGUMENT**

To survive on a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *SEC v. Sayid*, 2018 WL 357320, at *3 (S.D.N.Y. Jan. 10, 2018) (quoting *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011)). The court must accept well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. At this stage, Plaintiffs need only plead facts sufficient to permit a reasonable inference of liability; factual disputes and competing explanations are matters for discovery and, where appropriate, trial. *In re NTL Sec. Litig.*, 347 F. Supp. 2d 15, 21 (S.D.N.Y. 2004) (Kaplan, J.).

Claims sounding in fraud under Section 10(b) and Rule 10b-5 must satisfy Rule 9(b), which requires that "the circumstances constituting fraud ... shall be stated with particularity." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98–99 (2d Cir. 2007). Loss causation, however, is not subject to the PSLRA's heightened pleading standard. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005). The heightened particularity requirements also do not apply to Plaintiffs' claims which do not sound in fraud including under §20(a) of the Securities Exchange

Act of 1934 ("Exchange Act"), and Plaintiffs' claim under §§5 and 12(a)(1) of the Securities Act of 1933 ("Securities Act").

## I. THE COMPLAINT ALLEGES SCHEME LIABILITY AS TO ALL THREE BOARD DEFENDANTS

Reed, Henderson, and Slemmer largely ignore the allegations for scheme liability under Rule 10b-5(a) and (c) against them, recycling the argument that specific acts in furtherance of the scheme must be somehow specifically linked to each defendant. But this disregards the clear scheme allegations in the Complaint and the law.

Again, Defendants' scheme included: lowering investment minimums to attract investors (¶8), welcoming non-accredited investors (¶8), implementing and maintaining the "Linqto Bucks" program (¶42), blast marketing emails (¶47), creating the FiSo test (¶48), falsely classifying customers as "retail investors" (¶50), removing accreditation controls and requirements (¶52), designing and maintaining a convoluted web of ownership and entities (¶57), imposing markups and creating the algorithm to automatically increase them (¶64), having "spike days," buybacks, swaps, and exclusives (¶70), and evading the registration requirements of both the Securities Act and the 1940 Act. ¶99. These acts go to the very essence of the Company and the Platform and were later described as being "built into the platform itself." ¶120. Several of these acts can be directly ascribed to members of the Board. Take for example the creation of the web of LLCs, trusts, and SPVs required to hide the ownership structure of "shares." *See In re Zeta Glob. Holdings Corp. Sec. Litig.*, 2026 WL 1971169, at *14 (S.D.N.Y. July 8, 2026) (scheme from a "web of trusts and LLCs" to divest shares). This would have required Board approval and oversight. The same can be said of registration requirements. The Board is charged with, at a minimum, ensuring the Company is adequately registered in compliance with FINRA and securities law regulations. Here, the Company complied with *none* of them. Board Defendants'

claims of having no participation in the scheme are therefore not only implausible, but they are impossible.[7] And, there is no requirement to allege that all defendants "participated in each and every aspect of the fraudulent scheme" to plead primary scheme liability. *See SEC v. Sugarman,* 2020 WL 5819848, at *9 (S.D.N.Y. Sep. 30, 2020) (citation modified).

## II. THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS WITH RESPECT TO HENDERSON, REED, AND SLEMMER

The Complaint pleads several categories of actionable misstatements and omissions. Board Defendants do not contest their falsity or materiality. Their only argument is that every fraudulent statement alleged was made by someone else and thus not attributable to them. *See* RH Mot. at 5–6; Slemmer Mot. at 2–3. This argument falls flat.

To begin with, the group pleading presumption relieves Plaintiffs "of the burden of having to identify the specific roles of [Defendants] in the alleged fraud" and presumes that "the directors or officers of a company participate in the preparation and dissemination of group-published documents[.]" *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 482–83 (S.D.N.Y. 2004). Outside directors "can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider.'" *Id.* at 483 (citing *Schnall v. Annuity and Life Re (Holdings), Ltd.*, 2004 WL 231439 at *4 (D. Conn. Feb. 4, 2004)). Contrary to Board Defendants' arguments, courts in this Circuit apply the group pleading presumption to outside directors. *Id.* at 482 (group pleading presumption permitted as to two outside director defendants).

[7] Ignoring the Complaint's allegations, Board Defendants rely on inapplicable cases to argue that the only scheme participation allegations against them are "[a]llegations of Board membership[.]" RH Mot. at 4. These cases do nothing to bolster Board Defendants' position as both *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *14 (S.D.N.Y. Mar. 27, 2013) and *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) concerned only allegations regarding defendants' misrepresentations and omissions, not their role in a greater scheme. *In re Glob. Cord Blood Corp. Sec. Litig.*, 820 F. Supp. 3d 221, 258 (S.D.N.Y. 2026), is equally unavailing, because there, unlike here, plaintiffs did not explain how voting in favor of a "transaction could be a deceptive or manipulative act[.]"

In an attempt to escape the group pleading presumption, Board Defendants further argue the Complaint alleges nothing more than their titles. RH Mot. at 6; Slemmer Mot. at 3. That argument conveniently ignores the Complaint's detailed allegations as to Board Defendants' tenure, as well as the Board's role, involvement, and knowledge, including:

- Board Defendants served as Board members prior to Linqto's plan to IPO in late 2023, throughout the "months of review" undertaken by Linqto and BCSA preceding the BCA, and after Linqto terminated the BCA. ¶¶149, 175.
- Linqto's "review" included the regulatory review that a law firm conducted and memorialized in the 2023 Memo, advising the Company about securities violations that, if left untreated, seriously threatened the Company's future. ¶¶96–103.
- Board approval is required for merger agreements. 8 Del. C. §251(b). As part of its BCA-related review, the Board would have reviewed the regulatory review memorialized in the 2023 Memo.
- According to FE-1, in 2024 Linqto engaged Deloitte for an audit, likely in connection with the proposed IPO. ¶149. A company preparing for an IPO typically engages an auditor to prepare financials because Sarbanes-Oxley requires the Board of a public company to form audit committees to be "directly responsible" for the appointment and work of the company's auditor. Securities Exchange Act, 15 U.S.C. 78j-1(m)(2).
- In late September 2024, Linqto terminated the BCA, paying a $5 million termination fee, another action that the Board would have had to approve. ¶27.
- In November 2024, FE-1's acting supervisor explained that Defendant Sarris had told him that the "Board or Company" said "we need to shut everything down, we

are getting sued" and that "the Board told Sarris to stop marketing because they were getting sued." ¶150.

These allegations show that Board Defendants played a role in Linqto's management sufficient to allege their participation in the actionable misrepresentations and omissions so as to allow group pleading. *In re Philip Servs. Corp.*, 383 F. Supp. 2d at 483 (plaintiffs could invoke the group pleading doctrine with respect to outside directors based on allegations that "they had access to insider information" that would contradict the statements at issue). Plaintiffs have alleged here that Board Defendants had "the power and authority to control the contents" of Linqto's communications and access to material non-public information withheld from investors. ¶32.[8]

Defendants Henderson and Reed also argue that after *Janus Capital Group, Inc. v. First Derivative Traders*, only a person with "ultimate authority" over a statement can be liable for it. RH Mot. at 5 (citing *Janus*, 564 U.S. 135, 142 (2011)). However, courts have continued to conclude that "group pleading is alive and well after *Janus*." *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 241 (S.D.N.Y. 2018); *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) ("[M]ost judges in this District have continued to conclude that group pleading is alive and well."). There is, therefore, a presumption that those with "direct involvement in the everyday business" of a company issuing misstatements made the statements at issue. *Cannavest*, 307 F. Supp. 3d at 241.

[8] In an effort to analogize the present circumstances to inapposite cases that reject group pleading, Board Defendants ignore the Complaint's allegations regarding the involvement of the Board and the access to insider information it had. *E.g., Cannavest*, 307 F. Supp. 3d at 242 (no allegations of access to insider information); *In re ShengdaTech Sec. Litig.*, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (same); *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) (same).

In sum, the Complaint adequately alleges that Board Defendants had sufficient access to insider information, control, and involvement to invoke the group pleading presumption and are thus liable for the alleged misstatements and omissions.

## III. THE COMPLAINT ALLEGES A COGENT INFERENCE OF SCIENTER AS TO BOARD DEFENDANTS

"[S]cienter can be established by alleging facts to show . . . strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation modified).

"The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but need only be "at least as compelling" as any opposing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "The court's job is not to scrutinize each allegation in isolation," but to assess whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 310, 322–23. "At the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Oklahoma Firefighters Pension and Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 422 (S.D.N.Y. 2025) (citation modified). Here, the Complaint sets forth allegations of Board Defendants' scienter in multiple ways—far beyond the "guilt by association" claimed by them. RH Mot. at 9.

### A. <u>Board Defendants Were at a Minimum Reckless</u>

"Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more

importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Plaintiffs have successfully alleged that Board Defendants knew or were reckless in not knowing the true state of affairs at Linqto and with the Platform. *See, e.g.*, *In re Firstenergy Corp.*, 2022 WL 681320, at *22 (S.D. Ohio. Mar. 7, 2022) ("It is difficult to imagine such a scheme emerging without scienter").

As alleged, all three were members of the Board who would have received reports and analyses during the Class Period, including the two scathing legal memoranda that set out the various violations of securities laws. As discussed above, Board approval and review was required for the BCA and, as a part of that review, Board members would have reviewed the 2023 Memo. On top of this, the Complaint contains the following specific allegations as to Board Defendants' knowledge and access to information: a November 2024 conversation between Defendant Sarris and a marketing manager where Sarris specifically said the "Board or Company" said to shut everything down and stop marketing because they were getting sued (¶150); FE-2 describing that the practice of marking up shares was "fairly well known in the Company" (¶139); and Jiang's affidavit later filed and stating that Linqto had regulatory issues the Board needed to resolve. ¶117. These more than amply demonstrate Board Defendants' actual knowledge. *See Gruber v. Gilbertson,* 2018 WL 1418188, at *12 (S.D.N.Y. Mar. 20, 2018) (officers and directors had marshalled the company through a reverse merger and participated in negotiation efforts against the backdrop of investigations); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001) (finding scienter based on defendants' knowledge of facts "by virtue of their positions . . . and the interactions . . . that those positions demanded").

In the face of these allegations, Board Defendants make the predictable argument that the FEs must have specifically spoken to each Board member and the memos must have been hand-

delivered to each as well. Slemmer Mot. at 5–6; RH Mot. at 10–11.[9] But, the law is patently clear that there is "no baseline requirement of [direct] contact" between FEs and individual defendants. *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615–16 (S.D.N.Y. 2015). Indeed, "[t]he notion that CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law." *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019). And, again, the Board was required to review the BCA transactions which resulted in the 2023 Memo. *Gruber*, 2018 WL 1418188, at *12 (revelations unearthed by internal investigation "decisively swing the element of scienter . . . .").

These allegations taken together demonstrate Board Defendants' knowledge or recklessness of the worrying issues at the Company and with the Platform. Or, they constitute serious red flags that likewise give rise to an inference of scienter as, given their roles and responsibilities, they recklessly did not know of the misleading nature of the relevant statements and omissions. *In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 294 (S.D.N.Y. 2011). *See also In re Carter-Wallace*, 220 F.3d at 40 ("An egregious refusal to see the obvious, or to investigate the doubtful," can be a predicate for inferring recklessness).

### B. The Magnitude of the Fraud Adds to the Inference of Scienter

A fraud of this scale, scope, duration, and seriousness could not have escaped the attention of Board Defendants. *Selzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020)

[9] Board Defendants' cases do not help them. RH Mot. at 11, citing *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) and *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 480 (S.D.N.Y. 2013). In *Satyam*, the court dismissed claims against directors because plaintiffs never alleged that the purported warnings actually reached the directors, and because no misstatement was alleged after the one warning that arguably did. 915 F. Supp. 2d at 480. The Complaint here alleges the opposite: the 2023 and 2024 Legal Memos informed Board Defendants of the regulatory and compliance concerns at Linqto, and the challenged conduct continued for more than a year afterward. In *Lululemon*, plaintiffs relied on generalized allegations that the executives received and had "access to" reports about the company's problems without setting forth facts concerning the specific reports or statements containing the alleged contradictory information. 14 F. Supp. 3d at 574. Here the Complaint identifies the specific documents and details their contents, placing Linqto's specific securities-law violations squarely before the Board. ¶¶95–103, 104–10.

("seriousness of the impact that results from [Defendants'] conduct" supports scienter); *In re Alstom SA,* 406 F. Supp. 2d 433, 460 (S.D.N.Y. 2005) ("magnitude" of conduct and years during which arrangements were not disclosed contributed to scienter). This is a fraud that concealed the entire purpose of the Company, ultimately driving it to bankruptcy. That type of fraud could only have been orchestrated from the top, with the knowledge and approval of the Board.

Case law reinforces this conclusion. As to the seriousness of the conduct (resulting in bankruptcy and government investigations), "the more serious the error, the less believable are defendants' protests that they were completely unaware . . . ." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1020–21 (N.D. Ill. 2004). *See also No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) ("absurd to suggest that the Board of Directors would not discuss [FAA investigations or negotiations]."); *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *10 n.3 (E.D.N.Y. Dec. 5, 2013) (pattern of culpable conduct supports a strong inference of scienter); *Burstyn v. Worldwide Xceed Group, Inc.*, 2002 WL 31191741, at *6 (S.D.N.Y. Sep. 30, 2002) ("[T]he magnitude of the adjustments raises questions about defendants' credibility, makes the press statements increasingly suspect, and by doing such, further supports a strong inference of scienter.").

Then, under the "core operations" doctrine, if false and misleading statements are made when contradictory facts "of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). In *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989), for example, the Second Circuit found that directors of a company acted with scienter as their knowledge of import restrictions on a given product could be assumed as that

product was a "significant source of income for the company." *See also Altshares Event-Driven ETF v. Endeavor Group Holdings, Inc.*, 2026 WL 1848123, at *6 (C.D. Cal. June 23, 2026) (members of a board would have been aware of "all significant developments concerning a major transaction" and it would be "absurd" to suggest otherwise). "Core operations" include matters "critical to the long term viability" of the company and events affecting a "significant source of income." *In re Avon*, 2019 WL 6115349, at *20.

Here, the entire purpose of Linqto was for investors to allegedly hold shares in unicorns, which never happened. And, it is also clear in the Complaint that fraud did not concern ancillary issues, but that the Company was riddled with central and extensive issues. For example, the reasons given for filing for bankruptcy were "structural and ownership deficiencies" (¶118), while new management described the violations as "systematic" and "deep" and that the Company was not even properly structured. ¶¶117, 120. These issues go to the very foundation of the Company and to aspects that fall directly under the Board's purview. Therefore, not only did the fraud relate to the sold product of the Company, but the entire Company was a sham, making the core operations doctrine particularly applicable here.

### C. <u>Board Defendants Had a Duty to Monitor</u>

Board Defendants' insistence that they must have been told about every aspect of the fraud also blatantly ignores their duty to monitor. In the Second Circuit, a duty to monitor is a sufficient basis for scienter, separate and apart from Defendants' knowledge and access to information. *Empl's Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

In fact, the Second Circuit has consistently recognized such a duty and has held that the failure to inquire into matters for which individuals are responsible supports a strong inference of scienter. As the Second Circuit stated in *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008): "the required strong inference may arise where the

complaint sufficiently alleges that the defendants . . . failed to check information they had a duty to monitor." *See also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 290 (E.D.N.Y. 2023) (failure to check information subject to "duty to monitor" supports scienter); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2021 WL 4482151, at *4 (S.D.N.Y. Sep. 30, 2021) ("Scienter can be sufficiently pleaded through facts that suggest that defendants knew they had a duty to disclose information they withheld.") (citation modified); *Gruber*, 2018 WL 1418188, at *12 (even if could be said officer and director defendants truly had no knowledge of the misconduct, they still "acted with at least a reckless disregard of a known or obvious duty to disclose when, as alleged, [they] omitted this material information.").

Even assuming, *arguendo,* any of the Board Defendants did not have *direct knowledge* of the shenanigans occurring at the Company (which would mean the legal memos, complete lack of following registration requirements, flouting of accreditation rules, and creation of LLCs and SPVs to obfuscate ownership interests were all somehow kept from them), Plaintiffs' allegations make clear that, at a minimum, Board Defendants recklessly disregarded their duties as directors. Those duties included to comply with registration laws, disclose material adverse information, and supervise executives to prevent them from violating securities laws.

**D. <u>The Inference of Scienter Is More Plausible</u>**

The opposing inference here would be that Board Defendants simply somehow did not know of the blatant misconduct that went to every aspect of the Company, resulting in investigations and bankruptcy. Their innocent inference overlooks at least the following: that the value of the underlying interests were marked up by as much as 150% (¶¶40, 86, 91); that Linqto had massive compliance issues (that were reported to the Board in at least two memos) (¶¶95–110); that the SPV offerings were not registered, and Linqto was not registered as a licensed broker.

*Id.* Their innocent inference thus ignores the Complaint and fails badly. It also fails to take the facts in the light most favorable to Plaintiffs, as the law requires.

The most plausible inference is that Board Defendants ignored Linqto's problems and, for more than four years, stood by and oversaw an illegal, unregistered, unlicensed marketplace scamming non-accredited investors and charging undisclosed, exorbitant markups and fees on every single transaction executed on the Platform with total transactions topping over half a billion dollars. ¶6. The Platform was shut down in 2025, Linqto filed for bankruptcy, and criminal charges were brought against Sarris and Endoso. Quite simply, there can be no other inference than scienter. *See Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir. 1990) ("It is difficult to imagine how such events [of large financial magnitude] could have occurred if the defendants who controlled them had not actually intended to defraud.").

**IV. BOARD DEFENDANTS SOLD OR SOLICITED SHARES**

Board Defendants make a number of arguments to claim they are not statutory sellers under Section 12(a)(1) of the Securities Act. 15 U.S.C. §77*l*(a)(1). But the Complaint alleges in detail that Board Defendants designed, priced, marketed, and drove the sale of the unregistered Series interests which is sufficient under Section 12(a)(1). Each of their arguments fails.

To begin with, Defendant Slemmer's argument that she is not a statutory seller relies on *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635 (S.D.N.Y. 2017) and *Mabon, Nugent & Co. v. Borey*, 127 B.R. 727 (S.D.N.Y. 1991). But neither are particularly persuasive. In *Yi Xiang*, the only allegations regarding certain officers and directors' status as statutory sellers were that they signed the registration statement. *Yi Xiang*, 254 F. Supp. 3d at 645. The allegations made by Plaintiffs in this case are significantly more fulsome. *See infra*, Section III. Likewise, in *Mabon*, the only allegations against individuals were, essentially, that they were members of the board of directors which authorized the sale of securities. *Mabon*, 127 B.R. at 735. Again, Plaintiffs in this

case have alleged that Defendants (including Board Defendants) ran an illegal marketing scheme directing Linqto to send targeted solicitations to investors. *See infra*, Section III.

Defendants Henderson and Reed argue that they cannot be liable under Section 12(a)(1) because they neither passed title nor personally solicited the named Plaintiffs. RH Mot. at 7. That reflects a far narrower reading of the statute than the law requires. A defendant is a "statutory seller" if he successfully solicits the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the security's owner. *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019). "Liability does not require that the defendant actually passed title of the security; rather, [a]ny person who engaged in steps necessary to the distribution of the unregistered security is liable." *Id.* (citation modified); *see also S.E.C. v. Tecumseh Holdings Corp.*, 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009). Nor is strict privity or face-to-face contact with the plaintiff required. Courts in this Circuit impose Section 12(a) liability on officers and directors based on broadly disseminated solicitations—press releases, presentations, videos, and conferences—directed to the investing public rather than to a particular buyer.[10]

## V. LOSS CAUSATION IS ESTABLISHED

Loss causation need only be pled, not proved, to survive dismissal, and the pleading burden is deliberately modest. *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021). Courts in this Circuit have repeatedly found that proving loss causation is a fact-intensive inquiry requiring the benefit of discovery. *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 519 (S.D.N.Y. 2014) ("Loss causation is a fact-based inquiry."); *see also Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (even

[10] Defendants Henderson and Reed's additional cases do little to support their argument. *In re Gas Reclamation, Inc. Sec. Litig.*, 741 F. Supp. 1094 (S.D.N.Y. 1990) and *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 439 (S.D.N.Y. 2000) were decided *after* the opportunity to develop an evidentiary record. Moreover, neither decision speaks to whether a complaint alleging that directors designed, priced, and drove the sale of unregistered securities states a claim. That question is resolved on the pleadings in Plaintiffs' favor.

where an intervening event may have contributed to a plaintiff's loss, such is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss"). Plaintiffs may allege *either* (i) cause-in-fact of the loss following a negative market reaction to a corrective disclosure; or (ii) that the loss was foreseeable and caused by the materialization of the risk concealed by the misrepresentation or omission. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511–512 (2d Cir. 2010); *Sjunde AP-Fonden*, 545 F. Supp. 3d at 146. Plaintiffs have met their burden under either theory.

Defendants Reed and Henderson separately challenge loss causation, but the Complaint alleges that they were informed, through the 2023 and 2024 Legal Memos, of the very practices that caused the losses—the undisclosed markups, the sales to non-accredited investors, and the defective, unregistered Series structure—and that Defendants disregarded those warnings and allowed the practices to continue. ¶¶103, 147–48. The losses that followed (overpayment at purchase and Linqto's platform freeze, shutdown, and eventual bankruptcy) were thus the foreseeable materialization of precisely the risks these directors knew the Company was concealing, which is the essence of loss causation under the materialization-of-risk theory. Under that theory, a plaintiff pleads loss causation by alleging that the very risk concealed by the fraud came to pass and caused the loss. This Circuit requires "both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk[.]" *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). That is exactly what the Complaint here alleges.

Defendants Henderson and Reed's arguments to the contrary are not persuasive. First, their contention that *Dura* bars Plaintiffs' overpayment loss causation argument overlooks that Plaintiffs' overpayment is the *direct result* of undisclosed markups charged by Defendants. ¶¶90–

91, 97, 126. As discussed in the Omnibus Opposition, *Marini v. Adamo*, 995 F.Supp.2d 155 (E.D.N.Y. 2014), is particularly instructive. There, the seller of rare coins (deemed "securities") charged undisclosed markups. Following a bench trial, the court concluded that plaintiff had adequately proved loss causation because the value of the coin was lower than defendant claimed and his misrepresentations inflated the fair price. The court concluded that "the value of plaintiffs' investments did not drop after a corrective disclosure; it dropped immediately upon purchase." *Id.* at 196. So, too, here, Linqto misled investors into believing that they were purchasing the private stock itself, not Series membership interests in an SPV and did so at artificially inflated prices due to improper, undisclosed markups. ¶¶87, 97, 100–01, 125–26.

Then, Defendants Henderson and Reed claim the loss is somehow premature. However, the economic injury was realized at purchase, when investors paid inflated prices for interests worth less than represented. The Complaint further alleges present, ongoing injury. Investor accounts have been frozen, and investors "have been unable to access their property since the Platform was shut down." ¶13. That Linqto's bankruptcy plan might someday route value to investors through a Liquidating Trust or Closed-End Fund does not undo the completed injury; whether those options reduce damages is a merits and damages question, not a pleading defect. It is not appropriate at this stage of litigation to determine whether the bankruptcy was a result of the previous mismanagement, or a standalone decision by new management. Plaintiffs are under no obligation to "rule out other contributing factors or alternative causal explanations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015). Finally, the absence of allegations tying Defendants Henderson and Reed to the Ripple tender offer says nothing about the overpayment and materialization losses on which their liability rests and goes at most to the scope of that liability—a merits question rather than a basis for dismissal.

Nothing more is required of Plaintiffs at the pleading stage to establish loss causation.

## VI. REED, HENDERSON, AND SLEMMER WERE CONTROL PERSONS

To plead control-person liability, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 296 (S.D.N.Y. 2018) (citation modified). A Defendant has control if they had "the power to direct or cause the direction of the management and policies of a person[.]" *Zeta Glob. Holdings*, 2026 WL 1971169, at *12 (citation modified).

The Second Circuit construes the control-person provisions broadly because "they were meant to expand the scope of liability under the securities laws[,]" and "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011). Furthermore, control claims are governed by Rule 8's pleading standard and "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which [that claim] rests . . . is all that is required." *Schnall*, 2004 WL 231439, at *9.

Board Defendants argue that the Complaint only alleges that the three defendants are Board members. RH Mot. at 7; Slemmer Mot. at 6–7. This is not true. Plaintiffs allege that Board Defendants "participated in the day-to-day operation and management of Linqto, had supervision and oversight over Linqto's business and financial affairs, including the reviews conducted in preparation for Linqto's desired IPO, directed Linqto's investment strategies, purchasing, and decisions, and participated in the marketing and sales activities of Linqto." ¶176. Courts routinely sustain Section 20(a) claims on such allegations and permit control to be tested in discovery. *zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 447 (S.D.N.Y. 2025), *reconsideration denied*, 2025 WL 2962772 (S.D.N.Y. Oct. 21, 2025); *In re Alibaba Grp. Holding*

*Ltd. Sec. Litig.*, 2023 WL 2601472, at *15 (S.D.N.Y. Mar. 22, 2023); *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (similar). And, as discussed above, the Complaint also contains allegations about Board Members' access to contrary information which demonstrates control. *See, e.g., In re Quintel Ent. Sec. Litig.*, 72 F. Supp. 2d 283, 298 (S.D.N.Y. 1999) (allegations that defendants had "access to [the company's] internal reports, press releases, public filings, and had the ability to prevent the issuance of or correct the statements" were sufficient to establish control). *See also Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *25 (C.D. Cal. July 1, 2008) ("traditional indicia of [Section 20(a)] control" includes "having a seat on the board.") (citation modified).

Therefore, whether Board Defendants were actually "controlling persons" is thus an intensely factual question. However, for purposes of a 12(b)(6) motion to dismiss, the Complaint clearly states a claim against Board Defendants as controlling persons.[11]

## VII. STATE LAW CLAIMS

Board Defendants also make scattershot arguments as to why they somehow are not liable under the state law claims brought against them. None are persuasive.

*First*, as to the Texas Securities Act ("TSA"), Defendant Slemmer argues that the Complaint fails to allege that she "participated in [Plaintiffs'] purchases" and therefore cannot be held liable under TSA §§4008.051–052. Slemmer Mot. at 8–9. Slemmer relies primarily on *Billitteri v. Sec. Am., Inc.*, 2010 WL 6785484 (N.D. Tex. July 26, 2010), where the court failed to follow the wealth of Texas law holding liable all sellers who are any link in the chain of the selling process. *Compare Billitteri*, 2010 WL 6785484, at *7 *to Slack v. Shreve*, 2024 WL 4644610, at

[11] Board Defendants' reliance on *In re Smith Barney Transfer Agent Litig.,* 884 F. Supp. 2d 152, 166–67 (S.D.N.Y. 2012) is misplaced. Slemmer Mot. at 6. That case discusses the distinction between control status alone versus actual control. There, the only allegations of actual control were access to public filings. Here, Plaintiffs have put forth that Board Defendants not only had the ability to control the statements and procedures at the Company, but that they were charged with controlling central aspects of the Company (registration, IPO negotiations, audit).

*4 (Tex. Ct. App. Oct. 31, 2024); *Texas Cap. Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 775 (Tex. Ct. App. 2001); *Rio Grande Oil Co. v. State*, 539 S.W.2d 917, 922 (Tex. Ct. App. 1976); *Brown v. Cole*, 155 Tex. 624, 629 (1956).

Second, as to the California Unfair Competition Law ("UCL") claims (Cal. Bus. & Prof. Code § 17200 et seq.), Defendant Slemmer relies on *In re JUUL Labs, Inc., Mktg., Sales Pracs., and Prods. Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020) and *O'Connor v. Uber Techs., Inc.*, 2013 WL 6354534 (N.D. Cal. Dec. 5, 2013) to argue that the UCL does not impose liability "on a director based on status alone." Slemmer Mot. at 9. But *JUUL* only addresses when directors may be held liable under the Racketeer Influenced and Corrupt Organizations Act. 497 F. Supp. 3d at 608–09. And, *O'Connor* merely analyzes whether officers and directors may be held liable for torts of a company "unless they participate in the wrong or authorize or direct that it be done," not whether the UCL imposes liability on a director based on status under the unfair prong. 2013 WL 6354534, at *17. Plaintiffs here allege more than Defendant Slemmer's status as a Board member, alleging that she, along with other Defendants, controlled or participated in the communications, promotions, pricing decisions, platform presentations, and sales activities intended to cause investors to purchase Series interests. ¶¶32, 73, 129, 130–32.

Third, also as to the UCL claims, Defendants Reed and Henderson assert that the UCL does not apply to "securities transactions," relying on *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 788, 790 (2004). But the *Bowen* holding is limited to securities transactions, i.e., the buying or selling of a security. The UCL claim here goes beyond mere purchase or sale of a security. Plaintiffs' UCL theory targets Defendants' Platform that induced ordinary individuals to open accounts and deposit funds—conduct antecedent to, and distinct from, any securities transaction. ¶207.

The Complaint also adequately pleads participation by Board Defendants who are in positions of control and "permitted the known unlawful practices to continue[.]" *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1564 (2014). They are thus directly liable under the UCL, including for their failure to prevent the unlawful acts of the company's agents. For example, the Complaint alleges that Defendants Henderson and Reed (both California residents and directors of a California company) were repeatedly advised of Linqto's compliance violations through their activities as Board members and nonetheless allowed the illegal marketplace to operate for years. ¶¶147, 207. Their conduct amounts to participation and control over the scheme.

**CONCLUSION**

For the reasons stated herein, Board Defendants' motions to dismiss should be denied.[12]

Dated: October 1, 2026

Respectfully submitted,
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

By: */s/ Amanda F. Lawrence*

Amanda F. Lawrence
156 South Main Street
Colchester, CT 06415
Tel: (860) 537-5537
Fax: (860) 537-4432
alawrence@scott-scott.com

Lana V. Levin
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Hemsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax: (212) 223-6334
llevin@scott-scott.com

[12] Should the Court find that Plaintiffs have failed to meet any particular pleading standard to state a claim for relief for any reason, Plaintiffs respectfully request that leave to amend be granted pursuant to Fed. R. Civ. P. 15(a) to remedy perceived deficiencies. *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) ("Leave to amend shall be freely given when justice so requires.") (citation modified). In fact, from documents recently revealed in the bankruptcy proceeding, Plaintiffs have learned, for example, details surrounding Board Defendants' roles on various committees and awareness of regulatory violations.

**DILWORTH PAXSON LLP**
Catherine Pratsinakis (admitted *pro hac vice*)
Mariah Heinzerling (admitted *pro hac vice*)
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215)-575-7000
cpratsinakis@dilworthlaw.com
mheinzerling@dilworthlaw.com

*Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st of October, 2026, I caused the foregoing Opposition to be electronically served on all counsel of record via the CM/ECF electronic filing system.

*/s/ Amanda F. Lawrence*
Amanda F. Lawrence