UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

A.O.H. DRIEDIJK HOLDING B.V. and JAIMIN BHATT, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

– against –

WILLIAM SARRIS, JOSEPH A. ENDOSO, DAVID PAUL, BRIAN MORAN, KARIM NURANI, MARGARET SLEMMER, VICTOR JIANG, ALISON DAVIS, NORMAN REED, ADAM T. HENDERSON, and RAINMAKER SECURITIES, LLC,

Defendants.

--------------------------------------------------------------------------X

Case No. 1:25-cv-5643 (LAK) (BCM)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOVING DEFENDANTS' CONSOLIDATED MOTION TO DISMISS THE FIRST AMENDED COMPLAINT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS TO STRIKE AND FOR JUDICIAL NOTICE**


TREANOR DEVLIN BROWN PLLC
Timothy J. Treanor
Arlo Devlin-Brown
John J. Lavelle
230 Park Avenue, Suite 450
New York, NY 10169
*Counsel for Defendant William Sarris*

LAW OFFICE OF WILLIAM H. KIMBALL
William H. Kimball
803 Hearst Avenue
Berkeley, CA 94710
*Counsel for Defendant David Paul*

CHIESA SHAHINIAN & GIANTOMASI PC
Lee Vartan
11 Times Square, 34th Floor
New York, New York 10036
*Counsel for Defendant Brian Moran*

EHRLICH & CRAIG LLP
Alexander Setzepfandt
803 Hearst Avenue
Berkeley, California 94710
*Counsel for Defendant Karim Nurani*

KOPECKY SCHUMACHER ROSENBURG LLC
David Slovick
James L. Kopecky
120 N. LaSalle Street, Suite 200
Chicago, IL 60602
*Counsel for Defendant Rainmaker Securities, LLC*

PIERSON FERDINAND LLP
Aurora Cassirer
Alicia N. Washington
1270 Avenue of the Americas, 7th Floor – 1050
New York, NY 10020
*Counsel for Defendant Joseph A. Endoso*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1
ARGUMENT ..... 3
I. THE FAC DOES NOT ALLEGE THAT EITHER NAMED PLAINTIFF RELIED ON ANY CHALLENGED STATEMENT, AND THERE IS NO PRESUMPTION OF CLASS-WIDE RELIANCE ..... 3
A. The FAC Fails to Allege That Named Plaintiffs Saw Any Misstatement. ..... 3
B. The *Affiliated Ute* Presumption Does Not Apply. ..... 4
C. No Rule Excuses a Named Plaintiff from Alleging Reliance Because a Defendant's Statements Were Supposedly Uniform. ..... 6
II. THE MOTION TO STRIKE SHOULD BE DENIED. ..... 8
A. The Governing Rules. ..... 8
B. Defendants' Exhibits. ..... 9
C. Plaintiffs' Documents Should Not Be Noticed. ..... 10
III. THE FAC PLEADS NO ACTIONABLE MISSTATEMENT ABOUT OWNERSHIP OR FEES BECAUSE INVESTORS WERE TOLD WHAT THEY WERE BUYING AND HOW LINQTO WAS PAID ..... 11
A. The Documents Disclose What the FAC Alleges Was Hidden. ..... 12
B. Plaintiffs' Own Records Answer Their Timing Objection. ..... 12
C. Marketing Slogans Do Not Change What Was Bought. ..... 13
D. The Markup Was Disclosed in the Statement Plaintiffs Sue On, and No Improper Charge Is Pleaded. ..... 14
IV. THE FAC DOES NOT PLEAD WITH PARTICULARITY WHAT EACH DEFENDANT SAID OR DID, OR A STRONG INFERENCE OF ANY DEFENDANT'S SCIENTER ..... 15
A. The Group-Pleading Presumption Cannot Save the Inadequate FAC. ..... 15
B. The FAC Does Not Plead a Strong Inference of Scienter as to Any Defendant. ..... 18
C. Count III Fails With the Primary Claims. ..... 20
V. COUNT I FAILS BECAUSE IT ALLEGES NO DECEPTIVE ACT BEYOND THE CHALLENGED STATEMENTS ..... 21
VI. THE FAC DOES NOT ADEQUATELY PLEAD THAT THE ALLEGED FRAUD CAUSED EITHER PLAINTIFF AN ECONOMIC LOSS ..... 22
A. Paying a Markup Is Not an Economic Loss. ..... 22
B. The Shutdown and Bankruptcy Do Not Plead Loss Causation Under Either Theory Asserted Only in Plaintiffs' Brief. ..... 24
C. Plaintiffs' Argument That Loss Causation Is a Question of Fact Does Not Reach a Complaint That Pleads No Loss. ..... 25
VII. THE REMAINING COUNTS FAIL BECAUSE THE FAC PLEADS NO CLAIM ON EITHER PLAINTIFF'S OWN PURCHASES ..... 26

A. Section 12 Could Reach Only Bhatt's 2024 Purchases, and No Defendant Is Alleged to Have Solicited Them. .......... 26

B. Neither Plaintiff Bought Securities in or from Texas, and No Defendant Is a Seller or Control Person Under the Texas Act. .......... 28

C. The California UCL Does Not Reach the Purchase of Securities. .......... 29

CONCLUSION .......... 30

# TABLE OF AUTHORITIES

**Cases**

*Abbey v. 3F Therapeutics, Inc.*, 2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009) ............................ 13
*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) .......................................... 4
*Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427 (S.D.N.Y. June 14, 2007) ........................................................................................................................ 17
*Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134 (S.D.N.Y. 2015) .......................................... 6
*Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333 (2d Cir. 2011) .......................................... 12
*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .......................................11
*Audet v. Fraser*, 332 F.R.D. 53 (D. Conn. 2019) ............................................................................. 6
*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................... 26
*Baliga v. Link Motion, Inc.*, 2022 WL 16707361 (S.D.N.Y. Nov. 4, 2022) ...................................... 6
*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ................................................................................... 3
*Betz v. Trainer Wortham & Co.*, 829 F. Supp. 2d 860 (N.D. Cal. 2011) ....................................... 30
*Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194 (S.D.N.Y. 2018) ............................ 17
*Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777 (2004) ......................................................... 30
*Brown v. Cole*, 291 S.W.2d 704 (Tex. 1956) ................................................................................. 29
*Camofi Master LDC v. Riptide Worldwide, Inc.*, 2011 WL 1197659 (S.D.N.Y. Mar. 25, 2011) .. 17
*Capri v. Murphy*, 856 F.2d 473 (2d Cir. 1988) ............................................................................... 27
*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) ...... 25, 26
*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ..................................................... 8, 9
*Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430 (Tex. 2007) ............................................... 28
*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012) .............................................................................................................................. 16
*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705 (S.D.N.Y. 2013) 27
*Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018) ....................................................... 17
*Davis v. MSR Holdings, LLC*, No. 01-22-00451-CV, 2024 WL 3237623 (Tex. App.—Houston [1st Dist.] June 28, 2024, pet. denied) (mem. op.) ................................................................ 29
*DeAngelis v. Corzine*, 17 F. Supp. 3d 270 (S.D.N.Y. 2014) .......................................................... 17
*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ..................................................................... 22
*Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344 (S.D.N.Y. 2000), aff'd, 26 F. App'x 83 (2d Cir. 2002) .............................................................................................................................. 17
*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189 (2d Cir. 2003) .... 22, 23, 25
*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) ............................................. 1, 3
*Faulkner v. Beer*, 463 F.3d 130 (2d Cir. 2006) ......................................................................... 12, 13
*Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ............................................................................................................................ 29
*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ..................................................... 13, 15
*Giraldo v. Kessler*, 694 F.3d 161 (2d Cir. 2012) ............................................................................ 10
*Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006) ....................... 8

*Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90 (E.D.N.Y. 2014).......................... 7
*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184 (2d Cir. 1998) ................................................... 15
*Hardin v. TRON Found.*, No. 20-cv-2804 (VSB), 2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024) 28
*Heabeart v. Coinbase, Inc.*, 832 F. Supp. 3d 399 (S.D.N.Y. 2026)............................................... 4
*Hunt v. Alliance N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723 (2d Cir. 1998).............................. 13
*In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010)............................ 19
*In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................. 16
*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005)............................................... 16, 18
*In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148 (S.D.N.Y. 2008) ....................... 20
*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009)............................. 18
*In re DiDi Glob. Inc. Sec. Litig.*, No. 21-cv-5807 (LAK), 2025 WL 2345696 (S.D.N.Y. Aug. 13, 2025) ........................................................................................................................... 5
*In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013) .......... 6
*In re Fyre Festival Litig.*, 399 F. Supp. 3d 203 (S.D.N.Y. 2019) ................................................... 4
*In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) ............... 4
*In re Merrill Lynch Auction Rate Sec. Litig.*, 765 F. Supp. 2d 375 (S.D.N.Y. 2011) ................... 12
*In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y. 2004)................................................. 16
*In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005)................................................ 21
*In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152 (S.D.N.Y. 2012)........................ 20
*In re Stillwater Cap. Partners Inc. Litig.*, 853 F. Supp. 2d 441 (S.D.N.Y. 2012) ........................ 14
*In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013) ....................................... 7
*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ......................................................... 25
*In re Zeta Glob. Holdings Corp. Sec. Litig.*, 838 F. Supp. 3d 413 (S.D.N.Y. 2026).................... 21
*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) ................................ 15
*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ...................................................... 8, 20
*Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88 (2d Cir. 2018)............................... 28
*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).......................................... 22, 24, 25
*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015) ............ 16
*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ............................................................................. 17
*Marini v. Adamo*, 995 F. Supp. 2d 155 (E.D.N.Y. 2014), aff'd, 644 F. App'x 33 (2d Cir. 2016) 15, 23
*Okla. Firefighters Pension & Ret. Sys. v. Integral Ad Sci. Holding Corp.*, No. 25-cv-0847 (LAK), 2026 WL 575379 (S.D.N.Y. Mar. 2, 2026) ......................................................................... 12
*Okla. Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396 (S.D.N.Y. 2025)............... 21
*Osberg v. Foot Locker, Inc.*, 2014 WL 5800501 (S.D.N.Y. Nov. 7, 2014) .................................... 6
*Owen v. Elastos Found.*, No. 19-cv-5462 (GHW), 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) 27
*Pinter v. Dahl*, 486 U.S. 622 (1988) ................................................................................. 26, 27, 29
*Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021) ....................................................................................................................................... 18
*Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999).................................................... 15
*Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576 (S.D.N.Y. 1995)............. 18

*Rio Grande Oil Co. v. State*, 539 S.W.2d 917 (Tex. Civ. App. 1976) ........................................ 28
*Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) ................................................ 29
*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ................................................................ 8
*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) .............................................................. 20
*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300 (S.D.N.Y. 2024) ........................................................................................................ 20
*Schwab v. E*TRADE Fin. Corp.*, 285 F. Supp. 3d 745 (S.D.N.Y. 2018), aff'd, 752 F. App'x 56 (2d Cir. 2018) ........................................................................................ 4, 5, 7, 18
*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003 (N.D. Cal. 2024) .................... 19
*SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738 (2d Cir. 1941) .................................... 27
*SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ........................................................ 15
*SEC v. Farnsworth*, 692 F. Supp. 3d 157 (S.D.N.Y. 2023) ........................................................ 21
*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ..................................................... 15
*SEC v. Medallion Fin. Corp.*, No. 21-cv-11125 (LAK), 2022 WL 3043224 (S.D.N.Y. Aug. 2, 2022) ........................................................................................................ 9
*SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022) ..................................................................... 21
*SEC v. Sugarman*, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) .............................................. 18
*SEC v. Tecumseh Holdings Corp.*, No. 03-cv-5490 (SAS), 2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) ........................................................................................................ 26
*Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021) .......................................... 20
*Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015) .......................................... 20
*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120 (S.D.N.Y. 2021) ............. 11
*Slack v. Shreve*, No. 12-24-00014-CV, 2024 WL 4644610 (Tex. App.—Tyler Oct. 31, 2024) (mem. op.) ........................................................................................................ 28, 29
*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103 (2d Cir. 2005) .......... 13
*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) .......................... 23
*Szulik v. Tagliaferri*, 966 F. Supp. 2d 339 (S.D.N.Y. 2013) ...................................................... 14
*Tex. Capital Sec. Mgmt., Inc. v. Sandefer*, 80 S.W.3d 260 (Tex. App.—Texarkana 2002, pet. struck) ........................................................................................................ 29
*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) .................................................................. 2, 11
*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ........................................................... 4, 6
*Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024) .................................................................. 26, 28
*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ........................................ 10, 13, 23, 30

**Statutes**

15 U.S.C. § 7241(a) ........................................................................................................ 16
15 U.S.C. § 77f(a) ........................................................................................................ 16
15 U.S.C. § 78t(a) ........................................................................................................ 20
17 C.F.R. § 230.503(a)(1) ........................................................................................................ 9

## PRELIMINARY STATEMENT

In their Opposition,[1] plaintiffs avoid the core of their fraud claims: the nature of their own purchases.[2] They purchased units in investment vehicles that Linqto created, directly from Linqto, at prices Linqto set, providing an economic interest in private company securities owned by Linqto. (FAC ¶¶ 19, 57–58, 64.) To plead fraud in connection with those purchases, each named plaintiff must allege which misstatements it saw, that it relied on them, and how the falsehood caused it monetary damages. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10 (2011). The FAC does not plead these elements, and the Opposition cannot supply them.

*First*, neither plaintiff alleges that it saw, let alone relied on, any challenged statement. (Mem. 35–38.) Plaintiffs answer that reliance can be inferred because every investor paid the price per "share" shown on Linqto's order page (Opp. 31–33), but their cases decide whether a class could prove reliance by common evidence at certification, not whether a named plaintiff may skip alleging its own reliance in a complaint. Their fallback, the *Affiliated Ute* presumption (Opp. 33), applies to claims based primarily on omissions, and the FAC's claims rest overwhelmingly on affirmative statements: that investors were buying "shares" and would pay "no added fees." (FAC ¶¶ 84, 86.) That alone disposes of the Exchange Act claims against every defendant. (Point I.)

---

[1] "Opposition" and "Opp." refer to plaintiffs' opposition brief (Dkt. 142); "Mem." to defendants' opening brief (Dkt. 131); "Strike Mem." to plaintiffs' memorandum of law supporting their motion to strike (Dkt. 145-1); and "RJN" to plaintiffs' request for judicial notice (Dkt. 146), each cited to its own page numbers. "FAC" refers to the First Amended Complaint (Dkt. 46). "Ex." refers to an exhibit to the Declaration of Timothy J. Treanor (Dkt. 130), cited by ECF page. Unless noted, internal quotation marks, citations and alterations are omitted.

[2] Defendant Joseph A. Endoso joins this reply only as to Points I, II (other than the discussion of Exhibit C to the Treanor Declaration), III.A–III.C, IV.A, VI and VII, and the corresponding portions of this Preliminary Statement, as set forth in his separately filed supplemental reply. Mr. Endoso's joinder is limited to the legal sufficiency of the FAC's allegations under Rules 8, 9(b) and 12(b)(6) and the PSLRA; nothing in this reply is offered as, or should be construed as, a factual representation or denial by Mr. Endoso.

*Second*, plaintiffs ask the Court to strike the Series' operating agreement and Form Ds, on which the FAC relies, but to take judicial notice of an indictment of Mr. Sarris, a press release, and a declaration filed in the bankruptcy. They say they "do not ask the Court to accept the truth" of them (RJN 4) yet cite the press release as proof of a scheme and for a purported motive the FAC does not plead. (Opp. 12, 30; Point II.) The indictment is only an accusation, and in a criminal case the government need not prove reliance, economic loss or loss causation, which "relate to who (other than the government) may bring suit." *United States v. Vilar*, 729 F.3d 62, 75 (2d Cir. 2013). Those elements are missing here. (Points I, VI.)

*Third*, Plaintiffs' central theories—investors thought they were buying shares of the private companies themselves at a price with no markup—are refuted by documents that investors received and agreed to be bound by. The Linqto FAQ page advised investors, before Bhatt's first purchase, that they were buying "shares in a Special Purpose Vehicle managed by Linqto," and that Linqto "sources deals and marks them up." (Ex. G at ECF 2, 5, 8.) Each confirmation of A.O.H.'s orders likewise disclosed that the investor was "purchasing the number of units in the Series." (Ex. D at ECF 12, 14, 16, 18.) Plaintiffs do not dispute what these documents disclose, but rather that the confirmations came after their first orders. Yet two-thirds of A.O.H.'s investments came after its first confirmation, and the transaction documents disclosed the markup. (Point III.)

*Fourth*, plaintiffs make allegations against "Defendants" as a group and defend their scienter theory as "applicable to all named Defendants." (Opp. 31 n.19.) The Exchange Act requires an identified speaker and particular facts showing that the speaker knew the statement was false. But the FAC ties almost none of the challenged statements to an identified defendant, and does not plead that the legal memos plaintiffs rely on, which purported to assess regulatory

risk, informed any defendant that a specific statement to investors was false. (Point IV.) Nor does the FAC plead a scheme: the acts it calls a scheme are the challenged statements under another name, or ordinary business decisions that deceived no one. (Point V.)

*Fifth*, the FAC's loss-causation allegations plead only that investors paid prices above Linqto's acquisition cost and that the Ripple tender allegedly cost them value. (FAC ¶¶ 125–28.) The Opposition's theory that concealed risks resulted in the shutdown and bankruptcy (Opp. 35–37) is not pleaded as loss causation, and plaintiffs' own brief asserts that lost access is "distinct from the harm caused by the legal violations alleged." (Opp. 8; Point VI.) The remaining counts fail on their own terms. (Point VII.) In the end, the Opposition reveals that FAC's inartful pleading deficiencies are strategically driven because Linqto itself "cannot be named" as a defendant in this Court "given its bankruptcy filing." (Opp. at 2.) The motion to dismiss should be granted in full without leave to amend and the motion to strike denied.

## ARGUMENT

### I. THE FAC DOES NOT ALLEGE THAT EITHER NAMED PLAINTIFF RELIED ON ANY CHALLENGED STATEMENT, AND THERE IS NO PRESUMPTION OF CLASS-WIDE RELIANCE

Plaintiffs barely address (Opp. 33) Defendants' argument that no market-wide presumption of reliance is available under *Basic Inc. v. Levinson*, 485 U.S. 224, 241–47 (1988) (Mem. 37–38). And their arguments that reliance should be presumed under *Affiliated Ute* or can be established by "common evidence" of "uniform representations" both fail to defeat dismissal.

#### A. The FAC Fails to Allege That Named Plaintiffs Saw Any Misstatement.

In the absence of presumed reliance, each plaintiff must allege that it "was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Halliburton*, 563 U.S. at 810. The FAC's only specific allegation about the named plaintiffs' purchases is that they bought units "as set forth in their previously filed

certifications" (FAC ¶ 19), which list only trades, not why either plaintiff bought or what statement it relied on (Mem. 36). The Opposition does not address either point or identify any allegation that A.O.H. or Bhatt visited any particular web page, read the FAQ, opened a marketing email, saw a press release, or even believed that they were buying shares of the actual securities rather than SPV units. The FAC's only references to reliance are class-wide boilerplate: that "Plaintiffs and other Class members, relying on the materially false and misleading statements described herein," bought their interests (FAC ¶¶ 165, 171), and that "Plaintiffs and other Investors" relied on "Linqto's 'share prices' and other information relating to or contained on the Platform" (*id.* ¶ 122). Courts reject such vague allegations as insufficient to plead reliance. (Mem. 36.)[3]

**B. The *Affiliated Ute* Presumption Does Not Apply.**

Plaintiffs next argue that reliance can be presumed because the FAC also alleges omissions. In a case "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). The presumption does not apply to claims that, like these, rest overwhelmingly on affirmative misstatements, "or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017).

[3] *See, e.g.*, *Heabeart v. Coinbase, Inc.*, 832 F. Supp. 3d 399, 415 (S.D.N.Y. 2026) (dismissing claims of crypto token buyers who claimed they "reasonably relied" on Coinbase website statement, but failed to allege "that any individual plaintiff actually saw that statement before purchasing"); *Schwab v. E*TRADE Fin. Corp.*, 285 F. Supp. 3d 745, 753–54 (S.D.N.Y. 2018) (dismissing for failure to plead reliance where retail brokerage customer vaguely claimed he "relied on" E*TRADE's promise of "best execution," but failed to allege "that he actually read, or was otherwise aware of," that promise), *aff'd*, 752 F. App'x 56 (2d Cir. 2018); *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 5730020, at *3–4 (S.D.N.Y. Oct. 22, 2013) (Kaplan, J.) (dismissing Rule 10b-5 claim where plaintiffs did "not allege that they read the SEC Filings or that they purchased the Warrants in direct reliance upon the specific misrepresentations cited in the amended complaint"); *see also In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 216 (S.D.N.Y. 2019) (dismissing boilerplate allegation that "Plaintiffs and other Class members relied on Defendants' misrepresentations and omissions" as too "conclusory and generalized," and insufficient "[e]ven under Rule 8(a)").

The presumption rests on the difficulty of proving reliance on silence. It applies where "no positive statements exist" and "reliance as a practical matter is impossible to prove," and it "does not apply to cases where . . . plaintiffs could . . . plead reliance on certain of defendants' statements." *In re DiDi Glob. Inc. Sec. Litig.*, No. 21-cv-5807 (LAK), 2025 WL 2345696, at *1–3 (S.D.N.Y. Aug. 13, 2025) (citations omitted) (applying presumption where statements were in non-public officer certificates on which plaintiffs could not have relied). Here, every statement the FAC challenges was allegedly made to investors: on Linqto's website, its FAQ page, its app, its press releases, and its marketing emails. (*See* Mem. 8–11, 36.) Plaintiffs could have alleged whether they saw those statements. Their failure to do so does not render reliance impossible to prove or "transform this case from one about misrepresentations into one 'involving primarily a failure to disclose.'" *Schwab*, 285 F. Supp. 3d at 755.

Nor can plaintiffs recast the FAC as an omissions case in which *Affiliated Ute* would apply. (Mem. 38.) The Opposition itself asserts that the FAC alleges a "trove of misstatements." (Opp. 23.) None of the four "omissions" it lists (Opp. 24) is a fact Linqto concealed or passed over in silence; each is the flip side of an affirmative misstatement the FAC says Linqto made to investors. The Opposition asserts that Linqto failed to disclose its markups, but the FAC alleges that Linqto falsely told investors there were "no added fees or hidden costs." (FAC ¶ 86.) The Opposition asserts that Linqto failed to disclose that unaccredited investors were buying on the platform, but the FAC alleges that Linqto affirmatively told investors that "We qualify accredited investors." (*Id.* ¶ 76.) The Opposition asserts that Linqto failed to disclose that demand for Ripple shares was "imaginary," but the FAC alleges that Linqto's marketing emails falsely proclaimed that "limited quantities" were "available" for purchase. (*Id.* ¶ 92.) And the Opposition contends that Linqto failed to disclose its regulatory noncompliance, but the FAC alleges that Linqto falsely told

investors it was "bound by regulations." (*Id.* ¶ 76 & n.5.) Because each purported omission is tethered to an affirmative misstatement alleged in the FAC, the *Affiliated Ute* presumption does not apply. *See Waggoner*, 875 F.3d at 95–97.

The decisions on which Plaintiffs rely (Opp. 33) are distinguishable because, although they involved both omissions and affirmative misstatements, the heart of each claim was a fact the defendant never addressed at all.[4] Here, by contrast, the heart of the FAC is the affirmative misstatements Linqto allegedly made to investors, so the presumption does not apply.

### C. No Rule Excuses a Named Plaintiff from Alleging Reliance Because a Defendant's Statements Were Supposedly Uniform.

Finally, Plaintiffs argue that they may plead reliance where "common evidence" can show "that each individual plaintiff relied on the defendants' uniform representations." (Opp. 31–32 (quoting *Anwar*, 306 F.R.D. at 144).) That is not the law. Plaintiffs conflate the standard for pleading reliance under the PSLRA and Rules 9(b) and 12(b)(6) with the standard for certifying a class under Rule 23. The certification decisions plaintiffs cite address a different question: not whether a named plaintiff has alleged its own reliance at the pleading stage, but whether reliance can be resolved for a class with common proof.[5] *See Anwar*, 306 F.R.D. at 139, 144–45; *Audet v. Fraser*, 332 F.R.D. 53, 78 (D. Conn. 2019).[6] At the pleading stage, a plaintiff can show reliance

[4] *See Baliga v. Link Motion, Inc.*, 2022 WL 16707361, at *11 (S.D.N.Y. Nov. 4, 2022) (involving undisclosed related-party transaction that securities regulations independently required company to disclose); *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 146–47 (S.D.N.Y. 2015) (involving fund administrator's undisclosed internal doubts about Madoff feeder fund); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013) (claims were "based not on Defendants' pre-Class Period statements," but rather on NASDAQ's failure to disclose known problems with trading systems before Facebook IPO); *see also Osberg v. Foot Locker, Inc.*, 2014 WL 5800501, at *6 (S.D.N.Y. Nov. 7, 2014) (noting that "one cannot turn every misrepresentation case into an omission case," but applying presumption only because claim at issue was "not simply limited to words which would have changed a single misrepresentation into truth").

[5] Plaintiffs could not even make such a showing here. (Mem. 38 n.16.)

[6] Plaintiffs quote *Audet* for the proposition that the absence of a presumption "does not dictate the nature of" the proof of reliance. (Opp. 32.) The words they omit make the point: "The absence of a presumption *simply means that the plaintiffs must prove actual reliance*; it does not dictate the nature of that proof . . . ." 332 F.R.D. at 78 (emphasis added to omitted words).

in three ways: by showing that it was aware of the statement and bought because of it, or through one of the two exceptions in which reliance may be presumed under *Basic* or under *Affiliated Ute*. *See Schwab*, 752 F. App'x at 58. Plaintiffs plead none of the three. There is no fourth route for supposedly uniform statements made to everyone, and plaintiffs cite no case holding that a named plaintiff may skip alleging its own reliance *at the pleading stage* because the statements allegedly were uniform. Courts reject the argument even at class certification. If uniform, material statements were sufficient, "it would be pointless in any case to consider whether *Basic* or *Affiliated Ute* apply," and the rule "would collapse the reliance element into the materiality element in all securities fraud cases." *Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 109 (E.D.N.Y. 2014).

Plaintiffs' reliance on *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013), for the proposition that "payment alone may constitute circumstantial proof of reliance upon a financial representation" (Opp. 32), is also misplaced. There, a distributor allegedly inflated the "cost" on invoices sent to customers whose contracts priced goods at cost, plus a fixed markup, and the Second Circuit held, at class certification, that paying such an invoice could be circumstantial proof that the customer relied on "the invoice's implicit representation that the invoiced amount was honestly owed." 729 F.3d at 120. A customer pays an invoice because it believes it owes the amount billed. But the FAC does not allege that Linqto billed investors more than the price they agreed to pay; it alleges that buyers paid the price shown on the Linqto platform's order page. (FAC ¶¶ 60, 83.) Plaintiffs further allege that the combination of "price" and the word "shares" implied that investors were buying stock directly from the private company at a price set by the company (*id.* ¶ 84), and paying the price in this context does not show, for purposes of pleading reliance, that a buyer drew that implication.

## II. THE MOTION TO STRIKE SHOULD BE DENIED.

Plaintiffs move to strike four of the exhibits to the Treanor Declaration (Dkt. 130), and "all arguments related" to them: (1) the Liquidshares operating agreement (Ex. B; FAC ¶¶ 57–58, 88); (2) an amendment to that agreement (Ex. C); (3) Form D notices filed with the SEC (Ex. F); and (4) two forms of the Liquidshares subscription agreement (Ex. H). (Dkt. 145 at 1; Strike Mem. 3–6.) Defendants' opening brief relied on these documents to show that the transaction documents and public filings disclosed what the FAC alleges was hidden: that investors were buying units of a Series, and that Linqto's price included fees and a markup. (Mem. 15–20.) Plaintiffs also ask the Court to notice three post-FAC documents, including the Sarris indictment. (RJN 1–2.) The same rule decides both requests: the Court may consider documents on which the complaint relies, and documents subject to judicial notice, together with the complaint's allegations, but only for what they say, not for their truth. Defendants' exhibits meet that rule; Plaintiffs' do not.

### A. The Governing Rules.

The complaint includes the documents "incorporated in it by reference," and the Court may also consider a document whose "terms and effect" the complaint "relies heavily upon" (an "integral" document). *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). The Court may also notice SEC filings "required by law to be filed, and actually filed," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), and filings in other courts, *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). Either way, the document is considered "only to determine what the documents stated," and "not to prove the truth of their contents." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis omitted).

Plaintiffs rely on *SEC v. Medallion Financial Corp.*, No. 21-cv-11125 (LAK), 2022 WL 3043224, at *2 (S.D.N.Y. Aug. 2, 2022), which struck SEC filings and other materials because the complaint did not rely on them (none of the filings was "cited substantially" in it), and because the

defendants offered several of the filings "for the truth of their contents." The Liquidshares operating agreement and Form Ds differ on both points: the FAC relies on them, and they are offered only to show what they disclosed.

**B. Defendants' Exhibits.**

*The Operating Agreement (Ex. B).* Exhibit B, effective January 21, 2020, is the contract between Liquidshares' managing member and the persons who subscribe for interests, and it sets the fees and expenses each Series pays. (Ex. B at ECF 5, 15–16.) Plaintiffs contend that the FAC mentions the agreement only once, "in passing." (Strike Mem. 4.) But that one mention is the basis of one of the FAC's misstatement theories. Linqto's FAQ page told investors that Linqto had "no continuing management fees." (FAC ¶ 86.) The FAC alleges that statement was false because the operating agreement imposed a 0.5% annual "management fee" on each Series, and quotes the agreement's fee provision. (FAC ¶ 88.) Whether the FAQ statement was false thus turns on the agreement's terms, making it integral to the FAC. *Chambers*, 282 F.3d at 153.

*The Form D Filings (Ex. F).* Form Ds are notices that issuers selling unregistered securities under the SEC's Regulation D are required to file with the SEC. 17 C.F.R. § 230.503(a)(1). Exhibit F contains the Form Ds that Liquidshares filed for the Series listed in plaintiffs' sworn purchase certifications (*compare* Ex. F, *with* Ex. E at ECF 5, 8), so they are not "cherry-picked," as plaintiffs contend (Strike Mem. 5). And the FAC does not refer to Form Ds only in "passing" (*id.* at 5 n.4): it cites them as evidence of the Series offerings and takes from them two fee allegations, a 2.5% "supervisory" fee paid to defendant Rainmaker Securities, LLC and a 1.35% sales commission paid to brokers, both said to be passed on to investors (FAC ¶¶ 22, 62, 88). The Form D for the Ripple Series in which A.O.H. bought units reports both figures. (Ex. F at ECF 5.)

*The Amendment and the Subscription Agreements (Exs. C and H).* No argument in this reply depends on these two exhibits, but each confirms a point the reply makes. Exhibit C is an

amendment to the operating agreement that Liquidshares' managing member adopted in August 2024. It permits a Series' holdings to be sold without the members' approval "in connection with a . . . tender offer . . . initiated by a third party." (Ex. C at ECF 2–3.) The FAC calls the sale of Ripple shares in Ripple's December 2024 tender offer "unauthorized" because investors were not asked to approve it (FAC ¶ 127); the amendment by its terms permitted that sale without a vote. Exhibit H contains two versions of the subscription agreement used to buy Series units. Each tells the buyer that it is investing in "the membership interests . . . of Linqto Liquidshares LLC" in a Series, under the operating agreement (Ex. H at ECF 10, 58), confirming what A.O.H.'s order confirmations and Linqto's FAQ page told investors they were buying (Point III.A).

### C. Plaintiffs' Documents Should Not Be Noticed.

Plaintiffs ask the Court to notice a September 2, 2026 press release of the U.S. Attorney's Office announcing Mr. Sarris's indictment and a guilty plea by defendant Endoso (Dkt. 147-1), the Sarris indictment (Dkt. 147-2), and a July 19, 2026 declaration of the Linqto debtors' chief restructuring officer, filed in the bankruptcy case (Dkt. 147-3). Judicial notice extends to "relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). That an indictment was returned or a press release issued says nothing about whether the FAC states a claim.

Plaintiffs say they do not ask the Court to accept these documents as true (RJN 4), but that is how they use them. Their Opposition cites the press release as proof that "this was a classic scheme" (Opp. 12) and for a financial motive the FAC does not plead (Opp. 30; *see* Point IV.B), and their request offers the plea and the indictment to supply the "personal participation" the FAC does not allege (RJN 4–5). An indictment is an accusation, not proof. As for the reported plea by Endoso, it postdates the FAC and is not alleged in it, and plaintiffs may not amend their pleading through an opposition brief or other motion papers. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). Nor does a criminal plea supply the elements the FAC is missing: private

plaintiffs, unlike the government, must establish reliance, economic loss and loss causation, elements that "relate to who (other than the government) may bring suit." *Vilar*, 729 F.3d at 75; *see also id.* at 88–89 (reliance is not an element of a government action under Section 10(b) or Rule 10b-5). The Stein declaration, which none of plaintiffs' briefs cites, is irrelevant; plaintiffs offer it only because it was filed in a Texas court (RJN 5; *see* Point VII.B). The request should be denied or granted only for the documents' existence, *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 150–51 (S.D.N.Y. 2021) (noticing a deferred prosecution agreement only for the fact of its filing), and the motion to strike Exhibits B, C, F and H should be denied.

## III. THE FAC PLEADS NO ACTIONABLE MISSTATEMENT ABOUT OWNERSHIP OR FEES BECAUSE INVESTORS WERE TOLD WHAT THEY WERE BUYING AND HOW LINQTO WAS PAID

The FAC's central theories are that investors were misled about what they bought (the private companies' stock rather than units in a Series) and about what they paid (a price with no markup in it). (FAC ¶¶ 80–81, 84, 87, 89.) As defendants showed, the transaction documents and the FAQ page the FAC quotes disclosed to investors both facts the FAC says were hidden: that they were buying units in a Series, and that Linqto marked up the shares it sold. (Mem. 15–20.) Plaintiffs do not dispute what those documents say. Rather, they argue that the Court should not consider the documents, that the documents were presented to investors too late, that marketing statements told investors otherwise, and that Linqto needed to disclose more about its fees. (Opp. 17–21, 33–34; Strike Mem. 4–5.) Each argument fails, and none of the answers below relies on an exhibit that plaintiffs move to strike.[7]

[7] Plaintiffs' other falsity theories also fail. The accreditation theory pleads no loss caused by the alleged misstatement, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106–07 (2d Cir. 2007), and the claim that unaccredited buyers "harmed all investors" (Opp. 21) is not pleaded. The scarcity theory fails because plaintiffs tie their harm to the fees, not to the scarcity messages. (Opp. 22.) The Ripple tender is addressed in Points II.B and VI.A, and the omissions plaintiffs list (Opp. 24) in Point I.B.

### A. The Documents Disclose What the FAC Alleges Was Hidden.

Plaintiffs do not challenge the documents that show what investors were told. (Strike Mem. 1 n.1.) The FAQ page the FAC quotes three times (FAC ¶¶ 76, 86, 90), as captured six days before Bhatt's first purchase, answered "What am I purchasing when I invest?" with "the equivalent number of shares in a Special Purpose Vehicle managed by Linqto." (Ex. G at ECF 2, 8; Ex. E at ECF 8.) And each confirmation of A.O.H.'s four orders stated: "You are purchasing the number of units in the Series that represents the equivalent number of shares identified above." (Ex. D at ECF 12, 14, 16, 18.) The Court may consider the full text of a document the complaint quotes in part, *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006), and where such a document contradicts the complaint, "the document would control," *Okla. Firefighters Pension & Ret. Sys. v. Integral Ad Sci. Holding Corp.*, No. 25-cv-0847 (LAK), 2026 WL 575379, at *9 (S.D.N.Y. Mar. 2, 2026).

### B. Plaintiffs' Own Records Answer Their Timing Objection.

Plaintiffs argue that the confirmations arrived "upon [i.e., after]" each investment, so that receipt is a question of fact, and that defendants assert a fact-bound "truth-on-the-market" defense. (Opp. 18–19, 33–34; Strike Mem. 4–5.) Neither point helps them.

*First*, plaintiffs' own records place most of their purchases after the disclosure. Plaintiff A.O.H. placed its first order on December 22, 2022, received its confirmation the next day, and then placed three more orders totaling $200,016.72, two-thirds of its investment. (Ex. E at ECF 5, 10; Ex. D at ECF 12–18.) Every one of Bhatt's purchases, including his first, came after the date of the FAQ page quoted above. (Ex. E at ECF 8.) An investor that already holds a written disclosure cannot reasonably rely on a contrary statement when it buys again. *In re Merrill Lynch Auction Rate Sec. Litig.*, 765 F. Supp. 2d 375, 384 n.9 (S.D.N.Y. 2011); *see also Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337–38 & n.4 (2d Cir. 2011).

*Second*, nothing in the FAC puts receipt in dispute. It describes order pages on which investors could "review order[s]" and "place order[s]" (FAC ¶ 84)—a review step that, according to the FAQ page, presented the buyer's "associated agreements" (Ex. G at ECF 8)—and nowhere alleges that either plaintiff lacked any transaction document before buying. Plaintiffs cite *Faulkner* (Strike Mem. 5), but there the complaint itself alleged that all but one plaintiff invested before the offering memoranda upon which the district court relied were issued. 463 F.3d at 135. The FAC alleges nothing of the kind, and "a party is not entitled to amend its complaint through statements made in motion papers." *Wright,* 152 F.3d at 178.

*Third*, truth-on-the-market concerns whether a market price already reflected the truth, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000); here, there was no market price, only what each buyer was told in connection with its own transaction.[8]

**C. Marketing Slogans Do Not Change What Was Bought.**

Plaintiffs point to marketing statements describing a platform for investing "in" private companies and making "liquid investments." (Opp. 17.) Such statements cannot override the disclosures in each purchase agreement. *Hunt v. Alliance N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 730 (2d Cir. 1998) (advertising materials not misleading when read with offering documents investors using "minimal diligence" would consult). And neither plaintiff alleges seeing the statements. (Point I.A.) The "liquid" theory is also new, alleged nowhere in the FAC. *Wright*, 152 F.3d at 178.

[8] Plaintiffs' argument that whether the documents defeat reliance is a fact question (Opp. 33–34) rests on *Abbey v. 3F Therapeutics, Inc.*, 2009 WL 4333819, at *12 & n.6 (S.D.N.Y. Dec. 2, 2009), where a company employee's personal assurances were never addressed in the partnership agreement. An investor "may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005).

### D. The Markup Was Disclosed in the Statement Plaintiffs Sue On, and No Improper Charge Is Pleaded.

Plaintiffs argue that the statement "no added fees or hidden costs" denies "the existence of fees, costs, and markups"; that the markup disclosure was "buried" and omitted other fees; and that Linqto needed to disclose the size of each markup. (Opp. 19–21 & n.13.) Each argument fails.

*First*, the markup was disclosed on the FAQ page plaintiffs rely on: "No! Linqto sources deals and marks them up so that there are no further follow on fees for the investor whatsoever." The FAC pleads that answer as a misstatement, and another answer on the same page—that Linqto sells "with a reasonable markup"—as a "buried" disclosure. (FAC ¶¶ 86, 90.) A page cannot be prominent enough to mislead and too obscure to inform.

*Second*, on the FAC's own account, acquisition costs, supervisory fees, interest and the markup were all parts of the price shown on the order page, which is the price investors paid. (FAC ¶¶ 60–61, 87, 89; *see* Point I.C.) That is the pricing structure the FAQ answer described: a markup in place of "further follow on fees." (FAC ¶ 86.)[9] Plaintiffs' cited cases do not apply: each involved payments to the investors' own managers that the managers did not disclose. *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 363 (S.D.N.Y. 2013) (kickbacks); *In re Stillwater Cap. Partners Inc. Litig.*, 853 F. Supp. 2d 441, 458–59 (S.D.N.Y. 2012) (fees omitted from merger solicitation).

*Third*, the FAC pleads no markup on any SPV unit either plaintiff bought, only platform-wide ranges. (FAC ¶ 64.) Plaintiffs contend that transaction-level facts are not required (Opp. 21 n.13), but a plaintiff "must plead with particularity the facts that show the markups to be

---

[9] The only charge the FAC identifies outside the price is a 0.5% annual management fee in the operating agreement that ran, the FAC says, from January 21, 2020, to January 1, 2024. (FAC ¶ 88.) On the FAC's own dates, the "no continuing management fees" answer appeared after every A.O.H. purchase (*id.* ¶ 86 (August 4, 2023, and April 4, 2024)), so the overlap it pleads reaches only Bhatt's $2,257.60 purchase of August 10, 2023 (Ex. E at ECF 8). And the FAC does not allege that the fee was ever charged; its fee figures are its own arithmetic (reported investment totals multiplied by the 0.5% rate), not an allegation that anyone paid. (FAC ¶ 88.)

excessive," because a "conclusory allegation that markups are excessive is similar to a barroom generality." *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 193–94 (2d Cir. 1998). Excessiveness depends on the instrument: a ten percent markup "on an instrument that is difficult to obtain and priced accordingly might not be" excessive. *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 535 (2d Cir. 1999).[10]

## IV. THE FAC DOES NOT PLEAD WITH PARTICULARITY WHAT EACH DEFENDANT SAID OR DID, OR A STRONG INFERENCE OF ANY DEFENDANT'S SCIENTER

As set out in the motion to dismiss, the FAC does not identify which defendant made the statements it challenges or committed the acts it calls a scheme, and it pleads no particular facts showing that any defendant acted with scienter. (Mem. 26–35, 38–45.) Plaintiffs respond to both points the same way: each defendant held a senior position, so each must have spoken for Linqto and known what was false. (Opp. 14, 16, 29.) The law permits neither inference, and Counts I through III should be dismissed for these reasons as well.

### A. The Group-Pleading Presumption Cannot Save the Inadequate FAC.

Under Rule 10b-5(b), only the "maker" of a statement is liable for it: the person with "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The FAC does not identify any defendant as the maker of the statements on which its claims rest. (Mem. 26–29.)[11]

---

[10] Plaintiffs' cases on disclosing a markup's size derive from the rule for dealers selling to customers, which measures a markup against "the prevailing market price for the security." *Ganino*, 228 F.3d at 163 & n.5 (quoting *Press*, 166 F.3d at 533 n.2); *see Grandon*, 147 F.3d at 189–90; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1469 (2d Cir. 1996); *SEC v. Constantin*, 939 F. Supp. 2d 288, 306–07 n.12 (S.D.N.Y. 2013); *Marini v. Adamo*, 995 F. Supp. 2d 155, 188 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016). The FAC's only allegation that Liquidshares acted as a dealer is conditional (FAC ¶ 106), and plaintiffs do not address the point (Mem. 19–20 & n.8).

[11] The FAC attributes only one challenged statement to a named defendant: a sentence of Mr. Sarris's in a July 2023 press release. It groups that sentence with six other statements under a single generic explanation (FAC ¶¶ 79–80), and the Opposition's defense of paragraph 79 does not mention it (Opp. 17).

It attributes them to Linqto, or to "Defendants" as a group because of their "high-level positions." (FAC ¶¶ 32, 73.) Plaintiffs argue that this is acceptable for materials "where there can be no attributable speaker," relying on the group-pleading doctrine, which they contend remains "alive and well." (Opp. 16 & n.11.) That doctrine allows a plaintiff to presume that "prospectuses, registration statements, annual reports, press releases, or other group-published information" are "the collective work of those individuals with direct involvement in the everyday business of the company." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (Kaplan, J.) (quoting *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004)). Whether the doctrine survived *Janus* is unclear,[12] but it cannot help plaintiffs on these facts.

The group-pleading presumption rests on the premise that a public company's core disclosures "generally are not created by a single author, but by a group of corporate insiders involved in the daily management of a company." *BISYS*, 397 F. Supp. 2d at 440. Senior officers take part in preparing those documents, and the securities laws require them to sign or certify the most important ones. *See* 15 U.S.C. §§ 77f(a), 7241(a). In such documents, "a plural author is implied by the nature of the representations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015).

Applied to a private company, the doctrine reaches, at most, documents that are similarly official and similarly prepared. For example, the Second Circuit applied the presumption to the offering memorandum for a private placement, but not to representations the defendants allegedly made "apart from" that document. *Luce v. Edelstein*, 802 F.2d 49, 54–55 (2d Cir. 1986). No authority extends it to what the FAC challenges here: website copy, app screens, FAQ answers, a

[12] The Second Circuit has called its vitality in federal securities cases "an open question," *Loreley*, 797 F.3d at 172 n.7, and judges in this District have divided. *Compare City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012), *with In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 637–41 (S.D.N.Y. 2017).

press kit, and marketing emails. (FAC ¶¶ 73, 76, 79, 82–84, 86, 90, 92.) Courts in this District have refused to apply it to corporate websites because "it is far from obvious that senior corporate officers would be involved in drafting text for a corporate website." *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014) (Marrero, J.) (quoting *Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427, at *11 (S.D.N.Y. June 14, 2007)); *accord Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 807–08 (S.D.N.Y. 2018); *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 213 (S.D.N.Y. 2018).

Plaintiffs assert that "[p]ress releases and other marketing materials are the types of publications that the doctrine was designed for" (Opp. 16), but their only authority calls the doctrine "extremely limited in scope," and applied it to a securities purchase agreement and Forms 8-K. *Camofi Master LDC v. Riptide Worldwide, Inc.*, 2011 WL 1197659, at *6, *8 (S.D.N.Y. Mar. 25, 2011). And plaintiffs' own articulation of the doctrine confines it to officers "who participated in the preparation and dissemination" of the document. (Opp. 16 (quoting *Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344, 354 (S.D.N.Y. 2000), *aff'd*, 26 F. App'x 83 (2d Cir. 2002)).) The FAC alleges no such participation, only that the officers had the "power and authority to control" Linqto's website, app, and marketing. (FAC ¶ 32.)

The same defect defeats the scheme claim (Count I), which charges every scheme act in conclusory fashion to "Defendants together and individually." (FAC ¶ 163.) Plaintiffs respond that all defendants "played a key role," and that "[a]ll Defendants—the CEO, CFO, Board members—were required for the scheme to work." (Opp. 14.) That is the type of pleading the Second Circuit rejected in *Danske Bank*, where the complaint charged a "common plan" to a bank and four of its officers without alleging "which specific acts were conducted in furtherance of it."

*Plumbers & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).[13] And the group-pleading presumption has never applied to deceptive acts. (Mem. 29–30.)

**B. The FAC Does Not Plead a Strong Inference of Scienter as to Any Defendant.**

The FAC's scienter allegations fail first for the same reason: its counts allege scienter only of "Defendants" collectively (FAC ¶¶ 164, 169), and the group-pleading doctrine, even where it applies, "has no effect on the PSLRA's scienter requirement." *BISYS*, 397 F. Supp. 2d at 440. In a case "involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009).

Plaintiffs' core response is a table of titles, board seats, meetings attended and tasks such as signing Form Ds (Opp. 28), from which they argue that the executives must have known of the fraud "given their positions and the list of allegations above" (Opp. 29). That is not enough. "[B]oilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." *Schwab*, 285 F. Supp. 3d at 757 (citation omitted). Plaintiffs add that the former CRO raised unaccredited investors and markups at weekly meetings with "executive management" (FAC ¶¶ 53, 144–46), but the FAC does not allege what any particular defendant was told at those meetings, or that anything discussed there showed that a particular statement to investors was false. And while the FAC asserts that two legal memos "informed Individual Defendants" or put them "on notice" (*id.* ¶¶ 107, 147–48), no one other than Mr. Sarris is alleged to have received either memo

[13] Plaintiffs distinguish *Danske Bank* as a case of money laundering at a single bank branch, where the scheme alleged here was company-wide. (Opp. 14–15.) But a larger scheme still has to be tied to particular defendants; as plaintiffs' own authority puts it, a complaint "may not rely upon blanket references to acts or omissions by all of the defendants." *SEC v. Sugarman*, 2020 WL 5819848, at *5 (S.D.N.Y. Sept. 30, 2020) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995)).

(*id.* ¶¶ 95, 104). Plaintiffs' claim that the others "would have been aware of these memos given their roles in the company" (Opp. 31 n.19) is an inference *DDAVP* forbids.

Plaintiffs' authorities do not hold otherwise. They rely on *Ambac* for the proposition that it "strains credulity" that a CFO could remain ignorant of what the CEO and other senior managers knew. (Opp. 29.) But the *Ambac* court said it "need not rely upon such suppositions," because the complaint there identified the reports through which the CFO learned the facts that contradicted his public statements. *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 268–69 (S.D.N.Y. 2010). And *SEB*, plaintiffs' authority for inferring that the other defendants knew of the memos from their roles (Opp. 31 n.19), rested principally on allegations that the complaints at issue had gone directly to the board and to most of the individual defendants. *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1021 (N.D. Cal. 2024).

As for Mr. Sarris, plaintiffs' case rests principally on two legal memos, which purportedly "set out a majority of the elements of the scheme and fraud alleged." (Opp. 31.) The memos allegedly assessed how regulators would likely view certain practices and urged resolution of the issues "as soon as practicable." (FAC ¶¶ 96–105.) The opening brief showed that advice about regulatory risk is not knowledge that any statement to investors was false, and that seeking such advice weakens rather than strengthens an inference of scienter. (Mem. 42–43.) Plaintiffs identify no statement to investors that either memo called false, and do not respond to the second point.

Plaintiffs also claim that the FAC shows Mr. Sarris "orchestrated the fraud." (Opp. 29.) But the facts alleged show only that he ran the business closely, including pricing (FAC ¶¶ 41, 47, 51, 134), and running a company closely does not supply knowledge that any statement to investors was false (Mem. 41–42). Plaintiffs cite *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024), but there the CEO and CFO themselves set

unrealistic sales targets and pressured subordinates into stuffing excess inventory into distributors' channels, so each knew the inventory levels their public statements misdescribed. *Id.* at 312, 322. Nothing like that is alleged here. Finally, the motive plaintiffs allege, Linqto's profits and a hoped-for public listing (Opp. 29–30), is a generic corporate motive, which does not plead scienter (Mem. 40–41).[14] Plaintiffs' cited cases involved corporate defendants that themselves stood to profit from the alleged deception. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 81–82 (2d Cir. 2021); *Rothman v. Gregor*, 220 F.3d 81, 93–94 (2d Cir. 2000); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 95–96 (S.D.N.Y. 2015). Linqto is not a defendant, and no individual defendant is alleged to have sold a share or taken anything out of the Series. (Mem. 41.)

### C. Count III Fails With the Primary Claims.

Count III, for control-person liability under Section 20(a), 15 U.S.C. § 78t(a), fails with Counts I and II because the FAC pleads no primary violation (Points I and III–VI). It also fails because plaintiffs rest control principally on a "presumption of control" drawn from defendants' "extremely high ranks." (Opp. 41.) But officer or director status alone does not plead control; the complaint must allege that the defendant "exercised actual control over the matters at issue," and the FAC alleges only titles and generic oversight. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166–67 (S.D.N.Y. 2012) (emphasis omitted) (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008)); *see* Mem. 33–35.

---

[14] Plaintiffs also cite the U.S. Attorney's press release announcing Mr. Sarris's indictment, which says that he "had a sizeable stake in Linqto and was hunting for a way to cash out." (Opp. 30.) The FAC alleges no such motive, and it must be judged by what it alleges, not by extrinsic material. *Kramer*, 937 F.2d at 773. Even if the release could be considered, it calls its contents "merely accusations" (Dkt. 147-1 at 4), and plaintiffs themselves claim they offer it "not for the truth of the matters asserted" (RJN 5).

## V. COUNT I FAILS BECAUSE IT ALLEGES NO DECEPTIVE ACT BEYOND THE CHALLENGED STATEMENTS

As set out in Defendants' moving brief, scheme liability under Rule 10b-5(a) and (c) requires a deceptive act, "something beyond misstatements and omissions." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis omitted). Of the six acts Count I lists, three restate the misstatement claims, and the other three are regulatory lapses that are tied to no defendant and deceive no one. (Mem. 29–32; FAC ¶ 162.)

Plaintiffs' longer list (Opp. 12) adds nothing. Each item either could deceive investors only through what Linqto told them (the markups, the ownership structure, the accreditation test and the "spike day" emails) or is a business decision or regulatory lapse that deceives no one by itself (lower investment minimums, a referral credit, admitting unaccredited investors, forming entities to hold the investments, not registering).[15] And the FAC itself defines the scheme as an omission: selling "without disclosing unlawful markups." (FAC ¶ 161.)

Nor does *Parmalat* help plaintiffs. (Opp. 13.) The scheme claims sustained there rested on transactions that "were by nature deceptive" because they "depended on a fiction, namely that the invoices had value," and the same opinion dismissed the claims over financings that "were not shams," because "[a]ny deceptiveness resulted from the manner in which" Parmalat or its auditors described them. *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504–05 (S.D.N.Y. 2005) (Kaplan, J.). The scheme the FAC pleads is the second kind: ordinary sales, said to be deceptive only because of what Linqto told investors about them. Count I therefore fails for this reason as well.

---

[15] Plaintiffs' other cases upheld a scheme built on acts that deceived apart from any statement. *In re Zeta Glob. Holdings Corp. Sec. Litig.*, 838 F. Supp. 3d 413, 435 (S.D.N.Y. 2026) (CEO gave stock to supposedly independent affiliates he controlled, so he could sell it while avoiding reporting requirements); *Okla. Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 418–21 (S.D.N.Y. 2025) (buyer secretly accumulated stock while a required ownership filing went unmade); *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 190 (S.D.N.Y. 2023) (company reset customers' passwords under false pretenses).

## VI. THE FAC DOES NOT ADEQUATELY PLEAD THAT THE ALLEGED FRAUD CAUSED EITHER PLAINTIFF AN ECONOMIC LOSS

A private plaintiff suing under Section 10(b) must plead that the alleged deception caused it an economic loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–46 (2005). Here, the FAC only alleges that investors paid a markup and later lost access to their holdings, but connects neither allegation to an economic loss caused by the purported fraud. (Mem. 45–49.) Plaintiffs respond that the overpayment is itself the loss (Opp. 37–40); that the shutdown and bankruptcy were the materialization of concealed regulatory risks, and new management made corrective disclosures in 2025 (*id*. 35–37, 40–41); and that loss causation cannot be decided on a motion to dismiss (*id*. 34–35). But plaintiffs cannot cure pleading defects with theories that appear only in their brief.

### A. Paying a Markup Is Not an Economic Loss.

Plaintiffs assert that the FAC alleges "much more than price inflation." (Opp. 38.) They contend that, because the markups were concealed, investors "were induced to overpay for interests worth less than the price at the time of sale," so that the alleged loss occurred at the moment of purchase. (Opp. 38–39.) But the Supreme Court has held that such an inflated purchase price ordinarily is not itself a loss, because "at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." 544 U.S. at 342. Plaintiffs attempt to distinguish *Dura* because it concerned a publicly traded stock (Opp. 39, 40 n.23), but the Second Circuit applies the same rule to private purchases. (Mem. 46–47.) *See Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 198 (2d Cir. 2003) ("purchase-time value disparity" alone does not plead loss causation because it is "nothing more than a paraphrased allegation of transaction causation"); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005).

The FAC itself pleads only an inflated purchase price. Its loss-causation paragraphs allege that investors paid prices "far exceeding the Private Securities' acquisition price," meaning what Linqto had paid for the underlying shares, "in the form of undisclosed markups and fees." (FAC ¶¶ 125–26; *see id.* ¶¶ 61–64.) A markup over the seller's cost does not by itself allege what the buyer's unit was worth on the purchase date, and the FAC never alleges what any unit either plaintiff bought was worth, then or since. Plaintiffs' brief attempts to supply the missing allegation (Opp. 39), but a complaint cannot be amended by a brief. *Wright*, 152 F.3d at 178.

The Opposition quotes *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97–98 (2d Cir. 2001), for the proposition that loss causation is shown where misrepresentations "induced a disparity between the transaction price and the true 'investment quality' of the securities." (Opp. 38.) But *Emergent Capital* later held that such a disparity, standing alone, is insufficient. 343 F.3d at 198–99. And in *Suez Equity,* the complaint alleged that the founder's concealed lack of skill later caused the venture's liquidity problems and ultimate failure; the FAC contains no comparable allegation. (Opp. 38–39.) In *Marini*, 995 F. Supp. 2d at 196, the court found a loss only after a bench trial that valued the coins and found that their value "was always lower than" the dealer claimed. (Opp. 38.) These cases do not excuse Plaintiffs from alleging that what they purchased was worth less than what they paid.

Moreover, the FAC's allegations about the Ripple units, which account for about 63% of what the two named plaintiffs invested (Ex. E at ECF 10), indicate that some units are worth more than what plaintiffs paid.[16] Finally, Defendants do not ask the Court to set later gains against a

[16] Plaintiff A.O.H. bought in December 2022 at $22.50 for each Ripple share its units represented; Bhatt bought in August 2023 at $51.31 and in July 2024 at $39.93. (Ex. D at ECF 12; Ex. E at ECF 10.) According to the FAC, Ripple planned a buyback at $61 a share in December 2023 and January 2024, and Ripple shares were sold in a December 2024 tender at $60 and $100. (FAC ¶¶ 71, 128.)

pleaded loss, or argue that loss causation requires a public market or a public price decline. (Opp. 39.) Pleading a loss is Plaintiffs' burden, and their Ripple allegations are inconsistent with one.

### B. The Shutdown and Bankruptcy Do Not Plead Loss Causation Under Either Theory Asserted Only in Plaintiffs' Brief.

**Materialization of Risk.** Plaintiffs next argue that the risks concealed by the alleged fraud—regulatory violations, a defective offering structure, undisclosed markups—"materialized" when trading was suspended, the Platform shut down, and Linqto "collapsed into bankruptcy as a result." (Opp. 35–36.) They add that it is "immaterial" that new management put Linqto into bankruptcy, because that decision responded to the misconduct. (Opp. 37.)

Materialization of risk is a way of showing causation when no single announcement revealed the truth: the plaintiff alleges that the risk the fraud concealed came to pass and caused its loss. *Lentell*, 396 F.3d at 173. The theory still requires an alleged loss. The complaint must allege that the concealed facts "bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Id.* at 175. In *Lentell* the investors' shares had "plummeted" and become "virtually worthless," and the Second Circuit still affirmed dismissal, because the complaints did not tie that loss to the concealed facts. *Id.*

The FAC alleges that the shutdown and bankruptcy cost investors access to their holdings, not lost value. Investors "have been unable to access their property since the Platform was shut down" (FAC ¶ 13), and the bankruptcy is "exploring compliant structures for Investors to access investments and realize returns from those investments" (*id.* ¶ 121). The FAC does not allege that either event made either plaintiff's units worth less, or by how much; the word "impaired" appears in plaintiffs' brief (Opp. 40 n.23), not in the FAC. Plaintiffs themselves separate the two. Whether investors can access their investments, they assert, "has little bearing on and is distinct from the harm caused by the legal violations alleged in this case." (Opp. 8.) On that account, the events

Plaintiffs call the materialization of the concealed risks did not cause the harm for which they sue. For the same reason, the Court need not decide whether new management's decisions broke the chain of causation (Opp. 37), a question that arises only when the chain ends in a pleaded loss, which the FAC does not do.

**Corrective Disclosure.** Plaintiffs define a corrective disclosure as "a disclosure of the fraud correcting publicly available information causing a negative market reaction" (Opp. 36 (citing *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014))), and in their brief they identify new management's June 2025 summary of a town hall and its August 2025 letters to investors as corrective disclosures (Opp. 36–37; FAC ¶¶ 117, 119–20). By plaintiffs' own definition, the FAC must allege that the units lost value after those statements. It does not. The Platform had been shut since March 13, 2025, three months before the first of the alleged corrective disclosures (FAC ¶¶ 115, 117), so whatever plaintiffs lost by being shut out, they lost before any public "disclosure." A concealed fact "could not have caused a decrease in the value" of a security "before the concealment was made public." *Lentell*, 396 F.3d at 175 n.4.

Plaintiffs' argument that the two theories "are not rigidly separate doctrinal boxes" (Opp. 40) is unavailing. The decision on which Plaintiffs rely (*id.*) treated both theories as means of asking whether the truth, however it emerged, caused the value of the security to fall. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261–62 (2d Cir. 2016). The FAC alleges no such decline in value under either label.

### C. Plaintiffs' Argument That Loss Causation Is a Question of Fact Does Not Reach a Complaint That Pleads No Loss.

Plaintiffs also argue that loss causation is fact-intensive and whether an intervening event caused a loss is "a matter of proof at trial." (Opp. 34–35, 37 n.22 (quoting *Emergent Capital*, 343 F.3d at 197).) They rely on *Carpenters*, where the Second Circuit vacated a dismissal because the

defendants' competing explanations for a price drop raised questions of fact. (Opp. 35 (citing 750 F.3d at 233, 235).) But the complaint in *Carpenters* alleged that Barclays' stock fell 12% the day after the bank disclosed that its LIBOR submissions had been false; the court sustained the claim based on that drop, while calling the plaintiffs' materialization theory "untenable" because they did not allege that the concealed risk ever came to pass. 750 F.3d at 230, 233–34 & n.7. The FAC pleads nothing comparable, and so fails even under the standard plaintiffs invoke, which requires "some indication of the loss and the causal connection that the plaintiff has in mind." (Opp. 34.) The Court need not weigh competing causes, because the FAC pleads no loss caused by the fraud.

## VII. THE REMAINING COUNTS FAIL BECAUSE THE FAC PLEADS NO CLAIM ON EITHER PLAINTIFF'S OWN PURCHASES

### A. Section 12 Could Reach Only Bhatt's 2024 Purchases, and No Defendant Is Alleged to Have Solicited Them.

Plaintiffs' already limited Section 12 claim, time-barred as to A.O.H. and covering only Bhatt's most recent purchases,[17] fails because the statute reaches only the person who passed title to the buyer or who "successfully solicits the purchase." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). Plaintiffs claim that Section 12 liability reaches "any person who engaged in steps necessary to the distribution of the unregistered security." (Opp. 43 (quoting *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019)).) That is wrong. "Steps necessary to the distribution" is the test for liability in SEC enforcement actions under Section 5, which makes it unlawful for any person to sell unregistered securities "directly or indirectly." *SEC v. Tecumseh Holdings Corp.*, No. 03-cv-5490 (SAS), 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) (quoting *SEC v.*

[17] A Section 12(a)(1) claim must be brought within one year of the purchase on which it rests. *Williams v. Binance*, 96 F.4th 129, 141 (2d Cir. 2024). Plaintiffs do not dispute that this bars every claim by A.O.H., which bought only in December 2022, or that Bhatt may sue only over six 2024 purchases ($40,231.14) as to Mr. Sarris (named in the original July 2025 complaint), and four December 2024 purchases ($20,178.94) as to the other nine individual defendants (added in November 2025). (Mem. 51.)

*Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941)).[18] Section 12 is narrower. It gives a buyer a claim only against a person "from" whom he purchased. *Pinter*, 486 U.S. at 643. *Pinter* held that Section 12 does not reach "participants collateral to the offer or sale," *id.* at 650, and that being a "substantial factor" in causing a sale is not enough, *id.* at 654. Section 12 "focuses on the defendant's relationship with the plaintiff-purchaser," not "the defendant's degree of involvement in the securities transaction." *Id.* at 651. A person who takes "steps necessary to the distribution" is exactly the kind of participant *Pinter* excluded.

Nor does the FAC allege solicitation. Plaintiffs point to allegations that the defendants "ran the entire selling scheme and operation." (Opp. 44 (citing FAC ¶ 182).) Those allegations describe running Linqto: designing the Platform, setting prices, deciding which listings "to push for the day," earning commissions, filing Form D notices with the SEC, and "participat[ing] in the marketing and sales activities of Linqto." (FAC ¶¶ 21–22, 47, 57, 131, 134, 176.) None alleges that any defendant did anything to solicit Bhatt's purchases. This Court dismissed Section 12 claims against officers and directors, including officers who spoke to investors at an investor day, where the complaint did not describe their role in soliciting the securities at issue, and held that even signing a registration statement "does not itself constitute solicitation." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 719–20 (S.D.N.Y. 2013). A decision cited by Plaintiffs (Opp. 43) draws the same line: a company that "played a major role in setting up the coal-mining venture" was not a seller unless it "actually solicited their investment." *Capri v. Murphy*, 856 F.2d 473, 478–79 (2d Cir. 1988).

---

[18] *Balestra* appears to have taken the sentence plaintiffs quote "in error" from *Tecumseh*, which "quoted and followed pre-*Pinter* caselaw." When other plaintiffs relied on the same *Balestra* sentence, the court rejected it as "not the law" and held that plaintiffs "must plead that defendants solicited their purchases." *Owen v. Elastos Found.*, No. 19-cv-5462 (GHW), 2021 WL 5868171, at *15 n.6 (S.D.N.Y. Dec. 9, 2021).

### B. Neither Plaintiff Bought Securities in or from Texas, and No Defendant Is a Seller or Control Person Under the Texas Act.

The Texas Securities Act reaches only sales to Texas residents and sales made from Texas. *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 443–46 (Tex. 2007). Plaintiffs are not Texas residents: A.O.H. is based in the Netherlands, and Bhatt lives in New Jersey. (Ex. E at ECF 13.) Their purchases were not made from Texas: Linqto was headquartered in California (Opp. 48), and the FAC alleges that the challenged practices "took place in California" (FAC ¶ 210).

Plaintiffs argue that the Act applies whenever "any act in the selling process" occurs in Texas. (Opp. 48 (quoting *Rio Grande Oil Co. v. State*, 539 S.W.2d 917, 921–22 (Tex. Civ. App. 1976)).) The FAC alleges no such act, only the conclusion that defendants "offered for sale and sold securities in Texas" (FAC ¶ 195). The only Texas connections Plaintiffs identify are that other investors lived in Texas, that some companies listed on the Platform had Texas operations (FAC ¶ 195), and that Linqto created Linqto Texas, LLC "shortly prior to the initiation of the bankruptcy" to "anchor its own restructuring in a Texas forum" (Opp. 48).[19]

Count VI would fail even for a buyer in Texas, because the FAC does not plead that any defendant (as opposed to Linqto itself) was a seller or a control person. (Mem. 54.) Plaintiffs claim that a seller is "any link in the chain of the selling process." (Opp. 48–49 (quoting *Slack v. Shreve*, No. 12-24-00014-CV, 2024 WL 4644610, at *4 (Tex. App.—Tyler Oct. 31, 2024) (mem. op.)).) That is wrong. The phrase comes from *Brown v. Cole*, 291 S.W.2d 704, 708 (Tex. 1956), decided before the Legislature rewrote the Act's civil-liability provisions in 1977. The comments to that

---

[19] Plaintiffs ask the Court at least to defer the issue to class certification because absent class members could include Texas buyers. (Opp. 47 (citing *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 93 (2d Cir. 2018), and *Binance*, 96 F.4th at 145).) Those cases concern absent class members' claims. They do not keep alive the named plaintiffs' own claims, which courts decide "at the motion to dismiss stage." *Hardin v. TRON Found.*, No. 20-cv-2804 (VSB), 2024 WL 4555629, at *12 (S.D.N.Y. Oct. 23, 2024) (citation omitted). A.O.H.'s and Bhatt's own Count VI claims should be dismissed now.

revision call the seller provision "a privity provision" and state that *Brown v. Cole* "should have no application to the new law." *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 383 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Texas courts now follow *Pinter*, *Davis v. MSR Holdings, LLC*, No. 01-22-00451-CV, 2024 WL 3237623, at *9–11 (Tex. App.—Houston [1st Dist.] June 28, 2024, pet. denied) (mem. op.), and *Slack* itself held that the defendant's title of chief financial officer did not, "without more," put him "in privity to the sale," 2024 WL 4644610, at *6. The seller claim therefore fails for the reasons the Section 12 claim does. *Supra* Point VII.A.

The further allegations plaintiffs cite here (Opp. 49), about "Spike Days" on which "at the direction of management, Linqto employees sent out mass emails and individual messages to Investors" (FAC ¶ 68) and about statements on Linqto's website (*id.* ¶¶ 73, 86–87), describe a company's marketing, not the solicitation of a buyer. A solicitor "must, at a minimum, directly communicate with the buyer," *Davis*, 2024 WL 3237623, at *11 (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003)), and the solicitation must produce the purchase, *Pinter*, 486 U.S. at 647. The FAC alleges neither. Neither plaintiff is alleged to have opened a marketing email or visited any challenged web page (*supra* Point I.A), and the FAC identifies no other buyer who bought because of a Spike Day message.

Nor are the defendants control persons merely because they were officers and directors. (Opp. 49.) Texas courts hold, as federal courts do, that "status alone does not automatically cause defendants to be deemed control persons under the statute." *Davis*, 2024 WL 3237623, at *15–16 (quoting *Tex. Capital Sec. Mgmt., Inc. v. Sandefer*, 80 S.W.3d 260, 268 (Tex. App.—Texarkana 2002, pet. struck)). The FAC pleads control under the Act as it pleads control under Section 20(a), by titles and generic oversight (FAC ¶¶ 20–29, 196, 198), and the claim fails for the same reason.

### C. The California UCL Does Not Reach the Purchase of Securities.

Count VII is a securities claim. Its "unlawful" predicates are violations of "the Securities Act of 1933, the Securities Exchange Act of 1934, and/or the Investment Company Act of 1940" (FAC ¶ 206); its "unfair" prong rests on the same "violations of securities laws" (*id.* ¶ 213); its injury is that plaintiffs "were induced to purchase" (*id.* ¶ 209); and it seeks back what they paid (*id.* ¶ 215). The UCL "does not apply to securities transactions." *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 790 (2004).

Plaintiffs now attempt to recast this securities claim as a claim that targets "the illegal online marketplace that wooed unsuspecting individuals into opening accounts and transferring funds," conduct that "precede[s] any securities transaction." (Opp. 51.) But the FAC never alleges that opening an account or depositing money caused anyone a loss. It mentions deposits once, as the step before investors "submit orders for shares" (FAC ¶ 39), and the paragraphs plaintiffs cite for the new theory describe the Series structure, not accounts or deposits (*id.* ¶¶ 57–58). A plaintiff cannot amend its complaint through its briefs. *Wright*, 152 F.3d at 178. And courts applying *Bowen* look to what the claim actually targets: where "plaintiffs' theory unavoidably focuses on the purchase of securities," *Bowen* "is determinative." *Betz v. Trainer Wortham & Co.*, 829 F. Supp. 2d 860, 866 (N.D. Cal. 2011) (citation omitted). This one does.

**CONCLUSION**

For these reasons and those in their moving brief, Moving Defendants respectfully request that each count of the FAC be dismissed as against each Defendant, with prejudice, that plaintiffs' motion to strike be denied, and that their request for judicial notice be denied or granted only as to the documents' existence.

Dated: New York, New York
November 5, 2026

Respectfully submitted,

TREANOR DEVLIN BROWN PLLC
*/s/ Timothy J. Treanor*
Timothy J. Treanor
Arlo Devlin-Brown
John J. Lavelle
230 Park Avenue, Suite 450
New York, NY 10169
Telephone: +1 (212) 858-9080
ttreanor@tdblaw.com
arlo@tdblaw.com
jlavelle@tdblaw.com
*Counsel for Defendant William Sarris*

PIERSON FERDINAND LLP
*/s/ Aurora Cassirer*
Aurora Cassirer
Alicia N. Washington
1270 Avenue of the Americas
7th Floor – 1050
New York, NY 10020
aurora.cassirer@pierferd.com
alicia.washington@pierferd.com
*Counsel for Defendant Joseph A. Endoso (joining to the extent stated herein and in his supplemental reply)*

LAW OFFICE OF WILLIAM H. KIMBALL
*/s/ William H. Kimball*
William H. Kimball
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 704-1400
wkimball@wkimball.com
*Counsel for Defendant David Paul*

CHIESA SHAHINIAN & GIANTOMASI PC
*/s/ Lee Vartan*
Lee Vartan
11 Times Square, 34th Floor
New York, New York 10036
Telephone: (212) 973-0572
lvartan@csglaw.com
*Counsel for Defendant Brian Moran*

EHRLICH & CRAIG LLP
*/s/ Alexander Setzepfandt*
Alexander Setzepfandt
803 Hearst Avenue
Berkeley, California 94710
Telephone: (510) 548-3600
Fax: (510) 291-3060
alex@ehrlich-craig.com
*Counsel for Defendant Karim Nurani*

KOPECKY SCHUMACHER ROSENBURG LLC
*/s/ David Slovick*
David Slovick
James L. Kopecky
120 N. LaSalle Street, Suite 200
Chicago, IL 60602
Telephone: (312) 380-6552
dslovick@ksrlaw.com
jkopecky@ksrlaw.com
*Counsel for Defendant Rainmaker Securities, LLC*

**CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)**

I certify that this memorandum of law complies with Local Rule 7.1(c), this Court's so-ordered stipulation of October 13, 2026, ECF No. 149, and this Court's Individual Rules. The brief is 30 pages, not including the caption, signature blocks, and this certification.

*/s/ Timothy J. Treanor*
Timothy J. Treanor

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Timothy J. Treanor*
Timothy J. Treanor